# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSMAN GODFREY LLP, | |
| *Plaintiff*, | Civil Case No. 1:25-cv-1107 |
| v. | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | |
| *Defendants.* | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

    I.      Susman Godfrey LLP ...............................................................................5

    II.     The Executive Order and Accompanying "Fact Sheet" ..........................8

    III.    Prior Executive Orders Attacking Law Firms ........................................9

    IV.    The Order Is Inflicting Irreparable Harm ..............................................13

ARGUMENT ...................................................................................................................16

    I.      SUSMAN GODFREY IS LIKELY TO SUCCEED ON THE MERITS .............16

          A.     The Order Violates the First Amendment...................................17

               1.     The Order Retaliates in Violation of the First Amendment..........17

               2.     The Order Constitutes Impermissible Viewpoint Discrimination..................................................................................21

               3.     The Order Violates the Petition Clause .........................................24

               4.     The Order Abridges Freedom of Association................................24

          B.     The Order Violates Susman Godfrey's Right to Due Process.................26

               1.     The Order Deprives Susman Godfrey of Protected Liberty and Property Interests ...............................................................26

               2.     The Order Issued With No Process Whatsoever...........................29

               3.     The Order Is Impermissibly Vague................................................31

          C.     The Order Violates Susman Godfrey's Right to Equal Protection of the Laws .................................................................................32

          D.     The Order Violates Susman Godfrey's Clients' Due Process Right to Counsel .................................................................................34

          E.     The Order Exceeds the President's Statutory and Constitutional Authorities and Violates the Separation of Powers ....................35

    II.     SUSMAN GODFREY WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER .....................................39

          A.     The Order Has Impaired Susman Godfrey's Constitutional Rights .........39

          B.     Susman Godfrey Is Suffering Ongoing and Irreparable Reputational Harm .......................................................................41

          C.     Susman Godfrey Is Suffering Irreparable Economic Injuries...................42

## TABLE OF CONTENTS
## (continued)

Page

III.  THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR A TRO.....................................................................................................43

IV.  THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE THE RULE 65(c) SECURITY REQUIREMENT ........................................................45

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ........................................................................15

*Abdelfattah v. Dep't Homeland Sec.,*
    787 F.3d 524 (D.C. Cir. 2015) ..........................................................................27

*Am. Airways Charters, Inc. v. Regan,*
    746 F.2d 865 (D.C. Cir. 1984) ..........................................................................35

*Am. Ass'n of Political Consultants v. SBA,*
    613 F. Supp. 3d 360 (D.D.C. 2020) ..................................................................43

*Am. First Legal Found. v. Becerra,*
    2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..................................................18, 45

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ..........................................................................................25

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) .....................................................................17, 20

*Arnaud v. Odom,*
    870 F.2d 304 (5th Cir. 1989) .............................................................................24

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ............................................................................................21

*Bd. of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972) ..........................................................................................26

*Beacon Assocs., Inc. v. Apprio, Inc.,*
    308 F. Supp. 3d 277 (D.D.C. 2018) ..................................................................41

*Bill Johnson's Rests., Inc. v. NLRB,*
    461 U.S. 731 (1983) ..........................................................................................18

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) .....................................................................................26, 29

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) ..........................................................................................32

\* Key Authorities

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Borough of Duryea v. Guarnieri,*
564 U.S. 379 (2011)..................................................................................24

*Brock v. Roadway Express,*
481 U.S. 252 (1987)..................................................................................29

*Broudy v. Mather,*
460 F.3d 106 (D.C. Cir. 2006)..................................................................24

*Buckley v. Valeo,*
424 U.S. 1 (1976)......................................................................................32

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
404 U.S. 508 (1972)..................................................................................24

*Campbell v. District of Columbia,*
894 F.3d 281 (D.C. Cir. 2018)..................................................................26

*Caplin & Drysdale, Chartered v. United States,*
491 U.S. 617 (1989)..................................................................................34

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991)....................................................................................37

* *Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .............................................................39, 40

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979)..................................................................................36

*Cigar Ass'n of Am. v. FDA,*
317 F. Supp. 3d 555 (D.D.C. 2018)..........................................................39

*City & Cnty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) .............................................................17, 36

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985)..................................................................................34

*Cooksey v. Futrell,*
721 F.3d 226 (4th Cir. 2013) ....................................................................16

*Cordi-Allen v. Conlon,*
494 F.3d 245 (1st Cir. 2007)......................................................................33

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Costa v. Bazron*,
    456 F. Supp. 3d 126 (D.D.C. 2020) .......................................................................44

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) .........................................................................15

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) ......................................................................39, 41

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)...............................................................................................23

*Doctors for Am. v. OPM*,
    2025 WL 452707 (D.D.C. Feb. 11, 2025) .............................................................39

*Doe 1 v. Trump*,
    275 F. Supp. 3d 167 (D.D.C. 2017) .......................................................................40

*Doe 2 v. Shanahan*,
    755 F. App'x 19 (D.C. Cir. 2019).........................................................................40

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) ...............................................................................18

*Ex parte Burr*,
    22 U.S. (9 Wheat.) 529 (1824)...............................................................................37

*Ex parte Quirin*,
    317 U.S. 1 (1942)...................................................................................................37

\* *FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).................................................................................28, 29, 32

*FDIC v. Mallen*,
    486 U.S. 230 (1988)...............................................................................................29

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980)..............................................................................45

*Franks v. Rubitschun*,
    312 F. App'x 764 (6th Cir. 2009) ..........................................................................33

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)...............................................................................................37

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Fuentes v. Shevin*,
407 U.S. 67 (1972)..................................................................................29

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017)................................................................................37

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ...........................................................39, 41

*Goss v. Lopez*,
419 U.S. 565 (1975)................................................................................28

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)................................................................................32

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004)................................................................................30

*Harris v. Bessent*,
2025 WL 521027 (D.D.C. Feb. 18, 2025) .........................................15, 42

*Heffernan v. City of Paterson, N.J.*,
578 U.S. 266 (2016)................................................................................17

*Honeywell, Inc. v. Consumer Prod. Safety Comm'n*,
582 F. Supp. 1072 (D.D.C. 1984)..........................................................41

*Hous. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)...........................................................................17, 19

*Innovation Law Lab v. Nielsen*,
310 F. Supp. 3d 1150 (D. Or. 2018) .......................................................40

*Jenner & Block LLP v. Dep't of Just.*,
No. 25-cv-00916 (D.D.C. Mar. 28, 2025), ECF No. 9 .........................1, 16

* *Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951).......................................................................30, 37, 38

* *Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020).........................................................26, 39, 40

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ...............................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Laird v. Tatum*,
  408 U.S. 1 (1972).................................................................................17

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..............................................................43, 44

\* *Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001)........................................................................ *passim*

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982).............................................................................26

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021)...................................................42

*Mann v. Wash. Metro. Area Transit Auth.*,
  185 F. Supp. 3d 189 (D.D.C. 2016)...................................................42

*McDonald v. Smith*,
  472 U.S. 479 (1985).............................................................................18

*Media Matters for Am. v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024)......................................................40

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999).............................................................................36

*N.S. v. Hughes*,
  335 F.R.D. 337 (D.D.C. 2020)...........................................................44

*NAACP v. Button*,
  371 U.S. 415 (1963)........................................................................23, 24

*Nalco Co. v. EPA*,
  786 F. Supp. 2d 177 (D.D.C. 2011)...................................................42

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  2025 WL 573764 (D. Md. Feb. 21, 2025).........................................22

*Nat'l Counsel of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001).......................................................28, 30

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003).............................................................................16

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Neb. Press Ass'n v. Stuart,*
   427 U.S. 539 (1976)..................................................................22

*News Am. Pub., Inc. v. FCC,*
   844 F.2d 800 (D.C. Cir. 1988)...........................................32, 33

*Nieves v. Bartlett,*
   587 U.S. 391 (2019)..................................................................17

*Nken v. Holder,*
   556 U.S. 418 (2009)..................................................................43

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014)..................................................................37

* *NRA v. Vullo,*
   602 U.S. 175 (2024)............................................................ *passim*

*O'Donnell v. Barry,*
   148 F.3d 1126 (D.C. Cir. 1998)...............................................27

*Patriot, Inc. v. HUD,*
   963 F. Supp. 1 (D.D.C. 1997)...................................................41

*Penson v. Ohio,*
   488 U.S. 75 (1988)....................................................................44

*Powell v. Alabama,*
   287 U.S. 45 (1932)..............................................................34, 35

*In re Primus,*
   436 U.S. 412 (1978)..................................................................23

*R.I.L.-R v. Johnson,*
   80 F. Supp. 3d 164 (D.D.C. 2015)...........................................44

*Ramirez v. U.S. ICE,*
   568 F. Supp. 3d 10 (D.D.C. 2021)...........................................44

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)..............................................................21, 22

*Romer v. Evans,*
   517 U.S. 620 (1996)..................................................................34

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)...........................................................................21, 22

*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023)...........................................................16

*Schware v. Bd. of Bar Exam.*,
353 U.S. 232 (1957)...........................................................................27

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)...........................................................................37

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)...........................................................30

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012).....................................................44

*Sioux Tribe of Indians v. United States*,
316 U.S. 317 (1942)...........................................................................36

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)...........................................................................22

*Stern v. Marshall*,
564 U.S. 462 (2011)...........................................................................38

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...........................................................................16

*Swanson v. City of Chetek*,
719 F.3d 780 (7th Cir. 2013) .............................................................33

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020).....................................................42

*Toxco Inc. v. Chu*,
724 F. Supp. 2d 16 (D.D.C. 2010).....................................................29

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...........................................................................35

*Trentadue v. Integrity Comm.*,
501 F.3d 1215 (10th Cir. 2007) .........................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Trump v. Hawaii,*
    585 U.S. 667 (2018)..................................................................................................36

*Trump v. New York,*
    592 U.S. 125 (2020)..................................................................................................16

*Turner v. Rogers,*
    564 U.S. 431 (2011)..................................................................................................35

*U.S. Dep't of Labor v. Triplett,*
    494 U.S. 715 (1990)..................................................................................................34

*UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union,*
    72 F.3d 1243 (6th Cir. 1996) ....................................................................................29

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker,*
    893 F.2d 1374 (D.C. Cir. 1990)................................................................................18

*United States v. Williams,*
    553 U.S. 285 (2008)..................................................................................................31

*USAID v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013)............................................................................................24, 25

*Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.,*
    455 U.S. 489 (1982)..................................................................................................30

* *Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000)............................................................................................32, 33

*Widakusara v. Lake,*
    No. 25-cv-02390 (S.D.N.Y. Mar. 28, 2025), ECF No. 54......................................45

* *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President,*
    No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10 ..................................... *passim*

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008)......................................................................................................43

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985)..................................................................................39

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971)..................................................................................................28

x

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Wounded Knee Legal Def./Offense Comm. v. FBI*,
   507 F.2d 1281 (8th Cir. 1974) ...................................................34

*Xiaomi Corp. v. Dep't of Def.*,
   2021 WL 950144 (D.D.C. Mar. 12, 2021)....................................41, 42

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).....................................................................36

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)........................................................................37

**STATE CASES**

*US Dominion, Inc. v. Fox News Network*,
   293 A.3d 1002 (Del. Sup. Ct. 2023) ...............................................7

**FEDERAL STATUTES**

8 U.S.C. § 1182(f).........................................................................36

**FEDERAL RULES**

Fed. R. Civ. P. 65 .........................................................................45

Fed. R. Civ. P. 65(c) .....................................................................45

**STATE RULES**

D.C. R. Prof'l Conduct 1.3 Comment [1] ........................................44

**EXECUTIVE ORDERS**

Executive Order: *Addressing Risks from Jenner & Block* (Mar. 25, 2025),
   https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-
   from-jenner-block/ ................................................................10, 11

Executive Order: *Addressing Risks from WilmerHale* (Mar. 27, 2025),
   https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-
   from-wilmerhale/ ....................................................................11

**CONSTITUTIONAL PROVISIONS**

* U.S. Const. amend. I ............................................................ *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

U.S. Const. amend. V ................................................................................ *passim*

U.S. Const. amend. XIV ............................................................................. 32

U.S. Const. art. II, § 3 ................................................................................ 37

* U.S. Const. art. III .................................................................................. *passim*

OTHER AUTHORITIES

* Tr. of TRO Hearing at 48:1-5, *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-
   00916 (D.D.C. Mar. 28, 2025), ECF No. 10 ............................................ 19, 40, 43

* Tr. of TRO Hearing at 74:7-21, *Perkins Coie LLP v. Dep't of Just.*, No. 1:25-cv-
   716 (D.D.C. Mar. 12, 2025), ECF No. 22 ................................................ *passim*

Tr. of TRO Hearing, *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office
   of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 11 ........................ 1

Withdrawal Mem., *United States v. Coburn*,
   No. 19-cr-00120 (D.N.J.), ECF No. 1012-1 .............................................. 20

## INTRODUCTION

The President of the United States is engaged in an unprecedented and unconstitutional assault on the independent bar, the independent Judiciary, and the rule of law. In recent weeks, the President has issued a series of executive orders and presidential memoranda targeting law firms for representing clients and causes that the President disfavors. Those activities are, it should go without saying, protected by bedrock constitutional principles, including the First Amendment, which protects the right of attorneys to advocate for clients, petition the courts, and associate with clients of their choosing. And nothing in our Constitution or laws grants a President the power to punish attorneys for engaging in those protected activities; to the contrary, the specific provisions and overall design of our Constitution were adopted in large measure to ensure that presidents cannot exercise arbitrary, absolute power in the way that the President seeks to do in these executive orders.

Unsurprisingly, each executive order that has been challenged by the targeted law firms—so far, the firms of Perkins Coie, Jenner & Block, and WilmerHale—has been immediately restrained by the courts as a blatant violation of the Constitution. As Judge Leon observed in one such case, for each firm, the order is "like a Sword of Damocles hanging over its head." Tr. of TRO Hearing at 27:23-28:1, *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 11. And "[t]here is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm." Memorandum Order at 2, *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10 ("*Wilmer* TRO"); Tr. of TRO Hearing at 74:7-21, *Perkins Coie LLP v. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22 ("*Perkins* Tr."); *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-00916 (D.D.C. Mar.

1

28, 2025), ECF No. 9 ("*Jenner* TRO") (temporarily enjoining Sections 1, 3, and 5 of the Jenner Order).

The most recent Order—which issued the afternoon of April 9, with an accompanying "Fact Sheet"—targets Susman Godfrey LLP ("Susman" or "the Firm").[1]  The Order suffers from the same constitutional flaws as the prior executive orders against law firms and should likewise be immediately enjoined.  The Order begins by baselessly accusing Susman of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections," "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," and "support[ing] efforts to discriminate on the basis of race."   Order § 1.   It then directs top federal officials to "immediately . . . suspend any active security clearances held by individuals at Susman" and review whether they should be permanently revoked.  *Id.* § 2(a).   Next, the Order directs federal agencies to "require Government contractors to disclose any business they do with Susman" and instructs agency heads to review these contracts and seek to terminate them.  *Id.* § 3.   The Order also references a portion of the order targeting Perkins Coie (the "Perkins Order") that directed federal officials to "investigate" diversity, equity, and inclusion policies at "large, influential, or industry leading law firms."  *Id.* § 4.   Finally, the Order directs federal officials to restrict Susman employees' access to "Federal Government buildings"; stop "engaging with Susman employees"; "refrain from hiring employees of Susman," absent a special waiver; and "expeditiously cease" providing any "Government goods, property, materials, [or] services" that "benefit" Susman.  *Id.* §§ 2(b), 5.

---

[1] *See Addressing Risks from Susman Godfrey*, The White House (Apr. 9, 2025), Compl. Ex. A (the "Order" or "EO"); *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey*, The White House (Apr. 9, 2025), Compl. Ex. B ("Fact Sheet").

The Order leaves no doubt that it was issued as retaliation for protected advocacy with which the President takes issue. Specifically, the Order targets Susman for its supposed "efforts to weaponize the American legal system and degrade the quality of American elections." *Id.* § 1. Top White House Advisor Stephen Miller commented that Susman is allegedly "very involved in the election misconduct." Compl. ¶ 208; Declaration of Ginger D. Anders ("Anders Decl.") Ex. A. That is an unmistakable reference to Susman's work in the aftermath of the 2020 election, including its representation of Dominion Voting Systems in connection with Fox News' broadcasts of unfounded claims that Dominion attempted to influence the 2020 election against President Trump, as well as Susman's defense of state elections officials in litigation defending the integrity of the 2020 election. Press reports had little trouble making that connection—confirming the Order's obviously retaliatory motive. *See, e.g.*, Anders Decl. Exs. A, B. The broader context leaves no doubt: the orders targeting Perkins, Jenner, and Wilmer stated that those firms were *persona non grata* based on their representation of disfavored clients and their employment of individuals who had previously investigated the President. And during the 2024 election campaign, the President vowed to inflict severe consequences on political opponents and their "Lawyers." *E.g.*, Compl. ¶ 98.

The Order and the retaliation campaign it executes are starkly unconstitutional, and this Court should temporarily restrain Sections 1, 3 and 5 of the Order.[2] The First Amendment prohibits the government from "us[ing] the power of the State to punish or suppress disfavored expression," including legal advocacy on behalf of disfavored clients and causes. *NRA v. Vullo*,

---

[2] Susman has no urgent need for the Court to restrain the operation of Section 2 because, to the Firm's knowledge, none of the Firm's attorneys maintains a security clearance for purposes of litigating any currently active matters; nor do the Firm's attorneys receive "Government goods, property, materials, and services, including Sensitive Compartmented Information Facilities" in connection with any currently active matters.

602 U.S. 175, 188 (2024); *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546-48 (2001). The Order also unconstitutionally discriminates against Susman based on the viewpoints expressed in the Firm's advocacy, including its pro bono advocacy.

The Order violates many other constitutional provisions as well. It blatantly violates due process and equal protection principles, including by imposing severe consequences without notice or any opportunity to be heard; using vague language that does not inform Susman or its clients of what conduct gave rise to the Order's unprecedented sanctions and how those sanctions apply; and singling out Susman based on its representation of disfavored clients and advocacy of disfavored causes. The Order also violates Susman's clients' Fifth Amendment right to counsel. And the Order violates the separation of powers because the President lacked constitutional or statutory authority to issue the Order, and its provisions undermine the Judiciary's independence. For all of those reasons, Susman is highly likely to succeed on the merits of its suit.

Susman easily satisfies the remaining requirements for preliminary relief as well. Susman will suffer irreparable harm absent immediate relief, both because the ongoing violation of its constitutional rights is irreparable and because the Order sets out to tarnish Susman's reputation, permanently damage its relationships with clients, and inflict economic harm. Like Perkins, Jenner, and Wilmer before it, Susman is facing an imminent risk of losing clients, finding the doors to government buildings barred and scheduled meetings with government personnel cancelled, and having its ability to advocate for its clients severely curtailed.

The equities and public interest also tilt decisively in favor of immediate relief. Although Susman faces imminent constitutional, reputational, and economic injuries, the government would suffer no injury if prevented from implementing this unconstitutional order while its constitutionality is litigated. It should be obvious that the public interest is not served by leaving

the Order in place, when its avowed purpose and effect is to vitiate the ability of Susman—and, indirectly, the profession as a whole—to independently advocate for clients before the courts, including clients whom the government disfavors.

Susman respectfully asks this Court to immediately enter a TRO.

## **BACKGROUND**

### I.    **Susman Godfrey LLP**

Susman Godfrey is the Nation's preeminent trial firm.  *See* Declaration of Kalpana Srinivasan ("Srinivasan Decl.") ¶¶ 6, 8-10.  The firm's origins trace back to 1976, when Stephen Susman was approached by a small-business owner who sought representation against powerful manufacturers that were engaged in price fixing.  *Id.* ¶ 7.  Mr. Susman and his fellow attorney Gary McGowan took on that representation and, in 1980, founded their own firm—now Susman Godfrey.  *Id.*  That first representation resulted in the Firm recovering $550 million on behalf of plaintiffs through settlements and after a successful verdict in a three-month jury trial.  *Id.*  Since then, Susman has grown to employ over 235 of the country's most talented trial attorneys, spread across offices in Houston, Los Angeles, New York, and Seattle.  *Id.* ¶¶ 8, 12.

Susman is a litigation powerhouse.  The firm has represented clients in federal and state courts across the Nation, before myriad federal agencies, and in tribunals throughout the world. *Id.* ¶ 8.  It is one of the top 100 revenue-generating law firms in the country—one of only a handful of those top 100 firms that do not practice transactional law.  *Id.* ¶ 9.  The Firm and its lawyers have regularly been recognized for their excellence by a range of respected organizations, including *Chambers USA*, *Law360*, *National Law Journal*, and more.  *Id.* ¶ 10.  And the *Vault* survey has ranked Susman as the #1 Litigation Boutique in the Nation every year since the survey's inception.  *Id.*

Susman's lawyers come from all backgrounds and hold diverse political views.  *Id.* ¶ 14. All associates complete a federal clerkship before joining the Firm, and the judges for whom current Firm associates have clerked include some nominated by Republican presidents and some nominated by Democratic presidents.  *Id.*  For example, the current and recent Susman lawyers who clerked for the Supreme Court worked for Justices appointed by presidents of both parties: Justice Sandra Day O'Connor, Justice Anthony Kennedy, Justice Ruth Bader Ginsburg, Justice Stephen Breyer, Chief Justice John Roberts, Justice Samuel Alito, and Justice Elena Kagan.  *Id.* Attorneys have joined the Firm after other kinds of government service—some under Republican administrations and some under Democratic ones.  *Id.*  Many Susman lawyers also go on to careers in public service after their time at the Firm, and the Firm's alumni have served as federal and state judges and as high-ranking government officials on both sides of the aisle.  *Id.* ¶ 15.

Because Susman is first and foremost a litigation firm, its lawyers constantly appear in federal court.  Despite the Firm's relatively small size, it has scores of active matters before the federal courts and federal agencies, which represent more than a third of all active matters at the Firm.  *Id.* ¶ 20.  Already this year, Susman attorneys have made dozens of in-person appearances in federal court, and the Firm's attorneys have several in-person appearances in federal court and before federal agencies during the week of April 14, 2025, including an in-person hearing before the Executive Office of Immigration Review.  *Id.*  And the Firm currently has at least seven cases scheduled to go to trial in federal court within the next six months, with many more awaiting trial dates.  *Id.*  Because trial litigation is the heart of Susman's practice, the ability of its attorneys to appear in federal court is critical to the interests of Susman clients and thus vital to the Firm's reputation and its ability to discharge its duties.

Susman's service to its clients also requires its lawyers to interact extensively with the federal government in other ways.  A number of Susman's practice areas involve regular contact with federal officials or appearances before federal agencies.  *Id.* ¶ 21.  For example, Susman does substantial work on behalf of whistleblowers in actions under the federal False Claims Act and analogous state laws, and those representations require extensive contact with U.S. Attorney's Offices.  *Id.* ¶¶ 23-27.  Susman also frequently represents parties before the U.S. International Trade Commission or the Patent Trial and Appeal Board.  *Id.* ¶ 28.  Across its practice areas, Susman has numerous meetings with federal-government personnel scheduled in the next 90 days.  *Id.* ¶ 21.  Susman cannot effectively fulfill its obligations to its clients in those matters unless it is able to communicate effectively with federal officials and appear in federal agency proceedings.

Susman does not shy away from controversial legal work or from taking on powerful companies and institutions—including the federal government.  Susman has taken on well-funded and influential adversaries, including the National Football League, opioid manufacturers, and Fox News.  *Id.* ¶¶ 11, 36.  The Firm is adverse to the United States in multiple active matters, including in a suit against the U.S. Navy and one against an agency that unlawfully collected user fees.  *Id.* ¶ 34.

In connection with the 2020 election, Susman represented various State officers in their official capacities in defending the results of the 2020 election.  *Id.* ¶ 35.  And culminating in 2023, Susman represented Dominion Voting Systems in defamation actions against Fox News and Fox News Corporation for false statements about Dominion relating to the 2020 election.  *Id.* ¶ 36.  On March 31, 2023, the trial court granted summary judgment to Dominion on multiple issues, finding, among other things, that it was "CRYSTAL clear that none of the Statements related to Dominion about the 2020 election are true."  *US Dominion, Inc. v. Fox News Network*, 293 A.3d

1002, 1035-39 (Del. Sup. Ct. 2023).  Ultimately, that case resulted in a historic $787 million settlement, which is believed to be the largest defamation settlement in U.S. history.  Srinivasan Decl. ¶ 36.

Susman continues to represent Dominion to this day.  Susman represents Dominion in defamation lawsuits against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network.  *Id.* ¶ 39.  The Firm also is currently litigating a case against Newsmax Media for false and defamatory broadcasts accusing Dominion of vote fraud and rigging the 2020 presidential election.  *Id.* ¶¶ 37-38.  On April 9, 2025, mere hours before the President's Order targeting Susman issued, the court in that case ruled on summary judgment that Newsmax had made false and defamatory statements.  *Id.* ¶ 37.

## II.    The Executive Order and Accompanying "Fact Sheet"

On April 9, 2025, President Trump issued an Executive Order titled "Addressing Risks From Susman Godfrey," which cites no statutory or constitutional authority.  Compl. Ex. A. Susman did not receive any notice from the Administration prior to being subjected to the Order. Srinivasan Decl. ¶ 60.

Section 1 of the Order asserts that "action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP."  Order § 1. According to Section 1, Susman "spearheads efforts to weaponize the American legal system and degrade the quality of American elections"; "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; and "supports efforts to discriminate on the basis of race," among other things. *Id.*  Section 1 also states that "Susman itself engages in unlawful discrimination" and offers "employment opportunities only to 'students of color.'"  *Id.*  The "Fact Sheet" accompanying the Order echoes those allegations, branding Susman a "rogue law firm[]" and declaring that Susman

8

leads "efforts to weaponize the American legal system and degrade the quality of American elections." Compl. Ex. B.

Section 3 of the Order is focused on disrupting Susman's relationships with government contractors. That provision directs federal agencies to "require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract." Order § 3(a). Section 3 further directs federal agencies to "take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service" and "otherwise align their agency funding decisions" with the "goals and priorities of [the] Administration." *Id.* § 3(b). Within 30 days of the Order's issuance, agencies must provide OMB with a report on contract terminations or other actions taken pursuant to Section 3. *Id.*

Section 5 of the Order places a number of restrictions on Firm members' access to federal buildings, officials, and employment opportunities. Section 5 directs federal agencies to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* § 5(a). Section 5 also requires agencies to "provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with national security and other interests of the United States." *Id.* Finally, Section 5 instructs agency officials to "refrain from hiring employees of Susman, absent a waiver . . . that such hire will not threaten the national security of the United States." *Id.* § 5(b).

### III. Prior Executive Orders Attacking Law Firms

The Order follows on the heels of similar executive orders issued by President Trump attacking law firms. In recent months, President Trump has repeatedly stated that he intends to retaliate against his political adversaries and the attorneys who represent them. Compl. ¶¶ 98-101.

After his election victory, the President told Fox News that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people." *Id.* ¶ 101. And once in office, he made numerous similar statements complaining about supposedly "crooked law firms" and "violent vicious lawyers" who oppose him. *Id.*

Those were not empty threats. On February 25, 2025, the President issued the first of a series of executive orders targeting law firms. That first order took aim at Covington & Burling LLP because the firm had represented Jack Smith, the Special Counsel who brought criminal charges against then-former President Trump in the wake of Trump's efforts to challenge the 2020 election results. The order stripped security clearances held by "all members, partners, and employees . . . who assisted former Special Counsel Jack Smith during his time as Special Counsel." *Id.* ¶ 103.

Similarly retaliatory executive orders issued in the weeks that followed. The President imposed a range of penalties on Perkins Coie LLP on the ground that it "represent[ed] failed Presidential candidate Hillary Clinton" and "worked with activist donors" to challenge "election laws." *Id.* ¶ 104. He imposed similar sanctions on Jenner & Block LLP ("Jenner Order"),[3] asserting that Jenner "abus[es] its pro bono practice" by "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex" and "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Jenner Order § 1; Compl. ¶ 113. The Jenner Order specifically chastises Jenner for hiring (in the Order's words) "the unethical Andrew Weissmann," who worked under Special Counsel Robert Mueller during the 2017 investigation into Russian interference in the

---

[3] Executive Order: *Addressing Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

2016 Presidential election. Jenner Order § 1; Compl. ¶ 113. And most recently, the President issued a similar order as to WilmerHale ("Wilmer Order"),[4] accusing it of supposedly "engag[ing] in obvious partisan representations," "support[ing] efforts to discriminate on the basis of race," and "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." Wilmer Order § 1; Compl. ¶ 114. Wilmer, too, has particular associations with lawyers who drew the President's ire: Robert Mueller, along with two of his colleagues, joined the firm after the conclusion of the 2017 Special Counsel investigation. *See* Compl. ¶ 114.

Where firms have challenged those executive orders, they have invariably succeeded in obtaining TROs. On March 12, 2025, a court in this District (Howell, J.) issued a TRO against the Perkins Order, holding that Perkins is likely to prevail in establishing that the order violates "at least" the First, Fifth, and Sixth Amendments. *Perkins* Tr. at 74:7-21. At the hearing, Judge Howell described the order as an "effort to intimidate" attorneys that "casts a chilling harm . . . of blizzard proportions across the entire legal profession." *Id*. at 95:22-24, 96:1-2. Courts in this District likewise issued TROs against the Jenner Order (Bates, J.) and the Wilmer Order (Leon, J.). In Wilmer's case, Judge Leon concluded that "[t]here is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm." *Wilmer* TRO at 2.

The President also has entered into what he has deemed "settlements" with law firms in order to relieve them of the crushing harms associated with an executive order. On March 20, 2025, the President rescinded an executive order against Paul Weiss similar to the ones described above, stating in a post on social media that he was doing so "in light of a meeting with [the firm's]

---

[4] Executive Order: *Addressing Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

Chairman, Brad Karp, during which Mr. Karp" allegedly "acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice" and made other concessions.  Anders Decl. Ex. C.  The President also withdrew the threat of executive orders against Skadden Arps, Willkie Farr & Gallagher, and Milbank after those firms each agreed to provide $100 million in pro bono work for causes selected by the President; to commit to pro bono activities that "represent the full political spectrum, . . . including conservative ideals"; and to "strong[ly] commit[] to ending the Weaponization of the Justice System and the Legal Profession."  *Id.* Ex. D (Skadden agreement); *see id.* Ex. E (Willkie agreement); *id.* Ex. F (Milbank agreement).

Two days after issuing the Order at issue in this case, the President announced that he had reached deals with five more law firms.  Compl. ¶ 123.  Those deals are similar to the ones that came before, except that several include not only promises of certain pro bono work but also promises of "other free Legal services" for the President.  Anders Decl. Ex. G.  Four of those firms—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono and other free Legal services . . . to causes that President Trump and the Law Firms both support and agree to work on."  *Id.*  The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences."  *Id.*  In return, the President announced, the EEOC had "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues."  *Id.*  The fifth firm, Cadwalader, Wickersham & Taft LLP, made similar "commitments," agreeing to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support."  *Id.* Ex. H.

## IV.    The Order Is Inflicting Irreparable Harm

The Order is intended by its terms to disrupt Susman's existing and potential attorney-client relationships and representations, and to do so immediately, at the expense of the Firm's attorneys and its clients—all without any notice or an opportunity to be heard.  Susman was given no opportunity to respond to the false charges in the Order and Fact Sheet or to explain to the government the Order's inevitable impact.

The resulting immediate and irreparable harm is clear—even beyond the inherent irreparable harm associated with a violation of First Amendment or other constitutional rights. First, refusals by federal officials to meet or otherwise "engag[e]" with Susman lawyers or to permit them to access federal buildings, Order § 5, will immediately and irreparably harm both the Firm's legal practice and its clients' interests, Srinivasan Decl. ¶¶ 64-72.  To carry on the practice of law, Susman attorneys need to be able to access federal buildings and interact with federal officials this very week—and every week thereafter.  *See id.* ¶¶ 19-21.

There is every reason to think that such refusals are imminent, as firms subject to previous executive orders were quickly excluded from planned meetings with federal officials.  *See, e.g.*, *Wilmer* TRO at 4 ("[S]ince the Executive Order issued, the federal government has already cancelled two meetings with plaintiff's attorneys, at the last minute and without explanation. Should Section 5 be enforced, plaintiff would be thoroughly hamstrung from representing clients because its attorneys could not enter federal courthouses or other buildings, or meet with federal employees regarding cases.").  And even the mere overhanging threat that the Firm's ability to access federal officials and buildings could be cut off at any moment creates intolerable uncertainty that seriously interferes with the Firm's existing attorney-client relationships and undermines its ability to enter new ones.  Srinivasan Decl. ¶ 66.

Second, even beyond that serious problem, the Order is discouraging clients with federal government contracts from continuing their relationships with Susman or from beginning new relationships. The Order forces government contractors to disclose any relationship they have with the Firm and directs agencies to *terminate contracts* with contractors who have hired Susman to perform any contract-related service. Order § 3. Based on these provisions, Susman clients have already begun to inquire about the effects of the Order and whether the Order affects Susman's ability to access the federal courts or could negatively affect Susman's continued representation. Srinivasan Decl. ¶ 69. By provoking those discussions, the Order has already resulted in harassment and harm to Susman and its clients.

More generally, the Order's directives are intended to, and do, provide clients with a powerful incentive to seek alternate representation. Other targeted firms have already seen that dynamic play out. After the Perkins Order issued, agencies began reaching out to government contractors, directing them to report on their relationship with Perkins. Perkins Tr. at 105:2-4. And Perkins began to experience attrition immediately. *See* Declaration of David J. Burman ¶ 29, *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 11, 2025), ECF No. 2-2. The Order is intended to have the same effect here. Indeed, for many Firm clients, the existence of their relationship with Susman is nonpublic information. Srinivasan Decl. ¶ 69. Now, the mere fact of that association may need to be disclosed, and it could make them a target for reprisal. Defendants have made it crystal clear that they expect to find a way to punish law firms such as Susman, one way or another. *See* Status Report, *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 20, 2025), ECF 32 (explaining in guidance, issued after the Perkins TRO, that the "government reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie LLP").

Finally, the Order is more broadly harmful to the Firm's reputation and its business. It contains nakedly false, inflammatory statements about the Firm—ones that come directly from the President of the United States. *See, e.g.*, Order § 1 (accusing Susman of "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military"). Those disparaging falsehoods tarnish Susman's good name, thereby discouraging existing clients from continuing to work with the Firm and dissuading potential clients from retaining the Firm in the first place. Srinivasan Decl. ¶ 75. And the Order's other provisions only compound the risks for Susman's business. By impugning the Firm and attempting to interfere with Susman's ability to provide high-quality representation, the Order disincentivizes clients from choosing Susman over its competitors and threatens the Firm's bottom line. *Id.* ¶ 72.

## LEGAL STANDARD AND REVIEWABILITY

Susman Godfrey is entitled to a temporary restraining order enjoining implementation of at least Sections 1, 3, and 5 of the Executive Order. "An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief." *Harris v. Bessent*, 2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025). To obtain such relief, a plaintiff must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up). Where "the movant seeks to enjoin the government, the final two TRO factors . . . merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020).

The Executive Order is immediately reviewable. The Order is immediately effective and already is being implemented, and the Firm is feeling its "effects" in a "concrete way." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003). The issues raised in this motion

are thus "fit[] . . . for judicial decision" now. *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (permitting review where plaintiff's conduct was "arguably proscribed" by law); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (First Amendment rights "are particularly apt to be found ripe for immediate protection"). Moreover, "the hardship" to Susman of "withholding court consideration" until some later date would be immense. *Saline Parents*, 88 F.4th at 306. This case is not "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all," *Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up)—the harm is unfolding in real time. That is no doubt why every court to have been presented with a law firm's challenge to the executive order issued against it has immediately issued a TRO. *Perkins* Tr. at 74:7-21; *Wilmer* TRO at 4-5; *Jenner* TRO at 1-2.

## ARGUMENT

### I.    SUSMAN GODFREY IS LIKELY TO SUCCEED ON THE MERITS

The Firm is likely to succeed on the merits of its claims. The Executive Order is flagrantly unconstitutional. The Order violates the First Amendment because its punishments against Susman Godrey constitute unlawful retaliation, viewpoint discrimination, and otherwise unlawful restrictions on basic First Amendment rights to speech, association, and petitioning of the courts; it fails to comport with fundamental principles of due process, including the right to equal protection of the laws; and it violates the right to counsel of Susman's clients. Those constitutional violations are especially egregious because the President does not have any statutory or constitutional authority to punish a law firm as the Order punishes Susman. That the Order includes boilerplate language stating that agencies should implement it "to the extent permitted by law" (or the like) does nothing to "rescu[e]" the Order from those fatal legal deficiencies. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018).

A.    **The Order Violates the First Amendment**

Susman Godfrey will succeed in demonstrating that the Order violates the First Amendment by (1) retaliating against the Firm and its clients for their actual and perceived exercise of speech and associational rights, (2) discriminating against the Firm on the basis of viewpoint, (3) infringing on the right to petition the government, and (4) violating the right to freedom of association.

1.    **The Order Retaliates in Violation of the First Amendment**

It is bedrock law that government officials may not "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. The First Amendment "prohibits government officials" from retaliating "after the fact" based on "protected speech," *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)) (cleaned up), as well as from taking actions designed to coerce or chill speech in the future, *Vullo*, 602 U.S. at 189; *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations" in response to protected expression). That principle applies to retaliation based not only on a target's actual expressions, but also on its viewpoint as *perceived* by the government—even if that perception is inaccurate. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016).

To prevail on its claim for First Amendment retaliation, Susman must establish that it engaged in conduct protected under the First Amendment; that a causal link exists between that exercise of a constitutional right and adverse action; and that the government took adverse action sufficient to deter a person of ordinary firmness from speaking again. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Susman is very likely to prove each of those three elements because the Order is undisguised retaliation that satisfies every element on its face. It unapologetically—and severely—punishes Susman for its attorneys' advocacy on behalf of clients and causes that the

President does not like. And it does so for the avowed purpose of deterring Susman and other law firms from engaging in that sort of constitutionally protected conduct.

*First*, it is beyond dispute that Susman's advocacy on behalf of its clients, advice to its clients, and petitioning of the courts constitute "constitutionally protected expression" that "implicat[es] central First Amendment concerns." *Velazquez*, 531 U.S. at 547-48; *see McDonald v. Smith*, 472 U.S. 479, 484 (1985); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983). It is equally beyond dispute that the First Amendment prohibits the government from deeming certain legal positions, otherwise permissible in court, to be off limits or to serve as grounds to punish the lawyers taking those positions. *See Velazquez*, 531 U.S. at 546-48 (First Amendment violation where statute attempted to "exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts"); *Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) (First Amendment "violated if the Government affirmatively interferes with constitutionally protected litigation"); *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) ("state action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment").

*Second*, it is unmistakable from the face of the Order that the Order was issued for retaliatory reasons. Unlike in most cases, therefore, there is no need to infer retaliatory motive from circumstantial evidence; the Order itself *announces* that it was issued to punish Susman for its protected advocacy. The Order states that it is animated by Susman's supposed "efforts to weaponize the American legal system and degrade the quality of American elections" and the Firm's work on behalf of "clients" whom the President has deemed at odds with unspecified "American interests." Order § 1. The Order's assertion that Susman has engaged in representations that "degrade the quality of American elections" is transparently a reference to

18

Susman's representation of Dominion Voting Systems in connection with Fox News' claims that Dominion attempted to influence the 2020 election against President Trump, as well as Susman's representation of state elections officials in litigation defending the integrity of the 2020 election. *See* Srinivasan Decl. ¶¶ 35-36; *Wilmer* TRO at 2 ("The retaliatory nature of the Executive Order at issue here is clear from its face—not only from Section 1, but also from the Fact Sheet published the same day."); Tr. of TRO Hearing at 48:1-5, *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-00916 (D.D.C. Mar. 28, 2025), ECF No. 10 ("*Jenner* Tr.") (Jenner order "facially retaliates against Jenner because of its speech and association").

Context provides further corroboration. The Order is one of several similar orders targeting law firms that have represented the President's perceived political and personal opponents or have employed lawyers who have undertaken public representations adverse to the President. Srinivasan Decl. ¶¶ 39-47; Compl. ¶¶ 103-123. The President's rescission of the Paul Weiss Order underscores the retaliatory motive behind these orders, as it was accompanied by a compelled mea culpa and a commitment to spend $40 million on pro bono work that aligns with the Administration's views. *See* Anders Decl. Ex. C.

*Third*, the Order plainly "constitutes a sufficiently adverse action" against Susman "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 477. The Order imposes devastating consequences on Susman. It endeavors to drive clients away from the Firm by threatening those clients with disfavored contracting treatment—by branding Susman as an enemy engaging in "activities inconsistent with the interests of the United States," Order § 1, and then directing all agencies to "assess[]" government contracts with *any* Susman clients and to "align their agency funding decisions with the interests of the citizens of the United States," *id.* § 3. It restricts Susman from engaging with federal employees—a routine activity that is necessary

19

for a wide range of Susman's representations.  And it threatens to deny Susman's personnel access to federal government buildings, including federal courthouses.  Such clear retaliation against the Firm and its clients violates the First Amendment.

Those draconian punishments easily meet the standard for "adverse action."  There can be no serious dispute that the Order will—if not restrained—damage Susman's business prospects, disrupt its relations with current and future clients, and impede its lawyers' ability to zealously advocate as counsel.  *See* Srinivasan Decl. ¶¶ 64-75.  Proving the point, on March 19, 2025, Paul Weiss attorneys moved to withdraw from a major criminal case, explaining that the defendant "terminated [the firm]'s representation of him" "[i]n response to the March 14 Executive Order," out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case."  Withdrawal Mem. at 2-3, *United States v. Coburn*, No. 19-cr-00120 (D.N.J.), ECF No. 1012-1.  Those grave harms would "deter a [lawyer] of ordinary firmness" from representing the President's political opponents or advancing positions that are adverse to his interests.  *Cf. Aref*, 833 F.3d at 258.  Indeed, that is the whole point.

That conclusion is reinforced by the fact that the adverse actions have been taken by the President himself.  *Vullo*, 602 U.S. at 191-92.  It is hard to imagine a greater and more direct threat than one personally delivered by the President of the United States to be carried out by the heads of all federal agencies.  And the Order cannot be "reasonably understood" as anything other than a "threat[ of] adverse action" against those who would follow in Susman's footsteps, as it directs agency heads to bar Susman attorneys from doing the day-to-day work necessary to represent their clients.  *Id.* at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)).  As Judge Howell concluded with respect to the Perkins Order, "the plain language of [the] Executive Order . . . confirms that . . . government officials are attempting to . . . punish and

suppress views that the government, or at least the current administration, disfavors." *Perkins* Tr. at 79:15-20.

### 2.    The Order Constitutes Impermissible Viewpoint Discrimination

The Executive Order also violates the First Amendment because it discriminates against Susman for the Firm's viewpoints.   The Order's reference to Susman's participation in the "legal system" in the context of "elections" can refer to little other than the Firm's representation of Dominion, state government entities, and other clients in connection with the 2020 election. *See* Srinivasan Decl. ¶¶ 35-37.   The Order thus punishes the Firm for the positions it has taken—an "egregious form of content discrimination" that is subject to strict scrutiny.   *Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187.   And viewpoint discrimination in the context of legal advocacy is particularly pernicious. *See Velazquez*, 531 U.S. at 547 (holding unlawful an attempt to "prohibit" certain "advice or argumentation" by lawyers).   Government punishment based on petitioning the court on certain grounds or representing particular clients in court, or restrictions on undertaking those activities, "threatens severe impairment of the judicial function." *Id.* at 546.   That is because an "informed, independent judiciary" "presumes an informed, independent bar." *Id*. at 545.   By purporting to punish Susman for taking particular disfavored positions—including positions that are disfavored because they are adverse to the government—the Order not only impermissibly punishes Susman for its viewpoint, but also undermines the rule of law by hindering the courts' ability to decide cases brought before them. *See id.* at 548 (First Amendment "was fashioned to assure unfettered

interchange of ideas for the bringing about of political and social changes" (citation omitted));
Order § 1 (President is sanctioning Susman because, in his view, Susman has engaged in
"egregious conduct" by "fund[ing] groups" that "inject . . . political and radical ideology").

Such speaker- and viewpoint-based sanctions constitute a "'blatant' and 'egregious form
of content discrimination'" subject to strict scrutiny, which means that the government's action
may be sustained "only if the government proves" that the Order is "narrowly tailored to serve
compelling state interests." *Reed*, 576 U.S. at 163, 168-71 (quoting *Rosenberger*, 515 U.S. at 829).
But the existence of "viewpoint discrimination is uniquely harmful to a free and democratic
society," *Vullo*, 602 U.S. at 187, which "is 'all but dispositive'" of the strict-scrutiny test, *Nat'l
Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *15 (D. Md. Feb. 21,
2025) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)).   As the Supreme Court
underscored in *Vullo*, "the First Amendment prohibits government officials *from relying on the*
'*threat of invoking legal sanctions and other means of coercion* . . . to achieve the suppression' of
disfavored speech."  602 U.S. at 189 (emphasis added).

The Order does not come close to clearing the high bar of strict scrutiny.  It should go
without saying that the Executive Branch has no compelling interest in punishing lawyers for, or
chilling them from, advocating for clients whose interests are adverse to the government—or
whose positions were adverse to those of the Trump campaign during the 2020 election.  *See Neb.
Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976) (Bill of Rights was drafted by those "familiar with
the historic episode in which John Adams defended British soldiers charged with homicide for
firing into a crowd of Boston demonstrators"); *Velazquez*, 531 U.S. at 545-48 (recognizing
compelling interest in *permitting* lawyers to challenge constitutionality of statutes).  And although
the President has in the Order purported to deem certain forms of advocacy contrary to the interests

22

of the United States, in fact the zealous, ethical representation of those disfavored by the government has long been part of our constitutional tradition and is recognized as essential to reining in abuses of government power.  *See NAACP v. Button*, 371 U.S. 415, 440 (1963) (exercise "of First Amendment rights to enforce constitutional rights through litigation" on behalf of unpopular minorities "cannot be deemed malicious" as "a matter of law").

Nothing in the Order somehow conjures into existence any compelling interest.  Although the Order asserts (without basis) vague allegations of misconduct, the government has no compelling interest in broadly punishing law firms for alleged attorney misconduct, given that the courts have well-established mechanisms for addressing any alleged claims of misconduct and the Executive Branch has no history or tradition of taking on that responsibility and no authority to do so.  *See infra* pp. 35-38.  The Order's bare invocation of "national security" does not suffice either, as the Order leaves entirely unexplained what particular "national security" interest it intends to serve and contains no particularized findings concerning "national security."  *See* Order § 1; *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free" (citation omitted)).   In particular, the Order's unexplained reference to supposed "fund[ing]" of "groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," Order § 1, is so vague that even Susman has no idea to what it might be referring.

For the same reasons, the Order is not narrowly tailored: it lacks any "precision of regulation," a fatal defect when "political expression or association is at issue."  *In re Primus*, 436 U.S. 412, 432, 434 (1978).  The Order, for example, threatens the termination of *all* government contracts held by *any clients* of Susman—yet the Order is completely silent as to any justification for such a far-reaching and drastic punishment.  And the Order punishes Susman attorneys and

staff who have nothing to do with the conduct alleged in the order, including litigation regarding "elections," Order § 1—extending to, for example, the Firm's patent lawyers who engage with the Patent Trial and Appeal Board and any firm lawyer who has business with an adjudicative agency.

### 3.     The Order Violates the Petition Clause

The Order independently deprives the Firm of its "liberty interest in [its] First Amendment right to petition the government." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007); *Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989); *see Button*, 371 U.S. at 429. That protected right to petition "extends to all departments of the Government," including courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see Broudy v. Mather*, 460 F.3d 106, 117 & n.6 (D.C. Cir. 2006). The Order's provisions punishing Susman for past petitioning activity and restricting Susman's ability to petition federal employees and appear before federal agencies on federal property are in themselves a violation of the right to petition. But the Order also purports to restrict access to federal courthouses—a category encompassed within the Order's sweeping reference to "Federal Government buildings." Order § 5. Restricting access to federal courthouses is a particularly blatant violation of the right to petition. *See, e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

### 4.     The Order Abridges Freedom of Association

The Order's demand that government contractors "disclose any business they do with Susman" violates Susman's freedom of association under the First Amendment. Order § 3. The Order subjects Susman clients who have government contracts to risks of economic reprisal and other forms of governmental hostility simply because they have chosen to retain and associate with Susman. The Order provides that "[w]ithin 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Susman

24

or with entities that do business with Susman effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* That is a blatant threat that any government contractor who has associated with Susman can expect economic consequences and other repercussions in short order. The Fact Sheet confirms as much, stating that "the Federal Government will terminate contracts that involve Susman," to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." Compl. Ex. B. The open and acknowledged goal of the demand for disclosure is thus to chill clients from continuing to retain Susman as their counsel.

That chilling effect burdens Susman's right to associate with its clients, thereby triggering exacting scrutiny, which the Order fails for the reasons stated above. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). The governmental interest underlying the Order—trying to impede the ability of law firms to represent clients in matters that the President does not like—is not remotely legitimate, let alone a "sufficiently important" interest to satisfy exacting scrutiny. *Id.* And the Order is not narrowly tailored to that (illegitimate) interest. Forced "disclos[ure]" of "any business [clients] do with Susman," Order § 3(a), even if not related to a government contract or to any of the litigation with which the President takes issue, is not narrowly tailored to any professed interest in avoiding subsidizing particular litigation. *See USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). Nor is forced disclosure of "whether that business is related to *the subject of* the Government contract." Order § 3(a) (emphasis added). Those disclosures are instead simply designed to leverage the government's control over federal funding to punish Susman. But "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180.

**B.    The Order Violates Susman Godfrey's Right to Due Process**

The Order is an equally blatant violation of Susman Godfrey's due process rights.   The safeguards of the Due Process Clause are "'implicated' whenever the government imposes 'civil penalties.'"   *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996)).   And the Due Process Clause is violated when the plaintiff (1) faces a deprivation of a protected liberty or property interest, and (2) has not received the process that is due.   *E.g.*, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).   Susman unquestionably satisfies that test and therefore is likely to succeed on its due process claim. Moreover, the Order's impermissible vagueness creates an independent due process violation.

**1.    The Order Deprives Susman Godfrey of Protected Liberty and Property Interests**

Protected liberty interests "[w]ithout doubt" include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life," and, among other things, "generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness."   *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (internal quotation marks, ellipsis, and citations omitted).   The Order deprives Susman of protected liberty and property interests in at least three ways:   it (a) denies Susman and its attorneys the right to follow their chosen profession; (b) harms Susman's reputation; and (c) interferes with Susman's protected contractual relationships with clients.

a.    *Right to Chosen Profession.*   "One of the liberty interests protected by the Fifth Amendment is the right to 'follow a chosen profession free from unreasonable governmental interference.'"   *Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (quoting *Abdelfattah v. Dep't Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015)); *see Schware v. Bd. of Bar Exam.*, 353 U.S. 232, 238-39 (1957) (due process bars unreasonable government exclusion of

"a person from the practice of law or from any other occupation"). The government denies the right to pursue one's chosen profession by an act that (1) "formally or automatically exclude[s]" someone from work on government contracts "or from other government employment opportunities," or (2) has "the broad effect of largely precluding" her "from pursuing her chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994)).

The Order does both. The Order brands Susman as acting "inconsistent with the interests of the United States," requires all federal contractors to disclose "any business they do with Susman," and orders agency officials to review those contracts and "align their agency funding decisions with the interests of the citizens of the United States." Order §§ 1, 3. That is an unmistakable instruction to terminate government contracts with Susman clients. Simply put, the avowed purpose and predictable effect of the Order is to force Susman's government-contractor clients to end their relationships with Susman. *See* Declaration of Robert E. Hirshon ("Hirshon Decl.") ¶ 21. That pressure on clients to disassociate from Susman—not to mention the pressure on potential clients to avoid associating with Susman in the first place—is designed to destroy the client relationships that are the sine qua non of legal practice. In addition, the Order's purpose and "effect" is to preclude Susman from providing effective legal representation to a wide range of clients through limitations on its lawyers' ability to enter federal facilities and interact with federal officials. *See O'Donnell*, 148 F.3d at 1141. Section 5(a) of the Order gives federal officials broad discretion to limit Susman personnel's "access [to] Federal Government buildings," including, it appears, every federal court building in the Nation, as well as Article I courts, administrative agencies, federal prosecutors' offices, and innumerable other federal buildings that members of the private bar must regularly enter in order to do their jobs. The Order also restricts Susman from

27

"engaging" with federal "[g]overnmental employees" such as prosecutors, civil enforcement staff, investigators, and court personnel. Order § 5(a). Construed according to its terms, the Order would restrict Susman's lawyers from arguing motions and appeals or participating in trials in federal cases, engaging with federal regulators, meeting with federal prosecutors, and more. That result is untenable for a law firm whose lifeblood is engaging in precisely that conduct on a daily basis.

b. *Reputational Interest.* The Order deprives Susman of its "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see Perkins* Tr. at 85:5-9. The Supreme Court has made clear that Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255-56 (2012); *see, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574-75 (1975); *Nat'l Counsel of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001). The Order tarnishes the Firm's reputation in no uncertain terms, announcing that all Susman attorneys are unworthy to work on government contracts (or for government contractors); possess national-security information; enter government buildings; engage with government employees; receive government funds, property, or services; or be hired by government agencies. *See* Order §§ 1, 2, 3, 5. The Order also contains a long series of stigmatizing assertions about the purportedly "egregious" nature of Susman's actions, stating (for example) that the Firm has "degrade[d] the quality of American elections" and engaged in "conflicts of interests." *Id.* § 1.

c. *Protected Contractual Relationships.* Finally, the Order deprives Susman of its constitutionally protected property interest in contracts with its clients. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *see also Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010)

("[N]umerous courts have held that contracts between private parties may give rise to property interests sufficient to trigger Fifth Amendment due process protections.").  As discussed, the Order punishes Susman's clients for contracting with the Firm by, for example, depriving those clients of government contracts.  That interferes directly with Susman's own "private contractual agreements . . . with its clients," because it effectively penalizes clients for choosing to follow through on their contractual obligations to use the Firm's services.  *Perkins* Tr. at 86:4-8 (citing *UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996), and *Brock v. Roadway Express*, 481 U.S. 252, 260 (1987) (plurality opinion)).

## 2.     The Order Issued With No Process Whatsoever

Before engaging in a deprivation of liberty or property, the government must provide "fair notice of conduct that is forbidden or required," *Fox Television*, 567 U.S. at 253, 257, and of "the severity of the penalty that [the government] may impose," *Gore*, 517 U.S. at 574.  And to be "constitutionally sufficient," notice should be provided "*prior to* [a person's] being sanctioned." *Fox Television*, 567 U.S. at 257 (emphasis added).

Susman was not given prior notice that its conduct would trigger executive sanctions, and the Order does not identify any law that the Firm allegedly violated.  The Firm learned of the Order's existence and terms, along with the general public, when the President issued it on April 9 on live television.  Susman never received a chance to challenge the imposition of sanctions before the Order took effect.  As a result, the Firm was deprived of "an opportunity to speak up in [its] own defense." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  It could not rebut the government's defamatory assertions—such as the claims that the Firm has taken action to "degrade the quality of American elections," to "undermine the effectiveness of the United States military," or

"engage[] in unlawful discrimination," Order § 1—or explain why, even if any of those false allegations were true, the punishment was inappropriate and disproportionate.

To be clear, the Order's perfunctory references to "risk[]," the "United States military," and "national security," Order § 1, do not absolve the government of its due process obligations. The Order says *nothing* to suggest that any national-security concerns are actually implicated here, and there is no reason to believe that they are. And even where such concerns are implicated, process is still required before the government may impair a protected liberty interest or stigmatize an entity. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion) (citizen seeking to challenge "classification as an enemy combatant must receive notice of the factual basis for his classification" and "a fair opportunity to rebut" before a "neutral decisionmaker"); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 165-74 (1951) (Frankfurter, J., concurring) (due process requires notice and hearing for an organization slated to be designated as "Communist"); *Nat'l Council of Resistance of Iran*, 251 F.3d at 201, 208-09 (designating an entity a "foreign terrorist organization" without adequate notice or hearing violated due process). Susman received no process at all.

Any invocations of national security cannot ignore the weighty interests that militate against the Order's severe punishments. When, as here, the government "threatens to inhibit the exercise of constitutionally protected rights," a "more stringent" fair-notice test applies. *Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498-99 (1982). Indeed, because heartland "[F]irst [A]mendment guarantee[s]" are implicated, the government's decision to punish Susman cannot be made "arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). But the Order impermissibly seeks to penalize the Firm for its association with clients that the President perceives to be political adversaries. That arbitrary and

improper justification underscores the Firm's likelihood of success on the merits of its due process claim.

### 3.    The Order Is Impermissibly Vague

The Order's vagueness is an independent due process flaw.    A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted).

The Order is purposefully drafted to create immediate, irremediable uncertainty about the scope of the disabilities placed on Susman and its clients—and to leverage that vagueness for its in terrorem effect.    For example, the Order's "Personnel" provision definitively directs federal agencies to "limit[]" Susman's access to federal buildings and its ability to engage with federal employees, both to the extent warranted by the purported "interests of the United States."    Order § 5.    Given that the Order also brands Susman as engaging in "activities inconsistent with the interests of the United States," *id.* § 1, there is no doubt that the effect of the Order is to restrict Susman's ability to engage in the basic activities of its law practice.    But Susman and its clients have no way to know the full *scope* of that restriction.    The Order's reference to "interests of the United States" is so standardless that it gives agencies sweeping discretion to *further* restrict Susman's access over time, perhaps in retaliation for future Susman representations deemed to be somehow "inconsistent with the interests of the United States."    *Id.*    Other aspects of the Order exacerbate that concern.    For instance, the reference to "Federal Government buildings" is on its face broad enough to include federal courthouses—an interpretation that the government has not disclaimed in proceedings involving executive orders against other firms.    *See Wilmer* TRO at 4

(construing executive order to encompass federal courthouses); *Perkins* Tr. at 88:21-23 (government counsel "concede[d] that we don't know exactly what [a materially identical provision] means"). The Order's vagueness is thus designed to give federal agencies sweeping ability to impose severe consequences on Susman for undefined future conduct—and to deter Susman from engaging in representations and advocacy that could be perceived as adverse to the President's political interests or the government's interests more broadly. That is a textbook case of unconstitutional vagueness—vagueness that is designed to enable "arbitrary and discriminatory application," *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), and that is especially impermissible given that "speech is involved," *Fox Television*, 567 U.S. at 253-54.

### C.    The Order Violates Susman Godfrey's Right to Equal Protection of the Laws

Susman Godfrey also will succeed on its equal protection claim.[5] The Order singles out Susman for differential treatment, and the government has no legitimate justification for treating Susman differently than similarly situated entities.

The Supreme Court often has "recognized successful equal protection claims brought by a 'class of one.'" *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Such a claim requires the plaintiff to allege that it "has [1] been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Id.* at 564. Further, when the differential treatment burdens a plaintiff's First Amendment activity, a standard "appreciably more stringent than 'minimum rationality'" governs. *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 802, 814 (D.C. Cir. 1988).

---

[5] The Fifth Amendment's Due Process Clause contains an equal protection component applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954). The "[e]qual protection analysis . . . is the same" as under the Fourteenth Amendment. *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

Both parts of the equal protection test are readily satisfied here. First, the Order intentionally treats Susman differently from others that are similarly situated. Indeed, the targeted treatment inheres in the Order itself, which singles out Susman by name, airs the President's specific grievances with Susman, and assigns targeted sanctions. Countless other similarly situated law firms have not been subjected to the same—or remotely similar—sanctions. Worse still, unlike in the typical class-of-one claim, in which "improper motive is usually covert," here the "improper motive" is apparent on the face of the Order and the Administration's related public statements. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013); *supra* p. 18-20. When, as here, "animus is readily obvious," myopically applying the comparator requirement is inappropriate. *Swanson*, 719 F.3d at 784; *see Cordi-Allen v. Conlon*, 494 F.3d 245, 251 n.4 (1st Cir. 2007).

It is immaterial that several other law firms have previously been subjected to analogous orders. The fact remains that the number of similarly situated firms targeted by the President is dwarfed by the number who have been unaffected. It would defy logic and precedent to conclude that Defendants can avoid an equal protection violation on the ground that they have also targeted several other firms on similarly illegitimate grounds. "Whether the complaint alleges a class of one or of five is of no consequence because . . . the number of individuals in a class is immaterial for equal protection analysis." *Olech*, 528 U.S. at 564 n.*; *accord Franks v. Rubitschun*, 312 F. App'x 764, 765 n.2 (6th Cir. 2009) (claims are "typically referred to as class-of-one claims," but "the challenged government action" need not "single out one solitary person").

Second, the government lacks even a rational basis for the difference in treatment, much less an "appreciably more" persuasive justification. *News Am. Pub., Inc.*, 844 F.2d at 802. To satisfy even the lower rational-basis standard, the government must identify a "legitimate

governmental purpose," which cannot be "so attenuated" from the conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985). A "bare . . . desire to harm a politically unpopular group" is not a "legitimate state interest[]." *Id.* at 447. The Order has *no* legitimate governmental purpose; rather, its objective is to harm a law firm that the President perceives to have supported clients and causes that the President disfavors. In addition, the Order's means are far too attenuated to justify its punitive provisions. *See id.* at 446; *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (where a governmental act is "so discontinuous with the reasons offered" that it "seems inexplicable by anything but animus," it "lacks a rational relationship to legitimate state interests").

    **D.**     **The Order Violates Susman Godfrey's Clients' Due Process Right to Counsel**

        Susman Godfrey is also likely to succeed on its claims that the Order violates the right to counsel protected by the Fifth Amendment's Due Process Clause. That right protects litigants in civil and criminal cases alike against arbitrary deprivations of their counsel of choice. *See Powell v. Alabama*, 287 U.S. 45, 53, 68-69 (1932). The Order violates that right by baselessly preventing Susman's clients from being ably represented by their chosen attorneys.

        1. The Firm has constitutional standing to challenge infringement of its clients' right to counsel. Lawyers have prudential, third-party standing to challenge restrictions on their clients' access to counsel that interfere with the lawyers' practice. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990). That includes restrictions that interfere with a client's right to counsel of choice, *Caplin & Drysdale*, 491 U.S. at 623 n.3, as well as restrictions that "interfere[] with [counsel's] professional obligation to his client," *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974). Here, Defendants' violations have caused, and will continue to cause,

exactly those kinds of interference.  That is "concrete injury" that injunctive relief would redress.
*TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

2.  The Order violates Susman clients' Fifth Amendment right to counsel.  It hardly needs
saying that, as a general matter, the Due Process Clause protects a litigant's right to notice and a
hearing.  *Powell*, 287 U.S. at 68.  But that right to be heard would be "of little avail" if it did not
include the right to "the aid of counsel" in the hearing.  *Id.* at 69.  And the guarantee of an attorney
necessarily includes a party's right "to secure counsel of his own choice."  *Id.* at 53.  Accordingly,
although a civil litigant may not always have a constitutional right to appointed counsel, *Turner v.
Rogers*, 564 U.S. 431, 443-44 (2011), the Supreme Court has recognized that an "arbitrar[y]
refus[al]" to allow a party to be heard in a civil case via the arguments of his preferred "counsel,
employed by and appearing for him," constitutes a denial of due process.  *Powell*, 287 U.S. at 69;
*see Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873-74 (D.C. Cir. 1984).

The Order amounts to exactly that sort of arbitrary and unjustified interference.  By denying
Susman attorneys the ability to "engag[e] with" government officials or "access[] . . . Federal
Government buildings," Order § 5(a), the Order imposes imminent risk that Susman's clients will
have to go without their chosen counsel in upcoming meetings and hearings.  The Order offers no
legitimate rationale for that denial, making it a classically arbitrary government action and a denial
of due process rights.

### E.    The Order Exceeds the President's Statutory and Constitutional Authorities and Violates the Separation of Powers

The many constitutional violations described above are all the more egregious because the
President lacks even basic authority to issue several of the Order's mandates.  Section 3 of the
Order imposes draconian contracting consequences on Susman Godrey and its clients, and Section
5 restricts Susman's personnel from engaging with the federal government and presumptively

makes such personnel ineligible for federal employment. Susman is likely to succeed on its claim that those punishments exceed the President's statutory and constitutional authority and otherwise violate the separation of powers.

"The President's power, if any, to issue" an executive order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Courts have therefore routinely held that an executive order lacks legal effect if it is not justified by an "express constitutional or statutory authorization." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942); *see, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 193-95 (1999) (similar); *City & Cnty. of San Francisco*, 897 F.3d at 1234-35 (similar); *see also Trump v. Hawaii*, 585 U.S. 667, 683 (2018) (upholding presidential action taken pursuant to 8 U.S.C. § 1182(f), which addresses restrictions on entry of noncitizens).

No statute authorizes the President or his executive officers to sanction a law firm for its general representation of clients. The President thus is exacting retribution against a law firm for representing clients he considers his political opponents, or who hold views he disfavors, without even an indication of statutory authority. Put differently, "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588 (emphasis added). In short, there is no "nexus between the" President's action "and some delegation of the requisite legislative authority by Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979).

Lacking any statutory basis, the Order could survive only if supported by some inherent executive power. None applies here. The power to punish disfavored law firms through contracting orders and access restrictions finds no home in Article II of the Constitution; rather,

"officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments." *McGrath*, 341 U.S. at 143-44 (Black, J., concurring). Such punishment is not an exercise of the President's power as Commander in Chief, *see, e.g.*, *Ex parte Quirin*, 317 U.S. 1, 26 (1942), or any foreign-policy power vested in the President, *see, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015), and it is not a component of the President's "executive Power" to oversee certain subordinate officials, *see, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Nor do Sections 3 and 5 of the Order represent an exercise of the President's responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, because the President executes no law whatsoever in imposing those punishments.

The lack of any historical precedent for an executive order targeting a law firm due to its advocacy on behalf of clients is further powerful evidence that the Constitution does not permit, much less affirmatively authorize, the President's action. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010); *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014). Indeed, the historical power to sanction attorneys for alleged professional misconduct in federal court rests with a different, co-equal branch of our government: the Article III judiciary. The Supreme Court has long held that federal courts have inherent power to "discipline attorneys who appear before [them]." *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991) (citing *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531 (1824)). That power is integral to federal courts' ability to adjudicate the "Cases" and "Controversies" assigned to them under Article III, as "the ability to fashion an appropriate sanction" for attorney misconduct ensures that courts may "manage" their "own affairs" and prevent "abuse[]" of the "judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citations omitted). The Order intrudes on that inherently judicial role

37

by imposing blunderbuss sanctions on attorneys based not on a judicial finding of professional wrongdoing but rather on the President's own disagreement with (for example) actions that Susman took in connection with the 2020 election—actions that Susman took in court. Our system of separated powers does not permit that intrusion on the judiciary's role. *See Stern v. Marshall*, 564 U.S. 462, 482-84 (2011).

Nor could Article II reserve any such power to the President, as to do so would empower the President to interfere with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545. In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case." *Id.* The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Id.* at 546. The Order flouts these "accepted separation-of-powers principles," "threaten[ing] severe impairment of the judicial function." *Id.* at 544-46.

On top of that, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of [an unlawful] bill[] of attainder." *McGrath*, 341 U.S. at 143-44 (Black, J., concurring). It punishes Susman—and only Susman— "without any formal investigation, trial, or even informal process." *Perkins* Tr. at 89:10-22. From the Founding, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 144 (Black, J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.*

## II.    SUSMAN GODFREY WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER

Irreparable harm justifying issuance of a TRO must be "'certain and great,' 'actual . . . not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief.'" *Doctors for Am. v. OPM*, 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  That "high standard," *id.*, is more than satisfied here.

### A.    The Order Has Impaired Susman Godfrey's Constitutional Rights

"[T]here is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (internal quotation marks and citation omitted).  "[A] prospective violation of a constitutional right constitutes irreparable injury for . . . purposes" of such relief.  *Karem*, 960 F.3d at 667 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).  Multiple such invasions and violations have already occurred here.

***First Amendment.***  "The loss of First Amendment freedoms, for even minimal periods of time[,] . . . constitute[s] irreparable injury." *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (quoting *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 301 (D.C. Cir. 2006)).  If denied a TRO, Susman will incur an injury that is "certain" and "imminent" because the Order "threatens" and "in fact . . . impair[s]" the Firm's "First Amendment interests 'at the time relief is sought.'"  *Cigar Ass'n of Am.*, 317 F. Supp. 3d at 562 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301).  As Judge Leon explained in granting a TRO in WilmerHale's challenge to an analogous order, "[t]here is no doubt this retaliatory action chills speech and legal advocacy," and "violations of plaintiffs' constitutional rights constitute irreparable harm, even if the violations occur only for short periods of time."  Wilmer TRO at 2-3; *see also Jenner* Tr. at

39

54:22-24 ("[E]ven more simply, Jenner is suffering irreparable harm because the order likely impinges on the firm's First Amendment rights."); *Perkins* Tr. at 95:2-3 (First Amendment violations "in and of themselves lead[] to irreparable harm").

Moreover, given the Order's clear retaliatory purpose and effect, there is no question that it is intended to chill Susman's speech and advocacy going forward. That is why the Order imposes severe sanctions while giving agency heads discretion to tighten those sanctions still further. There is thus at minimum "some likelihood of a chilling effect on" Susman's rights—that is the Order's very purpose. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301; *see* Hirshon Decl. ¶ 20 ("Lawyers' zealous advocacy will be hindered if they must fear retribution for advancing arguments with which the President disagrees."). In addition, Susman "need not show that the government action led [it] to stop speaking altogether, only that it would be likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 29 (D.D.C. 2024) (internal quotation marks and citations omitted). "Therefore, the fact that" Susman has "defended its work does not mean that [it] ha[s] not suffered irreparable harm." *Id.*

**Fifth Amendment.** "[A] violation of Fifth Amendment due process rights," including unlawful interference with the right to counsel, gives rise to irreparable harm. *Karem*, 960 F.3d at 668; *see Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1163 (D. Or. 2018). So too does a violation of the "right[] to equal protection of the laws under the Fifth Amendment." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017), *vacated on other grounds*, *Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019). Susman is suffering exactly those forms of irreparable harm here. *See supra* pp. 26-35. The harm inflicted by the Order is ongoing and "do[es] not . . . require

proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis*, 158 F.3d at 1346).

**B.    Susman Godfrey Is Suffering Ongoing and Irreparable Reputational Harm**

Absent emergency relief, Susman will suffer severe and irreparable reputational harm as a result of the Order. *See Xiaomi Corp.*, 2021 WL 950144, at *9 ("injury to reputation or goodwill" is "irreparable" (citation omitted and alterations accepted)).    Not only does the Order disparage the Firm's work as "dangerous" and "detrimental to critical American interests," it accuses the Firm of, among other things, "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections." Order § 1.    Allowing these falsehoods to go unrestrained could damage Susman's "corporate goodwill and reputation."    *Honeywell, Inc. v. Consumer Prod. Safety Comm'n*, 582 F. Supp. 1072, 1078 (D.D.C. 1984); *see* Srinivasan Decl. ¶ 75.  More generally, there is a public perception that orders like the one here make law firms less able to do their work effectively. *See, e.g.*, Anders Decl. Ex. I (article discussing impact of earlier executive orders).  That perception is amplified by the fact that the Order articulates the grievances of the President, who occupies an office that exerts great influence and to which many people play close attention.

The Order's (false) suggestion that Susman is so untrustworthy or "dangerous" that it cannot be permitted to represent clients in interactions with the federal government, at federal agencies, and in federal courtrooms poses concrete, here-and-now harm to the Firm's reputation. Order §§ 1, 3.  This Court has found far less reputational damage to be irreparable.[6]

---

[6] *See, e.g.*, *Xiaomi Corp.*, 2021 WL 950144, at *1, 9 ("almost unquestionable" that plaintiff's designation as "Communist Chinese military company" "damaged its reputation[]"); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("termination for default . . . left a black mark on [plaintiff's] reputation, irreparable absent an injunction"); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) (agency letter characterizing plaintiff as "pressuring" senior citizens into financial decisions was irreparable reputational harm).

C.      **Susman Godfrey Is Suffering Irreparable Economic Injuries**

Without relief from this Court, the Executive Order will subject Susman to unrecoverable losses.   Although economic loss is not always irreparable, *Harris v. Bessent*, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025) (granting TRO), economic injuries justify emergency equitable relief when "legal remedies after the fact [are] inadequate to restore the party seeking a stay to the status quo ante," *Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016). Where damages are unrecoverable (for example, due to sovereign immunity), "significant" economic loss constitutes irreparable harm.   *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (issuing injunction).

That is true here.   Defendants' sovereign immunity limits Susman to nonmonetary equitable relief, and Susman's unrecoverable revenue losses will be "significant" absent injunctive relief, *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021) (citations omitted); *see* Srinivasan Decl. ¶ 71.  *See Xiaomi Corp.*, 2021 WL 950144, at *11 (irreparable harm where there was "exodus of lucrative contracts"); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (irreparable harm where there was "loss of long-standing clients that may be unwilling, or unable, to do business with [plaintiff] hereafter if no injunction is issued" (cleaned up)).

The Order also imminently threatens significant irreparable economic harm by hindering Susman's ability "to recruit and retain employees to build—or even maintain—its business." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020); *see also Luokung*, 538 F. Supp. 3d at 192-93 (irreparable harm included "difficulty recruiting and retaining talent").   Employees are drawn to Susman in part due to the significant substantive responsibilities the Firm provides, which can make them more compelling candidates for federal employment.  Srinivasan Decl. ¶ 76.  By directing federal agencies to refrain from hiring Susman employees, the Order impairs the Firm's

ability to recruit and retain lawyers and professionals who are interest in federal service.  *Id.*; *see* Hirshon Decl. ¶ 22.

## III.   THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR A TRO

The final two TRO factors—the balancing of the equities and weighing of the public interest—"merge when the [g]overnment is the opposing party."  *Am. Ass'n of Political Consultants v. SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "must balance the competing claims of injury and must consider the effect on each party [and the public] of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

The injury to Susman Godfrey has been immediate and severe.  The Order is *already* inflicting severe and irreparable harm on Susman by actively violating the constitutional rights of the Firm and its clients.  Those injuries will only multiply if the Order is not restrained.  *See supra* pp. 39-41.  Even if there were only a "substantial risk" of a deprivation of "fundamental . . . right[s]," that would be enough to tilt the equities against the government.  *See League of Women Voters*, 838 F.3d at 12.  Here, it is certain that the Order will have that effect.  Further, with each day that goes by, the risk mounts that Susman will suffer unrecoverable economic losses and uncurable reputational harm.  *See* Srinivasan Decl. ¶¶ 71-72, 75.

Making matters worse, the Order threatens to deter attorneys across the Nation from taking on clients and causes for fear of drawing the ire of an Administration that has laid bare its willingness to impose harsh sanctions on those who express opposition to its policies.  *See* Hirshon Decl. ¶¶ 17-20.  As Judge Bates stated, "[t]he legal profession as a whole is watching and wondering whether its courtroom activities, in the best tradition of lawyering, will cause the federal government to turn its unwanted attention to them next."  *Jenner* Tr. at 54:25-55:3.  That chilling

effect will ultimately make it difficult for lawyers to fulfill their duty to provide their "client and [] the legal system" with "zealous[]" and "vigorous representation" "within the bounds of the law"—a responsibility of "paramount importance" to our "system of justice" and to the public interest. D.C. R. Prof'l Conduct 1.3 cmt. [1]; *Penson v. Ohio*, 488 U.S. 75, 84 (1988). The Order also will deter potential litigants from challenging the Administration's policies. Indeed, it already has. *See* Anders Decl. Ex. J ("The volunteers and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear."). In short, the "adverse impact" on the public interest "cannot be [over]stated," *Perkins* Tr. at 102:13-14, as it puts in peril the "informed, independent bar" on which our judicial system depends, *Velazquez*, 531 U.S. at 545. Moreover, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) (brackets in original) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012)).

In contrast, any purported harm to the Defendants is non-existent. *See Perkins* Tr. at 101:8-10 ("The government . . . would suffer no cognizable injuries from the issuance of a TRO."). Because the government "cannot suffer harm from an injunction that merely ends an unlawful practice," "any hardship" the Government might identify is "not legally relevant." *Ramirez v. U.S. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020). On the contrary, there is a "substantial public interest" in ensuring that "'governmental agencies abide'" by the law. *League of Women Voters*, 838 F.3d at 12. The balance of equities and public interest thus weigh decisively in favor of temporarily restraining and enjoining implementation of the Order and preserving the status quo.

## IV.   THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE THE RULE 65(c) SECURITY REQUIREMENT

Susman Godfrey respectfully requests that the Court waive any security under Rule 65(c). *See* Fed. R. Civ. P. 65(c).  This Court has "wide discretion" to grant relief under Rule 65 without requiring the movant to post any bond.  *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024).  Here, the requested relief will "do the defendant[s] no material damage"—and that fact counsels strongly in favor of "dispens[ing] with any security requirement whatsoever," as is typical in cases in which government action is at issue.  *Id.* (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)); *see, e.g.*, Opinion and Order at 21, *Widakusara v. Lake*, No. 25-cv-02390 (S.D.N.Y. Mar. 28, 2025), ECF No. 54 ("[r]equiring that plaintiffs suing the government to vindicate constitutional and statutory rights" post large bonds "would ensure that very few individuals could afford to sue the federal [g]overnment," and federal defendants "can hardly gripe about" the cost of "abiding by their constitutional role as members of the executive branch").

## **CONCLUSION**

Plaintiff's motion for a temporary restraining order should be granted.


Dated: April 14, 2025                    Respectfully submitted,


                                        */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
                                        Elaine J. Goldenberg (D.C. Bar. No. 478383)
                                        Ginger D. Anders (D.C. Bar. No. 494471)
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Avenue, NW, Suite 500E
                                        Washington, D.C. 20001
                                        (202) 220-1100
                                        Donald.Verrilli@mto.com
                                        Elaine.Goldenberg@mto.com
                                        Ginger.Anders@mto.com

Brad D. Brian**
Michael R. Doyen**
Hailyn J. Chen**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Brad.Brian@mto.com
Michael.Doyen@mto.com
Hailyn.Chen@mto.com

**_Pro hac vice_ application forthcoming

_Attorneys for Susman Godfrey LLP_

(_Additional counsel listed on following page_)

Bethany W. Kristovich**
Adam B. Weiss**
Jennifer L. Bryant**
William M. Orr**
Miranda E. Rehaut**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
William.Orr@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee**
Shannon C. Galvin Aminirad**
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

* Admission pending
**Pro hac vice application forthcoming

*Attorneys for Susman Godfrey LLP*