UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSMAN GODFREY LLP, <br><br> *Plaintiff*, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> *Defendants*. | Civil Case No. 1:25-cv-01107 |

## DECLARATION OF ROBERT E. HIRSHON

I, Robert E. Hirshon, declare as follows:

1.  I am a former president of the American Bar Association and, until my retirement last year, I was the Frank G. Millard Professor from Practice and Special Counsel on Developments in the Legal Profession at the University of Michigan Law School. At the University of Michigan Law School, I taught both basic and advanced courses on ethics and professional responsibility. I also taught a seminar called "Law Firm Careers in an Evolving Profession." My experience includes decades of law practice with private firms, as well as management of large law firms.

2.  My qualifications to provide expert opinions on the legal profession and rules of professional responsibility are set forth more fully in Exhibits A and A-1.

3.  Plaintiff Susman Godfrey LLP ("Susman") is paying an hourly fee of $625 per hour for the time I spend working on this declaration and otherwise assisting counsel on this case. My compensation is not contingent on the outcome in this case. The views expressed herein are my own. I render my opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated.

1

4.      In preparing this declaration, I have considered the April 9, 2025 Executive Order titled "Addressing Risks from Susman Godfrey" (hereafter, the "Executive Order"), the accompanying Fact Sheet explaining the Executive Order, the similar executive orders that have been issued against other law firms, news coverage of the executive orders, and the other materials cited herein.

## Background and Summary of Opinions

5.      As a longtime practitioner, teacher, and leader within the legal profession, I have been asked by counsel for Susman for my opinions on the Executive Order. Specifically, I have been asked for my opinions on whether the Executive Order will have an effect on lawyers, clients, and the administration of justice.

6.      Prior to this engagement, I was retained by counsel for Perkins Coie LLP to opine on the same question with respect to the March 6, 2025 Executive Order titled "Addressing Risks from Perkins Coie LLP."[1] Between then and now, the Administration has issued executive orders against Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss");[2] Jenner & Block LLP;[3] and Wilmer Cutler Pickering Hale and Dorr LLP[4] that impose the same punitive measures as the order against Perkins Coie and the instant order against Susman.

---

[1] *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 1:25-cv-716 (D.D.C. Mar. 11, 2025), ECF No. 2-4.

[2] *Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

[3] *Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

[4] *Addressing Risks from WilmerHale*, The White House (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

2

7.     The Administration has also announced agreements reached with other firms to avert threatened executive orders.[5] According to the President, many of these other law firms have agreed to provide $100 million in pro bono work on issues the President supports, among other commitments.[6] The firms that have struck preemptive deals with the Administration have followed in the footsteps of Paul Weiss. The White House stated that Paul Weiss "indicated that it will engage in a remarkable change of course" and align with the Administration in exchange for the Administration revoking the executive order that had been issued against it.[7] Most recently, the amount law firms have pledged to causes the Administration favors to avert an executive order has increased to $125 million.[8] At the signing ceremony for the order against Susman, the President's aide remarked that "the numbers are adding up" and will be "close to a billion soon."[9]

---

[5] Matthew Goldstein, *Another Big Law Firm Reaches Agreement with Trump*, New York Times (Apr. 2, 2025), *available at* https://www.nytimes.com/2025/04/02/business/trump-law-firms-milbank-deal.html; Justin Henry, *Trump Talks Deal with Three Massive Law Firms as Others Fight*, Bloomberg Law (Apr. 10, 2025), *available at* https://news.bloomberglaw.com/business-and-practice/trump-talks-deal-with-three-massive-law-firms-as-others-fight?.

[6] Donald J. Trump, Truth Social (Mar. 28, 2025, 10:57 AM), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594 (announcing agreement with Skadden, Arps, Slate, Meagher & Flom LLP); Donald J. Trump, Truth Social (Apr. 1, 2025, 1:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553 (announcing agreement with Willkie Farr & Gallagher LLP); Donald J. Trump, Truth Social (Apr. 2, 2025, 11:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114269692330126501 (announcing agreement with Millbank LLP); Donald J. Trump, Truth Social (Apr. 11, 2025, 9:19 AM), https://truthsocial.com/@realDonaldTrump/posts/114320237164839938 (announcing agreement with Cadwalader, Wickersham & Taft LLP).

[7] *Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss/.

[8] Donald J. Trump, Truth Social (Apr. 11, 2025, 9:21 AM), https://truthsocial.com/@realDonaldTrump/posts/114320245355397433 (announcing agreement with Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP).

[9] *President Trump Discusses Tariff Reversal and Signs Executive Order in the Oval Office* (Apr. 9, 2025) at 10:46-12:57, https://www.youtube.com/watch?v=mYm7kmOC37s&t=646s.

8. In my opinion, the Executive Order against Susman—like the prior executive orders targeting law firms—will be understood by lawyers and law firms as an extreme, dangerous, and unprecedented effort to intimidate them and prevent them from representing clients whom the President does not wish to have access to legal counsel or to the courts, or whose advocacy the President wishes to punish. If implemented, the Executive Order will have the effect of preventing lawyers from performing their required role in our democracy, and it will inflict grievous harm on the administration of justice in the United States. In my opinion, the gravity of the threat to the rule of law has grown more severe as additional law firms have been targeted, and as the President has extracted "deals" from many of his targets.[10]

**The Executive Order Undermines Bedrock Principles of the Legal Profession**

9. Start with first principles. A key function of a lawyer in the United States is advocacy on behalf of the clients who retain them. In our system, it is the client, not the lawyer, who determines what objectives the lawyer is to pursue on behalf of the client. "A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d), and (e)..."[11] "A lawyer's representation of a client . . . does not constitute an endorsement of the client's political, economic, social, or moral views or activities."[12]

---

[10] Michael S. Schmidt, Ben Protess, Matthew Goldstein, Jessica Silver-Greenberg, Maureen Farrell, *Skadden, a Top Law Firm, Is in Talks to Avert an Executive Order*, New York Times (Mar. 27, 2025), *available at* https://www.nytimes.com/2025/03/27/business/trump-law-firms-skadden-arps.html (reporting on President Trump boasting about his "track record of bringing big law firms to heel").

[11] D.C. R. Prof'l C. r. 1.2(a). For convenience, I cite herein the version of the Rules of Professional Conduct enacted in the District of Columbia. All 50 states have enacted substantially similar versions of those Rules, and numerous federal courts have adopted them.

[12] D.C. R. Prof'l C. r. 1.2(b).

10. Moreover, a lawyer has a duty to "represent a client zealously and diligently within the bounds of the law."[13] "A lawyer shall not intentionally . . . [f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules[.]"[14]

11. D.C. R. Prof'l C. r. 1.3, Comment [1] provides:

> The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations, such as agency regulations applicable to lawyers practicing before the agency. This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.

12. D.C. R. Prof'l C. r. 1.3, Comment [2] provides:

> This duty derives from the lawyer's membership in a profession that has the duty of assisting members of the public to secure and protect available legal rights and benefits. In our government of laws and not of individuals, each member of our society is entitled to have such member's conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense.

13. The quality of justice in the United States depends in large measure on lawyers' diligent advocacy of their clients' respective positions. Indeed, the United States Supreme Court has written that "vigorous representation" is of "paramount importance" to "our adversarial system of justice."[15] This adversarial system of justice distinguishes the United States legal system from that of other countries.

---

[13] D.C. R. Prof'l C. r. 1.3(a).

[14] D.C. R. Prof'l C. 1.3(b)(1).

[15] *Penson v. Ohio*, 488 U.S. 75, 84 (1988).

14. "Legal representation should not be denied to people . . . whose cause is controversial or the subject of popular disapproval."[16] Indeed, lawyers have a "responsibility" to "accept[] a fair share of unpopular matters or . . . unpopular clients."[17] This fundamental principle has been part of the fabric of the American legal system since the country's founding, as exemplified by John Adams' defense of the British soldiers involved in the Boston Massacre—a representation that Adams described as "one of the most gallant, generous, manly and disinterested Actions of [his] whole Life, and one of the best Pieces of Service [he] ever rendered [his] Country."[18] As the late Theodore B. Olson (solicitor general of the United States from 2001 to 2004) and Georgetown Law School Professor Neal Katyal wrote (about the lawyers representing accused terrorists at Guantanamo Bay, Cuba), "[t]he ethos of the bar is built on the idea that lawyers will represent both the popular and the unpopular, so that everyone has access to justice"; "[i]f lawyers are going to be attacked . . . for trying to help, the best ones won't lend their talents to the cause"; "ultimately, the public will suffer because the best arguments aren't being made."[19] "Patriotism is believing that the American system, not whim and insult, will reach the right results."[20]

15. The Executive Order is also an unprecedented intrusion of the Executive Branch into the regulation of lawyers. With rare exceptions (e.g., for misconduct in connection with an

---

[16] D.C. R. Prof'l C. r. 1.2, Comment [3].

[17] *Id.* at r. 6.2, Comment [1].

[18] John Adams, Diary (Mar. 5, 1773), *available at* https://www.masshist.org/digitaladams/archive/doc?id=D19#:~:text=I%20have%20Reason%20to%20remember,I%20ever%20rendered%20my%20Country.

[19] Theodore B. Olson & Neal Katyal, *We Want Tough Arguments: When Top Advocates Stand Up For Uncle Sam and Detainees, America Gets the Best Law,* The Legal Times (Jan. 22, 2007).

[20] *Id.*

6

agency proceeding), it has long been the courts that regulate lawyers, adjudicate claims of attorney wrongdoing, and punish attorney misconduct. Lawyers can be disciplined, held civilly liable, criminally prosecuted, or sanctioned—all in the context of judicial proceedings, and after notice and a hearing to ensure due process of law. In view of the availability of the existing judicial processes to adjudicate claims of lawyer misconduct, lawyers will understand the Executive Order to be an incursion by the President into the power of the judiciary to regulate lawyers and an effort at intimidation of the bar.

16.    In sum, the Executive Order, if upheld, would undermine first principles that have long served as the foundation of the legal profession. It would send the message that lawyers and law firms will face dire consequences, at the hands of the executive branch, if they perform their "responsibility" to undertake "unpopular matters . . . or unpopular clients."[21] This will cause lawyers to worry about their own interests—avoiding retribution from the executive branch—at the expense of the interests of their clients and at the expense of the zealous advocacy on which the justice system depends. And, as discussed further below, it will deter lawyers and law firms from representing clients or causes that they fear the President may oppose.

**The Executive Order Threatens to Cast a Debilitating Chill Across the Legal Profession**

17.    A law firm subject to an Executive Order such as this one, should it be allowed to stand for any extended period of time, would reasonably fear a tsunami of adverse consequences that would threaten its ability to continue to effectively operate—from clients leaving, to partners and/or practice groups departing, to the pipeline of new lawyers and clients coming to the firm drying up. These adverse impacts would be reasonably feared by any law firm. But the reputational and competitive harms flowing from the stigma of being branded by the federal government as a

---

[21] D.C. R. Prof'l C. r. 6.2, Comment [1].

"rogue law firm[] . . . engage[d] in conduct detrimental to critical American interests"[22] may be especially concerning for large and prominent law firms like those that have been targeted by the Administration—such firms typically have many clients who have some form of exposure to the federal government, and there is fierce competition for talent and clients among such firms. This reasonable fear of very consequential adverse effects creates a dangerous chilling effect on the legal profession that threatens to inflict grievous harm on the rule of law.

18. The Administration's attacks on law firms began chilling lawyers' advocacy on behalf of clients immediately. As reported by *The Wall Street Journal*, in the aftermath of the executive order against Perkins Coie, law firms across the country were already "fearful of taking on a president who hasn't shied away from punishing his enemies."[23] As more and more firms have been targeted, the chill has grown greater. As reported by the *New York Times*, "lawyers at top corporate law firms . . . recently informed some pro bono clients that they could no longer represent them because their firms were scared by Mr. Trump's executive orders."[24]

19. Reasonable lawyers will understand the Executive Order to mean not only that lawyers may suffer government retribution for representing clients in matters of which the President disapproves for personal or political reasons, but also that they may be punished for representing clients who challenge the legality of government policies. The "Fact Sheets" that have

---

[22] *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey*, The White House (Apr. 9, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/.

[23] Erin Mulvaney & C. Ryan Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall Street Journal (Mar. 9, 2025), *available at* https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec.

[24] David Enrich, *Trump's Not-So-Subtle Purpose in Fighting Big Law Firms*, New York Times (Mar. 29, 2025), *available at* https://www.nytimes.com/2025/03/29/business/trump-law-firms-lawsuits.html.

accompanied the executive orders targeting law firms have stated as part of their justification that the firms have "filed lawsuits against the Trump administration,"[25] "degrade[d] the quality of American elections[,]"[26] "pursue[d] partisan goals,"[27] and "abused [their] pro bono practice[s] to engage in activities" that the President believes are adverse to the "interests of the United States."[28] The implication for lawyers is that representing a client with interests adverse to the President or that contradict administration policies will expose the lawyers, their colleagues, and their law firms to punishment.

20. The Executive Order's chilling effect also extends to lawyers' advocacy within existing representations. Lawyers' zealous advocacy will be hindered if they must fear retribution for advancing arguments with which the President disagrees.

21. This chilling effect will inevitably harm clients. If lawyers are fearful to advocate for causes adverse to the federal government or adverse to the President's personal and political interests, it will be difficult for clients with such interests to find lawyers to represent them. The Executive Order also will deter clients from exercising their Constitutional right to select the

---

[25] *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.

[26] *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey*, The White House (Apr. 9, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/.

[27] *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block*, The White House (Mar. 25, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block/; *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, The White House (Mar. 26, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/.

[28] *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, The White House (Mar. 26, 2025); *available at* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/.

counsel of their choosing. In our system, clients—not the government—decide which lawyer will represent them. The Executive Order's threatened limitations on Susman's ability to practice law (e.g., the prospect of barring Susman lawyers from federal buildings and prohibiting federal employees from "engaging" with Susman lawyers) will, as a practical matter, deprive clients of their right to be represented by their chosen lawyers. Indeed, the Executive Order, if upheld, would punish clients (through cancellation of their government contracts and compelled disclosure of their attorney-client relationships) for seeking advice or other legal services from their chosen lawyer, or from a law firm the President dislikes. The detrimental impact on clients is especially acute because the Executive Order against Susman is not an isolated attack. Weeks ago, the President stated that "we have a lot of law firms we're going to be going after,"[29] and recent events have confirmed the President's intent to continue targeting law firms he views as opponents. If the Executive Order is implemented and the Administration's campaign against large and prominent law firms continues unabated, it will become increasingly difficult for clients to be represented by their chosen counsel.

22.     The Executive Order, if enforced, also could deter law school graduates from going to work at law firms that represent clients or advocate causes of which the President disapproves. When I was a law school professor, some of my brightest students went to work at the law firms that have been targeted by the Administration. The Executive Order would impair Susman's hiring of lawyer and non-lawyer professionals because of the risk that joining a law firm disfavored by

---

[29] Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'*, Mediaite (Mar. 9, 2025), *available at* https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/.

the President could destroy any possible future in federal government service (e.g., as a federal prosecutor, judicial clerk, or SEC lawyer).

23. In sum, my opinion is that, if allowed to stand, the Executive Order against Susman will have the effect of forcing lawyers to choose between performing their assigned role in our democracy or pleasing the President, all to the detriment of clients and the fair administration of justice.

\*      \*      \*

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge, information, and belief. Executed on this 14th day of April, 2025.

Robert E. Hirshon

## EXHIBIT A

At the University of Michigan Law School, in addition to teaching both basic and advanced courses on ethics and professional responsibility, I was the law school's "Co-Director" of the State Bar of Michigan's Professionalism in Action Program presented at the law school during 2015-2018. The Program was a half-day seminar developed by the Michigan State Bar. First-year law students discussed hypotheticals based upon the Michigan Rules of Professional Conduct ("MRPC") with experienced practitioners and judges. As co-director, I assisted in the drafting of these hypotheticals and attended to various administrative details.

Additionally, I have volunteered my time to the Michigan Supreme Court Board of Law Examiners and provided them with comments and suggestions to the proposed ethics and professional responsibility questions and model answers for the Michigan Bar Examination.

Prior to the outbreak of the COVID virus, I was an Adjunct Professor at Peking University's School of Transnational Law in Shenzhen, China, and Visiting Professor at Haim Striks School of Law in Israel. Also, I was a consultant to a large law firm located in New England until 2022; I advised the firm on law practice management issues.

My legal experience includes thirty years of practice in a medium-sized Portland, Maine law firm. My management responsibilities at the firm included advising the firm's lawyers on their ethical responsibilities as described in the Maine Code, and, subsequently, the Maine Rules of Professional Responsibility. The Maine rules are based upon the Model Rules adopted by the American Bar Association's House of Delegates.

Additionally, I served as the CEO of a 75-lawyer law firm and the COO of a 370-lawyer regional law firm, both headquartered in Portland, Oregon. In these firms, I confronted and assisted in the resolution of numerous ethical issues.

As a result of my various positions as a practicing lawyer, law firm manager (CEO and COO), law school professor teaching ethics, and a law firm consultant, I have substantial familiarity with the administration of the rules of professional conduct.

During the period of time that I was a practicing lawyer, I was the President of the Maine State Bar Association, the Maine Bar Foundation, and the American Bar Association ("ABA"). While serving as President of the ABA, I appointed a committee to revisit Model Rule 1.6 for consideration of possible amendments. The current version of Rule 1.6 is a result of this Committee's recommendations. Prior to serving as President, I was chair of the ABA's Pro Bono Committee. I was the primary author of and floor manager for Model Rule 6.1.

As a former ABA president, I am a life-long member of the ABA's House of Delegates. I have personally participated in the debates which amended Model Rules.

Presently, I am a member of the American Law Institute, which drafts the various restatements including the Restatement of the Law Governing Lawyers. I recently served a three-year term as a member of the ABA's Standing Committee on Ethics and Professional Responsibility. This committee issues ethics opinions interpreting both the Model Rules of

Professional Conduct and the Model Code of Judicial Conduct. Additionally, the Committee reviews and proposes amendments of the Model Rules to the ABA's House of Delegates. I have prepared, with others, amendments to the Model Rules 1.4 and 5.5.

  I have participated in numerous CLE panels and delivered many presentations focused on legal ethics and professional responsibility. I received a B.A. from the University of Michigan in 1970 as well as a J.D. in 1973, before returning to my home state of Maine to practice law.

  Attached as Exhibit A-1 is a list of my Honors, Service to the Community, and a few of my more recent presentations.

# EXHIBIT A-1

***HONORS:***

    2014 A.W. Brian Simpson Memorial Award, Student Funded Fellowships (SFF) University of Michigan Law School

    2005 Distinguished Service Award, The National Judicial College

    Muskie Access to Justice Award, The Muskie Fund for Legal Service

    Special Award for Support of Military Reservists, Standing Committee of Legal Aid to Military

    Muskie Award for Public Service, American Bar Association

    Honorary Degree, Suffolk University School of Law, Boston, Massachusetts

    Honorary Degree, Willamette College of Law, Salem, Oregon

    Honorary Degree, University of Denver School of Law

    Fellow, Maine Bar Foundation

    Howard Dana Pro Bono Award, Maine Bar Foundation

    Reece Smith Special Service Award, National Association of Pro Bono Coordinators

    Fellow and State Chairperson, American Bar Foundation

    Joint Legislative Resolution honoring contributions made to community and legal profession, Maine Senate and Maine House of Representatives

    Award for support of Pro Bono Legal Services, Voluntary Legal Services of Northern California

    Award of Honor, Armenian Assembly of America

    Award for promotion of equal access to justice, American Bar Association Fund for Justice and Education

    Listed in Who's Who in America

    Listed in Who's Who in American Law

***SERVICE TO THE COMMUNITY:***

- Member, Board of Directors of Pine Tree Legal Assistance, Inc.
- President, Maine Jewish Museum Board of Directors
- Member, Board of Visitors, Lewis and Clark Law School
- Member, Campaign Cabinet, United Way of the Columbia-Willamette
- Board of Trustees, Oregon Independent College Foundation, Inc.
- Member, Board of Directors, National Constitution Center
- Member, Dean's Advisory Council, University of Michigan Law School
- Chair, Board of Trustees, Breakwater School
- Member, Vice-Chair, Zoning Board of Appeals, Town of Cape Elizabeth, Maine
- Member, AVVO Advisory Board

***RECENT PRESENTATIONS:***

<u>AFL/CIO Lawyers Conference</u>: Moderator – I Should Have Just Stayed at Home – The Unauthorized Practice of Law

<u>Maine State Bar Association Annual Meeting</u>: Speaker – The Disruption of the Legal Profession

<u>College of Management Academic Studies, Israel</u>: Speaker – The Future of the Legal Profession: A Global View

<u>University of Michigan Law School</u>: Speaker – The Future of the Legal Profession: Scarier than you Think

<u>National Conference of Bar Presidents</u>: Speaker – The Future of the Legal Profession: Why You Should Be Afraid (annual program)

<u>The David Weiner Center for Lawyer's Ethics and Professional Responsibility</u>: Keynote Speaker – The Future of the Legal Profession