# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

          *Plaintiff*,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

          *Defendants*.

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

  A. Susman Godfrey LLP ..........................................................................3

  B. The Executive Order and Accompanying "Fact Sheet" .............................5

  C. Prior Executive Orders Attacking Law Firms .............................................7

  D. The Order Threatens Immediate Irreparable Harm and Is Temporarily Enjoined by This Court .................................................10

LEGAL STANDARD ..........................................................................................................13

ARGUMENT .......................................................................................................................13

  I. SUSMAN GODFREY IS ENTITLED TO SUMMARY JUDGMENT ..............13

   A. The Order Violates the First Amendment....................................................14

    1. The Order Retaliates in Violation of the First Amendment..........14

    2. The Order Constitutes Impermissible Viewpoint Discrimination................................................................................18

    3. The Order Violates the Petition Clause .......................................22

    4. The Order Abridges Freedom of Association................................22

   B. The Order Violates Susman Godfrey's Right to Due Process.................23

    1. The Order Deprives Susman Godfrey of Protected Liberty and Property Interests With No Process Whatsoever .................24

    2. The Order Is Impermissibly Vague..............................................27

   C. The Order Violates Susman Godfrey's Right to Equal Protection of the Laws .................................................................................................28

   D. The Order Violates Susman Godfrey's Clients' Due Process Right to Counsel .....................................................................................................29

   E. The Order Exceeds the President's Statutory and Constitutional Authorities and Violates the Separation of Powers .....................................30

   F. The Government's Piecemeal Efforts to Salvage the Order Lack Merit..............................................................................................................33

  II. SUSMAN GODFREY IS ENTITLED TO PERMANENT RELIEF...................40

   A. The Order Inflicts Irreparable Harm that Cannot Be Adequately Addressed by Remedies at Law.....................................................................41

   B. The Balance of Equities and Public Interest Strongly Favor a Permanent Injunction..................................................................................44

**<u>TABLE OF CONTENTS</u>**
**<u>(continued)</u>**

<u>**Page**</u>

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allen v. City of Louisiana*,
103 U.S. 80 (1880)................................................................................33

*Am. Airways Charters, Inc. v. Regan*,
746 F.2d 865 (D.C. Cir. 1984)................................................................30

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................................23

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
64 F.4th 1354 (D.C. Cir. 2023)........................................................41, 44

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................13

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)..........................................................14, 17

*Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*,
280 F. Supp. 3d 59 (D.D.C. 2017)...........................................................41

*Baggett v. Bullitt*,
377 U.S. 360 (1964)................................................................................27

*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996)..........................................................................38, 39

*Bill Johnson's Rests., Inc. v. NLRB*,
461 U.S. 731 (1983)................................................................................15

*Bolling v. Sharpe*,
347 U.S. 497 (1954)................................................................................28

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)................................................................................22

*Brock v. Roadway Express*,
481 U.S. 252 (1987)................................................................................26

*Broudy v. Mather*,
460 F.3d 106 (D.C. Cir. 2006)................................................................22

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)................................................................................22

iii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989)...................................................................................30

*Chambers v. NASCO*,
    501 U.S. 32 (1991)....................................................................................32

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)..................................................................41

*Cigar Ass'n of Am. v. FDA*,
    317 F. Supp. 3d 555 (D.D.C. 2018)..........................................................41

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..................................................................................29

*Costa v. Bazron*,
    456 F. Supp. 3d 126 (D.D.C. 2020)..........................................................44

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)..................................................................................21

* *Dep't of Navy v. Egan*,
    484 U.S. 518 (1988)................................................................35, 36, 37, 38

*Doe 1 v. Trump*,
    275 F. Supp. 3d 167 (D.D.C. 2017), *vacated on other grounds*, 755 F. App'x
    19 (D.C. Cir. 2019)...................................................................................42

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009)..................................................................15

*Ex parte Burr*,
    22 U.S. (9 Wheat.) 529 (1824)..................................................................32

*Ex parte Quirin*,
    317 U.S. 1 (1942).....................................................................................31

* *FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..............................................................................25, 27

*FDIC v. Mallen*,
    486 U.S. 230 (1988)..................................................................................25

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010)..................................................................................................32

*Fuentes v. Shevin*,
 407 U.S. 67 (1972)....................................................................................................26

*Garcetti v. Ceballos*,
 547 U.S. 410 (2006)..................................................................................................38

*Gill v. DOJ*,
 875 F.3d 677 (D.C. Cir. 2017)..................................................................................37

*Goodyear Tire & Rubber Co. v. Haeger*,
 581 U.S. 101 (2017)..................................................................................................32

*Gordon v. Holder*,
 721 F.3d 638 (D.C. Cir. 2013)..................................................................................42

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)..................................................................................................28

*Heffernan v. City of Paterson, N.J.*,
 578 U.S. 266 (2016)..................................................................................................14

*Hegab v. Long*,
 716 F.3d 790 (4th Cir. 2012) ....................................................................................37

*Holcomb v. Powell*,
 433 F.3d 889 (D.C. Cir. 2006)..................................................................................13

*Honeywell, Inc. v. Consumer Prod. Safety Comm'n*,
 582 F. Supp. 1072 (D.D.C. 1984).............................................................................42

*Houston Cmty. Coll. Sys. v. Wilson*,
 595 U.S. 468 (2022)............................................................................................14, 16

*Janus v. AFSCME, Council 31*,
 585 U.S. 878 (2018)..................................................................................................39

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
 341 U.S. 123 (1951)..................................................................................................33

*Karem v. Trump*,
 960 F.3d 656 (D.C. Cir. 2020) ..................................................................................42

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kartseva v. Dep't of State,*
  37 F.3d 1524 (D.C. Cir. 1994) ...................................................................................... 24

*Kentucky v. Biden,*
  57 F.4th 545 (6th Cir. 2023) ......................................................................................... 40

*Kucana v. Holder,*
  558 U.S. 233 (2010) ...................................................................................................... 40

*Laird v. Tatum,*
  408 U.S. 1 (1972) .......................................................................................................... 14

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 44, 45

* *Lee v. Garland,*
  120 F.4th 880 (D.C. Cir. 2024) ................................................................... 35, 36, 37, 38

* *Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001) ............................................................................................. *passim*

*Logan v. Zimmerman Brush Co.,*
  455 U.S. 422 (1982) ...................................................................................................... 23

*Lozman v. Riviera Beach,*
  585 U.S. 87 (2018) ........................................................................................................ 22

*Luokung Tech. v. Dep't of Def.,*
  538 F. Supp. 3d 174 (D.D.C. 2021) .............................................................................. 43

*Mann v. WMATA,*
  185 F. Supp. 3d 189 (D.D.C. 2016) .............................................................................. 43

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ...................................................................................................... 18

*McDonald v. Smith,*
  472 U.S. 479 (1985) ...................................................................................................... 15

*Mills v. District of Columbia,*
  571 F.3d 1304 (D.C. Cir. 2009) .................................................................................... 41

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
  526 U.S. 172 (1999) ................................................................................................. 31, 33

vi

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*NAACP v. Button*,
371 U.S. 415 (1963)...............................................................................20, 22

*Nalco Co. v. EPA*,
786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................43

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
2025 WL 573764 (D. Md. Feb. 21, 2025) ..........................................19

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001)............................................................27

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
983 F.2d 286 (D.C. Cir. 1993)......................................................35, 36

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998)..........................................................41

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)............................................................................20

*News Am. Pub. v. FCC*,
844 F.2d 800 (D.C. Cir. 1988)............................................................29

*Nieves v. Bartlett*,
587 U.S. 391 (2019)............................................................................14

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)............................................................................32

* *NRA v. Vullo*,
602 U.S. 175 (2024).....................................................................*passim*

*O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998)....................................................24, 25

*O'Hare Trucking Serv., Inc. v. City of Northlake*,
518 U.S. 712 (1996)............................................................................38

*Penson v. Ohio*,
488 U.S. 75 (1988)..............................................................................45

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009)............................................................................34

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Powell v. Alabama*,
    287 U.S. 45 (1932).................................................................................29, 30

*In re Primus*,
    436 U.S. 412 (1978)..................................................................................21

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................45

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ..................................................................26

*Ramirez v. ICE*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ............................................................45

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..............................................................................18, 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..............................................................................19, 38

*Ryan v. Reno*,
    168 F.3d 520 (D.C. Cir. 1999) ..................................................................35

*Schware v. Bd. of Bar Exam'rs*,
    353 U.S. 232 (1957)..................................................................................24

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)..................................................................................31

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ..................................................................27

*Sioux Tribe of Indians v. United States*,
    316 U.S. 317 (1942)..................................................................................31

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)..................................................................................20

*State of Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) .......................................................................40

*Stern v. Marshall*,
    564 U.S. 462 (2011)..................................................................................32

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Swanson v. City of Chetek*,
  719 F.3d 780 (7th Cir. 2013) ................................................29

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020) ..........................................43

*Toolasprashad v. Bureau of Prisons*,
  286 F.3d 576 (D.C. Cir. 2002) ..............................................39

*Toxco Inc. v. Chu*,
  724 F. Supp. 2d 16 (D.D.C. 2010) ......................................25, 26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .........................................................30

*Trentadue v. Integrity Comm.*,
  501 F.3d 1215 (10th Cir. 2007) ............................................22

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .........................................................31

*Turner v. Rogers*,
  564 U.S. 431 (2011) .........................................................30

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) .........................................................30

*UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*,
  72 F.3d 1243 (6th Cir. 1996) ...............................................26

*UAW-Lab. Emp. & Training Corp. v. Chao*,
  325 F.3d 360 (D.C. Cir. 2003) ..............................................40

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) ............................................15

*United States v. O'Brien*,
  391 U.S. 367 (1968) .........................................................18

*United States v. Williams*,
  553 U.S. 285 (2008) .........................................................27

* *USAID v. All. for Open Soc'y Int'l*,
  570 U.S. 205 (2013) .................................................. *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Vill. of Hoffman Est. v. Flipside, Hoffman Est.*,
    455 U.S. 489 (1982)..........................................................................................27

\* *Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000)...................................................................................28, 29

*Webster v. Doe*,
    486 U.S. 592 (1988)...................................................................................35, 37

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..........................................................................................40

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)..............................................................................................44

\* *Wisconsin v. Constantineau*,
    400 U.S. 433 (1971)...................................................................................25, 34

*Wounded Knee Legal Def./Offense Comm. v. FBI*,
    507 F.2d 1281 (8th Cir. 1974) .........................................................................30

*Xiaomi Corp. v. Dep't of Def.*,
    2021 WL 950144 (D.D.C. Mar. 12, 2021)..................................................42, 43

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................31

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)..............................................................................................31

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) .............................................................................................13

**STATE RULES**

D.C. R. Prof'l Conduct 1.3 ...................................................................................45

**FEDERAL REGULATIONS**

Executive Order 14263, 90 Fed. Reg. 15615 (Apr. 15, 2025)............................... *passim*

Executive Order 14173 (Jan. 21, 2025) .................................................................40

x

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ............................................................................................ *passim*

U.S. Const. amend. V........................................................................................... *passim*

U.S. Const. art. II, § 3 ..................................................................................................31

## INTRODUCTION

The April 9, 2025 Executive Order entitled "Addressing Risks from Susman Godfrey" attacks Susman Godfrey for advocacy on behalf of clients and causes that have drawn the President's ire. Bedrock constitutional principles forbid this brazen, unprecedented assault on the independent bar, the independent Judiciary, and the rule of law. Nothing in our Constitution or laws grants a President the power to punish attorneys for advocating on behalf of clients and petitioning the courts. To the contrary, the specific provisions and overall design of our Constitution were adopted in large measure to ensure that no president could abuse the weighty power of the presidency as this President seeks to do.

On April 15, 2025, this Court temporarily enjoined the Order, concluding that it blatantly violated the First and Fifth Amendments. Each similar executive order that has been challenged by a targeted law firm—so far, the firms of Perkins Coie, Jenner & Block, and WilmerHale—has met the same fate. Memorandum Order at 2, *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10 ("*Wilmer* TRO"); Tr. of TRO Hearing 74:7-21, *Perkins Coie LLP v. DOJ*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22 ("*Perkins* Tr."); Order, *Jenner & Block LLP v. DOJ*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9 ("*Jenner* TRO"). That is unsurprising: each such order is a transparent attempt to chill protected advocacy with which the President disagrees and to undermine the independence of the bar. As this Court put it, "allowing the government to coerce private businesses, law firms and lawyers solely on the basis of their views is antithetical to our constitutional republic and hampers this Court and every court's ability to adjudicate its cases." Tr. of TRO Hearing 52:10-14 (Apr. 15, 2025), ECF No. 19 ("Tr.").

The Court should now enter judgment for Susman and issue injunctive relief that puts a stop to the President's unprecedented abuse of the powers of his office. Section 1 of the Order

baselessly accuses Susman of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections," "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," and "support[ing] efforts to discriminate on the basis of race."  Order § 1.  The Order then directs government officials to take several punitive actions premised on Section 1's findings.  Section 2 directs federal officials to "immediately . . . suspend any active security clearances held by individuals at Susman" and review whether they should be permanently revoked.  *Id*. § 2(a).  Section 3 directs federal agencies to "require Government contractors to disclose any business they do with Susman" and instructs agency heads to review those contracts and seek to terminate them.  *Id*. § 3.  Finally, Section 5 directs federal officials to restrict Susman employees' access to "Federal Government buildings"; stop "engaging with Susman employees"; "refrain from hiring" them, absent a special waiver; and "expeditiously cease" providing any "Government goods, property, material, [or] services" that "benefit" Susman.  *Id*. §§ 2(b), 5.

Together and separately, those provisions violate a raft of constitutional provisions.  The Order violates the First Amendment by retaliating for protected advocacy with which the President takes issue, most notably Susman's representation of Dominion Voting Systems and state election officials in litigation defending the integrity of the 2020 presidential election.  *See NRA v. Vullo*, 602 U.S. 175, 188 (2024); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546-48 (2001).  The Order violates due process and equal protection principles, including by imposing severe consequences without notice or any opportunity to be heard; using vague language that does not inform Susman or its clients of what claimed conduct gave rise to the Order's unprecedented sanctions and how those sanctions apply; and singling out Susman based on its representation of disfavored clients and advocacy of disfavored causes.  The Order also violates Susman's clients'

Fifth Amendment right to counsel. And the Order violates the separation of powers because the President lacks constitutional or statutory authority to issue the Order, and its provisions constitute a direct attack on the Judiciary's independence.

Susman easily satisfies the remaining requirements for permanent injunctive relief. The Order will cause Susman irreparable harm absent relief, both because the ongoing violation of its constitutional rights is irreparable and because the very purpose of the Order is to tarnish Susman's reputation, permanently damage its relationships with clients, and inflict irreparable economic harm. Among other things, the Order directs government contractors to disclose their association with Susman so as to bring about the end of those associations; directs agencies to bar the doors to government buildings and limit engagement with Susman; and directs an immediate security clearance review on the ground that Susman has acted against the "interests of the United States." Each of those provisions, together with the purported findings made in Section 1 of the Order, seeks to choke off Susman's ability to attract, retain, and represent clients. The Order's goal of driving Susman out of business could hardly be more apparent.

The equities and public interest also tilt decisively in favor of permanent relief. Although Susman faces constitutional, reputational, and economic injuries, the government would suffer no injury if prevented from implementing this unconstitutional order. The public interest demands enjoining the Order, when its avowed purpose and effect is to chill politically disfavored legal advocacy and vitiate Susman's ability to independently advocate for clients before the courts, including clients whom the government disfavors. The Court should grant summary judgment in Susman's favor and permanently enjoin the Order's implementation.

## **BACKGROUND**

### A.    **Susman Godfrey LLP**

Susman Godfrey is widely regarded as the Nation's foremost trial firm. *See* Statement of

Undisputed Material Facts ("SOF") ¶¶ 1-5.  Since Stephen Susman founded the Firm in 1980, the Firm has grown to employ over 230 of the country's most talented trial attorneys, spread across offices in Houston, Los Angeles, New York, and Seattle.  *Id.* ¶ 2.  Today, Susman is one of the top 100 revenue-generating law firms in the United States—and one of only a handful of those top 100 that do not practice transactional law.  *Id.* ¶ 4.

Susman's lawyers constantly appear in federal forums.  Despite the Firm's relatively small size, it has hundreds of active matters before the federal courts and federal agencies; those federal matters represent more than a third of all active matters at the Firm.  *Id.* ¶¶ 23, 178.  Already this year, Susman attorneys have made dozens of in-person appearances in federal court, and the Firm currently has at least seven cases scheduled to go to trial in federal court within the next six months, with many more federal cases awaiting trial dates.  *Id.* ¶ 24.  Because trial litigation is the heart of Susman's practice, such federal appearances are critical to the interests of Susman clients and thus vital to the Firm's reputation and its ability to practice law.

Susman's service to its clients also requires its lawyers to interact extensively with the federal government in other ways.  *Id.* ¶¶ 20, 25-26, 30-48.  For example, Susman does substantial work on behalf of whistleblowers in actions under the False Claims Act, and those representations require extensive contact with U.S. Attorney's Offices.  *Id.* ¶¶ 30-38.  Susman also represents parties before the U.S. International Trade Commission, which requires frequent interactions with investigative attorneys for the Commission's Office of Unfair Import Investigations, and represents clients in proceedings before the Patent Trial and Appeal Board.  *Id.* ¶¶ 39-43.  Across its practice areas, Susman has numerous meetings with federal-government personnel scheduled in the coming months.  *Id.* ¶¶ 24-25.  Susman cannot effectively fulfill its obligations to its clients if it cannot interact with federal officials and appear in federal agency proceedings.

Susman does not shy away from controversial legal work or from taking on powerful companies and institutions—including the federal government.  Susman represented various State officers in their official capacities in defending the results of the 2020 election.  *Id.* ¶¶ 66-68.  And Susman has represented Dominion Voting Systems in defamation actions against Fox News and Fox News Corporation for false statements about Dominion relating to the 2020 election.  *Id.* ¶¶ 56-60.  In 2023, that litigation resulted in a historic $787 million settlement, believed to be the largest publicly known defamation settlement involving a media company in U.S. history.  *Id.* ¶ 59.

Susman continues to represent Dominion today.  That representation includes ongoing defamation lawsuits against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network—all prominent supporters of President Trump.  *Id.* ¶ 65. The Firm also is currently representing Dominion in a case against Newsmax Media for false and defamatory broadcasts accusing Dominion of voter fraud and rigging the 2020 presidential election.  *Id.* ¶ 61.  Indeed, on April 9, 2025, mere hours before the Order targeting Susman issued, the court in that case ruled on summary judgment that Newsmax had made false and defamatory statements about Dominion and the 2020 election.  *Id.* ¶¶ 62-63.

### B.    The Executive Order and Accompanying "Fact Sheet"

On April 9, 2025, President Trump issued Executive Order 14263, titled "Addressing Risks From Susman Godfrey," as well as an accompanying "Fact Sheet."  90 Fed. Reg. 15615 (Apr. 15, 2025) ("Order"), Ex. 1; *see* Ex. 2 ("Fact Sheet"); SOF ¶¶ 155-56.[1]  Susman received no notice whatsoever prior to issuance of the Order or Fact Sheet; no one from the White House reached out to Susman in advance to discuss the Order or try to extract any kind of settlement.  SOF ¶ 157.

---

[1] All numbered exhibits are attached to the accompanying Declaration of Ginger D. Anders.

Section 1 of the Order asserts that "action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP." Order § 1. According to Section 1, Susman "spearheads efforts to weaponize the American legal system and degrade the quality of American elections"; "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; and "supports efforts to discriminate on the basis of race," among other things. *Id.* Section 1 also states that "Susman itself engages in unlawful discrimination" and offers "employment opportunities only to 'students of color.'" *Id.* The "Fact Sheet" echoes those allegations, branding Susman a "rogue law firm[]" and declaring that the Firm leads "efforts to weaponize the American legal system and degrade the quality of American elections." Fact Sheet.

Section 2 of the Order directs the Attorney General, the Director of National Intelligence, and all other relevant agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." Order § 2(a). Section 2 further instructs agencies to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman" and to "expeditiously cease such provision." *Id.* § 2(b).

Section 3 of the Order is focused on disrupting Susman's relationships with government contractors. That provision directs federal agencies to "require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract." *Id.* § 3(a). Section 3 further directs federal agencies to "take appropriate steps to terminate any contract . . . for which Susman has been hired" by a contractor or by the government "to perform any service" and to "otherwise align their agency funding decisions" with

6

the "goals and priorities of [the] Administration." *Id.* § 3(b); *see* Fact Sheet ("Federal Government will terminate contracts that involve Susman"). Within 30 days of the Order's issuance, agencies must provide the Office of Management and Budget ("OMB") with a report on contract terminations or other actions taken under Section 3. Order § 3(b).

Section 4 of the Order is aimed at Susman's hiring and other employment actions. That section provides that "nothing in this order shall be construed to limit" the language in the Perkins Coie order, Ex. 12 ("Perkins Order"), directing the EEOC Chair to review and the Attorney General to investigate law firms' employment practices. *Id.* § 4.

Section 5 of the Order imposes restrictions on Firm members' access to federal buildings, officials, and employment opportunities. Section 5 directs federal agencies to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* § 5(a). Section 5 also requires agencies to "provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States." *Id.* Finally, Section 5 instructs agency officials to "refrain from hiring employees of Susman, absent a waiver . . . that such hire will not threaten the national security of the United States." *Id.* § 5(b). The Fact Sheet underscores those restrictions, stating that "[t]he Federal Government will . . . restrict [Susman's] employees' access to government buildings" and "will also refrain from hiring Susman employees unless specifically authorized." Fact Sheet.

### C.    Prior Executive Orders Attacking Law Firms

The Order follows on the heels of similar executive orders issued by President Trump attacking law firms. Earlier this year, President Trump told Fox News that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people." SOF ¶ 119;

Ex. 29.  Days later, the President made numerous similar statements threatening supposedly "crooked law firms" and "violent, vicious lawyers" who oppose him.  *Id.* ¶ 120; Ex. 30.

Those were not empty threats.  On February 25, 2025, the President issued the first of a series of executive orders and memoranda targeting law firms.  SOF ¶ 70; *see* Ex. 10.  He took aim at Covington & Burling LLP because the firm had represented Jack Smith, the Special Counsel who brought criminal charges against then-former President Trump in the wake of Trump's efforts to challenge the 2020 election results.  SOF ¶¶ 70-71.  The resulting memorandum stripped security clearances held by "all members, partners, and employees . . . who assisted former Special Counsel Jack Smith during his time as Special Counsel."  *Id.* ¶ 72.

Similarly retaliatory orders issued in the weeks that followed.  The President imposed a range of penalties on Perkins Coie LLP on the ground that it "represent[ed] failed Presidential candidate Hillary Clinton" and "worked with activist donors" to challenge "election laws."  *Id.* ¶¶ 73-82.  He imposed similar sanctions on Jenner & Block LLP ("Jenner Order"), Ex. 21, asserting that Jenner "abus[es] its pro bono practice" by "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex" and "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," SOF ¶¶ 101-04.  And the President issued a similar order attacking WilmerHale ("Wilmer Order"), Ex. 25, accusing it of supposedly "engag[ing] in obvious partisan representations," "support[ing] efforts to discriminate on the basis of race," and "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote," SOF ¶¶ 110-13.

The President also has entered into "settlements" with law firms in order to relieve them of the crushing harms associated with a retaliatory executive order.  *Id.* ¶¶ 92-97, 123-47.  On

March 20, 2025, the President rescinded an executive order against Paul, Weiss, Ex. 18; *see* Ex. 16, that was similar to the orders described above, stating that he was doing so "in light of a meeting with [the firm's] Chairman, Brad Karp, during which Mr. Karp" allegedly "acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice" and made other concessions, SOF ¶¶ 88, 92-97.  The President also withdrew the threat of executive orders against Skadden Arps, Willkie Farr & Gallagher, and Milbank after those firms each agreed to provide $100 million in pro bono work for causes approved by the President; to commit to pro bono activities that "represent the full political spectrum, including Conservative ideals"; and to "strong[ly] commit[] to ending the Weaponization of the Justice System and the Legal Profession." *Id.* ¶¶ 123-38.

Two days after issuing the Order at issue here, the President announced that five more law firms had agreed to similar deals, which include not only promises of certain pro bono work but also promises of "other free Legal services" for the President. *Id.* ¶¶ 140-41.  Four of those firms— Kirkland & Ellis, Allen Overy Shearman Sterling, Simpson Thacher & Bartlett, and Latham & Watkins—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono and other free Legal services[] . . . to causes that President Trump and the Law Firms both support and agree to work on." *Id.* ¶ 141.  The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences." *Id.* The President announced that the EEOC had concurrently "withdrawn" letters concerning the firms' employment practices and would "not pursue any claims related to those issues." *Id.* ¶ 142.  The fifth firm, Cadwalader, Wickersham & Taft LLP, made similar "commitments," agreeing to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support." *Id.* ¶¶ 143-44.

The four firms that have challenged the executive orders rather than "settling" with the

9

President have obtained TROs in short order.  On March 12, 2025, a court in this District (Howell, J.) issued a TRO against the Perkins Order, holding that Perkins is likely to prevail in establishing that the order violates "at least" the First, Fifth, and Sixth Amendments.  *Perkins* Tr. 74:7-21.  Judge Howell described the order as an "effort to intimidate" attorneys that "casts a chilling harm . . . of blizzard proportions across the entire legal profession."  *Id*. at 95:22-24, 96:1-2.  Courts in this District likewise issued TROs against the Jenner Order (Bates, J.) and the Wilmer Order (Leon, J.).  In Wilmer's case, Judge Leon concluded that "[t]here is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm."  *Wilmer* TRO at 2.

**D.    The Order Threatens Immediate Irreparable Harm and Is Temporarily Enjoined by This Court**

1.    The Order targets Susman's attorney-client relationships and representations, at the expense of the Firm's attorneys and its clients.  As this Court recognized, the resulting irreparable harm is clear—even beyond the inherent irreparable harm associated with a violation of First Amendment or other constitutional rights.  *See* Tr. 48:11-50:25.

First, the Order's direction that agencies restrict Susman employees from accessing federal buildings and restrict federal officials from meeting or otherwise "engaging" with Susman employees, Order § 5, immediately and irreparably harms both the Firm's legal practice and its clients' interests, SOF ¶¶ 171-225.  To practice law, Susman attorneys must be able to access federal buildings and interact with federal officials just as other attorneys do.  *Id.* ¶¶ 175-79.

Even the threat that the Firm's ability to freely access federal officials and buildings could be cut off creates intolerable uncertainty that interferes with the Firm's attorney-client relationships and undermines its ability to enter new ones.  *Id.* ¶¶ 179, 220.  Moreover, there is every reason to think that Susman attorneys would lose that ability if the Order were to go into effect.  *See* Fact Sheet ("The Federal Government *will* . . . restrict [Susman's] employees' access

to government buildings." (emphasis added)). When White House Staff Secretary Will Scharf handed President Trump the Order to sign, Mr. Scharf stated that "[t]his is an executive order that takes certain measures against Susman Godfrey to ensure that they can't access government resources, government buildings." SOF ¶ 160. And firms subject to previous executive orders were quickly excluded from planned meetings with federal officials. *See, e.g.*, *Wilmer* TRO at 4 ("[S]ince the Executive Order issued, the federal government has already cancelled two meetings with plaintiff's attorneys, at the last minute and without explanation.").

Second, even beyond that serious problem, the Order discourages clients with federal government contracts or work involving classified information from continuing their relationships with Susman or beginning new relationships. The Order forces government contractors to disclose any relationship they have with the Firm and directs agencies to *terminate contracts* with contractors who have hired Susman to perform any contract-related service. Order § 3. Based on those provisions, since the signing of the Order, Susman clients have inquired about the effects of the Order and whether the Order hampers Susman's ability to access the federal courts or could negatively affect Susman's continued representation. SOF ¶ 223. By provoking those discussions, the Order has resulted in harassment and harm to Susman and its clients. The Order also directs agencies to "immediately" work to "suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." Order § 2. For matters involving classified information—which Susman has handled in the past, and expects to handle again in the future, SOF ¶¶ 198-200—that provision casts doubt on Susman's ability to serve its clients' needs, *id.* ¶ 201.

The Order's directives are intended to force clients to replace Susman with other counsel. Other targeted firms have already seen that dynamic play out. After the Perkins Order issued,

11

agencies began reaching out to government contractors, directing them to disclose their relationship with Perkins, *Perkins* Tr. 105:2-4, and Perkins immediately experienced attrition, *see* Ex. 56 ¶ 29 (Declaration of David J. Burman). The Order here seeks the same end. For many Firm clients, the existence of their relationship with Susman is nonpublic. SOF ¶ 190. Disclosing that association could well subject clients to reprisal, including cancellation of lucrative government contracts.

Finally, the Order harms the Firm's reputation and its business. It contains nakedly false, inflammatory statements about the Firm—ones that come directly from the President of the United States. *See, e.g.*, Order § 1 (accusing Susman of "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military"). Those falsehoods tarnish Susman's good name, thereby discouraging existing clients from continuing to work with the Firm and dissuading potential clients from retaining the Firm. SOF ¶¶ 214-16. The Order's other provisions only compound the risks for Susman's business. By impugning the Firm and attempting to interfere with Susman's ability to provide high-quality representation, the Order disincentivizes clients from choosing Susman over its competitors and threatens the Firm's bottom line. *Id.* ¶ 214.

Other cases involving law firm executive orders, in which government actors have seized on the orders in taking action involving those firms, help demonstrate the serious harms here. Defendants have made it crystal clear that they expect to find a way to punish law firms such as Susman, one way or another. *See* Status Report, Att., *Perkins Coie LLP v. DOJ*, No. 25-cv-716 (D.D.C. Mar. 20, 2025), ECF No. 32-1 (explaining in guidance issued after the *Perkins* TRO that the "government reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie LLP"); Status Report, Ex. 1, *Jenner & Block LLP v. DOJ*, No. 25-cv-916 (D.D.C. Apr. 8, 2025), ECF No. 21-1 (similar reservation as to Jenner,

which the post-TRO guidance calls a "law firm committed to the weaponization of justice, discrimination on the basis of race, radical gender ideology, and other anti-American pursuits").

2.  Susman filed this suit on Friday, April 11, 2025 and moved for a TRO on Monday, April 14.  Although the complaint challenges the entire Order, the Firm sought a TRO as to only Sections 1, 3, and 5 because those sections threatened the most immediate harm.

On April 15, this Court temporarily restrained enforcement of Sections 1, 3, and 5.  Tr. 42:12-54:21.  The Court concluded that the Firm is likely to succeed on a number of its claims, including its claims that (a) the First Amendment by retaliating based on protected First Amendment activities and discriminating based on viewpoint; (b) the right to due process both by depriving the Firm of protected liberty and property interests with no process and because the Order is impermissibly vague; (c) the right to equal protection; and (d) Susman's clients' right to counsel.  *Id.* at 43:20-48:10.  The Court further concluded that Susman demonstrated an irreparable injury absent relief, *id.* at 48:11-50:25, and that the balance of the equities and the public interest counseled in favor of blocking the Order, *id.* at 51:1-52:24.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'"  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Here, no genuine factual dispute exists, and summary judgment in favor of the Firm is warranted.

## ARGUMENT

## I.    SUSMAN GODFREY IS ENTITLED TO SUMMARY JUDGMENT

This Court has already observed that the "framers of our Constitution would see [the Order]

13

as a shocking abuse of power." Tr. 51:19-21. The undisputed facts establish that the Order violates the Constitution many times over.

### A.    The Order Violates the First Amendment

The Order brazenly violates the First Amendment in four respects. It retaliates against the Firm and its clients for their constitutionally protected expression, including advocacy in court; it constitutes pernicious viewpoint discrimination against the speech of the Firm and its clients; it restricts the Firm's right to petition the government; and it violates the Firm's freedom of association by driving a wedge between the Firm and its clients.

### 1.    The Order Retaliates in Violation of the First Amendment

It is bedrock law that government officials may not "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. The First Amendment "prohibits government officials" from retaliating "after the fact" based on "protected speech," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citing *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)), as well as from taking actions designed to coerce or chill speech in the future, *Vullo*, 602 U.S. at 189; *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations" in response to protected expression). That principle applies to retaliation based not only on a target's actual expressions, but also on its viewpoint as *perceived* by the government—even if that perception is inaccurate. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016).

This is as clear a case of unconstitutional retaliation as this Court will ever see. To prevail on that claim, Susman must establish that it engaged in conduct protected under the First Amendment; that a causal link exists between that exercise of a constitutional right and adverse government action; and that the adverse action is sufficient to deter a person of ordinary firmness from speaking again. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The Order here satisfies

every element on its face.  It unapologetically—and severely—punishes Susman for its attorneys'

advocacy on behalf of clients and causes that anger the President.  And it does so for the avowed

purpose of deterring Susman and other law firms from engaging in that sort of protected conduct.

First, Susman's advocacy on behalf of its clients, advice to its clients, and petitioning of

the courts self-evidently constitute "constitutionally protected expression" that "implicat[es]

central First Amendment concerns."  *Velazquez*, 531 U.S. at 547-48; *see McDonald v. Smith*, 472

U.S. 479, 484 (1985); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983).  It is equally

beyond dispute that the First Amendment prohibits the government from deeming certain legal

positions, otherwise permissible in court, to be off limits or to be grounds to punish the lawyers

taking those positions.  *See Velazquez*, 531 U.S. at 546-48 (First Amendment violation where

statute "exclude[d] from litigation those arguments and theories Congress finds unacceptable but

which by their nature are within the province of the courts"); *Ukrainian-Am. Bar Ass'n, Inc. v.*

*Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) (First Amendment "violated if the Government

affirmatively interferes with constitutionally protected litigation"); *Eng v. Cooley*, 552 F.3d 1062,

1069 (9th Cir. 2009) ("state action designed to retaliate against and chill an attorney's advocacy

for his or her client strikes at the heart of the First Amendment" (alterations adopted)).

Second, the face of the Order makes the causal link between the Order's punishments and

Susman's protected advocacy unmistakably clear.  There is no need here to infer retaliatory motive

from circumstantial evidence.  The Order itself *announces* that motive:  it is animated by Susman's

supposed "efforts to weaponize the American legal system and degrade the quality of American

elections" and the Firm's work on behalf of "clients" whom the President has deemed at odds with

unspecified "American interests."  Order § 1.  The Order's assertion that Susman has engaged in

"efforts" that "degrade the quality of American elections" is transparently a reference to Susman's

representation of Dominion Voting Systems in connection with Fox News' claims that Dominion attempted to influence the 2020 election against President Trump, as well as Susman's representation of state elections officials in litigation defending the integrity of the 2020 election. *See* Tr. 44:23-25 ("[T]he retaliatory nature of the executive order is plain from the language of the EO."); *see also* SOF ¶¶ 56-68 (describing Susman's election-related representations).

Context provides corroboration. The Order is one of several targeting law firms that have represented the President's perceived political and personal opponents or have employed lawyers who have undertaken public representations adverse to the President. SOF ¶¶ 69-97, 101-15; *see* Tr. 45:1-3 ("The order against Susman is not the first of its kind, it follows orders against Paul Weiss, WilmerHale, Perkins Coie and others."). Each order is equally upfront about its retaliatory nature. *See, e.g.*, *Wilmer* TRO at 2 ("The retaliatory nature of the Executive Order at issue here is clear from its face."); Tr. of TRO Hearing 48:1-5, *Jenner & Block LLP v. DOJ*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 10 ("*Jenner* Tr.") (Jenner Order "facially retaliates against Jenner because of its speech and association"). And the President's rescission of the Paul Weiss Order underscores the link between those orders and law-firm advocacy, as that rescission was accompanied by a compelled mea culpa and a commitment to spend $40 million on pro bono work that aligns with the Administration's views. SOF ¶¶ 92-94.

Third, the Order plainly "constitutes a sufficiently adverse action" against Susman "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 477. The Order imposes devastating consequences. It brands the Firm an enemy engaged in "activities inconsistent with the interests of the United States," Order § 1, and announces that all "security clearances held by individuals at Susman" must be suspended "immediately" pending review of whether they are "consistent with the national interest," *id.* § 2, thereby tarring Susman's

reputation and interfering with the Firm's ability to represent clients in matters involving classified information. The Order endeavors to drive clients away from the Firm by threatening those clients with disfavored contracting treatment, directing all agencies to "assess[]" government contracts with *any* Susman clients and to "align their agency funding decisions with the interests of the citizens of the United States." *Id.* § 3. The Order hamstrings Susman's ability to engage with federal employees—a routine activity that is necessary for a wide range of Susman's representations. And the Order directs agencies to deny Susman's personnel access to federal government buildings, thus imperiling the Firm's ability to enter federal courthouses.

Those draconian punishments easily meet the standard for "adverse action." Indeed, "[a]ny one" of them "alone" would be enough. Tr. 45:16-17. There can be no serious dispute that the Order will—if not restrained—damage Susman's business prospects, disrupt its relations with current and future clients, and impede its lawyers' ability to zealously advocate. *See* SOF ¶¶ 171-225. Proving the point, "[i]n response" to the Paul Weiss Order (before the President rescinded it), a defendant in a major criminal case "terminated [that firm]'s representation of him" out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case." Ex. 57 at 2-3; SOF ¶ 224. That kind of grave harm would "deter a [lawyer] of ordinary firmness" from representing the President's political opponents or advancing positions that are adverse to his interests. *Cf. Aref*, 833 F.3d at 258. Indeed, that is the whole point of the Order. *See* Tr. 51:23-52:1 (the coercive effect of the orders "is plain and simple").

That conclusion is reinforced by the fact that the adverse actions have been taken by the President himself. *See Vullo*, 602 U.S. at 191-92. It is hard to imagine a greater and more direct threat than one personally delivered by the President that commands the heads of all agencies to carry it out. And the Order cannot be "reasonably understood" as anything other than a "threat[ of]

adverse action" against those who would follow in Susman's footsteps, as it directs agencies to restrict Susman attorneys from doing the work necessary to represent their clients. *Id.* at 189.

Defendants cannot escape liability for retaliation by pointing to purported nonretaliatory grounds for the Order. At the TRO hearing, counsel for Defendants asserted that because "there is a logical basis" supporting the Order—an apparent reference to the Order's spurious accusation that Susman "engages in unlawful discrimination," Order § 1—this Court should "not inquire any further into [the Order's] discriminatory nature." Tr. 34:13-22. But the principle that courts will not go hunting for impermissible government intent, *see United States v. O'Brien*, 391 U.S. 367, 383 (1968), is irrelevant when the impermissible intent is express, *see, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (*O'Brien* applies only when "the law is justified without reference to the content of the regulated speech" (internal quotation marks omitted)). Here, it could not be clearer that the Order is directed at Susman's expressive activities. *That is what the Order says.* Order § 1. And that is enough to establish a First Amendment violation. *See, e.g.*, *Vullo*, 602 U.S. at 196 (government cannot act "to punish or suppress" entity's "protected expression," even if its actions could also be justified based on legitimate regulation of entity's sanctionable conduct).

## 2. The Order Constitutes Impermissible Viewpoint Discrimination

The Order also violates the First Amendment because it discriminates against Susman for the viewpoints the Firm has expressed on behalf of its clients. The Order references Susman's advocacy in the "legal system" in the context of "elections." Order § 1. These statements are indisputably "veiled [a]llusions" to the Firm's representation of Dominion, state government entities, and other clients in connection with the 2020 election. Tr. 45:22-23; *see* SOF ¶¶ 56-68. The Order thus punishes the Firm for advancing its clients' positions in court—an "egregious form of content discrimination" that cannot possibly survive the requisite scrutiny. *Reed v. Town*

18

*of Gilbert*, 576 U.S. 155, 168-71 (2015).

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. Viewpoint discrimination in the context of legal advocacy is particularly pernicious. *See Velazquez*, 531 U.S. at 547 (holding unlawful an attempt to "prohibit" certain "advice or argumentation" by lawyers). Government punishment based on petitioning the court on certain grounds or representing particular clients in court, or restrictions on undertaking those activities, "threatens severe impairment of the judicial function." *Id.* at 546. That is because an "informed, independent judiciary" "presumes an informed, independent bar." *Id*. at 545. By punishing Susman for taking particular disfavored positions—including positions adverse to the government—the Order not only punishes Susman for its viewpoint, but also attacks the very foundations of the rule of law by hindering the courts' ability to reach the right answer in cases brought before them. *See id.* at 548 (First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes" (citation omitted)); Order § 1 (President is sanctioning Susman because, in his view, Susman has engaged in "egregious conduct" by "fund[ing] groups" that "inject[] . . . political and radical ideology").

Such speaker- and viewpoint-based sanctions constitute a "'blatant' and 'egregious form of content discrimination'" subject to strict scrutiny, such that the government's action may be sustained "only if the government proves" that the Order is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163, 168-71 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The existence of "viewpoint discrimination is uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187, which "is 'all but dispositive'" of the strict-scrutiny test, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764,

at *15 (D. Md. Feb. 21, 2025) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)). As the Supreme Court underscored in *Vullo*, "the First Amendment prohibits government officials *from relying on the 'threat of invoking legal sanctions and other means of coercion . . .* to achieve the suppression' of disfavored speech." 602 U.S. at 189 (emphasis added & citation omitted).

The Order does not come close to clearing the high bar of strict scrutiny. It should go without saying that the Executive Branch cannot claim a compelling interest in punishing lawyers for, or chilling them from, advocating for clients whose interests are adverse to the government— or whose positions were adverse to those of the Trump campaign during the 2020 election. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976) (Bill of Rights was drafted by those "familiar with the historic episode in which John Adams defended British soldiers charged with homicide for firing into a crowd of Boston demonstrators"); *Velazquez*, 531 U.S. at 545-48 (recognizing compelling interest in *permitting* lawyers to challenge constitutionality of statutes). And although the President has in the Order purported to deem certain forms of advocacy contrary to the interests of the United States, in fact the zealous, ethical representation of those disfavored by the government has long been part of our constitutional tradition and is recognized as essential to reining in abuses of government power. *See NAACP v. Button*, 371 U.S. 415, 440 (1963) (exercise of "First Amendment rights to enforce constitutional rights through litigation" on behalf of unpopular minorities "cannot be deemed malicious" as "a matter of law").

Nothing in the Order somehow conjures into existence any compelling interest. Although the Order asserts (without basis) vague allegations of misconduct, the government has no compelling interest in broadly punishing law firms for alleged attorney misconduct, given that the courts have well-established mechanisms for addressing any alleged claims of misconduct and the Executive Branch has no authority to do so. *See infra* pp. 31-33. The Order's bare invocation of

"national security" does not suffice either, as the Order leaves entirely unexplained what "national security" interest it intends to serve and contains no particularized findings concerning "national security"—which is hardly surprising given that there is no conceivable basis for tarring Susman's lawyers as threats to national security. *See* Order § 1; Tr. 46:14-19 (the Order's "reference to national security . . . is quite vague"); *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free" (citation omitted)). In particular, the Order's unexplained reference to supposed "fund[ing]" of "groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," Order § 1, is so vague that Susman has no idea to what it might be referring—and when questioned by this Court, counsel for the United States was unable to identify a single fact that might support such an outlandish smear. Tr. 46:13-20; *see id.* 18:13-19.

For the same reasons, the Order is not narrowly tailored: it lacks "precision of regulation," which is a fatal defect when "political expression or association is at issue." *In re Primus*, 436 U.S. 412, 432, 434 (1978) (citation omitted). The Order, for example, threatens the termination of *all* government contracts held by *any clients* of Susman. It also sweeps so broadly as to potentially bar Susman employees from *all* federal buildings—including "courthouses, Post Offices, the VA hospital and beyond." Tr. 47:5-7; *see* SOF ¶ 160 (White House Staff Secretary stating that the Order "takes certain measures against Susman Godfrey to ensure that they can't access government resources [or] government buildings"). Yet the Order contains no justification for such far-reaching and drastic punishments. Further, the Order punishes Susman attorneys and staff who have nothing to do with any litigation regarding "elections," Order § 1, or any other conduct it alleges—extending to, for example, the Firm's patent lawyers who engage with the Patent Trial and Appeal Board and any firm lawyer who has business with a federal agency. The

Order's preoccupation with Susman's election-related representations "bears no connection to the national security concerns" that the Order purportedly seeks to address. Tr. 46:20-25.

### 3.    The Order Violates the Petition Clause

The Order independently deprives the Firm of its "liberty interest in [its] First Amendment right to petition the government." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007); *see Button*, 371 U.S. at 429. The Supreme Court has "recognized the 'right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (citation omitted). The right to petition "extends to all departments of the Government," including courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see Broudy v. Mather*, 460 F.3d 106, 117 & n.6 (D.C. Cir. 2006). The Order's provisions punishing Susman for past petitioning activity and restricting Susman's ability to petition federal employees and appear before federal agencies on federal property themselves violate the right to petition. But the Order also purports to restrict access to federal courthouses— a category encompassed in the Order's sweeping reference to "Federal Government buildings." Order § 5; *see* Tr. 47:5-7. Such a restriction is a particularly blatant violation of the right to petition. *See, e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

### 4.    The Order Abridges Freedom of Association

The Order's demand that government contractors "disclose any business they do with Susman," Order § 3, and its threat that any contractor who has associated with Susman can expect serious repercussions in short order, violates Susman's freedom of association. The Order provides that "[w]ithin 30 days of the date of this order, agencies shall submit" to the OMB Director "an assessment of contracts with Susman or with entities that do business with Susman . . . and any actions taken with respect to those contracts in accordance with this order." *Id.* And

the Fact Sheet states that "the Federal Government will terminate contracts that involve Susman," to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." Fact Sheet. The Order thus subjects Susman clients who have government contracts to risks of economic reprisal and other penalties simply because they have chosen to associate with Susman, with the express goal of chilling that continued association.

That compelled disclosure of "affiliation with" Susman chills that affiliation, triggering exacting scrutiny. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021); *id*. at 616 (given threat of government reprisals, compelled disclosure "can chill association even if there is no disclosure to the general public" (citation omitted and alterations adopted)). The government interest underlying the Order—deterring law firms from representing clients who take positions that the President dislikes—is not even legitimate, let alone "sufficiently important" to satisfy exacting scrutiny. *Id.* at 607. And forced "disclos[ure]" of "*any* business [government-contractor clients] do with Susman" and "whether that business is related to *the subject of* the Government contract," Order § 3(a) (emphasis added), which encompasses disclosure of business that is unrelated to a government contract or to legal work that the President disfavors, is not narrowly tailored to an interest in deterring particular litigation. *See USAID v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214-15 (2013). Those disclosures are simply designed to punish Susman. But "Government officials cannot attempt to coerce private parties in order to punish or suppress" disfavored views. *Vullo*, 602 U.S. at 180.

## B.    The Order Violates Susman Godfrey's Right to Due Process

The Order is an equally blatant violation of Susman Godfrey's due process rights. The Due Process Clause is violated when the plaintiff (1) faces a deprivation of a protected liberty or property interest, and (2) has not received the process that is due. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Susman unquestionably satisfies that test here. Moreover, the

Order's impermissible vagueness gives rise to an independent due process violation.

      **1.**      **The Order Deprives Susman Godfrey of Protected Liberty and Property Interests With No Process Whatsoever**

a.  As the Court previously concluded, the Order (i) denies Susman and its attorneys the right to follow their chosen profession; (ii) harms Susman's reputation; and (iii) interferes with Susman's protected contractual relationships with clients.  Tr. 47:8-21.

i.  The Order interferes with the constitutionally protected right of the Firm and its attorneys to pursue their chosen profession, "the practice of law."  *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238 (1957).  The government denies the right to pursue one's chosen profession by taking action that (1) "formally or automatically exclude[s]" one from work on government contracts "or from other government employment opportunities," or (2) has "the broad effect of largely precluding" her "from pursuing her chosen career."  *O'Donnell v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998) (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994)).

The Order does both.  First, it represents a formal exclusion from government work, because it specifically prohibits Susman and its employees from being employed by the government or working on government contracts.  Order §§ 3, 5(b).

Second, the Order broadly impedes Firm attorneys' pursuit of their legal careers.  The Order instructs the government to terminate government contracts with Susman clients.  *Id.* §§ 1, 3.  That pressure on clients to disassociate from Susman—not to mention the pressure on potential clients to avoid associating with Susman in the first place—is designed to destroy the client relationships that are the sine qua non of legal practice.

The Order has the same effect well beyond the government-contract context, limiting Susman's ability to provide effective legal representation to a wide range of clients through limitations on Firm lawyers' entry into federal facilities and interactions with federal officials.  *See*

*O'Donnell*, 148 F.3d at 1141.  Section 5(a) gives federal officials broad discretion to limit Susman personnel's "access [to] Federal Government buildings," including, it appears, every federal-court building in the Nation, as well as Article I courts, administrative agencies, federal prosecutors' offices, and innumerable other federal buildings that members of the private bar must regularly enter in order to do their jobs.  That provision also restricts Susman from "engaging" with federal "[g]overnment employees" such as prosecutors, civil-enforcement staff, investigators, and court personnel.  Order § 5(a).  Construed according to its terms, the Order would restrict Susman's lawyers from arguing motions and appeals or participating in trials in federal cases, engaging with federal regulators, meeting with federal prosecutors, and more.  That result is untenable for a law firm whose lifeblood is engaging in precisely that conduct on a daily basis.

ii.  The Order deprives Susman of its "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see* Tr. 47:13-18.  Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255-56 (2012).  The Order tarnishes the Firm's reputation by announcing that all Susman attorneys are unworthy to work on government contracts (or for government contractors); possess national-security information; enter government buildings; engage with government employees; receive government funds, goods, property, or services; or be hired by government agencies.  *See* Order §§ 1, 2, 3, 5.  The Order additionally contains a long series of stigmatizing assertions about the purportedly "egregious" nature of Susman's actions, stating (for example) that the Firm has "degrade[d] the quality of American elections" and engaged in "conflicts of interest."  *Id.* § 1.

iii.  Finally, the Order deprives Susman of its constitutionally protected property interest in contracts with its clients.  *See* Tr. 47:13-18; *FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *Toxco Inc.*

25

*v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010) ("contracts between private parties may give rise to property interests" for Fifth Amendment purposes). As explained, the Order punishes Susman's clients for retaining the Firm by, for example, depriving those clients of government contracts. That interferes directly with Susman's own "private contractual agreements . . . with its clients," because it penalizes clients for using the Firm's services. *Perkins* Tr. 86:4-8 (citing *UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996), and *Brock v. Roadway Express*, 481 U.S. 252, 260 (1987) (plurality opinion)).

b. The Order was "issued with no process whatever." Tr. 47:18-19. That violates the Firm's due process "right to know the factual basis for the action" and have "the opportunity to rebut" it. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

Susman was not given prior notice that its conduct would trigger executive sanctions, and the Order does not identify a single law that the Firm allegedly violated. The Firm learned of the Order's existence and terms, along with the general public, when the President issued it on April 9 on live television. As a result, Susman was deprived of "an opportunity to speak up in [its] own defense." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). The Firm could not rebut the government's defamatory assertions—such as the claims that the Firm has taken action to "degrade the quality of American elections," to "undermine the effectiveness of the United States military," or "engage[] in unlawful discrimination," Order § 1—or explain why, even if any of those false allegations were true, the punishment was inappropriate and disproportionate.

The Order's perfunctory references to "risk[]," the "United States military," and "national security," Order § 1, do not absolve the government of its due process obligations. The Order says *nothing* to suggest that any national-security concerns are actually implicated here, and none are. Even if they were, process would still be required before the government may impair a protected

liberty interest or stigmatize an entity. *See, e.g.*, *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001) (national security interests did not justify depriving entities designated as terrorists of pre-deprivation notice and process). Moreover, substance-less invocations of national security cannot override the weighty interests that militate against the Order's severe punishments. When, as here, the government "threatens to inhibit the exercise of constitutionally protected rights," a "more stringent" fair-notice test applies. *Vill. of Hoffman Est. v. Flipside, Hoffman Est.*, 455 U.S. 489, 498-99 (1982). Indeed, because heartland "[F]irst [A]mendment guarantee[s]" are implicated, the government's decision to punish Susman cannot be made "arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). The Order's illegitimate purpose of punishing the Firm for its association with clients disfavored by the President underscores the Order's clear violation of due process.

## 2.    The Order Is Impermissibly Vague

The Order's vagueness creates an independent due process violation. Tr. 48:4-48:10. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws chill expression by driving speakers "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

The Order creates immediate, irremediable uncertainty about the scope of the disabilities placed on Susman and its clients—and it leverages that vagueness for its in terrorem effect. The Order's "Personnel" provision, for example, directs agencies to "limit[]" Susman's access to

27

federal buildings and its engagement with federal employees, both to the extent warranted by the purported "interests of the United States." Order § 5. Given that the Order also brands Susman as a perpetrator of "activities inconsistent with the interests of the United States," *id.* § 1, there is no doubt that the Order will restrict Susman's ability to engage in activities necessary to its law practice. But Susman and its clients have no way to know the full *scope* of that restriction. The reference to "interests of the United States" is so standardless that it gives agencies sweeping discretion to *further* restrict Susman's access over time, perhaps in retaliation for future Susman representations deemed to be somehow "inconsistent with the interests of the United States."

Other aspects of the Order compound that concern. For instance, the reference to "Federal Government buildings" is certainly broad enough to include federal courthouses—an interpretation that the government has refused to disavow in this and every other case challenging a law-firm Executive Order. *See Wilmer* TRO at 4 (construing executive order to encompass federal courthouses); *Perkins* Tr. 88:21-23 (government counsel "concede[d] that we don't know exactly what" a materially identical provision "means"). The Order's vagueness is thus designed to give federal agencies sweeping ability to impose severe consequences on Susman for undefined future conduct—and to deter Susman from representations and advocacy that could be perceived as adverse to the President's political interests or the government's interests more broadly. That is a textbook case of unconstitutional vagueness that is designed to enable "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### C.    The Order Violates Susman Godfrey's Right to Equal Protection of the Laws

The Order likewise violates Susman's equal protection rights by treating Susman "differently from others similarly situated" with "no rational basis." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). When First Amendment activity is burdened, a standard "appreciably more stringent than 'minimum

rationality'" governs. *News Am. Pub. v. FCC*, 844 F.2d 800, 802, 814 (D.C. Cir. 1988).

Both parts of the equal protection test are satisfied here. *See* Tr. 48. First, the Order intentionally treats Susman differently from others that are similarly situated. Indeed, the targeted treatment inheres in the Order itself, which singles out Susman by name, airs the President's specific grievances with Susman, and assigns targeted sanctions. Countless other similarly situated law firms have not been subjected to the same—or remotely similar—sanctions.[2] Worse still, although an "improper motive" for differential treatment "is usually covert," here the "improper motive" is apparent on the face of the Order and the Administration's related public statements. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013); *see supra* pp. 14-16.

Second, the government lacks even a rational basis for the difference in treatment, much less an "appreciably more" persuasive justification. *News Am. Pub., Inc.*, 844 F.2d at 802. To satisfy even the rational-basis standard, the government must identify a "legitimate governmental purpose," which cannot be "so attenuated" from the conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). A "bare . . . desire to harm a politically unpopular group" is not a "legitimate state interest[]." *Id.* at 447 (citation omitted). The Order has *no* legitimate purpose; rather, its objective is to harm a law firm that the President perceives to have supported clients and causes that the President disfavors. In addition, the Order's means are far too attenuated to justify its punitive provisions. *See id.* at 446.

### D.    The Order Violates Susman Godfrey's Clients' Due Process Right to Counsel

The Fifth Amendment protects litigants in civil and criminal cases alike against arbitrary deprivations of their counsel of choice. *See Powell v. Alabama*, 287 U.S. 45, 53, 68-69 (1932).

---

[2] It is immaterial that several other law firms have been subjected to analogous orders. *See, e.g.*, *Olech*, 528 U.S. at 564 n.* (whether the "class" is of "one or of five is of no consequence" as "the number of individuals in a class is immaterial for equal protection analysis").

The Order violates that right to counsel by baselessly preventing Susman's clients from being ably represented by their chosen attorneys—and the Firm has standing to assert that right here.

The Due Process Clause protects a litigant's right to notice and a hearing, including the right to "the aid of counsel" in that hearing. *Powell*, 287 U.S. at 68-69. The right to such aid necessarily includes a party's right "to secure counsel of his own choice." *Id.* at 53. Accordingly, although a civil litigant may not always have a constitutional right to appointed counsel, *see Turner v. Rogers*, 564 U.S. 431, 443-44 (2011), the Supreme Court has recognized that an "arbitrar[y] refus[al]" to allow a party to be heard in a civil case via the arguments of his preferred "counsel, employed by and appearing for him," constitutes a denial of due process. *Powell*, 287 U.S. at 69; *see Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873-74 (D.C. Cir. 1984).

The Order amounts to exactly such arbitrary and unjustified interference. By restricting Susman attorneys' ability to "engag[e] with" government officials or "access . . . Federal Government buildings," Order § 5(a), the Order seeks to force Susman's clients to go without their chosen counsel in upcoming meetings and hearings. The Order offers no legitimate rationale for its restrictions, making it classically arbitrary and a denial of due process rights.

The Firm has prudential, third-party standing to challenge those restrictions on its clients' access to counsel, which ultimately "interfer[e] with" Firm lawyers' "professional obligation[s] to [their] client[s]." *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990). That interference is a "concrete injury" that injunctive relief would redress. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

### E.    The Order Exceeds the President's Statutory and Constitutional Authorities and Violates the Separation of Powers

The many constitutional violations described above are all the more egregious because the

President lacks statutory or constitutional authority to impose the mandates in Sections 3 and 5.

"The President's power, if any, to issue" an executive order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Courts therefore have routinely held that an executive order lacks legal effect if it is not justified by an "express constitutional or statutory authorization." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942); *see, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 193-95 (1999); *see also Trump v. Hawaii*, 585 U.S. 667, 683 (2018).

No statute authorizes the President or his executive officers to sanction a law firm for representing clients. The President thus is exacting retribution against Susman without a scintilla of statutory authority. Put differently, "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

Lacking any statutory basis, the Order could survive only if supported by some inherent executive power—but none applies here. Article II confers no power to punish disfavored law firms through contracting orders and access restrictions. The Order is not an exercise of the President's power as Commander in Chief, *see, e.g.*, *Ex parte Quirin*, 317 U.S. 1, 26 (1942), or any presidential foreign-policy power, *see, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015), or the power to oversee subordinate officials, *see, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Sections 3 and 5 of the Order also are not an exercise of the President's responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, because the President executes no law whatsoever in imposing those punishments. The fact that no President in our history has ever attempted to wield the power of his office to attack a law firm for its advocacy on behalf of clients is powerful confirmation that the Constitution does not permit,

31

much less affirmatively authorize, this President's action. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010); *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014).

Indeed, allowing the Executive to sanction attorneys for alleged professional misconduct in federal court would "encroach[] upon" the Judiciary. Tr. 16:17-20. The Supreme Court has long held that federal courts have inherent power to "discipline attorneys who appear before" them. *Chambers v. NASCO*, 501 U.S. 32, 43 (1991) (citing *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531 (1824)). That power is integral to federal courts' ability to adjudicate cases under Article III, as "the ability to fashion an appropriate sanction" for attorney misconduct ensures that courts may prevent "abuse[]" of the "judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citation omitted). The Order intrudes on that inherently judicial role: it imposes blunderbuss sanctions on attorneys, and it does so based not on a judicial finding of professional wrongdoing but rather on the President's own disagreement with Susman's actions, including actions that Susman took *in court* in connection with the 2020 election.

Separation of powers principles do not permit that intrusion, which represents presidential interference with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545; *see Stern v. Marshall*, 564 U.S. 462, 482-84 (2011). In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case." *Velazquez*, 531 U.S. at 545. Allowing the Executive to punish lawyers for the positions they take in court would "hamper[] . . . every court's ability to adjudicate its cases," Tr. 52:9-14, threatening "severe impairment of the judicial function." *Velazquez*, 531 U.S. at 546. The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Id.* at 546.

32

As if that were not enough, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of" an unlawful "bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). It punishes Susman—and only Susman—without "formal investigation, trial, or even informal process." *Perkins* Tr. 89:10-22. From the Founding, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 144 (Black, J., concurring). It cannot be that the Founders, "who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.*

## F.    The Government's Piecemeal Efforts to Salvage the Order Lack Merit

None of the arguments that Defendants have advanced has the slightest merit.

1. As an initial matter, and contrary to the government's position in the executive-order cases brought by other law firms, the Order must be analyzed as a whole, not artificially examined "section-by-section." *E.g.*, Opp. to Motion for Summary Judgment 3, *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 17, 2025), ECF No. 103 ("*Wilmer* Opp."). Where different provisions of an executive order "are so mutually connected with and dependent on each other" that it is apparent "that the [President] intended them as a whole," then a fatal flaw in any one provision takes down the whole order. *Allen v. City of Louisiana*, 103 U.S. 80, 84 (1880) (internal quotation marks and citation omitted). Here, the Order "embodie[s]" just such "a single, coherent policy, the predominant purpose of which" is to punish Susman for disfavored expression and associations. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. at 191. The entire Order was imposed to retaliate against Susman. The entire Order was decreed without due process. The entire Order singles out Susman for differential treatment. The entire Order lacks a statutory or constitutional basis. And the entire Order maligns Susman's "good

name," "reputation," and "integrity." *Constantineau*, 400 U.S. at 437. The Order's various sections are interlocking and reinforcing, and the Order is thus unconstitutional *in toto*.

2. In all events, Defendants' attempts to defend the Order's various provisions one by one each fail in their own right.

a. The government's efforts to defend the "statements in Section 1" as "classic government speech," akin to a "press conference," Tr. 27:20-24, is utterly implausible. It is true enough that a President is "entitled to say what [he] wishes." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (citation omitted). But the President cannot direct the Executive officers serving under him to target private parties for draconian punishment, announce defamatory "findings" to justify that targeting, and then hide behind a claim that the action and its underlying findings are mere presidential speech that the First Amendment does not reach. *See Vullo*, 602 U.S. at 188 (government official "can rely on the merits and force of her ideas," but cannot "use the power of the State to punish or suppress disfavored expression").

Section 1 announces official government findings and conclusions that give the Order operative effect. For example, Section 1 makes the defamatory assertion that Susman's advocacy on behalf of its clients is "detrimental to critical American interests," Order § 1, and Section 3 instructs agencies to make funding decisions that are "aligned with American interests," *id.* § 3. Section 1 thus lays the predicate—and sets the government policy—that will justify (even *require*) agencies' decisions to terminate contracts involving Susman or its clients. Similarly, Section 1 falsely accuses Susman of racial discrimination, and then directs that such alleged conduct disqualifies Susman from "engage[ment]" with the government and access to the "Nation's secrets"—directions that are effectuated in the Order's later sections. *See* Order §§ 2, 5.

*Vullo* thus forecloses the government's effort to treat Section 1 as government speech.

There, the Court rejected a similar effort to treat the official's criticism of the NRA as "permissible government speech," reasoning that doing so would improperly treat that speech "in isolation" from the official's threat to punish companies for associating with the NRA. 602 U.S. at 194-95. That reasoning applies *a fortiori* here, where Section 1's defamatory statements serve as the operative predicates for the punishments imposed in the Order's other provisions.

b.  Defendants' efforts to insulate Section 2 are no more persuasive. It is true, as the government has argued elsewhere, that the Supreme Court has held that individual security-clearance decisions are not subject to review by the Merit Systems Protection Board. *Dep't of Navy v. Egan*, 484 U.S. 518 (1988); *see, e.g.*, *Wilmer* Opp. 6. In *Lee v. Garland*, the D.C. Circuit held that "*Egan* also bars judicial review of constitutional claims like Lee's"—that is, claims that the Executive's decision to revoke an individual's clearance was pretextual and therefore violated the First and Fifth Amendments. 120 F.4th 880, 888 (D.C. Cir. 2024). But *Lee* and *Egan* are limited in important respects: they extend only to claims that require an evaluation of the "merits," *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999), of the Executive's "discretionary judgments" about whether a "particular employee" should or should not have a security clearance, *Lee*, 120 F.4th at 893; *see Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993). Plaintiff's challenge to Section 2 requires no such inquiry into the merits, for several reasons.[3]

Most fundamentally, Section 2 unconstitutionally subjects Susman employees to an additional layer of procedure to which other clearance holders are not subject by directing agencies

---

[3] Susman respectfully preserves the argument that *Lee* incorrectly deemed certain constitutional challenges to clearance determinations nonjusticiable. *Egan* says nothing about reviewability of constitutional challenges. *See* 484 U.S. at 520. And *Lee* denies plaintiffs "any judicial forum in which to raise" certain "colorable constitutional challenges," which creates a "serious" constitutional difficulty, even in the national-security context. 120 F.4th at 888 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)). Ultimately, though, that makes no difference here—even on its own terms, *Lee* does not bar Susman's claims.

to suspend the clearances of all Firm employees and then undertake an undefined "review" to re-evaluate their eligibility. *See* Order § 2. Section 2 does not codify any "nuanced" "predictive" "judgment call" about whether any "individual[]" should obtain or retain a clearance—that is, the sort of judgment that must be made by "those with the necessary expertise," and that *Lee* held was nonjusticiable. 120 F.4th at 886, 893. Instead, the Order imposes a *categorical* suspension and review that operates upstream from any decisions about whether an individual's clearance should be revoked. By requiring a blanket suspension and review, based on the declaration that any and all Susman employees' possession of a clearance is likely inconsistent with the interests of the United States, Section 2 has inflicted immediate procedural and reputational injury. Further, regardless of whether any clearances are permanently revoked, the Order immediately casts doubt on Susman lawyers' ability to acquire and retain clearances, thereby threatening their ability to obtain work that might require clearances. As a result, the Due Process Clause entitled Susman to process before the President announced his decision on live television. *See supra* pp. 26-27. And Section 2's categorical disabilities were imposed for the same retaliatory and viewpoint-discriminatory reasons as the rest of the Order, thereby violating the First Amendment.

*Egan* and *Lee* therefore do not bar adjudication of Susman's claims against Section 2. *Lee* explained that courts may redress injuries that "exist[] regardless" of how government "resolve[s] any particular" clearance decision—as Susman's injuries clearly do. 120 F.4th at 893; *see Greenberg*, 983 F.2d at 290 (claim that agency "deprived [employee] of due process by firing him for security reasons without following proper procedures" was reviewable). Relatedly, *Lee*'s concern that courts are ill equipped to second-guess individual decisions concerning the clearance of a "particular employee" are not implicated here. *Lee*, 120 F.4th at 892-93 (quoting *Egan*, 484 U.S. at 527). Because the Executive has categorically suspended the clearances of, and introduced

additional procedural hurdles for, all Susman employees, no nuanced individual security decision is at issue. Instead, at issue is the Executive's blanket policy—one that was imposed without due process and for retaliatory reasons that violate the First Amendment. The Judiciary is well placed to determine whether the President's punitive blanket sanction violates the Constitution. *See Gill v. DOJ*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) (equal protection challenge to "policy or practice of treating Muslims or naturalized citizens differently . . . would not be barred by *Egan*."); *Hegab v. Long*, 716 F.3d 790, 798 (4th Cir. 2012) (Motz, J., concurring) ("A court could assess the constitutionality of the CIA policy at issue in *Webster* without delving into the merits of an individualized security clearance determination.").

The Order's vague and unsupported invocations of "national security," Order §§ 1, 5, do not alter that conclusion. Nowhere does the Order even purport to make the sort of particularized national-security findings that would require deference under *Egan* and *Lee*. Section 2 itself contains no findings about national security, mentioning only "the national interest"—a term that the Order makes clear is capacious enough to encompass things that have nothing to do with national security, such as diversity initiatives and election litigation with which the President disagrees. The Order therefore leaves no doubt that references to the "national interest" describe the President's overt intent to retaliate against Susman for its protected conduct—not any particularized security decision. Further, whatever credibility such vague "national interest" concerns might otherwise have had is eliminated by the context of the President's broader campaign against law firms. Section 2 is identical to provisions appearing in each executive order targeting law firms. *See, e.g.*, Jenner Order § 2; Wilmer Order § 2. And the exact same "security" concerns about Paul Weiss apparently evaporated when the firm settled with the President in a way that did nothing whatsoever to affect national security. *See* SOF ¶¶ 92-97.

At the end of the day, Section 2 is openly and blatantly unconstitutional. Neither *Egan* nor *Lee* requires this Court to overlook that fact.

c. Defendants' efforts to salvage Section 3 and 5 fare no better. Defendants contend that the Court can ignore the constitutional problems with the contracting and personnel provisions of the Order because the Government is acting "in Section 3 as a contractor and in section 5 as a landlord and an office supervisor, not as the sovereign." Tr. 19:3-5. In Defendants' view, because the Government has acted in those purportedly non-sovereign capacities, its actions against Susman cannot be viewed as a "sanction or punishment." Tr. 19:11. Defendants essentially urge a boundless presidential authority to control federal contracting, federal building access, and federal employment—even if the President is using that authority to retaliate against his perceived political opponents. The Court should reject that disturbing vision of presidential power.

The President does not have a free pass to violate the Constitution when he acts in "non-sovereign" capacities. He cannot force public employees to "surrender all their First Amendment rights by reason of their employment," or otherwise make employment decisions on constitutionally proscribed bases. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see, e.g.*, *O'Hare Trucking Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996) (government may not "condition public employment" on prohibited bases). He cannot invoke the government's role as purchaser to evade those same restrictions when making contracting decisions. *See O'Hare*, 518 U.S. at 721-22; *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674-75 (1996); *see also USAID*, 570 U.S. at 214-15 (government may not "leverage funding" to federal funding recipients "to regulate speech outside the contours of the program itself"). And he cannot act as landlord to bar individuals from public buildings for reasons offensive to the Constitution. *See, e.g.*, *Rosenberger*, 515 U.S. at 829-30. Any other result would be a fundamental threat to our system of ordered

liberty, allowing the federal government to use its vast reach as the nation's largest employer, largest purchaser, and largest landlord to run roughshod over the Constitution.

To be sure, in the context of an ordinary employment or contracting decision, the government may invoke an "interest in achieving its goals as effectively and efficiently as possible" as a "significant" interest for courts to consider. *Umbehr*, 518 U.S. at 676. But the Order provides no basis whatsoever for such an argument. It does not assert—because it could not plausibly do so—that federal contracting would be more efficient if contractors could no longer work with Susman, or that the government would function better if it were restricted from hiring or engaging with Susman employees. The Order is instead expressly based on Susman's protected advocacy—a blatant and unjustifiable violation of the First Amendment. *See, e.g.*, *Vullo*, 602 U.S. at 196 (government cannot exercise otherwise legitimate functions "in order to punish or suppress . . . protected expression"); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) ("An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." (citation omitted and alterations adopted)); *Janus v. AFSCME, Council 31*, 585 U.S. 878, 907 (2018) (distinguishing between a "single supervisory decision" and a "speech-restrictive law" (citation omitted)).

For similar reasons, Defendants are wrong that the Order cannot constitute a "sanction or punishment" just because it applies to contracting and employment decisions. Unlike a typical contracting or employment policy, the Order is a focused effort to punish a single business. The Order makes findings regarding Susman's advocacy activities, determining that they are "inconsistent with the interests of the United States." Order § 1. And it imposes consequences to "address" Susman's purportedly "egregious conduct," including sanctions applicable to *all* of Susman's work with federal contractors, *all* of Susman's engagements with federal officials, and

*all* of Susman's employees. *Id.* §§ 1, 3, 5. That is punishment, plain and simple.

Finally, Defendants' invocation of a history of the President using contracting actions to "advance social policy" is unavailing. Tr. 21:8-10.[4] There is no history of the President using contracting orders to effect a bill-of-attainder-esque punishment against a business that does work with federal contractors. The Order identifies no "social policy" that such a punishment could plausibly advance. Nor does caselaw support a free-ranging authority for the President to advance even facially legitimate policy preferences through contracting orders—much less the kinds of partisan political preferences that animate the President's actions here. As a statutory matter, this Circuit has required contracting orders to have "a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'" *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted). And other courts have struck down procurement orders notwithstanding strong arguments that their requirements advanced presidential policy priorities. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ($15 minimum wage for contractors); *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023) (mandatory COVID-19 vaccination policy).[5] Even if Defendants could somehow show statutory authority for a contracting decision like this one, that does not save the Order from constitutional scrutiny—which, for the many reasons already explained, it cannot survive.

## II.    SUSMAN GODFREY IS ENTITLED TO PERMANENT RELIEF

The Court should permanently enjoin the entire Order. To obtain a permanent injunction,

---

[4] It is highly ironic that the government relies on President Johnson's anti-discrimination contracting order, *see* Tr. 20:4-10 (citing Executive Order 11246), as President Trump revoked that order at the start of his second term, *see* Executive Order 14173 of Jan. 21, 2025, § 3(b)(i).

[5] At a minimum, the President would need clear congressional authorization before he could use contracting authority to sanction a law firm. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"); *Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("[s]eparation-of-powers concerns . . . caution us against reading legislation, absent clear statement," to give the Executive "authority to remove cases from the Judiciary's domain").

a plaintiff "must demonstrate '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (citation omitted).  Susman Godfrey readily satisfies that standard here.

### A.    The Order Inflicts Irreparable Harm that Cannot Be Adequately Addressed by Remedies at Law

The first two factors—irreparable injury and inadequacy of legal remedies—are often considered together because a "show[ing] [of] irreparable injury" is "one possible basis for showing the inadequacy of the legal remedy."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks and citation omitted). Paradigmatic injuries that satisfy both factors include deprivation of constitutional rights, *see, e.g.*, *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); reputational injuries not easily measurable in monetary terms, *see, e.g.*, *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017); and significant economic injuries that are unrecoverable, *see, e.g.*, *Nat'l Mining*, 145 F.3d at 1408-09.  All three types of harm are present here.

**1.  *Constitutional Injuries.***  "The loss of First Amendment freedoms, for even minimal periods of time[,] . . . constitute[s] irreparable injury."  *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006)).  As this Court has recognized, if the Order is allowed to go into effect, "Susman will suffer certain and imminent injury because the order chills the firm's speech and advocacy."  Tr. 48:25-49:2; *see Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 ("[T]he moving party must demonstrate some likelihood of a chilling effect on their rights.");  SOF ¶¶ 204-

13; Declaration of Robert E. Hirshon ¶ 20 ("Lawyers' zealous advocacy will be hindered if they must fear retribution for advancing arguments with which the President disagrees.").

The Order also would irreparably injure Susman by depriving the Firm of its rights under the Fifth Amendment, as this Court acknowledged in granting the TRO. *See* Tr. 49:3-8. "[A] violation of Fifth Amendment due process rights," including the right to counsel, gives rise to irreparable harm. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). So does a violation of the "right[] to equal protection." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017), *vacated on other grounds*, 755 F. App'x 19 (D.C. Cir. 2019). Those harms exist whenever the Order is in effect, and "do not . . . require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

**2.  *Reputational Harm.*** Harm to "reputation or goodwill is not easily measurable in monetary terms" and is therefore "typically viewed as irreparable." *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (citation omitted). The reputational harm inflicted by the Order is plain. The Order disparages the Firm's work as "dangerous" and "detrimental to critical American interests," and accuses the Firm of, among other things, "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections." Order § 1. Allowing those falsehoods to go unrestrained damages Susman's "corporate goodwill and reputation," *Honeywell, Inc. v. Consumer Prod. Safety Comm'n*, 582 F. Supp. 1072, 1078 (D.D.C. 1984)—thereby decreasing the chances that clients will engage the Firm, *see* SOF ¶ 214.

This Court has already "agree[d] that [the Order's] characterization" of Susman "indeed threatens reputational harm and justifies emergency relief." Tr. 49:8-20. The same considerations amply warrant permanent relief.

**3.  *Economic Injuries.*** Finally, as this Court has concluded, the Order inflicts irreparable

economic injury on Susman.  Tr. 49:21-50:25.  Economic injuries are irreparable when "legal remedies after the fact [are] inadequate to restore the party seeking a stay to the status quo ante." *Mann v. WMATA*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016) (citation omitted).  Where damages are unrecoverable (for example, due to sovereign immunity), "significant" economic loss constitutes irreparable harm.  *Luokung Tech. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021).

Such irreparable economic injury is present here.  Defendants' sovereign immunity limits Susman to nonmonetary equitable relief, and Susman's unrecoverable revenue losses will be "significant" absent injunctive relief.  *Xiaomi Corp.*, 2021 WL 950144, at *10-11 (irreparable harm where there was "exodus of lucrative contracts") (citations omitted).  The Order has the effect of deterring clients from retaining the Firm and paying its fees, thus striking at the core of the Firm's operations.  *See* SOF ¶¶ 220-25; *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (irreparable harm where there was "loss of long-standing clients that may be unwilling, or unable, to do business with [plaintiff] hereafter if no injunction is issued" (cleaned up)).

The Order also threatens significant irreparable economic harm by hindering Susman's ability "to recruit and retain employees to build—or even maintain—its business."  *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020); *see Luokung*, 538 F. Supp. 3d at 192-93 (irreparable harm included "difficulty recruiting and retaining talent").  Section 5's bar on hiring Susman employees for federal jobs is just one example of such a hindrance.  Employment at Susman provides significant substantive experience that can make those employees more compelling candidates for federal employment.  SOF ¶ 181.  By directing federal agencies to refrain from hiring Susman employees, the Order impairs the Firm's ability to recruit and retain lawyers and professionals who are interested in later federal service.  *Id.* ¶ 183; *see* Hirshon Decl. ¶ 22.

**B.      The Balance of Equities and Public Interest Strongly Favor a Permanent Injunction**

"When the defendant is the government," the equities and public-interest factors "merge." *Zukerman*, 64 F.4th at 1364.  Courts "must balance the competing claims of injury and must consider the effect on each party" and the public of "granting or withholding" the "requested relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted).

The Order severely injures Susman Godfrey.  By its nature, the Order inflicts severe and irreparable harm and undermines the public interest by actively violating the constitutional rights of the Firm and its clients.  *See Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.").  Even if there were only a "substantial risk" of a deprivation of "fundamental . . . right[s]," that would be enough to tilt the equities against the government.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  But here, it is certain that if the Order were to go back into effect, it would further inflict constitutional injuries, unrecoverable economic losses, and uncurable reputational harm on Susman.  *See* Tr. 51-52; SOF ¶¶ 171-225.

Making matters worse, the Order threatens to deter attorneys across the Nation from taking on clients and causes for fear of drawing the ire of an Administration that has laid bare its willingness to impose harsh sanctions on those who express opposition to its policies.  *See* Hirshon Decl. ¶¶ 17-20.  As this Court stated in granting a TRO, the "government has sought to use its immense power to dictate the positions that law firms may and may not take" and to "control who law firms are allowed to represent."  Tr. 51:6-10; *see id.* 51:22-52:1 ("Law firms across the country are entering into agreements with the government out of fear that they will be targeted next, and that coercion is plain and simple.").  The resulting chilling effect will make it difficult for lawyers to provide their "client[s] and [] the legal system" with "zealous[]" and "vigorous representation"

"within the bounds of the law"—a responsibility of "paramount importance" to our "system of justice" and to the public interest.  D.C. R. Prof'l Conduct 1.3 cmt. [1]; *see Penson v. Ohio*, 488 U.S. 75, 84 (1988).  In particular, the Order will deter potential litigants from directly challenging the Administration's policies.  Indeed, it already has.  *See* SOF ¶ 209 ("The volunteers and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear.").  In short, the Order's "immensely oppressive power threatens the very foundation of legal representation in our country," Tr. 51:10-11, as it imperils the "informed, independent bar" on which our judicial system depends, *Velazquez*, 531 U.S. at 545.

In contrast, any purported harm to the Defendants is non-existent.  *See* Tr. 52:19-20 ("On the flip side, granting a TRO would not inflict harm to the government.").  Because the government "cannot suffer harm from an injunction that merely ends an unlawful practice," "any hardship" the government might identify is "not legally relevant."  *Ramirez v. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); *see League of Women Voters*, 838 F.3d at 12.  On the contrary, there is a "substantial public interest" in ensuring that "'governmental agencies abide'" by the law.  *League of Women Voters*, 838 F.3d at 12 (citation omitted).   The balance of equities and public interest thus weigh decisively in favor of permanently enjoining implementation of the Order.

## CONCLUSION

The Court should grant summary judgment in favor of Susman Godfrey and enter the proposed order for declaratory and permanent injunctive relief.

Dated: April 23, 2025                    Respectfully submitted,


                                         */s/ Donald B. Verrilli, Jr.*
                                         Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
                                         Elaine J. Goldenberg (D.C. Bar No. 478383)
                                         Ginger D. Anders (D.C. Bar. No. 494471)
                                         MUNGER, TOLLES & OLSON LLP
                                         601 Massachusetts Avenue, NW, Suite 500E
                                         Washington, D.C. 20001
                                         (202) 220-1100
                                         Donald.Verrilli@mto.com
                                         Elaine.Goldenberg@mto.com
                                         Ginger.Anders@mto.com

                                         Brad D. Brian (*pro hac vice*)
                                         Michael R. Doyen (*pro hac vice*)
                                         Hailyn J. Chen (*pro hac vice*)
                                         MUNGER, TOLLES & OLSON LLP
                                         350 S. Grand Avenue, Fiftieth Floor
                                         Los Angeles, California 90071
                                         (213) 683-9100
                                         Brad.Brian@mto.com
                                         Michael.Doyen@mto.com
                                         Hailyn.Chen@mto.com

                                         *Attorneys for Susman Godfrey LLP*

                                         (*Additional counsel listed on following page*)

Bethany W. Kristovich (*pro hac vice*)
Adam B. Weiss (*pro hac vice*)
Jennifer L. Bryant (*pro hac vice*)
William M. Orr (*pro hac vice*)
Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
William.Orr@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee (*pro hac vice*)
Shannon C. Galvin Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

* Admission pending

*Attorneys for Susman Godfrey LLP*