**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

SUSMAN GODFREY LLP,

                *Plaintiff,*

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

                *Defendants.*

---

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

---

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), Plaintiff Susman Godfrey LLP ("Susman Godfrey" or the "Firm") submits the following statement of undisputed material facts in support of its motion for summary judgment seeking declaratory and permanent injunctive relief with respect to Executive Order 14263, titled "Addressing Risks from Susman Godfrey" (hereinafter, the "Order" or "Executive Order").

**I.  Susman Godfrey is a Premier Litigation Law Firm.**

1.  Susman Godfrey is a trial firm that represents both plaintiffs and defendants in a variety of complex, commercial litigation.  Declaration of Kalpana Srinivasan in Support of Plaintiff's Motion for Summary Judgment ("Srinivasan Decl.") ¶ 6.

2.  Since its founding by Stephen Susman and Gary McGowan as an eight-lawyer firm in 1980, the Firm has grown to over 230 trial attorneys, located in offices in Houston, Los Angeles, New York, and Seattle.  Srinivasan Decl. ¶¶ 7–8.  Trial attorneys making their careers at the firm include equity partners, associates, of counsel, and staff attorneys.  Srinivasan Decl. ¶ 12.

3.      The Firm has represented clients in federal and state courts across the country (including the Supreme Court of the United States), before many federal agencies and regulatory bodies, and in tribunals throughout the world.  Srinivasan Decl. ¶ 8.

4.      Susman Godfrey has been named as an "Am Law 100" firm on *The American Lawyer 100* list in 2024 and 2025.  Out of the Am Law 100 top revenue-generating firms, it is one of only a handful that practices solely litigation.  Srinivasan Decl. ¶ 9.

5.      Susman Godfrey and its attorneys are regularly recognized for their standing in the legal community by *Chambers USA*, *Law360*, *Lawdragon*, *National Law Journal*, *Super Lawyers*, *American Lawyer*, *Benchmark Litigation*, national and local bar associations, and other publications and organizations.  Srinivasan Decl. ¶ 10.

6.      Susman Godfrey represents a range of clients, including small- and medium-sized businesses, families, individuals, charitable and public service-oriented organizations, and Fortune 500 companies.  Srinivasan Decl. ¶ 11.

7.      Susman Godfrey often represents plaintiffs—in many cases, individuals or smaller companies—in disputes against some of the largest organizations in the world, recovering billions of dollars and obtaining injunctive and declaratory relief for its clients.  Srinivasan Decl. ¶ 11.

8.      Susman Godfrey has over 350 attorneys and staff members.  Its professional support staff includes paralegals, legal assistants, and information technology specialists. Srinivasan Decl. ¶ 12.

9.      Susman Godfrey's attorneys come from diverse backgrounds, hold diverse political views, and bring diverse experiences to work.  Srinivasan Decl. ¶¶ 13–14.

10.     The Firm has been recognized for its culture of excellence and transparency by the legal publication *Vault*, including being named as #1 Best Midsize Law Firm for Career Outlook,

2

Selectivity, and Transparency and #3 Best Midsize Law Firm for Satisfaction and Quality of Work. Srinivasan Decl. ¶ 17.

11.    Many of Susman Godfrey's attorneys joined the Firm after government service.  Its attorneys have served in Democratic and Republican administrations.  Srinivasan Decl. ¶ 14.

12.    The Firm requires every associate it hires to have completed at least one clerkship for a federal Article III judge.  Srinivasan Decl. ¶ 14.

13.    Susman Godfrey attorneys have joined the Firm after clerking for judges nominated by Republican presidents and judges nominated by Democratic presidents, including Justices of the United States Supreme Court appointed by presidents of both parties.  Srinivasan Decl. ¶ 14.

14.    About half of Susman Godfrey attorneys clerked for judges nominated by Republican presidents, and about half clerked for judges nominated by Democratic presidents. Srinivasan Decl. ¶ 14.

15.    Former Susman Godfrey attorneys have served, or are now serving, as federal and state judges, judicial clerks, high-ranking government officials, federal prosecutors, and adjunct professors of law.  Srinivasan Decl. ¶ 15.

16.     Republican governors have appointed four former Susman Godfrey attorneys to state court judgeships.  Srinivasan Decl. ¶ 15.

17.    Two former Susman Godfrey attorneys currently serve as Article III federal judges: one nominated by President Trump and one by President Biden.  Srinivasan Decl. ¶ 15.

18.    Since its founding, the Firm has provided thousands of hours of pro bono legal services through its attorneys, paralegals, and other professionals to numerous clients, including indigent criminal defendants and community-based organizations, in matters concerning human

and civil rights, as well as electoral, housing, immigration, and reproductive issues. Srinivasan Decl. ¶ 16.

19.    Since 2020, Susman Godfrey attorneys, paralegals, and other business professionals have spent over 22,000 hours, valued at nearly $15 million, on pro bono legal services. Srinivasan Decl. ¶ 16.

## II.    Susman Godfrey Interacts Routinely with Federal Departments, Agencies, and Attorneys and Appears Regularly in Federal Forums.

20.    Susman Godfrey's attorneys interact regularly, on a near-daily basis, with the federal government. Srinivasan Decl. ¶¶ 19–34.

21.    The Firm's attorneys' interactions with the federal government and access to federal buildings are critical to their service to their clients, the practice of their profession, and the development of their careers. Srinivasan Decl. ¶¶ 19–34.

22.    Susman Godfrey's attorneys regularly appear in federal courts and federal administrative proceedings. Srinivasan Decl. ¶ 20.

23.    More than a third of all active matters at the Firm are before federal courts and agencies. Srinivasan Decl. ¶ 20.

24.    The Firm's attorneys already have made dozens of in-person federal court appearances in 2025, and they have numerous in-person appearances scheduled in federal courts and federal agencies in the coming months. Firm attorneys currently have at least seven trials scheduled to proceed in federal court within the next six months—in addition to more federal cases awaiting trial dates. Srinivasan Decl. ¶ 20.

25.    Susman Godfrey attorneys frequently meet with officials and attorneys from many different federal agencies and departments. Susman Godfrey attorneys have upcoming scheduled

4

meetings with federal government personnel from the Main Branch of the U.S. Department of Justice and from United States Attorneys' Offices. Srinivasan Decl. ¶ 21.

26.     In representative matters for clients, the Firm has interacted with, and anticipates future interactions with, at least the following federal departments, agencies, and officials (Srinivasan Decl. ¶ 32):

   a.     Attorney General of the United States

   b.     Department of Commerce

   c.     Department of Defense

   d.     Department of Health and Human Services

   e.     Department of Homeland Security

   f.     Department of Justice

   g.     Department of Treasury

   h.     Executive Office of Immigration Review

   i.     Federal Trade Commission

   j.     International Trade Commission

   k.     Securities and Exchange Commission

   l.     United States Attorneys' Offices

   m.     United States Customs and Border Protection

   n.     United States Citizenship and Immigration Services

   o.     United States Patent and Trademark Office

27.     Many of the Firm's clients do, or have done, business with the federal government directly or through an affiliate. Srinivasan Decl. ¶¶ 33–34.

28.     Susman Godfrey has nearly twenty clients that contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors. Srinivasan Decl. ¶ 33.

29.     Some of Susman Godfrey's largest clients contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors. Srinivasan Decl. ¶ 33.

### A.    Many of Susman Godfrey's Representations and Practice Areas Rely on Frequent and Substantive Interactions with Federal Government Employees.

30.     Many of Susman Godfrey's current matters—and recurring types of matters—require frequent interactions with the federal government.  Those matters include, but are not limited to, (a) *qui tam* and False Claims Act matters, (b) intellectual property matters, (c) antitrust matters, (d) environmental matters, and (e) pro bono matters.  Srinivasan Decl. ¶¶ 21–31.

#### Qui Tam *and False Claims Act Matters*

31.     Susman Godfrey frequently represents whistleblowers ("relators") in cases brought under the federal False Claims Act, involving private citizens who file suit on behalf of the government against those who have defrauded the government.  Srinivasan Decl. ¶ 23.

32.     *Qui tam* cases provide a significant financial benefit to the United States government.  Between 2022 and 2024, the federal government obtained almost $7 billion in False Claims Act recoveries on behalf of U.S. taxpayers.  Srinivasan Decl. ¶ 23; Declaration of Ginger D. Anders in Support of Plaintiff's Motion for Summary Judgment ("Anders Decl.") Ex. 3.

33.     The Firm's *qui tam* matters require frequent, substantive interaction with federal government employees on behalf of the relator-client and often require in-person contact with the government in federal buildings for meetings, interviews, and negotiations.  Srinivasan Decl. ¶¶ 24–27.

34.     Susman Godfrey's *qui tam* representations typically require ongoing and frequent interactions with responsible attorneys in United States Attorneys' Offices at various stages in the process, including (a) at the initial disclosure stage, in facilitating and conducting interviews between the relator and the federal government, (b) at the investigatory stage, and (c), should the federal government choose to intervene in the action brought by Susman Godfrey, at the discovery and trial stages of the action.  Srinivasan Decl. ¶¶ 24–27.

35.     Susman Godfrey attorneys who are currently representing clients in pending *qui tam* cases have made contact with dozens of United States Attorneys' Offices across the country in these pending cases.  Srinivasan Decl. ¶ 24.

36.     Susman Godfrey currently has at least one interview scheduled between a relator in a *qui tam* action in which it is involved and the federal government, and the Firm anticipates several more interviews to be scheduled in the near future, all of which will involve interaction with the federal government.  Srinivasan Decl. ¶ 25.

37.     In past *qui tam* matters, Susman Godfrey attorneys have entered into common-interest agreements with the Department of Justice that allow Susman Godfrey to review documents produced by the defendant(s) during the investigatory stage; Susman Godfrey attorneys may help Assistant United States Attorneys with reviewing documents and preparing memoranda to assist the Department of Justice in its investigation.  Srinivasan Decl. ¶ 26.

38.     If the federal government decides to intervene in a *qui tam* case involving a Susman Godfrey relator-client, as the government has in current cases handled by Susman Godfrey, then Susman Godfrey attorneys interact frequently with the government attorneys throughout the course of the action, including through telephone calls, videoconferences, and in-person meetings; these interactions involve sharing of information, memoranda, and presentations and, following a

settlement or judgment, resolution of the relator-client's share of the recovery.  Srinivasan Decl. ¶ 27.

### *Intellectual Property Matters*

39.    Susman Godfrey also handles a significant volume of patent-infringement litigation.  Srinivasan Decl. ¶ 28.

40.    Such patent-infringement matters include representing clients before federal agencies with responsibilities over patent validity and patent infringement disputes.  Srinivasan Decl. ¶ 28.

41.    Susman Godfrey attorneys also represent patent owners in the United States International Trade Commission in unfair import proceedings before administrative law judges and in frequent interactions with investigative staff attorneys for the United States International Trade Commission's Office of Unfair Import Investigations, as well as semi-regular interactions with attorneys from the United States International Trade Commission's Office of the General Counsel.  Srinivasan Decl. ¶ 28.

42.    Susman Godfrey attorneys also interact with attorneys working at the Exclusion Order Enforcement Branch of United States Customs and Border Protection to assist them in implementing and enforcing the exclusion orders issued by the United States International Trade Commission.  Srinivasan Decl. ¶ 28.

43.    Susman Godfrey attorneys represent patent owners and patent challengers before the United States Patent and Trademark Office in administrative post-grant proceedings, including before the Patent Trial and Appeal Board.  Srinivasan Decl. ¶ 28.

### *Antitrust Matters*

44.    Susman Godfrey represents plaintiffs with price-fixing, market allocation, refusal-to-deal, no-poach, and monopolization claims in numerous industries, including consumer products, healthcare, real estate, technology, telecommunications, and transportation.  Srinivasan Decl. ¶ 29.

45.    Susman Godfrey's antitrust matters frequently require interaction and coordination with the federal government, including the Antitrust Division of the Department of Justice and the Federal Trade Commission.  Srinivasan Decl. ¶ 29.  Susman Godfrey has had cases related to actions brought by the government, calling for close coordination with the DOJ or FTC in litigation.  *Id.*

### *Environmental Matters*

46.    Susman Godfrey represents plaintiffs and defendants in litigation concerning the discharge of hazardous substances into the environment, including toxic tort actions for personal injuries and property damage, natural resource damages actions, and Superfund remediation actions.  Srinivasan Decl. ¶ 30.

47.    Such representations frequently require interaction with United States Attorneys' Offices, the Environmental Protection Agency, and state and local governments that partner with federal agencies in implementing federal environmental programs and statutory mandates. Srinivasan Decl. ¶ 30.

### *Pro Bono Matters*

48.    Susman Godfrey's pro bono practice involves frequent and regular interactions with federal agencies and federal government employees, including in representations involving

human rights, anti-discrimination issues, constitutional challenges, and death penalty appeals. Srinivasan Decl. ¶ 31.

49.     Much of this pro bono litigation proceeds in federal courts.  Srinivasan Decl. ¶ 31.

**III.    Susman Godfrey has Represented Clients in Litigation Against the Federal Government and Relating to Federal Elections Involving President Trump.**

50.     On behalf of its clients, Susman Godfrey has brought litigation against the federal government in cases adverse to Democratic and Republican presidential administrations. Srinivasan Decl. ¶ 35.

51.     Susman Godfrey attorneys currently are litigating several Tucker Act cases in the Court of Federal Claims, which require frequent interactions with attorneys at the Department of Justice.  Those cases include (a) a Fifth Amendment takings claims against the United States Navy relating to an expansion of the Navy's flight-training program; (b) a case against a federal agency for inverse condemnation on behalf of property owners; and (c) a suit against a federal agency relating to user fees that it collected.  Srinivasan Decl. ¶ 35.

52.     In cases relating to federal elections, Susman Godfrey has represented clients who span the political spectrum.  Srinivasan Decl. ¶ 36.

53.     After then-former Vice President Biden defeated President Trump in the November 2020 presidential election, Anders Decl. Ex. 4, and after several media outlets began falsely claiming that Dominion Voting Systems had "rigged" the 2020 election, President Trump posted on the social media site Twitter on November 13, 2020:  "Now it is learned that the horrendous Dominion Voting System was used in Arizona (and big in Nevada).  No wonder the result was a very close loss!"  Anders Decl. Ex. 5.

54.     On December 15, 2020, President Trump posted on the social media site Twitter: "'Study:  Dominion Machines shifted 2-3% of Trump Votes to Biden.  Far more votes than needed

to sway election.'  Florida, Ohio, Texas and many other states were won by even greater margins

than projected.  Did just as well with Swing States, but bad things happened."  Anders Decl. Ex. 6.

55.     On December 16, 2020, MyPillow CEO and Trump campaign donor Mike Lindell

reposted the December 15, 2020 Twitter post by President Trump and added:  "This is how the

massive fraud was done!  The media should quit hiding the truth!  Everyone should get to see the

evidence and then all will know @realDonaldTrump is our president for 4 more years!  We can't

let our country be taken by China!  They are behind this!"  Anders Decl. Ex. 7.

56.     Susman Godfrey has represented Dominion Voting Systems in defamation actions

against various individuals and entities alleging that it knowingly perpetuated false claims relating

to the November 2020 presidential election.  Srinivasan Decl. ¶¶ 37–39.

57.     For example, Susman Godfrey has represented Dominion Voting Systems against

Fox News and Fox News Corporation based on their false claims relating to the 2020 election (the

"Fox Litigation").  Srinivasan Decl. ¶ 37.

58.     The trial court in the Fox Litigation ruled that none of Fox's disputed statements

about Dominion Voting Systems and the 2020 election were true.  Srinivasan Decl. ¶ 37; *see US

Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023).

59.     The Fox Litigation settled shortly before trial for $787.5 million, which has been

reported to be the largest publicly known defamation settlement involving a media company in

United States history.  Srinivasan Decl. ¶ 37; Anders Decl. Ex. 8

60.     Delaware Superior Court Judge Eric Davis praised the attorneys in the Fox

Litigation—including Susman Godfrey attorneys—for "the best lawyering [he has] had, ever" and

stated that he "would be proud to be [their] judge in the future."  Anders Decl. Ex. 9.

61.     Susman Godfrey also represents Dominion Voting Systems with respect to claims against Newsmax Media for allegedly false and defamatory statements that the network broadcasted accusing Dominion of voter fraud and rigging the 2020 election to flip votes from President Trump to then-former Vice President Joseph R. Biden, Jr. (the "Newsmax Litigation"). Srinivasan Decl. ¶ 38.

62.     In April 2025, the trial court in the Newsmax Litigation ruled at summary judgment that Newsmax had made false and defamatory statements about Dominion Voting Systems and the 2020 election.  Srinivasan Decl. ¶ 38; *see US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063, 2025 WL 1092289, at *17 (Del. Super. Ct. Apr. 9, 2025).

63.     The trial court in the Newsmax Litigation issued its ruling on April 9, 2025, hours before President Trump signed the Executive Order targeting Susman Godfrey.  Srinivasan Decl. ¶ 38.

64.     At the time the Order issued against Susman Godfrey, the Firm was scheduled to proceed to trial in the Newsmax Litigation less than three weeks later.  Srinivasan Decl. ¶ 38.

65.     Susman Godfrey continues to represent Dominion Voting Systems in similar defamation lawsuits arising out of allegedly false statements related to the 2020 presidential election, including actions against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network (OAN).  Srinivasan Decl. ¶ 39; *see, e.g.*, *US Dominion, Inc. v. Giuliani*, No. 1:21-cv-213-CJN (D.D.C. filed Jan. 25, 2021); *US Dominion, Inc. v. Powell*, No. 1:21-cv-40-CJN (D.D.C. filed Jan. 8, 2021); *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-445-CJN (D.D.C. filed Feb. 22, 2021); *US Dominion, Inc. v. Herring Networks, Inc.*, No. 1:21-cv-2130-CJN (D.D.C. filed Aug. 10, 2021).

66.    In addition, following the November 2020 presidential election, Susman Godfrey represented various state officers in their official capacities, including the Governor of Wisconsin and the Secretary of State of Arizona, against assertions that the election had been rigged. Srinivasan Decl. ¶ 36; *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. filed Dec. 1, 2020); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. filed Dec. 2, 2020).

67.    In the cases in which Susman Godfrey represented the Governor of Wisconsin and the Secretary of State of Arizona in connection with the 2020 presidential election, federal courts rejected the claims advanced by the Trump presidential campaign and individuals supporting President Trump that sought to decertify the election results based on allegations of voter fraud, improper vote dilution, and compromised voting machine security.  Srinivasan Decl. ¶ 36; *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. Dec. 9, 2020), ECF No. 83, *vacated on other grounds by Feehan v. Wis. Elections Comm'n*, No. 20-3448 (7th Cir. Feb. 1, 2021); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. Dec. 9, 2020), ECF No. 84.

68.    In election litigation in federal court in Arizona, Susman Godfrey presented at a hearing on behalf of all state-official defendants (including the Democratic Secretary of State and Republican Governor) that had been sued by voters and Republican party chairs for various Arizona counties.  Srinivasan Decl. ¶ 36; *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. Dec. 8, 2020), ECF Nos. 69, 83.

## IV.    The President Has Engaged in a Campaign of Retribution and Intimidation Against Law Firms Representing Causes or Clients that he Disfavors.

69.    Since February 2025, President Trump has signed executive orders and memoranda targeting law firms that (i) employ or have employed individuals he disfavors or (ii) represent or have represented causes or clients he disfavors.  Srinivasan Decl. ¶¶ 40–64.

### A.    Covington & Burling LLP

70.    On February 25, 2025, President Trump signed a memorandum directed to the heads of various agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts." Anders Decl. Ex. 10.

71.    President Trump's memorandum specifically calls out Peter Koski, a partner at Covington & Burling LLP "who assisted former Special Counsel Jack Smith," who brought criminal charges against President Trump in the wake of President Trump's efforts to challenge the 2020 election results. Anders Decl. Exs. 10, 11.

72.    President Trump's memorandum directs agency heads to "suspend any active security clearances held by" Mr. Koski and "all members, partners, and employees of Covington and Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," and directs those agency heads "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law." Anders Decl. Ex. 10.

### B.    Perkins Coie LLP

73.    On March 6, 2025, President Trump issued Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP" (the "Perkins Order"). Anders Decl. Ex. 12.

74.    The stated "Purpose" of the Perkins Order was to address the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including "representing failed Presidential candidate Hillary Clinton," which it characterized as "part of a pattern" of "egregious activity." Anders Decl. Ex. 12 § 1.

75.    The Perkins Order stated that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." Anders Decl. Ex. 12 § 1.

76.     The Perkins Order directed federal agencies to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie." Anders Decl. Ex. 12 § 2.

77.     The Perkins Order directed "Government contracting agencies . . . , to the extent permissible by law, [to] require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract." Anders Decl. Ex. 12 § 3.

78.     The Perkins Order directed the heads of all federal agencies to "review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie" and to "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, . . . for which Perkins Coie has been hired to perform any service."  Anders Decl. Ex. 12 § 3.

79.     The Perkins Order directed the heads of all federal agencies, "to the extent permitted by law, [to] provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Anders Decl. Ex. 12 § 5.

80.     The Perkins Order directed the heads of all federal agencies to "provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States."  Anders Decl. Ex. 12 § 5.

81.     The Perkins Order directed "[a]gency officials . . . , to the extent permitted by law, [to] refrain from hiring employees of Perkins Coie, absent a waiver . . . that such hire will not threaten the national security of the United States."  Anders Decl. Ex. 12 § 5.

82.    The Perkins Order directed the Chair of the Equal Employment Opportunity Commission to "review the practices of representative large, influential, or industry leading law firms" for what that order describes as "discrimination under 'diversity, equity, and inclusion' policies."  Anders Decl. Ex. 12 §§ 1, 4.

83.    On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order.  Anders Decl. Ex. 13; *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 1.

84.    On March 12, 2025, Judge Beryl A. Howell of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Perkins Order.  Anders Decl. Ex. 14; *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 21.

85.    The same day, President Trump's Deputy Chief of Staff for Policy Stephen Miller posted an article about Judge Howell's ruling on the social media site X and commented:  "Lawless judicial tyranny.  Judges have no authority to force the executive branch to provide classified secrets to Democrat activist law firms."  Anders Decl. Ex. 15.

86.    Judge Howell's order said nothing about the security clearance issues raised by the Perkins Order.  Anders Decl. Ex. 14.

**C.    Paul, Weiss, Rifkind, Wharton & Garrison LLP**

87.    After the district court temporarily enjoined the Perkins Order, President Trump issued Executive Order 14237, titled "Addressing Risks from Paul Weiss" (the "Paul Weiss Order").  Anders Decl. Ex. 16.

88.    The Paul Weiss Order directed government officials to apply measures with respect to Paul Weiss and its employees similar to those applied to Perkins Coie under the enjoined Perkins Order.  Anders Decl. Ex. 16.

16

89.    The Paul Weiss Order stated that "[g]lobal law firms" have "played an outsized role in undermining the judicial process and in the destruction of bedrock American principles," and "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections."  Anders Decl. Ex. 16 § 1.

90.    The Paul Weiss Order stated that, in addition to work done on behalf of paying clients, the allegedly improper litigation brought by "[g]lobal law firms" includes work done "pro bono" or "for the public good."  Anders Decl. Ex. 16 § 1.

91.    The Paul Weiss Order identified specific Paul Weiss partners, including a "former leading prosecutor in the office of Special Counsel Robert Mueller" whom the Order describes as having "brought a pro bono suit" "on behalf of the District of Columbia Attorney General" "against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021."  Anders Decl. Ex. 16 § 1.

92.    On March 20, 2025, on Truth Social, the President announced that, as part of an agreement with Paul Weiss, he would withdraw the Paul Weiss Order.  Anders Decl. Ex. 17.

93.    The President stated that "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives."  Anders Decl. Ex. 17.

94.    The President stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."  Anders Decl. Ex. 17.

95. On March 21, 2025, President Trump issued Executive Order 14244, "Addressing Remedial Action by Paul Weiss," which rescinded the Paul Weiss Order. Anders Decl. Ex. 18 .

96. Mr. Karp, Paul Weiss's Chairman, stated: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration." Anders Decl. Ex. 17.

97. Neither the President's March 20, 2025 Truth Social post regarding the agreement with Paul Weiss nor Executive Order 14244 referenced any national security concerns regarding Paul Weiss nor any resolution of such concerns. Anders Decl. Exs. 17, 18.

**D. Alleged Abuses of the Legal System**

98. Two days after the agreement with Paul Weiss, President Trump issued a memorandum dated March 22, 2025, titled "Preventing Abuses of the Legal System and the Federal Court" (the "Legal System Memorandum"). Anders Decl. Ex. 20.

99. The Legal System Memorandum directed the Attorney General to "seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States." Anders Decl. Ex. 20. Such sanctions include "reassess[ing]" attorney security clearances and "terminat[ing] . . . any Federal contract" under which they provide services—whenever the Attorney General concludes that their conduct warrants such measures. Anders Decl. Ex. 20.

100. The Legal System Memorandum further instructed the Attorney General to review attorney conduct in litigation against the federal government over the past eight years and to recommend the same range of disciplinary actions if the Attorney General "identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices." Anders Decl. Ex. 20.

E.      **Jenner & Block LLP**

101.    On March 25, 2025, President Trump issued Executive Order 14246, titled "Addressing Risks from Jenner & Block" (the "Jenner Order").  Anders Decl. Ex. 21.

102.    The Jenner Order directed government officials to apply measures with respect to Jenner & Block and its employees similar to those set forth in the enjoined Perkins Order and the withdrawn Paul Weiss Order.  Anders Decl. Ex. 21.

103.    The Jenner Order stated that "so-called 'Big Law' firms . . . regularly conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients."  Anders Decl. Ex. 21 § 1.

104.    The Jenner Order stated that Jenner & Block is "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."  Anders Decl. Ex. 21 § 1.

105.    The Jenner Order singled out Jenner & Block for re-hiring Andrew Weissmann after he served as part of Special Counsel Robert Mueller's "entirely unjustified investigation." Anders Decl. Ex. 21 § 1.

106.    On March 28, 2025, Jenner & Block sued to enjoin the Jenner Order.  Anders Decl. Ex. 22; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1.

107.    On that same date, Judge John D. Bates of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Jenner Order.  Anders Decl. Ex. 23; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9.

108.    In a memorandum informing federal agency heads of that temporary restraining order (the "Jenner Notice"), Attorney General Pamela Bondi and Office of Management and Budget Director Russell Vought described Jenner & Block as "committed to the weaponization of justice, discrimination on the basis of race, radical gender ideology, and other anti-American pursuits." Anders Decl. Ex. 24; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 21-1.

109.    The Jenner Notice also stated that, by issuing the temporary restraining order, the district court had "invaded the policy-making and free speech prerogatives of the executive branch," and that the order was a "blatant overstepping of the judicial power." Anders Decl. Ex. 24; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 21-1.

### F.    Wilmer Cutler Pickering Hale and Dorr LLP

110.    On March 27, 2025, President Trump issued Executive Order 14250, titled "Addressing Risks from WilmerHale" (the "WilmerHale Order"). Anders Decl. Ex. 25.

111.    The WilmerHale Order applied measures with respect to WilmerHale and its employees similar to those set forth in the prior orders concerning other law firms. Anders Decl. Ex. 25 § 1.

112.    The WilmerHale Order stated that WilmerHale "engages in obvious partisan representations to achieve political ends," including by "support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." Anders Decl. Ex. 25 § 1.

113.    The WilmerHale Order stated that WilmerHale is "bent on employing lawyers who weaponize the prosecutorial power," as reflected in its hiring of Robert Mueller and two of his

colleagues from the Mueller investigation, Aaron Zebley and James Quarles.  Anders Decl. Ex. 25 § 1.

114.    On March 28, 2025, WilmerHale sued to enjoin the WilmerHale Order.  Anders Decl. Ex. 26; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

115.    On that same date, Judge Richard J. Leon of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 3 and 5 of the WilmerHale Order.  Anders Decl. Ex. 27; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

### G.    The Trump Administration's Threatened Action Against Other Large Law Firms

116.    President Trump has threatened government action against additional law firms. Srinivasan Decl. ¶ 51.

117.    The Trump Administration has stated as among its "priorit[ies] both to end lawfare and the weaponization of government and also to hold those who have engaged in lawfare accountable."  Anders Decl. Ex. 28 at 4:44–4:53.

118.    When he signed the Perkins Order, President Trump stated that his administration was "looking at about 15 different firms" as potential targets for similar measures.  Anders Decl. Ex. 28 at 5:45–5:50.  President Trump's aide added, "That, or more, sir."  *Id.*

119.    Days after he issued the Perkins Order, President Trump stated in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people."  Anders Decl. Ex. 29.

120.    The same day that President Trump issued the Paul Weiss Order, he delivered a speech at the Department of Justice referencing "crooked law firms," "violent, vicious lawyers," and "fake lawyers."  Anders Decl. Ex. 30.

121.    Upon signing the Order targeting Susman Godfrey, the President told the gathered press that "we've signed with many law firms, the ones that we thought were inappropriate" and "we have another five to go."  Anders Decl. Ex. 31 at 0:38–1:32.

122.    Steve Bannon, a senior counselor and strategist for President Trump during the first Trump Administration, has stated that President Trump is "going after" law firms "to cut them off," explaining that "what we are trying to do is put [law firms] out of business and bankrupt [them]."  Anders Decl. Ex. 32.

**H.    President Trump Reaches Agreements with Additional Law Firms**

123.    Following the Paul Weiss agreement, additional law firms have chosen to reach agreements with the White House.  Srinivasan Decl. ¶ 53.

124.    On March 28, 2025, in a post on Truth Social, the President announced an agreement with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  Anders Decl. Ex. 33.

125.    The agreement with Skadden occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 33.

126.    Public reporting has stated that the President intended to issue an executive order with respect to Skadden on account of its pro bono work and diversity, equity, and inclusion initiatives.  Anders Decl. Ex. 34

127.    Skadden agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support," including causes that "represent the full political spectrum," and to award

pro bono fellowships to "Law Graduates that . . . represent a wide range of political views, including conservative ideals."  Anders Decl. Ex. 33.

128.    In the March 28, 2025 Truth Social post announcing the agreement with Skadden, the President announced that Skadden had "declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession," and stated that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."  Anders Decl. Ex. 33.

129.    On April 1, 2025, in a post on Truth Social, the President announced a similar agreement with the law firm Willkie Farr & Gallagher LLP ("Willkie").  Anders Decl. Ex. 35.

130.    The agreement with Willkie occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 35.

131.    Public reporting has stated that, prior to reaching this agreement, Willkie had learned that the President intended to issue an executive order against the firm.  Anders Decl. Ex. 36.

132.    Willkie committed "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support," including causes that "represent the full political spectrum, including Conservative ideals." Anders Decl. Ex. 35.

133.    In the April 1, 2025 Truth Social post announcing the agreement with Willkie, the President announced that Willkie had "offer[ed] their decisive commitment to ending the Weaponization of the Justice System and the Legal Profession," and stated that he "is delivering on his promises of eradicating Partisan Lawfare in America, and restoring Liberty and Justice FOR ALL."  Anders Decl. Ex. 35.

134.    On April 2, 2025, in a post on Truth Social, the President announced an agreement with the law firm Milbank LLP.  Anders Decl. Ex. 37.

135.    The agreement with Milbank occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 37.

136.    Public reporting has stated that, prior to reaching this agreement, President Trump's administration contacted Milbank with concerns about Milbank's approach to pro bono and diversity initiatives and suggested that Milbank reach an agreement similar to Skadden's.  Anders Decl. Ex. 38.

137.    Milbank committed to "perform a total of at least $100 Million Dollars in pro bono legal services during the Trump Administration, and beyond, on initiatives supported by both the President and Milbank," including causes that "represent the full political spectrum, including Conservative ideals"  Anders Decl. Ex. 37.

138.    In the April 2, 2025 Truth Social post announcing the agreement with Milbank, the President announced that Milbank had "stat[ed] their resolve to help end the Weaponization of the Justice System and the Legal Profession," and stated that he "continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America, and restore Liberty and Justice FOR ALL."  Anders Decl. Ex. 37.

139.    On April 8, 2025, during a White House event relating to the coal industry, President Trump remarked:  "Have you noticed that lots of law firms have been signing up with Trump?  A hundred million dollars, another hundred million, for damages that they've done.  But they give you $100 million, and then they announce that, 'But we have done nothing wrong.  And I agree, they've done nothing wrong, but what the hell, they give me a lot of money considering they've done nothing wrong."  He continued:  "And we'll use some of those people, some of those

great firms. They are great firms too, they just had a bad moment." Gesturing to the gathered members of the coal industry, he added: "But we're going to use some of those firms to work with you on you leasing and your other things, and they'll do a great job. I think they're going to do a fantastic job." Anders Decl. Ex. 39 at 25:56–26:39.

140.    On April 11, 2025, in a post on Truth Social, the President announced that he had reached agreements with five additional law firms. Anders Decl. Ex. 40.

141.    Four of those firms—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—agreed to "provide an aggregate total of at least $500 Million Dollars in pro bono and other free Legal services, during the Trump Administration and beyond, . . . to causes that President Trump and the Law Firms both support and agree to work on," including causes that "represent the full political spectrum, including Conservative ideals." Anders Decl. Ex. 40. The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences." *Id.*

142.    The President stated that, concurrently, the Equal Employment Opportunity Commission had "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues." Anders Decl. Ex. 40.

143.    The President also announced "commitments" made by a fifth firm, Cadwalader, Wickersham & Taft LLP. Anders Decl. Ex. 41.

144.    Cadwalader agreed to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support." Anders Decl. Ex. 41.

145.    President Trump has stated that the law firms the Administration has reached agreements with "went for some pretty big numbers," "millions of dollars an hour," but "they don't admit guilt, remember that, they don't admit guilt." Anders Decl. Ex. 31 at 0:55–1:28.

146.    White House Press Secretary Karoline Leavitt said in a statement:  "Big Law continues to bend the knee to President Trump because they know they were wrong."  Anders Decl. Ex. 42.

147.    President Trump has since stated that law firms that have reached agreements with the Administration might help him negotiate trade deals, revive the coal industry, or represent President Trump and his allies if they are investigated.  Anders Decl. Exs. 43, 60.

## V.    Susman Godfrey is the Latest Target of the President's Campaign of Retribution.

148.    On April 4, 2025, Susman Godfrey was one of more than 500 law firms that signed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice*. No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1 (Anders Decl. Ex. 44).  Srinivasan Decl. ¶ 58.  Susman Godfrey also signed the amicus briefs filed on behalf of more than 800 law firms in the *Jenner* and *WilmerHale* cases. *Id.*; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Apr. 11, 2025), ECF No. 45-1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 11, 2025), ECF No. 80.

149.    The amicus brief that Susman Godfrey signed argued that the President's Executive Orders against Perkins Coie and other leading law firms "pose a grave threat to our system of constitutional governance and to the rule of law itself" and warned that "any controversial representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation."  Anders Decl. Ex. 44 at 1–2; *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1.

150.    Susman Godfrey was one of only eight firms in the Am Law 100 (the top 100 firms by revenue in the United States) that signed the amicus brief.  Srinivasan Decl. ¶ 58.

151.    At the time of signing the amicus brief, Susman Godfrey was the fifth-largest Am Law 100 firm to sign the brief, and two of the larger firms already had been subjects of Executive Orders (WilmerHale and Perkins Coie).  Srinivasan Decl. ¶ 58.

152.    On April 8, 2025, Susman Godfrey filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice* on behalf of 27 former national security, foreign policy, intelligence, and other public officials who have worked in Democratic and Republican administrations.  Srinivasan Decl. ¶ 59; Anders Decl. Ex. 45; *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Apr. 8, 2025), ECF No. 104.

153.    The amicus brief filed by Susman Godfrey argued, among other things, that "[t]he Constitution did not make the President a king empowered to punish subjects arbitrarily based on animus or whim."  Anders Decl. Ex. 45 at 2.  It further stated:  "When Amici served in the United States government, executive orders of this nature would have been viewed as unthinkable violations of their constitutional oath.  Yet the repeated issuance in recent weeks of punitive executive orders against specific lawyers and law firms, with perhaps more to come, makes clear that this Administration will continue to levy such sanctions unless enjoined by the courts."  *Id.* at 25.

154.    Susman Godfrey informed the Department of Justice that it intended to seek leave to file the above-described amicus brief of former senior government officials on April 5, 2025.  The Firm filed the amicus brief on April 8, 2025.  Srinivasan Decl. ¶ 59.

155.    The day after Susman Godfrey filed the amicus brief, on April 9, 2025, President Trump signed the Order targeting Susman Godfrey.  Anders Decl. Ex. 1; Srinivasan Decl. ¶ 59.

156.    The Order was accompanied by a "Fact Sheet."  Anders Decl. Ex. 2.

157.    Susman Godfrey received no contact or other outreach from the Trump Administration prior to issuance of the Order and Fact Sheet, and was provided no notice that the Order and Fact Sheet were forthcoming.  Srinivasan Decl. ¶ 61.

158.    Susman Godfrey was not given an opportunity to respond to the allegations in the Order and Fact Sheet prior to their issuance.  Srinivasan Decl. ¶ 61.

159.    As of the date hereof, the Administration has not contacted Susman Godfrey regarding the assertions in the Order.  Srinivasan Decl. ¶ 61.

160.    When handing the Order to President Trump to sign, White House Staff Secretary Will Scharf said to the President:  "This is an executive order that takes certain measures against Susman Godfrey to ensure that they can't access government resources, government buildings—scrutinizing certain aspects of their practices as a law firm given their previous activities."  Anders Decl. Ex. 31 at 0:18–0:33.

161.    During the signing ceremony for the Order, President Trump stated:  "We're just starting a process with this [firm], because there were some very bad things that happened with these law firms."  Deputy White House Chief of Staff for Policy Stephen Miller added:  "This firm was very involved in the election misconduct."  Anders Decl. Ex. 31 at 1:30–1:44.

162.    The Order and Fact Sheet state that Susman Godfrey "spearheads efforts to weaponize the American legal system and degrade the quality of American elections."  Anders Decl. Ex. 1 § 1; Anders Decl. Ex. 2 § 1.

163.    The Order and Fact Sheet state that Susman Godfrey "also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology."  Anders Decl. Ex. 1 § 1; Anders Decl. Ex. 2 § 1.

164.    At oral argument on Susman Godfrey's motion for a temporary restraining order in this action, the Court asked: "But you don't have any understanding of what the funding groups that undermine the effectiveness of the military is?"  The Government answered: "Regrettably, Your Honor, I have no further information than what's contained in the order."  Anders Decl. Ex. 46 at 18:13–17.

165.    The Order states that Susman Godfrey "supports efforts to discriminate on the basis of race" and that the Firm "itself engages in unlawful discrimination, including discrimination on the basis of race."  Anders Decl. Ex. 1 § 1.

166.    The Order cites as the sole support for this statement a Susman Godfrey program that the Order states "offers financial awards and employment opportunities only to 'students of color.'"  Anders Decl. Ex. 1 § 1.

167.    The Firm does not operate any program that offers employment opportunities only to people of color.  Srinivasan Decl. ¶ 64.

168.    To the extent the Order intends to reference the Susman Godfrey Prize, that is a cash prize that is awarded to up to 20 students of color who are finishing their first or second year at certain law schools.  Srinivasan Decl. ¶ 64; Anders Decl. Ex. 47.

169.    The Susman Godfrey Prize program does not offer any "employment opportunities."  Students receiving the Susman Godfrey Prize are not, in connection with or as a condition of receipt of that prize, offered employment at Susman Godfrey.  Srinivasan Decl. ¶ 64; Anders Decl. Ex. 47.

170.    At oral argument on Susman Godfrey's motion for a temporary restraining order in this action, when the Court asked counsel for the United States to "start with Section 1 and tell me what you think are the allegations behind each of the statements," counsel for the United States

stated:  "Regrettably, I don't have any further information beyond what is contained in here aside from the discrimination issue.  And for that, all I have is a web page from the Susman website discussing some of the diversity initiatives, which we think would speak to the sort of gray zone under the Students for Fair Admissions case and diversity and quotas and so forth."  Anders Decl. Ex. 46 at 18:2–12.

## VI.    The Executive Order has Harmed, is Currently Harming, and will Continue to Harm Susman Godfrey.

### A.    Limits on Access to Federal Courts and Federal Officials

171.    Section 5 of the Order directs that "heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise would be inconsistent with the interests of the United States."  Anders Decl. Ex. 1 § 5(a).

172.    Section 5 also directs that "the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States."  Anders Decl. Ex. 1 § 5(a).

173.    The memorandum that the Department of Justice sent affected agencies notifying them of the Court's Temporary Restraining Order stated that the Order "imposes certain requirements related to limiting the access of employees of [Susman] Godfrey to Federal buildings and engaging with or hiring [Susman] Godfrey employees."  Anders Decl. Ex. 48.

174.    Federal courthouses are "Federal Government buildings," as referenced in the Order.  *See* Anders Decl. Ex. 1 § 5(a); Anders Decl. Ex. 46 at 45:14–16.

175.    Susman Godfrey attorneys frequently access federal courthouses to advocate on behalf of their clients in federal court.  Srinivasan Decl. ¶¶ 19–34.

176.    Susman Godfrey attorneys frequently engage with federal government employees in their official capacities in order to petition the federal government on behalf of the Firm's clients.  Srinivasan Decl. ¶¶ 19–34.

177.    Susman Godfrey attorneys are in federal court and interacting with federal officials every week and nearly every day.  Srinivasan Decl. ¶ 20.

178.    Susman Godfrey has hundreds of active matters before federal courts and federal agencies that require access to federal government buildings and officials.  Srinivasan Decl. ¶ 66.

179.    Limitations on Susman Godfrey attorneys accessing federal buildings or interacting with federal personnel, or even uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel, negatively impacts the Firm's ability to practice law in federal courts and on federal issues.  Srinivasan Decl. ¶ 66.

### B.    Harm to Recruitment and Retention of Employees

180.    The Order directs that federal agency officials, "to the extent permitted by law, refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  Anders Decl. Ex. 1 § 5(a).

181.    Susman Godfrey attorneys and professional staff frequently leave the firm for federal service.  Srinivasan Decl. ¶ 77.  Many law students and currently practicing attorneys are drawn to the Firm and stay at the Firm due to the significant substantive responsibility that the Firm gives to associates, which helps make those attorneys more compelling candidates for federal employment.  Srinivasan Decl. ¶ 77.

182.    It is common for attorneys to begin their careers at private law firms such as Susman Godfrey before departing for clerkships for federal judges or employment in United States

Attorneys' Offices, other parts of the United States Department of Justice, or federal agencies. Srinivasan Decl. ¶ 77.

183.    Unless the Order is permanently enjoined, the Order's direction to federal agencies to refrain from hiring Susman Godfrey employees, absent a waiver, will impair the Firm's ability to recruit and retain employees who are interested in future federal employment.  Srinivasan Decl. ¶ 77; Declaration of Robert E. Hirshon in Support of Plaintiff's Motion for Summary Judgment ("Hirshon Decl.") ¶ 22.

184.    Law firms compete for legal talent, and attorneys regularly move to different law firms to seek expanded opportunities or pay.  Anders Decl. Ex. 61.

185.    Unless the Order is permanently enjoined, attorneys may leave Susman Godfrey to seek employment at other law firms that are not subject to the restrictions the Order imposes on Susman Godfrey.  Anders Decl. Ex. 62.

### C.    Forced Disclosure of Attorney-Client Relationships

186.    Section 3 of the Order directs that "Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract."  Anders Decl. Ex. 1 § 3(a).

187.    Section 3 further directs that agency heads "shall review all contracts with Susman and with entities that disclose doing business with Susman."  Anders Decl. Ex. 1 § 3(b).

188.    Section 3 further directs that agency heads shall "take appropriate steps to terminate any contract, to the maximum extent permitted by law . . . for which Susman has been hired to perform any service" and "otherwise align their agency funding decisions with the interests of the citizens of the United States . . . and as heads of agencies deem appropriate."  Anders Decl. Ex. 1 § 3(b).

189.    Nearly twenty of Susman Godfrey's clients, including several of the Firm's largest clients, contract with or otherwise do business with the federal government or have affiliates who are government contractors and subcontractors.  Srinivasan Decl. ¶ 33.

190.    For many of Susman Godfrey's clients, the fact that the Firm provides them legal advice is not public information.  Srinivasan Decl. ¶ 69.

191.    Susman Godfrey vets numerous cases to consider whether or not to pursue them long before they are filed.  Srinivasan Decl. ¶ 69.

192.    If not permanently enjoined, the Order will require certain of the Firm's clients to divulge confidential information regarding their legal representations to the federal government.  Srinivasan Decl. ¶ 69.

193.    By terminating government contracts and compelling disclosure of attorney-client relationships, the Order, if not permanently enjoined, will adversely impact clients who contract or otherwise do business with the federal government and who seek legal advice or legal services from Susman Godfrey.  Hirshon Decl. ¶ 21.

### D.    Revocation of Security Clearances

194.    In Section 2, titled "Security Clearance Review," the Order directs that the Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies "shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest."  Anders Decl. Ex. 1 § 2(a).

195.    The Fact Sheet accompanying the Order states that the Order is "suspending security clearances to protect the national interest."  Anders Decl. Ex. 2.

196.    Susman Godfrey personnel currently possess active security clearances.  Srinivasan Decl. ¶ 79.

197.    One attorney at Susman Godfrey possesses a Top Secret/Sensitive Compartmented Information clearance in connection with that attorney's service in the military.  Srinivasan Decl. ¶ 79.

198.    Active security clearances are necessary for the effective representation of clients in certain cases involving sensitive government information, such as in matters involving national security or defense and certain *qui tam* and False Claims Act matters.  Srinivasan Decl. ¶ 79.

199.    Susman Godfrey has in the past had matters that require active security clearances. Srinivasan Decl. ¶ 79.

200.    Susman Godfrey expects to have matters requiring security clearances in the future. Srinivasan Decl. ¶ 79.

201.    Unless permanently enjoined, the Order's creation of a Susman Godfrey-specific "Security Clearance Review" process will restrict the Firm's ability to represent clients in matters involving classified information, including, for instance, matters in the Firm's *qui tam* and False Claims Act practice.  Srinivasan Decl. ¶ 79.

202.    Section 2 also directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman" and to "expeditiously cease such provision," to the extent permitted by law.  Anders Decl. Ex. 1 § 2(b).

203.    The federal government does not currently provide Sensitive Compartmented Information Facilities access to Susman or its employees.  Srinivasan Decl. ¶ 80.

**E.    Effect on Exercise of Profession**

204.    Before the Order was enjoined, the Order was intended to impose and did impose chilling effects on Susman Godfrey attorneys deciding whether to take on future representations

34

that may lead to further executive action due to potentially disfavored viewpoints or identities. Srinivasan Decl. ¶ 75.

205.    Unless the Order is permanently enjoined, Susman Godfrey attorneys will have to reconsider how they approach current matters requiring appearances in federal forums or requiring interactions with federal officials, attorneys, and personnel.  Srinivasan Decl. ¶ 75.

206.    The stated intent of the Order is to chill the prosecution in court of claims the administration does not favor.  Anders Decl. Ex. 1.

207.    The executive orders targeting law firms have chilled speech at other affected law firms:

> a.    Perkins Coie reported that the Perkins Order "had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings."  Anders Decl. Ex. 49 ¶ 51.
>
> b.    WilmerHale reported that the WilmerHale Order "impeded and will impede its lawyers' ability to zealously advocate as counsel."  Anders Decl. Ex. 50 ¶ 76.
>
> c.    Jenner & Block reported that the Jenner Order "threatens Jenner attorneys' right to practice their chosen profession," including in what types of pro bono work the firm chooses to pursue.  Anders Decl. Ex 51 ¶ 70.

208.    Public reporting also has described a chilling effect on law firms' representations. Anders Decl. Exs. 52–54.

209.    The *Washington Post* reported on March 25, 2025 that "law firms [were] refus[ing] to represent Trump opponents in the wake of his attacks."  Anders Decl. Ex. 52 ("The volunteers

and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear.").

210.    *CNN* reported on March 27, 2025 that "law firms [were] scared to speak out amid Trump's attacks on their livelihood." Anders Decl. Ex. 53.

211.    *NPR* reported on April 13, 2025 that "Trump attacks on law firms [were] begin[ning] to chill pro bono work on causes [the President] doesn't like."  Anders Decl. Ex. 54.

212.    Organizations that regularly partner with law firms to provide pro bono assistance to challenge government actions or policies have recently found law firms to be less willing to partner with them on pro bono work.  Anders Decl. Ex. 54.

213.    Legal ethics expert Professor Robert Hirshon has opined that if attorneys are fearful of advocating for causes adverse to the federal government or adverse to the President's personal and political interests, it will be difficult for clients with such interests to find attorneys to represent them.  Hirshon Decl. ¶ 21.

**F.    Reputational Harm to the Firm**

214.    By characterizing the Firm's work as "dangerous" and "detrimental to critical American interests," Anders Decl. Ex. 1 § 1, among other things, the Order has harmed Susman Godfrey's reputation in the markets for clients, attorneys, and staff.  Srinivasan Decl. ¶ 76.

215.    The Order suggests that Susman Godfrey is so "dangerous" that it cannot be permitted to represent clients in interactions with the federal government, at federal agencies, or in federal courtrooms.  Anders Decl. Ex. 1.

216.    Public reporting has suggested that orders like the Executive Order implicating Susman Godfrey render it more difficult for law firms to perform work on behalf of their clients effectively.  *See, e.g.*, Anders Decl. Exs. 52–55, 61.

### G.    Financial Harm to the Firm

217.    Susman Godfrey attorneys already have devoted hundreds of hours to monitoring and analyzing the Administration's actions targeting other law firms, preparing Susman Godfrey's response should the Firm be targeted by President Trump, and, now, responding to the Order targeted at Susman Godfrey.  Srinivasan Decl. ¶ 57.

218.    Susman Godfrey also has been required to engage outside counsel to represent the Firm in this challenge to the April 9, 2025 Order.  Srinivasan Decl. ¶ 57.

219.    Unless the Order is permanently enjoined, the Order will cause further financial harm to Susman Godfrey.  Srinivasan Decl. ¶ 72.

220.    If the Order is not permanently enjoined, limitations on Susman Godfrey attorneys accessing federal buildings or interacting with federal personnel, or even uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel, will negatively impact the Firm's business.  Srinivasan Decl. ¶ 66.

221.    Unless the Order is permanently enjoined, existing and potential government-contractor clients will in some instances choose competitor firms because those firms are not subject to the Order's Section 3 restrictions.  Srinivasan Decl. ¶¶ 69, 72–73; *see* Hirshon Decl. ¶ 17.

222.    Unless the Order is permanently enjoined, existing and potential clients will in some instances choose competitor firms because those firms are not restricted in their ability to access federal government buildings and engage with federal employees.  Srinivasan Decl. ¶¶ 66, 72–73.

223.    Since the signing of the Order, clients contacted Susman Godfrey partners to inquire about the effects of the Order, and whether it affected Susman Godfrey's ability to access

the federal courts or could negatively affect Susman Godfrey's continued representation of those clients.  Srinivasan Decl. ¶ 70.

224.    Other law firms subject to similar executive orders reported that they lost clients and had meetings with the federal government cancelled before temporary restraining orders issued against the executive orders affecting them:

a.    Before the Perkins Order was temporarily enjoined, the federal government informed a Perkins Coie client that Perkins Coie attorneys could not attend upcoming scheduled meetings with the federal government.  Perkins Coie also reported that numerous clients had terminated engagements with the firm.  Anders Decl. Ex. 56 ¶¶ 25–26, 29; Anders Decl. Ex. 49 ¶¶ 44–45.

b.    Before the Paul Weiss Order was rescinded, at least one Paul Weiss client terminated his representation by Paul Weiss as a result of the Paul Weiss Order.  Anders Decl. Ex. 57 at 2–3.

c.    Before the Jenner Order was temporarily enjoined, the federal government informed Jenner & Block attorneys that they could not attend an upcoming meeting with the Department of Justice, and several clients expressed concern about Jenner & Block's ongoing representation of them.  Anders Decl. Ex. 51 ¶¶ 63–64, 68; Anders Decl. Ex. 58 ¶¶ 70–72.

d.    Before the WilmerHale Order was temporarily enjoined, a federal agency contacted a WilmerHale government contractor client requesting that the WilmerHale client disclose whether it had any business relationship with WilmerHale.  Two meetings between WilmerHale attorneys and a federal agency were also abruptly postponed.  Anders Decl. Ex. 59 ¶¶ 4–5.

225.    Absent a permanent injunction, Susman Godfrey expects to have the government cancel meetings with its attorneys, to have its employees' access to government buildings restricted, and to lose clients, similar to the other affected law firms.  Srinivasan Decl. ¶¶ 50, 65–73.

**H.    Effect on Employees' Ability to Perform Their Civic Duties**

226.    If a Susman Godfrey employee reports for federal jury duty, the employee must access federal government buildings and interact with federal government employees.  Srinivasan Decl. ¶ 78.

227.    If a Susman Godfrey employee reports for duty in the military reserves, the employee must access federal government buildings and interact with federal government employees.  Srinivasan Decl. ¶ 78.

228.    Unless the Order is permanently enjoined, the Order will impair Susman Godfrey employees' ability to perform their civic duties, such as serve on a federal jury or in the military reserves.  Srinivasan Decl. ¶ 78.

Dated: April 23, 2025                   Respectfully submitted,

                                        */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
                                        Elaine J. Goldenberg (D.C. Bar No. 478383)
                                        Ginger D. Anders (D.C. Bar. No. 494471)
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Avenue, NW, Suite 500E
                                        Washington, D.C. 20001
                                        (202) 220-1100
                                        Donald.Verrilli@mto.com
                                        Elaine.Goldenberg@mto.com
                                        Ginger.Anders@mto.com

                                        Brad D. Brian (*pro hac vice*)
                                        Michael R. Doyen (*pro hac vice*)
                                        Hailyn J. Chen (*pro hac vice*)
                                        MUNGER, TOLLES & OLSON LLP
                                        350 S. Grand Avenue, Fiftieth Floor
                                        Los Angeles, California 90071
                                        (213) 683-9100
                                        Brad.Brian@mto.com
                                        Michael.Doyen@mto.com
                                        Hailyn.Chen@mto.com

                                        *Attorneys for Susman Godfrey LLP*

                                        (*Additional counsel listed on following page*)

Bethany W. Kristovich (*pro hac vice*)
Adam B. Weiss (*pro hac vice*)
Jennifer L. Bryant (*pro hac vice*)
William M. Orr (*pro hac vice*)
Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
William.Orr@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee (*pro hac vice*)
Shannon C. Galvin Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

* Admission pending

*Attorneys for Susman Godfrey LLP*