# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

        *Plaintiff,*

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

        *Defendants.*

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

## DECLARATION OF KALPANA SRINIVASAN IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Kalpana Srinivasan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a partner at Susman Godfrey LLP ("Susman Godfrey" or the "Firm") and one of its two Managing Partners. I submit this Declaration in support of Susman Godfrey's Motion for Summary Judgment. I am of the age of majority and I am competent to submit this declaration.

2.      I have been an attorney at Susman Godfrey for nearly 20 years, following a clerkship with the Honorable Raymond C. Fisher on the United States Court of Appeals for the Ninth Circuit. I joined the Firm as an associate in 2005, became a partner in 2009, and was elected co-Managing Partner in 2020. During my time at Susman Godfrey, I have served on the Firm's Executive Committee and have chaired the Firm's practice development, employment, and training committees. I have served as lead trial counsel for numerous clients and in courtrooms across the country. I am a member in good standing of the California bar and have been admitted in many state and federal courts nationwide.

3.      Susman Godfrey is a firm that is run by its lawyers. Every partner and associate has an equal vote on whether to hire a partnership-track associate at the Firm. The same is true for any case requiring an investment of Firm time or resources. Management decisions are made by the equity-only partnership. Those decisions are guided and led by the Firm's Managing Partners and its Executive Committee, which convenes weekly.

4.      As a Managing Partner, I am very familiar with the Firm's business and operations and have been involved in Susman Godfrey's efforts to prepare for, assess, address, and respond to the April 9, 2025 Executive Order targeting the Firm (the "Order"). As a Managing Partner, I co-chair the Firm's Executive Committee. I help assess potential business, policy, or conflicts concerns raised by the matters the Firm takes on.

5.      The facts set forth in this declaration are based on my personal knowledge of the Firm's history and operations or business records and information with which I am familiar.

**I.      Susman Godfrey is a firm of civil trial lawyers.**

6.      Susman Godfrey is a trial firm that represents both plaintiffs and defendants in a variety of complex, commercial litigation. Trials are our specialty, and we excel at trying all kinds of cases.

7.      **History.** The Firm was founded on a simple vision: Hire the best, reward success, and handle every case with a relentless focus on winning at trial. The Firm's origins date back to 1976, when Stephen Susman—then an attorney at a small Houston-based personal-injury and admiralty law firm—was approached by a small-business owner seeking representation against more powerful adversaries. The potential client owned a small business that sold cardboard boxes, and he alerted Susman to the existence of a potential price-fixing conspiracy by manufacturers of corrugated boxes. That conversation planted the seeds of the *Corrugated Container Antitrust Litigation* (S.D. Tex.), a class action brought by Susman on behalf of cardboard-box purchasers

against the manufacturers that made them. Susman and fellow attorney Gary McGowan founded the eight-lawyer firm, Susman & McGowan, in 1980 to pursue the *Corrugated* case, from which the firm recovered $550 million on behalf of plaintiffs through settlements and obtaining the then-largest verdict in antitrust history after a three-month jury trial. Lee Godfrey joined the firm in 1983 and the firm became Susman Godfrey & McGowan. After Gary McGowan left the firm in 1989, it became Susman Godfrey LLP, which it has been ever since.

8.      What began as a one-office firm with a small handful of lawyers has grown to a litigation powerhouse made up of more than 230 of the country's best trial attorneys spread across four offices in Houston, Los Angeles, New York, and Seattle. Over its 45-year history, Susman Godfrey and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, before myriad federal agencies and regulatory bodies, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. Susman Godfrey is widely recognized as one of the leading litigation firms for bet-the-company cases by companies, and since our founding, we have proudly represented a wide range of industry leaders throughout the world.

9.      **Recognitions.** Susman Godfrey is one of the top-performing firms in the country. The Firm has been recognized as an "Am Law 100" firm on *The American Lawyer* 100 list in 2024 and 2025. Out of those 100 top revenue-generating firms, Susman Godfrey is one of only a few firms that solely practices litigation and not transactional law. The Firm's success is also notable because we pioneered success-based fee agreements, for both plaintiffs and defendants, that reward the results we achieve and not the hours we bill. In other words, the Firm's financial success directly corresponds to the success we achieve for our clients in court.

10.     The Firm and its lawyers are regularly recognized for excellence in the legal community by *Chambers USA*, *Law360*, *Lawdragon*, *National Law Journal*, *Super Lawyers*, *American Lawyer*, *Benchmark Litigation*, national and local bar associations, and other respected publications and organizations. As just a few examples:

- For the past 14 consecutive years, Susman Godfrey has been named as the #1 Litigation Boutique in the nation by the *Vault* survey—a distinction the Firm has held since the survey's inception.

- For the past 10 consecutive years, Susman Godfrey has had the largest number of lawyers of any firm named to *Lawdragon*'s annual list of 500 Leading Lawyers in the nation.

- In 2024, Susman Godfrey was named Class Action Firm of the Year and Media & Entertainment Firm of the Year by *Law360*, was a finalist for the *National Law Journal*'s Plaintiff Firm of the Year and Antitrust Firm of the Year awards, was a finalist for *Texas Lawyer*'s Firm of the Year and Litigation Department of the Year in General Commercial Litigation awards, and had 32 of its lawyers recognized as *Super Lawyers* in their respective states.

- In 2023, the Firm received the award for Specialty/Boutique Litigation Department of the Year from *The American Lawyer* and was named the General Commercial Litigation Firm of the Year by *Benchmark Litigation*.

- In 2022, the Firm was named Trial Firm of the Year by *Benchmark Litigation*.

11.     **Clients and notable representations.** The Firm represents a wide range of clients across a variety of industries, from small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations to Fortune 500 companies. Courts across the country have appointed the Firm to serve as lead or co-lead counsel in many cases in recognition

4

of the Firm's ability, skill, and expertise in prosecuting and managing complex litigation. Notably, the Firm has represented individuals and smaller companies in disputes against some of the largest and most powerful companies in the world. To offer just a few examples:

- In 2024, Susman Godfrey won a $266 million verdict on behalf of the City of Baltimore against McKesson and AmerisourceBergen in the city's nearly seven-year lawsuit against the opioid distributors and manufacturers that fueled the worst opioid epidemic in the nation's history.

- Susman Godfrey also led class-action efforts on behalf of residents of Flint, Michigan, who pursued claims for personal injuries and property damage arising from widespread lead contamination in the city's water supply, securing court-approved settlements valued at $626 million on behalf of the class.

- In 2024, Susman Godfrey achieved a groundbreaking $418 million joint settlement on behalf of a nationwide class of home sellers with the National Association of Realtors, resolving antitrust claims asserting that the National Association of Realtors and several of the nation's largest residential real estate brokerage companies implemented anticompetitive rules requiring real estate agents for home sellers to offer to pay buyer broker fees in addition to their own brokers' commissions.

12. **Our colleagues.** Susman Godfrey has over 350 lawyers and staff members. Of those, over 230 are attorneys—including equity partners, associates, of counsel, and staff attorneys—and the remainder are professional support staff, including paralegals, legal assistants, and information technology specialists.

13. Our employees create community, enrich civic engagement, and serve their country. Susman Godfrey attorneys have served in the Army, Navy, Air Force, and Marines, both

in active combat and as members of the JAG corps, and some continue to serve as military reserves. The Army recognized one current attorney's heroism with the award of a Bronze Star. The Firm's lawyers are leaders and members of national, state, and local bar associations around the country. Susman Godfrey lawyers are members of the American Bar Association, the Federal Bar Council, state bar associations in Texas, New York, California, and Washington, and local bar associations in such cities and counties as Los Angeles County, Harris County, and New York City—among other esteemed professional organizations.

14.    Susman Godfrey's lawyers come from all backgrounds and hold diverse political views. Attorneys have joined the Firm after government service in both Democratic and Republican administrations. The Firm requires associates it hires to have completed at least one clerkship for a federal Article III judge; many clerked for two judges and some even three. Susman Godfrey lawyers have joined the Firm after clerking for judges nominated by both Republican and Democratic presidents. Current Susman Godfrey attorneys have clerked for federal appeals court judges in each of the 13 federal circuit courts of appeals. Following in the footsteps of firm founder Stephen Susman, who clerked for United States Supreme Court Justice Hugo Black, more than 10 current and recent Susman Godfrey attorneys have clerked on the United States Supreme Court for justices appointed by presidents of both parties: Chief Justice William Rehnquist, Justice Sandra Day O'Connor, Justice Anthony Kennedy, Justice Ruth Bader Ginsburg, Justice Steven Breyer, Justice Elena Kagan, Justice Samuel Alito, and Chief Justice John Roberts. Of our current lawyers, the breakdown is roughly evenly split: about half clerked for judges nominated by Republican presidents and about half for judges nominated by Democratic presidents.

15.    **Alumni.** Susman Godfrey alumni have served or are now serving as federal and state judges, judicial clerks, high-ranking government officials, federal prosecutors, and adjunct

professors of law. Republican governors have appointed four former Susman Godfrey lawyers to state court judgeships. Two former Susman Godfrey lawyers currently serve as Article III federal judges: one nominated by President Trump and one by President Biden.

16.    **Pro bono.** Susman Godfrey is dedicated to its pro bono practice, even if it means taking on unpopular clients and controversial causes. The Firm is committed to representing those who cannot afford to pay for legal services. We encourage our attorneys to participate in pro bono opportunities and make Firm resources available to ensure our pro bono efforts are meaningful and effective. Since its founding, the Firm has provided thousands of hours of pro bono services by attorneys, paralegals, and other professionals to innumerable clients, including indigent criminal defendants and community-based organizations of all sizes, in matters championing human and civil rights, as well as electoral, housing, immigration, and reproductive issues. Since 2020, Susman Godfrey lawyers, paralegals, and other professionals have spent over 22,000 hours, valued at nearly $15 million, on pro bono service. Susman Godfrey has received numerous awards from a wide range of organizations for its pro bono representations, including recognition on the *National Law Journal*'s "Pro Bono Hot List." The Firm's decision whether to take on any particular pro bono representation is driven by the varying interests and passions of its lawyers—not by any ideological or political agenda established by the Firm.

17.    Susman Godfrey fosters a work environment in which all lawyers and business professionals are judged on their merit, and the Firm has been recognized for its culture of excellence and transparency. For example, in the 2025 *Vault* Rankings, Susman Godfrey was named #1 Best Midsize Law Firm for Career Outlook, Selectivity, and Transparency and #3 Best Midsize Law Firm for Satisfaction and Quality of Work.

18.    I am proud to have spent nearly 20 years of my career at the Firm.

II.    **Susman Godfrey attorneys frequently interact with the federal government on behalf of the Firm's clients.**

19.    As a commercial litigation firm that represents a wide array of clients across numerous industries, Susman Godfrey lawyers necessarily and regularly interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession, develop their careers, and serve their clients. Susman Godfrey is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege and thus cannot disclose the specifics of client engagements without authorization. No client has authorized Susman Godfrey to disclose its engagement of the Firm (to the extent that engagement is not a matter of public record) in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details or disclosing client confidences.

20.    **Active federal cases.** Our attorneys are litigators who regularly appear in federal courts or administrative proceedings across the country on behalf of their clients. The Firm's lawyers are in federal court and interact with federal officials every week and nearly every day. Indeed, a team of Susman Godfrey lawyers was in federal court in Northern California at the time the April 9, 2025 Order was issued. The Firm has hundreds of active matters before federal courts and federal agencies, which represent more than a third of all active matters at the Firm. Susman Godfrey attorneys already have made dozens of in-person appearances in federal court in 2025, and the Firm's attorneys have several in-person appearances in federal court this week and next, including in the Southern District of New York, Northern District of Illinois, Southern District of Iowa, Western District of Texas, and Eastern District of Texas, with numerous in-person appearances in federal court and before federal agencies scheduled in the coming months. Susman Godfrey attorneys currently have at least seven trials scheduled to go forward in federal court in

the next six months. The Firm has many more federal court actions presently awaiting trial dates for 2025.

21.    **Practice areas interacting with the federal government.** The Firm has no formal practice groups and engages in all forms of commercial litigation, but many of our matters require frequent interactions with the federal government. While representing their clients, Susman Godfrey lawyers frequently meet with officials from many different federal agencies. Susman Godfrey partners have numerous upcoming meetings scheduled with federal government personnel in the next 90 days, including with officials from the Main Branch of the Department of Justice and multiple United States Attorneys' Offices. At any given time, and consistent with the nature of the Firm's matters, I estimate that no fewer than one third of our active matters require Susman Godfrey lawyers to appear before federal courts or interact with federal agencies in some capacity.

22.    Our attorneys also practice in a variety of areas that require extensive interaction with the federal government in order to represent our clients:

23.    Qui tam *and False Claims Act.* Susman Godfrey dedicates itself to a significant number of False Claims Act cases in which the firm represents whistleblowers ("relators") in cases brought under the federal False Claims Act and comparable state laws. These laws permit private citizens to file suits on behalf of the government (called "*qui tam*" suits) against those who have defrauded the government. *Qui tam* cases provide significant monetary and other benefits to the United States Government.

24.    These matters frequently require regular interaction with federal government employees on behalf of the relator-client and often involve in-person contact with the government in federal buildings for important meetings, interviews, and negotiations. Most False Claims Act

*qui tam* cases begin with the identification of a responsible attorney in one of the United States Attorneys' Offices. Our practice is to make an initial disclosure to the United States Government disclosing all material evidence and information in the relator's possession relating to the claim. This process necessitates engagement with a federal employee—typically an Assistant United States Attorney. Susman Godfrey attorneys who are currently representing clients in pending *qui tam* cases have made contact with dozens of United States Attorneys' Offices across the country. Susman Godfrey attorneys and the Assistant United States Attorneys typically engage in further communications via emails and/or phone calls after the initial disclosure.

25.     Following the initial disclosure, a *qui tam* case is filed under seal in United States District Court. It is often standard, post-filing, for the Assistant United States Attorney to set up an interview between the government and the relator; Susman Godfrey attorneys participate as the relator's counsel. For smaller cases, the post-filing interviews may be held remotely by phone or videoconference. For larger cases, relator interviews are more likely to be held in-person in federal buildings. The interviews will always include at least one Assistant United States Attorney, and, for larger cases, may include attorneys or investigators from other responsible federal agencies that have an interest in the false claim, including, for instance, individuals from a responsible agency's Office of Inspector General. Susman Godfrey currently has at least one such interview scheduled and anticipates that several more will be scheduled in the near future.

26.     After the initial relator interview, the case proceeds to the investigatory phase, during which time the matter remains under seal. During this stage, there are typically three types of routine engagements with government employees:

    a.      *First*, the Assistant United States Attorney may make contact with Susman Godfrey because he or she wishes to enlist Susman Godfrey's assistance in the investigation. In

previous matters, Susman Godfrey attorneys have entered into common-interest agreements with the Department of Justice that allow Susman Godfrey to participate in reviewing documents produced by the defendant(s) during the investigatory stage. Pursuant to that common-interest agreement, Susman Godfrey may help Assistant United States Attorneys with reviewing documents and preparing memoranda to assist the Department of Justice in the investigation. Many of these engagements occur by telephone or videoconference.

b. *Second*, government employees may seek direct assistance from the relator-client him- or herself to assist with the investigation. This may include asking for assistance in deciphering an internal document or record, or providing information or other details about the defendant's internal operations or knowledge. These engagements may occur by telephone or videoconference but have also been held in person.

c. *Third*, the government may wish to engage with Susman Godfrey and the relator-client to facilitate settlement with the defendant. The settlement process frequently involves in-person meetings between the government and the defendant involving detailed presentations of evidence. Although the relator-client is not part of those meetings, Susman Godfrey attorneys may be involved in assisting the government in its presentation and helping the government prepare responses to the defendant's settlement positions.

27.    If the government decides to intervene in a *qui tam* case, as it has in current cases handled by the Firm, Susman Godfrey's interactions with the government are frequent and involved, similar to a co-counsel relationship. Susman Godfrey often holds at least weekly phone calls with the government, and may be in contact with government lawyers daily during discovery, for purposes of motions practice, and during trial if the case does not settle. Susman Godfrey and the government typically share extensive amounts of joint work-product necessary for the effective

prosecution of the case. Following a settlement or judgment, the government also engages with Susman Godfrey to reach resolution on the relator-client's share of the recovery, which can include the sharing of information, memoranda, and presentations.

28.    *Intellectual property.* Susman Godfrey also handles a large volume of patent-infringement litigation, often representing clients before federal agencies with responsibilities over patent validity and patent infringement disputes. For example, Susman Godfrey represents patent owners in the United States International Trade Commission in unfair import proceedings before administrative law judges and in frequent interactions with investigative staff attorneys for the United States International Trade Commission's Office of Unfair Import Investigations, as well as semi-regular interactions with attorneys from the United States International Trade Commission's Office of the General Counsel. Susman Godfrey attorneys also represent patent owners and patent challengers before the United States Patent and Trademark Office in administrative post-grant proceedings, including before the Patent Trial and Appeal Board. Susman Godfrey attorneys also frequently interact with attorneys working at the Exclusion Order Enforcement Branch of United States Customs and Border Protection to assist them in implementing and enforcing the exclusion orders issued by the United States International Trade Commission.

29.    *Antitrust.* Ever since the landmark *Corrugated Container* price-fixing case in 1980, in which Susman Godfrey recovered $550 million on behalf of plaintiffs as a result of settlements and a verdict after a 3-month jury trial, the Firm has been at the forefront of antitrust litigation. The Firm has successfully represented and is currently representing plaintiffs bringing price-fixing, market allocation, refusal to deal, no-poach, and monopolization claims in numerous industries: consumer products, healthcare, real estate, technology, telecommunications, and transportation. Such cases frequently require interaction and coordination with the federal

12

government, including the Antitrust Division of the Department of Justice and the Federal Trade Commission. For example, in the *In re Qualcomm Antitrust Litigation*, the Firm served as co-lead counsel in a consumer class action that was coordinated with a parallel action brought by the Federal Trade Commission, and that required close and regular coordination with agency staff.

30.    *Environmental.* Susman Godfrey also represents both plaintiffs and defendants in litigation concerning the discharge of hazardous substances into the environment. These actions have included toxic tort actions for personal injuries and property damage, natural resource damages actions, and Superfund remediation matters. These matters can involve interaction with United States Attorneys' Offices, the Environmental Protection Agency, and state and local governments that partner with federal agencies in implementing federal environmental programs and statutory mandates.

31.    *Pro bono.* In carrying out pro bono work, Susman Godfrey lawyers are frequently before federal agencies and regularly interact with federal government officials. Lawyers at Susman Godfrey are often tapped by trial and appellate courts across the country to assist on precedent-setting pro bono matters. These matters include human rights, anti-discrimination issues, constitutional challenges, and death penalty appeals; much of this litigation is in federal court. For example, Susman Godfrey successfully challenged in federal court Harris County, Texas's practice of holding in jail tens of thousands of people who were arrested for misdemeanors but were financially unable to post bail. The United States Court of Appeals for the Fifth Circuit upheld the ruling on appeal. *See ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018).

32.    **Federal agencies.** In representative matters for clients, the Firm has interacted with, and anticipates future interactions with, at least the following federal departments, agencies, and officials:

    a.     Attorney General of the United States

    b.     Department of Commerce

    c.     Department of Defense

    d.     Department of Health and Human Services

    e.     Department of Homeland Security

    f.     Department of Justice

    g.     Department of the Treasury

    h.     Executive Office of Immigration Review

    i.     Federal Trade Commission

    j.     International Trade Commission

    k.     Securities and Exchange Commission

    l.     United States Attorneys' Offices

    m.     United States Customs and Border Protection

    n.     United States Citizenship and Immigration Services

    o.     United States Patent and Trademark Office

33.    **Government contractor clients.** Among Susman Godfrey's clients, including several of the Firm's largest clients, are nearly twenty persons and entities that contract with or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors.

34.    In short, the Firm's civil litigation practice—at the trial court and appellate levels—frequently requires us to interact with the federal government, regularly and repeatedly, on behalf of our clients. This means that much of our work on behalf of our clients requires access to federal government buildings housing courthouses and agencies. This is true of every matter pending in

federal court or a federal agency at the Firm. Certain practice areas, such as False Claims Act cases, rely heavily on interacting with the federal government. And many of the Firm's clients do, or have done, business with the federal government.

### III.  Susman Godfrey recently has pursued litigation against the federal government, in federal court, and related to federal elections.

35.     Susman Godfrey is no stranger to suing the United States Government. It has sued the federal government in cases against both Democratic and Republican presidential administrations, and in cases that span the ideological spectrum. For example, Susman Godfrey attorneys currently are litigating several Tucker Act cases in the Court of Federal Claims, involving frequent interactions with attorneys at the Department of Justice. Those cases include a Fifth Amendment takings claim against the United States Navy on behalf of dozens of property owners whose property values and quality of life have decreased on account of a vast expansion of the Navy's flight-training program; a case against a federal agency for inverse condemnation on behalf of property owners; and a suit against a federal agency for user fees that it collected in violation of the agency's statutory and regulatory mandates.

36.     Susman Godfrey also has defended the United States' democratic electoral system generally and for clients who span the political spectrum. After the November 2020 election, Susman Godfrey represented various state officers in their official capacities defending the results of the 2020 election against unfounded conspiracy theories that the election had been rigged. Susman Godfrey represented, among other officials, the Governor of Wisconsin and the Secretary of State of Arizona. *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. filed Dec. 1, 2020) (counsel for Defendant Tony Evers in his official capacity as Wisconsin Governor); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. filed Dec. 2, 2020) (counsel for Defendant Katie Hobbs in her official capacity as the Arizona Secretary of State). Federal courts rejected the

arguments put forth by the Trump campaign and related individuals in those cases. *Feehan*, ECF No. 83 (granting defendants' motions to dismiss), *vacated on other grounds by Feehan v. Wis. Elections Comm'n*, No. 20-3448 (7th Cir. Feb. 1, 2021); *Bowyer*, ECF No. 84 (granting defendants' motions to dismiss). In Arizona, Susman Godfrey presented at a hearing on behalf of all state-official defendants (including the Democratic Secretary of State and Republican Governor) who had been sued by voters and GOP chairs for various Arizona counties. *Bowyer*, ECF No. 83 (transcript).

37.     In recent years, Susman Godfrey represented Dominion Voting Systems in defamation actions against Fox News and Fox News Corporation for false claims relating to the 2020 election. *US Dominion Inc. v. Fox News Network LLC*, No. N21C-03-257 (Del. Super. Ct. filed Mar. 26, 2021); *US Dominion Inc. v. Fox Corp.*, No. N21-C11-082 (Del. Super. Ct. filed Nov. 8, 2021). In legal filings in the months leading up to trial, the Susman Godfrey team exposed what had gone on at Fox in the weeks and months after the 2020 election, when Fox was publicly broadcasting falsehoods about Dominion while privately disparaging those same statements and the individuals promoting them. At summary judgment, the trial court ruled that none of Fox News' disputed statements about Dominion were true, vindicating the claims advanced by Susman Godfrey and paving the way for a trial focused on whether Fox News acted with actual malice. *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023) ("The evidence developed in this civil proceeding demonstrates that is [sic] **CRYSTAL** clear that none of the Statements relating to Dominion about the 2020 election are true." (emphasis in original)). Only shortly before trial did the case settle. This case received widespread media attention and resulted in a historic $787.5 million settlement—reported to be

the largest publicly known defamation settlement involving a media company in United States history.

38.    At the time the Order issued, Susman Godfrey was scheduled to try a case less than three weeks later on behalf of Dominion Voting Systems against Newsmax Media. The lawsuit concerns false and defamatory statements broadcasted by Newsmax accusing Dominion of voter fraud and rigging the 2020 election to flip votes from President Trump to then-former Vice President Joseph R. Biden, Jr. Siding with arguments made by Susman Godfrey, the court recently denied the defendant's motion for summary judgment and partially granted Susman Godfrey's cross-motion for summary judgment, ruling that Newsmax made false and defamatory statements. *US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063, 2025 WL 1092289, at *12-17 (Del. Super. Ct. Apr. 9, 2025). The court's ruling issued just hours before the Administration announced the Executive Order targeting the Firm on April 9, 2025.

39.    Susman Godfrey continues to serve as counsel for Dominion in defamation lawsuits arising out of allegedly false statements related to the 2020 presidential election against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network (OAN).

**IV.    The executive orders targeting other law firms have inflicted significant harm on those firms and on the industry, including on Susman Godfrey.**

40.    On February 25, 2025, President Trump signed a memorandum directed to the heads of various agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts," that targeted the law firm Covington & Burling LLP (the "Covington Memo"). Declaration of Ginger D. Anders in Supp. of Mot. for Summ. J. (hereinafter "Anders Decl.") Ex. 10. The Covington Memo singled out Peter Koski, a partner of Covington & Burling "who assisted former Special Counsel Jack Smith." *Id.* The Covington

Memo directed the agency heads to "suspend any active security clearances held by" Mr. Koski and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel" and "to terminate any engagement of Covington & Burling LLP by any agency." *Id.*

41.    On March 6, 2025, President Trump issued Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP" (the "Perkins Order"). Anders Decl. Ex. 12. The Perkins Order described what it calls the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including "representing failed Presidential candidate Hillary Clinton," which the Perkins Order asserted was "part of a pattern" of "egregious activity." *Id.* § 1. The Perkins Order also asserted that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." *Id.* The Perkins Order directed federal agencies to "suspend any active security clearances held by individuals at Perkins Coie" until further notice; require government contractors to disclose any business they do with Perkins Coie; "terminate any contract" with Perkins Coie "to the maximum extent permitted by applicable law"; issue guidance "limiting [the] official access" of Perkins Coie employees to federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States"; issue guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States"; and "refrain from hiring employees of Perkins Coie, absent a waiver." *Id.* §§ 2-5. The Perkins Order also directed the Chair of the Equal Employment Opportunity Commission to investigate "the practices of representative large,

influential, or industry leading law firms" for what that order describes as "discrimination under 'diversity, equity, and inclusion' policies." *Id.* §§ 1, 4.

42.    On March 12, 2025, Judge Beryl A. Howell of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Perkins Order. Anders Decl. Ex. 14; *see Perkins Coie LLP v. Dep't of Just.* No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 21.

43.    On March 14, 2025, President Trump issued Executive Order 14237, titled "Addressing Risks from Paul Weiss" (the "Paul Weiss Order")—an order that the President subsequently rescinded. Anders Decl. Ex. 16. That order directed government officials to impose against Paul Weiss and its employees sanctions nearly identical to those imposed under the already-enjoined Perkins Order. *Id.* §§ 2-5. The Paul Weiss Order attacked "[g]lobal law firms," asserting that they are "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections." *Id.* § 1. The Paul Weiss Order asserted that the supposedly improper litigation brought by "[g]lobal law firms" includes not only work done on behalf of paying clients, but also work done "pro bono" or "for the public good." *Id.* And the Paul Weiss Order targeted specific Paul Weiss partners, including a partner and "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit" "on behalf of the District of Columbia Attorney General" "against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021." *Id.*

44.    On March 20, 2025, the President announced on Truth Social that he would withdraw the Paul Weiss Order as part of an "agreement" with Paul Weiss. Anders Decl. Ex. 17. The President stated that "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal

services over the course of President Trump's term to support the Administration's initiatives." *Id.*
He also stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman,
Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner,
Mark Pomerantz." *Id.* Mr. Karp, Paul Weiss's Chairman, stated: "We are gratified that the
President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward
to an engaged and constructive relationship with the President and his Administration." *Id.*

45.    In a Presidential Memorandum dated March 22, 2025, President Trump directed
the Attorney General to assess whether attorneys and law firms currently litigating against the
federal government have engaged in "misconduct" and to "seek sanctions" or recommend other
disciplinary actions—including "reassess[ing]" security clearances held by the firms' lawyers and
"terminat[ing] . . . any federal contract" under which they provide services—whenever the
Attorney General concludes that their conduct warrants such measures. Anders Decl. Ex. 20.
President Trump also instructed the Attorney General to review attorney conduct in litigation
against the federal government over the past eight years and to recommend the same range of
disciplinary actions "[i]f the Attorney General identifies misconduct that may warrant additional
action, such as filing frivolous litigation or engaging in fraudulent practices." *Id.*

46.    On March 25, 2025, President Trump issued Executive Order 14246, titled
"Addressing Risks from Jenner & Block" (the "Jenner Order"). Anders Decl. Ex. 21. The Jenner
Order directed government officials to impose sanctions against Jenner and its employees nearly
identical to those set forth in the enjoined Perkins Order and the since-withdrawn Paul Weiss
Order. The Jenner Order criticized "so-called 'Big Law' firms," alleging that such firms "regularly
conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of
millions of their clients' dollars for destructive causes, that often directly or indirectly harm their

own clients." *Id.* § 1. The Jenner Order specifically criticized Jenner for purportedly "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.* In addition, the Jenner Order singled out the firm's re-hiring of Andrew Weissmann after he served as part of Special Counsel Robert Mueller's team to investigate Russian interference in the 2016 election.

47.    On March 27, 2025, President Trump issued Executive Order 14250, titled "Addressing Risks from WilmerHale" (the "WilmerHale Order"). Anders Decl. Ex. 25. The WilmerHale Order again referenced the Administration's campaign against "so-called 'Big Law' firms," and again imposed sanctions similar to those set forth in the prior orders against other law firms. *Id.* § 1. The WilmerHale Order singled out WilmerHale on the ground that the firm "engages in obvious partisan representations to achieve political ends," including by allegedly "support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." *Id.* The WilmerHale Order also claimed that WilmerHale demonstrated that it was "bent on employing lawyers who weaponize the prosecutorial power" by hiring Robert Mueller and two of his colleagues from the Mueller investigation, Aaron Zebley and James Quarles. *Id.*

48.    On March 28, 2025, Jenner and WilmerHale separately sued to enjoin their respective executive orders. Anders Decl. Exs. 22, 26; *Jenner & Block LLP v. Dep't of Just.*, No.

25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

49.     The same day that those suits were filed, Judge John D. Bates and Judge Richard J. Leon of the United States District Court for the District of Columbia issued temporary restraining orders against the Jenner and WilmerHale Orders, respectively. Those temporary restraining orders concluded that each law firm had established a likelihood of success on the merits and made a showing of irreparable harm; Judge Bates enjoined implementation and enforcement of Sections 1, 3, and 5 of the Jenner Order, and Judge Leon enjoined implementation and enforcement of Sections 3 and 5 of the WilmerHale Order. Anders Decl. Exs. 23, 27; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

50.     From publicly available information, I understand that the law firms subject to the executive orders described above immediately began to experience irreparable harm as a result of those executive orders. In support of Perkins Coie's motion for a temporary restraining order, a Perkins Coie attorney stated that the government had informed a Perkins Coie client that Perkins Coie attorneys could not attend upcoming scheduled meetings and that numerous clients had terminated engagements with the firm. Anders Decl. Ex. 56 ¶¶ 25-26, 29; *see* Anders Decl. Ex. 49 ¶¶ 44-45. According to a declaration filed by Jenner, the government informed a firm client that Jenner attorneys could not attend an upcoming meeting with the Department of Justice, and several clients expressed concern about Jenner's ongoing representation of them. Anders Decl. Ex. 51 ¶¶ 63-64, 68; Anders Decl. Ex. 58 ¶¶ 70-72. At least one of Paul Weiss's clients cited the Paul Weiss Order as the reason for terminating his representation by Paul Weiss attorneys. *See* Anders Decl. Ex 57 at 2-3. And within 24 hours of the issuance of the WilmerHale Order, at least one of

WilmerHale's government-contractor clients was contacted by a federal agency requesting that the client disclose whether it had any business relationship with WilmerHale, and two meetings between WilmerHale attorneys and a federal agency were abruptly postponed. Anders Decl. Ex. 59 ¶¶ 4-5. Unless, the Order is permanently enjoined, I expect Susman Godfrey to suffer similar irreparable harm.

51.     In addition to the existing executive orders, President Trump has threatened to target additional law firms. When he signed the Perkins Order, President Trump referenced how his team "was looking at about 15 different law firms" as potential targets for similar sanctions. Anders Decl. Ex 28 at 5:45-5:50. A few days after he issued the Perkins Order, President Trump said in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people." Anders Decl. Ex. 29. The same day that President Trump issued the March 14 Paul Weiss Order, he delivered a speech at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers." Anders Decl. Ex. 30. And upon signing the Order targeting Susman Godfrey, the President told the gathered press that he had five more law firms in his sights. Anders Decl. Ex. 31 at 1:28-1:32.

52.     Those closely associated with President Trump have made similar comments concerning the intent behind these executive orders targeting law firms. Steve Bannon has stated that President Trump is "going after" law firms "to cut them off." Anders Decl. Ex. 32. According to Mr. Bannon, "what we are trying to do is put you [law firms] out of business and bankrupt you." *Id.*

53.     These threats by the President and his allies have been effective, as law firms have chosen to make concessions to the White House rather than face the existential threat that an executive order would pose. First, on March 28, 2025, the President announced another

"agreement" similar to the one reached with Paul Weiss—this time with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Anders Decl. Ex. 33. That new "agreement" was reached without the President having to issue any executive order against the firm in the first place; the mere threat of such an order was enough. This "agreement" followed public reports that the President intended to issue an executive order targeting Skadden over its pro bono work and diversity, equity, and inclusion initiatives. Anders Decl. Ex. 34. In a post on Truth Social, the President announced that Skadden had agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support." Anders Decl. Ex. 33. The President asserted that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL." *Id.*

54.     On April 1, 2025, the President announced a substantially identical "agreement" to the ones reached with Paul Weiss and Skadden—this time with the law firm Willkie Farr & Gallagher LLP ("Willkie"). Anders Decl. Ex. 35. Like the Skadden "agreement," this "agreement" was reached without the President having issued an executive order. It was publicly reported that, before negotiating this "agreement," Willkie had learned that the President intended to issue an executive order against the firm. Anders Decl. Ex. 36. Willkie committed "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support." *Id.*

55.     On April 2, 2025, another law firm, Milbank LLP, preemptively reached an "agreement" with the President prior to receiving an executive order targeting the firm. Anders Decl. Ex. 37. Public reporting stated that, before negotiating this "agreement," President Trump's administration had contacted Milbank with concerns about Milbank's approach to pro bono and

diversity initiatives and suggested that Milbank reach an agreement similar to Skadden's. Anders Decl. Ex. 38. The Milbank "agreement," like the others, committed to provide $100 million in pro bono services to causes favored by the President. Anders Decl. Ex. 37.

56.     On April 11, 2025, the President announced that he had reached deals with five more law firms. Anders Decl. Ex. 40. Those deals were similar to the ones that came before, except that several of the latest deals committed not only to provide certain pro bono work but also "other free Legal services." *Id.* Four of the firms involved in those deals—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono and other free Legal services . . . to causes that President Trump and the Law Firms both support and agree to work on." *Id.* The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences." *Id.* The President announced that the Equal Employment Opportunity Commission had concurrently "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues." *Id.* The President also announced "commitments" made by a fifth firm, Cadwalader Wickersham & Taft LLP. Anders Decl. Ex. 41. Cadwalader agreed to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support." *Id.* President Trump has since suggested that he intends to direct free legal work promised by law firms towards, among other things, negotiating trade deals with foreign nations, reviving the coal industry, and representing President Trump and his allies if they are investigated. Anders Decl. Exs. 43, 60. Faced with the threat of irreparable harm that an executive order would pose, each of these firms decided to pay the steep price of avoiding one.

57.     Susman Godfrey was forced to expend significant resources to address the risk that it would be targeted by an executive order and would suffer similar types of irreparable harm, and now has expended significant resources in responding to the Order. Susman Godfrey attorneys have devoted hundreds of hours to monitoring and analyzing the Administration's actions targeting other law firms, preparing Susman Godfrey's strategy for responding should the Firm be targeted by President Trump, and, now, responding to the Order targeted at Susman Godfrey. Susman Godfrey also engaged outside counsel to represent the Firm in a challenge to the April 9, 2025 Order, which has now come to pass.

58.     Susman Godfrey also has spoken out against the executive orders targeting other law firms. On April 4, 2025, Susman Godfrey was one of more than 500 law firms that filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice*. No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1. Anders Decl. Ex. 44. Susman Godfrey was one of only eight firms in the Am Law 100 (the top 100 firms by revenue in the United States) that signed the brief. At the time of signing, Susman Godfrey was the fifth-largest firm by revenue to sign the brief, and two of the larger firms (WilmerHale and Perkins Coie) previously had been targets of separate executive orders directed against them. Susman Godfrey also signed the amicus briefs filed on behalf of more than 800 law firms in the *Jenner* and *WilmerHale* cases. *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Apr. 11, 2025), ECF No. 45-1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 11, 2025), ECF No. 80.

59.     In addition, on April 8, 2025, Susman Godfrey filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. Department of Justice*, on behalf of 27 former national security, foreign policy, intelligence, and other public officials who have worked on security

matters at the most senior levels of the federal government for both Democratic and Republican administrations. No. 25-cv-716 (D.D.C. Apr. 8, 2025), ECF No. 104; Anders Decl. Ex. 45. Susman Godfrey informed the Department of Justice that it intended to seek leave to file this amicus brief on April 5. On April 9, 2025—the day after Susman Godfrey filed the amicus brief—President Trump issued the Order targeting Susman Godfrey.

## V. President Trump signs the executive order targeting Susman Godfrey.

60.     On April 9, 2025, President Donald J. Trump signed the Order (No. 14263), titled "Addressing Risks from Susman Godfrey." *See* Anders Decl. Ex. 1. The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* Anders Decl. Ex. 2 (the "Fact Sheet").

61.     Susman Godfrey was not contacted by the Administration regarding the Order at any time prior to the public signing of the Order. Susman Godfrey was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the Firm before they were issued. To this day, the Administration has not contacted Susman Godfrey concerning the claims in the Order and Fact Sheet.

62.     **Litigation to defend businesses and public officials from false accusations about the conduct of the 2020 election.** The Order attacks Susman Godfrey because it purportedly "spearheads efforts to weaponize the American legal system and degrade the quality of American elections." Anders Decl. Ex. 1 § 1. The Order and Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Anders Decl. Exs. 1, 2. Consistent with its history of zealous advocacy for its clients, and as described above, Susman Godfrey represented Dominion, the Arizona Secretary of State, and the Governor of Wisconsin (among others) to defend the American election system against false and unsupported attacks on its legitimacy, accuracy, and reliability. Indeed, Susman

27

Godfrey's handling of the Dominion case earned the Court's praise for the quality of its lawyering. Anders Decl. Ex. 9.

63. **Unspecified efforts to "undermine" military effectiveness.** The Order attacks Susman Godfrey based on the assertion that the Firm "also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Anders Decl. Ex. 1 § 1. The Order and Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Anders Decl. Exs. 1, 2. Susman Godfrey is aware of none. I attended the oral argument on Susman Godfrey's motion for a temporary restraining order in this action on April 15, 2025, during which the Court asked counsel for the Government about the basis for this assertion; the Government replied that it did not have any further information beyond what is contained in the Order. Anders Decl. Ex. 46 at 18:13-17.

64. **The Firm's diversity and inclusion efforts.** The Order attacks Susman Godfrey on the ground that the Firm "supports efforts to discriminate on the basis of race" and that the Firm "itself engages in unlawful discrimination, including discrimination on the basis of race." Anders Decl. Ex. 1 § 1. The sole example cited is an unnamed program alleged to "offer[] financial awards and employment opportunities only to 'students of color.'" *Id.* To the extent this refers to the Susman Godfrey Prize, then it is inaccurate on multiple levels. The Firm does not have any program that offers employment opportunities only to people of color. The Susman Godfrey Prize is a cash prize that is awarded to up to 20 students of color who are finishing their first or second years at certain law schools. The Susman Godfrey Prize program does not offer any "employment opportunities." Anders Decl. Ex. 47; Anders Decl. Ex. 1 § 1. Nor does it constitute unlawful

discrimination. Anders Decl. Ex. 47. Neither the Order nor the Fact Sheet attempts to articulate how such a program constitutes unlawful discrimination.

**VI.    If the Executive Order is not permanently enjoined, Susman Godfrey will suffer irreparable harm.**

65.    Unless permanently enjoined, the Order will disrupt existing attorney-client relationships and representations to the detriment of the Firm, its attorneys, and its clients, without notice or opportunity to be heard. Refusals by federal officials to meet with Susman Godfrey lawyers, or to permit Susman Godfrey lawyers to access federal agencies and buildings, will immediately and irreparably harm Susman Godfrey's legal practice, its clients' interests, and the careers of its attorneys.

66.    **Impact on active matters in federal forums.** The Order broadly limits Susman Godfrey's access to the federal government. The Order's prohibition against (or limitations on) Susman Godfrey attorneys or personnel interacting with the federal government will have severe effects on the Firm's practice. As noted, Susman Godfrey has scores of active matters before federal courts and federal agencies that require access to federal government buildings and officials. And Susman Godfrey lawyers have numerous upcoming meetings scheduled with federal government personnel across various matters in the next 90 days, including with officials from the Main Branch of the Department of Justice and United States Attorneys' Offices. Even mere uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel has wide-ranging negative impacts on the Firm's ability to practice law and on its business.

67.    **Interference with attorney-client relationships.** The purpose and only business of the Firm is representing clients—and hiring, retaining, and supporting lawyers representing those clients. These client relationships are the lifeblood of Susman Godfrey's business. The Firm

29

has cultivated these relationships over years by being constantly available to handle its clients' immediate and pressing problems, and providing excellent service to resolve those problems promptly. By limiting Susman Godfrey's access to the federal government and forcing clients to disclose their relationship with the Firm, the Order, if not permanently enjoined, will directly interfere with Susman Godfrey's relationships with its clients, attempting to intimidate and coerce Susman Godfrey's clients to resort to another firm.

68. **Forced disclosure of attorney-client relationships.** The Order mandates that federal agencies (a) require government contractors to disclose any relationship they have with Susman Godfrey, and (b) terminate government contracts for clients for which Susman Godfrey has been hired to perform any service. A significant number of Susman Godfrey's clients contract with or otherwise do business with the federal government, or have affiliates who are government contractors or subcontractors. Many other Susman Godfrey clients have significant interactions with the federal government. And many of those clients are represented by the Firm in legal matters completely unrelated to government contracting.

69. For many of the Firm's clients, the fact that the Firm gives them legal advice is not public information. In particular, our firm vets countless cases to consider whether or not to pursue them long before they are filed. Accordingly, if not permanently enjoined, the Order will require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts.

70. **Disruption to relationships with current clients.** Since the signing of the Order, Firm clients have contacted partners of the Firm to inquire about the effects of the Order, whether it impacts Susman Godfrey's ability to access the federal courts, whether it could negatively affect Susman Godfrey's continued representation of those clients, and whether it might influence juries

who will be empaneled for their cases. If the Order is not permanently enjoined, other clients of

the Firm will likely consider, and some will experience similar reservations or concerns about, the

impact of the Order and its potential impact on Susman Godfrey's ability to represent them. Indeed,

the Order appears expressly designed for that purpose.

71.     **Interference with clients' right to counsel.** In addition to interfering with Susman

Godfrey's relationships with its clients, the Order will interfere with Susman Godfrey's clients'

right to, and choice of, counsel. Without cause, the Order will bar Susman Godfrey attorneys from

interacting with federal officials, preventing Susman Godfrey from carrying out key aspects of its

representation of certain of its clients and forcing those clients to obtain other counsel, in wholly

unjustified violation of their Fifth Amendment rights.

72.     **Financial impact to the Firm.** As noted above, by interfering with Susman

Godfrey's attorney-client relationships and by limiting Susman Godfrey's ability to advocate on

behalf of its clients before the federal government, the Order will cause significant economic harm

to the Firm if not permanently enjoined. As discussed above, a substantial portion of the Firm's

active matters—no fewer than one third—are in federal court or require interaction with the federal

government in some way. And a significant number of Susman Godfrey clients have contracts or

subcontracts with the federal government. The very purpose of the Order is to force clients with

government contracts to terminate their relationships with Susman Godfrey and not to hire Susman

Godfrey for future work.

73.     **Financial harm regarding future opportunities.** We are proud of the trust that

clients place in us and value their loyalty, but the Order seeks to disrupt both existing client

relationships and potential future client relationships. Unless the Order is permanently enjoined,

potential future clients will have an incentive to retain other law firms, not targeted by the federal

government, that do not face the restrictions the Order imposes on our ability to provide the full breadth and depth of professional service on which we pride ourselves. Likewise, existing clients deciding which firm to retain for new matters will have incentives to choose competitor firms that are not saddled with the restrictions imposed by the Order and have not suffered the reputational harm that the Order inflicts on Susman Godfrey. The legal industry is competitive, and the existence of competitors not subject to such an executive order and able to offer a broader suite of professional services (including unfettered interactions with the federal government) will adversely affect our ability to attract new clients and new matters.

74.    **Attorneys' ability to practice chosen profession.** The Order targets Susman Godfrey attorneys' right to practice their chosen profession: providing lawful representation to clients in need of legal services. If not permanently enjoined, the Order will pose a threat not only to the Firm's revenue-generating practice, but also to its attorneys' professional development and careers. It also will threaten the Firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies on behalf of clients.

75.    **Immediate chilling effect and effect on exercise of profession.** If not permanently enjoined, the Order will have an immediate chilling effect on Susman Godfrey attorneys, the exercise of their chosen profession, and the expression of their own viewpoints. The Order retaliates against the Firm on the stated basis of causes and clients that the President dislikes or finds to be in opposition to the Administration's priorities. If not permanently enjoined, the Firm's attorneys will have to reconsider how they approach current matters requiring appearances in federal forums or requiring interactions with federal officials, attorneys, and personnel. The Firm's lawyers already have felt a chilling effect in deciding whether to take on future representations

that may lead to further baseless ire and punitive action from the federal government due to potentially disfavored viewpoints or identities.

76.    **Harm to Susman Godfrey's reputation.** The Order has harmed Susman Godfrey's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the Firm and its attorneys. It also threatens Susman Godfrey's reputation among prospective jruors in trials for Susman Godfrey clients. The Order says many things that are not only inflammatory—for instance, branding the Firm as "detrimental to critical American interests" and accusing it of "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military," Anders Decl. Ex. 1 § 1—but also false, as described above.

77.    **Harm to recruitment and retention of attorneys interested in future federal service.** The Order directs federal agencies to refrain from hiring any "employees" of the Firm, absent a pre-hire waiver from an agency head made in consultation with the Director of the Office of Personnel Management following determination that such a hire will not "threaten the national security of the United States." Anders Decl. Ex. 1 § 1. The Firm prides itself on a commitment to public service that is often reflected in lawyers leaving the firm for federal service. In my experience, many law students and currently practicing attorneys are drawn to our firm and stay at our firm due to the significant substantive responsibility we give to associates, which helps make them more compelling candidates for federal employment. Moreover, it is increasingly common for lawyers to begin their careers at private law firms such as ours before then departing for clerkships for federal judges or employment at United States Attorneys' Offices. Unless the Order is permanently enjoined, its direction to federal agencies to refrain from hiring our employees— including non-lawyers—notwithstanding the potential for a waiver through an opaque and

undisclosed process, will impair our ability to recruit and retain lawyers and employees who are interested in future federal employment.

78.    **Employees' ability to perform their civic duties.** Unless permanently enjoined, the Order also will impair Susman Godfrey employees' ability to perform their civic duties, including Susman Godfrey employees who have been called for federal jury duty and those who proudly serve our nation in the military reserves and must access government facilities and interact with government employees when called to serve.

79.    **Revocation of security clearances.** The Order requires the immediate suspension of all active security clearances held by Susman Godfrey employees and purports to create a "Security Clearance Review" process applicable to all such personnel. Anders Decl. Ex. 1 § 2(a). It directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments and agencies" to "immediately take steps to suspend any active security clearances held by individuals at Susman [Godfrey] pending a review of whether such clearances are consistent with the national interest." *Id.* Susman Godfrey personnel currently possess active security clearances, including one attorney who possesses a Top Secret/Sensitive Compartmented Information clearance in connection with service in the military. The Firm does not currently have any active matters requiring security clearances, but has had such matters in the past and expects to have future matters requiring security clearances. Active security clearances are necessary for the effective representation of clients in certain cases involving sensitive government information, such as in matters involving national security or defense and certain *qui tam* and False Claims Act matters. The Order identifies no "national security interest" that it purportedly serves and no basis for the claim that the Firm's conduct is inconsistent with the "national interest" other than litigation the Firm has engaged in relation to elections and for unidentified groups said to "inject[] . . . radical

ideology" into the military. The Order's creation of a Susman Godfrey-specific "Security Clearance Review" process, in addition to the federal government's existing security clearance adjudication procedures, could undermine the Firm's efforts to bring in matters involving classified information, including, for instance, matters in the Firm's *qui tam* and False Claims Act practice.

80.      **Revocation of Sensitive Compartmented Information Facilities.** Section 2 of the Order directs the Office of Management and Budget to "identify all Government goods, property, materials, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman [Godfrey]" and to "expeditiously cease such provision," to the extent permitted by law. Anders Decl. Ex. 1 § 2(b). The federal government does not provide Sensitive Compartmented Information Facilities access to Susman Godfrey or its employees.

81.      The Order is designed to disrupt and injure Susman Godfrey's representation of its clients, has done so, and will continue to do so unless it is permanently enjoined by this Court.

82.      I declare under penalty of perjury, on this 23rd day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

Kalpana Srinivasan

35