# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

                 *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, FEDERAL
COMMUNICATIONS COMMISSION,
OFFICE OF MANAGEMENT AND BUDGET,
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, OFFICE OF PERSONNEL
MANAGEMENT, GENERAL SERVICES
ADMINISTRATION, OFFICE OF THE
DIRECTOR OF NATIONAL INTELLIGENCE,
THE UNITED STATES OF AMERICA, and, in
their official capacities, PAMELA J. BONDI,
BRENDAN CARR, RUSSELL T. VOUGHT,
ANDREA R. LUCAS, CHARLES EZELL,
STEPHEN EHEKIAN, and TULSI GABBARD,

                 *Defendants*.

Case No. _____

## **COMPLAINT**

Plaintiff, the law firm of Perkins Coie LLP, brings this case against the U.S. Department

of Justice, the Federal Communications Commission, the Office of Management & Budget, the

Equal Employment Opportunity Commission, the Office of Personnel Management, the General

Services Administration, the Office of the Director of National Intelligence, the United States of

America, and, in their respective official capacities, Pamela J. Bondi, Brendan Carr, Russell T.

Vought, Andrea R. Lucas, Charles Ezell, Stephen Ehekian, and Tulsi Gabbard, and states as

follows:

1

## WHAT THIS CASE IS ABOUT

1.      This case concerns an Executive Order issued on March 6, 2025, entitled, "Addressing Risks From Perkins Coie LLP" ("the Order").  The Order is an affront to the Constitution and our adversarial system of justice.  Its plain purpose is to bully those who advocate points of view that the President perceives as adverse to the views of his Administration, whether those views are presented on behalf of paying or pro bono clients.  Perkins Coie brings this case reluctantly.  The firm is comprised of *lawyers* who advocate for *clients*; its attorneys and employees are not activists or partisans.  But Perkins Coie's ability to represent the interests of its clients—and its ability to operate as a legal-services business at all—are under direct and imminent threat.  Perkins Coie cannot allow its clients to be bullied.  The firm is committed to a resolute defense of the rule of law, without regard to party or ideology, and therefore brings this lawsuit to declare the Order unlawful and to enjoin its implementation.

2.      The Order's peculiar title betrays its oddity as an Executive Order, for its purpose is not executive in nature.  Rather, the Order reflects a purpose that is judicial—to adjudicate whether a handful of lawyers at Perkins Coie LLP ("Perkins Coie," "the law firm," or "the firm") engaged in misconduct in the course of litigation and then to punish them by:  (1) terminating government contracts with firm clients, thereby driving away current and prospective clients; (2) denying *all* members and employees of the firm access to federal buildings and meetings or other engagement with federal employees; and (3) immediately suspending, and possibly revoking, security clearances for all firm employees.

3.      The Order imposes these punishments on the entire law firm even though the attorneys involved in the purported misconduct numbered a mere handful of the more than 1,200

2

attorneys in the firm, and even though the two attorneys the Order appears to target have not been with the firm for years.

4.    The Order imposes these punishments *ex post facto*—the President having already supposedly adjudicated the matters—determining that Perkins Coie engaged in "dishonest and dangerous activity," "manufactured" evidence in connection with the Clinton 2016 presidential campaign, engaged in "a pattern" of "egregious activity" by challenging (and defending) election laws, and "racially discriminated against" its employees and applicants, all without giving notice to Perkins Coie and without giving Perkins Coie an opportunity to be heard and contest these and other false and disparaging claims made in the Order.

5.    The Order imposes these punishments as retaliation for the firm's association with, and representation of, clients that the President perceives as his political opponents.  Many law firms represented candidates, parties, and related political committees and organizations in the 2016 and 2020 campaigns.  But the Order targets only one firm—Perkins Coie—because the President views it, more than any other firm, as aligned with the Democratic Party by reason of its representation of the 2016 Clinton presidential campaign and its successful handling of challenges brought by the Trump campaign seeking to overturn the results of the 2020 election, as well as victories the firm won for its clients in a significant number of voting rights cases, including cases where Perkins Coie succeeded in upholding existing laws, in connection with the 2020 election.

6.    During the campaign, the President promised to retaliate against his political opponents, including the attorneys who represented them ("WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. Please beware that this legal exposure extends to Lawyers….").  And, in signing the Order, he insisted that Perkins Coie

3

engaged in weaponization "against a political opponent" (i.e., himself) and justified the Order for the chilling effect it would have ("it should never be allowed to happen again").

7.      The retaliatory aim of the Order is intentionally obvious to the general public and the press because the very goal is to chill future lawyers from representing particular clients.  The Associated Press wrote that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct."  And that aim is also obvious to the profession, many of whom will only comment anonymously, as Law.com reported ("most law firm leaders are choosing to stay anonymous when speaking about the administration's orders").

8.      The principal claims made by the Order have already been raised in the proper forum and resolved by the branch of government with constitutional authority to do so.  Regarding the claim that the firm engaged in misconduct in connection with its representation of the Clinton campaign, the President filed a federal court lawsuit in March 2022 against Perkins Coie, Hillary Clinton, and others.  That lawsuit asserted RICO claims concerning the campaign and allegedly falsified documents.  The district court dismissed that lawsuit in September 2022.  Regarding the assertion that the firm "pushed" false claims about ties between Russia and the 2016 Trump campaign, a Special Counsel appointed during the first Trump Administration indicted Michael Sussmann, a former partner of the firm, in connection with evidence he brought to the attention of the FBI, allegedly without disclosing his ties to the Clinton campaign.  That case went to trial in this Court in May 2022, and the jury quickly and unanimously acquitted him.  Regardless, Mr. Sussmann is now at a different firm.  And regarding the claim that former members of the firm were not candid with the court, the court concerned—the Court of Appeals for the Fifth Circuit— sanctioned three lawyers in 2021 by requiring them to pay $8,700 in legal fees in connection with

one duplicative motion to supplement the record on appeal.  None of those lawyers work for Perkins Coie today.

9.     The Order also seeks to impermissibly punish Perkins Coie because of its disfavored support of "diversity, equity and inclusion."  Perkins Coie has a longstanding commitment to diversity and inclusion.  Perkins Coie, however, does not discriminate against its attorneys or employees on the basis of race or otherwise.  Rather, fostering an environment where attorneys from diverse backgrounds and experiences can thrive and make meaningful contributions enables Perkins Coie to attract top talent and deliver exceptional legal counsel to its clients.  Perkins Coie does not have, and has never had, percentage quotas for hiring or promoting minorities.  The lawsuit referenced in the Order challenging the firm's diversity fellowship was quickly dismissed by the plaintiff after clarification that the program is open to all, regardless of race.  Perkins Coie's commitment to diversity and inclusion is not unlawful and the Order's allegations are a thinly veiled pretext for further punishing the firm for a disfavored viewpoint.

10.     Because the Order in effect adjudicates and punishes alleged misconduct by Perkins Coie, it is an unconstitutional violation of the separation of powers.  Because it does so without notice and an opportunity to be heard, and because it punishes the entire firm for the purported misconduct of a handful of lawyers who are not employees of the firm, it is an unconstitutional violation of procedural due process and of the substantive due process right to practice one's professional livelihood.  Because the Order singles out Perkins Coie, it denies the firm the equal protection of the laws guaranteed by the due process clause of the Fifth Amendment.  Because the Order punishes the firm for the clients with which it has been associated and the legal positions it has taken on matters of election law, the Order constitutes retaliatory viewpoint discrimination and, therefore, violates the First Amendment rights of free expression and association, and the

5

right to petition the government for redress. Because the Order compels disclosure of confidential information revealing the firm's relationships with its clients, it violates the First Amendment. Because the Order retaliates against Perkins Coie for its diversity-related speech, it violates the First Amendment. Because the Order is vague in proscribing what is prohibited "diversity, equity and inclusion," it violates the Due Process Clause of the Fifth Amendment. Because the Order works to brand Perkins Coie as *persona non grata* and bar it from federal buildings, deny it the ability to communicate with federal employees, and terminate the government contracts of its clients, the Order violates the right to counsel afforded by the Fifth and Sixth Amendments.

## JURISICTION AND VENUE

11.     The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

12.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

13.     Venue lies in this District because Plaintiff has offices here and each Defendant is an agency or officer of the United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## THE PARTIES

### Plaintiff

14.     Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney. Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific

Northwest and has opened offices in Asia and in Europe. Perkins Coie has approximately 2,500 employees. Of those, nearly half are attorneys and half are business professionals. Its employees are deeply woven into the fabric of their communities. They are Sunday school teachers, Scout leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. And they include former members of the armed forces, and current reservists in the U.S. military.

15.     The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, individuals, and charitable and public service-oriented organizations. Over its 113-year history, the lawyers of Perkins Coie have represented clients in every state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States). Perkins Coie alumni have been and are presently serving as state and federal court judges, law clerks, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies.

16.     Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. It has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and its individual offices are often named to similar local lists. The firm and its lawyers are also regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations. And Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential.

17.     Perkins Coie attorneys are drawn from all sides of the political spectrum, with most not politically active. There are attorneys who are liberal and attorneys who are conservative. At

the time Bob Bauer started the firm's small Political Law practice it was known in Seattle as, if anything, a "Republican firm." Things have become more balanced, and many of the firm's attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in recent years, four Perkins Coie partners have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.

18.     Perkins Coie is dedicated to serving its clients, its communities, and each other. It has a longstanding, firmwide commitment to pro bono service. In 2024, for example, Perkins Coie lawyers and business professionals spent over 89,000 hours valued at nearly $70 million in pro bono service. Over the past 35 years, the firm has provided approximately 1.45 million hours of pro bono service to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice. Its pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment. Much of its pro bono work involves advocating for military and veterans' rights. The firm has dozens of active veterans-benefits matters on behalf of those who have served this country.

19.     As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government and its employees on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession. The firm's lawyers routinely appear in federal court on behalf of their clients in civil and criminal cases, as well as in

administrative proceedings before federal agencies.  They also communicate on behalf of their clients with federal government officials in court proceedings alongside, adverse, or incidental to the federal government in government-owned and -controlled buildings, and as part of daily informal communications through in-person meetings, telephone calls, videoconferences, letters, and the like.

20.    Every single one of the firm's nine main client-facing practice groups intersects with the federal government and each includes clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys.  The vast majority of the work in those groups is performed on behalf of clients who have had, or are competing for, business with the government.  The smallest practice group by headcount is Political Law, which includes 8 attorneys (and 19 others affiliated with that practice).  The firm's Political Law practice has historically been much smaller than the firm's other practice groups, and it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group.  It currently accounts for about 0.5% of the firm's revenue.  This practice group historically has handled a mix of paying and pro bono cases.

21.    The firm's nearly 1,000 active matters for its clients require Perkins Coie lawyers to interact with more than 90 different federal agencies.  For example, the firm's Intellectual Property group—among the largest practices at the firm—depends heavily on access to and interaction with the federal government.  The hundreds of attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board (PTAB).  Perkins Coie lawyers are

currently representing over five hundred clients in over 5,000 pending patent applications before the USPTO and dozens more in active post-grant proceedings (i.e., administrative trial proceedings) before the PTAB before the International Trade Commission (ITC). Perkins Coie lawyers are also representing clients in trademark and copyright matters before agencies, including over 60 matters before the Trademark Trial and Appeal Board (TTAB), almost 2,000 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government. And many of the firm's practice areas, such as its White Collar & Investigations group, rely almost exclusively on interacting with the federal government.

## **Defendants**

22.    The U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

23.    Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

24.    The Federal Communications Commission is a federal agency headquartered in Washington, D.C.

25.    Brendan Carr is Chairman of the Federal Communications Commission. He is sued in his official capacity.

26.    The U.S. Office of Management & Budget is a federal agency headquartered in Washington, D.C.

27.    Russell T. Vought is Director of the U.S. Office of Management & Budget. He is sued in his official capacity.

28. The Equal Employment Opportunity Commission is a federal agency headquartered in Washington, D.C.

29. Andrea R. Lucas is Acting Chair of the Equal Employment Opportunity Commission. She is sued in her official capacity.

30. The Office of Personnel Management is a federal agency headquartered in Washington, D.C.

31. Charles Ezell is Acting Director of the Office of Personnel Management. He is sued in his official capacity.

32. The General Services Administration is a federal agency headquartered in Washington, D.C.

33. Stephen Ehikian is the Acting Director of the General Services Administration. He is sued in his official capacity.

34. The Office of the Director of National Intelligence is a federal agency headquartered in Washington, D.C.

35. Tulsi Gabbard is U.S. Director of National Intelligence. She is sued in her official capacity.

36. The United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action respecting Perkins Coie. In light of the fact that Perkins Coie's attorneys interact with and appear before more than 90 different federal agencies, and the Order at issue is directed generally to "all agencies," the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as defendants.

# THE FACTS

## Recent Relevant Litigation

37.     In the wake of the 2020 election, Perkins Coie successfully handled numerous challenges brought by the Trump campaign seeking to overturn the results of the 2020 election. These cases came on the heels of many pre-election cases involving voting rights, including cases where Perkins Coie succeeded in upholding existing laws.

38.     On March 24, 2022, Donald Trump sued a number of defendants, including Perkins Coie, Hilary Clinton, the Democratic National Committee, Michael Sussmann, Marc Elias, and Fusion GPS, in the U.S. District Court for the Southern District of Florida, alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia and engaged in actionable conduct regarding Fusion GPS and Alfa Bank. *See* Dkt. 1, 2:22-cv-14102 (S.D. Fla.).  Mr. Trump asserted civil RICO claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits.  On September 9, 2022, the District Court dismissed the lawsuit with prejudice, writing:  "As [defendants] view it, 'whatever the utilities of the Amended Complaint as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit.'  I agree."  *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1284 (S.D. Fla. 2022).

39.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging an Executive Order targeting transgender servicemembers.  Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights

Campaign. Perkins Coie filed a motion for a preliminary injunction on February 19, 2025, asking the court to bar implementation of that Executive Order until it could adjudicate the case, and the court ordered the government, while preliminary injunction briefing is underway, to notify the court immediately before making any changes to the status quo.

### The Executive Order and Accompanying "Fact Sheet"

40.     The President of the United States on March 6, 2025, issued the Executive Order titled "Addressing Risks From Perkins Coie LLP." Ex. 1.[1]

41.     Section 1 of the Order falsely declares that Perkins Coie had engaged in "dishonest and dangerous activity" that has affected the country "for decades." As evidence of such so-called "dishonest and dangerous activity," the Order cites the firm's representation of the 2016 presidential campaign of the Democratic Party candidate, Hillary Clinton, and the firm's hiring of Fusion GPS in the course of that representation, stating that Fusion "manufactured a false 'dossier' designed to steal an election."

42.     As further evidence of such supposed "dishonest and dangerous activity"—activity that the Order brands as "egregious" and "part of a pattern"—the Order asserts that Perkins Coie has worked "to judicially overturn popular, necessary, and democratically enacted election laws" and that it has done so in association with so-called "activist donors."

43.     The Order does not mention the fact that Marc Elias, the lawyer who led the representation of the 2016 Clinton presidential campaign is no longer employed by Perkins Coie. Nor does the Order mention the fact that the firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election, and the firm's

---

[1] The exhibits referenced herein are attached to the declaration of Christopher N. Manning in support of Perkins Coie's motion for a temporary restraining order, filed contemporaneously herewith.

clients also prevailed in a significant number of voting rights cases, including cases where it was successful in upholding existing laws, relating to the 2020 election.  Also absent from the Order is any acknowledgment that, before his reelection, a federal court in Florida dismissed with prejudice the President's personal lawsuit against Perkins Coie alleging that the firm had conspired with the Clinton campaign and others to weave a false narrative about Mr. Trump colluding with Russia to interfere with the 2016 election.  The Order also omits that no one involved with the engagement of Fusion GPS remains at Perkins Coie.

44.     Section 1 of the Order further declares that one court sanctioned Perkins Coie attorneys "for an unethical lack of candor before the court."  The Order does not mention that the incident occurred in 2021; that the sanction, collectively, was $8,700; that the three sanctioned attorneys are no longer members of, or employed by, the firm; that what the court determined to be a lack of candor was a failure to notify the court of appeals that a motion to supplement the record on appeal was "nearly identical" to an earlier motion to supplement the record when the attorneys had sought an emergency stay; and that, upon reconsideration, the court explained that a violation of the local rules, without any need to find bad faith, supported the sanctions.

45.     Section 1 of the Order also declares that Perkins Coie "racially discriminates against its own attorneys and staff."  It does not, and did not.  The allegedly discriminatory practices cited in the Order date back to 2019 and 2023; they did not exist then and they do not exist now.  And the Order does not purport to identify any current practices that discriminate on the basis of the race.  It is true that Perkins Coie has a longstanding commitment to diversity and inclusion and has made, and continues to make, public statements advancing the ideals of diversity, equity, and inclusion.  But Perkins Coie does not, and did not, have percentage quotas for hiring or promoting minorities.  Reflecting the firm's core values, Perkins Coie introduced a summer

associate program decades ago (in 1991) geared towards providing diverse first-year law students with valuable professional experience.  Perkins Coie was one of the first law firms in the country to offer such an innovative program and expanded it in 2021 to include second-year law students. Although the program was successful, following the Supreme Court's decision on race-conscious admissions in *Students for Fair Admissions, Inc. (SFFA) v. President & Fellows of Harvard College*, 143 S. Ct. 2141 (2023), Perkins Coie reexamined its diversity initiatives to adapt to changing jurisprudence. While this review was already in progress, the American Alliance for Equal Rights filed a lawsuit challenging Perkins Coie's fellowship programs.  As a result of the litigation, the firm's leadership clarified that 1L and 2L diversity fellowships were open to all applicants.  In fact, Perkins Coie had previously awarded the fellowship to non-diverse applicants. American Alliance for Equal Rights consequently dismissed its lawsuit.

46.     Section 1 relies on the false premise that, by promoting diversity in the legal profession, Perkins Coie has engaged in "blatant race-based and sex-based discrimination" and therefore, violated the public trust.  Section 1 wrongly concludes that diversity, equity, and inclusion policies "disrespect. . . the bed rock principle of equality" and therefore, represent good cause to terminate access to national security clearances and federal funds.

47.     Section 4 instructs the Chair of the Equal Employment Opportunity Commission (EEOC) to target "representative large, influential, or industry leading law firms"—like Perkins Coie—to determine if large law firms hire and promote individuals; permit client access; or provide access to events, trainings, or travel "on a discriminatory basis."  Section 4 further instructs the Attorney General, in coordination with the Chair of the EEOC, to investigate large law firms who do business with federal entities "for compliance with race-based and sex-based non-

discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered."

48. On the same day that the White House issued the Order, it also issued a so-called "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP." That Fact Sheet, Ex. 2, embellishes the Order's allegations concerning Perkins Coie. It characterizes the Order as "Stopping Abuses That Undermine the Nation" and states that "President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security."

49. Unlike the Order, which states that Perkins Coie, in the course of its representation of the Clinton campaign, hired a consultant that "manufactured a false 'dossier' designed to steal an election," the Fact Sheet declares that the law firm hired the consultant for the very purpose of preparing a false document ("In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false 'dossier' designed to steal an election …."). The Fact Sheet does not mention that a federal court dismissed President Trump's suit because it was no more than "a fundraising tool, press release, or a list of political grievances," and had no merit as a lawsuit. *Trump*, 626 F. Supp. 3d at 1284.

50. The Fact Sheet further explains the Order by stating that the law firm "pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme." The Fact Sheet does not mention that a jury in this Court quickly and unanimously acquitted Mr. Sussmann, nor the fact that he resigned from the firm in 2021 and is now employed at a different law firm.

51. The Fact Sheet repeats the same false and disparaging statements about discrimination and lack of candor that the Order does.

52. The Fact Sheet also repeats a myth that Perkins Coie "hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." That rumor was long ago debunked. Like many law firms who represent clients involved in national security issues, the firm was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to its current building years ago. The FBI's only involvement was examining and approving the security of the space. Mr. Sussmann—who was not in the firm's Political Law practice and has not been at the firm for years—used that space as his office. Perkins Coie no longer has a SWE.

53. Although the Order says nothing about "abuses" supposedly affecting military strength and national security, the Fact Sheet purportedly explaining the Order states that "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." On information and belief, that statement refers to the pending lawsuit brought by servicemembers, represented by Perkins Coie and others, challenging the Executive Order that bans transgender personnel from serving in the United States Armed Forces. The firm represents the plaintiffs on a pro bono basis.

## The Retaliatory Character of the Executive Order and "Fact Sheet"

54. These many disparaging statements in the Order and Fact Sheet about Perkins Coie were intended to constitute, and in fact do constitute, retaliation for the law firm's representation of the President's Democratic opponent in the 2016 election and of clients who, in 2016 and afterward, challenged and defended cases adverse to the President and his allies.

55. Only ten days before issuing the Order and Fact Sheet, the White House had issued a memorandum to the Secretaries of State and Defense, the Attorney General, the Director of National Intelligence, and other agency heads directing them to suspend any active security

clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," falsely referring to Mr. Smith's service as "the weaponization of judicial process." That memorandum also directed the same persons "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law ...."

56. Observers immediately understood and characterized the Order targeting Perkins Coie, like the earlier memorandum concerning Covington & Burling LLP, as retaliation against the law firm for its association with, and representation of, the President's political opponents.

57. The Washington Post wrote that, through the Order directed at Perkins Coie, the Administration "targeted another elite law firm that has represented clients the president considers his political enemies." The Associated Press wrote that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct." Politico described the Order as "the latest chapter in the president's campaign to punish his perceived political enemies," noting the earlier termination of security clearances for the lawyers representing Mr. Smith. The Wall Street Journal noted that the president "hasn't shied away from punishing his enemies" and that his moves "have sent a chill through" the legal profession. The New York Times recognized the Order as an "escalation of efforts to punish groups the president sees as aiding his enemies" and called it "a form of payback for [Perkin Coie's] legal work for Democrats during the 2016 presidential campaign." The Financial Times called the Order a "further move against lawyers that worked in opposition to him." And associates of the President have made clear that the Administration is monitoring which lawyers and firms are representing his political opponents. Elon Musk, for example, reposted a story on X about lawsuits challenging the Administration's cuts to funding at

the National Institutes of Health, asking, "Which law firms are pushing these anti-democratic cases to impede the will of the people?"

58. In seeking comment on the Order, the press also determined that the Order was having an immediate chilling effect. Law.com reported that "most law firm leaders are choosing to stay anonymous when speaking about the administration's orders[.]" It quoted one anonymous firm leader as stating that "[n]ow firms need to consider the Trump administration backlash in client intake," and, another, that "'you will see most firms take a more conservative approach to taking on matters that piss off the administration.'" Similarly, the Wall Street Journal cited "private conversations" with partners at the nation's leading law firms who have declined to object to the Order "in part because of retaliation fears." The article also stated that "[a]dvocacy groups and smaller law firms say it has been more difficult to recruit larger firms to help with cases against Trump" and quoted a NAACP Legal Defense Fund employee as saying that "Law firms are not as vocal and as zealous" in their representations.

59. Observers rightly recognized the Order as retaliation for Perkins Coie's association with, and advocacy on behalf of, the President's political opponents because he repeatedly promised during his 2024 presidential campaign to retaliate against his perceived political enemies, including the lawyers who represented them.

60. In June 2024, in an interview with Sean Hannity, the President said, "Look, when this election is over, based on what they've done, I would have every right to go after them …." In September 2024, Trump warned on Truth Social that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. Please beware that this legal exposure extends to Lawyers…." By October, NPR counted "100 threats to investigate, prosecute, imprison or otherwise punish his perceived opponents."

61.    In signing the Order, the President confirmed this intention.  His staff secretary handed him the Order, stating it was part of the effort "to hold those who engaged in lawfare accountable," to which the President responded that Perkins Coie engaged in weaponization "against a political opponent" and "it should never be allowed to happen again."

62.    Since issuing the Order, the President has stated that his Administration will continue to retaliate against law firms that have represented persons that he perceives as political enemies.  Interviewed on March 9, 2025, the President said (and repeated), "We have a lot of law firms that we are going to be going after."

### The Irreparable Harm to Perkins Coie

63.    The Order does more than disparage Perkins Coie by declaring that the firm engages in "racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust[.]" It has caused clients to sever their relationship with the firm, and it incentivizes that in three ways.

64.    First, the Order requires clients that are government contractors to disclose "any business they do with Perkins Coie," regardless of whether that business relates to the client's federal contracting work, where the consequence of such disclosure will be that "the heads of agencies shall … take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law … for which Perkins Coie has been hired to perform any service."  The Fact Sheet is even more explicit that contracts will, in fact, be terminated and that the purpose is punishment.  The Fact Sheet states, "[T]he Federal Government will prohibit funding contractors that use Perkins Coie LLP."  And it states that the Government will do so "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States[.]"

65.     Many of Perkins Coie's largest clients (for example, the firm's 15 largest clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue), or their affiliates, are known either to have, or to compete for, contracts or subcontracts with the federal government, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters.  For many of Perkins Coie's clients, the fact that the firm gives them legal advice is not public information. Accordingly, if implemented, the Order will seek to require clients to divulge confidential information regarding consultation of counsel to the federal government, at risk that the Administration will then terminate the clients' government contracts.

66.     Second, the Order directs the heads of "all agencies" to limit the access of Perkins Coie attorneys and employees to federal buildings when access would be "inconsistent with the interests of the United States," to limit Government employees "from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," and to "refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management."

67.     Citing the Order, Government employees have already twice indicated that Perkins Coie attorneys should not, or could not, attend scheduled meetings.  The day after the President signed the Order, an official of a federal agency, informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter.

68.     On March 6, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Criminal Division could not proceed with a scheduled meeting relating to a firm client.  The attorney stated that he was awaiting further

guidance as to whether the Criminal Division could meet at all with the firm's lawyers in light of the Order. This postponement has threatens the ability of that client to achieve a swift resolution of the matter.

69. Third, the Order directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments" immediately to suspend any security clearances of Perkins Coie attorneys pending a review of whether such clearances "are consistent with the national interest." The Order thus gives clients, like defense contractors, reason to sever ties with lawyers that lack clearances and to retain lawyers who have or can secure the requisite clearances, particularly when those clients can have no assurance that the review of Perkins Coie's clearances will be timely, much less that it will be favorable given the retaliatory character of the Order.

70. Because of the Order—including the restrictions imposed on Perkins Coie, the obligations imposed on, and risk of contract termination faced by clients with government contracts, the uncertainty, and the Government animus to the firm reflected by the Order—several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. This is a rapidly evolving situation, which changes by the hour. Some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility

71. One client informed Perkins Coie within hours of the Order's release that, due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

72. A major government-contractor client for over 35 years withdrew its work from Perkins Coie in light of the Order as of March 7. Shortly before the Order, that client had added

Perkins Coie to its preferred-provider program, and annual billings to the client have often been in the millions of dollars.

73.     Another government-contractor that has been a firm client since 2018 has also withdrawn all work from the firm as a result of the Order as of March 7.

74.     A group of four clients have withdrawn all work from the firm as of March 7, due to their need to engage with various federal agencies, including the Drug Enforcement Administration, Health and Human Services, and the Department of Justice (DOJ).

75.     Another major government-contractor client for over 10 years informed the firm on March 7 that it is reconsidering its engagements with Perkins Coie unless something changes in terms of the Order's requirements.

76.     Another client indicated on March 7 that it is now considering retention of an alternative firm to represent it in connection with a DOJ investigation.

77.     Because of the uncertainty created by the Order, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.   The time that Perkins Coie's attorneys spend attending to these inquiries is a present and irreparable cost to Perkins Coie, because its lawyers (like most lawyers) are compensated by clients for their time.  Every hour spent responding to the Order is an hour that an attorney cannot spend serving his or her clients on their cases and other matters.  Both Perkins Coie's clients and its bottom line are harmed every day the Order is left undisturbed. Perkins Coie's largest clients want to keep using the firm, but are reviewing the relationship, their government contracts, and other government interactions, and have indicated that they will need to make decisions shortly.

78. Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued. Like any law firm or business, Perkins Coie has debts, obligations and expenses. Upon information and belief, Perkins Coie will continue to lose existing and prospective clients if the Order is allowed to stand, and the losses would be such as to jeopardize the firm's long-term health.

79. The Order also threatens the right of Perkins Coie attorneys to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, as Perkins Coie attorneys frequently appear in federal court and before federal agencies in criminal, civil, or administrative matters. The firm is built around representation of clients who interact with the federal government.

80. The Order has also adversely affected and will continue to affect the firm's recruiting and, potentially, retention of employees. Since the issuance of the Order, business-professional candidates to whom offers have been extended have questioned the economic health of the firm and whether there will be layoffs. At least one interviewee asked questions obviously prompted by the Order. The firm also has a recruiting event within the next two weeks that is focused on practice before a federal court of appeals, from which the firm historically has hired clerks to practice in areas related to government contracts, international trade, and intellectual property. The Order will dissuade talented candidates from joining Perkins Coie under fear that they will be foreclosed from later entering service with the federal government

81. The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie employees.

82. The Order has also harmed and will harm Perkins Coie's reputation in the market through its false and disparaging characterizations of the firm and its attorneys.

24

83.     In short: the Order has had its intended effect already—irreparable impact that will only continue to grow.  The disparagement of the firm, which signals to present and prospective clients alike that it is *persona non grata* with the Administration, combined with the threat of termination of clients' government contracts and suspension of security clearances, has caused financial and reputational harm to the firm.  By reason of the Order, the firm has lost clients, lost business (as clients have withdrawn business or given new business to other firms), and received worried inquiries from clients, including its largest clients, which question whether it can adequately represent them in light of the Administration's demonstrated animus.

84.     The Order has had, and will continue to have, a chilling effect on whether and how Perkins Coie will litigate on behalf of certain clients, and is having a chilling effect on attorneys and other persons considering employment with the firm.  These consequences will continue to mount if the Order is allowed to stand.

## CLAIMS FOR RELIEF

## COUNT I

## (Against All Defendants)

### *Ultra Vires Presidential Action – Unconstitutional Exercise of Judicial Authority*

85.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

86.     Fundamental to the Constitution is that the separation of powers prevents the "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).  The separation of powers "protects the liberty of the individual from arbitrary power."  *Bond v. United States*, 564 U.S. 211, 222 (2011).

87.     The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

88.     There is no enumerated or inherent executive authority from the Constitution to regulate and to sanction lawyers for professional misconduct.  That is not part of the President's "core constitutional power[]." *Trump v. United States*, 603 U.S. 593, 606 (2024).  Nor is it one of his "incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1563 (1st ed. 1833)).

89.     The Order also identifies no constitutional or statutory source of authority.  The Order is ultra vires because there is "no express constitutional or statutory authorization" empowering the President to retaliate against and punish Plaintiff for representing clients outside of agency proceedings. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942).

90.     The Judicial Branch, not the President, has the inherent authority to regulate the legal practice. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  Such authority "includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (cleaned up).  Courts find facts to support punishments limiting private rights of liberty, property, and contract. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–56 (1989).  And they impose punishments only after ensuring due process. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring).

91.     Article III of the Constitution vests the "judicial Power of the United States" in the federal courts.  That power enables courts "to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." *Muskrat v. United*

26

*States*, 219 U.S. 346, 356 (1911) (quoting Samuel Freeman Miller, Lectures on the Constitution of the United States 314 (1891)).

92.     Section 1 of the Order purports to find that Perkins Coie has engaged in "dishonest and dangerous activity" and "worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws."  It then falsely asserts that Perkins Coie "undermin[es] democratic elections, the integrity of our courts, and honest law enforcement" and "racially discriminates against its own attorneys and staff, and against applicants."

93.     Section 3 of the Order relies on Section 1 to penalize Perkins Coie for its legal advocacy by instructing "Government contracting agencies … [to] require Government contractors to disclose any business they do with Perkins Coie," "to terminate any contract … for which Perkins Coie has been hired to perform any service," and to report on actions taken with respect to "contracts with Perkins Coie or with entities that do business with Perkins Coie."  It thus strips Perkins Coie's clients and business partners of their government contracts.

94.     Likewise, wielding the purported findings of Section 1, Section 5 of the Order restricts Perkins Coie employees' "access [to] Federal Government buildings" and limits Perkins Coie employees' ability to "engag[e]" with government personnel.

95.     No statute authorizes these actions.  Nor could one exist, because the power to impose penalties for legal advocacy—after an adjudication of the facts accordant with due process—rests with federal and state courts.

96.     The President punishes Perkins Coie with an order that shares all the essential features of a bill of attainder.  The Order thus invades judicial power by adjudicating facts to support a restriction of Plaintiff's private rights in a way the Constitution prohibits the legislature

from doing. The Constitution prohibits presidents from arrogating judicial power unto themselves to "pronounce[] upon the guilt of [Plaintiff] … in accordance [solely] with [their] own notions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

97.     The Order is therefore *ultra vires* because it violates the separation of powers by exercising judicial power and because no statute grants such authority.

98.     The *ultra vires* nature of the Order has already harmed, and continues to harm, Plaintiff.

## COUNT II

### (Against All Defendants)

### *Unconstitutional Deprivation of Procedural Due Process*

99.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

100.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

101.     The Order interferes with and impairs multiple liberty and property interests protected by the Due Process Clause. Perkins Coie represents clients in federal-court litigation and in matters before federal agencies. In order to provide legal services, Perkins Coie is required to access federal government buildings and engage with federal government employees. The Order impairs Perkins Coie's ability to follow its chosen profession by limiting its ability to practice law, including its ability to represent clients in court and before agencies, and to contract with the federal government. The Order also impairs Perkins Coie's private contracts with its clients. The Order harms Perkins Coie's constitutionally protected property interests by

prohibiting Perkins Coie from participating in federal contracting and seeking to terminate private contractual relationships between Perkins Coie and its clients. The Order harms Perkins Coie's cognizable reputation interest by stigmatizing Perkins Coie as dishonest, untrustworthy and racially discriminatory. The Order also deprives Perkins Coie of its liberty interest in its First Amendment right to petition the government because it restricts access to governmental facilities and governmental personnel.

102.    Perkins Coie did not receive notice prior to being subjected to the Order. Perkins Coie was not aware, prior to the issuance of the Order, of the conduct that would subject it to punishment or the severity of the potential punishment.

103.    Defendants did not provide Perkins Coie with any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement. Following the issuance of the Order, Perkins Coie has not been given an opportunity by Defendants to challenge the Executive Order.

104.    No compelling government interest justifies Defendants' violation of Perkins Coie's due process rights. The decision to adopt the Order was based on improper purposes. Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to punish Perkins Coie for exercising rights protected by the First Amendment. The Order is based on false premises, but even assuming that it were not, the sanctions it imposes would be wildly disproportionate. Indeed, the President's choice to punish an entire law firm—rather than the handful of attorneys allegedly responsible for the misconduct the Order purports to identify— clarifies the retaliatory nature and gross disproportionality of the Order. So too its focus singling out Perkins Coie from among similarly situated firms. This improper purpose and absence of any

legitimate justification demonstrates that the Order is an abusive, irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

105.    As a result of Defendants' actions, Perkins Coie's Fifth Amendment right to due process has been violated.  Defendants' violation of due process has caused Perkins Coie to suffer ongoing and irreparable harm.

## COUNT III

### (Against All Defendants)

### *Unconstitutional Deprivation of Due Process (Void for Vagueness)*

106.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

107.    A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

108.    The Order is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  It does not provide Perkins Coie with a basis to understand what conduct is prohibited or how to avoid further sanctions in the future.  The Order also does not provide any guidance on which interactions and buildings, and in what circumstances, its employees are restricted from.  The Order's vagueness also permits Defendants to engage in arbitrary and discriminatory enforcement against Perkins Coie.

109.    The Order also fails to provide adequate notice as to what are prohibited "diversity, equity, and inclusion" policies.  The Order is unconstitutionally vague because Perkins Coie

cannot know whether it can hire, promote, staff or train employees who are racial minorities or unspecified "other categories prohibited by civil rights laws." Nor can Perkins Coie know how it is deemed untrustworthy to have access to national security information simply because it embraces programs and policies that are deemed by the Order to be discriminatory "diversity, equity, and inclusion" policies. The Order threatens and compels various punishments and investigations against Perkins Coie because of its "diversity, equity, and inclusion" policies. Because the order is vague with respect to prohibited "diversity, equity, and inclusion" policies it is a violation of the firm's constitutional due process rights.

110.     The Order's threatened investigation and enforcement action by the EEOC and the Department of Justice against Perkins Coie because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

111.     The Order's threatened suspension of active security clearances held by Perkins Coie employees because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

112.     The Order's threatened termination of contracts or funding with Perkins Coie or entities doing business with Perkins Coie because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

113.     The Order's threatened limitation of access to Federal property and engaging with government employees because of the firm's vaguely defined "diversity, equity, and inclusion" policies make it a violation of the firm's constitutional due process rights.

114.     The Order's threatened prevention of the hiring of Perkins Coie employees for Federal positions because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

115.    No compelling government interest justifies Defendants' violation of Perkins Coie's due process rights.  The decision to adopt the Order was based on improper purposes. Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to punish Perkins Coie for exercising rights protected by the First Amendment.  The Order is based on false premises, but even assuming that it were not, the sanctions it imposes would be wildly disproportionate.  Indeed, the President's choice to punish an entire law firm—rather than the handful of attorneys allegedly responsible for the misconduct the Order purports to identify— clarifies the retaliatory nature and gross disproportionality of the Order.  So too does its singling out of Perkins Coie from among similarly situated firms.  This improper purpose and absence of any legitimate justification demonstrates that the Order is an abusive, irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

116.    As a result of Defendants' actions, Perkins Coie's Fifth Amendment right to due process has been violated.  Defendants' violation of due process has caused Perkins Coie to suffer ongoing and irreparable harm.

### COUNT IV

### (Against All Defendants)

### *Unconstitutional Denial of Equal Protection*

117.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

118.    The Equal Protection Clause as incorporated by the Fifth Amendment to the United States Constitution prohibits the federal government, its agencies, its officials, and its employees from denying persons the equal protection of the laws.

119.     The Equal Protection Clause bars the government from disfavoring similarly situated individuals without a constitutionally legitimate basis.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

120.     To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Communications*, *Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985) (citing, *inter alia*, *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973)).  "[A] bare desire to harm a politically unpopular group" is "not [a] legitimate state interest[]."  *City of Cleburne*, 473 U.S. at 447.

121.     The purpose of the Order is to discriminate against Perkins Coie.  The Order intentionally targets Perkins Coie with extraordinary sanctions not levied on other, materially similarly situated firms or lawyers.

122.     The improper motive behind the Order is also apparent on its face and through the President's related public statements, as well as the statements of members of his Administration.

123.     The government lacks even a rational justification for the Order.  Among other things, the Order targets a 1,200-lawyer, 21-office international law firm based on almost ten-year-old allegations that courts have rejected and that involve partners whom Perkins Coie has not employed for several years.  The Order expressly seeks to punish Perkins Coie for representing clients in lawsuits that successfully struck down unconstitutional election laws and defeated challenges brought by President Trump or his allies to the results of the 2020 election.  There is not a shred of evidence of any national security threat from Perkins Coie, let alone one sufficient

to justify barring Perkins Coie from engaging in government contracts, interacting with federal employees, and accessing federal buildings.

124.  The Order is therefore in violation of the Equal Protection Clause.

125.  The Order's violations cause ongoing and irreparable harm to Perkins Coie.

## COUNT V

## (Against All Defendants)

### Unconstitutional Denial of First Amendment
### Free Speech and Associational Rights (Political Viewpoint Discrimination)

126.  Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

127.  The First Amendment prohibits the regulation or censure of speech based on "'the specific motivating ideology or the opinion or perspective of the speaker.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Such government action is a "'blatant' and 'egregious form of content discrimination'" and is subject to strict scrutiny.  *Reed*, 576 U.S. at 168, 171.

128.  The Order (and Fact Sheet explaining it) constitute viewpoint discrimination because they single out and punish Perkins Coie for its association with, and advocacy on behalf of, the President's political opponents in the 2016 and 2020 elections.

129.  The Order and Fact Sheet do not distinguish between the client's viewpoint and the firm's zealous advocacy of that viewpoint, but attribute the viewpoint to the firm and retaliate against the firm on that basis.

130.  The Order's viewpoint discrimination is all the more egregious because it concerns speech that is at the core of First Amendment protection—i.e., speech concerning the election of candidates to national office and what the law should be governing those elections.

34

131.     Viewpoint discrimination that is retaliatory cannot be justified by any government interest.  Even if the Order were not retaliatory in purpose and in the public's perception, as it clearly is, no compelling interest can support the Order.  It is the job of the courts to police misconduct by the lawyers who appear before them, and it is the job of state bars to discipline ethical misconduct by members of the bar.  The President has no authority in these areas.  Here, moreover, the President has presented his claims concerning the 2016 election to a federal court, and that court has dismissed his case.  He presented his claims regarding the 2020 election to numerous courts without material success, frequently losing to parties represented by Perkins Coie. Nor can there be any compelling government interest in punishing the entire Perkins Coie firm of over 1,200 lawyers and over 1,200 non-lawyer professionals now, in 2025, when the purportedly offending speech (i) occurred years ago and (ii) involved a mere handful of lawyers (iii) none of whom are members or employees of the firm today.

132.     The First Amendment forbids the government's use of a patronage system whereby it conditions government benefits, such as contracts, access to government facilities or employment, or security clearances on political support or affiliation.  Even where there is no right to a government benefit, the government cannot revoke or condition benefits on grounds that violate the First Amendment's guarantee of free speech and association.  The Order punishes Perkins Coie for the lack of political fealty and conditions the further receipt of government benefits on adherence to the President's political points of view.

133.     The First Amendment protects the right to petition the government for redress of grievances.  Such petition includes seeking relief in courts of law and agencies of government. The Order violates that right by denying the ability of Perkins Coie lawyers to enter public buildings and, even short of entry, communicate and meet with government employees (two of

35

whom have already refused to meet with Perkins Coie lawyers, as scheduled before issuance of the Order).

134.    Facially overbroad regulation violates the First Amendment because it chills protected speech.  The Order and Fact Sheet are facially overbroad, *inter alia*, because they do not define what constitutes "dishonest and dangerous activity."  The Order, on its face, also encompasses legally protected activity, such as petitioning the government for redress of grievances in the courts.

135.    The Order's violations cause ongoing and irreparable harm to Perkins Coie.

## COUNT VI

### (Against All Defendants)

### *Unconstitutional Denial of First Amendment*
### *Free Speech and Associational Rights (Compelled Disclosures)*

136.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

137.    The First Amendment limits the government's ability to compel individuals to disclose their "affiliation[s] with groups engaged in advocacy." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).  Such compelled disclosures must satisfy "exacting scrutiny," a standard that requires the government to show that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

138.    Section 3 of the Order "require[s] [g]overnment contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract."

139.    Perkins Coie has third-party standing to assert the First Amendment rights of its clients who are subject to Section 3 because (i) Perkins Coie's right to freedom of association is burdened by the disclosure requirements and the disclosure requirements will cause Perkins Coie to lose clients; (ii) Perkins Coie has a close relationship with its clients; and (iii) Perkins Coie's clients are hindered from challenging the disclosure requirements and protecting their First Amendment rights because the act of challenging the disclosure requirements would require the clients to disclose their relationship with Perkins Coie. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020).

140.    The government's interest—retaliating against Perkins Coie for First-Amendment-protected activity of which the President disapproves—is not "sufficiently important" to withstand exacting scrutiny.

141.    Requiring all "[g]overnment contractors to disclose any business they do with Perkins Coie" irrespective of "whether that business is related to the subject of the Government contract," EO § 3, is not the kind of "narrow specificity" required by the First Amendment, *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963).

142.    Section 3 of the Order is facially unconstitutional.

143.    This constitutional violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT VII

### (Against All Defendants)

### *Unconstitutional Denial of First Amendment Free Speech and Associational Rights (Retaliation for Statements in Favor of Diversity and Inclusion)*

144.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

145. Perkins Coie has a longstanding commitment to diversity and inclusion and has made, and continues to make, public statements advancing the ideals of diversity, equity, and inclusion. Such statements of political opinion are core protected speech.

146. The Order's viewpoint discrimination stems from the threatened investigation and enforcement action against Perkins Coie because it embraces programs and policies that are deemed by the Order to be discriminatory "diversity, equity, and inclusion" policies.

147. Section 1 of the Order falsely asserts that Perkins Coie, by espousing views supportive of diversity and inclusion, has "disrespect[ed] . . .the bedrock principle of equality" and concludes that good cause therefore exists to terminate Perkins Coie's national security clearances and access to any federal funds. Such allegations are bad faith, pretextual, and lack any basis in fact.

148. The Order's threatened investigation and enforcement action by the EEOC and the Department of Justice against Perkins Coie because it embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

149. The Order's threatened suspension of active security clearances held by Perkins Coie employees because the firm embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

150. The Order's threatened termination of contracts or funding with Perkins Coie or entities doing business with Perkins Coie because the firm embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

151.     Section 4(a) of the Order unconstitutionally retaliates against Perkins Coie for First Amendment protected speech supporting and promoting diversity, equity, and inclusion in the legal profession and orders the Chair of the Equal Employment Opportunity Commission to investigate "representative large, influential or industry leading law firms"—like Perkins Coie— to determine if discriminatory hiring and promotion practices exist.

152.     Section 4(b) instructs the Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and the State Attorneys General, to conduct compliance investigations of any "large law firms"—like Perkins Coie—who do business with federal entities and to take "additional actions" deemed appropriate by the Attorney General "in light of the evidence uncovered."

153.     The threatened investigations into Perkin Coie's hiring, retention, promotion, and training practices constitute a "retaliatory action sufficient to deter a person of ordinary firmness in [Perkins Coie's] position from speaking again" and would thus be cognizable.  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  *See Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) (Retaliatory actions "that would chill a person of ordinary firmness" include "prosecution, threatened prosecution, bad faith investigation, and legal harassment.").

154.     The threat of an investigation by the Equal Employment Opportunity Commission and/or the Department of Justice imposes costs on Perkins Coie, including the potential costs of litigation and the need to redirect dedicated resources from other purposes to engage with the investigation.  Those harms are in addition to the reputational harms imposed on Perkins Coie by the false allegations in the Order which have resulted or will result in the loss of clients, employees, and prestige.

155.     The Order, thus, violates the First Amendment.

156.     That violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT VIII

## (Against All Defendants)

### *Unconstitutional Denial of Right to Counsel (Sixth Amendment)*

157.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

158.     The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  The Sixth Amendment affords criminal defendants the right to effective assistance provided by the counsel of one's choosing. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Actions that substantially interfere with, or deprive, the right to counsel constitute a violation of the Sixth Amendment.

159.     Lawyers have prudential, third-party standing to challenge violations of their clients' Sixth Amendment or Due Process rights to counsel that interfere with the lawyers' practice. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990).  In particular, because an attorney's duty to provide effective counsel "may not be fettered by harassment of government officials," a lawyer has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee Legal Def. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1284 (8th Cir. 1974).  Because the firm represents criminal defendants and others in dealings with the government, it has standing to challenge the Order's attempted interference with its clients' rights to counsel.

40

160.    The Order violates the firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] Government employees acting in their official capacity from engaging with Perkins Coie employees" and thus significantly impairs Perkins Coie's ability to advance clients' interests before the government.

161.    The Order violates the firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] official access from Federal Government buildings to employees of Perkins Coie" and thus significantly impairs Perkins Coie's ability to advance clients' interests before the government.

162.    The Order also violates the firm's clients' Sixth Amendment rights to their preferred counsel because it "require[s] Government contractors to disclose any business they do with Perkins Coie" and thus compels clients to choose between their livelihood and their preferred counsel.

163.    The Order is therefore in violation of the Sixth Amendment.

164.    This violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT IX

## (Against All Defendants)

### *Unconstitutional Denial of Right to Counsel (Fifth Amendment)*

165.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

166.    Lawyers and clients have due process interests in their contractual and professional relationships.

167.    The Order's sanctions interfere with and chill all of those representations and relationships.  Like the firm's other due process interests, the Order failed to provide adequate

41

process before interfering with the firm's and clients' due process rights to counsel. And because these sanctions—which punish a firm for successful lawsuits and threaten the firm's clients—are not rationally related to a legitimate government interest they cannot stand.

168. The Order's violations cause ongoing and irreparable harm to Perkins Coie and its clients.

## PRAYER FOR RELIEF

**WHEREFORE,** Perkins Coie respectfully requests that the Court:

169. Declare the Executive Order unconstitutional as violative of the Separation of Powers and Article II of and the First, Fifth and Sixth Amendments to the Constitution.

170. Immediately enjoin implementation of the Order pending consideration of a motion for preliminary injunction.

171. Preliminarily, then permanently, enjoin implementation of the Order.

172. Grant such other relief as the Court deems just and proper.

Dated: March 11, 2025

Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:  */s/ Dane H. Butswinkas*
Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)
Christopher N. Manning (D.C. Bar #464069)
Ryan T. Scarborough (D.C. Bar #466956)
Malachi B. Jones (D.C. Bar #455555)
Charles Davant IV (D.C. Bar #484305)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)
Jesse T. Smallwood (D.C. Bar #495961)

Amy M. Saharia (D.C. Bar #981644)
Matthew B. Nicholson (D.C. Bar #1013418)
Carol J. Pruski (D.C. Bar #1006941)*
Charles L. McCloud (D.C. Bar #1012047)*
Krystal C. Durham (D.C. Bar # 987768)
Eden Schiffmann (D.C. Bar #1035019)

680 Maine Avenue, SW
Washington, DC  20024
(202) 434-5000

*Counsel for Plaintiff Perkins Coie LLP*

* DDC bar application pending