# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSMAN GODFREY LLP,<br><br>   Plaintiff,<br><br> v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, U.S. DEPARTMENT OF JUSTICE, OFFICE OF MANAGEMENT AND BUDGET, SECURITIES AND EXCHANGE COMMISSION, UNITED STATES INTERNATIONAL TRADE COMMISION, FEDERAL TRADE COMMISION, UNITED STATES PATENT AND TRADEMARK OFFICE, EQUAL EMPLOYMENT OPPORTUNITY COMMISION, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF VETERANS AFFAIRS, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, CENTRAL INTELLIGENCE AGENCY, ENVIRONMENTAL PROTECTION AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF STATE, DEPARTMENT OF ENERGY, DEPARTMENT OF LABOR, DEPARTEMNT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SMALL BUSINESS ADMINISTRATION, OFFICE OF THE TRADE REPRESENTATIVE, DEPARTEMNT OF THE INTERIOR, DEPARTMENT OF TRANSPORTION, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, RUSSELL T. VOUGHT, MARK T. UYEDA, AMY A. KARPEL, ANDREW | Civil Action No. 25-1107 (LLA) |

N. FERGUSON, COKE MORGAN
STEWART, ANDREA R. LUCAS, SCOTT
BESSENT, PETER B. HEGSETH,
ROBERT F. KENNEDY, JR., LINDA M.
MCMAHON, DOUGLAS A. COLLINS,
TULSI GABBARD, JOHN L.
RATCLIFFE, LEE M. ZELDIN, KRISTI
NOEM, MARCO RUBIO, CHRIS
WRIGHT, LORI CHAVEZ-DEREMER,
BROOKE L. ROLLINS, HOWARD
LUTNICK, SCOTT TURNER, KELLY
LOEFFLER, JAMIESON GREER, DOUG
BURGUM, and SEAN DUFFY,

                    Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

**LEGAL STANDARDS AND RULE STATEMENTS** ................................... 3

    *Shotgun Pleading* .................................................................................. 3

    *Rule 12(b) & 56* ..................................................................................... 4

**ARGUMENT** ..................................................................................................... 7

    **I.**    **Plaintiff's claims fail as to Section 1 of the Executive Order** ................ 7

    **II.**    **Plaintiff's claims fail as to Section 2 of the Executive Order** ............. 12

    **III.**    **Plaintiff's claims fail as to Section 3 of the Executive Order** ............. 15

    **IV.**    **Plantiff's claims fail as to Section 4 of the Executive Order** ............... 24

    **V.**    **Plantiff's claims fail as to Section 5 of the Executive Order** ............... 27

    **VI.**    **Plantiff's Naming of the Executive Office of the President and the United States as Defendants is Improper** ....................................... 31

**CONCLUSION** ................................................................................................ 35

The U.S. Department of Justice, *et al*. (collectively, "Defendants"), respectfully move this Court to dismiss the Complaint.

## INTRODUCTION

On April 9, 2025, President Trump issued Executive Order 14263 (the "Executive Order"). The Executive Order lays out the President's concerns about the law firm Susman Godfrey LLP ("Plaintiff" or "Susman") in matters related to election integrity, national security, and discriminatory employment practices. In light of those considerations, the Executive Order directs a review of Susman Godfrey to ensure that the Federal Government's dealings with the firm are consistent with the national security of the United States and other public interests. And it seeks to ensure that taxpayer funds are not in any way diverted to support unlawful or unsavory practices that—if they should be permitted at all—must be financed by the private dime.

Plaintiff's 220-paragraph complaint raising ten separate legal claims only obscures what is a straightforwardly legal Executive Order. Try as it might to frame the Executive Order as "punitive" or a "sanction," the preamble in Section 1 and the operative sections of the Executive Order, Sections 2, 3, 4, and 5, act within the bounds of established executive authority.

As to the Section 1 preamble, Plaintiff's lawsuit carries with it a dangerous risk of muzzling the Executive. No less than Plaintiff, the Government has a right to speak which encompasses the statements in Section 1.

Section 2 of the Executive Order directs that agencies "review" whether "active security clearances" held by Plaintiff's employees "are consistent with the national interest." EO 14263 § 2. Plaintiff does not and cannot argue that it should have security clearance privileges if *contrary* to the national interest. As detailed herein, courts have long held that on such matters the President is entitled to great deference.

Section 3 of the Executive Order seeks to cancel any contracts for which Susman Godfrey is hired to perform services. The Executive Order specifies that, among other goals, Section 3 seeks to ensure that there is no transfer of taxpayer dollars to entities that engage in racial discrimination. Executive use of the procurement power to advance social policy has long been held to be on the firmest possible grounds of authority.

Section 4 simply makes reference to Executive Order 14230, issued on March 6, 2025 (Addressing Risks from Perkins Coie LLP), in which the Executive directed the Attorney General and the Chair of the Equal Employment Opportunity Commission ("EEOC") to review whether large law firms are violating the civil rights laws—in other words, to do what it was already the EEOC's job to do. Again, this is firmly within the prerogative of the Executive.

In Section 5, the Executive Order directs agencies to issue guidance as to what access Plaintiff's employees should have to government buildings and government officials, consistent with national security and applicable law, as well as examine the propriety of hiring employees from Plaintiff's firm. Plaintiff's claims are unripe as to this section, as no agency has issued the guidance the order calls for. The parameters of access to executive branch staff, offices, and employment are well within the rights of the Executive. Try as Plaintiff might to describe potential impacts on the right to counsel, these assertions are pure conjecture and speculation. The guidance—which must be consistent with the law—has yet to be issued and therefore there is no actual controversy before this Court.

The Executive Order directs agencies to do what they should already be doing, declines to contract with entities who act inconsistently with valid social policies regarding discrimination, and calls for the lawful examination of security clearances and government access of employees of Plaintiff's firm. The law does not support Plaintiff's claims as to Sections 1, 2, 3, 4, and 5; and

as to Section 5 specifically, Plaintiff's claim is at best too early and, as any guidance will be consistent with the law, will eventually fail on the merits.  Accordingly, this Court should dismiss the Complaint.

## LEGAL STANDARDS AND RULE STATEMENTS

### *Shotgun Pleading*

Each count of the Complaint begins with a paragraph stating, "The paragraphs above are incorporated and reasserted as if fully set forth herein."  *See* Compl. ¶¶ 141, 153, 162, 168, 175, 182, 191, 198, 203, 212.  The Complaint does not limit "the preceding paragraphs" to those relevant to or illustrative of the legal and factual basis for each individual count, but incorporates every paragraph, including any preceding counts, count after count.  As an example, Count X necessarily includes every preceding paragraph, including those in Counts I–IX.  From a practical perspective, this severely handicaps the Defendants' and the Court's ability to ascertain the particulars of Plaintiff's challenges to the various sections of the Executive Order, including which allegations and claims in the Complaint pertain to which sections of the Executive Order.

The D.C. Circuit has emphasized that FED. R. CIV. P. 8 "underscore[s] the emphasis placed on clarity and brevity by the federal pleading rules."  *Ciralsky v. CIA*, 355 F.3d 661, 668–69 (D.C. Cir. 2004).  This case demonstrates why.  Plaintiff's imprecise practice here only complicates Defendants' task in moving for dismissal and the Court's ability to assess these arguments.  Indeed, Plaintiff's Complaint in this respect is a paradigm example of a "shotgun pleading."  *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015).  Defendants reserve the right to include in any follow-on briefing additional argument or bases for dismissal or judgment to the extent Plaintiff clarifies their claims in a manner not clearly evident on the face of its Complaint and TRO Motion.  To provide some structure regarding this overbroad shotgun

Complaint, Defendants have organized this motion to dismiss by addressing what appear to be Plaintiff's challenges to each section of the Executive Order.

*Rule 12(b) & 56*

On a Rule 12(b)(6) motion to dismiss, the Court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023).  The factual allegations "must still be enough to raise a right to relief above the speculative level," and "the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint." *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023).  The Court may also consider "any documents either attached to or incorporated in the complaint," "matters of which [the Court] may take judicial notice," and matters of public record.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997); *Sheppard v. United States*, 640 F. Supp. 2d 29, 32 (D.D.C. 2009).  For a motion brought under Rule 12(b)(1), the Court may consider the complaint "supplemented by undisputed facts evidenced in the record or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Sheppard*, 640 F. Supp. 2d at 32.  Summary judgment under Rule 56(a) may be granted only if "there is no genuine dispute as to any material fact," including based on information outside the pleadings, and "the movant is entitled to judgment as a matter of law."

Plaintiff raises First Amendment claims (Counts I-V), including a joint First Amendment-spending clause/unconstitutional conditions claim (Count V), due process claims (Counts VI and VII), a right-to-counsel claim (Count VIII), an equal protection claim (Count IX), and an *ultra vires* claim (Count X).

Plaintiff raises five claims based upon the First Amendment in Counts I through V. First, Plaintiff claims that Defendants engaged in unconstitutional retaliation against protected expression. Second, Plaintiff alleges that Defendants engaged in impermissible viewpoint discrimination. Third, Plaintiffs allege infringement on their right to petition the government. Fourth, Plaintiff argues that the Executive Order's requirement that government contractors disclose their business with Susman Godfrey and whether that business is related to a government contract, compels speech. Finally, Plaintiffs allege that the EO amounts to an unconstitutional condition on government contracts.

To succeed on a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). In the specific context of contractor speech, "for a government employee's or contractor's speech to have First Amendment protection, the employee or contractor must have (1) spoken as a citizen and (2) addressed matters of public concern." *Ramey v. U.S. Marshals Serv.*, 755 F. Supp. 2d 88, 93 (D.D.C. 2010). At the same time, "[t]he government needs to be free to terminate both employees and contractors for poor performance." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).

Plaintiff raises a procedural due process challenge and a void-for-vagueness due process challenge in Counts VI and VII. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *see also English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013) ("The procedural due process protections under the Fifth and

Fourteenth Amendments are the same.").  Whether the process provided is adequate depends on "(1) the importance of the private interest at stake, (2) the risk of an erroneous deprivation of the interest because of the procedures used and the probable value of additional procedural safeguards, and (3) the government's interests, including the cost of additional procedures." *English*, 717 F.3d at 972.  And "[t]he Due Process Clause prohibits the Government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Kincaid v. Gov't of the District of Columbia*, 854 F.3d 721, 728 (D.C. Cir. 2017) (Kavanaugh, J.) (internal quotation marks omitted).

Plaintiff brings one claim based on the right to counsel in Counts VIII.  But such a claim under the Fifth Amendment also requires a causal link, that is, that the disruption of the counsel relationship is attributable to the Government's regime.  *See Department of Labor v. Triplett*, 494 U.S. 715, 722–24 (1990).  Moreover, "[t]he constitutional right to choice of counsel . . . is not absolute." *United States v. Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988). It "must be balanced against the government's interest in the fair, orderly, and effective administration of the courts which, in a given case, may require an accused to resort to his second choice of counsel." *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir. 1986); *see also Triplett*, 494 U.S. at 722–24 (weighing government interest restricting payments to counsel).

Plaintiff also raises an equal protection claim in Count IX, based on a class-of-one theory. To bring such a claim, a plaintiff must "allege that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."

*Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013).  And "[e]ven at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not any reasonable conceivable state of facts that could provide a rational basis for the classification."  *Lillemoe v. U.S. Dep't of Agric.*, 344 F. Supp. 3d 215, 229 (D.D.C. 2018).

Finally, an *ultra vires* challenge such as that brought in Count X is "available only for the narrow purpose of obtaining injunctive relief against agency action taken in excess of its delegated powers and contrary to a specific prohibition in the law."  *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 765 (D.C. Cir. 2022).  Such claims are subject to a "demanding standard" and are "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court."  *Id.* at 764-65 (cleaned up).  "Only error that is patently a misconstruction of [a statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief."  *Id.* (cleaned up).  Further, to state an *ultra vires* claim properly, a plaintiff must show "there is no alternative procedure for review" of its claim.  *Id.* at 763.

## ARGUMENT

### I.    Plaintiff's claims fail as to Section 1 of the Executive Order.

Section 1 of the Executive Order contains a brief factual explanation for the operational elements of the Executive Order that describes Susman Godfrey's activities both in its capacity as a law firm offering legal representation and in its capacity as an employer.  As to its legal services, Section 1 explains that Susman Godfrey "spearheads efforts to weaponize the American legal system and degrade the quality of American elections."  EO 14263 § 1.  The Executive Order also notes that Susman Godfrey "funds groups that engage in dangerous efforts to undermine the

effectiveness of the United States military through the injection of political and radical ideology." *Id.* As to Susman Godfrey's employment practices, the Executive Order notes that the firm itself engages in "unlawful discrimination, including discrimination on the basis of race." *Id.* In particular, Susman Godfrey "administers a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.* These points, too, cannot be seriously contested. Susman claims that the firm "does not have any program that offers employment opportunities only to people of color." Compl. ¶ 155. However, in approximately one week, Susman will select the 2025 recipient of the Susman Godfrey prize, which provides a cash award and ongoing mentorship from Susman attorneys to selected "students of color." *See* Susman Godfrey, *The Susman Godfrey Prize* (available at https://www.susmangodfrey.com/the-susman-godfrey-prize/) (accessed Apr. 22, 2025).

Counts I, II, VI, and VII of the Complaint are the only ones that actually challenge Section 1. In Count I, Plaintiff claims that "President Trump issued the Order to retaliate against Susman Godfrey for [] protected First Amendment activity." Compl. ¶ 145. In Count II, Plaintiff claims that Section 1's "attributes to Susman Godfrey certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints." *Id.* ¶ 155. In Count VI, Plaintiff alleges that Section 1 (and Section 3) of the Order impair "Susman Godfrey's constitutionally protected property interests by seeking to impair and terminate private contractual relationships between Susman Godfrey and its clients." *Id.* ¶ 186. Finally, in Count VII, Plaintiff claims that the Order, specifically Section 1, "makes clear what its penalties are, but does not specify in any way what triggered the punishment" and is therefore void for vagueness. *Id.* ¶ 194.

None of these carries any water. Count VI raises a procedural due process challenge that requires Plaintiff to identify a "constitutionally protected interest," *Bowman v. Iddon*, 848 F.3d

1034, 1039 (D.C. Cir. 2017), and the typical plaintiff "lack[s] . . . any constitutional protection for the interest in reputation," *Siegert v. Gilley*, 500 U.S. 226, 234 (1991).  A narrow exception to that general rule exists for "reputation-plus claim[s]," which "require[] a plaintiff to identify an act of defamation made in conjunction with an adverse employment action." *Langeman*, 88 F.4th at 296.  "A defamatory statement must be false as well as defamatory," and for that reason "a statement of pure opinion cannot" be "the basis for a defamation claim." *Campbell v. District of Columbia*, 126 F. Supp. 3d 141, 150 (D.D.C. 2015) (internal quotation marks omitted).

Count VI fails because Plaintiff has not identified any specific defamatory act or statement on the part of Defendants.  *See Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 115 (D.D.C. 2020) (noting that "a reputation-plus claim requires showing that the government made defamatory statements concerning the plaintiff").  Indeed, although the Complaint asserts in conclusory fashion that Section 1 is false, such statements need not be credited under the pleading standard, and Plaintiff does precious little to contest any particular fact in Section 1.

The Complaint identifies as false Section 1's assertion that Susman Godfrey supports "efforts to discriminate on the basis of race," as exemplified by the firm's "supposed 'administ[ration of] a program where it offers financial awards and employment opportunities only to 'students of color.'" Compl. ¶ 155. (quoting EO § 1).  But even then, that charge by Plaintiff is conclusory and unsupported.  It ignores not only the Susman Godfrey prize—which was expanded in recent years, but the fact that Susman continues to offer and advertise on its website a 1L Diversity Fellowship available to those who are from "groups underrepresented in the legal profession." *See* Susman Godfrey, *Diversity: Diversity Fellowship for 1L Students* (available at https://www.susmangodfrey.com/diversity/) (accessed Apr. 22, 2025).  These exclusionary programs, and Susman's continued use of them, are evidence of Plaintiff's longstanding

commitment to considering irrelevant racial- and sex-based criteria in hiring decisions, and the Complaint does not suggest that Plaintiff has any apparent intention of backing away from these practices.

The Government has every right to use its procurement power to discourage such practices. Diversity initiatives have always been legally suspect, *see Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("Would a private employer not be guilty of unlawful discrimination if he refrained from establishing a racial hiring quota but intentionally designed his hiring practices to achieve the same end?  Surely he would."), and especially so since the Supreme Court's decision in *Students for Fair Admissions, Inc., v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*").  The practices engaged in by Plaintiff and other large law firms provide ample basis for any review by the EEOC Commissioner.  By the same token, those practices also justify the lesser action of simply reviewing contracting decisions involving Plaintiff.  This Court should dismiss Count II as it relates to Section 1 of the Executive Order.

Count VII fares no better, and there is no merit to Plaintiff's void-for-vagueness challenge. As an initial matter, it is telling that Plaintiff cites criminal cases to support its claim, including one in which the Supreme Court did *not* find the underlying statute to be impermissibly vague. *Grayned v. City of Rockford*, 408 U.S. 104 (1972), as well as an APA case involving whether an agency was arbitrary and capricious in how it regulated television entities that show fleeting images of nudity or broadcast an errant epithet.  *FCC v. Fox*, 576 U.S. 239 (2012).  Here, of course, the Executive Order is neither regulatory nor a criminal statute (indeed, not a statute at all) and is not proscriptive like a criminal statute; accordingly, it is unclear that vagueness doctrine even applies.  The D.C. Circuit expressed doubt that the doctrine should be applied to laws other than

"those that define criminal offenses" and "those that fix the permissible sentences for criminal offenses." *Kincaid*, 854 F.3d at 729 (Kavanaugh, J.). The Executive Order does neither.

Regardless, the "degree of vagueness that the Constitution allows depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). Thus, it is a low bar for civil statutes to satisfy due process. *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) ("To find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all."); *see also Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1174 (D.N.M. 2014) (explaining that negligence law "would . . . fail the void-for-vagueness analysis that applies to criminal statutes"). Even more so when all that is at stake are government contracts. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) ("[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe.").

And here, Plaintiff has no plausible argument that the Executive Order is unconstitutionally vague. The Executive Order, after all, refers to racial discrimination, which is already prohibited by civil rights laws. EO 14263 § 1. Plaintiff alleges that this reference is "unconstitutionally vague," Compl. ¶¶ 143-144, but it is no vaguer than *the civil rights laws themselves* to which Susman is subject. *See also* DOJ Press Release, *EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination* (Mar. 19, 2025) (available at https://www.justice.gov/opa/pr/eeoc-and-justice-department-warn-against-unlawful-dei-related-discrimination) (noting that the "widespread adoption of DEI . . . does not change longstanding legal prohibitions against the use of race, sex, and other protected characteristics in employment"). In other words, to find in Plaintiff's favor that the Executive Order is unconstitutional on vagueness grounds would also call into question the constitutionality of the civil rights laws.

The Court should decline to reach such an extraordinary conclusion. So long as it provides an "intelligible benchmark," a civil statute is not void for vagueness. *See K-S Pharms., Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 732 (7th Cir. 1992) (Easterbrook, J.). The Executive Order easily meets that standard, to the extent the standard even applies. The Court should dismiss Count VII.

At the end of the day, Plaintiff simply does not like what the current Administration thinks about Plaintiff. That is not the stuff plausible claims are made of. "A government entity has the right to speak for itself"; it is "entitled to say what it wishes," and "to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). That is all that Section 1 of the Executive Order does, and Plaintiff has no right to silence the Government's own opinions. Plaintiff's claims asking this Court to do just that should be dismissed.

## II.    Plaintiff's claims fail as to Section 2 of the Executive Order.

Section 2 of the Executive Order directs relevant agency heads to "take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." EO 14263 § 2(a).[1] Plaintiff appears to challenge this aspect of the Executive Order on *ultra vires* grounds and as violating due process and the First Amendment. *See* Compl. ¶¶ 106–16, 126–35.

Plaintiff's challenges to Section 2 of the Executive Order fail. To begin, the challenges run headlong into governing D.C. Circuit precedent reflected in *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). Under that precedent, consistent with *Department of Navy v. Egan*, 484 U.S. 518 (1988), courts may not review a decision to deny or revoke a security clearance even when the

---

[1] Also, Section 2(b) of the Executive Order requires, "to the extent permitted by law," the cessation of the provision of material and services, "including Sensitive Compartmented Information Facilities, provided for the benefit of Susman." Other than references to the language of 2(b), Susman does not appear to contest this subsection. Compl. ¶ 127.

denial or revocation is challenged on statutory or constitutional grounds. *Lee*, 120 F.4th at 883; *id*. at 891 ("The Constitution commits the question whether to deny or revoke a security clearance to the Executive Branch."); *id.* ("[F]ederal courts generally may not second-guess the political branches' discretionary judgments about matters of national security."). Importantly, the *Lee* court considered the fact that assessment of "constitutional challenges often require courts to make nuanced judgments about the challenged government action." *Id.* at 893. For instance: "What was its motivation? . . . Did the government have a compelling, substantial, or legitimate interest for its decision? Was its reasoning adequately tailored to that interest?" *Id.* at 893-94. The Court concluded, however, that "[i]n the context of clearance decisions, a court could not answer such questions without doing what *Egan* said is not reasonably possible." *Id.* at 894. And that makes sense. As the court in *Lee* recognized, "[c]learance decisions involve an assessment of intangible qualities such as loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." *Id.* at 893. Courts are not equipped to second-guess the Executive's determinations in those regards. Accordingly, to the extent Plaintiff in this case challenges the suspension of security clearances pending further review, such claims, even when constitutionally based, are not judicially reviewable and must fail.

The same should be true with respect to the Executive Order's call for that further review. "[E]ntities charged with making security clearance decisions . . . need full access to even unsubstantiated and doubtful information in order to make the sensitive, predictive judgments that *Egan* protects." *Rattigan v. Holder*, 689 F.3d 764, 769 (D.C. Cir. 2012). Accordingly, even providing *false* information for purposes of making security clearance decisions is generally not actionable so long as that information was not *knowingly* false. *Id.* And here, the review called for by the President easily surpasses that low standard. Indeed, the Executive Order notes that

13

Susman Godfrey "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," at the least supporting the President's call for a review.

Furthermore, Plaintiff's procedural due process challenge to Section 2 must also fail. The Executive Order provides that the suspension of any security clearances is to be done through "steps consistent with applicable law . . . pending a review whether such clearances are consistent with the national interest." Executive Order 14263 § 2(a). Another executive order, Executive Order 12968, 60 Fed. Reg. 40245 (1995), "establishes a uniform Federal personnel security program" for individuals "considered for initial or continued access to classified information." Section 5.2(a) of that executive order provides extensive procedural process guarantees to individual clearance holders whose access to classified information is terminated, including notice, an opportunity to submit information, and appeal, subject to national security considerations.[2] The executive order also directs agencies to promulgate regulations consistent with these process requirements. EO 12968 § 5.2(c). Many agencies have such regulations or directives. *See*, *e.g*., Department of Defense Manual 5200.02 (Procedures For The DoD Personnel Security Program (PSP)) (available at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/520002m.pdf); *see id*. § 9.2.d (providing that "[n]o final unfavorable national security eligibility determination may be taken" without process provided by the Manual).

---

[2] For example, Section 5.2(e) provides: "This section shall not be deemed to limit or affect the responsibility and power of an agency head pursuant to any law or other Executive order to deny or terminate access to classified information in the interests of national security. The power and responsibility to deny or terminate access to classified information pursuant to any law or other Executive order may be exercised only where the agency head determines that the procedures prescribed in subsection (a) of this section cannot be invoked in a manner that is consistent with national security. This determination shall be conclusive."

Accordingly, any individual employee of Plaintiff with a security clearance will receive appropriate process, pre- or post-deprivation, with regard to maintaining or restoring their security clearance, and such process in the circumstances of security clearance related matters is permissible.  *Cf. Smith v. District of Columbia*, 387 F. Supp. 3d 8, 31 (D.D.C. 2019) ("[I]n 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the' deprivation, a post-deprivation opportunity to be heard suffices.") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971)).  Relatedly, any claim associated with the security clearance process that, under governing precedent, may be reviewable, is, at this point, not ripe.  *See In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) ("The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes.").  Until any clearance suspension is accomplished consistent with applicable law, and then reviewed consistent with applicable law and a further security clearance determination made, any dispute is premature for judicial consideration.

Accordingly, Plaintiff's challenge to Section 2 of the Executive Order must fail.

### III.    Plaintiff's claims fail as to Section 3 of the Executive Order.

Section 3 of the Executive Order concerns the Federal Government's contracting policies. As relevant, Section 3 issues two directives.  First, "to the extent permissible by law," "Government contractors" shall be "require[d] . . . to disclose any business they do with Susman Godfrey and whether that business is related to the subject of the Government contract."  EO 14263 § 3(a).  Second, "the heads of agencies shall . . . take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service."  *Id.* § 3(b)(i).

As a preliminary point, it must be emphasized that when implementing Section 3 the government is acting as a private party, not as a sovereign.  *Waters v. Churchill*, 511 U.S. 661, 675

(1994) (plurality opinion) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer."). The effort to combat racial discrimination through the procurement power has been a feature of executive orders since at least the 1940s. *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 168–71 (3d Cir. 1971). Such orders enjoy the firmest possible constitutional support. *Id.* at 170 ("In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), discussing varying levels of deference to Executive authority]: action pursuant to the express or implied authorization of Congress."). Furthermore, while Section 3 relies equally on Plaintiff's racial discrimination and its malfeasance in election litigation for its authority, *either* ground is sufficient to sustain its provisions. *McGowan v. State of Maryland*, 366 U.S. 420, 426 (1961) (a statute with discriminatory provisions "will not be set aside if any state of facts reasonably may be conceived to justify it").

    In protest of Section 3, Plaintiff levies Counts I (First Amendment retaliation), II (First Amendment viewpoint discrimination), III (First Amendment right to petition government), IV (First Amendment free association and compelled disclosure), V (First Amendment unconstitutional condition), VI (procedural due process), VII (due process vagueness), VIII (right to counsel), IX (equal protection), and X (*ultra vires*). The Court should dismiss each one.

    *First*, Defendants are clearly authorized to manage their contracts. "*Ultra vires* review is an extraordinary cause of action that has repeatedly been described as extremely limited in scope." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 193 (D.D.C. 2024). Plaintiff must show that Defendants "plainly act[ed] in excess of [their] delegated powers" in a way "so extreme that one

may view [the error] as jurisdictional or nearly so." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). But Defendants are plainly authorized to enter into, manage, and terminate contracts. And Federal regulations provide that such contracts include a clause permitting the Government exceptionally wide latitude to "terminate performance of work" where "termination is in the Government's interest." 48 C.F.R. § 52.249-2(a). Plaintiff might dislike *how* Defendants would exercise that authority under the Executive Order, but that does not make Defendants' actions *ultra vires*.

*Second*, this Court should reject Plaintiff's equal protection claim. To begin, the class-of-one theory of equal protection is inapplicable in the government employment context. *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008); *see also Umbehr*, 518 U.S. at 685 (treating government contractors and government employees similarly). And for good reason. "[R]atifying a class-of-one theory of equal protection in the context of public employment would impermissibly constitutionalize the employee grievance," *Engquist*, 553 U.S. at 609—or, in this case, the contract bidding and termination process.

In all events, to "properly plead" a class-of-one claim "a plaintiff must demonstrate they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Neighborhood Assistance Corp. of Am. v. CFPB*, 907 F. Supp. 2d 112, 126 (D.D.C. 2012). Neither condition is met here. Plaintiff is not "similarly situated" to other potential government contractors who do not engage in unlawful DEI practices. And the distinction the Executive Order makes—between potential contractors who "engage in blatant race-based and sex-based discrimination" and those who do not—is plainly rational.

*Third*, Plaintiff's procedural due process claim is meritless. For one, Plaintiff has not demonstrated standing to challenge Section 3 insofar as it regulates its clients. "[N]o principle is

more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). "[T]he law of Art[icle] III standing is built" on fundamental separation-of-powers principles, *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (citation omitted), and "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 568 U.S. at 408. Accordingly, application of Article III standing requirements must be "especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch[] of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20.

To establish standing, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent," and not "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). There must be a "causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant; and it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.* As the party invoking Federal court jurisdiction, Plaintiff "bears the burden of establishing these elements." *Id.* at 555. Further, "[P]laintiff must demonstrate standing for each claim . . . [it] seeks to press," *DaimlerChrysler Corp.*, 547 U.S. at 335. And because Plaintiff seeks prospective equitable relief, the "threatened injury must be certainly impending" and not merely "possible." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding prospective relief unavailable based on mere speculation of future injury). Such proof of an imminent and non-conjectural injury serves to ensure that legal

questions "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982).

Plaintiff vaguely complains that the Executive Order "disrupt[s] the Firm's relationships with clients and harm[s] the Firm's business prospects." Compl. ¶ 147. In fact, the Complaint lacks specifics as to any client or clients that have left the Firm, and it asserts no particularized injury as a result of the EO. *See id.* ¶ 172 ("even if Susman Godfrey wishes to keep associating with such clients, its ability to do so has been severely impaired"). Thus, Susman faces a significant traceability issue. *See Doe v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024) (traceability requires a "causal connection between the assertedly unlawful conduct and the alleged injury"). Section 3 only "terminate[s] any contract . . . for which Susman Godfrey has been hired to perform any service." EO 14263 § 3(b)(i). Plaintiff, for its part, never alleges in the Complaint that it was "hired to perform any service" under any government contract, nor does it allege a direct nexus between the termination of a client relationship and the cancellation of any specific contract. There is thus a significant factual predicate missing from the Complaint that connects the Executive Order to any injury this Court can remedy. *See Apple, Inc.*, 96 F.4th at 409 (no standing when the "chain of causation" "result[s] from the independent action of some third party not before the court").

Plaintiff also argues that it was deprived of adequate process to protect its property interest on the theory that it was deprived of the "right to be considered for government contracts in common with all other persons." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1108-09 (D.C. Cir. 1985). Here, too, Plaintiff runs into a standing problem. Plaintiff never alleges that the

Government is currently contracting for Plaintiff's services, or that Plaintiff ever intends to bid for any government contract. With only speculative injury, Plaintiff cannot ask relief of this Court. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("To establish Article III standing, an injury must be concrete, particularized, and actual or imminent."). But, even on the merits, this claim is just Plaintiff's equal protection argument dressed in different garb, and this Court should dismiss it. Plaintiff *does* have the "right to be considered for government contracts in common with all other persons." *Id.* And, as the Executive Order indicates, *no* person who engages in blatant race-based and sex-based discrimination should be granted a government contract. EO 14263 § 1.

*Fourth*, Plaintiff raises a variety of First Amendment challenges. As before, Plaintiff lacks standing to press these claims, because it cannot trace any injury to the Executive Order itself. Regardless, Plaintiff has failed to state a plausible claim that the Executive Order's requirement that government contractors "disclose any business they do with Susman Godfrey and whether that business is related to the subject of the Government contract" is unconstitutional. EO 14236 § 3(a). For one, when business conducted with Susman Godfrey is "related to the subject of the Government contract," it is very likely that Susman Godfrey is a government subcontractor, whose work Defendants are entitled to monitor.

For another, a regulation that compels disclosure satisfies the First Amendment so long as there is a "substantial relation between the disclosure requirement and a sufficiently important government interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). Here, the disclosure requirement is not of the type that compelled-speech doctrine is designed to prevent. Plaintiff's clients are not required to adopt any viewpoint; all they are asked to do is to make a *factual* disclosure, and even then only to the Government and not to the public as a whole. *Am.*

*Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (disclosure requirement subject to relaxed scrutiny when only "purely factual and uncontroversial" information had to be disclosed).

As for Plaintiff's claims of First Amendment retaliation and viewpoint discrimination, both fail. A contractor pressing these claims must "show (1) that she spoke as a citizen on a matter of public concern and (2) that the termination of her contract was motivated by her speech on a matter of public concern." *Navab-Safavi v. Broad. Bd.*, 650 F. Supp. 3d 40, 54 (D.D.C. 2009). Even then, the Government acts within its rights when its "legitimate interests as a contractor, deferentially viewed, outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685.

The speech in this case consists of employment practices involving racial discrimination and practices that interfere with free and fair elections. EO 14263 § 3(a). The fact that these actions are punishable under civil rights laws amply demonstrates that such speech is not "protected" in any meaningful sense. *See Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) ("To establish a claim for retaliation under the First Amendment, an individual must prove . . . that he engaged in *protected* conduct." (emphasis added)). Regardless, Defendants' "legitimate interests as a contractor . . . outweigh the free speech interests at stake" here. *Umbehr*, 518 U.S. at 685. "Efficiency and fiscal responsibility are powerful governmental interests." *Messman v. Helmke*, 133 F.3d 1042, 1047 (7th Cir. 1998). "The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Umbehr*, 518 U.S. at 674.[3] Those are exactly the rationales the Executive Order provides in Section 3. It

---

[3] Moreover, *Umbehr*'s retaliation analysis is limited to current government employees or contractors. The Court specifically noted that its decision did "not address the possibility of suits

is reasonable to consider a contractor's performance subpar when they retain the services of a law firm that has proudly engaged (and appears to continue to engage) in racial discrimination. It is inefficient for Federal funds to ultimately flow into the coffers of such entities. And it serves taxpayers to ensure that their dollars are not in any way traceable to the subsidization of "racial discrimination." EO 14263 § 3.

Furthermore, the fact that a funding program supports one point of view does not necessarily establish viewpoint discrimination against disfavored alternatives. *Rust v. Sullivan*, 500 U.S. 173 (1991). There are no constitutional concerns with programs that encourage certain activities without providing funds for alternative options on the same issue. There are only so many government contracts to go around; "the Government has not discriminated on the basis of viewpoint" merely by "fund[ing] one activity to the exclusion of the other." *Id.* at 193. By the same token, a "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." 448 U.S. 297, 317, n.19 (1980). Try as it might, Plaintiff cannot transmogrify the denial of a contract into a sanction that only the judicial branch can enter. Choosing who to contract with is not "viewpoint discrimination" or "punishment" in any meaningful sense of those words; it is merely a fact of life. If Plaintiff dislikes the Government's choices in this regard, the solution is that "a government entity is ultimately accountable to the electorate and the political process for its advocacy." *Pleasant Grove City*, 555 U.S. at 469. It is not to ask this Court for a remedy that it cannot give.

Section 3 does not impermissibly burden the speech or association rights of the firm or its clients, therefore it does not place an unconstitutional condition on Federal contracts that cause or

---

by bidders or applicants for new government contracts who cannot rely on [pre-existing] relationship[s]." *Umbehr*, 518 U.S. at 685.

will cause Susman or its clients harm. Instead, Section 3 of the Executive Order applies to a small number of government contractors, all of whom are already subject to substantial disclosure requirements as a condition of doing business with the Federal Government. Pursuant to this Executive Order, they must merely identify business with Plaintiff for the limited purpose of facilitating agency review of government contracts with Plaintiff. This is narrowly tailored to Section 3's stated goal.

Section 3 also does not interfere with attorney-client privilege. As this Court has recognized, generally "the attorney-client privilege does not protect from disclosure the 'identity of the client . . . and the general purpose of the work performed.'" *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) (quoting *United States v. Naegele*, 468 F.Supp.2d 165, 171 (D.D.C. 2007)). Law firms may be required to disclose the identity of a client yet still enjoy the full benefits of attorney-client privilege. *See, e.g.*, *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371 (D.D.C. 1976). Indeed, firms are regularly required to disclose the identity of clients in contexts raising national security concerns. *See, e.g.*, Foreign Agents Registration Act, Pub. L. 75-583, 52 Stat. 631 (codified at 22 U.S.C. §§ 611 *et seq.*). This additional disclosure requirement limited to a subset of government contractors is far afield from the core associational rights at issue in political association and charitable donation cases.

And *fifth*, this Court should reject Plaintiff's claims based on the right to counsel, because Plaintiff simply lacks standing to press them. Plaintiff suggests that a constitutional violation is implicated because the Executive Order requires government contractors to disclose their business with Susman Godfrey. But—again—the Executive Order only directs the termination of contracts *under which Susman Godfrey provides services*. Plaintiff never explains how the disclosure requirement would itself make it impossible to represent its clients in criminal or civil proceedings.

23

And, unsurprisingly, the Complaint provides no examples.  Unless a DOJ investigation of Susman somehow implicates a government contract (which the Complaint does not allege), Section 3 has nothing to say about the matter.  And in any event, administrative investigations—even ones that "might one day ripen into criminal charges"—frequently do not "implicate the right to counsel."  *Collins v. CFTC*, 737 F. Supp. 1467, 1482 (N.D. Ill. 1990).  The right to counsel simply does not enter the picture as to Section 3.

## IV.    Plaintiff's claims fail as to Section 4 of the Executive Order.

Section 4 of the Executive Order merely cross-references Executive Order 14230, issued on March 6, 2025 (Addressing Risks from Perkins Coie LLP), which directs the Chair of the Equal Employment Opportunity Commission to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*], including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis."  EO 14230 § 4(a).  It also directs the Attorney General, "in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate," to investigate such matters with respect to such firms that do business with Federal entities.  *Id.* § 4(b).

Plaintiff appears to challenge Section 4 on First Amendment retaliation grounds as part of Count I and as impermissible viewpoint discrimination as part of Count II.  However, all Susman alleges is that "[t]hreatening targeted investigations by the Equal Employment Opportunity Commission and Attorney General, with the prospect of potential prosecution . . . damages Susman Godfrey's reputation, with attendant harm to client relationships and Firm business prospects."

Compl. ¶ 148.  As already explained, the language Plaintiff complains of as being overly vague is no less clear than the civil rights laws themselves.

To repeat, Section 4 merely refers to an earlier directive that the Attorney General "investigate," and EEOC Chair "review," "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws.  EO 14230 § 4.  That is *already* what the EEOC is supposed to be doing.  The EEOC is already "empowered . . . to prevent any person from engaging in any unlawful employment practice" under the civil rights laws.  42 U.S.C. § 2000e-5(a).  The EEOC is already required to make "report[s] . . . to the President . . . on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review.  *Id.* § 2000e-4(e).  And members of the EEOC are already authorized to file charges against "employer[s] . . . engaged in an unlawful employment practice."  *Id.* § 2000e-5(b).

In any event, Susman does not allege the EEOC has issued a Commissioner's Charge against it on account of Section 4.  Further, Susman was not included in one of the March 17, 2025 letters from the EEOC Acting Chair requesting information from various law firms.  *See* Compl. ¶ 140 n.48.[4]  Thus, beyond Susman's conclusory statement that it might be subjected to "prosecution" in the future, or that its business relationships might be impacted, there is no concrete, particularized injury that Susman has allegedly suffered.

---

[4] *Cf. Horton v. Espindola*, 319 F. Supp. 3d 395, 400 (D.D.C. 2018) ("Under the incorporation-by-reference doctrine, a defendant can submit—and the court can consider—a document that is not attached by the plaintiff, but is referred to in the complaint and integral to the plaintiff's claim."); *see also* EEOC Press Release, *EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices* (Mar.17, 2025) (available at https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei).

Accordingly, any supposed injury is not traceable to the Executive Order, and there is no plausible relief that the Court can give. In short, Plaintiff's supposed injury of being potentially subject to a review for civil rights violations is unredressable. Even if the President *never* issued the Executive Order, Plaintiff would *still* be potentially subject to review by the EEOC and to potential legal action from the EEOC—just like any other employer in the country. The only relief that would "redress" Plaintiff's injury is not an injunction against the Executive Order, but rather an injunction granting Plaintiff immunity from civil rights laws.

For similar reasons, this Court should reject Plaintiff's claim of First Amendment retaliation even if it were to reach the merits. To succeed on a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref*, 833 F.3d at 258. "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action," *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015); that is, the plaintiff must allege that the retaliatory action "would not have been taken absent the retaliatory motive," *Houston Community College System v. Wilson*, 595 U.S. 468, 477 (2022).

Even assuming Plaintiff engaged in protected conduct, Plaintiff cannot demonstrate the requisite causal link. Even before the Executive Order was issued, this Administration had begun taking steps consistent with the view that certain DEI practices, misapplied, could constitute a violation of Title VII. *See* EO 14173 of Jan. 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"). EO 14173, issued more than a

month *before* the challenged Executive Order, directed, among other things, Federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, EO 14173 § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination in large, private entities); *supra* Part I (regarding EEOC/DOJ press release concerning DEI-related guidance). It should not be surprising, then, that an executive order concerning a large private law firm included a provision like Section 4, not limiting the EEOC's "review" of practices of "representative large, influential, or industry leading law firms," as part of the Administration's broader efforts. Plaintiff's retaliation claim cannot succeed.

At bottom, the Administration has raised legitimate legal issues of just how far DEI policies and programs can go and whether such policies cross the line into illegal discrimination under Title VII. The Court should not use its equitable and other powers to excuse Plaintiff from the scope of a review of multiple law firms on this issue. Plaintiff may believe its practices are not illegal, but it is not entitled to a "free pass" from a legitimate review of multiple law firms' employment practices, if and when those practices may be reviewed.

## V.    Plaintiff's claims fail as to Section 5 of the Executive Order.

Finally, Section 5 of the Executive Order concerns Federal hiring, access to government buildings, and interaction with government employees. As relevant, Section 5 provides three directives. First, agency heads "shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman Godfrey when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." EO 14263 § 5(a). Second, agency heads "shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman Godfrey

employees to ensure consistency with the national security and other interests of the United States." *Id.* Third, "[a]gency officials shall, to the extent permitted by law, refrain from hiring employees of Susman Godfrey, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* § 5(b).

Plaintiff raises a variety of challenges to Section 5. This Court should reject them as unripe without even reaching the merits. "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *In re Al-Nashiri*, 47 F.4th at 826. That describes Plaintiff's claims against Section 5 to a tee. Section 5 directs agency heads to "provide guidance" on "limiting" access to government buildings and interactions with government employees. It does not outright *ban* such access. Plaintiff can only guess the degree to which agency heads will limit government access, and indeed Section 5 directs such agency heads only to do so "to the extent permitted by law." Perhaps agency heads will limit their guidance to prohibiting Plaintiff from entering government locations storing sensitive information, which no member of the public has a right to access. Perhaps the agency heads and the OPM director will, as a matter of course, waive the hiring freeze in all cases but the ones posing the most egregious threats to national security. Either way, Plaintiff cannot bring this challenge on nothing more than rank speculation of what agency heads *might* do in response to Section 5 and without concrete examples of harm alleged to have been caused by Section 5.

That lack of ripeness infects the entire challenge against Section 5. Plaintiff alleges that the Executive Order "impairs Perkin Coie's ability to follow its chosen profession by limiting . . . its ability to represent clients in court and before agencies." Compl. ¶¶ 184-185. It accuses the order of barring Susman Godfrey from interacting with Federal employees and accessing Federal

buildings. *Id.* ¶¶ 129, 137, 147, 195. It cries alarm that the order conditions access to government facilities on political support or affiliation. *Id.* ¶¶ 137. And it lambasts the Order for allegedly interfering with the attorney-client relationship. *Id.* ¶ 138.

None of these purported issues are ripe for judicial review. The Executive Order only tells agency heads to "issue guidance." It therefore cannot plausibly allege that Section 5 caused it injury on the basis of guidance which *has not been issued*. There is simply no case for this Court to hear on this subject.

Even if this Court were to proceed to the merits, it should dismiss Plaintiff's challenges to Section 5. Start with Plaintiff's *ultra vires* claim, which remarkably suggests that Federal agencies lack any authority to control over who can enter their buildings or interact with their employees on official business. There is no constitutional right to enter government buildings at will, *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981), and "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," *Greer v. Spock*, 424 U.S. 828, 836 (1976). As before, Plaintiff might think that Defendants plan to exercise this authority in an unconstitutional manner (though, again, no guidance has yet issued), but that is reason to raise a constitutional claim, not an *ultra vires* claim. *Cf. Eagle Trust Fund v. USPS*, 811 F. App'x 669, 670 (D.C. Cir. 2020).

Those constitutional claims, however, fare no better. Once again, Plaintiff lacks standing to press its due process claims, because it cannot point to any injury traceable to Section 5 of the Executive Order. Furthermore, whether Plaintiff received adequate process depends on the "importance of the private interest at stake," *English*, 717 F.3d at 972, and the "interest at stake" depends on what guidance the agency heads will issue. Until then, Plaintiff's conclusory assertion

that the Executive Order "deprives Susman Godfrey of its liberty interest in its First Amendment right to petition the government" is due no weight at all.  Compl. ¶¶ 142, 144, 163.

Plaintiff's equal protection claim fails as well.  According to Plaintiff, there is not a "credible, rational justification for treating Susman Godfrey differently than similarly situated firms."  *Id.* ¶ 210.  But that ignores the actual text of Section 5.  Every part of Section 5 is tied to "the national security" of the United States.  EO 14263 § 5.  Agency heads are directed to "limit official access" only when "access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  They are directed to "limit Government employees acting in their official capacity from engaging with Susman Godfrey employees" only "to ensure consistency with the national security and other interests of the United States."  And the hiring freeze may be overridden so long as the agency head and the OPM Director determines "that such hire will not threaten the national security of the United States."  In other words, Section 5 clearly states a rational justification.

And Plaintiff's First Amendment claims falter for similar reasons.  To state a First Amendment retaliation claim, a plaintiff must allege "a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref*, 833 F.3d at 258.  Even assuming Plaintiff engaged in protected conduct Plaintiff cannot demonstrate the requisite causal link.  Section 5 is not tied to speech; it is tied to the "national security" and the "interests" of the United States, "to the extent permitted by law."  EO 14263 § 5.

Finally, Plaintiff appears to rest heavily on the notion that Section 5 violates its clients' right to counsel.  Again, until agency heads issue guidance, Plaintiff can only speculate as to whether anyone's right to counsel will be affected at all by Section 5.  Regardless, "[t]he constitutional right to choice of counsel . . . is not absolute."  *United States v. Friedman*, 849 F.2d

1488, 1490 (D.C. Cir. 1988). It "must be balanced against the government's interest in the fair, orderly, and effective administration of the courts which, in a given case, may require an accused to resort to his second choice of counsel." *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir. 1986). And the right is "qualified by the need to avoid undermining public confidence in the integrity of the legal system." *United States v. Wheat*, 813 F.2d 1399, 1401-02 (9th Cir. 1987); *see also Triplett*, 494 U.S. at 722-24 (weighing government interest restricting payments to counsel).

Read as a whole, the Executive Order considered Plaintiff's history. EO 14263 § 1. And as to Section 5 itself, the Executive Order is preoccupied with the "national security" and "interests" of the United States. *Id.* § 5. *If* completely unfettered access to government buildings and government employees in fact "threaten[ed] the national security" of the United States, *id.*, turning a blind eye to that threat would surely "undermine public confidence in the integrity of the legal system," *Wheat*, 813 F.2d at 1401-02, and would impair "the fair, orderly, and effective administration of the courts," *Koblitz*, 803 F.2d at 1528. And if completely unfettered access would *not* threaten the national security or interests of the United States, then Section 5 will have no impact whatsoever on Plaintiff and it would lack any injury to complain of. Either way, the Court should dismiss this claim as well.

## VI. Plaintiff's Naming of the Executive Office of the President and the United States as Defendants is Improper.

Defendants have demonstrated above why Plaintiff's claims challenging Executive Order 14263 should be dismissed. Regardless, Plaintiff's naming of the United States and the Executive Office of the President as defendants in this case is improper, and should any relief be afforded Plaintiff, those defendants should be dismissed.

As to the Executive Office of the President ("EOP"), the D.C. Circuit has recognized that the EOP is an entity comprising a number of other entities, offices, and establishments providing

advice and assistance to the President, as well as exercising a variety of management and regulatory-type functions, in a wide range of matters of policy, politics, administration, and management. *See Armstrong v. Executive Office of the President*, 90 F.3d 553, 558–59 (D.C. Cir. 1996); Website: "The White House: Executive Office of the President (available at https://www.whitehouse.gov/eop/). Plaintiff, however, fails to specify in the Complaint whether it seeks to limit relief to any particular EOP entity and, if so, which one, and what Plaintiff's claims are against that entity and why relief against it is necessary. *See* Compl. ¶¶ 25, 26. That Plaintiff does name the Office of Management and Budget ("OMB"), which is part the EOP, as a defendant, Compl. ¶ 28, only illustrates the point. Presumably OMB is named given its role in distributing executive orders to appropriate Federal agencies, but that makes Plaintiff's additional naming of EOP writ large all the more puzzling and improper. The Court should dismiss EOP as a defendant.

Plaintiffs' decision to name the United States as defendant is similarly faulty. Compl. ¶ 79. Suits alleging unconstitutional action by the Government must be brought "against officials," not against the "agenc[y]" or the "State[]" writ large, "which retain their immunity against all suits in federal court." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (noting that *Ex parte Young* doctrine applies only to suits against officials); *see also Armstrong v. Exceptional Child Center., Inc.*, 575 U.S. 320, 326–27 (2015) (explaining that *Ex parte Young* and the principles governing suits against Federal officials are similar). Under the *ultra vires* doctrine, Plaintiff can bring a suit against Federal officers—and, indeed, Plaintiff did. *See* Compl. ¶¶ 53–78 (listing Federal officers named in their official capacities). But Plaintiff *cannot* sue for injunctive relief against the entire Government *qua* Government. *Cf. Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996) (distinguishing between "bring[ing] the judicial power to bear directly on the President," which is impermissible,

and "the long established non-statutory review of a claim directed at a subordinate executive official," which is permissible).

Indeed, sovereign immunity bars the Court from granting the injunction to the extent it is directed to Federal officials not specifically named.  The general waiver of sovereign immunity is located in 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of an agency action . . . is entitled to judicial review thereof."  But that waiver comes with a caveat:  it requires that "any mandatory or injunctive decree *shall* specify the Federal officer or officers . . . personally responsible for compliance."  *Id.* (emphasis added).  That language was intentional—it was a "nod[] to traditional standing rules and remedial principles."  *See United States v. Texas*, 599 U.S. 670, 698 (2023) (Gorsuch, J., concurring in the judgment).  Yet, to this point, Plaintiff has named as defendants only the two dozen or so officials to whom any injunctive relief should apply and not Federal officials representing every Federal agency part of "the United States."[5]

In short, the United States should never have been named in this suit.  No cause of action exists against it that Plaintiff has articulated, and sovereign immunity has not been waived for the government-wide relief the Court is asked to grant.  And, once the United States falls out of the picture, the case is limited to the two dozen or so named agencies and their representative officials as arguably proper defendants.  Plaintiff can seek to enjoin only the specific agency officials it named in its Complaint; it cannot enjoin the rest of the Federal Government.

As alluded to above, Plaintiff also improperly uses naming the United States as defendant to seek to dodge the well-settled prohibition against courts enjoining the President.  Plaintiff hardly

---

[5] In a similar vein, the more traditional *Larson-Dugan* exception to sovereign immunity applies only when "a plaintiff brings a suit for injunctive or declaratory relief against a *federal officer* for an *ultra vires* act."  *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) (emphasis added).

bothers to disguise this attempted end-run. The Complaint describes "[t]he United States of America" as the party "responsible for the exercise of executive action by the named defendants and all other departments and agencies that are directed by the Order to take action respecting Susman Godfrey." Compl. ¶ 79. This, per Plaintiff, "ensure[s] that the relief ordered by the Court will apply on a government-wide basis, including to any federal agencies that are not specifically listed as defendants." *Id.* Of course, there is only one entity which fits with Plaintiff's description: the President of the United States. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'").

Plaintiff cannot ask this Court to enjoin the President by another name. "A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010); *see also id.* at 1013 ("With regard to the President, courts do not have jurisdiction to enjoin him."). And for good reason. The "President, like Congress, is a coequal branch of government"; to enjoin him "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Accordingly, the D.C. Circuit has "never attempted to exercise power to order the President to perform" even a "ministerial duty," *id.*, much less enjoin the President in his plainly discretionary functions.

Time and again, Judges in this district have abided by this "[b]edrock separation of powers principle[]." *See, e.g.*, *Pickup v. Biden*, 2022 WL 17338099, at *4 (D.D.C. Nov. 30, 2022); *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (noting that "the critical lesson" in past cases involving challenges to presidential executive orders "is that, in such litigation, the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue, not the President"); *Center for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 224

(D.D.C. 2020) ("The injunctive relief that CDT seeks against the President is unavailable."); *Doe v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting these forms of relief against the President directly."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005) ("There is longstanding legal authority that the judiciary lacks the power to issue an injunction or declaratory judgment against the co-equal branches of the government—the President and the Congress.").  Plaintiff cannot avoid this principle by replacing the "President" with the "United States" and thereby enjoin every Federal agency in one fell swoop.

And if Plaintiff cannot even identify the agencies it wishes to enjoin, it certainly cannot identify any cognizable injury traceable to those agencies.  Crucially, standing "is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press against each defendant."  *Garcia v. Stewart*, 531 F. Supp. 3d 194, 205 (D.D.C. 2021).

At bottom, Plaintiff simply cannot absolve itself of the responsibility of naming the specific Federal defendants it seeks to enjoin.  The Court should hold Plaintiff to that duty and dismiss the United States.

## CONCLUSION

The Court should dismiss the Complaint and grant judgment to Defendants.

Dated: April 23, 2025
        Washington, D.C.

Respectfully submitted,


CHAD MIZELLE
Acting Associate Attorney General


/s/ *Richard Lawson*
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042

*Counsel for Defendants*