# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSMAN GODFREY LLP, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-01107-LLA |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | |
| *Defendants*. | |

## BRIEF OF LEGAL ETHICS PROFESSORS
## AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF

Ruth Greenwood*
Samuel J. Davis*
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-2181
rgreenwood@law.harvard.edu
sadavis@law.harvard.edu

*Pro hac vice pending*

Kelsi Brown Corkran
Elizabeth R. Cruikshank
Mary B. McCord
Joseph W. Mead
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Ave. NW
Washington, DC 20001
(202) 662-9042
kbc74@georgetown.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF INTEREST ................................................................................................. 1

INTRODUCTION ..................................................................................................................... 2

ARGUMENT ............................................................................................................................. 4

    I.    The recent executive orders targeting law firms create inevitable and irresolvable ethical issues for lawyers at firms that accede to the President's demands. ........................................... 4

    II.    Firms that enter into agreements with the President to avoid being targeted could be perceived as violating federal anti-bribery laws. .................................................................... 10

    III.    The President's attempt to redefine legal ethical rules threatens the profession's historic independence and the rule of law. ....................................................................................... 12

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Booth v. Fletcher*, 101 F.2d 676 (D.C. Cir. 1938) ................................................................ 4

*Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976) .................................... 6

*Doe v. Nielsen*, 883 F.3d 716 (8th Cir. 2018) ................................................................ 7

*Evans v. Jeff D.*, 475 U.S. 717 (1986) .............................................................................. 7

*Hollingsworth v. Perry*, 570 U.S. 693 (2013) ................................................................ 4

*Holloway v. Arkansas*, 435 U.S. 475 (1978) .................................................................. 7

*In re McConnell*, 370 U.S. 230 (1962) ............................................................................ 13

*In re Portsmouth Sav. Fund Soc.*, 19 F. Cas. 1087 (E.D. Va. 1877) ............................ 13

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010) ........ 4

*Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) .................................................. 4

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ............................................ 3, 14

*McDonnell v. United States,* 579 U.S. 550 (2016) ........................................................ 11

*Mickens v. Taylor*, 535 U.S. 162 (2002) ........................................................................ 5

*Minebea Co. v. Papsti*, 374 F. Supp. 2d 231 (D.D.C. 2005) ........................................ 13

*Nat'l Sec. Counselors v. CIA*, 811 F.3d 22 (D.C. Cir. 2016) ........................................ 7

*Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982) ...................................................... 7

*Ridder v. City of Springfield,* 109 F.3d 288 (6th Cir. 1997) ...................................... 10

*So v. Suchanek*, 670 F.3d 1304 (D.C. Cir. 2012) .......................................................... 8

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................................ 5

*United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) ...................................... 11

*United States v. Adams*, 2025 WL 978572 (S.D.N.Y. Apr. 2, 2025) .......................... 12

*United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975) ................................................ 12

*United States v. Marmolejo*, 89 F.3d 1185 (5th Cir. 1996) ........................................ 11

*United States v. Rhynes*, 218 F.3d 310 (4th Cir. 2000) ................................................................. 13

*United States v. Soto Hernandez*, 849 F.2d 1325 (10th Cir. 1988) ............................................. 6

*United States v. Williams*, 705 F.2d 603 (2nd Cir. 1983) ........................................................... 11

*Williams v. Reed*, 29 F. Cas. 1386 (C.C.D. Me. 1824) ................................................................ 5

**Statutes**

15 U.S.C. §§ 78dd *et. seq.* ............................................................................................................ 11

18 U.S.C. § 201 ............................................................................................................................. 10

**Other Authorities**

*Belarus: Analysis of Arbitrary Disbarments of Liudmila Kazak, Konstantin Mikhel, Maxim Konon, and Mikhail Kirilyuk*, ABA (May 19, 2021) .................................................. 15

Brief of *Amici Curiae* Bar Associations in Support of Plaintiff's Motion for Summary Judgment and For Declaratory and Permanent Injunctive Relief, *Perkins Coie v. Department of Justice*, No. 1:25-cv-00716 (D.D.C. April 7, 2025) ........................................................ 15

Dana A. Remus, *Reconstructing Professionalism*, 51 Ga. L. Rev. 807 (2017) ............................ 4

Debra Cassens Weiss, *Paul Weiss Leader Cites Potential 'Existential Crisis' as 1 Reason for Trump Deal; Critics Include 141 Firm Alumni*, ABA Journal (Mar. 24, 2025) ....................... 8

Executive Order 14,250, *Addressing Risks from WilmerHale*, 90 Fed. Reg. 14549 (Mar. 27, 2025) ............................................................................................................................. 9

*Iran Intensifies Crackdown on Human Rights Lawyers Amid Growing Repression*, Ct'r for Hum. Rts. in Iran  (Jan. 13, 2025) .............................................................................................. 15

*Matthew* 6:24 .............................................................................................................................. 6

Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of his Attacks*, The Washington Post (Mar. 25, 2025) ................................................................................ 14

*Opposing Turkish Government Attacks on Lawyers*, N.Y.C. Bar (July 16, 2020) ..................... 15

Rachel Leingang & Dharna Noor, *Fear Spreads as Trump Targets Lawyers and Non-Profits in 'Authoritarian' Takedown*, The Guardian (Apr. 10, 2025) ...................................................... 15

Robert W. Gordon, *The Independence of Lawyers*, 68 B. U. L. Rev. 1 (1988) ........................... 13

Roy Strom, *Trump Says He'll Enlist Big Law Dealmakers for Coal, Tariffs*, Bloomberg Law (Apr. 8, 2025) ........................................................................................................................ 9

Sam Levine, *Two More Law Firms Reach Deals with Trump to Avoid Executive Orders: 'They're All Bending'*, The Guardian (Apr. 2, 2025) ................................................................. 8

The Federalist No. 47 (James Madison) ........................................................................ 13

U.S. Dep't of Just. & Enforcement Div. of the SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 16 (2d ed. 2020) .................................................................. 12

**Rules**

Am. Bar Ass'n Model Rules of Prof'l Conduct (preamble) ..................................... 4, 12

Am. Bar Ass'n Model Rules of Prof'l Conduct r. 1.0(e) ............................................. 8

Am. Bar Ass'n Model Rules of Prof'l Conduct r. 1.7 ...................................... 5, 6, 7, 9

Am. Bar Ass'n Model Rules of Prof'l Conduct r. 3.3 .................................................. 9

## STATEMENT OF INTEREST

*Amici curiae* are distinguished professors of legal ethics. As scholars dedicated to studying the ethical questions that arise when lawyers weigh their duties to clients, the courts, and society writ large—and teachers who introduce aspiring lawyers to ethical rules and norms—*amici* have a substantial interest in governmental efforts to shape the legal profession. Individually, they have nuanced and varying perspectives regarding how to resolve the inevitable, often thorny ethical issues lawyers must confront. As a group, however, they believe that lawyers must be free to exercise their own independent judgment in resolving these issues without coercive interference by the federal government.

*Amici* seek leave to file this brief because the resolution of this case has profound implications for the ability of the legal profession to regulate itself and, by extension, for the administration of justice in our nation's legal system. *Amici* wish to explain the ethical quandary that the sanctions imposed by Executive Order 14,263, *Addressing Risks From Susman Godfrey*, 90 Fed. Reg. 15615 (Apr. 9, 2025)—and similar orders directed at other law firms—have created for firms seeking to avoid such penalties. Entering a deal with the government by which a law firm makes certain commitments, including the provision of valuable "pro bono" services to causes favored by the President, makes it difficult for the lawyers in those firms to meet their ethical obligations as attorneys, and could potentially subject the firms to criminal liability. *Amici* also seek to illustrate why conditioning a law firm's ability to function on the firm's acquiescence to conditions dictated by the President, which is contrary to the American legal profession's longstanding history of independence, undermines basic rule of law principles and mirrors actions taken by anti-democratic political actors globally.

Counsel for *amici curiae*, the Election Law Clinic at Harvard Law School and the Institute for Constitutional Advocacy and Protection at Georgetown University Law Center, are the sole

authors of this brief. No party, and no other person, contributed money that was intended to fund the preparation or submission of this brief. The full list of *amici*[1] is as follows:

- George M. Cohen, Brokaw Professor of Corporate Law at the University of Virginia School of Law.

- Susan P. Koniak, Professor of Law, Emerita, Boston University School of Law.

- Jonah E. Perlin, Associate Professor of Law, Legal Practice and Senior Fellow of the Center on Ethics and the Legal Profession at Georgetown University Law Center.

- Nancy B. Rapoport, UNLV Distinguished Professor & Garman Turner Gordon Professor of Law at William S. Boyd School of Law, University of Nevada, Las Vegas.

- Mitt Regan, McDevitt Professor of Jurisprudence and Director of the Center on Ethics and the Legal Profession, Georgetown University Law Center.

- Jeffrey Stempel, Doris S. and Theodore B. Lee Professor of Law at William S. Boyd School of Law, University of Nevada, Las Vegas.

- W. Bradley Wendel, Edwin H. Woodruff Professor of Law at Cornell Law School.

## INTRODUCTION

Executive Order 14,263, *Addressing Risks From Susman Godfrey*, 90 Fed. Reg. 15615 (Apr. 9, 2025), and other similar executive orders, pose a profound threat to the ethical rules and norms that govern the legal profession. If the sanctions imposed by the executive orders take effect, it will put pressure on the law firms subject to them to enter a settlement with the government to

---

[1] The arguments contained in this brief represent the individual views of *amici*, not their academic institutions.

avoid the sanctions. Law firms threatened with similar executive orders may attempt to avoid sanctions entirely by entering into agreements with the administration, as many have already. But this creates another set of intractable ethical issues. A firm that can survive only by staying in the President's good graces has incentives that conflict with its lawyers' stringent fiduciary duties to remain loyal to the interests of their clients, exercise independent judgment, and be truthful and candid in all dealings with the courts. These ethical issues will persist as long as the executive orders are enforceable: however a firm responds to the administration's demands, the President can always declare a firm noncompliant and impose further sanctions.

Lawyers who fail to fulfill their professional legal obligations to their clients and to the courts could be subject to bar disciplinary proceedings. They may potentially also be civilly liable to clients for breach of fiduciary duty if they accept a representation burdened by a conflict of interest. Firms that hope to avoid punitive consequences by entering into agreements with the federal government may face even greater risks. Although businesses may engage in a wide range of charitable activities, and firms may negotiate settlements of legal complaints, firms that agree to provide tens or hundreds of millions of dollars in pro bono legal services to support the President's pet causes, in express exchange for a reprieve from punishment, may be undertaking actions that arguably run afoul of federal anti-bribery law.

In addition to the consequences for individual lawyers and law firms, the President's practice of targeting lawyers who represent clients or causes he does not like will, if left unchecked, chip away at the foundations of the American legal system. "An informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 534 (2001). For our legal system to function, lawyers must "be unintimidated—free to think, speak, and act as members of an Independent Bar." *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 273

(1957). The President's recent executive orders seek to define for lawyers what constitutes unethical professional conduct—and then to punish lawyers for violating its purported "rules"— in contravention of the legal profession's historic independence and separation-of-powers principles. The result is likely to be fewer lawyers and firms willing to take on politically unpopular or controversial cases, at great cost to our adversarial system.

**ARGUMENT**

## I.     The recent executive orders targeting law firms create inevitable and irresolvable ethical issues for lawyers at firms that accede to the President's demands.

Every lawyer has an "ethical obligation of zealous advocacy on behalf of a client." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 597 (2010). Lawyers are also "subject to duties of candor, decorum, and respect for the tribunal and co-parties alike, all of which guard against the possibility that [advocates] will somehow fall short of the appropriate standards for federal litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 722 (2013) (Kennedy, J., dissenting). Collectively, these ethical obligations, "instruct[] lawyers to balance multiple and sometimes conflicting duties to clients, opponents, third parties, and the legal system." Dana A. Remus, *Reconstructing Professionalism*, 51 Ga. L. Rev. 807, 841 (2017). How to weigh these obligations "must be resolved through the [lawyer's] exercise of sensitive professional and moral judgment." Am. Bar Ass'n (ABA) Model Rules of Prof'l Conduct (preamble). Adherence to these rules and norms enables lawyers to fulfill their dual role in the American legal system as fierce advocates of their clients' interests and "officer[s] of the court bound by oath to support the administration of the laws." *Booth v. Fletcher*, 101 F.2d 676, 680 n.7 (D.C. Cir. 1938).

Executive orders that punish or threaten to punish law firms for engaging in "activities" the federal government does not like make it difficult for lawyers at those firms to fulfill their ethical duties to their clients, the court, and society writ large. These orders put lawyers at these

4

firms in an ethical bind: they must weigh the potential costs to their firms of displeasing the administration against their duties to loyally and zealously advocate for their client's interests and to exercise independent judgment in advising their clients how to achieve their desired outcomes. Given the consequences for those caught in the President's crosshairs, lawyers at targeted firms will face serious ethical challenges if these executive orders are enforceable: firms threatened with similar penalties may enter into agreements to avoid an executive order, while the firms subject to the orders may be forced into settlements to avoid the penalties. Either way, the lawyers at these firms will find it difficult to comply with their ethical obligations.

A. <u>Lawyers at firms that accede to the President's demands may not be able to comply with the duty of loyalty that lawyers owe to their clients.</u>

A lawyer's duty of loyalty to their clients is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). The duty of loyalty imposes a corresponding duty to avoid conflicts of interest. *Id.* As early as 1824, Justice Story articulated these twin ethical obligations: a lawyer must "ha[ve] no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him" and "no interest, which may betray his judgment, or endanger his fidelity." *Williams v. Reed*, 29 F. Cas. 1386, 1390 (C.C.D. Me. 1824). Since then, "[e]very state bar in the country has [adopted] an ethical rule prohibiting a lawyer from undertaking a representation that involves a conflict of interest unless the client has waived the conflict." *Mickens v. Taylor*, 535 U.S. 162, 188 n.13 (2002) (Stevens, J., dissenting). All states follow some version of the prohibition on conflicts of interest in the American Bar Association's Model Rules of Professional Conduct: a "lawyer shall not represent a client if . . . there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to another client, a former client *or a third person or by a personal interest of the lawyer*." ABA Model Rules of Prof'l Conduct r. 1.7 (emphasis added).

Law firms that accede to the President's demands to avoid the punitive sanctions these executive orders inflict create unavoidable conflicts of interest. Law firms and individual lawyers have strong interests—including pecuniary, professional, and reputational interests—in avoiding the consequences of these executive orders. If the only way for a targeted firm to avoid these consequences is by obtaining the President's ongoing approval, this will presumably mean forgoing advocacy that, in the President's sole view, "undermin[es]" the "interests and priorities" of the United States. Executive Order § 1. But the United States is a party in all federal criminal cases and in many civil cases. In these cases, firms will be torn between their need to stay in the President's good graces and their duty of loyalty to their clients. *Cf. Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976) ("'[N]o man can serve two masters'") (quoting *Matthew* 6:24). Acquiescing to the President's demands therefore creates a material limitation on the firm's representation of a vast array of clients in civil litigation, transactional, and advisory matters, risking violations of Rule 1.7(a)(2).

The duty to avoid conflicts of interest "extends to any situation in which a [client's] counsel owes conflicting duties to that [client] and some other third person." *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988). In matters involving large corporations or regulated industries, for example, the federal government might have an interest in the outcome even if it is not a party. In these matters, lawyers might conduct investigations that uncover facts the government perceives as damaging, or lawyers might devise legal arguments that oppose or undermine positions the government has previously taken. Under threat of financial and professional ruin, however, a firm will have an incentive to downplay bad facts and soft-pedal strong arguments. In these circumstances, the firm's "divided obligations" will "interfere[] with the undivided loyalty [that] the attorney owes his client" and "detract[] from achieving the most

6

advantageous position" for them. *Doe v. Nielsen*, 883 F.3d 716, 719 (8th Cir. 2018) (quoting *Pelham v. Griesheimer*, 440 N.E.2d 96, 100 (Ill. 1982)); *see also Nat'l Sec. Counselors v. CIA*, 811 F.3d 22, 30 (D.C. Cir. 2016) (an attorney "is legally and ethically required to be loyal to client interests, as distinct from his own").

These kinds of conflicts of interest could also interfere with a lawyer's duty to use independent judgment to advance their clients' interests. *See* ABA Model Rules of Prof'l Conduct r. 1.7, cmt. 8 ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interest."). Every lawyer "is under an ethical obligation to exercise independent professional judgment on behalf of his client; he must not allow his own interests, financial or otherwise, to influence his professional advice." *Evans v. Jeff D.*, 475 U.S. 717, 728 n.14 (1986). But if lawyers accede to the President's conditions, the need to protect the firm's financial and professional viability will necessarily be part of a lawyer's calculus when advising clients whose interests may bring them into conflict with the federal government. Advice on key decisions will be colored by a lawyer's need to consider the preferences and whims of the federal government. *See Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) (remarking that "the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing . . . ."). Throughout the course of an attorney–client relationship, lawyers help clients make innumerable choices about when and how to fight for their interests. Under these circumstances, the government's intrusion into the firm's independent professional judgment creates "a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer."

7

B. <u>Lawyers at firms that enter agreements to avoid the conditions imposed by the executive orders may not be able to obtain informed consent from their clients to waive potential conflicts.</u>

Lawyers at affected firms who recognize the potential conflicts, but nonetheless believe that they can provide their client with competent and diligent counsel, may ask the client to waive potential conflicts by giving their informed consent to continue the representation. *See, e.g.*, *So v. Suchanek*, 670 F.3d 1304, 1308 (D.C. Cir. 2012). But informed consent can be given only after a lawyer has "communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." ABA Model Rules of Prof'l Conduct r. 1.0(e). Firms that have entered into agreements with the President simply cannot provide this information to their clients, meaning clients cannot waive their lawyers' conflicts under the legal profession's ethical rules.

Already, several firms have entered into agreements with the federal government to avoid being targeted by executive orders. *See, e.g.*, Sam Levine, *Two More Law Firms Reach Deals with Trump to Avoid Executive Orders: 'They're All Bending'*, The Guardian (Apr. 2, 2025), https://perma.cc/K99N-KN57. These agreements are only the beginning, not the end, of what promises to be a mutable and ongoing relationship between each firm and the President. These agreements are not enforceable contracts with definite terms: already, law firm leaders and the President have expressed disagreement about the precise terms of what actions firms are obligated to undertake.[2] Even if these agreements are binding, they are temporary: they do not purport to

---

[2] *Compare* Debra Cassens Weiss, *Paul Weiss Leader Cites Potential 'Existential Crisis' as 1 Reason for Trump Deal; Critics Include 141 Firm Alumni*, ABA Journal (Mar. 24, 2025), https://perma.cc/4B92-29X8 ("[Paul Weiss managing partner Brad] Karp sent a copy of the

grant safe harbor from future executive orders, nor do they guarantee non-action or release any future claims against the firm. Firms that enter into agreements with the federal government cannot plausibly represent that they will not be required to take certain actions to maintain their agreement with the federal government.

Even if clients consent to representation in full recognition of this uncertainty, it is impossible for firms to accurately forecast what actions might trigger further reprisals. The Executive Orders target firms because, in the President's discretionary judgment, their advocacy "undermin[es] critical American interests and priorities." Executive Order § 1; *see also* Executive Order 14,250, *Addressing Risks from WilmerHale*, 90 Fed. Reg. 14549 § 1 (Mar. 27, 2025) ("My Administration is committed to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests."). These orders leave open the possibility of further retaliatory action based on some undefined national interest, which are potentially implicated in practically every matter across a firm's litigation, transactional, and regulatory practices. Thus, there will be no way for its lawyers to apprise their clients of the "reasonably foreseeable risks" to their attorney–client relationship, and the conflicts will likely be non-waivable under Rule 1.7(b)(1). Unless courts hold these orders unenforceable, lawyers will face inevitable and irresolvable conflicts.

---

agreement to firm employees that differs from [President] Trump's description. . . . Karp also said under the agreement, 'the administration is not dictating what matters we take on, approving our matters or anything like that.'"), *with* Roy Strom, *Trump Says He'll Enlist Big Law Dealmakers for Coal, Tariffs*, Bloomberg Law (Apr. 8, 2025), https://perma.cc/N7X6-Y79M ("'We're going to use some of those firms to work with you on your leasing and other things,' Trump told miners at the White House on Tuesday. 'They'll do a great job. I think they're going to do a fantastic job.' Trump also said the law firms would help with tariff negotiations. 'We're going to use them and we're getting them for the right price because we need a lot of talent,' Trump said. 'We have a lot of countries coming in to make deals.'").

C. <u>Firms that accede to the President's demands imperil their lawyers' ability to adhere to their duty of candor.</u>

Lawyers have an ethical duty of candor, requiring them to speak truthfully to courts, correct statements they know to be false, and disclose relevant legal authority. ABA Model Rules of Prof'l Conduct r. 3.3. The duty of candor does not require "an impartial exposition of the law," but it does require avoiding and correcting known falsehoods in order "to avoid . . . undermin[ing] the integrity of the adjudicative process." *Id*. cmt. 2. Rule 11 of the Federal Rules of Civil Procedure "embrac[es] a continuing duty of candor," meaning that lawyers may face judicial sanctions for violating this duty. *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997).

Lawyers at firms that have entered into agreements with the President will face pressures that may inhibit their ability to adhere to their duty of candor. If correcting a false statement or disclosing a legal authority will be detrimental to the federal government's nebulously defined interests, lawyers will be placed in an ethical catch-22: duty-bound to speak honestly and fully to the court under threat of sanctions, on the one hand, and facing severe consequences that may imperil their firm and the interests of their clients, on the other.

II.    **Firms that enter into agreements with the President to avoid being targeted could be perceived as violating federal anti-bribery laws.**

One goal of Executive Order 14,263 (and similar orders) is apparent on its face: to leverage the threat of devastating punishments to induce law firms to offer millions of dollars' worth of pro bono legal services to support the White House's favored causes. Although firms that enter into such agreements may lack the evil purpose required by the federal bribery statute, their agreements could nevertheless be perceived as "corruptly giv[ing], offer[ing], or promis[ing] anything of value to any public official . . . with intent to influence any official act." 18 U.S.C. § 201(b)(1)(A).

Notwithstanding that the Department of Justice is unlikely to investigate firms that enter into deals crafted by the President, the fact that firms are being pressured—arguably extorted—to engage in behavior that could be perceived as violating federal bribery law further emphasizes the magnitude of the ethical problems these orders create.

Just as the President's decision to issue executive orders that sanction certain law firms is an official act, so too is the President's decision to withhold issuing executive orders that would sanction other law firms. *See McDonnell v. United States*, 579 U.S. 550, 574 (2016) (holding that for purposes of construing § 201, an "official act" essentially has two components: (1) "the public official must make a decision or take an action" on (2) "something specific and focused that is 'pending' or 'may by law be brought'" before a public official). A law firm's commitment to provide valuable pro bono services to the President's preferred causes, made "with intent to influence" the decision whether to issue or withhold an executive order targeting those law firms, would appear to meet the *quid pro quo* requirement of federal bribery law.

Moreover, the term "anything of value" as used in § 201 "has consistently been given a broad meaning." *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983). The term is not limited to transactions involving money, goods, or services given directly to a public official—it is capacious enough to include "intangible items," *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996), and donations to political or lobbying efforts favored by the government official. *See United States v. Siegelman*, 640 F.3d 1159, 1170-173 (11th Cir. 2011). In the closely related context of the Foreign Corrupt Practices Act (FCPA), which uses identical "anything of value" language, 15 U.S.C. §§ 78dd–1(a), 78dd–2(a), 78dd–3(a), the U.S. government has consistently taken the position that charitable donations qualify as a "thing of value" if those donations are "dues the [donor] was required to pay for assistance from the government official." U.S. Dep't of

Just. & Enforcement Div. of the SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 16 (2d ed. 2020). The law firms that have offered substantial pro bono services in support of the President's interests have, arguably, engaged in similar conduct: they have sought to avoid sanctions by offering substantial donations to causes chosen by a government official, in this case the President.

In the present circumstances, the Department of Justice likely would conclude that it is not in the public interest to prosecute law firms that offer pro bono services in exchange for avoiding the consequences of an executive order, even if that offer arguably constitutes a violation of § 201.[3] Regardless, the President's exertion of pressure on law firms to engage in conduct that could violate federal anti-bribery law further illustrates the ethical quandaries these executive orders create. Allowing Executive Order 14,263 to take effect would put more pressure on law firms to reach agreements with the President to avoid a similar fate, and in doing so compromise themselves to potential criminal liability.

### III. The President's attempt to redefine legal ethical rules threatens the profession's historic independence and the rule of law.

The legal profession's independence is important not merely because it preserves the relationship between lawyer and client. "[T]he vindication of individual rights, especially as against the state, requires that lawyers be able to assert and pursue client interests free of external controls, especially controls imposed by state officials." Robert W. Gordon, *The Independence of*

---

[3] Or perhaps not: the threat of criminal prosecution is a potent form of influence the federal government could exert to compel law firms to continue complying with the President's demands. *Cf. United States v. Adams*, No. 24-CR-556, 2025 WL 978572, at *36 (S.D.N.Y. Apr. 2, 2025) (stating that the government "extract[ing] a public official's cooperation with the administration's agenda in exchange for dropping a prosecution . . . would be 'clearly contrary to the public interest'" because it "violate[s] norms against using prosecutorial power for political ends" (quoting *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975))).

*Lawyers*, 68 B. U. L. Rev. 1, 10 (1988); *see also* ABA Model Rules of Prof'l Conduct (preamble) ("An independent legal profession is an important force in preserving government under law, for abuse of legal authority is more readily challenged by a profession whose members are not dependent on government for the right to practice."). The federal government's efforts to coerce private lawyers is inconsistent with separation of powers and federalism principles and undermines the judiciary's capacity to protect fundamental constitutional rights.

In America's constitutional system, it is the role of the judiciary to check the executive when it exceeds the bounds of its lawful authority. *See* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."). To accomplish this, the judiciary needs an independent bar comprising lawyers willing and able to freely and fiercely advocate for *every* party to a dispute. *See In re McConnell*, 370 U.S. 230, 236 (1962) (it is "essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases"). As one nineteenth-century district court judge explained,

> An independent bar, composed of learned and honorable lawyers, is as necessary to securing an equality of right among suitors, as even an independent judiciary or a jury of twelve impartial men. The law and the courts equally recognize the value and necessity of legal services . . . . The assistance of counsel is indispensable to the courts in ascertaining and defining the law on the subject litigated.

*In re Portsmouth Sav. Fund Soc.*, 19 F. Cas. 1087, 1089 (E.D. Va. 1877). In America's system of laws, the judiciary "'must trust and rely on lawyers' abilities to discharge their ethical obligations' . . . otherwise, the adversary process, the judicial system and the legal profession itself are in grave jeopardy." *Minebea Co. v. Papsti*, 374 F. Supp. 2d 231, 237 (D.D.C. 2005) (quoting *United States v. Rhynes*, 218 F.3d 310, 320 (4th Cir. 2000)).

For these reasons, the Supreme Court has rejected efforts by the legislative and executive branches to encroach upon the judicial power by curtailing the independence of lawyers. In *Legal Services Corp. v. Velazquez*, for example, the Court struck down a federal statutory provision "prohibit[ing] legal representation funded by recipients of LSC moneys if the representation involves an effort to amend or otherwise challenge existing welfare law." 531 U.S. 533, 536–37 (2001). The Court explained that "the restriction imposed by the statute threatens severe impairment of the judicial function" because it would "sift[] out cases presenting constitutional challenges in order to insulate the Government's laws from judicial inquiry." *Id.* at 546. The law would "distort[] the legal system by altering the traditional role of the attorneys," *id.* at 544, and, ultimately, "prohibit[] speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id.* at 545.

What the Supreme Court prevented Congress from doing by statute in *Velazquez* the President is now attempting to achieve by executive fiat. This effort is having its intended effect. Former members of the Biden administration have said they are having trouble finding lawyers willing to represent them. *See* Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms. One former official lined up a pro bono lawyer from a major law firm, but after the White House issued the executive order challenged in this case, the firm said it had discovered a conflict of interest and dropped him as a client. *Id*. Then, five other firms said they had conflicts, although one partner told him privately that he was dropped "because the leadership didn't want to take the risk." *Id.* Non-profit advocacy groups have experienced a similar chill. *See* Rachel Leingang & Dharna Noor, *Fear Spreads As Trump Targets Lawyers and Non-Profits in 'Authoritarian' Takedown*, The Guardian (Apr. 10,

14

2025), https://perma.cc/E76N-D9YY. If lawyers are cowed from representing people and causes disliked by the President, the cases they would bring to challenge executive overreach and vindicate individual rights may not be filed, and the courts will have no opportunity to review even blatantly unlawful executive actions.

The threat that an independent bar poses to executive abuses is a key reason illiberal governments around the world have attacked independent bars. *See* Brief of *Amici Curiae* Bar Associations in Support of Plaintiff's Motion for Summary Judgment and For Declaratory and Permanent Injunctive Relief, at 19-25, *Perkins Coie v. Dep't of Just.*, No. 25-CV-0716, at 19-25 (D.D.C. April 7, 2025). In recent years, autocratic leaders in Belarus, Turkey, and Iran have attacked lawyers to cement and maintain authoritarian regimes.[4] This is no surprise: as America's own history demonstrates, the rule of law depends upon an independent judiciary, which in turn requires an independent bar.

## CONCLUSION

The recent executive orders targeting law firms, including the one at issue in this case, are a serious threat to the legal profession. Whatever law firms choose to do in response, these orders interfere with the capacity of lawyers at the targeted firms to fulfill their ethical obligations. In turn, these orders threaten to undermine the adversarial system of justice and the judiciary's capacity to check unlawful executive actions. Accordingly, *amici* respectfully submit this brief in

---

[4] *See, e.g., Belarus: Analysis of Arbitrary Disbarments of Liudmila Kazak, Konstantin Mikhel, Maxim Konon, and Mikhail Kirilyuk*, ABA (May 19, 2021), https://www.americanbar.org/groups/human_rights/reports/belarus-arbitrary-disbarment; *Opposing Turkish Government Attacks on Lawyers*, N.Y.C. Bar (July 16, 2020), https://www.nycbar.org/blogs/opposing-turkish-government-attacks-on-lawyers; *Iran Intensifies Crackdown on Human Rights Lawyers Amid Growing Repression*, Ctr. for Hum. Rts. in Iran (Jan. 13, 2025), https://iranhumanrights.org/2025/01/iran-intensifies-crackdown-on-human-rights-lawyers-amid-growing-repression.

support of Plaintiff's motion for summary judgment and for declaratory and permanent injunctive

relief barring enforcement of Executive Order 14,263.

Dated: April 25, 2025

Respectfully submitted,

<div style="display: flex; justify-content: space-between;">

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran
Elizabeth R. Cruikshank
Mary B. McCord
Joseph W. Mead
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Ave. NW
Washington, DC 20001
kbc74@georgetown.edu
(202) 662-9042

*/s/ Ruth Greenwood*
Ruth Greenwood*
Samuel J. Davis*
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-2181
rgreenwood@law.harvard.edu
sadavis@law.harvard.edu

</div>

*Counsel for Amici Curiae*

*pro hac vice pending