# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

*Plaintiff,*

v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

*Defendants.*

Civil Action No. 1:25-cv-01107-LLA

## BRIEF OF FORMER SENIOR GOVERNMENT OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Harold Hongju Koh*
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
203-432-4932
harold.koh@ylsclinics.org

Amy Jeffress, Bar No. 449258
Joshua A. Matz, Bar No. 1045064
Trisha Anderson, Bar No. 497224*
Carmen Iguina González, Bar No. 1644730
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

Matthew J. Craig*
Mack Jenkins*
HECKER FINK LLP
1150 S Olive St., Suite 10-140
Los Angeles, CA 90015
(212) 763-0883
mcraig@heckerfink.com

Sean Hecker*
Julie E. Fink*
Shawn G. Crowley*
Jenna M. Dabbs*
Kate L. Doniger*
Michael Ferrara, Bar No. NY0621
David Gopstein*
Marshall L. Miller, Bar No. NY0372*
David Patton*
John C. Quinn*
Gabrielle E. Tenzer*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
shecker@heckerfink.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................... 2

ARGUMENT ............................................................................................................. 5

I.    THE ORDER IS SUPPORTED NEITHER BY AN ACT OF CONGRESS NOR BY
      THE INHERENT POWERS OF THE PRESIDENT. ........................................... 5

      A.    The Order Is Not Authorized by Any Act of Congress. ......................... 5

      B.    The Order Is Not Authorized by the President's Inherent Constitutional Powers.. 8

      C.    The Lack of Historical Precedent for This Order Further Demonstrates That It Is
            Without Constitutional Authority. ......................................................... 9

II.   THE ORDER UNCONSTITUTIONALLY VIOLATES THE SEPARATION OF
      POWERS BY USURPING THE POWER OF THE JUDICIARY. ................................ 13

      A.    The Order Violates the Separation of Powers by Intruding on the Exclusive
            Authority of the Judicial Branch. ........................................................ 13

      B.    The Order Also Violates the Separation of Powers by Functioning as a Bill of
            Attainder. ............................................................................................ 15

            1.    The Prohibition on Bills of Attainder Constrains Usurpation of Judicial
                  Authority. .................................................................................... 15

            2.    The Order Functions as an Unlawful Bill of Attainder............................ 20

CONCLUSION......................................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Al-Aulaqi v. Panetta*,
35 F. Supp. 3d 56 (D.D.C. 2014) .................................................................... 11, 20

*Amiri v. Kelly*,
No. 17 Civ. 12188, 2018 WL 623652 (E.D. Mich. Jan. 30, 2018) .............................. 11, 20

*BellSouth Corp. v. FCC*,
162 F.3d 678 (D.C. Cir. 1998) .................................................................................... 20

*Consol. Edison Co. of N.Y. v. Pataki*,
292 F.3d 338 (2d Cir. 2002) ........................................................................................ 24

*Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb*,
No. 98 Civ. 0949, slip op. (D.D.C. Mar. 29, 1999) ................................................... 20

*Cummings v. Missouri*,
71 U.S. 277 (1866) ............................................................................ 16, 17, 18, 21, 22

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .......................................................................................... 11, 13

*Davies v. Young*,
No. 12 Civ. 2794, 2013 WL 5450308 (D. Colo. Sept. 30, 2013) ............................... 20

*Dehainaut v. Pena*,
32 F.3d 1066 (7th Cir. 1994) ..................................................................................... 20

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) ...................................................................................................... 7

*El-Ganayni v. U.S. Dep't of Energy*,
591 F.3d 176 (3d Cir. 2010) .......................................................................................... 7

*Ex parte Garland, 71 U.S.*,
71 U.S. (4 Wall.) 333 (1866) .......................................................................... 14, 21, 22

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) ........................................................................ 20, 21, 22

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .................................................................................................... 12

*Garner v. Jones*,
    529 U.S. 244 (2000) ................................................................................. 20

*Goodyear Tire & Rubber Co. v. Haeger*,
    581 U.S. 101 (2017) ................................................................................. 14

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012) ................................................................. 21

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*,
    85 F. Supp. 2d 174 (E.D.N.Y. 2000) ....................................................... 20

*Joint Anti-Fascist Refugee Committee v. McGrath*,
    341 U.S. 123 (1951) ............................................................................ 18, 19

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) .............................................................. 20

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
    909 F.3d 446 (D.C. Cir. 2018) ............................................................ 22, 24

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ................................................................................. 23

*Korte v. Off. of Personnel Mgmt.*,
    797 F.2d 967 (Fed. Cir. 1986) ................................................................. 20

*Kovac v. Wray*,
    2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) .......................................... 20

*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) .................................................................. 8

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ............................................................................ 14, 15

*Luis v. United States*,
    578 U.S. 5 (2016) ..................................................................................... 12

*Lynce v. Mathis*,
    519 U.S. 433 (1997) ................................................................................. 16

*Marshall v. Sawyer*,
    365 F.2d 105 (9th Cir. 1966) ................................................................... 20

*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................................. 13

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999) ............................................................................... 5

*Muskrat v. United States*,
    219 U.S. 346 (1911) ............................................................................. 15

*Myers v. United States*,
    272 U.S. 52 ......................................................................................... 14

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977) ................................................. 15, 21, 22, 23, 24

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ............................................................................... 8

*Paradissiotis v. Rubin*,
    171 F.3d 983 (5th Cir. 1999) ............................................................. 20

*Peters v. Hobby*,
    349 U.S. 331 (1955) ....................................................................... 19, 22

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ............................................................................. 24

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ............................................................. 7

*Scheerer v. U.S. Att'y Gen.*,
    513 F.3d 1244 (11th Cir. 2008) ......................................................... 20

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ............................................................................. 14

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ............................................................................. 12

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*,
    468 U.S. 841 (1984) ............................................................................. 21

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ............................................................................. 24

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ........................................................................................ 16

*TikTok v. Garland*,
    145 S. Ct. 57 (2025) ........................................................................................ 12

*Trump v. United States*,
    603 U.S. 593 (2024) .......................................................................................... 8

*United States v. Brown*,
    381 U.S. 437 (1965) ............................................................................ 15, 16, 24

*United States v. Lovett*,
    328 U.S. 303 (1946) ................................................................................... 21, 23

*United States v. Will*,
    449 U.S. 200 (1980) ........................................................................................ 16

*Walmer v. U.S. Dept. of Defense*,
    52 F.3d 851 (10th Cir. 1995) .......................................................................... 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................... 4, 5, 6, 7, 8, 11, 13

## US CONSTITUTIONAL PROVISIONS

Article I § 7 ............................................................................................................. 18

Article I § 9 ......................................................................................................... 4, 15

Article I § 10 ....................................................................................................... 4, 15

Article III § 1 .......................................................................................................... 14

## STATUTES

21 U.S.C. § 1901 ...................................................................................................... 6

22 U.S.C. § 10101 .................................................................................................... 6

50 U.S.C. § 1701 ...................................................................................................... 6

50 U.S.C. § 3341(b)(2) ............................................................................................. 7

## RULES

Fed. R. App. P. 29(a)(4) ............................................................................................ 27

Fed. R. App. P. 29(a)(4)(E) ......................................................................................... 1

Local Civil Rule 7(o) .................................................................................................. 1

## OTHER AUTHORITIES

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563
    (1st ed. 1833) ................................................................................................ 8, 15

After Rescinding Paul, Weiss Order, The Hill (Mar. 21, 2025, 1:17 PM),
    https://thehill.com/homenews/administration/5207675-trump-paul-weiss-law-firm-deal .. 23

Brett Samuels, *Trump Suggests Law Firms 'Want to Make Deals' After Rescinding Paul,
    Weiss Order*, The Hill (Mar. 21, 2025, 1:17 PM),
    https://thehill.com/homenews/administration/5207675-trump-paul-weiss-law-firm-deal
    [https://perma.cc/5HMT-2RTL]; ...................................................................... 23

Exec. Order No. 9835, 12 Fed. Reg. 1,935 (Mar. 21, 1947) ...................................... 18

Exec. Order No. 13928, § 1(a)(i), 85 Fed. Reg. 36,139 (June 11, 2020) .................... 12

Exec. Order No. 14203, 90 Fed. Reg. 9,369 (Feb. 6, 2025) ........................................ 6

Exec. Order No. 14237, 90 Fed. Reg. 13,039 (Mar. 14, 2025) .................................. 10

Exec. Order No. 14246, 90 Fed. Reg. 13,997 (Mar. 25, 2025) ............................. 10, 23

Exec. Order No. 14250, 90 Fed. Reg. 14,549 (Mar. 27, 2025) .................................. 10

Exec. Order No. 14263, 90 Fed. Reg. 15,615 (Apr. 9, 2025) ............................ 2, 5, 24

Exec. Order. No. 14152, 90 Fed. Reg. 8,343 (Jan. 20, 2025) .................................... 10

F.J. Stimson, *The Constitution and the People's Liberties*, 184 N. Am. L. Rev. 508 (1907) ..... 17

Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of
    Attainder*, Just Sec. (Apr. 9, 2025), https://www.justsecurity.org/110109/president-
    cannot-issue-attainder-bills/ [https://perma.cc/BC4R-R36W] ...................................... 17, 18

Jacob Reynolds, The Rule of Law and the Origins of the Bill of Attainder Clause, 18 St.
    Thomas L. Rev. 177, 202 (2005) ...................................................................... 17

Kenneth Pickthorn, *Early Tudor Government: Henry VII* 119 (1934) ....................... 17

Laurence H. Tribe, *American Constitutional Law* 500 (1st ed. 1978) (quoting Note, *The Supreme Court, 1964 Term*, 79 Harv. L. Rev. 105, 121 (1965) ........................................ 18

Matthew Steilen, *Bills of Attainder*, 53 Houston L. Rev. 767 (2016).......................................... 17

Memorandum on Rescinding Security Clearances and Access to Classified Information from Specified Individuals, White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals [https://perma.cc/G9EF-4P77] ......................................................................... 10

Memorandum on Suspension of Security Clearances and Evaluation of Government Contracts, White House (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts [https://perma.cc/H8CP-28B9] ............................................................................. 9

Mike Scarcella, *Why Target These Law Firms? For Trump, It's Personal*, Reuters (Mar. 26, 2025, 6:10 PM), https://www.reuters.com/world/us/why-target-these-law-firms-trump-its-personal-2025-03-26 [https://perma.cc/RTS6-J5FC] ................................................... 23

The Federalist No. 69 (Alexander Hamilton) ................................................................................ 17

The Federalist No. 78 (Alexander Hamilton) (C. Rossiter ed. 1961) ........................................... 16

Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 The Historical J. 675 (1975) ...................................................................................................................... 17

## INTEREST OF AMICI CURIAE

Amici curiae ("Amici") are former national security, foreign policy, intelligence, legal, and other public officials who have worked on security matters at the most senior levels of the United States government for both Democratic and Republican Administrations.[1] Amici have held the highest security clearances and have devoted decades to combating the various national security threats that the United States faces in an increasingly dangerous and dynamic world. Collectively, Amici have worked in senior leadership positions in the Administrations of seven Presidents from both major political parties.[2]

Amici have devoted their careers across multiple decades to protecting the security of the United States. They write to provide their views regarding the unprecedented nature of the executive order under dispute in these proceedings. In particular, they write to express their shared view that the President's unprecedented executive orders against Susman Godfrey LLP ("Susman Godfrey") and other law firms are *ultra vires* because they are based on no valid national security concern, were issued without any colorable legal authority, and unconstitutionally interfere with the separation of powers.

As former national security policy and legal advisers, Amici regard the judiciary's traditional deference to the executive on matters of national security and foreign affairs as vital to the proper functioning of our government. That deference is a function of the executive's special

---

[1] A complete list of signatories can be found in the Appendix.

[2] In accordance with Local Civil Rule 7(o) and Federal Rule of Appellate Procedure 29(a)(4)(E), Amici state that no counsel for a party to this case authored this brief in whole or in part. Attorneys at Susman Godfrey LLP, Plaintiff in this case, filed a previous version of this brief in *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, No. 25 Civ. 917 (D.D.C.) (RJL); no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief in this matter; and no person other than counsel for amici curiae contributed money that was intended to fund preparing or submitting the brief in this matter. Plaintiff consents to Amici's filing of this brief, and Defendants do not oppose. Amici have concurrently filed a motion seeking the Court's leave to file this brief.

capacities and responsibilities when it comes to national security and foreign affairs, and of the "presumption of regularity" that courts indulge when reviewing executive actions generally. But in return for substantial deference to the executive on matters of national security, courts expect the executive to confine its invocations of that interest to circumstances that can reasonably be presumed to genuinely implicate national security. Precisely because judicial deference to the executive on legitimate matters of national security is so important, Amici urge that no such deference be afforded the President's attempt to invoke national security to justify this punitive, retributive, *ad hominem* order.

The Constitution did not make the President a king empowered to punish subjects arbitrarily based on animus or whim. Even setting aside the many constitutional rights violated by his order, the President possesses no general national security power that empowers him to sanction U.S. citizens or entities simply because they disagree with him. Nor does any Supreme Court decision or historical practice authorize the President to unilaterally issue punitive bills of attainder targeting American citizens or entities against whom he holds discriminatory animus. If national security considerations can justify this order, then national security could be invoked to justify any arbitrary executive act. Left undisturbed, this order will jeopardize the executive's ability to call for judicial deference in those cases where national security is genuinely implicated.

## SUMMARY OF ARGUMENT

On April 9, 2025, President Trump signed Executive Order 14263 "Addressing Risks from Susman Godfrey" ("the Order"). Alleging that Susman Godfrey has "spearhead[ed] efforts to weaponize the American legal system and degrade the quality of American elections" (§ 1), the Order purported to immediately suspend any active security clearances held by the firm's employees (§ 2), to require review for potential termination of all government contracts with Susman Godfrey or with those represented by the firm (§ 3), to limit the access of Susman Godfrey

employees to Federal buildings and their engagement with Federal employees when this would "threaten the national security of . . . the United States" or be "inconsistent with the interests of the United States" (§ 5), and to instruct federal agencies to refrain from hiring Susman Godfrey employees (§5).

In their decades of government service, Amici have never before seen or condoned an *ad hominem*, punitive, and retaliatory order of this kind, attacking and intimidating lawyers or a law firm on the basis of their lawful activities. This Order is unlike any Amici have encountered because it appears to be unprecedented in American history. For reasons well detailed in other briefs, this Order—along with similar executive orders targeting the law firms of Perkins Coie, Covington & Burling, Jenner & Block, WilmerHale and others—violates numerous constitutional rights guaranteed by the Bill of Rights, including under the First, Fifth, and Sixth Amendments.

But independent of these individual rights violations, the Court should hold this illegal Order void for two reasons rooted in the principles of separation of powers established by the United States Constitution. First, the President issued the Order *ultra vires*, without constitutional authority. By targeting specific American citizens and entities for retaliatory extrajudicial punishment, this Order exceeds any authority constitutionally entrusted to the President by Article II or properly delegated to the President by Congress under Article I. The Constitution does not grant the President any explicit or implicit constitutional authority to issue punitive orders of this kind. Nor has Congress passed any law expressly or impliedly authorizing the President to issue such an order. Historical practice and our experience confirm the President's lack of power to issue the Order. The Government cites no prior executive order that has ever singled out specific American citizens or entities for such retaliatory extrajudicial punishment—and we are not aware of any. This complete absence of historical precedent makes clear that the Order does not approach

3

the type of "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned" required before an executive practice "may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring).

Second, the Order violates fundamental separation-of-powers principles by unconstitutionally seizing the judicial role for the executive. Article III of the Constitution vests "[t]he judicial Power of the United States" in the courts, not the executive. But an order of this sort unconstitutionally installs the President as judge, prosecutor, and jury for individuals and institutions that have been neither charged with nor found guilty of any crime. By so doing, the Order violates the separation-of-powers principles underlying the Constitution.

The absolute prohibition against bills of attainder found in Article I of the Constitution reinforces this conclusion. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed . . . ."); U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder . . . ."). Those clauses explicitly forbid Congress and the President acting together, as well as the states, from passing laws that bypass judicial process to declare the guilt and punishment of named individuals. As the Framers well understood, the bill of attainder provisions guard against executive, no less than legislative, abuses—for it was precisely through bills of attainder that English kings often moved against their enemies. Both this Nation's legal tradition and common sense demonstrate that if the President could not constitutionally issue a bill of attainder against Susman Godfrey when acting together with Congress, then surely he lacks the constitutional power to issue the same bill of attainder when acting alone. By its structure and text, the Constitution protects both natural persons and legal persons from a President who attempts to usurp the power of the judiciary. This Order flagrantly violates these core constitutional principles.

4

## ARGUMENT

I.  **THE ORDER IS SUPPORTED NEITHER BY AN ACT OF CONGRESS NOR BY THE INHERENT POWERS OF THE PRESIDENT.**

In Amici's experience, the President does not possess unconstrained discretion under the Constitution to issue executive orders. To the contrary, the Supreme Court has made clear as "a statement of black letter law," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188 (1999), that presidential power to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585 (majority opinion).

Executive Order 14263 begins and ends with a generic assertion of executive power: "By the authority vested in me as President by the Constitution and the laws of the United States of America . . . ." Exec. Order No. 14263, 90 Fed. Reg. 15,615, 15,615 (Apr. 9, 2025). But the President has cited no specific "laws of the United States" authorizing Executive Order 14263— because there are none. Thus, the constitutionality of the Order must turn entirely on whether it can be said to "stem . . . from the Constitution itself." *Youngstown*, 343 U.S. at 585. Significantly, the Order fails to identify any particular constitutional provision justifying the assertion that the Order was issued pursuant to "authority vested in me as President." To the contrary, the text and structure of the Constitution, long-settled Supreme Court case law, and past historical practice all make clear that the President possesses *no* constitutional authority to sanction individuals simply because they disagree with him.

A.  **The Order Is Not Authorized by Any Act of Congress.**

The Order nowhere cites any act of Congress as authority to punish U.S. citizens or entities at the President's unfettered discretion. To be sure, Congress has, in a number of laws, established economic sanctions regimes that permit the executive to freeze or block assets of individuals or

entities in furtherance of national security or foreign policy goals.[3] In other recent executive orders, President Trump has cited such congressional enactments as claimed authority for his actions. *See, e.g.*, Exec. Order No. 14203, 90 Fed. Reg. 9,369 (Feb. 6, 2025) (invoking IEEPA and other statutes to impose sanctions on the prosecutor of the International Criminal Court). The President's failure to cite any statutory basis in the Order speaks volumes: "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. Congress has never authorized the President to single out a U.S. citizen or entity for punishment in this manner, without due process or even reasoned explanation. Nor could it do so without running afoul of the constitutionally mandated separation of powers and the Constitution's absolute prohibition against bills of attainder, as further discussed below.

    With respect to the Order's purported immediate suspension of security clearances, the President has acted not only without congressional authority, but in contradiction to it. In Amici's experience, security clearances can be revoked solely based on a "[p]redictive judgment" that compelling national security interests necessitate a specific revocation for a particular individual, as determined by officials "with the necessary expertise in protecting classified information"—

---

[3] *See, e.g.*, International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1702 (granting the President broad authority to impose economic sanctions when necessary "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat"); Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901–1908 (authorizing the President to deny "foreign narcotics traffickers, their organizations, and the foreign persons who provide support to [them], whose activities threaten the national security, foreign policy, and economy of the United States" access to the United States financial system and prohibit their dealing with United States persons); Global Magnitsky Human Rights Accountability Act, 22 U.S.C. §§ 10101–10103 (2016) (authorizing the President to impose economic sanctions and visa ineligibility on foreign persons who have violated human rights).

never as a form of punishment. *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). Congress reaffirmed this point by specifically directing the President to select a single entity to "develop[] and implement[] uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of security clearances and determinations for access to highly sensitive programs"—a directive that is not compatible with decisionmaking based on the arbitrary or retaliatory whims of any Executive Branch official. 50 U.S.C. § 3341(b)(2). Indeed, this settled practice is reflected in prior Executive Order 12968, which requires that any decision to grant or deny access to classified information be "based on judgments by appropriately trained adjudicative personnel." 60 Fed. Reg. 40,245, 40,250 (1995). The Order's directive to immediately suspend security clearances through a blanket decree directed at an entire class of people without process contravenes this settled practice. Mass punishment of unspecified individuals is contrary to the statutory scheme for the orderly revocation of security clearances. Acting contrary to the express will of Congress, the President's authority is at its "lowest ebb" in issuing the Order. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

To be sure, courts cannot review the substance of security clearance determinations made through proper channels. *Egan*, 484 U.S. at 527–30. However, courts can review procedural irregularities and actions that fall outside the proper clearance process. *See Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012) (distinguishing between unreviewable "expert, predictive judgement[s]" about security clearances and reviewable actions that were "categorically unlike the predictive judgment made by 'appropriately trained adjudicative personnel'" (citing Exec. Order No. 12968, 60 Fed. Reg. 40,245, 40,250 (Aug. 2, 1995))); *see also El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) (noting that "Article III courts have jurisdiction to hear constitutional claims arising from the clearance revocation process, even though the merits of that

revocation cannot be reviewed") (citation omitted). Here, the Order bypasses the established administrative process entirely, unlike the security clearance decision in *Lee v. Garland*, 120 F.4th 880, 886–88 (D.C. Cir. 2024) (holding nonjusticiable a Title VII challenge to a security clearance revocation where proper administrative procedures were followed, and expert judgment was exercised based on specific security concerns).

**B.    The Order Is Not Authorized by the President's Inherent Constitutional Powers.**

Absent congressional authorization, a valid executive order must derive from the President's constitutional powers. Significantly, however, the Order cites no explicit constitutional authority. Nor does the Order find support within the established boundaries of inherent presidential authority. The Supreme Court has recently indicated that the "core constitutional powers," for which the President's authority "is sometimes 'conclusive and preclusive,'" include the power to pardon, to appoint and remove executive officials, and to make certain foreign policy and national security determinations. *Trump v. United States*, 603 U.S. 593, 606–609 (2024) (quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)). None of these core powers is relevant here. In Amici's experience, lawful national security orders must identify at least one *bona fide*, documented national security threat—but this Order identifies none. Nor is the Order authorized by any of the President's implied "incidental powers." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563 (1st ed. 1833)). The Court has made clear that these incidental powers include only the necessary extensions of the "functions, which are confided to" the President by the Constitution, *id.*, and do not permit encroachments into entirely new fields. Acts that are "manifestly or palpably beyond [presidential] authority" fall beyond the "outer perimeter" of the President's constitutional and statutory duties. *Trump*, 603 U.S. at 618.

No reasonable extension of the President's core constitutional powers—over pardons, appointments and removal, and foreign affairs and national security determinations—empowers the President to impose the punishments found in Executive Order 14263. Instead, the Order is replete with the types of vague and flexible executive allegations, unsupported by evidence, that can vary with "mood or political philosophy," making them "weapons which can be made as sharp or as blunt as the occasion requires." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 176 (1951) (Douglas, J., concurring). The Order thus deserves no legal force, because it is an *ultra vires* assertion of presidential authority entirely lacking foundation in either constitutional structure or text.

### C. The Lack of Historical Precedent for This Order Further Demonstrates That It Is Without Constitutional Authority.

In the nearly two-and-a-half centuries since the founding of our Republic, no previous President has issued an executive order targeting named U.S. entities or citizens for retaliatory punishment. Indeed, the only apparent parallels to this Order are President Trump's own recent actions to strip security clearances and impose punitive sanctions against his perceived enemies. To date, President Trump's targets have included (a) the Covington & Burling law firm for representing Special Counsel Jack Smith, who investigated the President's role in the January 6, 2021 Capitol demonstrations and the storage of classified presidential documents at his private home;[4] (b) the Perkins Coie law firm, for representing Hillary Clinton during her 2016 presidential campaign, working with George Soros, and bringing voting-rights challenges disfavored by the Trump Administration, Exec. Order No. 14230, 90 Fed. Reg. 11,781 (Mar. 6, 2025); (c) the Paul,

---

[4] Memorandum on Suspension of Security Clearances and Evaluation of Government Contracts, White House (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts [https://perma.cc/H8CP-28B9].

Weiss law firm for hiring an attorney who President Trump claimed in the order had joined the Manhattan District Attorney's Office "solely to manufacture a prosecution against [Trump]," and for also having a partner who worked with "Special Counsel Robert Mueller" and "brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021," Exec. Order No. 14237, 90 Fed. Reg. 13,039 (Mar. 14, 2025); (d) the Jenner & Block law firm, for its pro bono work and for hiring Mueller Special Counsel Team member Andrew Weissman, Exec. Order No. 14246, 90 Fed. Reg. 13,997 (Mar. 25, 2025); (d) the WilmerHale law firm, for hiring Special Counsel Mueller and Team members Aaron Zebley and James Quarles, Exec. Order No. 14250, 90 Fed. Reg. 14,549 (Mar. 27, 2025); (f) individual lawyers, such as Mark Zaid and Norman Eisen, for having brought litigation against the Trump Administration, as well as former President Joseph R. Biden, members of his cabinet, and the two Republican members of the January 6th Congressional Commission;[5] (g) 51 named former intelligence officials, for issuing a letter "discrediting the reporting that President Joseph R. Biden's son had abandoned his laptop at a computer repair business," Exec. Order. No. 14152, 90 Fed. Reg. 8,343 (Jan. 20, 2025); and (h) former Trump National Security Advisor John Bolton, for writing an unflattering memoir, *id*.

Apart from these and similar orders issued by President Trump in his second Administration, so far as Amici are aware, no other President has issued even one punitive executive order that specifically sanctions a U.S. citizen or entity by name for past acts—and the Government has cited none.

---

[5] Memorandum on Rescinding Security Clearances and Access to Classified Information from Specified Individuals, White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals [https://perma.cc/G9EF-4P77].

To be sure, Presidents have exercised authority delegated by Congress to take actions against individuals whose actions pose national security or foreign policy dangers. *See, e.g.*, *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014). *Al-Aulaqi* was a challenge to the placing of a terrorist operational leader with U.S. nationality on a military "kill list." *Id*. at 59–60, 81. Unlike here, that targeting was authorized by the President's military authorities under the Constitution and a statutory Authorization for the Use of Military Force (AUMF)—not as punishment for past acts, but as part of military operations conducted overseas against ongoing terrorist threats. In that different context, the court noted, "the judiciary has an exceedingly limited role" owing to the "delicate area of warmaking, national security, and foreign relations." *Id*. at 78; *see also Amiri v. Kelly*, No. 17 Civ. 12188, 2018 WL 623652, *5–10, *13 (E.D. Mich. Jan. 30, 2018) (rejecting a challenge by two non-citizens to their listing on the "no-fly list," where, unlike here, the listing was explicitly authorized by Congress through the Intelligence Reform and Terrorism Prevention Act of 2004 and grounded in the President's constitutional military authority).

As noted above, Presidents have also exercised authority delegated by Congress to impose economic sanctions or entry restrictions on foreign actors, particularly those outside of the United States. These sanctions against foreign actors and their supporters offer no precedent for this Order. First, these sanctions do not typically raise the same separation-of-powers concerns because they are explicitly authorized by Congress. *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) ("When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case, the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'") (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Second, to the extent that the

sanctioned parties are not U.S. persons or entities, the Supreme Court has found that regulations targeting foreign adversaries may be subject to different kinds of constitutional scrutiny. *See, e.g.*, *TikTok v. Garland*, 145 S. Ct. 57, 66 (2025) (explaining that the TikTok ban's "focus on a foreign government," which is in a "congressionally determined adversary relationship" with the United States, "impact[s] whether First Amendment scrutiny applies").

In short, there is no suggestion—nor could there be—that the Order here rests upon any such congressionally-authorized sanctions regime. Indeed, those statutory schemes rarely target persons or entities by name. Instead, they target *categories* of actors who share certain threatening attributes that warrant sanctioning on national security or foreign policy grounds. They then delegate to expert agencies the responsibility to identify through reasoned administrative process the specific individuals who exhibit those sanctionable attributes. *See, e.g.*, Exec. Order No. 13694, § 1(a), 80 Fed. Reg. 18,077 (Apr. 1, 2015) (sanctioning persons "determined by the Secretary of the Treasury" to be involved in certain categories of malicious cyber conduct); Exec. Order No. 13928, § 1(a)(i), 85 Fed. Reg. 36,139 (June 11, 2020) (sanctioning persons "determined by the Secretary of the State" to have certain relationships to the International Criminal Court).

The Supreme Court has explained that "'[p]erhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it." *Seila Law LLC v. CFPB*, 591 U.S. 197, 220 (2020) (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010)); *see also Luis v. United States*, 578 U.S. 5, 29 (2016) (Thomas, J., concurring) (concluding, in a case involving "[p]retrial freezes of untainted forfeitable assets, that such asset freezes "did not emerge until the late 20th century," and that "'the lack of historical precedent' for the asset freeze here is '[p]erhaps the most telling indication of a severe constitutional problem'" (citations omitted)). In *Medellín v. Texas*, the Court similarly ruled that the President lacked

constitutional authority to direct state courts to reopen final criminal judgments in order to give effect to a decision of the International Court of Justice, citing the "unprecedented" nature of the presidential directive at issue to confirm its unlawfulness. 552 U.S. 491, 505, 532 (2008). Although the Court has recognized that "'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II,'" *Dames & Moore*, 453 U.S. at 686 (quoting *Youngstown*, 343 U.S. at 610–11 (Frankfurter, J., concurring)), it has never given similar deference to entirely novel executive acts, unblessed by Congress and undertaken without consulting Congress, such as the Order at issue here.

In Amici's experience, this Order is not only unprecedented, but actually *defies* the historical precedents on which this Country was founded—precedents which all prior Presidents have sought to honor. To allow the President to use unilateral executive orders to serially punish his domestic political opponents would defy the spirit of the Declaration of Independence, which expressly condemned the King for "establishing . . . an Arbitrary government," by *inter alia,* "taking away our Charters," "depriving us in many cases, of the benefits of Trial by Jury" and "destroy[ing] the lives of our people." U.S. Dec. of Ind. (1776). To permit such an order to stand would likewise undermine the fundamental purposes of the Constitution: to "establish Justice, . . . and secure the Blessings of Liberty." U.S. Const., pmbl.

## II.    THE ORDER UNCONSTITUTIONALLY VIOLATES THE SEPARATION OF POWERS BY USURPING THE POWER OF THE JUDICIARY.

### A.    The Order Violates the Separation of Powers by Intruding on the Exclusive Authority of the Judicial Branch.

The Order is unconstitutional not simply because there is no Executive authority for it, but also because it attempts to usurp the authority of the Judicial Branch. As the Supreme Court has made clear, "[i]f there is a principle in our Constitution . . . more sacred than another, it is that

13

which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (cleaned up); *see also id.* at 293 ("The doctrine of the separation of powers was adopted by the Convention of 1787 . . . to preclude the exercise of arbitrary power" and "to save the people from autocracy"). In constructing a constitutional system of separation of powers, the Framers took pains not to "concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). But this Order unconstitutionally installs the President as prosecutor, judge, and jury, levying retaliatory punishment against individuals and institutions who have been neither charged with nor found guilty of any crime. By placing the President into all three roles simultaneously, the Order circumvents the core mandate in Article III of the Constitution: that the "judicial Power of the United States" be vested in the federal courts, not the President. U.S. Const. art. III, § 1. To enforce the Order would both intrude executive power into the exclusive zone of a coordinate branch and condone a "severe impairment of the judicial function." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544–46 (2001).

In Amici's experience, the judiciary—*not* the president or executive officials—also possesses the expertise and unique constitutional authority to regulate the conduct of attorneys throughout legal proceedings. As the Supreme Court held more than a century ago, the "admission [of officers of the court] or their exclusion is . . . the exercise of *judicial power.*" *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378–79 (1866) (emphasis added). That power, which "includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process,'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citation omitted), falls outside the executive function. The President may not unilaterally decide to seize the judiciary's prerogative to evaluate and discipline the conduct of lawyers engaged in lawful practice. Only the courts have the constitutional power to "decide and pronounce a judgment and carry it into effect between persons

and parties who bring a case before it for decision," *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (citation omitted). To enforce this Order would be to disregard entirely the settled separation-of-powers and due-process norms that our "informed, independent judiciary" ensures. *Velazquez*, 531 U.S. at 545.

### B.    The Order Also Violates the Separation of Powers by Functioning as a Bill of Attainder.

#### 1.    The Prohibition on Bills of Attainder Constrains Usurpation of Judicial Authority.

The Constitution does more than enshrine a general principle of separation of powers. Through the Constitution's Bill of Attainder Clauses, the Framers expressed their particular concern that the other branches may seek to usurp judicial functions. The Constitution's Bill of Attainder Clauses evidence the Framers' *particular* concern that the other branches may seek to usurp the judicial function. *See* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1338 (1st ed. 1833) (noting that in bill of attainder cases "the legislature assumes judicial magistracy"). The fact that the Order takes the form of a bill of attainder thus further underscores that the President has unlawfully violated the separation of powers by intruding upon the authority of the judicial branch.

The prohibition against bills of attainder holds such importance in our constitutional structure that it is enshrined in the Constitution not once, but twice. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed [by the Congress]"); U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder . . . ."); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 469 (1977) (explaining that the prohibition on bills of attainder "[i]s an important ingredient of the doctrine of 'separation of powers,' one of the organizing principles of our system of government"); *United States v. Brown*, 381 U.S. 437, 441 (1965) (highlighting that the clauses prohibiting bills of attainder "were adopted by the Constitutional Convention unanimously, and without debate").

The Constitution's absolute ban on bills of attainder reflects the Framers' profound concern with preventing the government from "singling out disfavored persons and meting out summary punishment for past conduct." *Lynce v. Mathis*, 519 U.S. 433, 440 n.12 (1997) (citing *Brown*, 381 U.S. at 456–62). Article III grants "the judicial power of the United States" exclusively to the federal courts to safeguard litigants' "right to have claims decided before judges who are free from potential domination by other branches of government." *United States v. Will*, 449 U.S. 200, 218 (1980); *see also Thomas v. Union Carbide Agric. Prods. Co.* 473 U.S. 568, 582–83 (1985) (noting Article III's requirements of judicial independence).

The core evil inherent in bills of attainder is that they *bypass judicial processes* to directly target and punish specific individuals or groups without the due process required by law. *Cf. Cummings v. Missouri*, 71 U.S. 277, 323 (1866) (explaining that bills of attainder violate the separation of powers by allowing Congress to "*exercise[] the powers and office of judge*" and "assume[] . . . judicial magistracy . . . ." (emphasis added)). In contrast to the judiciary, the political branches are "not so well suited . . . to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." *Brown*, 381 U.S. at 445. Whether it is the executive or the legislative branch that infringes upon judicial authority, the consequence is the same: the judicial role is usurped. As Hamilton cautioned in Federalist No. 78, "[t]here is no liberty if the power of judging be not separated from the legislative *and the executive* powers." The Federalist No. 78, at 466 (Alexander Hamilton) (C. Rossiter ed. 1961) (emphasis added) (quoting Montesquieu, *The Spirit of Laws* 152 (Thomas Nugent trans., Hafner Publ'g Co. 1949) (1748)).

The Constitution's absolute prohibition against bills of attainder serves to prevent the political branches from "pronounc[ing] upon the guilt of the party, without any of the forms or

safeguards of trial" to stifle political opponents. *Cummings*, 71 U.S. at 323. Indeed, for the English monarchs, bills of attainder had long served as a favored tool for dispatching perceived enemies of the Crown while dispensing with the rigors of judicial trial. Henry VIII, for instance, together with his Parliament, attainted 130 persons, most of them (96) for treason. Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 The Historical J. 675, 701 (1975). These troubling historical episodes "were surely on the minds of the delegates at the [Constitutional] [C]onvention." Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 St. Thomas L. Rev. 177, 202 (2005).

By placing the Bill of Attainder Clauses in Article I, the Framers clearly did not intend to authorize the President to do alone what Congress and the President, acting together, could not. In the three hundred years preceding the American Revolution, the King, acting alone, could not pass a bill of attainder. By the late fifteenth century, it was settled that "the consent of both branches of Parliament was requisite" to issue a bill of attainder. Kenneth Pickthorn, *Early Tudor Government: Henry VII* 119 (1934). The House of Lords had, for example, refused to pass a bill of attainder introduced by Henry VIII until Sir Thomas More was removed from the list of those attained. *See* Matthew Steilen, *Bills of Attainder*, 53 Houston L. Rev. 767, 799–801 (2016). Thereafter, "an Executive Bill of Attainder . . . was hardly, if at all, attempted by the Stuart Kings." F.J. Stimson, *The Constitution and the People's Liberties*, 184 N. Am. L. Rev. 508, 512 (1907). The Framers would have rebelled at the notion that the President would possess a power denied to the British King. *See, e.g.*, The Federalist No. 69 (Alexander Hamilton) (declaring that the President's authority would be "in substance much inferior to" "that of the king of Great Britain"); Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Sec. (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-

bills/ [https://perma.cc/BC4R-R36W]. It strains credulity to suggest that by choosing to place the Bill of Attainder Clauses in Article I, the Framers intended to grant the President a power that even King George III did not possess.

The Constitution's structure reinforces this understanding. Legislation is enacted not by Congress alone, but becomes legally effective only when signed into law by the President pursuant to Article I's presentment requirement. U.S. Const. art. I, § 7, cl. 2. If the President cannot issue a bill of attainder when acting together with Congress, then surely he lacks the power to unilaterally issue the same bill of attainder by executive order. As the Supreme Court emphasized in *Cummings*, the "inhibition [on bills of attainder is] levelled at the *thing*, not the name"; "what cannot be done directly cannot be done indirectly." 71 U.S. at 325 (emphasis added). Therefore, "the ban of bills of attainder is best understood 'not to prohibit trial by a particular *body* but rather to prohibit trial by legislative *method* . . . .'" Laurence H. Tribe, *American Constitutional Law* 500 (1st ed. 1978) (quoting Note, *The Supreme Court, 1964 Term*, 79 Harv. L. Rev. 105, 121 (1965) (calling this the "more fundamental reason" why the constitutional ban on bills of attainder extends to the executive)).

Supreme Court Justices have echoed this sentiment. During the McCarthy era, in *Joint Anti-Fascist Refugee Committee v. McGrath*, the Court reviewed challenges to executive actions involving named organizations and individuals designated as Communist by a "Loyalty Review Board." 341 U.S. 123 (1951). This Board, established by President Truman under Executive Order 9835, had authority to remove government employees upon findings of disloyalty. *Id*. at 125; Exec. Order No. 9835, 12 Fed. Reg. 1,935 (Mar. 21, 1947). Although the *McGrath* Court did not rule on whether the Loyalty Board's determinations constituted unconstitutional bills of attainder, Justice

Black's powerful separate opinion condemned the determinations on precisely that basis. *See McGrath*, 341 U.S. at 126, 143–45 (Black, J., concurring).

After reviewing the text and constitutional history, Justice Black noted that the Framers "wisely withheld authority" for the political branches to issue "condemnations and blacklists as a substitute for imposition of legal types of penalties by courts following trial and conviction in accordance with procedural safeguards of the Bill of Rights." *Id.* at 144–45 (Black, J., concurring). It was unfathomable, Justice Black explained, that "the authors of the Constitution . . . inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the [legislative] bill [of attainder] such an odious institution." *Id.* at 144 (Black, J., concurring). Given that "officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder," the executive action was straightforwardly unconstitutional. *Id.* (Black, J., concurring).

In a second Loyalty Review Board case, *Peters v. Hobby*, both Justices Black and Douglas filed separate concurrences arguing that the Court should have addressed whether the Loyalty Board's orders constituted unconstitutional bills of attainder. 349 U.S. 331, 349–50 (1955) (Black, J., concurring); *id.* at 350–52 (Douglas, J., concurring). Justice Black argued that the Loyalty Board's orders "look[ed] more like legislation" than "properly authorized regulations to carry out a clear and explicit command of Congress." *Id.* at 350 (Black, J., concurring). Justice Douglas found the legislative nature of the orders problematic because had Congress rather than the Loyalty Board "condemned" the petitioner and "made [him] ineligible for government employment," it would clearly be an unconstitutional bill of attainder. *Id.* at 352 (Douglas, J., concurring). Like Justices Black and Douglas, the Seventh Circuit has acknowledged that the Bill of Attainder Clause may constrain executive actions. Because "an argument can be made for analyzing each case

*functionally* rather than structurally," the court reasoned, executive policies functionally equivalent to legislative enactments should be subject to bill of attainder analysis. *Dehainaut v. Pena*, 32 F.3d 1066, 1071 (7th Cir. 1994) (emphasis added).[6]

> **2.      The Order Functions as an Unlawful Bill of Attainder.**

The Framers likely did not foresee that a president would attempt to retaliate against perceived enemies through punitive executive orders. But history and precedent make clear that the constitutional bars against bills of attainder equally forbid executive orders that stand in for law. For a law to be prohibited as an unlawful bill of attainder it must "(1) appl[y] with specificity, and (2) impose punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998)) (cleaned up). Both prongs are straightforwardly satisfied by the Order challenged here.

---

[6] Other lower courts have left open the question of whether the constitutional prohibition on bills of attainder extends to the executive. *See, e.g.*, *Paradissiotis v. Rubin*, 171 F.3d 983, 988–89 (5th Cir. 1999); *Scherer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 n.9 (11th Cir. 2008); *Walmer v. U.S. Dept. of Defense*, 52 F.3d 851, 855 (10th Cir. 1995); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb*, Civ. Action No. 98–0949, slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd* 221 F.3d 195 (D.C. Cir. 2000). Two circuit courts have declined to apply the Bill of Attainder Clause to executive actions, but did not address the question of whether a particular executive action violated the separation of powers. *See Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966) ("[T]he fact that [a state agency's black book and accompanying letter] were not legislative acts deprives them of status as bills of attainder in the constitutional sense."); *cf. Korte v. Off. of Personnel Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986) (although the bill-of-attainder question was not dispositive, the court suggested that "[t]he clause is a limitation on the authority of the legislative branch . . . we are aware of [no authority] holding that the clause applies to the executive branch"). A handful of district courts have suggested, with similarly scant analysis, that the prohibition on bills of attainder is limited to the legislature. *See Al-Aulaqi*, 35 F. Supp. 3d at 82; *Kovac v. Wray*, 2020 WL 6545913, at *3 (N.D. Tex. Nov. 6, 2020); *Davies v. Young*, 2013 WL 5450308, at *12 (D. Colo. Sept. 30, 2013); *Amiri v. Kelly*, 2018 WL 623652, at *13 (E.D. Mich. Jan. 30, 2018); *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 184 (E.D.N.Y. 2000); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 42 (D.D.C. 2012); *cf. Garner v. Jones*, 529 U.S. 244 (2000) (finding that an action taken by the Executive Branch constituted a violation of the Bill of Attainder Clause's textual neighbor in Art. I, § 10, the Ex Post Facto Clause).

First, the Order specifically names and imposes punishment on Susman Godfrey without judicial trial: the Order "singles out a person or class by name" no fewer than seventeen times, including in its title. *Hettinga v. United States*, 677 F.3d 471, 477 (D.C. Cir. 2012) (citing *Foretich*, 351 F.3d at 1217).

Second, the Order clearly inflicts "punishment" under the tests set forth by the Supreme Court in *Nixon v. Administrator of General Services*, 433 U.S. 425, 473–78 (1977). The Order plainly "falls within the historical meaning of legislative punishment." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). The Order "mark[s] . . . with . . . infamy or disloyalty," *Foretich*, 351 F.3d at 1219, when it characterizes Susman Godfrey as engaging in "egregious conduct" and "activities inconsistent with the interests of the United States." Exec. Order 14263, § 1. This type of public denunciation of loyalty and trustworthiness parallels the loyalty tests that the Supreme Court has consistently found problematic in bill-of-attainder cases. *See, e.g.*, *Ex parte Garland*, 71 U.S. (4 Wall.) at 380–81 (invalidating a federal statute requiring attorneys to take a loyalty oath to practice in federal courts); *Cummings*, 71 U.S. at 330–32 (invalidating a state constitutional provision requiring a loyalty oath from clergymen); *United States v. Lovett*, 328 U.S. 303, 315–16 (1946) (invalidating a congressional appropriations act provision prohibiting any future payment of salaries to three named government employees alleged to have been subversive).

In addition, the Order constructs "bars to participation by individuals or groups in specific employments or professions," *Selective Serv. Sys.*, 468 U.S. at 852, by directing agency heads to "take appropriate steps to terminate any contract" with Susman Godfrey, directly harming the firm's ability to engage in government legal work. Exec. Order 14263, § 3(b)(i). By instructing agency officials to "refrain from hiring employees of Susman" and to "provide guidance limiting

official access from Federal Government buildings to employees of Susman," *id.* § 5, the Order creates substantial barriers to the firm's practice in areas involving federal agencies, similar to the attorney exclusions invalidated in *Ex parte Garland*, 71 U.S. at 380–81. And the Order expressly aims punishment not just at Susman Godfrey as a corporate entity, but at individuals *within* Susman Godfrey, specifically calling for barring individual attorneys from federal buildings, prohibiting their communication with federal employees, and limiting their possible future employment by the federal government—affecting their personal professional standing and opportunities. *Cf. Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 461 (D.C. Cir. 2018) ("[W]e do not foreclose the possibility that Congress could impose a brand of infamy or disloyalty upon a corporation that would rise to the level of legislative punishment.").

Nor can "the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably . . . be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76. Meeting this exception would require a factual showing "not [of] some *conceivable* nonpunitive purpose, but rather an *actual* nonpunitive purpose." *Kaspersky*, 909 F.3d at 456 (citing *Foretich*, 351 F.3d at 1223) (emphasis added). The Order itself offers no evidence that the prohibitions imposed are based on any valid or immediate national security concerns that Amici consider plausible. Instead, the Order lists a series of so-called allegedly "egregious" activities: representing and/or funding individuals and causes the President deems "inconsistent with the interests of the United States," and promoting diversity, equity, and inclusion in employment policies. As in *Cummings*, the challenged provisions do not explicitly "define any crimes, or declare that any punishment shall be inflicted," yet produce the exact results that would have occurred if such punishment had been declared. 71 U.S. (4 Wall.) at 327.

Third, President Trump has openly admitted that this and similar executive orders were motivated by a naked official intent to punish. *See Nixon*, 433 U.S. at 478; *Lovett*, 328 U.S. at 308–14; *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169–70 (1963). When asked about the intent of an essentially identical order targeting the Perkins Coie law firm, President Trump stated on March 25, 2025:

> "You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally? Are those the law firms you're talking about? . . . They're not babies. They're very sophisticated people. Those law firms did bad things. Bad things. They went after me for years."[7]

This admission proves that this Order, like the President's other recent executive orders targeting law firms, was explicitly personal and retaliatory: the President issued it to "go after" particular law firms in retaliation for the perception that they "went after [him] for years." But nothing in the Constitution empowers the President to weaponize executive orders to punish American citizens or business entities in order to exact revenge for perceived grievances. If the Executive Branch is to impose punishments, it must do so through the ordinary law enforcement process: not executive fiat, but indictment or charge, proofs and reasoned argument, conviction beyond a reasonable doubt by a jury of one's peers, and a sentence imposed by an independent federal judge. Because this Order includes none of these protections, it fundamentally violates the separation of powers established by the Constitution.

---

[7] Brett Samuels, *Trump Suggests Law Firms 'Want to Make Deals' After Rescinding Paul, Weiss Order*, The Hill (Mar. 21, 2025, 1:17 PM), https://thehill.com/homenews/administration/5207675-trump-paul-weiss-law-firm-deal [https://perma.cc/5HMT-2RTL]; *see also* Mike Scarcella, *Why Target These Law Firms? For Trump, It's Personal*, Reuters (Mar. 26, 2025, 6:10 PM), https://www.reuters.com/world/us/why-target-these-law-firms-trump-its-personal-2025-03-26 [https://perma.cc/RTS6-J5FC] (quoting the President calling Andrew Weissman, lead prosecutor on former Special Counsel Robert Mueller's team concerning the Trump campaign and Russia a "bad guy," just before signing Exec. Order No. 14246 concerning Weissmann's former law firm).

Finally, the fact that Susman Godfrey is not a natural person does not dispel the Order's illegality. The Supreme Court has twice suggested that the constitutional protection against bills of attainder is not confined to natural persons. *See South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (noting that the Bill of Attainder Clause covers "individual persons *and private groups*" (emphasis added)); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 n.9 (1995) (suggesting that the Bill of Attainder Clause's protections apply whenever a "single individual *or firm*" is targeted (emphasis added)). Every lower court to consider the issue has likewise held that "corporations . . . may not be singled out for punishment under the Bill of Attainder Clause . . . ." *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 349 (2d Cir. 2002) (citing *Nixon*, 433 U.S. at 468); *see also Kaspersky*, 909 F.3d at 454 ("[W]e shall continue to assume that the Bill of Attainder Clause extends to corporations."). Reinforcing this broader application, the Supreme Court has emphasized that the constitutional protection from bills of attainder "was intended not as a narrow, technical . . . prohibition, but rather as . . . a *general safeguard* . . . ." *Brown*, 381 U.S. at 442 (emphasis added). Where, as here, the punishment is targeted, extrajudicial, and arbitrary, it does not become lawful simply because the target of the sanction includes a legal person.

## CONCLUSION

Setting to one side the many other constitutional rights it violates, Executive Order 14263 is illegal because it functions as a bill of attainder in all meaningful respects. It lacks legal authority, specifically targets named individuals and entities for punishment without trial, lacks legitimate nonpunitive purpose, and stems from explicitly retaliatory intent. This is precisely the type of unconstitutional executive action prohibited by the separation-of-powers principles that animate the Bill of Attainder Clause.

Amici submit that there is no general national security power or statute that empowers the President to sanction U.S. citizens or entities simply because they disagree with him. The national

security policymakers among Amici would never have recommended that such an Order be imposed. If asked, the national security lawyers among Amici would have advised their clients that such an unprecedented executive order is illegal, because it was issued without colorable legal authority and in violation of the separation of powers. Nor do Amici know of any Supreme Court decision or historical practice that authorizes the President to issue such punitive *ad hominem* presidential actions against American citizens and entities against whom he seeks retribution.

When Amici served in the United States government, executive orders of this nature would have been viewed as unthinkable violations of their constitutional oath. Yet the repeated issuance in recent weeks of punitive executive orders against specific lawyers and law firms, with perhaps more to come, makes clear that this Administration will continue to levy such sanctions unless enjoined by the courts.

For all of the foregoing reasons, Amici submit that summary judgment should be granted in favor of the plaintiff Susman Godfrey in this case.

Dated: April 25, 2025                    Respectfully Submitted,

*/s/ Amy Jeffress*

Harold Hongju Koh*[8]

Peter Gruber Rule of Law Clinic[9]

Yale Law School

127 Wall Street, P.O. Box 208215

New Haven, CT 06520-8215

203-432-4932

harold.koh@ylsclinics.org

Amy Jeffress, Bar No. 449258

Joshua A. Matz, Bar No. 1045064

Trisha Anderson*

Carmen Iguina González, Bar No. 1644730

HECKER FINK LLP

1050 K Street NW, Suite 1040

Washington, DC 20001

(212) 763-0883

ajeffress@heckerfink.com

Matthew J. Craig*

Mack Jenkins*

HECKER FINK LLP

1150 S Olive St., Suite 10-140

Los Angeles, CA 90015

(212) 763-0883

mcraig@heckerfink.com

Sean Hecker*

Julie E. Fink*

Shawn G. Crowley*

Jenna M. Dabbs*

Kate L. Doniger*

Michael Ferrara, Bar No. NY0621

David Gopstein*

Marshall L. Miller, Bar No. NY0372*

David Patton*

John C. Quinn*

Gabrielle E. Tenzer*

HECKER FINK LLP

350 Fifth Avenue, 63rd Floor

New York, New York 10118

(212) 763-0883

shecker@heckerfink.com

**pro hac vice* or renewal application forthcoming

*Counsel for Amici Curiae*

---

[8] Law student interns Matthew Botvinick, Emily Elledge, Avi Gupta, Fred Halbhuber, Samantha Kiernan, Jake Mattis, Inbar Pe'er, Avi Siegal, and Brady Worthington contributed to this brief's drafting under supervision by counsel for Amici.

[9] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of Yale Law School or Yale University.

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of

LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not

exceed 25 pages in length.

 */s/ Amy Jeffress*
Amy Jeffress