## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

           Plaintiff,

      v.

EXECUTIVE OFFICE OF THE PRESIDENT, ET AL.

           Defendants.

Case No. 1:25-cv-01107-LLA

Hon. AliKhan

**BRIEF OF AMICI CURIAE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY, SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF TEACHERS, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, CENTER FOR CIVIL RIGHTS AND CRITICAL JUSTICE, RACE AND LAW CENTERS, AND CIVIL RIGHTS AND ADVOCACY ORGANIZATIONS IN SUPPORT OF PLAINTIFF**

Charlotte Garden*
University of Minnesota Law School†
Walter F. Mondale Hall
229 S. 19th Ave.
Minneapolis, MN 55455

Jeremiah Chin*
University of Washington School of Law†
William H. Gates Hall, Rm. 310
P.O. Box 353020
Seattle, WA 98195-3020

Jessica Levin*
Melissa Lee*
CENTER FOR CIVIL RIGHTS AND CRITICAL
  JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122

April 24, 2025

Jim Davy
D.D.C. Bar No. PA0117
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
215-792-3579
jimdavy@allriselaw.org

Robert S. Chang*
Susan McMahon*
THE FRED T. KOREMATSU CENTER FOR
  LAW AND EQUALITY
University of California–Irvine
401 E. Peltason Dr., Suite 1000
Irvine, CA 92697
(949) 824-3034
rchang@law.uci.edu

* *pro hac vice* applications forthcoming
† institutional affiliations listed for
  identification purposes only

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 7.5(e), counsel for Movants certifies that the Fred T. Korematsu Center for Law and Equality and other organizational amici are not publicly held corporations, do not have parent corporations, and that no publicly held corporation owns 10 percent or more of their stock.

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ..................................................................... i

Table of Authorities .................................................................................. iii

Introduction ............................................................................................. 2

Argument ................................................................................................. 5

I.    The Supreme Court has repeatedly held that the Government may not obstruct lawyers to deter challenges to government conduct. ........................... 5

    A.    Litigation is often expressive, and the First Amendment protects participants in litigation against government retaliation. ........................ 8

    B.    The First Amendment protects against disclosure requirements aimed at deterring association. .................................................. 10

II.    The Court should not defer to the Administration's casual invocation of national security to justify the EOs. .................................................. 13

    A.    *Korematsu* and the Guantanamo cases offer a cautionary lesson about judicial deference to unsubstantiated claims of national security. ........................................................................... 13

    B.    Judicial deference is unwarranted where the Government has failed to articulate even a plausible national security rationale .............. 19

Conclusion ............................................................................................... 20

Certificates ............................................................................................. 1a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ................................................................................ 11

*BE&K Constr. Co. v. NLRB,*
  536 U.S. 516 (2002) ............................................................................ 10, 12

*Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar,*
  377 U.S. 1 (1964) .................................................................................... 10

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ................................................................................ 17

*Boumediene v. Bush,*
  579 F. Supp. 2d 191 (D.D.C. 2008) .................................................... 16, 17

*Brown v. Board of Education,*
  347 U.S. 483 (1954) (*Brown I*) .............................................................. 5

*Brown v. Board of Education,*
  349 U.S. 294 (1955) (*Brown II*) ............................................................ 5

*Gibson v. Fla. Legis. Investigation Comm.,*
  372 U.S. 539 (1963) ................................................................................ 11

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ................................................................................ 16

*Hamdan v. United States,*
  696 F.3d 1238 (D.C. Cir. 2012) ............................................................. 16

*Hirabayashi v. United States,*
  828 F.2d 591 (9th Cir. 1987) ................................................................. 14

*In re Primus,*
  436 U.S. 412 (1978) ................................................................................ 10

*Korematsu v. United States,*
  323 U.S. 214 (1944) .................................................................................. 3

*Korematsu v. United States,*
  584 F. Supp. 1406 (N.D. Cal. 1984) ............................................... 3, 14, 15

*NAACP v. Alabama ex. rel Patterson,*
  357 U.S. 449 (1958) ................................................................................ 11

*NAACP v. Button,*
  371 U.S. 415 (1963) .......................................................................... 8, 9, 11

*NAACP v. Patty,*
  159 F. Supp. 503 E.D. Va. 1958) ............................................................. 5

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) .................................................................................. 4

*Scull v. Virginia ex rel. Comm. on Law Reform & Racial Activities,*
  359 U.S. 344 (1959) .................................................................................. 6

*Trump v. Hawaii,*
  585 U.S. 667 (2018) .................................................................................. 3

## TABLE OF AUTHORITIES—continued

**Page(s)**

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,
    389 U.S. 217 (1967) ......................................................... 9
*United Transp. Union v. State Bar of Mich.*,
    401 U.S. 576 (1971) ......................................................... 9

**Other Authorities**

1956 Va. Extra Session Acts 29–42 (chs. 31–37) .............................................. 6, 8, 11
ACLU Board Minutes (June 22, 1942) *microformed on* ACLU Microfilms, Reel 9 .... 2
Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of
    Brown v. Board of Education in Virginia* (2006) ...................................................... 7
Brief for the United States, *Korematsu v. United States*, 323 U.S. 214 (1944) ........ 15
Carol Rosenberg, *They Were Guantánamo's First Detainees. Here's Where They Are
    Now*, N.Y. Times, May 18, 2021 ........................................................... 15
Eugene Cook, Ga. Att'y Gen, The Ugly Truth About the NAACP, Address Before the
    55th Annual Convention of the Peace Officers Association of Georgia .................. 6
Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ....................................... 19
Katya Jestin, Co-Managing Partner, Jenner & Block LLP, Testimony Before U.S.
    Sen. Committee on the Judiciary, Closing Guantanamo: Ending Twenty Years of
    Injustice (Dec. 7, 2021) ............................................................... 18
Lorraine K. Bannai, *Enduring Conviction: Fred Korematsu and His Quest for
    Justice* (2015) .................................................................................. 2, 3
Matthew Goldstein, *Five More Big Law Firms Reach Deals with Trump*, N.Y.
    Times, April 12, 2025 ............................................................................. 7
*NAACP Suit Dismissal Is Sought*, Richmond News Leader, Mar. 16, 1957 .............. 6
Peter Irons, *Justice at War: The Story of the Japanese American Internment Cases*
    (1993) ......................................................................................... 2
Press Release, Haw. Dep't of the Att'y Gen., Hawaii Concludes Travel Ban Case
    (Aug. 13, 2018) ........................................................................... 3
Robert S. Chang, Alice Hsu, Robert A. Johnson, Elizabeth C. Rosen & Sofie Syed,
    *Stop Repeating History: The Story of an Amicus Brief and Its Lessons for
    Engaging in Strategic Advocacy, Coalition Building, and Education*, 68 Case W.
    L. Rev. 1223 (2018) ...................................................................... 3
Tr. of Oral Arg., *Boumediene v. Bush*, 553 U.S. 723 (2008) (No. 06-1195) ............... 17

## INTERESTS OF THE AMICI CURIAE

*Amici*[1] are Race and Law Centers from law schools across the country engaged in research, advocacy, and education regarding issues of race and the law; the Service Employees International Union (SEIU), which advances worker rights and has over 150 affiliates representing approximately two million members in healthcare, the public sector, and property services; the American Federation of Teachers (AFT), a union with more than 3,000 local affiliates nationwide and representing 1.8 million members who are America's educators, school and higher education staff, nurses, healthcare professionals, and public employees; the American Association of University Professors (AAUP), a membership association of faculty and academic professionals with chapters at colleges and universities throughout the country, which advances academic freedom and economic security of academic workers; and legal advocacy organizations dedicated to defending human and civil rights. *Amici* have a common interest in supporting the rule of law and upholding the Constitution and the liberties it protects.

*Amici* are also deeply familiar with the evils that can result when courts fail to check executive power and are committed to challenging executive overreach.

---

[1] Statements of interest for each signatory to this brief are set forth in the accompanying Motion for Leave to File Brief of Amici Curiae. *Amici* file this brief with the consent of the Parties. No Party or counsel for a Party authored this brief in whole or in part, or contributed money to its preparation.

## INTRODUCTION

When Fred Korematsu stood in the San Francisco federal district court in 1942 to challenge the constitutionality of a criminal charge that he had violated an exclusion order issued pursuant to Executive Order 9066, he was represented by pro bono counsel funded by the San Francisco office of the American Civil Liberties Union (ACLU).[2] But just four days after Fred's attorneys filed a motion to dismiss his criminal charges, ACLU director Roger Baldwin—wanting to avoid angering President Roosevelt—conveyed the "national board's decision to prohibit test cases from challenging Roosevelt's authority to issue Executive Order 9066."[3] Instead, local ACLU affiliates could "only argue that [General] DeWitt's orders were arbitrary because they did not except individuals who were loyal, they covered too wide an area, and they unlawfully discriminated against Japanese Americans."[4] For cases already filed, the national board "advised defendants … 'to arrange, if they desire, for counsel who will be free to raise other constitutional issues.'"[5]

In defiance of national ACLU's orders, Fred's pro bono counsel appealed his conviction, continuing to argue that the forced exclusion from their homes and incarceration of Japanese Americans in camps were unlawful exercises of executive

---

[2] Lorraine K. Bannai, *Enduring Conviction: Fred Korematsu and His Quest for Justice* 43 (2015).

[3] *Id*. at 59.

[4] *Id*. at 60.

[5] Peter Irons, *Justice at War: The Story of the Japanese American Internment Cases* 130 (1993) (citing ACLU Board Minutes (June 22, 1942) *microformed on* ACLU Microfilms, Reel 9).

power: "We undertook to defend Korematsu and we informed him before he accepted our help that in the event he was convicted, we would undertake an appeal, if necessary, because we regarded his as a test case."[6] Though the Supreme Court ruled against him in 1944, *Korematsu v. United States*, 323 U.S. 214 (1944), pro bono counsel again raised the failure of justice in his case in 1984—and this time, a federal court agreed, overturning Fred's wartime conviction, *Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984). The Supreme Court finally recognized this failure of justice when Chief Justice Roberts, in *Trump v. Hawaii*, declared that *Korematsu* had been overruled in the court of history, and that the Government's treatment of Fred had been "gravely wrong." 585 U.S. 667, 710 (2018).

Like Fred, countless others have depended on pro bono counsel to defend their constitutional rights.[7] But President Trump's recent Executive Orders targeting

---

[6] Bannai*, supra*, at 68. National ACLU eventually supported Fred's challenge, including submitting an amicus brief at the Supreme Court. Charles Horsky, a partner with Covington, Burling, Rublee, Acheson & Shorb (now Covington & Burling) argued for the ACLU, sharing argument time with Fred's attorney, Wayne Collins.

[7] In *Trump v. Hawaii*, the State of Hawaii was represented by Neal Katyal and his firm, with most of their services provided pro bono. Press Release, Haw. Dep't of the Att'y Gen., Hawaii Concludes Travel Ban Case (Aug. 13, 2018), https://ag.hawaii.gov/wp-content/uploads/2018/08/News-Release-2018-47.pdf. The children of the three men—Fred Korematsu, Minoru Yasui, and Gordon Hirabayashi—who challenged Exclusion Order 9066 during WWII filed amicus briefs supporting challenges to each iteration of the executive order travel ban. They were represented by pro bono counsel. *See* Robert S. Chang, Alice Hsu, Robert A. Johnson, Elizabeth C. Rosen & Sofie Syed, *Stop Repeating History: The Story of an Amicus Brief and Its Lessons for Engaging in Strategic Advocacy, Coalition Building, and Education*, 68 Case W. L. Rev. 1223, 1226-28 (2018).

Susman Godfrey ("Susman") and other law firms, Executive Orders 14230 (the "Perkins EO"), 14246 (the "Jenner EO"), 14250 (the "WilmerHale EO"), and 14,263 (the "Susman EO") (collectively, the "EOs"), aim to curtail firms' pro bono work when it conflicts with the Administration's policy goals. This violates the First Amendment rights of the firms and their clients. As the Supreme Court recently and unanimously held, "[a] government official can share her views freely and criticize particular beliefs . . . . What she cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

## ARGUMENT

*Amici* make two points. First, drawing on Southern states' massive resistance to school desegregation, they show that the EOs mirror earlier, unconstitutional attempts by governments to suppress disfavored legal arguments by targeting the lawyers who made them. Second, they sound a cautionary note about the Government's casual and unsupported invocation of national security to justify the substance of the executive orders, and they argue that the courts should not defer to the Executive branch without scrutinizing their claims.

## I.     The Supreme Court has repeatedly held that the Government may not obstruct lawyers to deter challenges to government conduct.

The EOs take more than one page from the massive resistance playbook that Southern states developed to hamstring the efforts of civil-rights groups and lawyers in their fight for racial equality. This playbook, developed in Virginia and other states in response to the Supreme Court's 1954 and 1955 decisions in *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*); 349 U.S. 294 (1955) (*Brown II*), involved labeling civil-rights groups as threats to public safety, targeting their operation under the guise of regulation of the legal profession, and undermining their funding through implied threats to their members.

In 1956, Virginia's General Assembly went into Extra Session to pass a set of bills to prevent school desegregation, which the Governor characterized as "a clear and present danger." *NAACP v. Patty*, 159 F. Supp. 503, 514 (E.D. Va. 1958) (quoting

Governor Stanley's address to the Assembly, opening the Extra Session).[8] Key to this effort were a set of bills designed to prevent the NAACP from filing new school desegregation cases in the state. These included two registration and disclosure measures, and several related measures on attorney licensing and the practice of law.[9] In the words of Delegate James M. Thomson—who later chaired the Assembly's Committee on Law Reform and Racial Activities—the "so-called NAACP laws"[10] would "bust that organization . . . wide open." *Scull v. Virginia ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 347 (1959) (quoting Thomson's testimony).

Much like Southern states aimed to interrupt school desegregation by targeting the lawyers and organizations bringing desegregation cases, the EOs state plainly that the named firms were targeted in part because the Government objects to their pro bono work, including civil rights litigation: Jenner's work on transgender rights and immigration; WilmerHale's work in immigration and election cases; and

---

[8] Southern public officials often invoked broad public-safety concerns to justify their refusals to desegregate or their opposition to the NAACP. In another representative example, Georgia's Attorney General claimed that the NAACP "has allowed itself to become part and parcel of the Communist conspiracy to overthrow the democratic governments of this nation and its sovereign states." Eugene Cook, Ga. Att'y Gen., The Ugly Truth About the NAACP, Address Before the 55th Annual Convention of the Peace Officers Association of Georgia 10, https://egrove.olemiss.edu/citizens_pamph/79/.

[9] *See* 1956 Va. Extra Session Acts 29–42 (chs. 31–37), https://babel.hathitrust.org/cgi/pt?id=uc1.d0000507608&seq=39.

[10] *E.g.*, *NAACP Suit Dismissal Is Sought*, Richmond News Leader, Mar. 16, 1957, at 2 (referring to "the so-called NAACP laws").

Perkins's advocacy against voter identification laws.[11] The Susman EO accuses the firm of "spearhead[ing] efforts to … degrade the quality of American elections," when in fact, their pro bono representation of public officials in the 2020 presidential election served to defend the integrity of that election. Pls.' Compl. ¶ 96, ECF 1. The EOs purport to respond to problems with how the named firms operate—specifically, that the firms have used impermissible methods of diversifying their workforces—similar to how Virginia and other Southern states nominally focused on the NAACP's client-recruitment practices.[12] And the EOs impose disclosure requirements designed to deter current or potential clients from working with the named firms in the future, echoing the Southern states' disclosure rules designed to deter NAACP membership, which was also the organization's main source of revenue.[13]

---

[11] Moreover, recently announced settlements between the Trump administration and other firms have included terms requiring those firms to perform substantial amounts of pro bono work of which the administration approves. *See, e.g.*, Matthew Goldstein, *Five More Big Law Firms Reach Deals with Trump*, N.Y. Times, April 12, 2025, at A12 (noting that the new deals, when combined with previous ones, resulted in "some of the biggest firms in the legal profession have agreed over the past month to provide a combined $940 million in free legal services to causes favored by the Trump administration, including ones with 'conservative ideals'").

[12] *Amici* do not argue that individual litigants or the government would be barred from enforcing employment discrimination laws through the usual channels. Instead, like accusations of barratry, accusations of employment discrimination can be strategically deployed as a facially plausible justification for government retaliation.

[13] *See* Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia* 63–65 (2006) (recounting that these measures caused the Virginia NAACP chapter to lose thousands of members, depleted its coffers, and diverted lawyers from desegregation cases).

This Court should hold that the EOs violate the speech and association rights of the firms and their clients—a result required by the First Amendment jurisprudence that emerged from the challenges to Southern states' interference with the NAACP's advocacy.

### A.    Litigation is often expressive, and the First Amendment protects participants in litigation against government retaliation.

In *NAACP v. Button*, the Court held that Chapter 33 of the 1956 Extra Session Acts of the General Assembly, which expanded Virginia's definition of "malpractice or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct" to include "improper solicitation of any legal or professional business,"[14] could not be applied to the NAACP's efforts to solicit clients willing to pursue school desegregation efforts. 371 U.S. 415, 419, 437 (1963). The Court emphasized that the First Amendment protects "vigorous advocacy," including litigation, particularly (though not exclusively) when it is used as "a form of political expression." *Id*. at 429. This was true precisely because litigation can be counter-majoritarian—politically powerless groups and individuals have often turned to the courts to protect them when the political process failed to do so. *Id*.. The *Button* Court emphasized that even potential infringements of the NAACP's advocacy were enough to violate the First Amendment: "It makes no difference whether such prosecutions or proceedings would actually be commenced. It is enough that a vague and broad statute lends itself to selective enforcement against unpopular causes." *Id.* at 435.

---

[14] 1956 Va. Extra Session Acts 34.

8

Importantly, the Court also rejected Virginia's argument that Chapter 33's application to NAACP lawyers was justified as an ordinary regulation of the practice of law. Here, it emphasized that the state had failed to state a specific interest in regulating the NAACP's conduct. That is, before it could interfere with litigation protected under the First Amendment, Virginia would have to make a record of "substantive evils flowing from [the NAACP's] activities." *Id.* at 444.

The *Button* Court did not suggest that its analysis was limited to the NAACP itself, or to groups that operated in a similar fashion. To the contrary, it observed that "a State cannot foreclose the exercise of constitutional rights by mere labels." *Id.* at 429. Subsequent cases confirm that one can change any number of variables about the NAACP's approach to litigation and get the same result under the First Amendment. For example, the Supreme Court has repeatedly recognized that unions use a range of methods to connect workers who get hurt on the job with lawyers who will help them pursue their rights under workers' compensation or other statutes— and all are protected by the First Amendment as expressions of the unions' political and moral commitments to workers' rights. *See United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 581 (1971) (finding injunction restricting union's facilitation of litigation by members violated First Amendment because it did not "relate specifically and exclusively to the pleadings and proof"); *id.* at 582–83, 584–85 (finding First Amendment protected union's right to recommend specific lawyers working on contingency basis to members pursuing claims under the Federal Employers Liability Act, and to transport members to and from lawyers' office); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 218, 225

(1967) (finding First Amendment protected union's choice to retain attorney on salary basis to represent members in workers' compensation claims); *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 8 (1964) (finding First Amendment protected union's practice of encouraging injured members to seek legal advice from specific counsel); *see also In re Primus*, 436 U.S. 412, 414, 439 (1978) (finding First Amendment protected client solicitation by lawyer working on behalf of ACLU). In other contexts, the Court has suggested that nearly *all* litigation may be protected under the First Amendment's petition clause, even if it does not have a political or ideological purpose. *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 531 (2002) (construing NLRA in light of First Amendment concerns and concluding that retaliatory litigation may be an unfair labor practice only if both brought for an unlawful purpose and objectively baseless).

This fundamental principle should control this case: the Government violates the First Amendment when it sanctions law firms because it objects to their choices about which causes to take up. The EOs rely on scattershot grievances about the firms' decisions to take on clients and causes that the President dislikes; they are devoid of specific factual findings of wrongdoing, and therefore the sanctions they impose cannot be tailored to findings of wrongdoing. On this basis alone, this Court should conclude that the EOs violate the First Amendment.

### B. The First Amendment protects against disclosure requirements aimed at deterring association.

Southern states' attempts to force the NAACP to disclose sensitive information—particularly membership lists—met a similar fate to their attempts to regulate client-

recruitment.[15] In *NAACP v. Alabama ex rel. Patterson*, the Court concluded that Alabama's efforts to compel disclosure of the NAACP's membership roster was a "substantial restraint upon the exercise by petitioner's members of their right to freedom of association." 357 U.S. 449, 462 (1958). This was because the NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* That some of this retaliation came from "private community pressures" rather than state action did not matter: "The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463.

More recent decisions have clarified that compelled disclosures that burden the right of association should be "reviewed under exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021); *see also Patterson*, 357 U.S. at 460 ("state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny"); *see also Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 554–56 (1963) (finding Florida could not compel disclosure of NAACP

---

[15] Although the *Button* Court did not rule on this basis, it observed that Virginia's anti-barratry law also imposed associational burdens by deterring others from working with or financially supporting NAACP lawyers. *See Button*, 371 U.S. at 434–36. Specifically, Chapter 33 declared it malpractice to accept "employment, retainer, compensation or costs" from anyone who had themselves violated Virginia's law on solicitation of professional employment. 1956 Va. Extra Session Acts 34. And Chapter 35 made it a misdemeanor to offer financial or other support to a "barrator"—that is, someone who "stirs up litigation." 1956 Va. Extra Session Acts 36.

membership records to investigate group's connection to communist activities absent plausible basis for belief that connection existed).

The law firm EOs cannot possibly survive this exacting standard. First, as discussed above, the law firms are engaged in association for the purpose of litigation, protected under the First Amendment's speech and petition clauses. And while the Supreme Court has suggested that nearly all litigation, undertaken for any purpose, may qualify for First Amendment coverage, *see BE&K*, 536 U.S. at 531, the pro bono and political work named in the EOs is, at a minimum, plainly covered by the First Amendment. Second, the EOs require disclosure of "any business" that government contractors have with the named firms, as well as the nature of that business. *See, e.g.*, Susman EO § 3. These compelled disclosure requirements are packaged with a threat of economic harm: agencies are directed to "terminate any contract, to the maximum extent permitted by applicable law" that is serviced by a named firm and to at least consider stopping *all* funding to entities that do *any* business with a named firm. *Id*. Third, there is very little on the Government's side of the ledger once one discounts the President's objections to the firms' and their clients' viewpoints—and what remains lacks the specific fact-finding that the Supreme Court has emphasized is necessary to justify an infringement of First Amendment rights. Accordingly, this Court should hold that the mandatory disclosure provisions of the EOs violate the First Amendment right of association.

II.    **The Court should not defer to the Administration's casual invocation of national security to justify the EOs.**

This Court should not defer to the administration's invocation of national security to justify the infringements of First Amendment rights detailed above and in Plaintiff's Motion for Summary Judgment. *See* Pl.'s Mot. Summ. J. & Declaratory & Permanent Injunctive Relief, ECF No. 19. First, governments frequently offer unfounded national-security or public-safety justifications for their otherwise-unconstitutional actions; *Korematsu* shows the catastrophic harm that can result when courts defer to those explanations without adequate basis. And, as *Korematsu* and the Guantanamo cases arising out of the "global war on terror" illustrate, lawyers—often acting pro bono—have been instrumental in revealing unjustified invocations of national security. Second, courts should not defer to facially implausible national security rationales. Here, the Government's assertions are belied by its own actions, including settlements it has reached with other firms in exchange for millions of dollars' worth of pro bono work on causes supported by the administration. This quid-pro-quo belies the administration's position in this litigation that the EOs are based on national security concerns.

A.    ***Korematsu* and the Guantanamo cases offer a cautionary lesson about judicial deference to unsubstantiated claims of national security.**

Fred Korematsu was subject to relocation orders during WWII because of unfounded national security concerns. His conviction for violating those orders was upheld because courts—having been misled by DOJ attorneys—failed to discover the

truth. This episode illustrates the dangers of blind deference to executive branch assertions that an individual or group constitutes a threat to national security.

We now know that the Department of Justice was not forthcoming in their *Korematsu* and *Hirabayashi* Supreme Court briefs. Initially, DOJ attorneys in *Hirabayashi* proposed alerting the Court that the basis for General DeWitt's decision to "evacuate," exclude, and incarcerate based on exigent military necessity was refuted by information the Office of Naval Intelligence (ONI) had provided to DeWitt; in fact, ONI had concluded that mass incarceration was unnecessary, as "individual determinations could be made expeditiously," *Hirabayashi v. United States*, 828 F.2d 591, 602 n.11 (9th Cir. 1987) (emphasis omitted).[16] In *Korematsu*, DOJ attorneys— by then aware that the FBI and ONI did not support DeWitt's conclusions—initially drafted the following footnote for inclusion in their brief.

> The recital [in the General DeWitt Report] of the circumstances justifying the evacuation as a matter of military necessity … is in several respects, particularly with reference to the use of illegal radio transmitters and to shore-to-ship signaling by persons of Japanese ancestry, in conflict with information in possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not ask the Court to take judicial notice of the recital of those facts contained in the [DeWitt] Report.

*Korematsu*, 584 F. Supp. at 1417 (quoting original footnote) (citation omitted).

But the DOJ attorneys were ordered to alter the footnote. The version that was submitted to the Court read:

---

[16] This proceeding, four decades after the U.S. Supreme Court upheld a curfew that singled out persons of Japanese ancestry, stemmed from an effort to reverse Gordon Hirabayashi's WWII criminal conviction based on DOJ attorneys withholding critical information from the Supreme Court.

> [The DeWitt Report] is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. We have specifically recited in this brief the facts relating to the justification for the evacuation, of which we ask the Court to take judicial notice, and we rely upon the Final Report only to the extent that it relates to such facts.

*Id.* at 1418 (quoting Brief for the United States at 11, *Korematsu v. United States*, 323 U.S. 214 (1944)).

This lack of candor contributed to federal courts' failure to safeguard constitutional rights, which they did not remedy until decades later. But the courts also could have pressed the issue by seeking more detail about the nature of the national security interest and questioning the Government about some of the obvious problems with its case. Why, for example, had DeWitt found it necessary to incarcerate tens of thousands of people living in the western U.S., when his counterpart in the eastern U.S. had not? Why treat Americans of Japanese descent worse than German or Italian citizens living in the U.S.? Why was individualized due process impossible?

In contrast, challenges to the indefinite detention of individuals held at Guantanamo Bay after the September 11, 2001 attacks show how courts can test invocations of national security. The Pentagon had claimed the men held at the U.S. Naval Station at Guantanamo Bay, detained in the months following the Sept. 11 attacks, were "the worst of the worst"; the Chairman of the Joint Chiefs of Staff said they "would gnaw through hydraulic lines" of a cargo plane "to bring it down."[17] In the years that followed, advocacy by lawyers from firms including Jenner & Block,

---

[17] Carol Rosenberg, *They Were Guantánamo's First Detainees. Here's Where They Are Now*, N.Y. Times, May 18, 2021, at A1.

WilmerHale, and Perkins Coie revealed the inadequacy of the procedures the Government used to justify the detention, the deficiencies in the evidence supporting its claims, and the abuse it inflicted upon the men in its custody.

One of the other targeted firms, Perkins Coie, was part of the team representing Salim Ahmed Hamdan, the petitioner in *Hamdan v. Rumsfeld* who challenged the legality of the military commissions that were originally set up to try detainees. 548 U.S. 557 (2006). The rules of that tribunal barred the accused and his civilian counsel from attending (or even seeing the evidence presented) during closed proceedings. *Id.* at 614. The Supreme Court found that jettisoning so basic a protection—the right to be present—"particularly disturbing" and held that the commissions were deficient on that and other grounds. *Id.* at 624. When Mr. Hamdan's case was eventually adjudicated, he was acquitted of one of the two charges against him; the D.C. Circuit later vacated his conviction on the other charge. *Hamdan v. United States*, 696 F.3d 1238, 1244, 1253 (D.C. Cir. 2012).

While Perkins Coie's advocacy laid bare the dearth of procedural protections in the Government's preferred tribunals, WilmerHale's advocacy shone a light on the evidentiary infirmities in the cases against the detainees. WilmerHale attorneys represented Lakhdar Boumediene, a Guantanamo detainee who was arrested in Bosnia along with five other men. *Boumediene v. Bush*, 579 F. Supp. 2d 191, 193 (D.D.C. 2008). Mr. Boumediene's case similarly reached the Supreme Court, where, during oral argument, WilmerHale attorney Seth Waxman illustrated the importance of testing government assertions. He explained that after one detainee's lawyer saw the name of the detainee's associate—alleged to have died as a suicide

bomber—in the Government's filings, "[w]ithin 24 hours, his counsel had affidavits not only from the German prosecutor but from the supposedly deceased [suicide bomber], who is a resident of Dresden never involved in terrorism and fully getting on with his life."[18] The Supreme Court subsequently ordered that the detainees could invoke the protections of habeas corpus. *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

A few months later, after assessing the evidence underlying Mr. Boumediene's detention, the U.S. District Court for the District of Columbia granted his habeas petition. *Boumediene*, 579 F. Supp. 2d at 197–98. The court noted that the Government had rested its case on a single source, whose credibility could not be assessed; it provided no corroborating evidence supporting its claims that Mr. Boumediene had planned to travel from Bosnia to Afghanistan to fight against U.S. and allied forces. *Id.* at 197. "To rest this case on so *thin* a reed . . . would be inconsistent with this Court's obligation . . . to protect petitioners from the risk of erroneous detention." *Id.*

Not only did these firms' pro bono representations reveal weaknesses in the Government's evidence and process, but it also revealed details of the torture some detainees suffered at the hands of the Government. Jenner & Block represented Guantanamo detainee Majid Khan, who pled guilty to crimes associated with his work for Al Qaeda.[19] After his arrest, Mr. Khan was "beaten, starved, hung by his

---

[18] Tr. of Oral Arg. 75–76, *Boumediene v. Bush*, 553 U.S. 723 (2008) (No. 06-1195).

[19] Katya Jestin, Co-Managing Partner, Jenner & Block LLP, Testimony Before U.S. Sen. Committee on the Judiciary, Closing Guantanamo: Ending Twenty Years

arms and sleep-deprived for days on end, waterboarded, and sexually assaulted."[20] His lawyers submitted Mr. Khan's detailed statement about his abuse to the jury deciding Mr. Khan's post-plea sentence.[21] That jury recommended clemency, calling his abuse "a stain on the moral fiber of America."[22] One of his Jenner & Block lawyers later testified to Congress about his "brutal [] torture," stating that "[t]hrough transparency, we can achieve some modicum of accountability, and move past this ugly chapter in our nation's history."[23]

Counsel for these detainees fought for meaningful review of their clients' cases and transparency about their treatment at the Government's hands. In time, the evidence against many of the men was demonstrated to be far weaker than the Government initially asserted. As with *Korematsu*, the scrutiny for which these counsel fought—of the process, and of the evidence—revealed deficiencies that required correction.

Under the various law firm EOs, Perkins Coie, WilmerHale, and Jenner & Block would have been barred from performing this essential work because it could not be carried out without security clearances. Other firms may not have picked up the slack, for fear that they would become the subject of their own executive orders. With regard to ensuring the integrity of future elections, law firms might be reluctant to

---

of Injustice 2–3 (Dec. 7, 2021), https://www.judiciary.senate.gov/imo/media/doc/Jestin%20Testimony.pdf.

[20] *Id.* at 2.

[21] *Id.*

[22] *Id.* at 7.

[23] *Id.* at 2, 7.

take on this work on behalf of any public official or any political party for fear of picking the "wrong" side and incurring the wrath of whoever wins.

### B.    Judicial deference is unwarranted where the Government has failed to articulate even a plausible national security rationale.

In court filings and in oral argument, the Government has conflated its policy goals—the President's own view of what is in the best interests of the United States—with bona fide national security concerns. *See, e.g.*, Defs.' Mem. Supp. Mot. Dismiss 1, 27, 30, 31, ECF No. 58-1. Further, the Government has asserted that its national security determinations are owed special deference. *Id.* at 13.

This deference is particularly unwarranted here, where the Government's own actions show that it is not acting in good faith. First, the Susman EO ties the Government's national security rationale to the Firm's employment practices. Whatever one might think of the connection between national security and employment discrimination in the abstract, that connection is impossible to square with the fact that the Government has also directed the Department of Labor's Office of Federal Contract Compliance Programs to stop most of its work auditing government contractors' compliance with non-discrimination mandates established by (now revoked) Executive Order 11246. *See* Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Further, when this Court at the TRO Hearing asked, "But you don't have any understanding of what the funding groups that undermine the effectiveness of the military is," Defendants' Counsel confirmed that he had no information about it and apologized, saying he "just wasn't able to procure that before we got here." Tr. of TRO

Hearing 18:13–19, ECF No. 19. This Court should view the claimed national security concern with skepticism.

Moreover, the Government has also taken the position that the firm Paul, Weiss, Rifkind, Wharton & Garrison posed a threat to national security—up until they agreed to provide at least $40 million dollars in pro bono services to causes favored by the President. Likewise, other firms including Skadden, Arps, Slate, Meagher & Flom, and Willkie Farr & Gallagher apparently avoided becoming the subjects of executive orders by making similar pledges. These agreements reveal the true purpose of the Executive Orders: securing the firms' compliance with achieving the Government's policy goals.

## CONCLUSION

For the foregoing reasons, in addition to the reasons articulated by the Plaintiff, this Court should grant summary judgment for Susman Godfrey.

Respectfully submitted,

/s/ Jim Davy

Charlotte Garden*
University of Minnesota Law
  School†
Walter F. Mondale Hall
229 S. 19th Ave.
Minneapolis, MN 55455

Jeremiah Chin*
University of Washington School
  of Law†
William H. Gates Hall, Rm. 310
P.O. Box 353020
Seattle, WA 98195-3020

Jessica Levin*
Melissa Lee*
CENTER FOR CIVIL RIGHTS AND
  CRITICAL JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Robert S. Chang*
Susan McMahon*
THE FRED T. KOREMATSU CENTER FOR
  LAW AND EQUALITY
University of California–Irvine
401 E. Peltason Dr., Suite 1000
Irvine, CA 92697
(949) 824-3034
rchang@law.uci.edu

* *pro hac vice* applications forthcoming
† institutional affiliations listed for
  identification purposes only

Counsel for Amici Curiae

April 24, 2025

## CERTIFICATE OF SERVICE

I certify that on April 24, 2025, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.


/s/ Jim Davy

Jim Davy