## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**SUSMAN GODFREY LLP,**

       *Plaintiff*,

**v.**

**EXECUTIVE OFFICE OF THE PRESIDENT,** *et al.*,

      *Defendants*.

</td><td>

**Case No.: 1:25-cv-1107-LLA**
**Hon. Loren L. AliKhan**

</td></tr>
</table>

## BRIEF OF *AMICI CURIAE*

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,
PUBLIC COUNSEL, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS, PUBLIC INTEREST LAW CENTER,
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, MISSISSIPPI
CENTER FOR JUSTICE, AND LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE
SAN FRANCISCO BAY AREA**

**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iii

DISCLOSURE STATEMENT ........................................................................................ vi

INTEREST OF AMICUS CURIAE ..................................................................................1

INTRODUCTION ............................................................................................................5

ARGUMENT ...................................................................................................................6

I.  Pro bono representation is central to the protection of civil rights and the rule of law. ......7

    A.  An independent judiciary demands a robust adversarial system. ...........................7

    B.  Pro bono representation has contributed significantly to the preservation of our Constitution's structure and its guarantees. ..........................................................8

        1.  The American legal system recognizes a professional responsibility to undertake pro bono representation.................................................................8

        2.  The Lawyers' Committee and its local affiliates robustly leverage pro bono representation to protect civil rights. ..................................................9

II. The Executive Order must be permanently enjoined because it threatens grave harm to the pro bono bar and the public interest in pro bono representation................................11

    A.  The Executive Order causes grave harm to communities the Lawyers' Committee and its local affiliates serve...................................................................................12

    B.  The Executive Order causes grave harm to the pro bono bar. ..............................14

CONCLUSION...............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States*,
    564 U.S. 211 (2011)................................................................................................7

*Chambers v. Baltimore & Ohio R.R.*,
    207 U.S. 142 (1907)................................................................................................8

*Legal Servs. Corp v. Velazquez*,
    531 U.S. 533 (2001)............................................................................................7, 8

*McWaters v. FEMA*,
    408 F. Supp. 2d 221 (E.D. La. Dec. 12, 2005) ...........................................1, 10, 13

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..............................................................................................11

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)...................................................................................1, 6, 9, 10

*Penson v. Ohio*,
    488 U.S. 75 (1988)..................................................................................................7

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021) ........................................................................11

*Smith v. Plati*,
    258 F.3d 1167 (10th Cir. 2001) ............................................................................15

*Strickland v. Washington*,
    466 U.S. 668 (1984)................................................................................................8

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..............................................................................................16

*Wash. Park Lead Comm., Inc. v. EPA*,
    No. 98-cv-421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998)............................1, 10

**Executive Orders**

Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025)...........................................5

Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025).........................................5

Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025)..................................15, 16

Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025)...........................................5

Exec. Order No. 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025)...........................................5

Executive Order No. 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025) ......................................... *passim*

**Other Authorities**

Abigail Adcox & Amanda O'Brien, *Milbank Becomes Next Big Law Firm to
    Reach Deal with Trump*, Am. Law. (Apr. 2, 2025) .....................................15

Alan Berube & Bruce Katz, Brookings Inst., *Katrina's Window: Confronting
    Concentrated Poverty Across America* (Oct. 12, 2005) .................................13

Am. Bar Ass'n, Canons of Professional Ethics 14 (1908).................................................9

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the
    Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ......................................7

Arloc Sherman & Isaac Shapiro, Ctr. on Budget and Pol'y Priorities, *Essential
    Facts about the Victims of Hurricane Katrina*, (Sept. 19, 2005)............................12

C. Ryan Barber & Erin Mulvaney, *Willkie Farr Becomes the Latest Big Law Firm
    to Strike Deal with Trump*, Reuters (April 1, 2025) ...................................15

Deborah L. Rhode, Access to Justice (2004)...................................................................9

Eric Tucker, *Trump Reaches Deals with 5 Law Firms, Allowing them to Avoid
    Prospect of Punishing Executive Orders*, AP (Apr. 11, 2025) ...........................16

*Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*,
    The White House (Mar. 6, 2025) ......................................................................14

*Fact Sheet: President Donald J. Trump Reinvigorates America's Beautiful Clean
    Coal Industry*, The White House (Apr. 8, 2025) ...................................16

Keith Goldberg, *Trump Wants To Use Firms That Cut Deals For Coal Leases*,
    Law360 (Apr. 8, 2025)......................................................................................16

Josh Gerstein & Kyle Cheney, *Trump Targets Washington Law Firm That Aided
    Jack Smith*, Politico (Feb. 25, 2025) .......................................................15

Lon L. Fuller & John D. Randall, *Professional Responsibility: Report of the Joint
    Conference of the ABA and AALS*, 44 A.B.A. J. 1159 (1958)............................7, 16

Louis Galambos, *The Emerging Organizational Synthesis in Modern American
    History*, 44 Bus. Hist. Rev. 279 (1970)............................................................9

Melissa Quinn, *Law Firm Skadden Cuts $100 Million Pro Bono Deal with Trump to Avoid Executive Order*, CBS (Mar. 28, 2025) ................................................... 15

Model Code of Pro. Resp. EC 2-25 ............................................................................. 9

Model Rules of Pro. Conduct R. 6.1 ........................................................................... 9

*Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025) ..................................................................................... 5

Texas Lawbook, *How Should Lawyers, Firms and GCs Respond to President Trump's Challenges?* (Mar. 24, 2025) ....................................................................... 15

The Federalist No. 78 (C. Rossiter ed. 1961) .............................................................. 7

Transcript of Hearing on TRO, *Jenner & Block LLP v. DOJ, et al.*, 1:25-cv-00916 (D.D.C. Mar. 28, 2025) ........................................................................................... 14

Transcript of Hearing on TRO, *Perkins Coie LLP v. DOJ, et al.*, 1:25-cv-00716 (D.D.C. Mar. 12, 2025) ........................................................................................... 16

U.S. Sent'g Comm'n, *An Analysis of the Implementation of the 2014 Clemency Initiative* (Sept. 2017) ......................................................................................... 11, 13

## DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), counsel for *amici* state that *amici* are non-profit, tax-exempt organizations that have issued no stock; have no parent corporations; and that there is no publicly owned corporation that owns 10% or more of their stock. Counsel further state that no counsel for any party authored this brief in whole or in part, and no person other than *amici*, its members, or its counsel made a monetary contribution to the brief's preparation or submission.

## INTEREST OF AMICI

*Amicus* Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the private bar's leadership and resources in combating racial discrimination and the resulting inequality of opportunity—work that continues to be vital today. As part of this work, the Lawyers' Committee uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have voice, opportunity, and power to make the promises of our democracy real. The Lawyers' Committee is a catalyst within the civil rights community, having been at the forefront of many significant civil rights cases. *See, e.g., NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982); *Wash. Park Lead Comm., Inc. v. EPA,* No. 98-cv-421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998); *McWaters v. FEMA*, 408 F. Supp. 2d 221 (E.D. La. Dec. 12, 2005). Each year, lawyers from across the country partner with the Lawyers' Committee to provide pro bono legal services for the protection of civil rights. The private bar thus plays a critical role in the Lawyers' Committee's mission and its provision of effective legal advocacy.

*Amicus* Public Counsel is a nonprofit public interest law firm dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the power of our clients through comprehensive legal advocacy. It is the Southern California affiliate of the Lawyers' Committee for Civil Rights Under Law. Founded on and strengthened by a pro bono legal service model, our staff and volunteers seek justice through direct legal services, promote healthy and resilient communities through education and outreach, and support community-led efforts to transform unjust systems through litigation and policy advocacy in and beyond Los Angeles. Public Counsel relies heavily on the private bar as partners in its litigation, and thus has a strong interest in ensuring that the private bar can litigate against the federal government without fear of retribution.

*Amicus* Washington Lawyers' Committee for Civil Rights and Urban Affairs is a nonprofit civil rights organization established to combat racial discrimination and poverty by enforcing civil rights laws through litigation and public policy advocacy in the District of Columbia, Virginia, and Maryland. Since its founding in 1968, the Washington Lawyers' Committee has worked in partnership with private law firms to pursue its objectives and relies on the pro bono resources and commitment of the private bar. Government retaliation against the private bar poses an immediate threat to the Committee's co-counsel model and thereby endangers its important public interest mission.

*Amicus* Public Interest Law Center was founded in 1969 as the Philadelphia affiliate of the Lawyers' Committee for Civil Rights Under Law. The Law Center uses high-impact legal strategies to advance the civil, social, and economic rights of communities in the Philadelphia region and throughout Pennsylvania facing discrimination, inequality, and poverty. It uses litigation, community education, advocacy, and organizing to secure access to fundamental resources and services in the areas of public education, housing, health care, employment, environmental justice, and voting. For the past 56 years, the Law Center has worked alongside pro bono co-counsel in the private bar to defend constitutional rights, protect democracy, and ensure equal justice under the law.

*Amicus* Chicago Lawyers' Committee for Civil Rights is a public interest law organization founded in 1969 that works to secure racial equity and economic opportunity for all. Chicago Lawyers' Committee for Civil Rights provides legal representation through partnerships with the private bar and collaborates with grassroots organizations and other advocacy groups throughout Illinois and Indiana. Through coalition work, litigation, and policy advocacy, Chicago Lawyers'

Committee works to advance civil rights by implementing community-based solutions that promote transparency, accountability, and equity.

*Amicus* Mississippi Center for Justice is a nonprofit, public-interest law firm committed to advancing racial, social, and economic justice. Mississippi Center for Justice was organized to address the urgent need to re-establish in-state advocacy for low-income people and communities of color. Mississippi Center for Justice is supported and staffed by attorneys and other professionals working to develop and pursue strategies to combat discrimination and poverty and collaborates with the private bar to advance its mission.

*Amicus* Lawyers' Committee for Civil Rights of the San Francisco Bay Area is one of the oldest civil rights institutions on the West Coast. We work to dismantle systems of oppression and racism and build an equitable and just society. Our pro bono model is critical to all aspects of our multifaceted, community-based approach to systems change. In 2024, we provided 1,600 clients with direct legal service in pursuit of racial, economic, and immigrant justice, and we engaged in many impact litigation and policy advocacy matters to prevent future harm and build antiracist, equitable systems. To deliver these services, we train and partner with more than 1,000 attorneys, paralegals, law clerks, and interpreters who, in 2024, donated more than 29,000 hours to represent, advise, and counsel clients seeking meaningful and lasting change. Partnership with the private bar is integral to our ability to challenge policies, institutions, and systems that are violent, unjust, and inequitable to historically marginalized communities.

For decades, the local Lawyers' Committees have successfully litigated cases to secure civil rights, and address many of the same issues as the national Lawyers' Committee. Each local Committee has also taken on other issues that reflect the needs of their respective communities. The national Lawyers' Committee works effectively with the local Committees and regularly

partners with them on specific litigation and legal advocacy to strengthen what is already the largest network of private lawyers in America directed to advocate for civil rights.

Executive Order No. 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025) (the "Executive Order"), and others like it, represent an existential threat to the critical tradition of American law firms providing pro bono representation to protect civil rights. *Amici* are uniquely situated to opine on a substantial inequity the Executive Order has caused, and will continue to cause, as well as its deleterious effect on the public interest. As civil rights organizations that leverage the resources of private law firms to hold government at all levels to account, *amici* are also well positioned to discuss the harm to those communities who rely on pro bono firm assistance if those firms no longer represent them for fear of retribution by the chief executive.

## INTRODUCTION

The object of the Executive Order is to cow into submission, through a campaign of official intimidation, not only its express target, Susman Godfrey, but also any other law firm tempted to advocate positions displeasing to the Trump administration. *See, e.g.*, Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025) ("Perkins Coie Order"); Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025) (targeting Paul Weiss); Exec. Order No. 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025) ("WilmerHale Order"); *see also Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025) (suspending security clearances of lawyers at Covington & Burling), https://tinyurl.com/4z7fvhmm. The campaign is brazenly unconstitutional, for the many reasons explained by Susman.

Worse still, as this brief conveys, the Executive Order and others like it threaten the continued vitality of our system of separation of powers and its promise to "assure the absence of despotism." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 881 (1983). The judiciary's ability to serve as a check on government abuse largely relies on the zealous advocacy of legal counsel in our adversarial system of justice. By punishing law firms for their advocacy in support of clients or causes this Administration disfavors, the government aims to suppress challenges to its overreach and chill legal representation for those who need it most.

*Amici* support summary judgment for Susman Godfrey and granting the declaratory and injunctive relief the firm seeks. The Executive Order and others like it form an existential threat to the tradition—central and critically important to our system of justice—of law firms representing clients, often on a pro bono basis, against government action. Unless the Court declares this Executive Order unconstitutional and permanently enjoins its enforcement, it will have an immediate and lasting chilling effect on law firm engagement in pro bono representation. Clients

and communities like those whom the national and local Lawyers' Committees represent alongside the nation's leading law firms would bear the brunt of this harm.

## ARGUMENT

The Lawyers' Committee and its local affiliates file this amicus brief in support of Susman Godfrey to emphasize the public's interest in zealous pro bono representation, especially in cases involving civil rights enforcement, and the threat the Executive Order poses to that interest.

The Lawyers' Committee was born of the need for legal counsel in the face of oppression by the government and private actors. It is no surprise that in 1963, demands for racial justice were increasingly met with hostility and outright lawlessness, intimidation, and violence. That is precisely why that year President Kennedy summoned nearly 250 lawyers to the White House and urged them to defend the rule of law and the rights of civil rights activists. Within one week of that historic meeting, the Lawyers' Committee was formed. The specific goal: to obtain equal opportunity for Black people, specifically by marshaling the resources of the private bar to engage in the fight for racial justice. Most notably, key leaders in the private bar came together across lines of difference by race, geography, and party affiliation to advance this mission. For sixty years, the Lawyers' Committee has partnered with the private bar in its pro bono representation of our shared clients, leveraging the resources of law firms to advocate for communities living on the margins, who have long faced barriers to equality and endured the ongoing effects of systemic racism and discrimination. In partnership with law firms providing pro bono representation, the Lawyers' Committee has worked to protect voting rights and educational opportunities, promote economic justice and fair housing, address inequity in the criminal justice system, and combat organized racial hatred. The Lawyers' Committee's affiliates, which tailor civil rights advocacy to the needs of their local communities, work to address many of the same issues, and more. Local Lawyers' Committees engage in a range of advocacy, such as representing children in poverty,

6

representing applicants for asylum and refugee rights, and protecting the rights of people with disabilities, among other subject areas. All this work is now imperiled by the Executive Order.

**I.** **Pro bono representation is central to the protection of civil rights and the rule of law.**

No principle is of greater importance to our form of government than the separation of powers: "[T]hat feature, above all others, was to assure the absence of despotism." Scalia, *The Doctrine of Standing*, 17 Suffolk U. L. Rev. at 881. It is this principle that "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

The separation of powers in our system of government requires three independent, coordinate branches. The judiciary is uniquely situated among those three, having itself neither sword nor purse. *See* The Federalist No. 78, p. 465 (C. Rossiter ed. 1961). The judiciary's power to check abuses by the legislative and executive branches comes from its judgment. *See id.* And that judgment, in turn, is shaped by zealous advocacy—often for unpopular causes—in our unique, adversarial system of justice.

A. An independent judiciary demands a robust adversarial system.

"An informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp v. Velazquez*, 531 U.S. 533, 534 (2001) (holding that statute restricting recipients of Legal Services Corporation from challenging "existing welfare law" violated the First Amendment). The latter aids the former by "present[ing] all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* For this reason, "forceful and vigorous representation" is of "paramount importance in our adversarial system of justice." *Penson v. Ohio*, 488 U.S. 75, 84 (1988); *see also* Lon L. Fuller & John D. Randall*, Professional Responsibility: Report of the Joint Conference of the ABA and AALS*, 44 A.B.A. J. 1159, 1160 (1958) ("[T]he integrity of the adjudicative process itself depends upon the participation of the advocate."). It has been that way from the start of the republic, as the Sixth Amendment right to counsel reflects the

understanding that lawyers play "a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington,* 466 U.S. 668, 685 (1984); *see also Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907) (The ability to "sue and defend" is "conservative of all other rights, and [it] lies at the foundation of orderly government.").

The Executive Order runs roughshod over the concept of an independent judiciary, "distort[ing] the legal system by altering the traditional role of the attorneys" in our republic. *Legal Servs. Corp.,* 531 U.S. at 544. It seeks to punish Susman Godfrey and its attorneys for having undertaken the very task required of them by the judiciary: zealous representation in adversarial proceedings. But representing clients in causes disfavored by the chief executive has not generally exposed American lawyers to retribution without due process. At least until now. The Executive Order exacts costly, undisguised vengeance on the law firm by revoking security clearances, limiting access to government buildings, terminating government contracts held by Susman Godfrey and its clients, and harassing the firm for promoting a diverse and inclusive workplace. Allowing this undeserved punishment to go unchecked will threaten the independence of the judiciary by chilling the advocacy on which it depends to function, including as a shield against abuses by the other coordinate branches. And because the Executive Order is just one in a series that imposes the same punishments on different actors for similar conduct—representing clients or causes disfavored by the chief executive—that threat is growing.

B.  Pro bono representation has contributed significantly to the preservation of our Constitution's structure and its guarantees.

The provision of legal services *pro bono publico* ("for the public good") is an essential feature of the American legal system.

    *1.*    *The American legal system recognizes a professional responsibility to undertake pro bono representation.*

The concerted effort by the profession to provide pro bono services came with the boom in industry and population in the latter part of the nineteenth century. *See generally* Louis Galambos, *The Emerging Organizational Synthesis in Modern American History*, 44 Bus. Hist. Rev. 279 (1970). At the turn of the twentieth century, the ABA's recommended oath for lawyers included the promise that the lawyer would "never reject, from any consideration personal to [himself], the cause of the defenseless or oppressed." Am. Bar Ass'n, Canons of Professional Ethics 14 (1908). Over time this general oath became more specific. *See* Model Code of Pro. Resp. EC 2-25 ("A lawyer has an obligation to render public interest and pro bono legal service."); Model Rules of Pro. Conduct R. 6.1 ("Every lawyer has a professional responsibility to provide legal services to those unable to pay. A lawyer should aspire to render at least (50) hours of pro bono publico legal services per year."). This development reflects the profession's understanding that "access to justice is a fundamental interest" and "that inadequate legal assistance jeopardizes individual rights, compounds other social inequalities, and undermines America's commitment to procedural fairness." Deborah L. Rhode, Access to Justice 146 (2004).

Pro bono representations are as varied as the law itself, and they have contributed immensely to the advancement and security of civil rights. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (pro bono representation culminating in holding that the First Amendment protects "a nonviolent, politically motivated boycott designed to force governmental and economic change").

       2.    *The Lawyers' Committee and its local affiliates robustly leverage pro bono representation to protect civil rights.*

Each year, lawyers from across the country partner with the Lawyers' Committee and their affiliates to provide pro bono legal services to clients in cutting-edge civil rights cases. The Lawyers' Committee boasts nearly 200 board members, made up of lawyers from approximately

forty-five "big law" firms, as well as professors at law schools, in-house corporate counsel, and lawyers at small to mid-size firms. The local affiliates of the Lawyers' Committee engage in similar advocacy that is critically important for its focus on the needs of their local communities, and they likewise rely on the pro bono support of private law firms. While the impact of *amici's* pro bono partners is immeasurable, the following examples demonstrate just how significant our work in collaboration with pro bono counsel has been.

Consider *NAACP v. Claiborne Hardware*. There, the Lawyers' Committee and pro bono counsel represented the National Association for the Advancement of Colored People ("NAACP") when white business owners in Mississippi sued the NAACP in response to an economic boycott campaign promoting racial equality and integration. *Id.* at 888–89. The Supreme Court ruled in favor of the NAACP, holding that boycotting businesses was a protected activity under the First Amendment. *Id.* at 914–15. Or *McWaters v. FEMA*, where the Lawyers' Committee brought the very first challenge against FEMA in response to Hurricane Katrina, successfully stopping the evictions of nearly 100,000 Katrina survivors in New Orleans and forcing FEMA to improve and continue providing housing assistance to victims. 408 F. Supp. 2d 221 (E.D. La., Dec. 12, 2005). In *Washington Park Lead Committee, Inc. v. EPA*, the Lawyers' Committee and co-counsel successfully sued the EPA on behalf of Black residents living in low-income public housing who suffered from lead poisoning due to contamination from an operating foundry adjacent to their homes. No. 98-cv-421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998). As a result of the lawsuit, the EPA agreed to settle the case and the parties entered into a consent decree, which provided that the residents would be permanently relocated into a non-segregated area of the city. Pro bono assistance from private firms also was instrumental in our Clemency Project in 2014, where the Lawyers' Committee worked with dozens of large law firms to help screen applications and submit

clemency petitions for those incarcerated for nonviolent drug offenses, who had no significant criminal histories or histories of violence, demonstrated good conduct in prison, and who served at least 10 years of their prison sentence. *See* U.S. Sent'g Comm'n, *An Analysis of the Implementation of the 2014 Clemency Initiative* 1 (Sept. 2017) ("Analysis of Clemency Initiative"), available at https://tinyurl.com/3b64beee.

The Executive Order's attack on law firms based on the clients or ideas they represent will likely deter firms from taking on representation of anyone or anything the current president finds unfavorable. If the Court upholds the Executive Order, the natural result is that law firms will refrain from engaging in pro bono efforts for fear of retaliation. Going forward, the zealous pro bono advocacy that helped achieve successful outcomes in *Claiborne*, *McWaters*, and *Washington Park* may very well be unavailable.

## II.    The Executive Order must be permanently enjoined because it threatens grave harm to the pro bono bar and the public interest in pro bono representation.

Susman Godfrey has demonstrated that all factors necessary for a permanent injunction are present here: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate; (3) that, weighing the balance of hardships, equitable relief is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010); *see also Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 21 (D.D.C. 2021) (noting that the equity and public interest considerations merge when the government is a party). Of greatest import to the Lawyers' Committee and its affiliates is the public's interest in zealous pro bono representation, especially in cases involving civil rights enforcement.

A.  The Executive Order causes grave harm to communities the Lawyers' Committee and its local affiliates serve.

The consequences of the Executive Order go well beyond the harm felt by firms like Susman Godfrey. The Executive Order will chill pro bono advocacy, or at least any kind with which the chief executive disagrees. Sanctioning a law firm for its representation of clients or advocacy necessarily means that those clients will not have access to their counsel of choice and will suffer, too. Yet unlike private, commercial clients, if a law firm stops its representation of pro bono clients, they may no longer have access to counsel *at all*. Beneficiaries of pro bono representation often come from communities who have been sidelined in this country and left without a voice, usually because they cannot afford the kind of zealous representation necessary to have a fair shot in our adversarial system. They will be harmed greatly by the fallout from law firms no longer taking on pro bono representation. In particular, the communities of color and vulnerable populations whom the Lawyers' Committee and its local affiliates serve will be among the groups disproportionately hurt if the Executive Order is upheld.

By punishing law firms for taking certain positions in advocating for their clients, the Executive Order chills the exact advocacy the Lawyers' Committee, its local affiliates, and pro bono partners have championed for over sixty years. Consider the *McWaters* case. In 2005, Hurricane Katrina had a disproportionate impact on low income and minority households in Louisiana. Notably, about one in every three people who lived in areas hit hardest by Katrina were Black. *See* Arloc Sherman & Isaac Shapiro, Ctr. on Budget and Pol'y Priorities, *Essential Facts about the Victims of Hurricane Katrina*, (Sept. 19, 2005) ("Mississippi, Louisiana, and Alabama are, respectively, the first, second and eighth poorest states in the nation. . . . Th[is] information . . . helps explain why relief efforts are so important to Katrina victims . . . [who] have little or no resources on which to rely in these difficult times."), http://www.cbpp.org/9-19-05pov.htm. Nearly

100,000 people at the time of Katrina lived in "extreme poverty neighborhoods," where the average household income was just over $20,000 a year and nearly 55% of individuals fell below the poverty line. Alan Berube & Bruce Katz, Brookings Inst., *Katrina's Window: Confronting Concentrated Poverty Across America* 4 (Oct. 12, 2005), available at https://tinyurl.com/4d73mvbh. The Lawyers' Committee, in partnership with its local affiliate the Mississippi Center for Justice and a pro bono law firm, successfully sued FEMA for its failure to provide emergency assistance after the hurricane. *McWaters*, 408 F. Supp. 2d at 223. Additionally, within weeks of the Hurricane, the Lawyers' Committee worked with local organizations and outside pro bono counsel to establish a program designed to provide legal assistance to Katrina victims and to address the lack of affordable housing and discriminatory housing-related actions that violated civil rights laws. That advocacy on behalf of low-income Black Louisianans was made possible in part because law firms had the freedom to take on pro bono matters without the fear of retribution restraining them from representing what some may have perceived as controversial clients or causes.

Or consider the Lawyers' Committee's efforts in advancing the 2014 Clemency Project. Many federal inmates were serving life sentences for nonviolent drug offenses under federal sentencing laws that created unjustified and extreme racial disparities. With critical pro bono assistance from the private bar, the project resulted in nearly 1,700 federal inmates having their sentences commuted. Analysis of Clemency Initiative at 11. Were it not for pro bono assistance, these inmates may not have had access to the legal representation that ultimately led to their freedom.

There is a persistent unmet need for pro bono assistance, and law firms that engage in pro bono work fill a critical role in closing that gap. If upheld, the Executive Order will widen the gap

between those who have means to access and navigate the legal system and those who do not. As another judge of this Court observed, if law firms are deterred from engaging in pro bono work for fear of reprisal from a chief executive who does not agree with the mission of that work, it will harm the individuals and communities most in need of legal representation: those who must advocate for themselves against a hostile and powerful government that threatens their civil rights. *See* Tr. of Hr'g on TRO 53:22–54:13, *Jenner & Block LLP v. DOJ, et al.*, 1:25-cv-00916-JDB (D.D.C. Mar. 28, 2025) (noting the Executive Order's "disturbing" condemnation of pro bono work chills law firms from "representing some of the most vulnerable individuals and social groups").

    B.  <u>The Executive Order causes grave harm to the pro bono bar.</u>

A particularly shocking aspect of the Executive Order, and its analogues, is the way in which it retaliates against Susman Godfrey for its advocacy on behalf of its clients, including its pro bono advocacy. *See* Executive Order § 1 (referencing Susman's advocacy on behalf of individuals and causes displeasing to the President); *see also* Plaintiff's Mem. at 4, 17, ECF 10-1 (arguing the Executive Order "discriminates against Susman based on the viewpoints expressed in the Firm's advocacy, including its pro bono advocacy" and "punishes Susman … for the avowed purpose of deterring Susman and other law firms from engaging" in that advocacy); Jenner Order § 1 (referencing representation of individuals affected by the current administration's policies on immigration, asylum, and gender equity); WilmerHale Order § 1 (citing involvement in challenges to immigration and voting laws); *Fact[1] Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins 'Fact' Sheet") (alluding to Perkins

---

[1] *Amici* uses the title the White House has given these documents, but it does not agree that the documents are accurately labeled. There is no indication that the White House undertook anything approaching a fact-finding effort before levying its punishments or issuing these fact sheets.

Coie's pro bono representation of transgender military personnel), https://tinyurl.com/mr2cyv8z;

Josh Gerstein & Kyle Cheney, *Trump Targets Washington Law Firm That Aided Jack Smith*,

Politico (Feb. 25, 2025) (speaking to reporters about a memorandum targeting Covington &

Burling, President Trump stated, "[t]he weaponization of our system by law firms, even pro bono

work they're doing in order to clog up government, stop government. And … hopefully, that will

never happen again."), https://tinyurl.com/c4fexmks.

    The government asserts that Susman Godfrey and other large law firms are acting

"inconsistent with the interests of the United States," and engaging in "egregious conduct" by

"fund[ing] groups" that "inject . . . political and radical ideology." Executive Order §§ 1, 3. That

is the chief executive's justification for revoking security clearances, barring entrance to federal

buildings, and terminating government contracts. There is no reasonable way to read the Executive

Order and its analogues as anything other than retaliatory. *See Smith v. Plati*, 258 F.3d 1167, 1176

(10th Cir. 2001) (Retaliatory actions "that would chill a person of ordinary firmness" include

"prosecution, threatened prosecution, bad faith investigation, and legal harassment.").

    It is unsurprising, then, that the Executive Order and parallel orders have had a chilling

effect on pro bono representation. For example, some nonprofit organizations have reported that

major law firms that once assisted them with pro bono work are now steering clear because the

firms do not want to risk the Trump Administration going after them as a result. *See* Michael

Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of his Attacks*,

Washington Post (March 25, 2025), https://tinyurl.com/mu2ccb3u. Meanwhile, legal reporters

were recently shut out from speaking with lawyers they were scheduled to interview because the

topic of discussion involved "pro bono representation in asylum" matters and representation of "a

gay military veteran." Texas Lawbook, *How Should Lawyers, Firms and GCs Respond to*

*President Trump's Challenges?* (Mar. 24, 2025), https://tinyurl.com/33pzewyt. The Administration has made no effort to conceal its contempt for these and other causes it deems "inconsistent with the interests of the United States." Executive Order § 1. Indeed, in parallel executive orders the chief executive described them as "destructive causes," Jenner Order § 1, and he specifically targeted them in the executive orders issued against Jenner & Block, Perkins Coie, and WilmerHale.

The chilling effect has been felt so completely that large law firms have taken unusual steps to preemptively address the executive orders. One law firm has already entered into a settlement agreement with the government to have a similar order revoked. *See* Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025). Other law firms have entered into what amounts to a non-prosecution agreement before the Administration could even issue orders against them. *See, e.g.*, Melissa Quinn, *Law Firm Skadden Cuts $100 Million Pro Bono Deal with Trump to Avoid Executive Order*, CBS (Mar. 28, 2025), https://tinyurl.com/57uepfn9; C. Ryan Barber & Erin Mulvaney, *Willkie Farr Becomes the Latest Big Law Firm to Strike Deal with Trump*, Reuters (April 1, 2025), https://tinyurl.com/y2vaxdwt; Abigail Adcox & Amanda O'Brien, *Milbank Becomes Next Big Law Firm to Reach Deal with Trump*, Am. Law. (Apr. 2, 2025), https://tinyurl.com/55np8c5p. Within two days after President Trump issued the Executive Order against Susman, he announced that he reached deals with five additional law firms. *See*, Eric Tucker, *Trump Reaches Deals with 5 Law Firms, Allowing them to Avoid Prospect of Punishing Executive Orders*, AP (Apr. 11, 2025), https://tinyurl.com/2f4hva7w.  In all these instances, the firms committed to provide tens of millions of dollars in pro bono representation to causes supported by the Administration. *Id.*; *see also* Exec. Order No. 14244 § 1. And now the chief executive is intimating he will use these pro bono commitments to advance his own policy goals,

such as "reinvigorating America's beautiful clean coal industry," *Fact Sheet: President Donald J. Trump Reinvigorates America's Beautiful Clean Coal Industry*, The White House (Apr. 8, 2025), https://tinyurl.com/3rkumepe, by conscripting the settling law firms to "help coal companies with their leasing matters," Keith Goldberg, *Trump Wants to Use Firms that Cut Deals for Coal Leases*, Law360 (Apr. 8, 2025), https://tinyurl.com/4pc8bcus.

Coercive tactics such as these and the chill they have caused are unprecedented. "One of the highest services the lawyer can render to society is to appear in court on behalf of clients whose causes are in disfavor." Fuller & Randall*, Professional Responsibility*, 44 A.B.A. J. at 1216. Yet the Executive Order seeks to stifle that service. Indeed, as another judge of this Court previously observed, the Executive Order is already having a chilling effect of "blizzard proportions across the entire legal profession." Tr. of Hr'g on TRO 95:22–24, *Perkins Coie LLP v. DOJ, et al.*, 1:25-cv-00716-BAH (D.D.C. Mar. 12, 2025) ("Perkins TRO Tr."). The Executive Order "force[s] lawyers to choose between performing their assigned role in our democracy or pleasing the President." Perkins TRO Tr. 96:17–19 (citation omitted). In doing so, the Executive Order attacks the basic principle of liberal democracies everywhere: that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Without the ability of lawyers to take on clients or causes unpopular with the Administration, our form of government and its guarantees suffer greatly. In no area of our justice system will this chilling effect have a greater adverse impact than pro bono advocacy.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's Motion for Summary Judgment and issue the declaratory and injunctive relief Plaintiff seeks.

17

Dated: April 25, 2025

/s/ Edward Caspar
Edward Caspar
DC Bar No. 1644168
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, N.W., Suite 900
Phone: (202) 662-8300
Fax: (202) 783-0857
ecaspar@lawyerscommittee.org


/s/ Adria J. Bonillas
Adria J. Bonillas*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
abonillas@lawyerscommittee.org
*Pro hac vice motion forthcoming

Counsel for amici

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, I electronically filed this motion with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ Edward Caspar
Edward Caspar, DC Bar No. 1644168
*Counsel for Amicus Curiae*