# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

            *Plaintiff*,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

            *Defendants*.

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.      DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT ........................3

      A.      Susman's Complaint Is Not a "Shotgun Pleading"....................................3

      B.      Susman Has Standing to Challenge the Order .............................................4

      C.      Susman's Claims Are Ripe ..........................................................................9

II.     ALL OF SUSMAN'S CLAIMS SHOULD PROCEED ON THE MERITS........14

      A.      The Complaint States Claims for Multiple Violations of the First
            Amendment................................................................................................14

            1.      The Complaint Adequately Alleges Retaliation in Violation
                    of the First Amendment (Count I) ..................................................14

            2.      The Complaint Adequately Alleges Impermissible
                    Viewpoint Discrimination (Count II)..............................................20

            3.      The Complaint Adequately Alleges Violation of the Petition
                     Clause (Count III) ..........................................................................23

             4.      The Complaint Adequately Alleges an Unconstitutional
                    Restriction on Freedom of Association (Count IV)......................23

      B.      The Complaint States Claims for Violations of Due Process ...................25

            1.      The Complaint Adequately Alleges That the Order Deprives
                    Susman of Protected Liberty and Property Interests with No
                    Process Whatsoever (Count VI)......................................................25

             2.      The Complaint Adequately Alleges That the Order Is
                    Impermissibly Vague (Count VII)..................................................28

      C.      The Complaint Adequately States an Equal Protection Claim (Count
            IX)............................................................................................................29

      D.      The Complaint Adequately Alleges That the Order Violates
             Susman's Clients' Due Process Right to Counsel (Count VIII)...............31

      E.      The Complaint Adequately Alleges That the Order Exceeds the
            President's Statutory and Constitutional Authorities and Violates
            the Separation of Powers (Count X) ........................................................32

III.    DEFENDANTS' PIECEMEAL EFFORTS TO SALVAGE THE ORDER
      LACK MERIT ..................................................................................................33

**TABLE OF CONTENTS**
**(continued)**

**Page**

IV.    THIS COURT SHOULD NOT DISMISS ANY OF THE DEFENDANTS OR REJECT ANY OF THE REQUESTED INJUNCTIVE AND DECLARATORY RELIEF .................................................................40

CONCLUSION.......................................................................................................................45

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*In re Al-Nashiri,*
 47 F.4th 820 (D.C. Cir. 2022)..................................................................................9

*Allen v. City of Louisiana,*
 103 U.S. 80 (1880)...................................................................................................33

*Am. Airways Charters, Inc. v. Regan,*
 746 F.2d 865 (D.C. Cir. 1984).................................................................................31

*Ams. for Prosperity Found. v. Bonta,*
 594 U.S. 595 (2021)...........................................................................................23, 24

*Aref v. Lynch,*
 833 F.3d 242 (D.C. Cir. 2016)...........................................................................14, 19

*Armstrong v. Exceptional Child Center, Inc.,*
 575 U.S. 320 (2015)...........................................................................................42, 43

*Armstrong v. Exec. Off. of the President,*
 90 F.3d 553 (D.C. Cir. 1996)............................................................................40, 41

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)............................................................................................2, 17

*Bill Johnson's Rests., Inc. v. NLRB,*
 461 U.S. 731 (1983).................................................................................................15

\* *Board of County Commissioners v. Umbehr,*
 518 U.S. 668 (1996)...........................................................................................19, 38

*Borough of Duryea v. Guarnieri,*
 564 U.S. 379 (2011).................................................................................................23

*Boutilier v. INS,*
 387 U.S. 118 (1967).................................................................................................29

*Campbell v. District of Columbia,*
 126 F. Supp. 3d 141 (D.D.C. 2015)........................................................................27

*Campbell v. District of Columbia,*
 894 F.3d 281 (D.C. Cir. 2018).................................................................................25

*Caplin & Drysdale, Chartered v. United States,*
 491 U.S. 617 (1989)...................................................................................................7

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Cato Inst. v. SEC,*
4 F.4th 91 (D.C. Cir. 2021) .............................................................................6, 7

*Chamber of Com. of U.S. v. FEC,*
69 F.3d 600 (D.C. Cir. 1995) ..........................................................................9, 13

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ............................................................................................31

*Cordi-Allen v. Conlon,*
494 F.3d 245 (1st Cir. 2007) ...............................................................................30

*Dep't of Homeland Sec. v. Regents of Univ. of Ca.,*
591 U.S. 1 (2020) ................................................................................................39

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988) ............................................................................................35

*Engquist v. Or. Dep't of Agric.,*
553 U.S. 591 (2008) ............................................................................................30

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................................................42

* *FCC v. Fox Television Stations,*
567 U.S. 239 (2012) ...............................................................................8, 26, 29

*FDIC v. Mallen,*
486 U.S. 230 (1988) ............................................................................................26

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................................................................44

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) ............................................................................................33

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ............................................................................................38

*GE Co. v. Jackson,*
610 F.3d 110 (D.C. Cir. 2010) ..............................................................................8

*Gill v. DOJ,*
875 F.3d 677 (D.C. Cir. 2017) ............................................................................36

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .................................................................................29

*Gross v. Lopez*,
    419 U.S. 565 (1975) .................................................................................27

*Hegab v. Long*,
    716 F.3d 790 (4th Cir. 2013) ...................................................................36

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022) .................................................................................14

*Janus v. AFSCME, Council 31*,
    585 U.S. 878 (2018) .................................................................................39

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) .................................................................................32

*Kartseva v. Dep't of State*,
    37 F.3d 1524 (D.C. Cir. 1994) ....................................................................8

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ....................................................................40

*Kucana v. Holder*,
    558 U.S. 233 (2010) .................................................................................40

*Laird v. Tatum*,
    408 U.S. 1 (1972) .....................................................................................14

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................9

*Lederman v. United States*,
    131 F. Supp. 2d 46 (D.D.C. 2001),
    *aff'd and injunction expanded*, 291 F.3d 36 (D.C. Cir. 2002) ................43

\* *Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) ...........................................................35, 36

\* *Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ........................................................................15, 20, 32

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982)................................................................25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...............................................................4, 6

*Maynard v. Melton*,
2021 WL 6845008 (D.D.C. 2021),
*R&R adopted*, 2023 WL 1963919 (D.D.C. 2023) ..............3, 4

*McCullen v. Coakley*,
573 U.S. 464 (2014)................................................................17

*McDonald v. Smith*,
472 U.S. 479 (1985)...........................................................15, 16

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)................................................................33

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................................................................7

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................21

*Nader v. Democratic Nat'l Comm.*,
567 F.3d 692 (D.C. Cir. 2009).................................................23

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
2025 WL 573764 (D. Md. Feb. 21, 2025)................................20

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
983 F.2d 286 (D.C. Cir. 1993).................................................36

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) .....................................................40

*Newman v. Moore*,
743 F. Supp. 3d 62 (D.D.C. 2024)...........................................29

* *News Am. Publ'g, Inc. v. FCC*,
844 F.2d 800 (D.C. Cir. 1988).................................................30

# TABLE OF AUTHORITIES
## (continued)

Page(s)

\* *NRA v. Vullo*,
    602 U.S. 175 (2024) ........................................................................................... *passim*

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) .............................................................................25

*O'Hare Trucking Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996) ...............................................................................................38

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ...............................................................................................42

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) .........................................................................41, 42

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ...............................................................................................33

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ...............................................................................................34

*Powell v. Alabama*,
    287 U.S. 45 (1932) ..............................................................................................8, 31

*In re Primus*,
    436 U.S. 412 (1978) ...............................................................................................21

*Ralls Corp. v. Comm. on Foreign Inv.*,
    758 F.3d 296 (D.C. Cir. 2014) ..............................................................................26

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ..............................................................................37

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...............................................................................................20

\* *Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ..........................................................................................22, 38

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ...............................................................................................22

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ..........................................................................................28, 29

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Sickle v. Torres Advanced Enter. Sols.*,
  884 F.3d 338 (D.C. Cir. 2018) ................................................................3

*Stern v. Marshall*,
  564 U.S. 462 (2011) ............................................................................32

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................14

*Swanson v. City of Chetek*,
  719 F.3d 780 (7th Cir. 2013) ...............................................................30

*T.M. v. District of Columbia*,
  961 F. Supp. 2d 169 (D.D.C. 2013) .......................................................3

*Toxco Inc. v. Chu*,
  724 F. Supp. 2d 16 (D.D.C. 2010) .......................................................26

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ........................................................41, 43

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ............................................................................44

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) ..............................................................................7

*UAW-Lab. Emp. & Training Corp. v. Chao*,
  325 F.3d 360 (D.C. Cir. 2003) .............................................................40

*United States v. Emor*,
  785 F.3d 671 (D.C. Cir. 2015) ...............................................................4

*United States v. Friedman*,
  849 F.2d 1488 (D.C. Cir. 1988) ...........................................................31

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................17

*United States v. Williams*,
  553 U.S. 285 (2008) ............................................................................28

\* *USAID v. All. for Open Soc'y Int'l*,
  570 U.S. 205 (2013) .......................................................................22, 38

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Webster v. Doe*,
  486 U.S. 592 (1988)...................................................................................................35

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
  2025 WL 946979 (D.D.C. Mar. 28, 2025)................................................................16

\* *Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)..........................................................................................26, 27, 34

\* *Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)................................................................................................32, 44

**STATE CASES**

*US Dominion, Inc. v. Fox News Network*,
  293 A.3d 1002 (Del. Super. Ct. 2023) ....................................................................16

**FEDERAL STATUTES**

\* 5 U.S.C. § 702..................................................................................................41, 42, 43

\* 5 U.S.C. § 703.......................................................................................................41, 43

**FEDERAL RULES**

Fed. R. Civ. P. 65(d)(2)......................................................................................................42

**FEDERAL REGULATIONS**

 Executive Order 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025) .......................................8

**OTHER AUTHORITIES**

Andrea R. Lucas, *Review of Perkins Coie LLP's Compliance with Title VII of the
  Civil Rights Act of 1964*, EEOC (Mar. 17, 2025),
  https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-
  _03.17.2025.pdf ......................................................................................................18

Susman Godfrey, *The Susman Godfrey Prize* (available at
  https://www.susmangodfrey.com/the-susman-godfrey-prize/) (accessed Apr.
  30, 2025) ................................................................................................................28

## INTRODUCTION

Defendants' motion to dismiss goes to great lengths to distract from the indisputable truth that prompted this Court to temporarily enjoin the Executive Order:  the Order is a blatantly unconstitutional effort to retaliate against Susman Godfrey for representing clients and causes that have angered the President.  Remarkably, Defendants barely acknowledge the Order's stated purpose of inflicting multiple severe disabilities on Susman to punish it for supposedly "spearhead[ing] efforts to . . . degrade the quality of American elections"—that is, for representing Dominion Voting Systems and state elections officials in defending the integrity of the 2020 election.  Order § 1.  Defendants instead offer a muddled assortment of insubstantial threshold procedural arguments, and go so far as to deny that the President acted as a sovereign in issuing the Order—even as the Order marshals the vast power of the federal government to drive away Susman's clients and hobble its ability to litigate in court or even meet with federal officials.  There is no denying that the President issued the Order to punish a perceived enemy—something no prior president has ever attempted.  This Court should not countenance Defendants' effort to shield it from judicial review.

Defendants' attempts to evade review on procedural grounds are meritless.  First, Susman unquestionably has standing.  Considered both as a whole and provision-by-provision, the Order expressly aims to inflict immediate and irreparable constitutional, reputational, and economic harm on Susman, and it would self-evidently do so were it allowed to go into effect.  Those injuries are directly traceable to the Order and redressable by this Court—as the TRO order confirms.  Second, Susman's claims are just as obviously ripe.  As the Court has already concluded, the Order chills the firm's speech and advocacy and punishes it without due process.  Those here-and-now injuries give rise to a concrete legal dispute for which no further factual development is necessary.  Third,

Defendants' complaints about "shotgun pleading" are borderline frivolous. Defendants' arguments about whether certain defendants were properly named likewise ignore black-letter law.

Turning to the merits, Defendants' conclusory contentions that Susman has failed to plausibly plead its claims are equally insubstantial. The Order is starkly unconstitutional in multiple respects, and Susman has adequately pleaded each element of its constitutional claims under well-established law. Defendants, by contrast, offer up a smorgasbord of astonishing arguments, including that representing clients in court is not protected speech, Mot. 21; that the President may brand disfavored political speech as against the national interest and direct the Executive Branch to take action against the disfavored speaker on that basis, Mot. 30; and that the Order's sword-of-Damocles provisions cannot be unconstitutionally vague because they are not criminal, Mot. 10-11. Even worse, Defendants argue at length that the Constitution imposes no constraints whatsoever on the President when he acts as a contractor, proprietor, and employer rather than as sovereign. No court has ever accepted such an outlandish proposition.

It is important not to lose sight of what Defendants' motion to dismiss asks this Court to do. As Defendants would have it, the President can—without any statutory or constitutional authority—issue a punitive executive order that seeks to destroy a law firm in retaliation for its past representations of clients and causes that the President disfavors, and no court can do anything about it because the Executive Branch has not yet filled in every detail of the retributive scheme or fully carried out the Order's unconstitutional commands. This Court should not accept such brazen defiance of the separation of powers and the rule of law.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citation omitted).  The Court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all" reasonable inferences.  *Sickle v. Torres Advanced Enter. Sols.*, 884 F.3d 338, 345 (D.C. Cir. 2018) (alterations adopted).

## ARGUMENT

## I.    DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT

The motion to dismiss devotes considerable space to contending that this Court should ignore the Order's blatant, repeated violations of the Constitution and instead dispose of this case on threshold grounds.  Those contentions should be rejected out of hand.

### A.    Susman's Complaint Is Not a "Shotgun Pleading"

The government's lead argument, that the Complaint is an impermissible "shotgun pleading," is frivolous.  Mot. to Dismiss ("Mot.") 3-4.[1]  "[D]ismissal under Rule 8 is typically reserved for complaints that are so excessively long as to be unmanageable, or so poorly conceived and drafted that it is difficult to decipher a coherent, viable cause of action."  *T.M. v. District of Columbia*, 961 F. Supp. 2d 169, 175 (D.D.C. 2013).  But the Complaint here is focused and organized, and its length is a product of the fact that the Executive Order flagrantly violates the Constitution in so many different ways.  Further, the Complaint's practice of beginning each claim by stating that "[t]he paragraphs above are incorporated and reasserted," *e.g.*, Compl. ¶ 141, is standard.  Indeed, the government often does the same thing.  *See, e.g.*, Complaint, *United States v. LLM Placements*, No. 23-cv-2190 (D.D.C. July 27, 2023), ECF No. 1.  And courts in this District have blessed that practice where, as here, "[e]ach count includes additional allegations that make clear which of the broadly applicable facts specifically pertain to that count."  *Maynard v. Melton*,

---

[1] Notably, the government does not seek dismissal on that basis, but rather purports to "reserve the right to include in any follow-on briefing additional argument or bases for dismissal."  Mot. 3.

2021 WL 6845008, at *4 (D.D.C. 2021), *R&R adopted*, 2023 WL 1963919 (D.D.C. 2023).

### B.    Susman Has Standing to Challenge the Order

There is no serious dispute that Susman has standing to assert every claim set forth in the Complaint.  To establish standing, Susman must demonstrate that it faces an "actual or imminent" injury caused by Defendants that is redressable by this Court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted).  The Complaint easily satisfies those requirements.[2]

1.  The Order injures Susman.  Indeed, that is the Order's very point.  *See* Compl. ¶ 101 (Order is part of President's campaign to "go[] after" the "crooked law firms" that have represented clients and advocated for causes the President disfavors).  As Susman has cataloged before, *see* Mot. for TRO ("TRO") 13-15, 39-43; Mot. for Summ. J. ("Susman Mot.") 10-13, 40-43, and as this Court has already held, the Order would badly harm the Firm in myriad ways if it were allowed to go back into effect.  Tr. of TRO Hearing 48:20 (Apr. 15, 2025), ECF No. 19 ("Tr.")  It would chill the Firm's speech and advocacy.  Tr. 48:25-49:2; Compl. ¶ 133.  It would deprive the Firm of its Fifth Amendment rights.  Tr. 49:3-8; Compl. ¶ 133.  It would sully the Firm's reputation. Tr. 49:8-20; Compl. ¶ 134.  And it would inflict significant economic harm by driving away Susman's existing clients and discouraging prospective clients from retaining the Firm.  Tr. 49:21-25; Compl. ¶¶ 135-38.

All of those injuries are directly traceable to the Order and are redressable by this Court. The Firm's injuries flow directly from the Order's direct attack on Susman.  And a permanent injunction against the Order's enforcement will protect the Firm from the devastating consequences the Order imposes.  *See Lujan*, 504 U.S. at 561-62 (when "the plaintiff is himself an

---

[2] Susman has made the necessary showing both by plausibly pleading the requirements for standing in its Complaint and through detailed evidentiary submissions.  *See United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015) ("A district court deciding a motion to dismiss on jurisdictional grounds, such as standing, may consider evidence outside the complaint.").

object of the [challenged] action, . . . there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing or requiring the action will redress it").

2. Unable to dispute those basic propositions, Defendants attack Susman's standing to challenge certain specific sections of the Order: Section 3 (regarding government contracting) and Section 4 (regarding employment practices). Defendants are wrong. Susman is just as injured by those sections as by other portions of the Order, and that injury is fully redressable by this Court.

a. *Section 3.* Contrary to Defendants' arguments (Mot. 17-20, 23-24), Section 3 harms Susman. It makes clear that any government contractor associated with Susman can expect economic reprisal and other penalties in short order. *See* Order § 3; Compl. Ex. B ("Fact Sheet") ("[T]he Federal Government will terminate contracts that involve Susman."). It does so by directing agencies to "require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract"; to "review all contracts with Susman" or its clients and "terminate any contract" for which "Susman has been hired to perform any service"; and to "otherwise align their agency funding decisions with the interests of the citizens of the United States" and the "goals and priorities of [the Trump] Administration as expressed in executive actions," including Section 1's express finding that Susman's advocacy is "detrimental to critical American interests." Order §§ 1, 3.

Susman has standing to challenge that set of punitive directives. As to Susman's existing clients who have government contracts, Section 3 seeks to force those clients to sever or cut back on their relationship with Susman by requiring them to reveal any business they do with the Firm, which may well not be public information, and by threatening them with loss of government contracts that are almost certainly important to their businesses if they maintain their relationships with Susman. By the same token, Section 3 seeks to deter prospective government contractor

clients from retaining Susman for fear that doing so would risk unacceptable restrictions on their contracting work. In either case, the loss of clients and business would have a direct impact on Susman's bottom line.

It makes no difference that, during the six-day period between issuance of the Order and entry of the TRO, the Order did not (to Susman's knowledge) result in Susman's loss of specific existing clients or in cancellation of any government contracts. *See* Mot. 19. To support Article III standing, an injury must be "actual *or* imminent," *Lujan*, 504 U.S. at 560 (emphasis added)— and here, both kinds of injury exist. Section 3 inflicts actual and immediate injury because Susman's current and prospective attorney-client relationships are chilled by the very existence of the Order. Section 3 also creates a "substantial probability," *Cato Inst. v. SEC*, 4 F.4th 91, 94 (D.C. Cir. 2021), that Susman will imminently suffer serious economic harm. Clients have already inquired about how the Order will affect Susman's ability to represent them. Declaration of Kalpana Srinivasan ¶ 70, ECF No. 51-3. Prospective clients looking for representation may factor in how the Order could impact their case when deciding whether to even contact Susman or proceed with an engagement. And other law firms targeted by similar orders have lost clients as a result of government-contractor restrictions identical to those at issue here. *See* Declaration of David J. Burman ¶ 29, *Perkins Coie v. DOJ*, No. 25-cv-716 (D.D.C. Mar. 11, 2025), ECF No. 2-2 ("Burman Decl."); Supplemental Declaration of Bruce M. Berman ¶¶ 6, 8, *Wilmer Cutler v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 8, 2025), ECF No. 16-3 ("Berman Decl."). Indeed, those restrictions' devastating economic consequences help explain why nine of the country's largest firms agreed to onerous settlements as a means of avoiding Section 3's sanctions. *See* Compl. ¶¶ 109-10, 116, 119-20, 123.

The government's argument that Susman "has not demonstrated standing to challenge

Section 3 insofar as it regulates [the Firm's] clients," Mot. 17, likewise fails.  The economic harm that Susman faces depends in part on existing or prospective clients' decisions to find alternative representation—but the Court need not engage in any "guesswork" here "as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024); *see Cato Inst.*, 4 F.4th at 94-95 (acknowledging that standing may exist where "injury arises from the government's regulation of a third party").  Clients that depend on government contracts will "react in predictable ways," *Murthy*, 603 U.S. at 57-58 (citation omitted), by taking their business elsewhere if Section 3 is allowed to take effect.  Accordingly, there is at minimum a "substantial risk" that, unless Section 3 is permanently enjoined, "at least one" Susman client will depart or "at least one" prospective client will take business elsewhere.  *Id.* at 58.  Article III requires nothing more.

If the government means to argue that Susman lacks standing to assert the rights of its clients, that is also wrong.  Because the attorney-client relationship is of "special consequence," lawyers have standing to challenge government action that "materially impair[s]" their clients' constitutional rights—particularly where obstacles prevent the client from "advanc[ing] his own rights"—as well as to challenge restrictions on their clients' access to counsel that interfere with the lawyers' practice.  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990).  Here, the Complaint alleges that Susman's clients' constitutional rights are materially impaired:  Section 3 infringes on those clients' freedom to associate with Susman and unconstitutionally conditions their contracts on the requirement that they fire the Firm.  *See* Compl. ¶¶ 168-81.  In addition, clients face obstacles in coming forward themselves to sue, as doing so would require them to disclose their relationship with the Firm—a central component of the harm that Susman seeks to prevent.  The Complaint

also alleges that the Order restricts clients' right to counsel and thereby interferes with Susman's practice: the Order makes it cost-prohibitive for Susman's government-contractor clients to retain their preferred attorney. Defendants assert that the Firm "never explains how [Section 3's] disclosure requirement would . . . make it *impossible*" for the Firm "to represent its clients," Mot. 23, but impossibility is not necessary to establish a right-to-counsel violation, and Section 3 does far more than impose a disclosure requirement. The Fifth Amendment forbids "arbitrar[y]" interference with clients' ability to "secure counsel of [their] own choice," *Powell v. Alabama*, 287 U.S. 45, 53, 69 (1932), and Susman has standing to claim that Section 3 violates that rule.

Finally, it is irrelevant that Susman has not alleged that it is itself a government contractor. *See* Mot. 19-20. As discussed above, Susman is severely injured by the Order's effect on Susman's clients, including the threat to terminate "*all* contracts with . . . entities that disclose doing business with Susman." Order § 3(b). That inflicts harm on Susman whether or not the Firm has contracts of its own. In addition, the wholesale exclusion of Susman from federal contracting is one of many ways in which the Order slanders Susman's reputation and thereby damages its prospects for attracting business. *See GE Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010); *FCC v. Fox Television Stations*, 567 U.S. 239, 256 (2012); *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). The Firm has independent standing to seek relief from that independent harm.

b. *Section 4.* Defendants' attack on Susman's standing to challenge Section 4 is equally meritless. That provision specifies that the Order "shall [not] be construed to limit the action authorized by section 4" of the Perkins Order, Order § 4, which directs the EEOC and the Attorney General to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII," Executive Order 14230, 90 Fed. Reg. 11781, 11782 (Mar. 6, 2025).

Defendants insist that Section 4 does not injure Susman because it is a "mere[] cross-

reference" instructing the EEOC to do what it "is *already . . .* supposed to be doing" and has not yet resulted in any EEOC action against Susman.  Mot. 24-25.  That simply ignores the multiple ways in which Section 4 harms the Firm.  Section 4 sends a clear signal to the EEOC and the Attorney General that they should train their gaze specifically on Susman.  Indeed, the Fact Sheet accompanying the Order states that the "practices of Susman *will be reviewed* under Title VII to ensure compliance with civil rights laws."  Compl. Ex. B (emphasis added).  Section 4 damages the Firm's reputation by (falsely) indicating that there is some special reason to believe that Susman, as among many "large, influential, or industry leading law firms," Order § 4, has engaged in illegal practices.  Section 4 also has a chilling effect on Susman's First Amendment rights because it effectively requires an investigation based on viewpoints Susman is perceived to have espoused and in retaliation for the Firm's protected expression—and even a "credible threat" of an investigation that runs afoul of the First Amendment is sufficient to confer standing.  *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995).

### C.    Susman's Claims Are Ripe

Defendants' ripeness arguments (Mot. 15, 28-29) are likewise unavailing.  It is well established that "Damocles's sword does not have to actually fall" before a plaintiff may seek relief.  *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  Rather, "a case is ripe when it presents a concrete legal dispute" and "no further factual development is essential to clarify the issues."  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (citation omitted).  All of Susman's claims about the illegality of the Order, which was issued weeks ago and took effect immediately, readily meet that standard—which is exactly why the parties and the Court agreed that the case could move expeditiously to summary-judgment briefing.  *E.g.*, ECF No. 27.

1. a.  Susman's First Amendment claims are fully ripe.  This Court has already concluded that "the order chills the firm's speech and advocacy," thereby inflicting an immediate, here-and-

now injury that presents a concrete legal dispute.  Tr. 48:25-49:2.  And the Court has already recognized that the Firm's claim of impermissible retaliation for protected speech is similarly concrete:  it requires no further factual development because "the retaliatory nature of the executive order is plain from the language of the EO."  *Id.* 44:23-25.  The same is true with respect to viewpoint discrimination as well as violation of the right to petition and the freedom of association. *See, e.g.*, Tr. of TRO Hearing 79:15-20, *Perkins Coie v. DOJ*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22 ("*Perkins* TRO Tr.") ("plain language of Executive Order 14230 confirms that . . . government officials are attempting . . . to punish and suppress views that the government, or at least the current administration, disfavors"); Tr. of TRO Hearing 49:1-5, *Jenner & Block v. DOJ*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 10 ("*Jenner* TRO Tr.") ("[T]he reasons the Executive Order gives for its sanctions against Jenner . . . are viewpoints.").

b.  Susman's remaining claims also do not turn on future contingencies or require factual development.  The government does not dispute, for instance, that whether the Order violates the separation of powers presents a pure question of law.  Nor could the government seriously contest that the same goes for Susman's claims that the Order was imposed without due process and is void for vagueness.  Once more, the merits of those claims turn on known facts about the Order's timing and text.  Infringements of the Fifth Amendment right to counsel and guarantee of equal protection are also apparent from "the plain language of the executive order."  *Perkins* TRO Tr. 92:5.  After all, the Order's plain language gives rise to draconian punishments that threaten Susman and its attorneys' "ability to provide effective assistance of counsel to their clients," *id.* at 92:21-22, and "target" Susman without a legitimate purpose, *Jenner* TRO Tr. 51:3-4.

2.  a.  Defendants contend (Mot. 27-29) that Susman cannot currently challenge Section 5 (which addresses access to government buildings, employees, and employment) on the ground that

the provision merely instructs agency heads to "issue guidance," Order § 5(a), which has not yet occurred. That argument is meritless several times over.

As an initial matter, the argument does not apply to half of Section 5. Section 5(b) directly limits the federal government's hiring of Susman employees and requires no guidance or other imminent step for that limitation to take effect. *See* Order § 5(b) ("[a]gency officials shall . . . refrain from hiring employees of Susman, absent a waiver").

Section 5(a) does contemplate issuance of guidance—but that subsection *itself* gives rise to a concrete dispute right now. Section 5(a) mandates that agencies "shall" issue guidance, and it states in no uncertain terms that such guidance will "*limit[]*" Susman's access to federal government buildings and federal government engagements. Order § 5(a) (emphasis added). The White House itself has acknowledged as much. *See* Fact Sheet ("[t]he Federal Government *will* . . . restrict [Susman] employees' access to government buildings.") (emphasis added). Moreover, Section 5 directs agencies to limit Susman's access to ensure "consistency" with the "interests of the United States"—and Section 1 finds that Susman has engaged in "activities inconsistent with the interests of the United States." Order §§ 1, 5. The Order itself therefore already makes the finding that determines the scope and effect of agencies' guidance, effectively *requiring* agencies to restrict Susman's access. The directions in Section 5(a) are thus an immediate and severe blow to Susman's ability to attract and retain clients, which depends on Susman's unfettered ability to appear in federal forums and engage with federal personnel. The concrete harm imposed by Section 5 is why this Court issued a TRO enjoining the provision's enforcement. Tr. 48:20-50:15; *see id.* at 50:10-15.

The experience of law firms targeted by similar executive orders further refutes Defendants' argument. Even in the brief period before those orders were temporarily enjoined,

agencies began implementing them.  *See* Compl. ¶ 140 (noting that shortly after the Perkins Order was signed, OMB and the EEOC issued implementing guidance).  In fact, after the orders issued, some agencies did not even wait for guidance before they began cancelling scheduled meetings with attorneys from targeted firms.  *See, e.g.*, Burman Decl. ¶ 26; Berman Decl. ¶¶ 4, 7; Declaration of Thomas J. Perrelli ¶ 70, *Jenner & Block v. DOJ*, No. 25-cv-916 (D.D.C. Apr. 8, 2025), ECF No. 19-30.

Thus, if Section 5 took effect, Susman attorneys would be facing the certainty of "*limit[s]*," Order § 5(a), on critical federal access that would impair their ability to fully serve their clients' needs.  And even mere uncertainty about the services the Firm could provide, or could commit to providing in the future, would have wide-ranging negative effects on its business.  Compl. ¶ 137.  Those harms qualify as concrete and immediate injuries and create a ripe controversy.

Moreover, the factual details of government guidance on exactly how to "limit[]" Susman's activities are not required to adjudicate the merits of Susman's challenges to Section 5, because the Order contains all the specifics that are needed to assess Susman's claims.  As noted above, to be consistent with Section 1's findings, the forthcoming guidance must limit Susman's access to federal buildings and federal employees based on the Firm's First Amendment protected activity.  Nothing more is needed to establish that the Order commits a raft of First Amendment violations, *see infra* at pp. 14-25; that it deprives Susman of its protected professional and reputational interests without any process whatsoever, *see infra* at pp. 25-27; that it baselessly intrudes on Susman's clients' right to counsel, *see infra* at p. 31; and that the President lacks any statutory or constitutional authority to inflict those penalties on law firms, *see infra* at pp. 32-33.

In short, as this Court put it, Section 5 makes clear that the government is "taking actions" adverse to the Firm.  Tr. 34:3-6.  "The degree of those actions, to be sure, we won't know until we

see the guidance." *Id.* at 34:7-9.  But we know enough already to be certain that the Order, and the guidance it directs agencies to issue, is necessarily unlawful many times over.  *See id.*

In fact, with respect to Susman's First Amendment claims in particular, Section 5's promise of future limiting guidance does not make the constitutional violations more remote—instead, it exacerbates the problem.  A mere "credible threat" of government sanction can chill protected expressive activity in violation of the First Amendment.  *Chamber of Com.*, 69 F.3d at 603.  And Section 5 is more than a credible threat.  Although the Order makes clear that the forthcoming guidance will limit the Firm's ability to represent its clients and cause economic harm, it leaves the exact extent of the damage unspecified.  Section 5 gives agency heads discretion to tighten the sanctions as much as they please, until those sanctions are "consisten[t] with the national security and other interests of the United States."  Order § 5(a).  That conveys a message that is both unmistakable and ominous—while the guidance is pending, the more that Susman engages in representations the Administration disfavors, the more severe a penalty it can expect.  It is hard to conceive of a scheme more clearly designed to chill protected speech.

b.  Finally, Defendants' brief argument that Susman's challenge to Section 2(a) (regarding security clearances) is unripe until a "clearance suspension is accomplished" and "reviewed" and a "further security clearance determination [is] made," Mot. 15, makes no sense.  Section 2(a), which "suspend[s] any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest," Order § 2(a), is already unconstitutional, regardless of what happens next.  The Order directs the suspensions to begin "immediately."  Order § 2(a).  The forthcoming review and ultimate clearance determinations cannot cure the fact that Susman employees were singled out for additional review and subjected to additional procedure based on the Firm's protected speech and its viewpoint, without process

of any kind. Accordingly, no factual development can change the outcome here, and Susman's challenges are justiciable today. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("purely legal" issue that would "not be clarified by further factual development" is ripe).

## II.    ALL OF SUSMAN'S CLAIMS SHOULD PROCEED ON THE MERITS

Susman has plausibly pleaded that the Order is unconstitutional in myriad ways. Rather than deal with those allegations head on, Defendants advance a section-by-section defense of the Order that is confused, conclusory, and devoid of any legitimate basis for dismissing Susman's claims.

### A.    The Complaint States Claims for Multiple Violations of the First Amendment

#### 1.    The Complaint Adequately Alleges Retaliation in Violation of the First Amendment (Count I)

a. It is bedrock law that government officials may not "use the power of the State to punish or suppress disfavored expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024). The First Amendment prohibits government officials from retaliating for speech that has already occurred as well as from acting to coerce or chill future expression. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *Vullo*, 602 U.S. at 189; *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("violations may arise from the deterrent, or 'chilling,' effect of governmental regulations" in response to protected expression).

Susman has adequately pleaded all three elements of a First Amendment retaliation claim: that it engaged in conduct protected under the First Amendment; that a causal link exists between that exercise of a constitutional right and adverse government action; and that the retaliatory action is sufficiently adverse to deter a person of ordinary firmness from speaking again. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); Compl. ¶¶ 141-52. First, the Firm's advocacy on behalf of its clients, advice to its clients, adoption of legal arguments, and petitioning of the courts

self-evidently constitute "constitutionally protected expression" that "implicat[es] central First Amendment concerns." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546-48 (2001); *see McDonald v. Smith*, 472 U.S. 479, 484 (1985); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *see also* Susman Mot. 15.   Second, the Order admits on its face that Susman's protected activity motivated the Order's penalties, and the broader context of the President's campaign against law firms that have taken positions he disfavors confirms the President's retaliatory motive. *See* Order § 1 (announcing the Order issued due to Suman's supposed "efforts to weaponize the American legal system and degrade the quality of American elections" and advocacy the President has deemed at odds with unspecified "American interests"); Susman Mot. 15-16.   Third, the Order plainly amounts to adverse action against Susman.   It imposes devastating consequences—besmirching the Firm's reputation, interfering with the Firm's ability to represent clients, driving clients away from the Firm by threatening them with disfavored contracting treatment, training the EEOC's sights on the Firm's employment practices, and hamstringing Firm employees from holding security clearances or seeking future federal employment. *See* Susman Mot. 16-18.

b.  In contending that Susman fails to adequately allege any of the three elements of a First Amendment retaliation claim, Defendants take positions on behalf of the federal government that flout the most fundamental principles of our legal system.   On the first element, Defendants make the extraordinary and unsupported assertion that Susman's representations of clients in election-related litigation are "not 'protected'" under the First Amendment "in any meaningful sense" on the ground that those representations purportedly "interfere with free and fair elections" and are "punishable under civil rights laws."  Mot. 21.  But there is no question that those representations are in fact core protected speech. *See Velazquez*, 531 U.S. at 542 ("advocacy by the attorney to

the courts" is protected expression); *McDonald*, 472 U.S. at 484 ("filing a complaint in court is a form of [First Amendment] petitioning activity"). And they are entirely lawful—indeed, Susman *prevailed* in court. *See, e.g.*, Compl. ¶ 93; *US Dominion, Inc. v. Fox News Network*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023). Defendants' conclusory and wholly imaginary characterizations of that litigation plainly do not support dismissal of Susman's retaliation claim.

On the second element, Defendants' argument that Susman has not adequately pleaded a link between the Firm's protected expression and the Order's penalties ignores both the Complaint and the language of the Order itself. The Complaint plainly does plead such a link, and the Order's plain text makes that link as express as can be—as this Court has already ruled. *See, e.g.*, Compl. ¶¶ 10-11, 124-31, 141-52; Order § 1 ("I have determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with [Susman]. Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections."); *see also* Susman Mot. 15-16; Tr. 34:2-6 (Court stating that "we can read" from the text of the Order that the President issued it "as a result" of the "views that [Susman] has taken on behalf of its clients").[3] Indeed, elsewhere in their motion, Defendants out-and-out admit that Susman's protected activity motivated the Order. *See* Mot. 7 (describing Section 1, including its "descri[ption of]" Susman's "activities" as a "law firm offering legal representation," as the "explanation" for other provisions of the Order); *id.* at 16 ("Section 3 relies . . . on Plaintiff's . . . malfeasance in election litigation.").

Defendants' suggestion that the Order rests solely on Susman's alleged "racial

---

[3] Every court to have considered one of the executive orders targeting law firms similarly has concluded that the text of the order alone suffices to establish retaliatory motive. Tr. 44:23-25 ("[T]he retaliatory nature of the executive order is plain from the language of the EO; namely, Section 1."); *Perkins* TRO Tr. 75:12-13; *Jenner* TRO Tr. 48:1-5; *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025).

discrimination" and on unspecified "national security" considerations, Mot. 16, 30, does nothing to aid Defendants' cause. Given the language of the Order and Defendants' own admissions in their motion, that suggestion offends common sense. *See supra* at p. 16. Moreover, even in a made-up universe in which the President had legitimate reasons for wanting to punish Susman *in addition to* its protected speech, that still would not defeat the retaliation claim. To be sure, courts will sometimes sustain government action that disproportionately burdens certain messages if the action can be justified on nondiscriminatory grounds. Mot. 16; *see United States v. O'Brien*, 391 U.S. 367, 383 (1968). But that principle cannot help the government here because the government has *announced* that it is acting in retaliation for a targeted entity's protected expression. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (*O'Brien* applies only when "the law is justified without reference to the content of the regulated speech" (citation omitted)).[4]

In any event, Defendants' argument is independently and fatally flawed as to each of the two supposed alternative grounds for the Order. As to purported discrimination, the Complaint (correctly) alleges that Susman complies with applicable discrimination law as it "does not have any program that offers employment opportunities only to people of color," Comp. ¶ 155, and the government cannot question the truth of that factual assertion in its motion to dismiss, *see Iqbal*, 556 U.S. at 678. And even if the allegations in the Complaint did not control, the government lacks any factual basis to allege unlawful discrimination. At the TRO hearing, counsel for Defendants did not dispute that the Firm's practices are lawful. Tr. 18:8-12 (on race discrimination, "all I have is a web page from the Susman website discussing some of the diversity

---

[4] Defendants also make the narrower argument that Susman has not established causation with respect to Section 4 because the Administration had begun reviewing diversity, equity, and inclusion practices in the private sector before the Order issued. Mot. 26-27. But Section 4 specifically directs the EEOC to prioritize Susman in that review process, and that direction penalizes Susman for its exercise of its First Amendment rights.

initiatives, which we think would speak to the sort of gray zone under" current law). Moreover, the notion that the Administration is actually concerned about employment discrimination at Susman and that such concern drove issuance of the Order is impossible to square with facts that Defendants' own motion emphasizes. When the EEOC Acting Chair recently sent letters to a number of law firms requesting information, Susman did not receive one. Mot. 25. And some of the firms that *did* receive those letters, and therefore are part of an employment-related government inquiry, have neither been subjected to executive orders nor reached "settlements" with the President.[5]

As to national security, Defendants' argument is (if possible) even weaker. Defendants insist that Section 5, at least, "is not tied to speech; it is tied to the 'national security' and the 'interests' of the United States." Mot. 30. As the Complaint alleges, however, the Order *explains* that the whole reason that the President believes Susman's activities are inconsistent with the national interest is because the Firm has represented clients or otherwise supposedly taken political actions adverse to the President and his preferred policies. *See* Order § 1; Compl. ¶¶ 10-11, 124-31, 141-52. Defendants cannot circumvent the First Amendment by characterizing disfavored speech on political matters as against the national interest and then claiming the national interest as a separate, nonretaliatory basis for the Order. In addition, the Order itself makes no finding grounded in fact that Susman employees actually pose a danger to national security. The Order's single mention of the "military" is wholly mysterious, and Defendants' counsel has been unable to explain it. *See, e.g.*, Compl. ¶ 155; Tr. 18:13-19.

Finally, as to the third element of the retaliation claim, Defendants do no more than gesture

---

[5] *See* Andrea R. Lucas, *Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964*, EEOC (Mar. 17, 2025), https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf (listing firms).

at an argument that Susman has failed to plead an adverse action. Their unexplained assertion that the Order is not "'punitive' or a 'sanction,'" Mot. 1; *see* Tr. 19:6-20 (similar), is demonstrably incorrect, as the entire point of the President's campaign against law firms is to inflict punishment. *See* Compl. ¶¶ 98, 101 (quoting President's statements that lawyers "will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country" and that "[w]e have a lot of law firms that we're going to be going after"); *id.* ¶ 102 (close ally of the President stating that "what we are trying to do is put [law firms] out of business and bankrupt" them). And to the extent that Defendants mean to contend that the Order has insufficiently adverse consequences to trigger First Amendment scrutiny, they are indisputably wrong. The First Amendment retaliation inquiry does not ask whether the plaintiff has suffered a "punitive" action or a formal "sanction"; the retaliatory action need only be "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. As the Complaint properly alleges, the Order unquestionably clears that bar because it violates the Firm's constitutional rights; seeks to drive away its clients; impairs its attorneys' ability to practice their profession; and threatens the Firm's ability to recruit and retain talent. Compl. ¶¶ 132-40; *see* TRO 19-21; Susman Mot. 16-18. "Any one of these actions alone meets the standard for adverse action." Tr. 45:16-17.

c. In a last-ditch effort to defeat Susman's retaliation claim, Defendants appear to contend that no First Amendment violation exists because the government's "'legitimate interests as a contractor . . . outweigh the free speech interests at stake' here." Mot. 21 (quoting *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 685 (1996)). Even setting aside the confusing and unsupported attempt to analogize Susman itself to a government contractor, that contention fails. As explained above, and as the Complaint clearly alleges, the Order was motivated by the President's desire to retaliate against Susman for its protected speech. No "legitimate interest" is

at play, *see infra* at p. 20, let alone one that could possibly outweigh Susman's free-speech rights.

**2.    The Complaint Adequately Alleges Impermissible Viewpoint Discrimination (Count II)**

a.    Susman has adequately pleaded that the Order violates the First Amendment's prohibition on viewpoint discrimination. *See* Compl. ¶¶ 153-61. Viewpoint "discrimination is uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187—particularly in the context of legal advocacy, where it threatens the existence of an "informed, independent bar" and thus "threatens severe impairment of the judicial function." *Velazquez*, 531 U.S. at 545-47 (holding unlawful an attempt to "prohibit" certain "advice or argumentation" by lawyers). Accordingly, viewpoint-based sanctions are subject to strict scrutiny, and may be sustained "only if the government proves" that the action is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted).

As the Complaint alleges, the Order singles Susman out for disfavored treatment based on positions the Firm has taken in Court. Section 1 justifies the penalties that the Order imposes by pointing to Susman's advocacy in the "legal system" in the context of "elections." Order § 1. That is indisputably a "veiled [a]llusion[]" to the Firm's representation of Dominion and other clients in the Firm's efforts to defend the integrity of the 2020 election. Tr. 45:22-23; *see* Compl. ¶¶ 4, 93. In other words, as this Court has already observed, it is clear from the face of the Order that the "genesis" of the Order's penalties is the Administration's "disagreement with [Susman's] viewpoint." Tr. 34:7-9.

It is equally clear that the Order cannot survive strict scrutiny. The existence of viewpoint discrimination is "all but dispositive" of the strict-scrutiny test. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *15 (D. Md. Feb. 21, 2025) (citation omitted); *see* Tr. 46:10-12. There is no compelling interest in punishing lawyers who have advocated for clients

whose views the President dislikes.  In fact, there is a compelling interest in the opposite, given that zealous, ethical representation of those disfavored by the government has long been part of our constitutional tradition and is essential to reining in abuses of government power.  *See NAACP v. Button*, 371 U.S. 415, 440 (1963) (exercise of "First Amendment rights to enforce constitutional rights through litigation" on behalf of unpopular minorities "cannot be deemed malicious" as "a matter of law").  The Order's vague, unsupported references to discrimination and national security likewise do not come close to supplying a compelling interest sufficient to justify the Order.  *See* Tr. at 46:13-20 ("The Court agrees with Susman that nothing in the order shows a compelling interest."); *supra* at pp. 17-18.

Similarly, the Order is not narrowly tailored:  it lacks "precision of regulation," which is a fatal defect when "political expression or association is at issue."  *In re Primus*, 436 U.S. 412, 432, 434 (1978) (citation omitted).  As just one example, the Order sweeps so broadly as to potentially bar Susman employees from *all* federal buildings—including "courthouses, Post Offices, the VA hospital and beyond."  Tr. 47:5-7.

b.  Defendants' contrary arguments lack merit.  They try to defend Section 3 of the Order as narrowly tailored, claiming that it "applies" only "to a small number of government contractors" who "must merely identify business with [Susman] for the limited purpose of facilitating agency review of government contracts with [the Firm]."  Mot. 23.  But that is not what the Order says.  Section 3's disclosure obligations apply to "Government contractors," full stop.  Order § 3(a).  And once Susman's clients have identified themselves, agency heads must "review all contracts with Susman *or* with entities that disclose doing business with Susman" in order to "align" funding priorities with the "interests of the citizens of the United States"—interests, one might recall, that the Order finds that Susman undermines.  *Id.* §§ 1, 3(b) (emphasis added).  Section 3 thus threatens

21

the termination of *all* government contracts held by *any clients* of Susman—regardless of whether the work Susman does for the client relates to the government contract, and regardless of whether the contract relates in any way to purported national-security concerns. That penalty is not narrowly tailored by any measure.

Separately, Defendants resist the charge of viewpoint discrimination on the ground that "a funding program [that] supports one point of view does not necessarily establish viewpoint discrimination against disfavored alternatives." Mot. 22 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991)); *see id.* (asserting that "[c]hoosing who to contract with is not 'viewpoint discrimination'" because there are "only so many government contracts to go around"). But although the government may choose to subsidize certain perspectives over others, the government may not do what the Order does here: use its power over federal funding to manipulate speech "outside the scope of the federally funded program." *USAID v. All. for Open Soc'y Int'l*, 570 U.S. 205, 217 (2013) (citation omitted); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 832-33 (1995); *Rust*, 500 U.S. at 193. By attempting to leverage the contracting process to manipulate speech that has nothing to do with government contracts, the Order violates the First Amendment. *See Rosenberger*, 515 U.S. at 834 (government may not "discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas'" (citation omitted)).[6]

---

[6] For those reasons, this Court should deny the government's motion to dismiss not only Count II (claiming viewpoint discrimination) but also Count V, which challenges the Order's creation of a new condition of government contracting—that contractors not work with Susman—as a violation of the First Amendment and the Spending Clause. Compl. ¶¶ 175-81. The government does not argue that Count V fails to state a claim, and has therefore forfeited any such argument. In addition, Susman adequately alleges that the Order creates a new funding requirement that "leverage[s]" government contracting to "regulate speech outside the contours of the federal program itself." *Id.*

### 3. The Complaint Adequately Alleges Violation of the Petition Clause (Count III)

Susman also states a claim that the Order violates its right to petition. *See* Compl. ¶¶ 162-67. The government protests that Susman's claim under the Petition Clause is "conclusory" and thus "due no weight at all." Mot. 29-30. But Susman's complaint is far from conclusory on that score—it plausibly alleges that the Order violates the Petition Clause twice over. First, the Complaint alleges that the Order punishes Susman for past petitioning activity. *See* Compl. ¶¶ 144, 163. That runs afoul of the First Amendment's prohibition of "any sanction on" good-faith petitioning activity. *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009). Second, the Complaint alleges that the Order interferes with the ability of Susman attorneys to exercise their right to petition on an ongoing basis by restricting federal employees from engaging with Susman, which interferes with the Firm's ability to petition administrative agencies, and by limiting Susman's access to federal courthouses—a particularly blatant violation of the petitioning right. *See, e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). It is only *Defendants'* argument in support of dismissal of the claim that is conclusory, as that argument simply fails to engage with any of those infringements on Susman's petitioning rights.

### 4. The Complaint Adequately Alleges an Unconstitutional Restriction on Freedom of Association (Count IV)

As the Complaint adequately alleges, the Order's government-contractor provisions amount to an infringement of the right to associate. *See* Compl. ¶¶ 168-74. By demanding that government contractors "disclose any business they do with Susman," Order § 3(a), the Order "compel[s] disclosure" of Susman clients' "affiliation" with the Firm, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-07 (2021). And by subjecting any contractors who have associated with Susman to a risk of having their contracts terminated and facing other penalties, Order § 3(b); *see supra* at p. 5, the Order's disclosure requirements deter clients from continuing their

relationship with the Firm, *see Ams. for Prosperity Found.*, 594 U.S. at 606 (threats of economic reprisal have a chilling effect). In fact, that deterrent effect is the Order's express goal: it is aimed at discouraging contractors from continuing to retain Susman or from retaining it in the future. *See* Order § 1 (Susman "should not . . . be deemed [a] responsible steward[] of any Federal funds").

The Complaint also properly asserts that such infringement on the freedom of association fails the applicable level of scrutiny, which is exacting. *See Ams. for Prosperity Found.*, 594 U.S. at 607. Once again, the government's stated purpose of suppressing the exercise of First Amendment rights cannot possibly be a "sufficiently important interest." *Id.* The government has no legitimate interest, let alone an important one, in "coerc[ing] private parties in order to punish or suppress" disfavored views. *Vullo*, 602 U.S. at 180. And although Defendants stress that Section 3 requires Susman's clients to make a "*factual* disclosure" that is reviewed by the government and not distributed "to the public as a whole," rather than to "adopt any viewpoint," Mot. 20-21, that does not make the provision any more constitutional. The challenged statute in *Americans for Prosperity Foundation* likewise required a viewpoint-neutral disclosure of factual information to the government, without "disclosure to the general public," but the Supreme Court still found that the requirement violated the First Amendment because of its chilling effect. 594 U.S. at 600-01, 611, 616 (disclosure of identities of "major donors").

Defendants also suggest that the freedom-of-association claim must fail on the ground that the government is "entitled to monitor" Susman via Section 3 of the Order because "when business conducted with Susman Godfrey is 'related to the subject of the Government contract,' it is very likely that Susman Godfrey is a government subcontractor." Mot. 20. That suggestion rests on asserted facts that this Court cannot consider as a basis for dismissal—not to mention that the notion of Susman as government subcontractor when it does legal work in connection with its

clients' government contracts is both utterly fanciful and entirely unsubstantiated. In any event, Defendants' argument in that regard addresses only the subsection of Section 3 that applies when the "business" a contractor does with Susman "is related to the subject of the Government contract," Order § 3(a), and Section 3 sweeps far more broadly than that, *see supra* at pp. 21-22.[7]

**B.    The Complaint States Claims for Violations of Due Process**

A due-process claim must proceed when a plaintiff plausibly alleges that it (1) faces a deprivation of a protected liberty or property interest, and (2) has not received the process that is due. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Susman has plausibly alleged just that here. Moreover, the Complaint amply pleads that the Order is unconstitutionally vague, which gives rise to an independent due process violation.

**1.    The Complaint Adequately Alleges That the Order Deprives Susman of Protected Liberty and Property Interests with No Process Whatsoever (Count VI)**

a.    The Complaint plausibly alleges that the Order deprives Susman of at least three independent liberty and property interests. *See* Compl. ¶¶ 182-90. First, the Order "formally or automatically exclude[s]" the Firm and its attorneys from government work, or at minimum has "the broad effect of largely precluding" them "from pursuing [their] chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998) (citation omitted); *see Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (liberty interest in "a chosen profession free from unreasonable governmental interference"). Second, the Order deprives Susman of its "good name,

---

[7] Because the government has tried to treat each section of the Order in a vacuum—rather than as part of an intertwined, unified package of retaliatory sanctions, *see infra* at pp. 33-34—the government mistakenly concludes that Susman does not challenge Section 2(b). Mot. 12 n.1. But Section 2(b)'s revocation of any materials and services provided to Susman by the government violates the First Amendment for all of the same reasons the rest of the Order does: it is a penalty based on the Firm's perceived viewpoint, levied to punish various forms of First Amendment protected activity. Section 2(b) must be enjoined with the rest of the Order. *See* Compl. ¶¶ 13, 141-61.

reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  Third, the Order deprives Susman of its protected property interest in contracts with its clients.  *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010) ("contracts between private parties may give rise to" protected "property interests").

It is bedrock law that the Due Process Clause requires notice and an opportunity to be heard before such deprivations.  *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 318 (D.C. Cir. 2014) (recognizing that "the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process").  But as the government cannot contest, Susman did not receive any process at all before being subjected to the Order.  Compl. ¶¶ 187-88.  Susman was not, for instance, "informed, prior to the issuance of the Order, of the conduct that would subject the Firm to punishment or the severity of the potential punishment."  *Id.* ¶ 187.  Nor was Susman "given any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement."  *Id.* ¶ 188.

b.  The government's jumbled arguments supply no basis for dismissing Susman's due-process claim.  At the threshold, the government fails to respond to the Firm's well-pleaded allegations that, without any process, the Order (1) prevents Susman and its attorneys from pursuing their chosen profession, and (2) interferes with the Firm's relationships with clients.  *See* Compl. ¶¶ 184-86.  Count VI can proceed for that reason alone.

At any rate, the Order likewise deprives Susman of its constitutionally protected reputational interests.  It is well settled that Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process.  *Fox*, 567 U.S. at 255-56.  The Order tarnishes the Firm's reputation by announcing that all Susman attorneys are unworthy to work on government contracts (or for government contractors); possess

national-security information; enter government buildings; engage with government employees; receive government funds, goods, property, or services; or be hired by government agencies. *See* Order §§ 1-3, 5. The Order also has a series of stigmatizing assertions about the purportedly "egregious" nature of Susman's actions, stating (for example) that the Firm has "degrade[d] the quality of American elections" and supported "dangerous efforts to undermine the effectiveness of the United States military." *Id.* § 1. This creates the prospect of wide-reaching reputational damage, including as to potential jurors and others who may read reports of the Order.

In response, the government invokes the inapposite "reputation-plus" line of cases. According to the government, those cases stand for the proposition that when a *government employee* is terminated, she must allege that she was defamed in order to assert a procedural due-process claim. Mot. 10. But Susman is *not* a government employee that is being terminated; the Firm is a private organization that is the target of government retaliatory sanctions. And even under the government's own cases, defamation is not a requirement of a due-process claim where, as here, the reputational injury is not merely a product of "official *speech*, but [of] a continuing stigma or disability arising from official *action*." *Campbell v. District of Columbia*, 126 F. Supp. 3d 141, 153 (D.D.C. 2015) (citation omitted). For both of those reasons, Susman need not prove the merits of a defamation claim to show that it has been deprived of a cognizable reputational interest. At minimum, the Order infringes on the Firm's reputational interests and thereby triggers the protections of the Due Process Clause. *See Constantineau*, 400 U.S. at 437 ("due process comes into play" whenever "the State attaches a badge of infamy"); *Gross v. Lopez*, 419 U.S. 565, 574-75 (1975) (similar).[8]

---

[8] The government also contends that the Complaint "does precious little to contest any particular fact in Section 1." Mot. 9. That is both beside the point and wrong. The Complaint, for instance,

### 2. The Complaint Adequately Alleges That the Order Is Impermissibly Vague (Count VII)

The Complaint plausibly alleges that the Order is void for vagueness. *See* Compl. ¶¶ 191-97. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Here, the Order is drafted to create immediate, irremediable uncertainty about the scope of the disabilities placed on Susman and its clients—and to leverage that vagueness for its *in terrorem* effect. *See* Susman Mot. 27-28; Compl. ¶¶ 191-97. Susman and its clients have no way to know the full scope of the Order's restrictions, the standards by which it will be enforced, or what exactly triggered the Order's draconian punishments in the first place.

Unable to defend that vagueness on the merits, the government leads with the remarkable assertion that because the Order is not a criminal statute it *cannot* be unconstitutionally vague or, at minimum, is subject only to a relaxed version of the vagueness doctrine. Mot. 10-11. The Supreme Court has squarely rejected that argument. In *Sessions v. Dimaya*, 584 U.S. 148 (2018), "[t]he Government argue[d] that a less searching form of the void-for-vagueness doctrine applie[d] . . . because this is not a criminal case," *id.* at 156, but the Court reaffirmed its longstanding rule that "the 'void for vagueness' doctrine" is "applicable to civil as well as criminal

---

specifically contests the Order's allegation that Susman "administers a program where it offers . . . employment opportunities only to 'students of color.'" Order § 1. As explained, "Susman does not have any program that offers employment opportunities only to people of color." Compl. ¶ 155. Indeed, the Susman Godfrey prize, with which the government appears preoccupied, does not involve employment opportunities at all. *See* Susman Godfrey, *The Susman Godfrey Prize* (available at https://www.susmangodfrey.com/the-susman-godfrey-prize/) (accessed Apr. 30, 2025). And the Complaint repeatedly describes the Order's accusations of, among other things, "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military" and "weaponiz[ing] the American legal system and degrad[ing] the quality of American elections," Order § 1, as "unfounded," *e.g.*, Compl. ¶ 134, which they are.

actions," *Boutilier v. INS*, 387 U.S. 118, 123 (1967); *see* 584 U.S. at 156; *see also, e.g.*, *Newman v. Moore*, 743 F. Supp. 3d 62, 72 (D.D.C. 2024) ("vagueness doctrine applies" with full force to all "laws that regulate the primary conduct of private citizens," including "'laws that restrict speech,' and 'laws that regulate businesses'") (citation omitted).

That rule applies with special force where, as here, courts confront civil government action relating to speech.  As the Supreme Court explained in *FCC v. Fox Television Stations*, "[w]hen speech is involved, rigorous adherence to [fair-notice] requirements is necessary to ensure that ambiguity does not chill protected speech," 567 U.S. at 253-54, particularly where the challenged orders are likely to have "an adverse impact on [the target]'s reputation," *id.* at 256.  That precisely describes the situation presented in this case.

Defendants' other main argument on vagueness is that the Order cannot be improperly vague because it "refers to racial discrimination, which is already prohibited by civil rights laws" (Mot. 11)—but that argument is a makeweight.  Susman never alleges that the Order is impermissibly vague on the ground that it references civil rights laws.  *See* Compl. ¶¶ 191-97. Allowing Susman's due process claim to proceed would thus in no way "call into question the constitutionality" of those laws.  Mot. 11.  Rather, Susman contends that the Order is void for vagueness because it gives federal agencies sweeping discretion to impose severe consequences on Susman for ill-defined conduct—and thereby to deter Susman from representations and advocacy that could be perceived as adverse to the President's interests or the government's interests more broadly.  That is paradigmatic vagueness that invites "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### C.    The Complaint Adequately States an Equal Protection Claim (Count IX)

The Complaint also plausibly alleges an equal protection claim.  *See* Compl. ¶¶ 203-211. "Nowhere are the protections of the Equal Protection Clause more critical than when [the

government] singles out one or a few for uniquely disfavored treatment." *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 813 (D.C. Cir. 1988); *see Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). Here, the Order intentionally singles out Susman for differential treatment—without so much as a rational basis for that difference, much less the "appreciably more" persuasive justification that is required when First Amendment activity is burdened. *News Am. Pub., Inc.*, 844 F.2d at 802.

The government's counterarguments have no force. First, the government contends that the "class-of-one theory of equal protection is inapplicable in the government employment context." Mot. 17 (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008)). But the Order does not involve "subjective, individualized determinations" akin to adjudicating "employee grievance[s]"—much less actual individualized personnel decisions. *Engquist*, 553 U.S. at 602, 609. To the contrary, it is a clear order to federal agencies to target Susman and its government-contractor clients, *see* Order § 3, and it hamstrings Susman's ability to do business with the federal government in a host of other ways, *see, e.g.*, *id.* §§ 2, 5.

Second, the government insists that Susman is not "'similarly situated' to other potential government contractors who do not engage in unlawful DEI practices" and that the Order's distinction "between potential contractors who 'engage in [racial discrimination]' and those who do not" is "plainly rational." Mot. 17. But where, as here, "animus is readily obvious" or "easily demonstrated" on the face of government action, myopically applying the comparator requirement is unwarranted. *Swanson*, 719 F.3d at 784; *see Cordi-Allen v. Conlon*, 494 F.3d 245, 251 n.4 (1st Cir. 2007). Moreover, even setting aside the Complaint's (accurate) allegations that Susman does *not* engage in unlawful practices (*see, e.g.*, Compl. ¶ 155), the Order is the furthest thing from a general policy that distinguishes between firms that allegedly discriminate and firms that do not.

Susman was not even included among the twenty firms that received "letters from the EEOC Acting Chair" regarding employment discrimination.  Mot. 25; *see* Compl. ¶ 140.  Yet the Order homes in on only Susman.  The government has no legitimate reason for such targeting, and a "bare . . . desire to harm a politically unpopular group" is not a "legitimate state interest[]."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation omitted).

### D.    The Complaint Adequately Alleges That the Order Violates Susman's Clients' Due Process Right to Counsel (Count VIII)

Susman also has adequately pleaded that the Order violates its clients' rights to counsel.  *See* Compl. ¶¶ 198-202.  The Fifth Amendment protects litigants in civil and criminal cases alike against arbitrary deprivations of their counsel of choice.  *See Powell*, 287 U.S. at 53, 68-69; *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873-74 (D.C. Cir. 1984).  The Order amounts to exactly such arbitrary and unjustified interference.  By "limiting" Susman attorneys' ability to "engag[e] with" government officials or "access . . . Federal Government buildings," Order § 5(a), the Order limits Susman's clients' ability to participate in upcoming meetings and hearings via their counsel of choice.  The Order offers no legitimate rationale for those limitations, making it classically arbitrary.

To be sure, the right to counsel is "not absolute."  Mot. 30 (quoting *United States v. Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988)).  But at the very least, the Due Process Clause requires the government to point to *some* valid interest before it can infringe on that right.  *See Powell*, 287 U.S. at 68-69.  The Order flunks even that most basic test.  It does not identify any credible interest whatsoever to justify its intrusion on Susman's clients' right to counsel, and that groundless interference is a denial of due process.

**E.     The Complaint Adequately Alleges That the Order Exceeds the President's Statutory and Constitutional Authorities and Violates the Separation of Powers (Count X)**

The President lacks statutory or constitutional authority to impose the sanctions in Sections 3 and 5.  The "President's power, if any, to issue" an executive order "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  No statute authorizes the President or his executive officers to sanction a law firm for representing clients.  The President thus is exacting retribution against Susman without a scintilla of statutory authority.  Because the President is not exercising any power delegated by Congress, the Order could survive only if supported by some inherent executive power—but none applies here.  Article II confers no power to punish disfavored law firms through contracting orders and access restrictions; rather, "officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments."  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring).

Equally to the point, allowing the Executive to punish attorneys based on the President's personal pique over their past representations would countenance a massive intrusion on "the proper exercise of the judicial power."  *Velazquez*, 531 U.S. at 545; *see Stern v. Marshall*, 564 U.S. 462, 482-84 (2011).  In our adversarial system, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case."  *Velazquez*, 531 U.S. at 545.  Allowing the Executive to punish lawyers for the positions they take in court would "hamper[] . . . every court's ability to adjudicate its cases," Tr. 52:9-14, threatening "severe impairment of the judicial function," *Velazquez*, 531 U.S. at 546.  The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable."  *Id.* at 546.

32

It should come as no surprise that Defendants cannot identify a single example where the sort of campaign of retributive intimidation at issue here has ever been tried.  That no President in our history has attempted to wield the power of his office to attack a law firm for advocacy on behalf of clients is powerful confirmation that the Constitution does not permit, much less affirmatively authorize, this President's actions.  *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) ("That prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed.").

## III.   DEFENDANTS' PIECEMEAL EFFORTS TO SALVAGE THE ORDER LACK MERIT

To obfuscate the Order's pervasive and egregious unconstitutionality, Defendants urge this Court to consider it as a series of independent actions that bear no relation to each other.  But the Order is a single, comprehensive, and comprehensively unconstitutional executive action.  In all events, even if the Order could be segmented into separately analyzable pieces, the government's defenses would still fail.

1.  Contrary to Defendants' position, the Order must be analyzed as a whole, not artificially chopped up into its constituent parts.  Mot. 3-4.  Where different provisions of an executive order "are so mutually connected with and dependent on each other" that it is apparent "that the [President] intended them as a whole," then a fatal flaw in any one provision takes down the whole order.  *Allen v. City of Louisiana*, 103 U.S. 80, 84 (1880) (citation omitted).  Here, the Order "embodie[s]" just such "a single, coherent policy, the predominant purpose of which" is to punish Susman for disfavored expression and associations that anger the President.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999).  After all, the very title of the Order announces its comprehensive aim of "address[ing]" the perceived "risks from Susman Godfrey."  Moreover, the entire Order is an act of retaliation against Susman—without due

process, and without a statutory or constitutional basis.  And the entire Order maligns Susman's "good name," "reputation," and "integrity."  *Constantineau*, 400 U.S. at 437.  The Order's various sections are reinforcing, and the Order is thus unconstitutional *in toto*.

2.  In all events, Defendants' attempts to defend the Order's various provisions one by one each fall flat.

a.  Defendants' effort to defend the statements in Section 1 as simple government speech reciting "what the current Administration thinks about" Susman, Mot. 1, 12, is utterly implausible. It is true enough that a President is "entitled to say what [he] wishes."  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (citation omitted); Mot 12.  But Section 1 is no mere presidential musing.

Section 1 announces official presidential findings and conclusions that imbue every substantive provision of the Order with its operative effect.  Section 1 makes the defamatory assertion that Susman's advocacy on behalf of its clients is "detrimental to critical American interests," Order § 1, and Section 3 instructs agencies to make funding decisions that are "aligned with American interests," *id.* § 3.  Section 1 thus lays the predicate—and sets the government policy—that will justify (even *require*) agencies' decisions to terminate contracts involving Susman or its clients.  Similarly, Section 1 falsely accuses Susman of racial discrimination, and then directs that such alleged conduct disqualifies Susman from "engage[ment]" with the government and access to the "Nation's secrets"—directions that are effectuated in the Order's later sections.  *See* Order §§ 2, 5.

*Vullo* forecloses Defendants' "government speech" argument.  There, a unanimous Supreme Court rejected a similar effort to treat an official's criticism of the NRA as "permissible government speech," reasoning that doing so would improperly treat that speech "in isolation"

from the official's concomitant threat to punish companies for associating with the NRA. 602 U.S. at 194-95. That reasoning applies *a fortiori* here, where Section 1's defamatory statements serve as the operative predicates for the punishments imposed in the Order's other provisions. The President may not announce defamatory "findings" and direct Executive Branch officials to target Susman for draconian punishment based on those findings, and then hide behind the disingenuous claim that the action and its underlying findings are mere government speech.

b. Defendants' efforts to insulate Section 2 (Mot. 12-13) are no more persuasive. Susman's challenge to Section 2 does not implicate any "nuanced" "predictive" "judgment call" about whether any "individual[]" should obtain or retain a clearance—that is, the sorts of individualized security decisions that are nonjusticiable. *See Dep't of Navy v. Egan*, 484 U.S. 518 (1988); *Lee v. Garland*, 120 F.4th 880, 886, 893 (D.C. Cir. 2024).[9] Rather, Susman contends that Section 2 unconstitutionally subjects Susman employees to a layer of procedure to which other clearance holders are not subject by directing agencies to suspend all Firm employees' clearances and then undertake an undefined "review" to re-evaluate their eligibility. *See* Order § 2. Section 2 does so based on a completely unsupported declaration that any Susman employee's possession of a clearance is likely inconsistent with the interests of the United States. Regardless of whether any clearances are permanently revoked, the Order immediately injures Susman's reputation and casts doubt on Susman lawyers' ability to acquire and retain clearances, thereby threatening their ability to obtain work that might require clearances. Section 2 inflicts those injuries without any

---

[9] Susman respectfully preserves the argument that *Lee* incorrectly deemed certain constitutional challenges to clearance determinations nonjusticiable. *Egan* says nothing about reviewability of constitutional challenges. *See* 484 U.S. at 520. And *Lee* denies plaintiffs "any judicial forum in which to raise" certain "colorable constitutional challenges," which creates a "serious" constitutional difficulty, even in the national-security context. 120 F.4th at 888 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)). Ultimately, though, that makes no difference here—even on its own terms, *Lee* does not bar Susman's claims.

process—and for the same retaliatory and viewpoint-discriminatory reasons as the rest of the Order.[10]  *See supra* at pp. 14-22.

Those claims against Section 2 are not barred by *Egan* and *Lee*.  *Lee* explains that courts may redress injuries that "exist[] regardless" of how government "resolve[s] any particular" clearance decision—as Susman's injuries clearly do.  120 F.4th at 893; *see Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993) (claim that agency "deprived [employee] of due process by firing him for security reasons without following proper procedures" was reviewable).  In addition, because Susman challenges the Executive's blanket policy, the Judiciary is well placed to adjudicate Susman's claims that the categorical security review violates the First and Fifth Amendments.  *See Gill v. DOJ*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) (equal protection challenge to "policy or practice of treating Muslims or naturalized citizens differently . . . would not be barred by *Egan*"); *Hegab v. Long*, 716 F.3d 790, 798 (4th Cir. 2013) (Motz, J., concurring) (similar).

The Order's vague and unsupported invocations of "national security," Order §§ 1, 5, do not alter that conclusion.  Nowhere does the Order even purport to make the sort of particularized national-security findings that would require deference under *Egan* and *Lee*.  Section 2 itself contains no findings about national security, mentioning only "the national interest"—a term that the Order makes clear is capacious enough to encompass things that have nothing to do with national security, such as diversity initiatives and election litigation with which the President

---

[10] Defendants are wrong to assert that procedures in the forthcoming clearance review will provide Susman with all the process it is due.  *See* Mot. 14-15.  The President's announcement that the Firm's attorneys cannot be trusted with classified information immediately damaged Susman's reputation.  And if the Order were permitted to take effect, the reputational harm would only compound, as clients would grow increasingly concerned about whether they could entrust the Firm with their most sensitive matters.  Post-deprivation procedures do nothing to safeguard Susman's interest in avoiding unwarranted public shaming at the hands of the President.

disagrees. The Order therefore leaves no doubt that references to the "national interest" describe the President's overt intent to retaliate against Susman for its protected conduct—not any particularized security decision. Further, whatever credibility such vague "national interest" concerns might otherwise have had is eliminated by the context of the President's broader campaign against law firms. Section 2 is identical to provisions appearing in each executive order targeting law firms. *See, e.g.*, Jenner Order § 2; Wilmer Order § 2. Yet the exact same "security" concerns about Paul Weiss apparently evaporated when the firm settled with the President in a way that did nothing whatsoever to affect national security.[11] *See* Compl. ¶¶ 107-10.

At the end of the day, Section 2 is openly and blatantly unconstitutional. Neither *Egan* nor *Lee* requires this Court to overlook that fact.

c. Defendants' efforts to salvage Sections 3 and 5 fare no better. Defendants contend that the Court can ignore the constitutional infirmities of the Order's contracting and personnel provisions because the government adopted those provisions in its capacity as a property owner and an employer—that is, "as a private party, not as a sovereign." Mot. 15-17, 29. In Defendants' view, because the government has acted in those purportedly non-sovereign capacities, its actions against Susman cannot be viewed as "punitive" or a "sanction" and thus necessarily fall "within the bounds of established executive authority." *Id.* at 1; *see id.* at 15-16, 22, 29. Defendants essentially urge that the President has unbounded authority to declare that he is not acting as a sovereign—even as he wields the immense power of the federal government to retaliate against

---

[11] For those reasons, *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), does not help Defendants. *Rattigan*'s narrow protection for security-related reporting that is not knowingly false has no application here, where Defendants' rescission of the Paul Weiss order demonstrates that any stated security concerns are illusory, and Defendants have been conspicuously unable to substantiate the Susman Order's reference to military effectiveness. Nor does *Rattigan* address anything like the categorical procedural injuries inflicted by the Order here.

perceived political opponents. The Court should reject that disturbing vision of presidential power.

The powers of the presidency do not include a free pass to violate the Constitution when a president purports to be acting in "non-sovereign" capacities. Even when the government acts as an employer or proprietor, it is constrained by the Constitution. The President thus cannot force public employees to "surrender all their First Amendment rights by reason of their employment," or otherwise make employment decisions on constitutionally proscribed bases. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see, e.g.*, *O'Hare Trucking Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996). He cannot invoke the government's role as purchaser to evade those same restrictions when making contracting decisions. *See O'Hare*, 518 U.S. at 721-22; *Umbehr*, 518 U.S. at 674-75; *see also USAID*, 570 U.S. at 214-15 (government may not "leverage funding" to federal funding recipients "to regulate speech outside the contours of the program itself"). And he cannot act as landlord to bar individuals from public buildings for reasons offensive to the Constitution. *See, e.g.*, *Rosenberger*, 515 U.S. at 829-30. Any other result would pose an existential threat to our system of ordered liberty, allowing the federal government to use its vast reach as the nation's largest employer, largest purchaser, and largest landlord to run roughshod over the rights and liberties of American citizens.

To be sure, when making ordinary employment or contracting decisions, the government may invoke an "interest in achieving its goals as effectively and efficiently as possible" as a "significant" interest for courts to consider. *Umbehr*, 518 U.S. at 676. But the Order provides no basis whatsoever for such an argument. It does not—because it could not—assert that federal contracting would be more efficient if contractors could no longer work with Susman, or that the government would function better if it were restricted from hiring or engaging with Susman employees.

Defendants now argue that "[i]t is inefficient for Federal funds to ultimately flow into the coffers of" a firm that "has proudly engaged (and appears to continue to engage) in racial discrimination." Mot. 21-22. That outrageous smear should be rejected. Putting aside that the predicate accusation of racial discrimination is false, *see supra* at pp. 17-18, those purported "policy reasons" are "nowhere to be found" in the Order, *Dep't of Homeland Sec. v. Regents of Univ. of Ca.*, 591 U.S. 1, 22 (2020)—and an unadjudicated allegation of discrimination against Susman can hardly justify terminating the contracts of Susman's *clients*. Defendants' argument thus "can be viewed only as [an] impermissible post hoc rationalization[]." *Id.* This Order is exactly what it appears to be: unconstitutional retaliation for Susman's advocacy. *See, e.g.*, *Vullo*, 602 U.S. at 196 (government cannot exercise otherwise legitimate functions "in order to punish or suppress . . . protected expression"); *Janus v. AFSCME, Council 31*, 585 U.S. 878, 907 (2018).

For similar reasons, Defendants are wrong that the Order cannot constitute a sanction or punishment just because it applies to contracting and employment decisions. Unlike a typical contracting or employment policy, the Order is a focused effort to punish a single professional firm. It imposes consequences to "address" Susman's purportedly "egregious conduct," including sanctions applicable to *all* of Susman's work with contractors, *all* of Susman's engagements with officials, and *all* of Susman's employees. *Id.* §§ 1, 3, 5. That is punishment, plain and simple.

Finally, Defendants' invocation of a history of the President using contracting actions to "advance social policy" dishonors the history it purports to invoke. Mot. 2; *see id.* at 16. Until now, no President has deployed contracting orders to effect a bill-of-attainder-esque punishment against a business that does work with federal contractors. The Order identifies no "social policy" that such a punishment could plausibly advance. Nor does caselaw support a free-ranging authority for the President to advance even facially legitimate policy preferences through

contracting orders:  as a statutory matter, this Circuit has required contracting orders to have "a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'"  *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted).  Other courts have struck down procurement orders notwithstanding strong arguments that their requirements advanced presidential policy priorities.  *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ($15 minimum wage for contractors); *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023) (mandatory vaccination policy).[12]  And even if Defendants could somehow show statutory authority for making contracting decisions due to political retaliation, that would not save the Order from constitutional scrutiny—which, as the Complaint alleges, the Order cannot survive.

## IV.    THIS COURT SHOULD NOT DISMISS ANY OF THE DEFENDANTS OR REJECT ANY OF THE REQUESTED INJUNCTIVE AND DECLARATORY RELIEF

Finally, Defendants contend that the Executive Office of the President ("EOP") and the United States are improper defendants, and that naming the United States is pretext for seeking improper relief against the President.  Mot. 31-35.  Those arguments are meritless.

1.  EOP is a proper defendant.  Defendants' objection appears to be that EOP has multiple offices and sub-entities.  Mot. 31; *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 558-59 (D.C. Cir. 1996).  But Defendants never explain why that suggests EOP is not a proper defendant; countless other federal agencies have numerous subdivisions and are nonetheless subject to suit.  Nor does the fact that Susman named as a defendant one of EOP's components,

---

[12] At a minimum, the President would need clear congressional authorization before he could use contracting authority to sanction a law firm.  *See Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("[s]eparation-of-powers concerns . . . caution us against reading legislation, absent clear statement," to give the Executive "authority to remove cases from the Judiciary's domain").

the Office of Management and Budget ("OMB"), suggest that EOP could not also be named. Plaintiffs routinely name as defendants in the same action both an agency and one of its components. *See, e.g.*, *Texas v. ATF*, No. 2:24-cv-89 (N.D. Tex. May 1, 2024) (naming ATF and its parent agency). *Armstrong*, the lone case the government cites for the proposition that EOP has multiple components, proves the point: the plaintiff there named both EOP and a component (the National Security Council), yet the Court never suggested that EOP was not a proper defendant. *See* 90 F.3d at 567.

2. The government is likewise mistaken that the United States is not a proper defendant. Mot. 32-33. The APA expressly authorizes naming the United States in *any* equitable challenge to agency conduct, stating that "[t]he United States may be named as a defendant in any . . . action" that (a) is brought in federal court, (b) "seek[s] relief other than money damages," and (c) challenges agency conduct. 5 U.S.C. § 702. Section 702 thus waives the United States' sovereign immunity in *any* suit meeting those conditions, "whether under the APA or not." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) (quoting *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006)). Further, under Section 702, any case satisfying those criteria "shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. And Section 703 confirms that an "action for judicial review may be brought against the United States, the agency by its official title, *or* the appropriate officer." *Id.* § 703 (emphasis added).

This suit undeniably satisfies Section 702's criteria. Susman (a) sued in federal court, (b) seeks declaratory and injunctive relief only, and (c) challenges agency conduct—specifically, numerous agencies' implementation of the Order. *See, e.g.*, Compl. pp. 64-65 (Prayer for Relief). Susman's suit therefore "shall not be dismissed . . . on the ground that it is against the United States." 5 U.S.C. § 702. In fact, the statute specifically states that "a judgment or decree may be

entered against the United States" so long as any injunctive order also "specif[ies] the Federal officer or officers (by name or by title) . . . personally responsible for compliance." *Id.* As explained below, Susman's proposed order includes just those specifications.

The government's scattershot responses misconceive governing law. The government invokes the inapt rule that "[s]uits alleging unconstitutional action by the Government must be brought 'against officials,' not against" the "'State[]' writ large." Mot. 32 (alteration in original) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). By editing the word "States" to "State[]" in that quotation, the government seeks to import principles relating to *state* sovereign immunity into this altogether different scenario. For *States* that have not waived their sovereign immunity, prospective relief ordinarily may be sought against only *state* officials, not against state agencies or States themselves. *See Ex parte Young*, 209 U.S. 123, 149-56 (1908). But that doctrine has no relevance to suits against the *United States* because Congress has unequivocally waived the United States' sovereign immunity with respect to suits seeking prospective relief. 5 U.S.C. § 702; *see Perry Cap.*, 864 F.3d at 620. This is such a suit.[13]

In a similar vein, the government misconstrues Section 702 to argue that sovereign immunity precludes agencies or officials not named in the complaint from being bound by an injunction. Mot. 33. Section 702 provides that when the United States is sued, an injunctive *order*—as opposed to the complaint—must "specify the Federal officer or officers . . . personally responsible for compliance." 5 U.S.C. § 702. Susman's proposed order accordingly specifies the federal officials who would be bound by a judgment against the United States. *See* Proposed Order

---

[13] The government elliptically suggests that *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), holds that principles governing suits against state officials apply wholesale to suits against the federal government. Mot. 32. That misreads *Armstrong*, which observes only that federal courts may enjoin both state and federal officials. *See* 575 U.S. at 326-27.

6-14 (Appendix A); *see also* Fed. R. Civ. P. 65(d)(2).

The government also briefly asserts that "[n]o cause of action exists against" the United States. Mot. 33. That is once again wrong. Susman has a well-established cause of action in equity to challenge unconstitutional conduct by federal agencies. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27; *Trudeau*, 456 F.3d at 186. And Congress could hardly have been clearer that when a plaintiff brings an action challenging agency conduct, "[t]he United States may be named as a defendant in any such action." 5 U.S.C. § 702; *see id.* § 703 ("[T]he action for judicial review may be brought against the United States.").

3. The government also is mistaken that the Complaint "nam[es] the United States as defendant to seek to dodge the well-settled prohibition against courts enjoining the President." Mot. 33. The United States "is included as a Defendant to ensure that the relief ordered by the Court will apply . . . to any federal agencies that are not specifically listed as defendants." Compl. ¶ 79. To reiterate, Congress and this Court have made clear that injunctive relief can be entered against the United States. *See* 5 U.S.C. §702; *see also, e.g.*, *Lederman v. United States*, 131 F. Supp. 2d 46, 63-64 (D.D.C. 2001), *aff'd and injunction expanded*, 291 F.3d 36, 48 (D.C. Cir. 2002). And to the extent that naming the United States and permitting injunctive relief to run against the United States when the President has directed impermissible government-wide actions obviates the need to enjoin the President himself, that is far from a "dodge," but rather a practice that facilitates respect for a coordinate branch of government.

Indeed, Defendants' logic suggests that this Court should be barred from enjoining not only the United States but also lower-level federal officials whenever doing so would have the effect of restraining presidential policies. *See* Mot. 33-35. That position is untenable and foreclosed by precedent. The Supreme Court, for instance, has time and again reviewed constitutional challenges

to presidential proclamations—and it has recognized that even though a plaintiff may not enjoin the President, he may obtain the same effective relief by prohibiting a lower-level official from carrying out the President's policy. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 682-83 (2018); *Youngstown*, 343 U.S. at 582; *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992). Awarding Susman effective relief against the President's attempt to retaliate against it by ordering relief against the United States, its agencies, and officials would be entirely consistent with longstanding remedial and separation-of-powers principles.[14]

4. Finally, if the Court agrees that relief is warranted, Susman respectfully requests that the Court enter a detailed remedial order along the lines of Susman's proposal to ensure the government's compliance. Unfortunately, this request is necessary because of the government's track record of compliance with TROs entered in cases brought by other law firms against analogous executive orders. *See, e.g.*, Memorandum and Order at 4, *Perkins Coie v. DOJ*, No. 25-cv-716 (D.D.C. Apr. 25, 2025), ECF No. 173 ("This is not the first instance in this case that has raised the potential specter of noncompliance.").

In *Jenner*, for instance, as of the time that Jenner filed its motion for summary judgment, "the Department of Justice had not yet complied with the requirement in the TRO that non-defendant agencies receive notice of the TRO specifically from Attorney General Pamela Bondi

---

[14] The government makes the unsupported suggestion that Susman lacks "any cognizable injury traceable to" agencies not named in the complaint. Mot. 35. But Susman plainly has standing to seek declaratory and injunctive relief from each federal agency *subject to the Order* because each agency's implementation of the Order causes Susman cognizable injury. *See, e.g.*, *supra* at pp. 4-9; Memorandum and Order at 11, *Perkins Coie v. DOJ*, No. 25-cv-716 (D.D.C. Apr. 25, 2025), ECF No. 173 ("[E]very Executive branch department, agency and entity subject to [the Perkins Order] shares responsibility for implementing this presidential directive."). And the government gives no reason why a plaintiff challenging an Executive Order that conscripts the full might of government must name every last federal agency. In all events, the government does not contest that Susman has standing to seek injunctive relief against the numerous agencies and agency heads that the Complaint names as defendants, as well as against the United States.

and Office of Management and Budget Director, Russell Vought." Memorandum of Law in Support of Motion for Summary Judgment at 14 n.15, *Jenner & Block v. DOJ*, No. 25-cv-916 (D.D.C. Apr. 8, 2025), ECF No. 19-1. Once that notice was finally sent, it tacitly instructed the non-defendant agencies to ignore the TRO, referring to "local district judge[s]" who have "yet again invaded the policy-making and free speech prerogatives of the executive branch," and declaring that the Jenner Order "was necessary policy" because Jenner is "committed to the weaponization of justice, discrimination on the basis of race, radical gender ideology, and other anti-American pursuits." Status Report, Ex. 1, *Jenner & Block v. DOJ*, No. 25-cv-916 (D.D.C. Apr. 8, 2025), ECF No. 21-1. In guidance issued after the *Perkins* TRO, the government likewise reiterated that it "reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie." Status Report, Att., *Perkins Coie v. DOJ*, No. 25-cv-716 (D.D.C. Mar. 20, 2025), ECF No. 32-1.

To be sure, Susman is not aware of comparable issues here since this Court issued its TRO. *See* Status Report, Att., ECF No. 28-1. But that is no doubt due in part to Susman's and the other firms' sustained efforts in these cases to ensure government compliance with court orders. To that end, when this Court rules on the merits, the Court should enter a detailed order along the lines of Susman's proposed order. Such an order will confirm what the government must do to remedy its flagrantly unconstitutional conduct, and it will preempt claims of remedial ambiguity on the part of the government. By contrast, entering a generic order would invite the government to test the limits of the relief that this Court deems necessary.

## **CONCLUSION**

The government's motion to dismiss should be denied.

Dated: April 30, 2025                    Respectfully submitted,


                                         */s/ Donald B. Verrilli, Jr.*
                                         Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
                                         Elaine J. Goldenberg (D.C. Bar No. 478383)
                                         Ginger D. Anders (D.C. Bar. No. 494471)
                                         MUNGER, TOLLES & OLSON LLP
                                         601 Massachusetts Avenue, NW, Suite 500E
                                         Washington, D.C. 20001
                                         (202) 220-1100
                                         Donald.Verrilli@mto.com
                                         Elaine.Goldenberg@mto.com
                                         Ginger.Anders@mto.com

                                         Brad D. Brian (*pro hac vice*)
                                         Michael R. Doyen (*pro hac vice*)
                                         Hailyn J. Chen (*pro hac vice*)
                                         MUNGER, TOLLES & OLSON LLP
                                         350 S. Grand Avenue, Fiftieth Floor
                                         Los Angeles, California 90071
                                         (213) 683-9100
                                         Brad.Brian@mto.com
                                         Michael.Doyen@mto.com
                                         Hailyn.Chen@mto.com

                                         *Attorneys for Susman Godfrey LLP*

                                         (*Additional counsel listed on following page*)

Bethany W. Kristovich (*pro hac vice*)
Adam B. Weiss (*pro hac vice*)
Jennifer L. Bryant (*pro hac vice*)
Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee (*pro hac vice*)
Shannon C. Galvin Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

* Admission pending

*Attorneys for Susman Godfrey LLP*