IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSMAN GODFREY LLP,<br><br>    Plaintiff,<br><br>  v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et* al.,<br><br>    Defendants. | Civil Action No. 25-1107 (LLA) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION** …………………………………………………………………….. 1

**LEGAL STANDARD**……………………………………………………………….2

**ARGUMENT** …………………………………………………………………………….3

    **I.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order** ……………………………………….4

    **II.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order**…………………………………………… 5

    **III.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order**…………………………………………. 7

    **IV.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order** …………………………………………. 14

    **V.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order** ………………………………………..17

**CONCLUSION**……………………………………………………………………18

Plaintiff Susman Godfrey LLP ("Susman" or "Plaintiff") has moved for summary judgment (ECF 51) and contends there is no genuine dispute that President Trump's April 9, 2025, Executive Order 14263, titled "Addressing Risks from Susman Godfrey," 90 Fed. Reg. 15615 (April 15, 2025) ("Order" or "EO") violates the First and Fifth Amendments, as well as the constitutional separation of powers. For the reasons set forth herein, the Court should deny Plaintiff's motion and grant Defendants' motion to dismiss (ECF 58), which is incorporated by reference herein.

## INTRODUCTION

Plaintiff alleges a litany of legal claims that only obscure what is a straightforward Executive Order. Plaintiff tries to frame EO 14263 as "punitive" or a "sanction," but such labels should not convince this Court. In fact, the preamble in Section 1 and the operative sections of the Order—Sections 2, 3, 4, and 5—fall well within the bounds of established Executive authority.

Section 1 is simply the speech of the Government itself. There is no First Amendment right to silence the Government. Crediting Plaintiff's argument carries with it a dangerous risk of the Judiciary muzzling First Amendment protected Executive speech.

Section 2 directs agencies to "review" whether "active security clearances" held by Plaintiff's employees "are consistent with the national interest." EO 14263 § 2. Plaintiff does not and cannot argue that it should enjoy security clearance privileges if *contrary* to the national interest. Moreover, courts have long held that the President is entitled to great deference when making this determination.

Similarly, Section 3 is an example of the use of the procurement power to advance social policy, a practice that stands on firm authority.

1

Section 4 simply clarifies that nothing in the EO "shall be construed to limit the action authorized by section 4 of Executive Order 14230," which in turn directs the Attorney General and the Chair of the Equal Employment Opportunity Commission ("EEOC") to review whether large law firms are violating the civil rights laws. This also falls well within the prerogative of the Executive.

Plaintiff's claims against Section 5's call for guidance on access to agency buildings and staff as well as hiring policies are simply unripe: No agency has yet issued anything of the sort. Regardless, issuing guidance on access to Executive Branch staff, offices, and employment—all in the service of national security and national interests—is firmly within the prerogatives of the Executive.

The Executive Order directs agencies to do what they should already be doing, declines to contract with entities who act inconsistently with valid social policies regarding discrimination, and calls for the lawful examination of security clearances and government access of employees of Plaintiff's firm. Plaintiff's challenge to the Executive Order fails on the merits. This Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion to Dismiss.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense – or part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." *Id.* Once the moving party has met this burden, to defeat the motion, the non-moving party must designate "specific facts showing that there is a

genuine issue for trial." *Mount v. Johnson*, 36 F. Supp. 3d 74, 82 (D.D.C. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). A genuine issue of material fact exists if the evidence, "viewed in a light most favorable to the non-moving party," could support a reasonable jury's verdict for the non-moving party. *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

## ARGUMENT

Plaintiff asks the Court to hold, as a matter of law, that the EO, which directs a review of Susman to ensure that the Federal Government's dealings with it are consistent with the national security of the United States and other public interests, is unconstitutional on its face and will cause Susman grievous harm, both financial and otherwise, if implemented. However, neither the law nor the facts warrant such a conclusion. The law makes plain that the terms of the EO are well within the scope of Presidential prerogative. Further, Susman's claims of injury are largely speculative and based on a misreading of what the EO actually calls for, as a section-by-section analysis makes clear. In its Memorandum in Support of its Motion (ECF 51-1), as in its complaint, Susman takes a blunderbuss approach to challenging the EO; for sake of clarity, Defendants will discuss this case by considering the EO section-by-section when weighing the legal merits and factual disputes.

Amid all the furor generated in the press and elsewhere, it is important to recognize the EO for what it is and what it is not. What it is *not* is the Executive Branch of the Federal Government acting in its capacity as sovereign to punish citizens for exercising their First Amendment Rights. What it *is* is the Executive Branch acting as contractor and employer, managing who it does business with and how, based on what it believes to be in the public

3

interest. For these reasons, the Court should deny Plaintiff's motion and instead grant Defendant's Motion to Dismiss (ECF 58), currently pending before the Court.

I. **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order.**

Section 1 of the Executive Order (EO) is precatory language describing Susman's activities as both a law firm and employer, as well as the Executive Branch's policy to end illegal racial discrimination.

Section 1 is a textbook example of protected government speech. The Supreme Court has made clear that "the Government's own speech . . . is exempt from First Amendment scrutiny." *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005). Like other governmental entities, the Executive Branch has the right to "speak for itself." *Bd. of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000). "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others." *Matal v. Tam*, 582 U.S. 218, 234 (2017). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009). "It is the very business of government to favor and disfavor points of view." *Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12–13 (1990).

Courts identify government speech by looking to history, the objective expectations of observers, and who exercises control over the message. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210 (2015). Presidents have long used the preambles

of Executive Orders to express their own views, including on policies to end racial discrimination. *See, e.g.*, EO 8802 (June 25, 1941) (describing "policy of the United States to encourage full participation in the national defense program by all citizens . . . regardless of race" and referencing "evidence that available and needed workers have been barred from employment . . . solely because of considerations of race"). Everyone recognizes this is the President's own speech. That is because the President alone controls the content of his Executive Orders, which he publicly signs. Section 1 of the EO is a paradigmatic example of government speech promoting a policy to end racial discrimination and referencing publicly documented facts, with which Plaintiff simply disagrees.

When individuals disagree with government speech, there is a constitutionally prescribed remedy. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). But courts are on dangerous ground when enjoining the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468–69. This Court should reject Plaintiff's attempt to short-circuit the democratic process by lawsuit.

**II.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order.**

Plaintiff takes aim at Section 2(a) of the Executive Order, claiming that the Court should enjoin the suspension of security clearances mandated by the Order because it is improperly categorical. *See* Pl.'s MSJ (ECF 51-1) at 35–38.

5

Plaintiff's claim should be rejected. As explained in Defendants' Motion to Dismiss, the process to undertake security clearance suspensions here is directly called for by the President, thereby implicating the concerns reflected in *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), and *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). *See* Defs' MTD (ECF 58-1) at 12. In *Lee* the D.C. Circuit held that it is outside the role of the judiciary to evaluate constitutional challenges to the President's determination of who is afforded security clearances. 120 F.4th at 893-94. That was for good reason. "Clearance decisions involve an assessment of intangible qualities such as loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." *Id.* at 893 (internal quotation omitted). And such decisions also "involve predictive judgment about whether individuals are likely to divulge sensitive information under compulsion of circumstances or for other reasons, which is an inexact science at best." *Id.* These are all "judgment call[s]" that are for the President to make, and courts simply lack the authority or capability to reweigh them. *Id.*

In the face of *Lee*'s clear import, Plaintiff attempts to distinguish it.[1] It cannot. Plaintiff suggests that *Lee* only applies to instances where the President revokes the security clearance of a "particular employee." Pl.'s MSJ (ECF 51-1) at 35. But *Lee* contains no such limitation. Again, the *Lee* court held that it lacked jurisdiction because "[a]djudicating constitutional challenges to clearance decisions often would present . . . unmanageable questions." *Lee*, 120 F.4th at 893. The questions become no less unmanageable when they apply to multiple persons rather than one. Nor has Plaintiff explained why the individual's employer is categorically

---

[1] Perhaps recognizing that these precedents control, Plaintiff seeks to preserve the argument that *Lee* was incorrectly decided. *See* Pl.'s MSJ (ECF 51-1) at 35 n.3. It is remarkable that Plaintiff would seek to overturn a six-month-old opinion. In any event, *Lee* is binding on this Court, and its plain terms support dismissal of Plaintiff's challenge to Section 2 of the EO.

irrelevant to such expansive (and legitimate) considerations as "strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." *Id.*

Furthermore, Plaintiff's argument ignores the fact that the EO itself provides for the very sort of individualized, nuanced review of clearances to determine whether such clearances are "consistent with the national interest." EO 14263 § 2(a). As explained in Defendants' Motion to Dismiss, any individual employee of Plaintiff with a security clearance that is suspended will receive appropriate process with regard to maintaining or restoring their individual security clearance. Defs' MTD (ECF 58-1) at 15–16. Indeed, Defendants' Motion outlined the requirements of "applicable law" reflected in EO 12968, 60 Fed. Reg. 40245 (1995), including the extensive process and procedural guarantees reflected therein and in agency regulations implementing those requirements. Defs' MTD (ECF 58-1) at 14–15. As explained in Defendants' Motion, any clearance suspension is subject to agency review consistent with applicable regulations. And until that happens and a further security clearance determination is made, any dispute on such matters is premature for judicial consideration. For these reasons and those explained in Defendants' Motion, Plaintiff's challenge to Section 2 of the Executive Order must fail.

**III.     The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order.**

Section 3 of the Executive Order concerns the Federal Government's contracting policies. As relevant, Section 3 issues two directives. First, "to the extent permissible by law," "Government contractors" shall be "require[d] . . . to disclose any business they do with Susman and whether that business is related to the subject of the Government contract." EO 14263 § 3(a). Second, "the heads of agencies shall . . . take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service." *Id.* § 3(b)(i).

7

When implementing Section 3, the Government is acting as a contractor. *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer."). The effort to combat racial discrimination through the procurement power has been a feature of executive orders since at least the 1940s. *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 168–71 (3d Cir. 1971). Such orders enjoy the firmest possible constitutional support. *Id.* at 170 ("In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), discussing varying levels of deference to Executive authority]: action pursuant to the express or implied authorization of Congress.").

The EO's concerns about racial discrimination are particularly pertinent in light of the Supreme Court's recent decision in *Students for Fair Admissions, Inc., v. President & Fellows of Harvard College*, 600 U.S. 81, 230 (2023) ("*SFFA*") (holding that admissions programs that lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful endpoints cannot be reconciled with guarantees of the Equal Protection Clause).

Furthermore, while Section 3 relies equally on Plaintiff's racial discrimination and its malfeasance in election litigation for its authority, *either* ground is sufficient to sustain its provisions. For example, in *McGowan v. State of Maryland*, 366 U.S. 420 (1961), employees convicted of violating a Sunday business closure regulation challenged the law as violating the First Amendment's prohibition against the establishment of religion. *Id.* at 430-31. The Court held that that the closure law was a valid exercise of the government's power to advance the

8

"health, safety, recreation, and general well-being of our citizens." *Id.* at 444. The Court held that whatever may have been the purpose of a legislature in enacting a statute, a "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id*. at 426. Similarly, in *United States v. O'Brien*, 391 U.S. 367 (1968), the defendant challenged his conviction for destroying a draft card on the basis that the law infringed on his First Amendment rights; rejecting the argument, the Court held that, "[i]t it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383. Importantly, it should be noted that both *McGowan* and *O'Brien* involved challenges to improper motives in the enactment of *statutes* which carry true *punitive* sanctions—in other words, where the state is acting as *sovereign*. Not so here. In this case, the Government is merely managing its contracts, with an eye towards an undisputed federal interest. *See Contractors Ass'n of E. Pa.*, 442 F.2d at 168-71.

This distinction between the Government as sovereign and Government as contractor is of critical importance given the Plaintiff's reliance on cases such as *National Rifle Association v. Vullo*, 602 U.S. 175 (2024). *Vullo* addressed a potential First Amendment violation where the state used its *sovereign* regulatory powers to threaten private actors with enforcement actions in an attempt to discourage disfavored speech. *Id*. This Executive Order carries with it none of the force of the powers exhibited in *Vullo*. Plaintiff cannot create a constitutional violation by reframing the Government's actions in forming contracts as punishment. In contrast with *Vullo* is the Supreme Court's decision in *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996). *Umbehr* also affirms the principles of *McGowan* and *O'Brien* that courts should refrain from striking otherwise constitutional acts due to allegations of improper motivations. In analyzing a contractor's claim that his business relationship with a government was cancelled due to

9

unlawful viewpoint discrimination, the Court held that even if a plaintiff made a *prima facie* claim of discrimination, the decision to terminate could be upheld if otherwise supported by factors independent of the First Amendment protected activity. *Id*. at 685 (the government "will have a valid defense if it can show, by a preponderance of the evidence, that, in light of their knowledge, perceptions, and policies at the time of the termination, the Board members would have terminated the contract regardless of his speech.").

The Executive's ability to tie its procurement procedures, *i.e.*, to choose with whom it will do business, to the fulfillment of its public policy goals, including those involving national security and civil rights, is also plainly displayed in statutory and regulatory texts. For example, Title 40 of the United States Code provides for the management of Federal properties and the organization of the General Services Administration. Section 121(a) of title 40 specifically references the President's ability to prescribe policies necessary to carry out these powers. This Presidential authority has been relied on in the past in the context of shaping social policy, most particularly with respect to President Johnson's Executive Order 11246, which aimed to prevent discrimination and promote equal employment opportunity by federal contractors and subcontractors.

This authority is reflected in other regulations as well, most conspicuously in the Federal Acquisitions Regulations ("FAR") system under Title 48 of the Code of Federal Regulations. Section 1.102(a) of that system specifically states that the purpose of the FAR is to deliver on a timely basis the best value product or service to the customer "while maintaining the public trust and fulfilling public policy objectives." Those regulations additionally emphasize the fulfillment of public policy objectives. *See* 48 C.F.R. § 1.102(b)(4). Again, 48 C.F.R. § 1.102(d) calls on Executive Agency staff to review, among other things, executive orders when determining

whether a purchasing policy is valid. Finally, the performance standards under 48 C.F.R. § 102-2(d) specifically state that government procurement decisions "must" support the attainment of public policy goals adopted by the Congress and the President. To this end, 48 C.F.R. § 52.249-2(a) explicitly provides a clause in each contract that provides the Government exceptionally wide latitude to "terminate performance of work" where "termination is in the Government's interest."

Regulation of Federal contracting decisions is fully applicable downstream to a contractor's subcontractors or clients pursuant to 41 CFR § 60-1. Section 60-1.4(b) specifically binds a contractor's subcontractor or purchase to the same standard to which the contractor itself is bound. Indeed, subpart 8 of this subsection specifically cites to EO 11246, under which President Johnson forbade Federal contracts to entities debarred for failure to adhere to the equal employment opportunity policies outlined therein.

These regulations confirm that the President possesses wide discretion in managing Federal procurement and contracts based on the President's public policy objectives, including those related to national security and civil rights. This Executive Order is designed to address diversity in the Federal contracting process. Diversity initiatives have always been legally suspect. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("Would a private employer not be guilty of unlawful discrimination if he refrained from establishing a racial hiring quota but intentionally designed his hiring practices to achieve the same end? Surely he would."). That is especially true after the Supreme Court's decision in *SFFA*. As the Court explained, it has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 600 U.S. at 220 (citing *Shaw v. Reno*, 509 U.S. 640, 647 (1993)).

*SFFA* could not have been clearer that applicants must be judged on their own merits, rather than as ambassadors for various identity groups: "The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well." *Id.*  Furthermore, Courts in this Circuit routinely give great deference to Executive Orders addressing the nexus between social policy and the procurement power.  *See, e.g.*, *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360, 366–67 (D.C. Cir. 2003).

As to Susman Godfrey's own practices, the Executive Order notes that the firm itself engages in "unlawful discrimination, including discrimination on the basis of race." EO 14263 § 1.  In particular, Susman Godfrey "administers a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.*  This point cannot be seriously contested.  Susman claims that the firm "does not have any program that offers employment opportunities only to people of color." Compl. ¶ 155.  Yet on May 1, Susman is scheduled to notify recipients of their award of a Susman Godfrey Prize, which provides a cash award and ongoing mentorship from Susman attorneys to selected "students of color."  *See* Susman Godfrey, *The Susman Godfrey Prize* (Lawson Declaration ¶ 3 & Ex. 1, attached to Defs' Resp. to Pl.'s Statement of Material Facts) (available at https://www.susmangodfrey.com/the-susman-godfrey-prize/) ("Susman Godfrey Prize").  Susman also has a diversity statement on its website describing diversity as "one of the firm's core values."  *See* Susman Godfrey, *Diversity* (Lawson Decl. ¶ 4 & Ex. 2) (available at https://www.susmangodfrey.com/diversity/).  Susman explains that it operates a "Diversity Committee" that "regularly meets to discuss and execute diversity-related initiatives," focuses on "recruiting and supporting lawyers who identify as members of groups underrepresented in today's legal profession," and advances "work first initiated by the

12

Racial Justice Working Group." *Id.* The firm has also signed a Gender Fairness Commitment statement, which includes the explicit goal "to achieve gender parity," *i.e.*, a quota. *Id.*; *see also* Houston Bar Association, *2018 Gender Fairness Commitment Statement* (Lawson Decl. ¶ 5 & Ex. 3).[2]

This is precisely the sort of racial and gender considerations prohibited by civil rights laws, and Susman appears to have fallen short of these principles. Such explicit race-based criterion goes well beyond the hidden considerations of race that the Supreme Court condemned in *SFFA*. On this basis, the United States is justified in using its procurement power to review such practices and to decline to contract with those that do. This use of the procurement power may be a decision that Plaintiff dislikes, but the President's decision to advance *SFFA* is well within the prerogative of the Executive Branch.

Second, Plaintiff's challenge to Section 3 is not yet ripe for review. These provisions call for government contracting agencies to begin the process of review of any contracts between the Government and Susman or entities doing business with it in accordance with the policies and findings set out in Section 1. That process has not started. Again, nobody has been deprived of or denied anything. Allegations of damage or harm at this point are purely speculative. At some future point, the contracting agencies will make their decisions regarding that status of Susman's

---

[2] Plaintiff claims that the Executive Order's statement that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," *see* EO 14263 § 1, is also false. This claim of falsehood in the EO is also misplaced. Susman has provided funds to GLBTQ Legal Advocates and Defenders (GLAD), which previously sued the Federal Government to enjoin Department of Defense policy, based on a radical theory of gender ideology. *See* Complaint, *Stockman v. Trump*, Civil Action No. 5:17cv1799 (C.D. Cal.) (ECF 1) (Lawson Decl. ¶ 11 & Ex. 9); GLAD Briefs (Winter 2018) at 11 (Lawson Decl. ¶ 12 & Ex. 10).

13

contracts.³  At that point, if Susman believes that such decisions are not "permissible by law," it should challenge such decisions at that time.

Finally, Section 3 does not unlawfully limit the ability of Susman to represent its clients. Pl.'s MSJ (ECF 51-1) at 10.  As this Court has recognized, generally "the attorney-client privilege does not protect from disclosure the 'identity of the client ... and the general purpose of the work performed.'"  *Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) (quoting *United States v. Naegele*, 468 F.Supp.2d 165, 171 (D.D.C. 2007)).  Law firms may be required to disclose the identity of a client yet still enjoy the full benefits of attorney-client privilege.  *See, e.g.*, *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371 (D.D.C. 1976).  Indeed, firms are regularly required to disclose the identity of clients in contexts raising national security concerns.  *See, e.g.*, Foreign Agents Registration Act, Pub. L. 75-583, 52 Stat. 631 (codified at 22 U.S.C. §§ 611 et seq.).  This additional disclosure requirement limited to a subset of government contractors is far afield from core associational rights.

For all these reasons, the Court should reject Plaintiff's challenge to Section 3 of the Executive Order.

## IV. The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order.

Section 4 of the EO merely clarifies that nothing in the EO shall be construed to limit inquiries by the Attorney General or EEOC into whether law firms are complying with civil rights laws—as provided for in a separate Executive Order.  Plaintiff alleges that Section 4 "is aimed at Susman's hiring and other employment actions," Pl. MSJ (ECF 51-1) at 7, despite the fact that Section 4 cross-references an entirely separate EO that applies in general terms to large

---

³ In fact, as noted in the MTD, it is unclear if Susman even *has* any contractual relationship with the Federal government for the provision of goods or services.

14

law firms. EO 14230 § 4. Unsurprisingly, then, Plaintiff does not separately argue in the MSJ that Section 4 is unlawful—and for good reason.

First, any supposed injury of Plaintiff is not traceable to the Executive Order. To repeat, Section 4 merely references the "review" and "investigat[ion]" of "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws. EO 14263 § 4; EO 14230 § 4. That is *already* what the EEOC is supposed to be doing. The EEOC is already "empowered . . . to prevent any person from engaging in any unlawful employment practice" under the civil rights laws. 42 U.S.C. § 2000e-5(a). The EEOC is already required to make "report[s] . . . to the President … on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review. *Id.* § 2000e-4(e). And members of the EEOC are already authorized, where appropriate, to initiate charges against "employer[s] . . . engaged in an unlawful employment practice." *Id.* § 2000e-5(b). In other words, even if the President *never* issued the Executive Order at issue in this case, Plaintiff would *still* be subject to inquiries by the EEOC—just like any other employer in the country.

Second, any proposed remedy demonstrates that Susman's supposed injury is not redressable. Plaintiffs cannot ask for this Court to enjoin the EEOC from simply reviewing the practices of large law firms for compliance with Title VII. To do so would be to grant Plaintiff immunity from Title VII liability—or indeed any EEOC inquiry whatsoever. That is simply not an appropriate form of relief.

Third, Susman's First Amendment retaliation claim fails on the merits, because the firm cannot show the requisite causal link. First Amendment retaliation claims require plaintiff to show (1) plaintiff engaged in conduct protected by the First Amendment; (2) defendant took retaliatory action against plaintiff, sufficient to deter an individual in plaintiff's position from

15

speaking again; and (3) a causal connection between the speech and the retaliation. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). First Amendment retaliation claims are analyzed under a but-for causation standard. *Houston Community College Sys. v. Wilson*, 595 U.S. 468, 477 (2022). But just as Susman lacks standing, so too does it fail to show a causal link. For one thing, Susman has not received an inquiry letter from the Chair of the EEOC. *See* Defs' MTD (ECF 58-1) at 25. Moreover, even before the Executive Order was issued, this Administration had begun taking steps consistent with the view that certain DEI practices, misapplied, could constitute a violation of Title VII. *See* EO 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"). EO 14173, issued more than two months *before* the challenged Executive Order, directed, among other things, Federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, EO 14173 § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination in large, private entities). The inquiry is also in line with EEOC and DOJ priorities, as both agencies announced, well in advance of the issuance of the EO at issue here, that "rooting out unlawful DEI-motivated race and sex discrimination" was among their top concerns. *See* EEOC, *President Appoints Andrea R. Lucas EEOC Acting Chair* (Jan. 21, 2025) (Lawson Decl. ¶ 7 & Ex. 5); Memorandum from Attorney General, Subject: *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025) (Lawson Decl. ¶ 9 & Ex. 7).

To put it simply, Section 4 directs the EEOC to do what it already should be doing. Inquiring into employment practices for consistency with Title VII is the very point of the EEOC. This Court should refuse to give Susman a blanket exemption from the civil rights laws.

V. **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order.**

Finally, Susman objects that Section 5 of the EO limits all Firm personnel from access to every Federal building, up to and including the ability to access any Federal courthouse, Article I court, administrative agency, or U.S. Attorney office. Pl.'s MSJ (ECF 51-1) at 25. On this maximalist reading, Susman alleges that Section 5 impermissibly interferes with Susman's attorney-client relationships. Once again, Susman's objection mischaracterizes the EO's language and claims harm prematurely.

To begin, the text of Section 5 simply does *not* limit any Susman employee, much less all of them, from such access and activities. Instead, it calls for agency heads to provide guidance as to whether or when to limit Susman employees from entering a government building; whether or when to limit Government employees from engaging Susman personnel in their official capacity; whether or when to bar Susman employees from being hired into government employment. What is more, such guidance is not arbitrary but is to be consistent with the national security and other government interests articulated throughout the language of the EO and again is limited to the extent "permissible by law." EO § 5. What that guidance might consist of remains to be seen. Surely some Federal facilities, contacts, and employment positions require tighter restrictions than others based on national security concerns. Likewise, depending on relevant factors, the suitability of individual Susman employees within such contexts likely would differ. That is what guidance is for.[4] However, scenarios such as *all* Susman attorneys being barred from courtroom practice is, currently, the stuff of imagination.

---

[4] Thus, Susman's argument about Section 5 being impermissibly vague is also meritless.

17

## CONCLUSION

For all the reasons stated herein, the Court should deny Plaintiff's motion for summary judgment and instead grant Defendants' motion to dismiss.

Dated: April 30, 2025
Washington, D.C.

Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General


/s/ *Richard Lawson*
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042

*Counsel for Defendants*