## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

            Plaintiff,

    v.

EXECUTIVE OFFICE OF THE PRESIDENT,
*et* al.,
           Defendants.

Civil Action No. 25-1107 (LLA)

### <u>DECLARATION OF RICHARD LAWSON</u>

1.  I serve as Deputy Associate Attorney General in the United States Department of Justice and am counsel of record for Defendants in the above-captioned case. The facts provided herein are based on my personal knowledge or on information provided to me in my official capacity.

2.  All exhibits attached to this Declaration were obtained by visiting the URLs or other cites noted below within the last ten days.

3.  Attached as Exhibit 1 is a true and correct copy of a Susman Godfrey website entry, *The Susman Godfrey Prize* (available at  https://www.susmangodfrey.com/the-susman-godfrey-prize/).

4.  Attached as Exhibit 2 is a true and correct copy of a Susman Godfrey website entry, *Diversity* (available at https://www.susmangodfrey.com/diversity/ ).

5.  Attached as Exhibit 3 is a true and correct copy of the Houston Bar Association 2018 "Gender Fairness Commitment Statement" referenced in Exhibit 2 under the

"Gender Fairness Commitment Statement" topic and available by clicking the URL link contained in that topic.

6.    Attached as Exhibit 4 is a true and correct copy of a March 19, 2025 joint Department of Justice and Equal Employment Opportunity Commission (EEOC) press release, *EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination* (available at https://www.justice.gov/opa/pr/eeoc-and-justice-department-warn-against-unlawful-dei-related-discrimination ).

7.    Attached as Exhibit 5 is a true and correct copy of a January 21, 2025 EEOC press release, *President Appoints Andrea R. Lucas EEOC Acting Chair* (available at https://www.eeoc.gov/newsroom/president-appoints-andrea-r-lucas-eeoc-acting-chair).

8.    Attached as Exhibit 6 is a true and correct copy of a March 17, 2025 EEOC press release, *EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices*, (available at https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei ).

9.    Attached as Exhibit 7 is a true and correct copy of a February 5, 2025 Memorandum from the Attorney General to Department of Justice employees, *Subject: Ending Illegal DEI and DEIA Discrimination and Preferences* (available at https://www.justice.gov/ag/media/1388501/dl?inline).

10. Attached as Exhibit 8 is a true and correct copy of a White House website entry, *The White House: Executive Office of the President* (available at https://www.whitehouse.gov/eop/).

11. Attached as Exhibit 9 is a true and correct copy of the complaint filed in

*Stockman v. Trump*, Civil Action No. 5:17cv1799 (C.D. Cal.) (ECF 1).

12. Attached as Exhibit 10 is a true and correct copy of "GLAD Briefs" (Winter

2018) (available at https://glad-org-wpom.nyc3.cdn.digitaloceanspaces.com/wp-

content/uploads/2018/02/glad-winter-briefs-2018.pdf ).


I hereby declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge, information, and belief.

Executed this 30th day of April, 2025.

RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

# Exhibit 1

# SUSMAN GODFREY

# The Susman Godfrey Prize

SHARE   BOOKMARK   PRINT

Susman Godfrey is accepting nominations for the 2025 Susman Godfrey Prize, an honor awarded annually to up to 20 students of color who are finishing their first or second year at an eligible law school. The Prize is part of the firm's ongoing commitment to celebrate and promote diversity among civil trial lawyers.

## 2025 SUSMAN GODFREY PRIZE RECIPIENTS WILL RECEIVE:

(1) a $4,000 cash award; and

(2) ongoing mentoring from Susman Godfrey attorneys.

Recipients will be recognized at a virtual reception held in their honor by Susman Godfrey.

Susman Godfrey will select Prize recipients from the following law schools, recognizing the alumni presence these schools have at the firm: UC Berkeley, UCLA, University of Chicago, Columbia, Harvard, University of Houston, Northwestern, NYU, Stanford, University of Texas, Yale, Penn, and University of Washington.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept" you consent to the use of ALL the cookies.

__Do not sell my personal information__.

Cookie Settings    Accept

Law school faculty members and administrators are eligible to nominate for the Prize students of color who have excelled academically in law school and have impressive overall achievement. There is no cap on the number of nominations from a law school.

---

# NOMINATIONS SHOULD INCLUDE:

**(1) a completed <u>Nomination Form</u>, and**

**(2) a letter of recommendation detailing the basis for the nomination and describing the nominee's academic excellence and overall achievement.**

---

Upon receipt of these materials, a representative of Susman Godfrey will contact the nominee for a copy of their law school transcript and resume. Please notify your nominee that we will be doing so.

## The deadline to submit nominations is February 17, 2025.

Susman Godfrey will evaluate the nominations and make award decisions based on a review of each nomination form, the accompanying recommendation letter, the nominee's law school transcript and resume, and a virtual interview with each finalist.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

<u>Do not sell my personal information</u>.

Cookie Settings     Accept

Susman Godfrey will meet virtually with finalists by April 1, 2025.

Susman Godfrey Prize recipients will be notified by May 1, 2025.

Downloaded and saved nomination forms and recommendation letters should be sent by email to sgprize@susmangodfrey.com or mailed to:

**SUSMAN GODFREY**

ATTN: Susman Godfrey Prize

1000 Louisiana Street, Suite 5100

Houston, TX 77002

Nominators who submit via email will receive confirmation of receipt within 48 hours of submission. Nominators who submit via mail should allow up to two weeks after submission to receive a call or email confirming receipt. If you do not receive confirmation within 14 days of submission or have any questions about the Prize or nomination process, please contact either of our co-managing partners:

### **KALPANA SRINIVASAN**

(310) 789-3106

ksrinivasan@susmangodfrey.com

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Do not sell my personal information.

Cookie Settings        Accept

### **VINEET BHATIA**

(713) 653-7855

vbhatia@susmangodfrey.com

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Do not sell my personal information.

Cookie Settings        Accept

# Exhibit 2



# SUSMAN GODFREY

# Diversity

SHARE    BOOKMARK    PRINT

Susman Godfrey is committed to growing diversity among its trial lawyers and in the legal profession. This commitment is one of the firm's core values and is essential to maintaining our position as the nation's premier litigation firm. Diversity enriches the experience and ability of all our lawyers, and it is critical to achieving winning results for our clients.

## Leadership    —

In 2020, the firm elected <u>Kalpana Srinivasan</u> to serve as the fourth co-Managing Partner in the firm's 40-year history. She is the first person of color to serve as managing partner, the first female managing partner, and the first leader of the firm to have risen through the associate ranks. With the 2021 election of <u>Vineet Bhatia</u> to serve as co-Managing Partner alongside Ms. Srinivasan, both of Susman Godfrey's managing partners identify with groups that are underrepresented in the profession, a testament to the firm's belief that diverse leadership is a critical factor to our success.

## Talent    —

Susman Godfrey seeks to attract the brightest legal minds from diverse talent pools and understands that promoting diversity is an ongoing mandate. The firm strongly encourages members of all grounds underrepresented in the profession to apply to join us. Susman Godfrey does not discriminate based on race, creed, religion, color, national origin, ancestry, sex, age, marital status, disability, sexual orientation, or gender identity.

## Diversity Committee    —

The Susman Godfrey Diversity Committee regularly meets to discuss and execute diversity-related initiatives. The Diversity Committee is comprised of partners and associates who are dedicated to improving diversity within the firm, including by recruiting and supporting lawyers who identify as members of groups underrepresented in today's legal profession. The Committee also continues work first initiated by the Racial Justice Working Group, which was created in the wake of the wanton killing of George Floyd.

## Gender Fairness Commitment Statement    —

Susman Godfrey has signed a Gender Fairness Commitment Statement as part of the Houston Bar Association's Gender Fairness Initiative.

## Unlimited, Gender-Neutral Parental Leave    —

Susman Godfrey offers unlimited paid parental leave to new parents, regardless of gender or caregiver status..

## Diversity Fellowship For 1L Students    —

Susman Godfrey offers a two-week fellowship to first-year law students who have overcome personal or systemic hardships or disadvantages, including experiences of those who self-identify as members of groups underrepresented in today's legal profession. The firm seeks diverse applicants who have excelled in their first semester of law school and want to learn firsthand about trial work at Susman Godfrey. Fellows receive $5,000 upon acceptance of the fellowship. Click here to apply.

## The Susman Godfrey Prize for 1L and 2L Students    —

In 2020, the firm developed and announced the Susman Godfrey Prize, an honor awarded annually to students of color who are finishing their first or second year at an eligible law school. Recipients of the SG Prize receive $3,500 and ongoing mentoring from partners and associates at the firm. Learn about our past winners here: 2024, 2023, 2022, 2021..

# Exhibit 3



### 2018 GENDER FAIRNESS COMMITMENT STATEMENT

WHEREAS the Houston Bar Association ("HBA") announced its Gender Fairness Initiative in 2003 patterned after similar programs of other bar associations; and

WHEREAS the HBA established a Gender Fairness Task Force to develop programs and policies to promote equality for women in law offices and corporate law departments; and

WHEREAS during the 2006-2007 bar year, the Task Force became a standing committee of the HBA and is now known as the Gender Fairness Committee; and

WHEREAS studies of the legal industry indicate that women remain underrepresented in law firms and among general counsel, law school deans, and the judiciary;

NOW THEREFORE on behalf of my law firm/law department, I commit to taking concrete action to achieve the following objectives:

1. To achieve a material increase in the number of women at the partnership level and/or in leadership positions in law firms and corporate/public sector law departments by 2020;

2. To develop and implement objective and unbiased criteria and procedures for the evaluation and promotion of women attorneys to partner and/or into leadership positions;

3. To promote policies, practices, sponsorship opportunities, and transparency to retain and advance women attorneys and to achieve gender parity;

4. To support processes to obtain feedback from employees regarding the advancement of women attorneys;

5. To offer formal and/or informal networking opportunities, client development activities, and mentoring programs to women attorneys at all levels to help women enhance their professional skills and develop their professional networks and client relationships;

6. To identify and promote opportunities for women attorneys at all levels to participate in career-advancing projects, leadership committees, practice groups, and management training to help enable women to assume significant management roles within their organizations; and

7. To allow for appropriate flexible work arrangements that present an equitable and viable option for all attorneys.

_____          _____
Signature                                 Name of Organization

Date executed:  _____

*Please return this signed form via regular mail, e-mail or fax to: Tara Shockley, Houston Bar Association, 1111 Bagby Street, FLB 200, Houston, TX 77002; Phone: 713-759-1133; Fax: 713-759-1710; <u>taras@hba.org</u>*

# Exhibit 4

Case 1:25-cv-01107-LLA   Document 159-2   Filed 04/30/25   Page 15 of 74



**PRESS RELEASE**

# EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination

Wednesday, March 19, 2025

**For Immediate Release**

Office of Public Affairs

## Employers' DEI Policies, Programs, and Practices Can Violate Title VII of the Civil Rights Act of 1964

Today, the U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Justice (DOJ) released two technical assistance documents focused on educating the public about unlawful discrimination related to "diversity, equity, and inclusion" (DEI) in the workplace.

DEI is a broad term that is not defined in Title VII of the Civil Rights Act of 1964. Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated — in whole or in part — by an employee's or applicant's race, sex, or another protected characteristic.

In the past five years, DEI policies, programs, and practices have become increasingly prevalent in many of our nation's largest and most prominent businesses, universities, and cultural institutions. The widespread adoption of DEI, however, does not change longstanding legal prohibitions against the use of race, sex, and other protected characteristics in employment.

To help educate the public about how well-established civil rights rules apply to employment policies, programs, and practices — including those labeled or framed as "DEI" — the EEOC and the DOJ today released a joint one-page technical assistance document, "[What To Do If You Experience Discrimination Related to DEI at Work](#)." The EEOC also released a longer question-and-answer technical assistance document, "[What You Should Know About DEI-Related Discrimination at Work](#)." Both documents are based on Title VII, existing EEOC policy guidance and technical assistance documents and Supreme Court precedent.

"Far too many employers defend certain types of race or sex preferences as good, provided they are motivated by business interests in 'diversity, equity, or inclusion.' But no matter an employer's motive, there is no 'good,' or even acceptable, race or sex discrimination," said EEOC Acting Chair Andrea Lucas. "In the words of Justice Clarence Thomas in his concurrence in *Students for Fair Admissions*, 'two discriminatory wrongs cannot make a right.'"

Lucas emphasized, "While the public may be confused about what rules apply to DEI, the law itself is clear. And there are some serious implications for some very popular types of DEI programs. These technical assistance documents will help employees know their rights and help employers take action to avoid unlawful DEI-related discrimination."

"The Department of Justice is committed to ending illegal DEI initiatives, policies, and programs," said Deputy Attorney General Todd Blanche. "The technical assistance document provides clear information for employees on how to act should they experience unlawful discrimination based on DEI practices."

*Updated April 25, 2025*

**Topic**

> **CIVIL RIGHTS**

**Component**

[Office of the Attorney General](#)

Press Release Number: 25-277

# Related Content

PRESS RELEASE

## Attorney General Pamela Bondi Hosts First Task Force Meeting to Eradicate Anti-Christian Bias in the Federal Government

Today, Attorney General Pamela Bondi hosted members of the President's Cabinet at the U.S. Department of Justice for the inaugural meeting of the Task Force to Eradicate Anti-Christian Bias in...

April 22, 2025

PRESS RELEASE

## Unlawful Illinois DEI Scholarship Program Suspended After Justice Department Threatened Lawsuit

Today, the Justice Department announced that it has acted to end the state of Illinois' unlawful minority-only scholarship program. After the Justice Department threatened to file suit, the state and...

April 11, 2025

PRESS RELEASE

## Attorney General Pamela Bondi Statement Regarding Creation of a 2nd Amendment Task Force

Attorney General Pamela Bondi released the following statement regarding her creation of a 2nd Amendment Task Force at the Department of Justice:

4/29/25, 6:23 PM Office of Public Affairs, EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination | United States Departm…

Case 1:25-cv-01107-LLA Document 159-2 Filed 04/30/25 Page 18 of 74

April 9, 2025

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# Exhibit 5

 **U.S. Equal Employment Opportunity Commission**

**Press Release**
01-21-2025

# President Appoints Andrea R. Lucas EEOC Acting Chair

WASHINGTON – The U.S. Equal Employment Opportunity Commission (EEOC) today announced that President Donald J. Trump has named Commissioner Andrea R. Lucas Acting Chair of the EEOC. Lucas has served as an EEOC Commissioner since 2020, having been nominated by President Trump during his first term.

"I am honored to be chosen by President Trump to lead the EEOC, our nation's premier civil rights agency enforcing federal employment antidiscrimination laws," Lucas said. "I look forward to restoring evenhanded enforcement of employment civil rights laws for all Americans. In recent years, this agency has remained silent in the face of multiple forms of widespread, overt discrimination. Consistent with the President's Executive Orders and priorities, my priorities will include rooting out unlawful DEI-motivated race and sex discrimination; protecting American workers from anti-American national origin discrimination; defending the biological and binary reality of sex and related rights, including women's rights to single-sex spaces at work; protecting workers from religious bias and harassment, including antisemitism; and remedying other areas of recent under-enforcement."

During her tenure on the Commission, Lucas has **written and spoken (https://www.eeoc.gov/andrea-r-lucas-acting-chair#section1)** frequently about challenging and emerging issues in employment and civil rights law to educate workers about their rights, help employers comply with their responsibilities, and correct common misunderstandings about the law.

4/16/25, 9:21 AM
Case 1:25-cv-01107-A Document 159-2 Filed 04/30/25 Page 21 of 74
President Appoints Andrea R. Lucas as Acting Chair of U.S. Equal Employment Opportunity Commission

"Our employment civil rights laws are a matter of individual rights. We must reject the twin lies of identity politics: that justice is measured by group outcomes and that civil rights exist solely to remedy harms against certain groups," Lucas said. "I intend to dispel the notion that only the 'right sort of' charging party is welcome through our doors and to reinforce instead the fundamental belief enshrined in the Declaration of Independence and our civil rights laws—that all people are 'created equal.' I am committed to ensuring equal justice under the law and to focusing on equal opportunity, merit, and colorblind equality."

Before her appointment to the EEOC, Lucas practiced labor and employment law for an international law firm in Washington, D.C. Earlier in her career, she clerked on the United States District Court for the Eastern District of Virginia. More information about Lucas is available at **https://www.eeoc.gov/andrea-r-lucas-acting-chair (https://www.eeoc.gov/andrea-r-lucas-acting-chair)** .

The EEOC is the sole federal agency authorized to investigate and litigate against private companies and other private employers for violations of federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal government's employment antidiscrimination effort. More information about the EEOC is available at **www.eeoc.gov (http://www.eeoc.gov)** . Stay connected with the latest EEOC news by subscribing to our **email updates (https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# Exhibit 6

 **U.S. Equal Employment Opportunity Commission**

**Press Release**

03-17-2025

# EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI–Related Employment Practices

WASHINGTON – Today, U.S. Equal Employment Opportunity Commission (EEOC) Acting Chair Andrea Lucas sent letters to 20 law firms requesting information about their diversity, equity and inclusion (DEI) related employment practices.

Based on publicly available information, the letters note concerns that some firms' employment practices, including those labeled or framed as DEI, may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based on race, sex, or other protected characteristics, in violation of **Title VII of the Civil Rights Act of 1964 (Title VII) (https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964)** .

"The EEOC is prepared to root out discrimination anywhere it may rear its head, including in our nation's elite law firms," Lucas said. "No one is above the law—and certainly not the private bar."

Title VII prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin. Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.

Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored. There is no "diversity" exception to these prohibitions. It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to businesses and other private sector employers.

The law firms that received letters from Acting Chair Lucas include:

1. A & O Shearman

2. Debevoise & Plimpton LLP

3. Cooley LLP

4. Freshfields Bruckhaus Deringer LLP

5. Goodwin Procter LLP

6. Hogan Lovells LLP

7. Kirkland & Ellis LLP

8. Latham & Watkins LLP

9. McDermott Will & Emery

10. Milbank LLP

11. Morgan, Lewis & Bockius LLP

12. Morrison & Foerster LLP

13. Perkins Coie

14. Reed Smith

15. Ropes & Gray LLP

4/29/25, 6:26 PM EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices…

Case 1:25-cv-01107-LLA Document 159-2 Filed 04/30/25 Page 25 of 74

16. Sidley Austin LLP

17. Simpson Thacher & Bartlett LLP

18. Skadden, Arps, Slate, Meagher & Flom LLP

19. White & Case LLP

20. WilmerHale

You can read the letters here: **https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf (https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf)**

The EEOC has established an email where whistleblowers can submit information to the EEOC about potentially unlawful DEI practices at law firms: lawfirmDEI@eeoc.gov. Whistleblowers should be aware that emailing allegations of unlawful discrimination, harassment, or retaliation to the lawfirmDEI@eeoc.gov email address, **does not constitute filing a charge of discrimination**. If you suspect you have experienced or witnessed DEI-related discrimination at a law firm, and you wish to file a charge of discrimination, contact the EEOC promptly because there are strict time limits for filing a charge—you can learn more about the process to file a charge at **https://www.eeoc.gov/filing-charge-discrimination (https://www.eeoc.gov/filing-charge-discrimination)** .

Information obtained from individuals who contact the EEOC is **confidential (https://www.eeoc.gov/confidentiality)** and will not be revealed to the employer until the individual files a charge of discrimination. Your employer may not fire, demote, harass, or otherwise retaliate against you for filing a charge or cooperating with the EEOC. The laws the EEOC enforces make it illegal for an employer to **retaliate (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** against someone who files a charge or someone who takes part in an EEOC process, investigation, or lawsuit.

The EEOC is the federal agency authorized to investigate and litigate against private companies and other private employers for violations of Title VII and other federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal

government's employment antidiscrimination effort. More information about the
EEOC is available at **www.eeoc.gov (http://www.eeoc.gov/)** . Stay connected with
the latest EEOC news by subscribing to our **email updates
(https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# Exhibit 7



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 ENDING ILLEGAL DEI AND DEIA DISCRIMINATION
                         AND PREFERENCES

       The Department of Justice is committed to enforcing all federal civil rights laws and ensuring equal protection under the law. As the United States Supreme Court recently stated, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). On January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") "violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* at 8633.

       To fulfill the Nation's promise of equality for all Americans, the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds.[1]

## I.     Ending Illegal DEI And DEIA Discrimination and Preferences

       By March 1, 2025, consistent with Executive Order 14173, the Civil Rights Division and the Office of Legal Policy shall jointly submit a report to the Associate Attorney General containing recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including policies relating to DEI and DEIA. The report should address:

- Key sectors of concern within the Department's jurisdiction;

---

[1] This memorandum is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex. It does not prohibit educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination.

- The most egregious and discriminatory DEI and DEIA practitioners in each sector of concern;

- A plan including specific steps or measures to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences, including proposals for criminal investigations and for up to nine potential civil compliance investigations of entities that meet the criteria outlined in section 4(b)(iii) of Executive Order 14173;

- Additional potential litigation activities (including interventions in pending cases, statement of interest submissions, and amicus brief submissions), regulatory actions, and sub-regulatory guidance; and

- Other strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws.

## II.    Guidance to Institutions Receiving Federal Funds

Educational agencies, colleges, and universities that receive federal funds may not "treat some students worse than others in part because of race." *Students for Fair Admissions*, 600 U.S. at 304 (Gorsuch, J., concurring).  Consistent with the January 21, 2025, Executive Order, the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue actions, regarding the measures and practices required to comply with *Students for Fair Admissions*.

# Exhibit 8

*The* WHITE HOUSE

Executive Office of the President

Office of Management and Budget

Office of Science and Technology Policy

Council of Economic Advisors

Office of the National Cyber Director

Office of National Drug Control Policy

Council on Environmental Quality

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

# Exhibit 9

LATHAM & WATKINS LLP
  Amy C. Quartarolo (SBN 222144)
   amy.quartarolo@lw.com
  Adam S. Sieff (SBN 302030)
   adam.sieff@lw.com
  Harrison J. White (SBN 307790)
   harrison.white@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

*Attorneys for Plaintiffs*
*Aiden Stockman, Nicolas Talbott,*
*Tamasyn Reeves, Jaquice Tate,*
*John Does 1-2, Jane Doe, and*
*Equality California*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDEN STOCKMAN; NICOLAS TALBOTT; TAMASYN REEVES; JAQUICE TATE; JOHN DOES 1-2; JANE DOE; and EQUALITY CALIFORNIA,<br><br>              Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; RYAN D. MCCARTHY, in his official capacity as Acting Secretary of the Army; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; and ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>              Defendants. | CASE NO. 17-CV-6516<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# **NATURE OF THE ACTION**

1.    This  action,  brought  on  behalf  of  transgender  individuals,  seeks  to ensure  that  all  qualified  Americans  have  an  equal  opportunity  to  serve  in  the United  States  military,  that  transgender  individuals  are  free  from  arbitrary  and invidious  discrimination,  and  that  the  constitutional  rights  of  transgender individuals  to  autonomy,  privacy,  and  freedom  of  expression  are  respected  and protected.

2.    In June 2016, following an exhaustive multi-year review supported by reams  of  data,  interviews,  and  analysis,  the  Department  of  Defense  ("<u>DOD</u>") announced  that  it  would  reverse  its  prior  unconstitutional  policy  barring  openly transgender  people  from  serving  in  the  military,  and  would  implement  a  policy expressly  allowing  transgender  people  to  serve  openly  in  the  United  States  armed forces ("<u>June 2016 Policy</u>").  Since that announcement, and in reliance thereon, hundreds of American servicemembers followed protocol and informed their chain of  command  that  they  are  transgender.   These  transgender  servicemembers  have continued  to  serve  without  incident.   In  addition,  as  a  consequence  of  the  DOD's announced  policy,  after  years  of  unlawful  exclusion,  openly  transgender  persons have  believed  for  the  first  time  that  it  is  possible  for  them  to  serve  their  country  in the Armed Forces.

3.    However, in a burst of Twitter statements on July 26, 2017, Defendant President  Donald  J.  Trump  abruptly  announced  that  the  United  States  military would  return  to  discriminating  unlawfully  against  transgender  people  solely because  of  their  transgender  status.   By  proclaiming  that  "the  United  States Government  will  not  accept  or  allow  Transgender  individuals  to  serve  in  any capacity in the U.S. Military," President Trump signaled that transgender troops would be barred altogether from serving openly in our Armed Forces.

4.    On  August  25,  2017,  Defendant  President  Trump  formalized  the government's  policy,  directing  his  co-Defendants  as  leaders  of  the  DOD  and

Department of Homeland Security ("DHS," and together with the DOD, the "Departments") to reinstate the ban "on military service by transgender individuals that was in place prior to June 2016" (the "August 25 Directive"). Specifically, President Trump directed the Departments (i) to ban the "accession of transgender individuals into military service," (ii) to "halt all use of DOD or DHS resources to fund sex reassignment surgical procedures for military personnel" except in limited instances, and (iii) to implement a plan to return to the prohibition on military service for transgender people, including those current servicemembers who, in reliance on the June 2016 Policy, came out to their command. *See Memorandum Regarding Military Service by Transgender Individuals,* -- Fed. Reg. -------- (entered Aug. 25, 2017) (publication forthcoming). President Trump's August 25 Directive, which carries the force of law, does not reference any evidence, facts or analysis to support the imposition of this categorical ban.

5.     Plaintiffs here are (i) Aiden Stockman, Nicolas Talbott, and Tamasyn Reeves, transgender individuals who have taken steps to enlist in the military, (ii) Jaquice Tate and several other openly transgender active servicemembers, proceeding as anonymous plaintiffs, who will be impacted by President Trump's August 25 Directive, and (iii) Equality California, the nation's largest statewide lesbian, gay, bisexual, transgender, and queer ("LGBTQ") civil rights organization.

6.     The August 25 Directive inflicts serious injuries upon Plaintiffs and Plaintiff EQCA's members. First, the August 25 Directive expressly forecloses transgender people from acceding into military service. Second, the August 25 Directive causes immediate and concrete injury to the current servicemember Plaintiffs, each of whom came out as transgender to their chain of command in reliance on the June 2016 Policy lifting the prior ban. Specifically, the current servicemember Plaintiffs will be subject to involuntary separation beginning March 23, 2018, suspending their reasonable expectation of continued service. Third, the August 25 Directive denies the current servicemember Plaintiffs equal

access to full medical care.  Fourth, the August 25 Directive chills the speech and expression of each of the Plaintiffs and Plaintiff EQCA's members.

7.     Fundamentally, without any rational basis, the August 25 Directive denies Plaintiffs and their members the equal protection of the laws, their right to freedom of expression, and their right to liberty and privacy, in violation of the First and Fifth Amendments to the United States Constitution.   Accordingly, Plaintiffs seek a declaration that the August 25 Directive is unconstitutional, and an injunction preventing Defendants from implementing and enforcing it.

## JURISDICTION AND VENUE

8.     This court has jurisdiction over the claims pursuant to 28 U.S.C. Sections 1331 and 1343.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

9.     Venue is proper in the Central District of California under 28 U.S.C. Section 1391(e) because Plaintiffs reside in this judicial district and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

10.     Plaintiff Aiden Stockman is a transgender man who wants to serve his country through military service, and has taken steps to do so.  Mr. Stockman, 20, was raised and currently resides in California.   Mr. Stockman has long been interested in serving his country and intended to join the Air Force.  As a young man, Mr. Stockman spoke with friends and neighbors who were stationed at nearby Twenty-Nine Palms Air Force Base to discuss what it is like to serve in the Air Force.   Mr. Stockman came out to his family as transgender in the eighth grade.  At or about that time, he began seeking medical advice related to gender transition.  In June 2014, when he was in the eleventh grade, Mr. Stockman began hormone replacement therapy ("HRT").   Later that year, Mr. Stockman took the Armed Services Vocational Aptitude Battery ("ASVAB") test consistent with his intention of acceding into the military.  He hoped to join the Air Force following

his graduation from high school, but wanted to complete a double-mastectomy (i.e., "top surgery") first.  After finding a doctor, Mr. Stockman ultimately made plans to undergo top surgery, planning to enlist thereafter.  The June 2016 Policy permitting open service by transgender people gave Mr. Stockman comfort that he would be able to pursue a career of military service.  However, upon learning of the August 25 Directive, Mr. Stockman felt crushed, as he will no longer be able to pursue his dream of serving his country in the Air Force.

11.   Plaintiff Nicolas Talbott, 23, is a transgender man currently residing in Ohio.   After graduating from college with a degree in sociology and criminology, he planned to enlist in the military in pursuit of a career in counter-terrorism.  Prior to issuance of the June 2016 Policy, Mr. Talbott contacted military recruiters on several occasions to express his interest in serving his country, but each time he was informed that regulations prohibited his service because he is transgender.   After the June 2016 Policy was announced, Mr. Talbott found a recruiter for the Air Force National Guard who advised that he would help him enlist.   Mr. Talbott met with the recruiter in December 2016 and filled out paperwork confirming his interest in acceding into the military.   The recruiter asked Mr. Talbott to obtain a letter from his doctor confirming that being transgender did not have any adverse effects on his life or his ability to perform military-related duties.   The recruiter advised that the next step in the process would be to meet with the regional Military Entrance Processing Station ("MEPS") for a physical exam and to take the ASVAB test, but later advised that MEPS would not begin processing for transgender enlistees until mid-2017.  Mr. Talbott scheduled his appointment with his doctor, began studying practice ASVAB exams, and was training regularly for the physical exam, all in anticipation of enlisting in 2017.   However, when President Trump tweeted about the re-enactment of the ban on transgender military service and then issued the August 25

/ / /

1    Directive, Mr. Talbott was devastated and knew that he would no longer be able to
2    pursue a military career.

3            12.    Plaintiff Tamasyn Reeves is a transgender woman currently residing
4    in California.  Ms. Reeves, 29, has wanted to join the Navy since she was 17.  Her
5    family has a tradition of service in the military: her grandfather served in the Navy
6    during the Korean War, two of her uncles served in the Air Force, and two of her
7    cousins served in the Navy.  Ms. Reeves first spoke to a recruiter at age 21.  The
8    recruiter told Ms. Reeves that she was not eligible to enlist because of the
9    military's then-policy banning LGBTQ individuals from military service.  At age
10   23, Ms. Reeves began HRT, but continued to be barred from enlistment.
11   Following issuance of the June 2016 Policy, Ms. Reeves decided to enlist as soon
12   as  the  final  procedures  for  accession  of  transgender  individuals  were
13   solidified.  The abrupt reversal in the August 25 Directive prevents her accession
14   into the military, despite her longstanding desire to do so.

15           13.    Plaintiff Jaquice Tate is a transgender man currently serving in the
16   Army.  He enlisted in 2008 because he wanted a career in which he could take
17   pride.  He hopes to serve a twenty year term.  Mr. Tate has served domestically and
18   internationally, including a deployment to Iraq.  Currently, he is a Military Police
19   Officer and he has served on drug suppression teams.   Each of his command
20   leaders awarded him a Colonel Coin of Excellence and he has received numerous
21   Army Achievement Medals.  The Army has approved his application to become a
22   Drill Sergeant.  In reliance on the June 2016 Policy, Mr. Tate informed his chain of
23   command of his true gender.  His chain of command has supported him throughout
24   his process of medical transition.   However, since issuance of the August 25
25   Directive, Mr. Tate fears that he will lose his job and retirement opportunities after
26   his nearly ten years of dedicated service.  Mr. Tate and his wife had planned to
27   begin the process of having children next year, but the financial uncertainty caused
28   / / /

1   by the August 25 Directive is forcing them to place their future family on hold

2   indefinitely.

3       14.    Plaintiffs John Doe 1-2 and Jane Doe are active duty servicemembers

4   who serve openly as transgender persons.  They proceed under pseudonyms for

5   fear of retribution.

6       15.    Plaintiff John Doe 1 is a transgender man who has served in the

7   United States Air Force since 2012.  John Doe 1 comes from a military family; his

8   father served in the military for 30 years.  John Doe 1 has plans make a career out

9   of military service as well.  John Doe 1 currently is stationed and resides in

10  California.   In reliance on the June 2016 Policy permitting open service by

11  transgender servicemembers, John Doe 1 felt that the military had become an

12  "open space" to come out.  In April 2017, John Doe 1 came out to his chain of

13  command.  John Doe 1 subsequently met with Air Force medical doctors and

14  psychologists to discuss gender transition, and received a diagnosis of gender

15  dysphoria.   John Doe 1 is awaiting a meeting with his medical team and

16  commander to discuss his transition plan.  John Doe 1 recently was awarded

17  Academic Achievement and Distinguished Graduate distinctions from the Airmen

18  Leadership School, and received a "Must Promote" performance report.  Although

19  his colleagues and chain of command have been supportive of John Doe 1 since he

20  came out, John Doe 1 believes that the August 25 Directive will preclude him from

21  obtaining promotions and further advancing his career in the Air Force.

22      16.    Plaintiff John Doe 2 is a transgender man currently serving in the

23  Army.  John Doe 2 voluntarily enlisted with the Army to serve his country, to

24  achieve financial security, and to honor his family's tradition of service.   His

25  technical expertise pertains to the operations, diagnostics, and maintenance of the

26  multichannel communications systems necessary for the Army to make real-time

27  strategic and tactical decisions.   His position requires Secret-level Security

28  Clearance.  John Doe 2 earned an early promotion wavier to become an Army

Specialist and was awarded two Colonel Coins of Excellence.  In reliance on the June 2016 Policy, he came out as transgender to his unit, his chain of command, and his medical providers.  John Doe 2 has begun medical transition to his true gender, and has received the support of his chain of command and his unit.  John Doe 2's current term of enlistment ends in 2020.  He had hoped to become a twenty-year veteran, but under the shadow of the August 25 Directive, John Doe 2 fears that his future in the military, and his ability to support his family, is in jeopardy.

17.    Plaintiff Jane Doe is a transgender woman currently serving in the Air Force.  In the seven years since she enlisted, Jane Doe has been deployed twice.  She currently is stationed abroad as a Staff Sergeant.  Jane Doe joined the military in hopes of serving her country, achieving financial stability and garnering personal skills such as discipline, self-respect and service of others.  After the ban on transgender service was lifted by the June 2016 Policy, Jane Doe came out to her chain of command.  She found her military colleagues to be supportive.  Jane Doe carefully reviewed the guidance and policies issued by the DOD, and after meeting with her doctors, made the decision to pursue transition-related medical care.  While she has received early promotions, two achievement medals and one commendation medal, she now fears that the August 25 Directive compromises her ability to achieve promotion, jeopardizes her medical benefits and ultimately forecloses her ability to continue her career in the military.

18.    Plaintiff Equality California ("EQCA") is an I.R.S. 501(c)(4) organization dedicated to LGBTQ civil rights.  Specifically, EQCA is dedicated to combatting discrimination and injustice on the basis of sexual orientation and gender identity, and to protecting the fundamental rights of those within the LGBTQ community and the vulnerable communities of which they are a part.  Its more than 500,000 members include transgender individuals in active military service, transgender military veterans, and transgender individuals who have taken

steps to serve and ultimately intend to pursue long-term careers in the United States Armed Forces.  EQCA's membership also includes family members and dependents of openly transgender individuals, each of whom share an interest in ensuring that all qualified individuals wishing to serve their country through military service are permitted to do so regardless of their gender identity.

19.    Defendant Donald J. Trump is President of the United States and Commander in Chief of the Armed Forces of the United States.  On July 26, 2017, President Trump announced via Twitter that transgender people would not be permitted to serve "in any capacity in the U.S. military."  On August 25, 2017, he delivered an official executive directive to the Departments concerning "Military Service by Transgender Individuals."  The August 25 Directive, which is to be formally published in the Federal Register, unlawfully bans transgender persons from enlisting or serving openly in the military and prohibits the military from paying for certain forms of healthcare related to gender transition.

20.    Defendant James N. Mattis is the United States Secretary Defense.  Secretary Mattis directs the Department of Defense, which has been charged with execution and implementation of the President's unlawful August 25 Directive.

21.    Defendant Joseph F. Dunford, Jr. is a United States Marine Corps General and serves as the current Chairman of the Joint Chiefs of Staff.   In conjunction with co-defendants, General Dunford, Jr. has been charged with execution and implementation of the President's unlawful August 25 Directive.

22.    Defendant Richard V. Spencer is the United States Secretary of the Navy.  Secretary Spencer directs the Department of the Navy and the United States Marine Corps, which have been charged with execution and implementation of the President's unlawful August 25 Directive.

23.    Defendant Ryan D. McCarthy is the Acting United States Secretary of the Army.   Secretary McCarthy directs the Department of the Army, which has

/ / /

1    been charged with execution and implementation of the President's unlawful

2    August 25 Directive.

3         24.    Defendant Heather A. Wilson is the United States Secretary of the Air

4    Force.  She directs the Department of the Air Force, which has been charged with

5    execution and implementation of the President's unlawful August 25 Directive.

6         25.    Defendant Elaine C. Duke is the Acting United States Secretary of

7    Homeland Security.    She directs the DHS, which is responsible for the

8    administration and operation of the United States Coast Guard, and which has been

9    charged with execution and implementation of the President's unlawful August 25

10   Directive.

11                        **FACTUAL BACKGROUND**

12   **A.    Following an Exhaustive Review in 2015-2016, the DOD Concluded that**
13   **Open Service by Transgender People Best Served the Interests of U.S.**
     **Armed Forces**

14        26.    In May 2014, then-Secretary of Defense Chuck Hagel directed the

15   DOD to review whether transgender people should be permitted to serve openly in

16   the U.S. armed forces.

17        27.    In August 2014, the DOD amended its physical disability policy to

18   remove references to mandatory exclusion based on "sexual gender and identity

19   disorders," and issued a new regulation instructing each branch of the armed forces

20   to assess whether there was any justification to maintain a ban on service by

21   openly transgender persons.

22        28.    In issuing this regulation, Secretary Hagel stated that "every qualified

23   American who wants to serve our country should have an opportunity to do so if

24   they fit the qualifications and can do it."

25        29.    Secretary Hagel was succeeded as Secretary of Defense by Secretary

26   Ashton B. Carter.   In July 2015, Secretary Carter announced that the military

27   would comprehensively analyze whether there was any justification to maintain the

28   ban on service by openly transgender persons.    Accordingly, Secretary Carter

1   created a working group to address this issue including the Armed Services, the

2   Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and

3   medical specialists from across the DOD.  The lengthy and comprehensive review

4   process that followed included an examination of all available data, including but

5   not limited to existing studies and research and input from transgender service

6   members, commanding officers who supervised transgender service members,

7   military readiness and personnel experts, outside expert groups, and medical

8   professionals.  The review process also included a careful analysis of the eighteen

9   other countries that permit military service by openly transgender people.  Doctors,

10  employers, and insurance companies were consulted regarding the provision of

11  medical care to transgender people.

12      30.   The DOD also commissioned the RAND Corporation—a defense

13  consultancy formed after World War II to connect military planning with research

14  and development decisions, and which now operates as an independent think tank

15  financed by the U.S. government—to determine the impact of permitting

16  transgender servicemembers to serve openly.  The study titled *Assessing the*

17  *Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND

18  Study") ultimately concluded that allowing transgender people to serve openly

19  would cost little and have no significant impact on unit readiness.  As for the

20  potential impact on healthcare costs, the RAND Study concluded that health care

21  costs for transgender servicemembers, including costs related to gender transition-

22  related treatment, would "have little impact on and represents an exceedingly small

23  proportion of [DOD's] overall health care expenditures."

24      31.   Based on the results of this comprehensive review process, on June

25  30, 2016, the DOD announced its conclusion that open transgender service would

26  best serve the military's interests in recruiting and retaining the most highly

27  qualified personnel.  In issuing the June 2016 Policy, Secretary Carter explained

28  that this conclusion was based on a number of considerations, including *inter alia*:

(a) the fact that thousands of transgender people already serve, and that the military has already invested hundreds of millions of dollars to train them collectively; (b) that the military benefits by retaining individuals who are already trained and who have already proven themselves; (c) the need to provide both transgender servicemembers and their commanders with clear guidance on questions such as deployment and medical treatment; and (d) the principle that "*Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so*."

32. Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly. They can no longer be discharged or otherwise separated from the military just for being transgender." This unequivocal statement was accompanied by the formal issuance of Directive-Type Memorandum 16-005, *Military Service of Transgender Service Members*, which lifted the ban on military service and accession by openly transgender people. Directive-Type Memorandum 16-005 sets forth the DOD's conclusion, based on thorough review and analysis, that:

> The defense of the Nation requires a well-trained, all-volunteer force comprised of Active and Reserve Component Service members ready to deploy worldwide on combat and operational missions. The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military. These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

In accordance with Directive-Type Memorandum 16-005, transgender people were to be permitted to enlist in the U.S. military and openly serve beginning on July 1, 2017.

33.     In furtherance of its conclusions and in an effort to consistently and effectively implement this change in policy, the DOD took the following actions:

- In September 2016, the DOD issued an implementation handbook entitled *Transgender Service in the United States Military* setting forth guidance and instructions to both military servicemembers and commanders regarding how to understand and implement the new policies enabling open service of transgender servicemembers.

- On October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued DOD Instruction 1300.28 entitled *In-Service Transition for Transgender Service Members*. The instruction set forth further guidance to ensure open service by transgender servicemembers, including details regarding revisions to medical treatment provisions.

- The Acting Assistant Secretary of Defense for Health Affairs issued a memorandum entitled *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members*.

- On November 29, 2016, the DOD revised Directive 1020.02E, *Diversity Management and Equal Opportunity in the DOD*, expressly to prohibit discrimination and harassment on the basis of gender identity.

34.     In line with the guidance issued by the DOD, the United States Coast Guard adopted similar policies and procedures for service by transgender servicemembers.

**B.     Defendants Institute an Arbitrary Ban on Transgender Servicemembers**

35.     In a series of statements released via Twitter on July 26, 2017, Defendant President Donald J. Trump abruptly announced that the United States military would return to banning military service by transgender people.

36.     He tweeted: "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or

1   allow Transgender individuals to serve in any capacity in the U.S. Military.  Our

2   military must be focused on decisive and overwhelming victory and cannot be

3   burdened with the tremendous medical costs and disruption that transgender in the

4   military would entail. Thank you."

5       37.     This July 26, 2017 announcement was rendered without any

6   significant study or analysis and lacks a rational basis.

7       38.     Shortly after the Twitter announcement, members of both major

8   political parties criticized this abrupt change in policy, and fifty six former generals

9   and admirals issued a public statement denouncing the new policy.

10      39.     Less than one month following his initial Twitter statement,

11  Defendant President Trump issued the August 25 Directive formalizing the

12  administration's policy.  The August 25 Directive orders co-Defendants (i) to ban

13  the "accession of transgender individuals into military service," (ii) to "halt all use

14  of DOD or DHS resources to fund sex reassignment surgical procedures for

15  military personnel" except in limited instances, and (iii) to implement a plan to

16  return to the prohibition on military service for transgender people, including those

17  current servicemembers who, in reliance on the June 2016 Policy, came out to their

18  command.

19      40.     Similar to the July 26, 2017 Twitter announcement, the August 25

20  Directive was rendered without any significant study or analysis and lacks a

21  rational basis.

22      41.     The stated bases offered in support of Defendants' August 25

23  Directive are pretextual, arbitrary, capricious, and unsupported by facts, evidence,

24  or analysis.   Indeed, the DOD previously concluded in Directive Type

25  Memorandum 16-005, after more than a year of exhaustive analysis, that "open

26  service by transgender Service members . . . is consistent with military readiness,"

27  as well as the "defense of the Nation" generally.  Since issuance of Directive Type

28  Memorandum 16-005, transgender people have been serving openly without

1   incident or any negative impact upon military readiness, lethality, unit cohesion, or

2   the national defense generally.

3         42.    The government-commissioned RAND Report concluded that the

4   "costs of gender transition related healthcare treatment are relatively low," and

5   amount to possible increases of only between "$2.4 million and $8.4 million

6   annually, representing a 0.04% to 0.13% increase in active-component healthcare

7   expenditures."

8         43.    In contrast, separating and replacing currently serving transgender

9   service members would be costly and cause disruption, and also would undermine

10  unit cohesion, respect for military authority, and morale.  Research from the Naval

11  Postgraduate School published by the Palm Center in August 2017 (the "Palm

12  Center Report") concludes that the "financial cost of fully implementing President

13  Trump's ban on transgender servicemembers would be $960 million," assuming

14  the military acted to expel the estimated 12,800 transgender servicemembers and

15  needed to replace them.  Even assuming the military acted to expel and replace

16  only 1,320 transgender servicemembers, which was the RAND Report's lowest

17  estimate of the total number of active transgender servicemembers, the Palm

18  Center Report indicates the financial cost of fully implementing President Trump's

19  ban would still be at least $99 million.

20        44.    The August 25 Directive applies to currently serving open transgender

21  servicemembers, including Plaintiffs, who have not yet undergone gender

22  reassignment surgery, but have openly expressed their gender identity, as well as to

23  currently serving transgender servicemembers who have not yet come out to their

24  chain of command, but wish to do so.

25        45.    The August 25 Directive bars currently serving transgender

26  servicemembers, including Plaintiffs, from re-enlisting.

27        46.    The August 25 Directive bars currently serving transgender

28  servicemembers, including Plaintiffs, from earning and obtaining promotions in

1  rank, or from attaining the service record required to qualify for military retirement

2  benefits.

3      47.   The August 25 Directive bars currently serving transgender

4  servicemembers, including Plaintiffs, from receiving equal access to full medical

5  care.

6      48.   The August 25 Directive bars transgender people who wish to pursue

7  careers in the Armed Forces and are able to meet the standards for military service,

8  including Plaintiffs, from acceding into the military.

9                    **FIRST CLAIM FOR RELIEF**

10               **Fifth Amendment – Equal Protection**

11                    **(against all Defendants)**

12      49.   Plaintiffs re-allege and incorporate by reference the preceding

13  allegations in this Complaint as if fully set forth herein.

14      50.   The Due Process Clause of the Fifth Amendment prohibits the federal

15  government from denying persons the equal protection of the laws.

16  51.   Defendants' August 25 Directive excluding transgender persons from

17  eligible military service discriminates against Plaintiffs and Plaintiff's members

18  based on their sex and transgender status, without lawful justification, in violation

19  of the Equal Protection component of the Due Process Clause of the Fifth

20  Amendment.

21      52.   Defendants' exclusion of transgender persons from military service

22  lacks a rational basis, is arbitrary, and cannot be justified by any government

23  interest.

24      53.   Defendants' August 25 Directive denying equal health benefits to

25  transgender persons also discriminates against Plaintiffs and Plaintiff's members

26  based on their sex and transgender status, without lawful justification, in violation

27  of the Equal Protection component of the Due Process Clause of the Fifth

28  Amendment.

54.     Defendants' action to deny transgender persons equal health benefits lacks a rational basis, is arbitrary, and cannot be justified by any government interest.

55.     Defendants' above-described discrimination against transgender persons—a discrete and insular group that lacks the power to protect its rights through the legislative process, and one that has suffered a history of targeted discrimination and exclusion—is not narrowly tailored to advance any important or compelling government interest.

56.     As a result of Defendants' implementation and enforcement of the August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and will suffer further irreparable harm to their constitutional rights under the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

57.     Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Fifth Amendment – Due Process

### (against all Defendants)

58.     Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

59.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their property or other interests without due process of law.

60.     The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis before depriving any person of his or her property or liberty interests.

61.     Defendants' June 2016 Policy permitting transgender persons to serve openly in the military, together with reliance by Plaintiffs and Plaintiff's members on that policy, created a protected interest in their ability to continue serving in the military as openly transgender persons.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

62.     Defendants' August 25 Directive will deprive Plaintiffs and Plaintiff's members of their protected interests in continued military service as openly transgender persons.

63.     Defendants' deprivation of Plaintiffs' and Plaintiff's members' protected interests in continued military service as openly transgender persons is arbitrary and without any rational basis.

64.     As a result of Defendants' implementation and enforcement of the August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and will suffer further irreparable harm to their constitutional rights under the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

65.     Plaintiffs have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### Fifth Amendment – Right to Privacy

### (against all Defendants)

66.     Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

67.     The Due Process Clause of the Fifth Amendment grants Plaintiffs and Plaintiff's members constitutional liberties and a fundamental right to privacy that encompasses and protects Plaintiffs' and Plaintiff's members' right to self-identification and self-determination as transgender individuals who live, form intimate relationships, work, and pursue happiness and meaning as the gender, or non-gender, with which they identify.

68.     The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis before depriving any person of their liberty interests.

69.     Defendants' August 25 Directive impermissibly burdens Plaintiffs' and Plaintiff's members' fundamental liberty to live consistently with their gender

/ / /

1  identity, and unlawfully impinges upon Plaintiffs' privacy by penalizing and
2  stigmatizing them for expressing a fundamental aspect of their personal identity.

3      70.    Defendants' August 25 Directive to exclude transgender persons from
4  service in and accession into the military is arbitrary and lacks any rational basis.

5      71.    As a result of Defendants' implementation and enforcement of the
6  August 25 Directive, Plaintiffs and Plaintiff EQCA's members have suffered
7  injuries and will suffer further irreparable harm to their constitutional rights under
8  the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

9      72.    Plaintiffs have no adequate remedy at law.

10  **FOURTH CLAIM FOR RELIEF**

11  **First Amendment – Retaliation for Free Speech & Expression**

12  **(against all Defendants)**

13      73.    Plaintiffs re-allege and incorporate by reference the preceding
14  allegations in this Complaint as if fully set forth herein.

15      74.    The First Amendment grants Plaintiffs the constitutional right to
16  freedom of speech and expression.

17      75.    By banning military service by transgender people, Defendants'
18  August 25 Directive violates Plaintiffs' and Plaintiff's members' rights of free
19  speech and expression under the First Amendment by impermissibly restricting,
20  punishing, and chilling all public and private speech that would tend to identify
21  Plaintiffs and Plaintiff's members as transgender people. The August 25 Directive
22  impermissibly burdens such speech on the basis of the content and viewpoint of
23  such speech.

24      76.    As a result of Defendants' implementation and enforcement of the
25  August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and
26  will suffer further irreparable harm to their constitutional rights under the First
27  Amendment if the directive is not declared unconstitutional and enjoined.

28      77.    Plaintiffs have no adequate remedy at law.

1    **PRAYER FOR RELIEF**

2    WHEREFORE Plaintiffs pray for judgment on their Complaint as follows:

3    1.    That this Court find and declare that Defendants' August 25 Directive

4          to exclude transgender people from federal military service, ban the

5          accession of transgender people into the U.S. military, and prohibit

6          the funding of sex reassignment surgical procedures as part of health

7          care for transgender servicemembers is unconstitutional;

8    2.    That Defendants, and their officers, agents, servants, employees, and

9          attorneys, and those persons in active concert or participation with

10         them, preliminarily and permanently be enjoined from enforcing the

11         August 25 Directive to exclude transgender people from serving or

12         enlisting in the military or to preclude transgender servicemembers

13         from access to full medical care, including gender reassignment

14         treatment;

15   3.    That Plaintiffs be awarded their costs and reasonable attorneys' fees;

16         and

17   4.    For such other relief as the Court may deem just and proper.

18

19   Dated:  September 5, 2017              Respectfully submitted,

20                                         LATHAM & WATKINS LLP
                                               Amy C. Quartarolo
21                                             Adam S. Sieff
                                               Harrison J. White
22

23                                         By ____/s/ Amy C. Quartarolo____
24                                                Amy C. Quartarolo

25                                         *Attorneys for Plaintiffs Aiden Stockman,*
                                           *Nicolas Talbott, Tamasyn Reeves, Jaquice*
26                                         *Tate, John Does 1-2, Jane Doe, and*
                                           *Equality California*

27

28

# Exhibit 10



# GLAD Briefs

**WINTER '18**

Regan Kibby and Nicolas Talbott (right), two courageous plaintiffs challenging Trump's transgender military ban

**INSIDE**

Putting Children First: More Courts Recognize Today's Families...............3

Advocating for LGBTQ Youth in the Juvenile Justice System......................5

Fighting for the Dignity and Humanity of Transgender People Within the Correction System............7

Announcing the GLAD One Justice Fund...............................9

Thank You..........................................10

Legal Update.....................................16



## Fighting Trump's Transgender Military Ban

**Transgender Americans Became Eligible to Enlist January 1, But the Fight to End Trump's Discriminatory Ban for Good Goes On**

In the midst of challenging times for many in our nation, this new year began with one truly historic and promising moment. As of January 1, for the first time, transgender Americans became eligible to enlist in our nation's military.

This should be an incredibly proud step for our country. It follows a series of profound and positive changes in the history of our military—from racial desegregation, to welcoming service members from a multitude of faiths, from expanding roles for women, to ending the ban on service by lesbian, gay and bisexual people—all stemming from an understanding that our military is made stronger when it is reflective of the diverse American population it protects, and when all those who are both qualified and willing have an opportunity to serve.

On January 2, our plaintiff Nicolas Talbott contacted the Air Force recruiter he has been working with for more than a year, thrilled to finally take the next step toward his dream. "Service to me means coming together to take care of one another," says Nicolas, who studied national security issues in college, about what motivates his long-standing desire to join the military. "I just want to offer the skills and talents I have, to do what I can to make our country and our world a safer, better place. I'm excited and hopeful to finally move closer to that possibility."

But whether we would get to this moment—whether patriotic and talented transgender Americans like Nicolas would be able to pursue their dreams of service—was in question up until the very end of December. And the fight to ensure that capable, courageous transgender Americans are able to serve, and that our military is able to benefit from that service, still goes on, as we continue battling Trump's transgender military ban in court.

The June 2016 announcement that transgender people would be able to serve openly in the military followed over a year and a half of rigorous study by military experts, which concluded that open service would have no adverse impact and in fact would strengthen military readiness and national security. Transgender Americans who were already

continued on page 8

# From the Executive Director



Photo: Infinity Portrait Designs.com

*"Courage is the most important of all the virtues because without courage, you can't practice any other virtue consistently."*

This quote, by the incomparable Maya Angelou, has been on my mind as I reflect on the past year—a year in which we have witnessed a resurgence of hate groups, continued assaults on voting rights, a rise in anti-Semitism, the scapegoating of immigrants, and attacks from the highest levels of our government on the civil rights of so many of our communities.

It is easy in these times to wonder whether our nation's strongest virtues— justice, equality, freedom, compassion—will hold. For me, I need only look to the incredible courage of those individuals, families, and communities who are speaking out and resisting attempts to drag us back, to know that they will.

Here at GLAD I get to witness so much courage.

The brave plaintiffs who are at the heart of GLAD's cases against Trump's discriminatory transgender military ban show a determination to fulfill their dreams of serving their country that is nothing short of exemplary. *(see page 1)*

Also tremendously resilient are the LGBTQ youth we are working with in Long Creek Youth Development Center, Maine's juvenile prison, who are strong advocates for juvenile justice reform, determined to create a better future for themselves in spite of the systemic and social barriers they face. *(see page 5)*

And I am so incredibly moved by our client B.'s fight to be reunited with her partner of 30 years, D., so that she can care for D. in the community they both love *(see page 16)*. In these times especially, we must be fiercely protective of our relationships with one another.

The events of this past year have led us to a crossroads. We must decide what kind of society we envision for ourselves. Will we be a nation where LGBTQ people, people of color, immigrants, women, and so many vulnerable communities are cast as second-class citizens? Or will we continue moving forward and protect and defend the humanity and dignity of all Americans?

Maya Angelou's words deeply resonate now, not only because of the courage of those impacted by GLAD's work, whose stories you'll read more about in these pages, but because of the courage we'll all need to sustain our movement for justice in the year ahead.

Thank you for your ongoing support, and for your courage in staying with us in the fight for equality.

2

Toward Justice,

Janson Wu
Executive Director

## BOARD OF DIRECTORS

Richard J. Yurko, *President*
Joyce Kauffman, *Vice President*
David Hayter, *Treasurer*
Darian Butcher, *Clerk*
Leila Bailey-Stewart
Mark Brown
Edward Byrne
Francisco Cabas
Andre L. Campagna
Fred Csibi
Shane Dunn
Benjamin Franklin
Meghan E. Freed
Joseph Garland
George Hastie
Deborah Heller
Chuck Latovich
Dianne R. Phillips
Marlene Seltzer
David Wilson

## GLAD STAFF

Janson Wu, *Executive Director*
James Barden, *Public Affairs Assistant*
Brianna Boggs, *Director of Development*
Hayley Bohn, *Development Co-op*
Mary Bonauto, *Civil Rights Project Director*
Eva Boyce, *Chief Financial Officer*
Gary Buseck, *Legal Director*
Khari Charles, *Community Engagement Manager*
Patience Crozier, *Senior Staff Attorney*
Kathy Eow, *Communications Manager*
Beth Grierson, *Senior Manager of Operations and Administration*
Tessa Holtzman, *Legal Assistant*
Rianna Johnson-Levy, *Legal Assistant*
Amanda Johnston, *Director of Public Affairs and Education*
Kenyon King, *Web Developer*
Bennett Klein, *AIDS Law Project Director and Senior Staff Attorney*
Jennifer Levi, *Transgender Rights Project Director*
Stephanie Lowitt, *Assistant Director of Development*
Carol Marton, *Business Manager*
Elaine McGrath, *Operations Assistant*
Aria Pierce, *Major Gifts & Foundations Associate*
Chris Rainville, *Events Manager*
Chloe Sanders, *Development Co-op*
Erin Semagin Damio, *Database Manager*
Bob Tumposky, *IT Manager*
Alex Weinstein, *Legal Assistant*
Daniel Weiss, *Public Information Manager*
Michelle Wiener, *Senior Legal Assistant & GLAD Answers Assistant*
Allison Wright, *Staff Attorney*

## Putting Children First: More Courts Recognize Today's Families

Ensuring that all children are secure and all families are recognized —no matter how they are formed—is a top priority at GLAD. That more and more states are recognizing the diversity of our families and ensuring protections for all children means we are making incredible progress in catching up the courts and the law to today's families.

This past December, we celebrated a huge victory for children and families in Vermont, where the state's highest court recognized that families are formed not only through biology, adoption or marriage but through intention, love and caring.

In *Sinnott v. Peck*, the Vermont Supreme Court issued a groundbreaking ruling in favor of our plaintiff Sarah Sinnott, whose former partner sought to block her relationship with the daughter they jointly brought into their family through adoption.

Sarah and her former partner were in a committed relationship for seven years. During that time, the couple jointly planned for, adopted and raised their daughter, though for legal and logistical reasons, Sarah's former partner was the sole adoptive parent. After their relationship ended, the couple continued to jointly parent for three years before Sarah's former partner stopped allowing their daughter to see and be cared for by Sarah.

Sarah filed a Petition to Establish Parentage with the Vermont Superior Court, Family Division. The court declined to accept her filing, holding that Vermont law did not recognize parentage other than by married parents or those with a genetic or adoptive relationship to their child.

With co-counsel Sarah Star, GLAD Transgender Rights Project Director Jennifer Levi argued that Sarah meets the legal definition of a parent, and is entitled to seek custody under Vermont's Parentage Act. And the Court agreed.

"This decision is child-centered, as it should be," says Levi. "It protects parent-child relationships based on the loving bonds that create them, not based on legal formalities. The reality is that children in Vermont, as elsewhere, are being raised in many different types of families. This decision recognizes that, as more and more courts across the country are beginning to do."

"I'm grateful my case could open the door to protections for so many families," says Sinnott.

The ruling in *Sinnott v. Peck* is part of a growing trend of courts adopting modern approaches to recognizing our families. For instance, in October 2016 the Massachusetts Supreme Judicial Court ruled in our case *Partanen v. Gallagher*, that non-married, non-biological parents can be recognized as their children's full, legal parent.

As we continue to fight for these important court victories, GLAD is also advocating for other critical means of family recognition, from ensuring state policies follow such court rulings to advocating for parentage statues that reflect modern families. And GLAD also works with parents directly to help them navigate what can be complex legal terrain to understand their rights, and to find accessible resources to protect their families.

For example, although *Partanen* paved the way for unmarried, non-biological parents in Massachusetts to be recognized as full, legal parents, vital records such as Voluntary Acknowledgment of Parentage (VAP), which same-sex parents should be able to use to establish parentage, still reflect an antiquated view of families formed by same-sex couples. GLAD is currently advocating alongside a female couple to spur the state to update its records to be more inclusive.

K. and P. have been in a committed, unmarried relationship for four years. They planned for and conceived their daughter through alternative insemination. P. gave birth in December 2016, after the *Partanen* ruling, with K. supporting her the entire way. They tried to fill out the birth certificate worksheet listing them both as parents, but the hospital said they couldn't. GLAD Senior Staff Attorney Patience Crozier is working with K. and P. to get access to the VAP form to establish K.'s parentage simply and efficiently through this administrative procedure easily accessed by different-sex couples.

The courageous families and individuals pushing for the legal protection of their children are driving change, and we are proud to partner with them to ensure all children have the security, stability and love they need and deserve. ■

## GLAD Forward Is GLAD to Help

GLAD Forward, GLAD's young adult group, volunteered at the Greater Boston Food Bank this winter to help sort and package food for community members struggling with hunger. Visit www.glad.org/forward to learn more about GLAD Forward.

3

*Photos: Matt Kurkowski, xocialight.com*





A visual art piece made by incarcerated LGBTQ youth as part of Maine Inside Out's "Love Is: Alternatives to Incarceration," a showcase of theater, film, and visual art.

## We Need Each Other

Below is a poem by Sexuality and gender Awareness for Everyone (SAFE) Group Member J.O., DOC No. 115950, and performed by Maine Inside Out.

**We Need Each Other.**

Nobody knows what young people need more
   than young people themselves.
What they think we need and what we really need is different.
What will it take for our society and this country
   to realize that youth incarceration harms not
   only our youth, but also our communities?

Youth are locked up and told they can change,
   but how many kids who get locked up actually
   get the support they need to make change?

Do our communities really want us locked up?
Do they think we deserve what happens to us?
Do they know what happens to us?
Do they think we deserve the things we need to survive?

Take the time to work with us, don't just send us away.

What would our communities be willing to do to make a change?

**We need to be heard.**

The system says they listen to us, but do they really listen to us?

We are all human beings.
We make mistakes. But all of us have the power to make change.
Even if it's hard,
We have the power to make change.
The difference between change
& transformation
Is that transformation is something you can do on your own
But for change, you need help.
No one and no community can change alone.

**We need each other.**

For queer and trans folks:
We know it's difficult coming out, to be different, to be who you are
Especially for those of us in facilities or locked away
We are fortunate to have each other though
Without the chosen families we build in these places
We'd just be part of the zoo
We wouldn't make it through
All the harassment and discrimination we face
Without each other

Unless we push and try
We won't get what we deserve
To survive, to thrive, to build the world we know is possible
We need each other.

For young people out there,
Who may be struggling
Feeling isolated
Locked up or navigating the hardness of the world outside
Seek help and support
Know that millions of people in this world are
   fighting for you
And that some people (some closer than
   you think)
Are experiencing the same thing
We need each other

We need each other.
We should be heard.
We need to be heard.

We need each other.
We need each other.
We need each other.

4

# Advocating for LGBTQ Youth in the Juvenile Justice System

**GLAD** is engaged in advocacy work across New England to help create safe and affirming communities for LGBTQ young people, and that includes the juvenile justice system. Together with our local partners, we are working hard to reform a system that disproportionately harms LGBTQ youth.

LGBTQ youth, particularly LGBTQ youth of color, are overrepresented in the juvenile justice system due to stereotypes, pervasive stigma, bias, and structural factors. Family rejection, unsupportive schools and discriminatory policing practices contribute to increased interactions between LGBTQ youth and the juvenile and criminal justice systems.

Recent research by the Movement Advancement Project (MAP) reveals that 20 percent of the youth in seven juvenile detention centers and correctional facilities across the U.S. identify as LGBTQ or gender non-conforming, which is almost three times their estimated number in the general population. And LGBTQ youth of color are disproportionately more likely to be targeted by the juvenile justice system, with Black youth four times as likely as white youth to be incarcerated, and Latinx youth nearly twice as likely as white youth to be incarcerated.

MAP's research on the experience of LGBTQ youth once they are in the system found that many are placed in prisons without respect for their gender identity or expression. Additionally, youth prisons are often ill equipped to meet the needs of LGBTQ youth and ensure their safety. This puts LGBTQ youth at increased risk for harassment, violence, and sexual assault by other youth and staff.

GLAD is seeing these nationwide trends in focus at Long Creek, a juvenile detention center and prison in Maine, and is deeply engaged in a critical intervention there to support the youth inside. We became involved with Long Creek when we learned that a detained transgender youth died by suicide last November, demanding a thorough and transparent investigation of the youth's tragic death.

Through our work, we have uncovered that the facility's conditions do not comply with federal standards. And we have learned that 30 percent of youth in its custody identify as LGBTQ and are at increased risk of harm, facing daily harassment and abuse by staff and other inmates due to their perceived or actual sexual orientation.

GLAD Civil Rights Project Director Mary L. Bonauto and GLAD Senior Staff Attorney Patience Crozier have been deeply involved with the youth in Long Creek and are now representing two young people who are LGBTQ or perceived to be, advocating alongside them for their safety and ultimately their release from Long Creek. Bonauto has been personally visiting Long Creek virtually every week since last November, checking on the facility's conditions and on our clients.

Our clients have become courageous advocates for themselves and other LGBTQ youth in Long Creek. Speaking honestly about the realities of living in a place like Long Creek is part of their advocacy. For example, it is important to them to be referred to as inmates, not residents, an unambiguous message for us all that Long Creek is a prison, cell blocks and all.

continued on page 18

## Letter for GLAD, From Long Creek Inmate, DOC No. 121309

Life in Long Creek Youth Development Center (LCYDC) depends very much on where you fall in the pecking order. Those at the bottom—LGBTQ youth, youth judged to be weak, youth unwilling to fight other youth, mentally disabled youth, or youth with sex crime related charges—endure boundless torment. They are relentlessly harassed, assaulted, threatened, and demoralized. Sometimes this means having their chairs kicked out from under them, food thrown at them, vulgar images drawn on their cells or clothing. Sometimes it means brutal assaults, being told they don't deserve to be alive, being forced to hand over meals and hygiene supplies. Sometimes it means being too afraid to leave their cell for days at a time.

Most of these offensive actions come from other inmates who have been shown by peers and staff that it is okay and even commendable to torture these youth. The staff often ignore or even actively encourage this behavior.

All inmates at LCYDC endure hours each day spent in an 8 x 12 cell, poor quality (sometimes expired) food, persistent untreated skin rashes and infection lasting years, and excessive, unnecessary use of force from the staff. Doors don't open and close here. They are locked, unlocked, and can only slam shut.

A punishment-based "rehabilitation" system is inherently flawed. It demoralizes impressionable youth, reinforcing the belief that the crime path is the only one available to them. It increases trauma and abuse, which is typically a huge factor in the underlying conditions which brought youth to LCYDC in the first place and a factor in recidivism.

In order for youth to learn how to function in society, they need to be told that they have a place in society. Their positive behavior needs focus, not neglect. Groups of at-risk youth need to be kept small enough to meet these demands for success.

Adequate mental health care must be provided to help youth deal with past abuse and trauma.

Sexuality and gender Awareness For Everyone (SAFE) group, an Incarcerated LGBTQ youth and allies group that is an off-shoot of Portland Outright, is one of the only places in LCYDC where this culture is actively being developed. It provides a space with leadership instead of authority, acceptance instead of judgement, tenderness instead of hate, encouragement and empathy instead of indifference, and a safe place where the burden of incarceration is eased and youth are allowed to grow.

SAFE Group, along with Maine Inside Out and GLAD, have shown that they truly care about the children of our communities, and that they are willing to do the work needed to repair the damages we have sustained while free and incarcerated in order to give us a healthier, happier, and prosperous future. ■

5

# The Most Anti-Gay Corporate Policy in America Today

By Ben Klein and Alex Weinstein

Perhaps we have become a little too accustomed to Fortune 500 companies that tout their LGBTQ employee affinity groups, advertise to our community with the rainbow flag, march in our parades, and even donate to our organizations and sign briefs in the U.S. Supreme Court showing considerable business support for our rights. Those corporate acts make a big difference and reflect tangible positive change in the world we live in.

But what about actual business practices? Here's our vote for the most unrecognized anti-gay and AIDS-phobic corporate policy in America today: the largest insurance companies in America that are blatantly discriminating against gay men who take steps to prevent HIV transmission by using PrEP (or HIV pre-exposure prophylaxis), a once-a-day dosage of the medication Truvada.

Fortunately, most health insurers and state Medicaid agencies are covering the cost of the medication so people can have access to this extraordinary breakthrough in prevention. But when people take PrEP and then individually apply for life insurance, long-term care insurance, and disability insurance, they are automatically denied coverage solely because they take PrEP.

Some of the largest insurance companies in the nation are engaging in this categorical exclusion of PrEP users. GLAD has learned about denials of insurance coverage by State Farm, Aetna, Metropolitan Life, John Hancock, Protective Life, Lincoln Financial, and many more. We have sued Mutual of Omaha Insurance Company for denying long-term care insurance to a qualified HIV-negative gay man because he uses PrEP. This is an industry-wide policy and practice. Gay men can either get insurance or they can take the best biomedical HIV prevention method in the history of an epidemic that has claimed so many lives.

So, what are all these corporate giants saying about PrEP users? Life, disability, and long-term care insurers underwrite the risk that an applicant will claim benefits and when. They get your medical records and exclude you if you have a disqualifying health condition, or charge you higher premiums if you have certain health conditions. But people who are excluded solely because they take PrEP do not have any disqualifying health condition. They are excluded because these corporations believe they are engaging in "high-risk sexual behavior" and deem them at high risk for HIV. Let's be frank: they are talking about anal intercourse. In other words, you are fully eligible for insurance, but you are turned away because of the sex you are having.

In an industry that is based on rationality, and is supposed to make decisions based on actual data, how does this make sense? Research demonstrates that PrEP is close to 100% effective at reducing the risk of HIV transmission, far more effective than condoms. Let us say that again: *Close to 100% effective* in stopping HIV. And yet the insurers ignore the efficacy of PrEP and instead use it as a proxy for "high risk sexual behavior" in their underwriting. That is not science; it's a moral judgment about the people who use PrEP. By the way, 80% of PrEP users are gay men.

These insurers argue that not everybody takes PrEP as directed (once daily) which reduces its effectiveness, or that the long-term effects of Truvada usage are unknown (PrEP has been demonstrated to be well tolerated with no significant side effects). These same insurers offer insurance to people with a range of conditions, such as diabetes and bipolar disorder, as long as the applicant demonstrates adherence to medications that control those conditions. Yet they don't allow PrEP users to demonstrate adherence. And insurers obviously don't exclude every new drug approved as safe by the FDA simply because there is not long-term data for new drugs.

This "no PrEP users need apply" policy belongs on the long list of just plain stupid beliefs about HIV transmission that have been proffered over the course of the epidemic. This corporate policy does nothing to achieve its stated goal of reducing the overall prevalence of HIV in an insurer's pool of beneficiaries. Take two people with identical sex lives: The PrEP user is denied insurance; the person who doesn't use PrEP is covered. That make zero sense. And worse, it actually risks discouraging use of a powerful tool that could help end the HIV epidemic.

And the fact is that most people at risk for HIV in the United States are not yet on PrEP. The Centers for Disease Control and Prevention estimates that 1.2 million people could benefit from PrEP. Yet, since PrEP was approved by the FDA in 2012 there have only been about 145,000 total PrEP users. Before the advent of PrEP, life, disability, and long-term care insurers did not assess for HIV risk. They did not ask applicants about sexual practices or condom use and make underwriting decisions on that basis. But with the advent of PrEP, they are carving out and excluding just a small percentage of the whole group of people who have some risk for HIV—those who use the most effective prevention tool. This is discrimination, not a rational policy.

From the earliest days of HIV, we have often said: We're not going to end this epidemic if myths, fear and discrimination interfere with our best public health policies. We need to be doing everything we can to end the stigma associated with PrEP so that people can make decisions based on what's best for their own health, not based on barriers to access or fear of discrimination. The corporate practices of these insurance companies reflect and reinforce stigma. They put the public health at risk by creating an incentive to avoid or delay PrEP.

Many of the companies perpetuating this policy and practice are Fortune 500 companies and some, like Aetna, John Hancock, State Farm, and Mutual of Omaha have a 100% approval rating from Human Rights Campaign (HRC). These corporations can't wave the rainbow flag with one hand and the other turn us away because of our sex lives. It's time to end the PrEP exclusion in America's insurance industry. ∎



GLAD's Senior Manager of Operations and Administration Beth Grierson (right) with Trish Settles and Julia Slee at the Boston Women's March 2018.

6

## Fighting for the Dignity and Humanity of
# Transgender People Within the Correction System

This fall, GLAD filed a groundbreaking case, *Jane Doe v. MA Department of Correction* (DOC), on behalf of a transgender woman currently incarcerated at Massachusetts Correctional Institution-Norfolk (MCI), a state facility that houses male inmates. The suit, filed in coordination with Prisoner Legal Services and Goodwin Procter LLP, seeks for our client to be appropriately transferred to DOC's female corrections facility, MCI-Framingham.

Our client, Jane Doe, is a transgender woman who transitioned 40 years ago. Despite having lived as a woman for the near entirety of her life, she is housed in an all-male facility where she faces the traumatizing experience of being a woman locked up in a men's prison, including daily sexual harassment and mistreatment from other inmates and guards. We are fighting for our plaintiff to be treated with dignity and humanity in a case that could set a precedent for other correction systems nationwide.

According to federal data, transgender inmates report being targeted for sexual assault and harassment by guards and other inmates at a rate 10 times that of the general incarcerated population. Guidelines for federal prisons recognize the need to assess placement for transgender people on a case-by-case basis, and to take into consideration where the person will be safest. Massachusetts, like most states, currently fails to meet this federal standard in making placement decisions.

"Massachusetts is a state with strong policy recognizing the humanity of transgender people," says Jennifer Levi, GLAD Transgender Rights Project Director. "That humanity must also be recognized in our correction system. Transgender people who are serving time for an underlying offense should not be punished for being transgender."

The results of housing a woman in a male facility are predictably disturbing. Our client is regularly subjected to strip searches by male correctional officers, who routinely grope her breasts in the process. She is forced to shower in view of male prisoners who inappropriately comment on her body and otherwise harass her. She fears for her safety daily.

The impact of this daily discriminatory and traumatizing treatment is scarring, humiliating, and both physically and emotionally harmful.

"The level of harassment, fear, and trauma our client experiences at MCI-Norfolk is horrifying—anyone who hears her story can plainly see that," says GLAD Senior Attorney Ben Klein. "By housing her in a men's facility the Department of Corrections is putting her safety and her health at risk on a daily basis."

The suit filed in U.S. District Court for the District of Massachusetts asserts that DOC is violating our client's constitutional right to equal protection, as well as her rights under the Americans with Disabilities Act. We are seeking for Ms. Doe to be appropriately transferred to MCI-Framingham, and that DOC take certain immediate steps in the interim to reduce threats to her safety, including that she be searched only by female correctional officers; that she be provided with a separate shower time without the presence of men; and that she be referred to by the correct name and female pronouns.

Our laws, our Constitution, and our values say that people should not be stripped of their basic humanity when they are incarcerated, and our state prisons have a responsibility to ensure the safety of all inmates—including that of our client. State correctional systems in Massachusetts and across the country must adopt safer and more humane policies for assessing placements for transgender inmates. ■

## 18th Annual Spirit of Justice Award Dinner

Honoring Eric H. Holder Jr., the 82nd Attorney General of the United States • October 22, 2017

*Photos: InfinityPortraitDesign.com*



GLAD Civil Rights Project Director Mary Bonauto with GE Vice President Mo Cowan and State Street Vice President Paul Francisco

Honorable Eric H. Holder Jr.

Darla Pires DeGrace and Shelle Mendes

7

## Fighting Trump's Transgender Military Ban
continued from page 1

serving—some for decades, all with dignity and courage—began to come out to their commanding officers. At the same time, it was announced that openly transgender Americans would be able to enlist beginning the following year.

But that thoroughly vetted and thoughtful policy was suddenly threatened when, last July, President Trump tweeted an announcement that transgender people would be prohibited from serving in any capacity in the U.S. military.

GLAD and our partners at the National Center for Lesbian Rights (NCLR) immediately saw this announcement for what it was—a serious attack on our community. We knew we needed to act quickly to ensure the rights and dignity of transgender Americans, preserve the stability of our military, and protect our nation's core values of equality and fairness.

We filed the first challenge to Trump's discriminatory and harmful transgender military ban, *Doe v. Trump*, on August 9, on behalf of five (since joined by a sixth) service members and two individuals seeking to serve. A few weeks later, we joined a second case, *Stockman v. Trump*, representing additional current and aspiring service members.

On October 30, D.C. District Court Judge Colleen Kollar-Kotelly issued a nationwide preliminary injunction halting the ban in *Doe v. Trump*. Judge Kollar-Kotelly agreed our plaintiffs were likely to prevail on their claim that Trump's ban violates their constitutional right to equal protection, and recognized the serious harm the ban was already causing to transgender service members—who under it face discharge and the loss of their livelihoods, health care, and post-military retirement they have worked hard to earn—as well as to transgender Americans who the ban blocked from ever being able to serve, regardless of their individual qualifications.

Since then, each of the other three federal district courts to consider Trump's transgender military ban, including in GLAD's second case *Stockman v. Trump*, has issued a similar injunction halting its enforcement while the cases proceed.

The Trump administration challenged those rulings on appeal—and, as we got closer to the January 1, 2018 start date for open enlistment,

began to ask for "emergency stays" of those rulings, seeking to delay that date. But neither the district courts nor the courts of appeal were persuaded by the administration's argument that the military was not prepared for open enlistment to begin. The district courts denied the government's request for an emergency stay, and the courts of appeal followed suit.

In ruling against a stay, the D.C. Court of Appeals described the central question with these profound words: "[I]t must be remembered that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them."

Late in the evening on December 29, we got incredible and welcome news: the Pentagon confirmed that the government was withdrawing its appeals of the temporary orders prohibiting enforcement of the ban, and would not seek a last minute "emergency" stay from the United States Supreme Court to delay the January 1 enlistment date. Transgender people throughout the country, whose future educational and career dreams rest on their being able to enlist, would finally be able to move forward.

But this fight is far from over. While enforcement of the ban is currently blocked by court order, it remains official policy to deny

continued service and enlistment by transgender people. The government is continuing to defend Trump's ban in federal district court, where we are currently engaged in the discovery process. The government has also said that it will soon conclude a study of transgender people serving in the military, and we expect that it may use the outcome of that study as a further attempt to defend Trump's discriminatory policies.

"The beginning of open transgender enlistment is truly historic and something to celebrate," says GLAD Transgender Rights Project Director Jennifer Levi, who with NCLR's Shannon Minter is one of two transgender attorneys leading the fight against the ban. "But we can't let down our guard. Beyond its devastating discriminatory impact on individual service members and on our military itself, allowing a ban on transgender service members to stand would have wide ranging implications. If transgender people are deemed categorically unfit to serve in the military, that exclusion will be used to justify discrimination in housing, employment, social services, family law, healthcare, public benefits, insurance, and beyond. This is a critical fight, for our community and for our nation's values."

GLAD, with our partners at NCLR and the other organizations who are challenging Trump's ban in court, will not stop fighting until it is gone for good. ■

To follow case developments, visit www.glad.org/cases/doe-v-trump and www.glad.org/cases/stockman-v-trump

8



Photo: The History Project, Matt Karkowski, xoxolight.com

GLAD Staff Attorney Allison Wright (right) was awarded the distinguished Lavender Rhino Award last October by The History Project for her contribution to the LGBTQ community.

# Announcing the GLAD One Justice Fund

*Lawyers are a key bulwark in the ongoing fight against discrimination and oppression—not just for the LGBTQ community but for all our communities that are fighting for liberation and justice. And GLAD's lawyers do us proud—every single time. That's why we need to support GLAD—now more than ever!*

*–Elyse Cherry, Co-Chair, GLAD One Justice Fund*



We are facing unprecedented, hateful attacks by an administration determined to strip away our rights and freedoms. The president has reversed sound military policy with his reckless ban barring transgender Americans from serving their country. He has appointed anti-LGBTQ officials to the highest levels of government and the federal bench. His actions threaten to roll back



rights for transgender students, while opening the door to religious discrimination against LGBTQ people and people seeking birth control. Deportations and unconstitutional travel bans are separating families and demonizing immigrants. Meanwhile, the health and insurance needs of our loved ones are under assault, and federal agencies are stripping away metrics to track the needs and wellbeing of LGBTQ communities, especially elders. In courts and state legislatures across the country, similar attacks are happening every day.

While the president and his advisors are hell-bent on dividing our communities—LGBTQ, immigrant, Muslim, communities of color, women—GLAD is proud to show that we are one justice movement. GLAD is responding to these injustices with strategic and unwavering resistance—by defending against attacks in the courts and advancing justice for all.

**That's why we are announcing the creation of the GLAD One Justice Fund, a $1.7 million investment that will launch the next generation of GLAD's litigation and advocacy work to defend and advance LGBTQ rights for years to come.**

At a critical time for the LGBTQ community, the One Justice Fund will build on GLAD's winning track record and expertise in litigation, policy and education to:

- Leverage the courts to resist attacks on marriage and parenting rights, and advance transgender protections, employment non-discrimination and more
- Expand legal staff to advance groundbreaking litigation and legal work nationwide—to stop bigotry before it spreads
- Increase rapid-response services of our GLAD Answers infoline to field the surge in daily emergency legal inquiries

- Launch new education and advocacy initiatives to advance strategic, movement-building priorities for equality in law, racial and economic justice

The three-year fund will ensure that GLAD's growth will be sustained—expanding our Legal team now and growing our Development team to meet new demands by 2020.

We are proud to announce that generous donors have already made gifts and pledges of nearly $1M, or 58% of our $1.7M goal.

Our deepest thanks go to our One Justice Fund Co-chairs for



their leadership: Elyse Cherry and Scott Pomfret. And our One Justice Fund Committee Members: Gary Daffin, Catherine D'Amato, Kristen Elechko, Deborah Heller Oz Mondejar, Rick McCarthy, Richard Moore, Bryan-Eric Simmons Ian Tzeng, and Rich Yurko.

Become an influential part of the movement toward justice for all by investing in the GLAD One Justice Fund today. Your one-time or multi-year support will ensure a staunch, smart, swift opposition to these outrageous attempts to curtail the rights and dignity of LGBTQ people, women, people of color, immigrants, religious minorities and every one of our allies. ■

*For more information about the GLAD One Justice Fund, contact GLAD Director of Development Brianna Boggs at bboggs@glad.org or 617-426-1350*

9

## Thank You

GLAD thrives due to the support of volunteers, donors and in-kind contributors. We extend our thanks to the following individuals and organizations who worked with us in the past year toward achieving a more just world. We apologize if we have omitted anyone.

**ATTORNEYS**

Sally Abrahamson (DC)
Daniel Ball (MA)
Richard D.
  Batchelder, Jr. (MA)
Courtney Beer (ME)
Inga Bernstein (MA)
Christopher Berry (ME)
Judith Berry (ME)
Karen Blum (MA)
Robert C. Boyd (DC)
Kathleen M. Brill (MA)
C. Thomas Brown (MA)
Vanessa M. Brown (MA)
Hays Burchfeld (MS)
Adam M. Cambier (MA)
Tiffany F. Carney (DC)
Phil Catanzano (MA)
Arcaneglo S. Cella (MA)
Denny Chan (CA)
Katrina Chapman (MA)
Teresa Cloutier (ME)
Catherine R. Connors (ME)
Susan Crockin (DC)
Andrew Davis (ME)
Stuart F. Delery (DC)
Kathleen DeLisle (MA)
Walter Dellinger (DC)
Adriel Cepeda Derieux (NY)
Andrew DeVoogd (MA)
Christine Dinan (DC)
Catherine J. Djang (NY)
Christopher D. Dodge (MA)
J. Anthony Downs (MA)
Douglas C. Dreier (DC)
Dianne Ellis (MS)
Carolyn N. Famiglietta (MA)
John Freedman (DC)
Peter Grossi (DC)
Bruce Hale (MA)
Matthew Handley (DC)
Cathy Harris (DC)
Lindsay C. Harrison (DC)
Lisa Hays (MA)
Jordan D. Hershman (MA)
John Brent Hill (DC)
Harriet Hoder (MA)
Brook Hopkins (MA)
Rachel Hutchinson (MA)
Richard Iandoli (MA)
Robert Intile (MA)
Kristi L. Jobson (MA)
Richard Jones (MA)
Courtney G. Joslin (CA)
Joyce Kauffman (MA)
Jennifer A. Kirby (MA)
Nicole Kinsley (MA)
Tiffany Knapp (MA)
Katherine Knox (ME)
Andrea Kramer (MA)
Kevin Lamb (DC)

Paul Lannon (MA)
Michelle LaPointe (MA)
Claire Laporte (MA)
Ronald M. LaRocca (ME)
David M. Lehn (DC)
Michael J. Licker (MA)
Ariel Linet (ME)
Sharen Litwin (MA)
Louis Lobel (MA)
Christopher Looney (MA)
Sandra Lundy (MA)
Lizz Matos (MA)
Maureen McBrien (MA)
John N. McClain, III (NY)
Daniel McFadden (MA)
Gerald McIntyre (CA)
Anton Metlitsky (DC)
Matthew E. Miller (MA)
Margaret Minister (MA)
Shannon Minter (DC)
Ashley E. Moore (MA)
Tiffany Moore (MA)
Andrew Musgrave (MA)
Susan Murray (VT)
David Nagle (MA)
Kim Nemirow (IL)
Juliette Niehuss (DC)
Andrew O'Connor (MA)
Zack Paakkonen (ME)
Patricia A. Peard (ME)
Amy L. Pierce (CA)
Nancy Polikoff (DC)
Amy Christine
  Quartarolo (CA)
Marco J. Quina (MA)
Pauline Quirion (MA)
Vivek J. Rao (ME)
Nolan L. Reichl (ME)
Carolyn Reyes (CA)
Anna Rich (CA)
Elizabeth Roberts (MA)
Cynthia C. Robertson (MA)
G. David Rojas (IL)
Peter Romer-Friedman (DC)
Alexandra Roth (NY)
Cathy Sakimura (CA)
Hema Sarang-
  Sieminski (MA)
Margo Schlanger (MI)
Mary Schmidt (MA)
Matthew D. Schnall (MA)
Joseph Schneiderman (CT)
Alan Schoenfeld (NY)
Richard M. Segal (CA)
Leah Segal (MA)
Giovanna Shay (CT)
John Shope (MA)
Emily R. Shulman (MA)
Adam Sieff (CA)
Steven Silver (ME)
Andrew Silvia (MA)
Stephanie Simon (NY)

Joseph W. Singer (MA)
Deirdre Smith (ME)
Nathaniel R. Smith (CA)
Andrew Sokol (NY)
David Soutter (MA)
Kate Stewart (MA)
Joel Thompson (MA)
Joshua Tom (MS)
Juno Turner (NY)
Jill Ward (ME)
John Ward (CA)
Sarah Warlick (DC)
Daniel Wathen (ME)
Ryan N. Watzel (DC)
Harrison J. White (CA)
Shannan Wilber (CA)
Emma S. Winer (MA)
Paul R.Q. Wolfson (DC)
Jennifer Wriggins (ME)
Paloma Wu (MS)
Gina Yamartino (ME)
Mary Zou (NY)

**LAW FIRMS**

Bernstein, Shur, Sawyer &
  Nelson, PA
Cadwalader, Wickersham
  & Taft LLP
Foley Hoag LLP
Gibson, Dunn &
  Crutcher LLP
Greater Hartford Legal Aid
Goodwin Procter LLP
Jenner & Block
Justice in Aging
Kator, Parks &
  Wesler, PLLC
Kauffman Crozier LLP
Latham & Watkins LLP
Morgan, Lewis &
  Bockius LLP
O'Melveny & Myers LLP
Outten & Golden LLP
Paul, Weiss, Rifkind,
  Wharton & Garrison LLP
Pierce Atwood LLP
Ropes & Gray
Schmidt & Federico, PC
Sullivan & Worcester LLP
Wilmer Cutler Pickering
  Hale and Dorr LLP

**GLAD ANSWERS
VOLUNTEERS**

William Albinger
Bruce Bell
Sam Bock
Marjorie Charney
Alexa Cho
Caitlin Delehanty

Michael Dicaprio
Anthony Fleenor
Pat Freedman
Laura Frye
Myra Hindus
Roger Hooper
Nicole Kesner
Carol Kirchick
Patsy Leibensperger
Malavika Lobo
Debbie London
Jessie Lowell
Bob Mack
Aarthi Madadi
Juliana Medina
Howard Muise
Han Park
Justin Pelletier
Sharon Pritchett
Julia Remotti
Cara Rotschafer
Michaela Santos
Karen Silver
Caitlin Simens
Charles Studen
Shen Tang
Henry Thomas
Sofia Tort
Jessi Whitby
Michael Wilson
Lorraine Wong
Ryan Wood
Sydney Wright
David Zhang
Joelle Zhu
Cris Zubizarreta

**INTERNS**

Hana Al-Henaid
Grace Arredondo
AJ Bolan
Portia Caruso
Eric Cheng
Ryley Copans
Courtney Copp
Kelcey Duggan
Grizel Flores
Andrew Hellman
Charlie Hunsinger
Clarice Johnson
Erik Laats
Cory Lamz
Emily Leen
Rachael Littlehale
Olivia Milne
Moriah Rodriguez
Michaela Santos
Lila Selle
Lindiwe Sibande
Marie Stephens

**VOLUNTEERS**

Michael Andrzejewski
Grace Arredondo
Michele Arroyo
Karina Berçan
Jen Brown
Robert Bryant
Bob Bryant
Gayara Bulathsinhalage
Emily Calbick
Mikayla Carignan
Jessica Carignan
Lindsay Child
Alexandra Cipolla
Alejandro Clark
Elsbeth Colson
Sherryl Drasin
Cara Durgin
Constance Fontanet
Joey Francoeur-Krzyzek
Alexa Frongillo
Ava Gallo
Ellen Goodman
David Gorin
Alice Gottesman
Taylor Grenga
Barbara Grindell
Tom Hay
Sarah Horn
Zach Honer
Sydney Hubbell
Julia Huesa
Kristen Hunsinger
Reva Kasman
Vanessa Larrieux
Aki Lin
Deborah London
Caroline Lucas
Shirley Márquez Dúlcey
Claire McDonell
Mark McNally
Cherai Mills
Melissa Munoz
Frances Murphy
Brody Nagy
Ina Neugebauer
Amy Nishman
Elizabeth O'Neill
Van Pham
Mary Potts
Julia Ratzlaff
Paulina Ruiz
Julia Ruiz Borys
Elijah Rumbaut
Karl Sanchez
Emily Saunders
Althea Smith
Eliza Sparkes
PJ Strachman
Jesse Strachman
Madison Summers

Kyle Thai
Mike Thomas
Marisa Thomassie
Emmalee Todd
Jo Trigilio
Susan Trotz
Bobby Valentine
Ke Wang
Mason Weintraub
Marina Weisz
Randi Whitcomb
Amy Wong



GLAD thanks our generous
major donors who transform
the law through their
leadership giving.

**$250,000 – 500,000**
Anonymous

**$100,000 – 249,999**
Anonymous
Gill Foundation
Evelyn & Walter Haas,
  Jr. Fund
H. van Ameringen
  Foundation

**$50,000 – 99,999**
The Aldrich Family
Arcus Foundation
Barr Foundation
Elton John AIDS
  Foundation
Gilead Sciences, Inc
Klarman Family
  Foundation
Krupp Family Foundation
Frank E. Payne and
  Seba B. Payne
  Foundation

**$25,000 – 49,999**
Anonymous
The Boston Foundation
Elyse Cherry
The Corners Fund
Cummings Foundation
The Herrman Family
Richard Moore &
  Matt Lafond
Partners Healthcare
  System, Inc.
Dianne R. Phillips &
  Evelyn C. Kaupp
Scott Pomfret &
  Scott Whittier

10

## Thank You

Alix Ritchie &
  Marty Davis
SheGives Inc.

**$10,000–24,999**
Anonymous (2)
Akamai
  Technologies, Inc.
Ronald M. Ansin &
  Jim Stork
Cameron Baird
  Foundation
Bruce W. Bastian
Adam Berger &
  Stephen Frank
BNY Mellon
Mr. Matt Damon
Dell EMC
Eastern Bank
Fidelity Investments
Douglas P. Fielberkorn &
  Andrew Hall
GE
Eric Green
Anne Guenzel &
  Frances Pieters
Esmond Harmsworth &
  Jerome Buet
David Hayter
Holland & Knight LLP
Ambassador
  James C. Hormel &
  Michael P. Nguyen
Jack Hornor & Ron Skinn
James E. Humphreys
Richard Iandoli, Esq.
Ralph & Janice James
Rev. David S. King
Charles &
  Rebecca Ledley
Jeanne Leszczynski &
  Diane DiCarlo
Jeffrey Levin &
  Andrew J. Goffe
Diane K. Lincoln
Macy's
Amy Mandel &
  Katina Rodis
Jeffrey H. Munger &
  Robert T. Whitman
Andrew S. &
  Samuel C. Pang, MD
Rhode Island Foundation
Daniel L. Romanow &
  B. A. Zelermyer
Ropes & Gray LLP
Samantha Rosman &
  David Rosman
Timothy Sabol &
  Judd Flesch
Evan Schwartz &
  Robert K. Fitterman
Lynnae Schwartz &
  Leslie K. Serchuck
Ted Snowdon &
  Duffy Violante

Anne Stanback &
  Charlotte Kinlock
State Street Bank &
  Trust Co.
Stickk.com, LLC
Cecilia Stone
TD Bank
Ian Tzeng
Scott Webster &
  Peter Black
Trina Soske &
  Sarah Yedinsky
Richard J. Yurko

**$5,000–9,999**
Anonymous (3)
5 Star Travel
American Heart
  Association
Sandy Anderson &
  Meg Wallace
Atwater Wealth
  Management
Ashley Banfield &
  Emily Drahzal
Beacon Hill Legal
Adrienne Benton
Biogen
Edward S.W. Boesel
Mary L. Bonauto &
  Jennifer Wriggins
Kraig V. Kissinger &
  Mark S. Brown
Gary Buseck
André L. Campagna &
  Gary H. Sherr
Steven Carlin &
  Michael Cormier
Amelia M. Charamba &
  Maralyn Wheeler
Choate Hall &
  Stewart LLP
Circle Surrogacy
A.M. Clark
Christine Coakley &
  Michelle O'Connell
Mark A. Cohen &
  Jerrold E. Hyman
Collora LLP
Rob Compton &
  David Wilson
Cooley LLP
Fred Csibi & Daniel Levin
Phyllis Dixon &
  Diana Rubin
DLA Piper
Lisa J. Drapkin &
  Debbie Lewis
Nannette Dumas
Foley Hoag LLP
David P. Gagne &
  Devan F. Dewey
Joseph Garland &
  Phillip Haines
Gonzalez & Associates PC
Goodwin Procter LLP

John D. Hancock &
  Jay Wood
Lindsay Harrison &
  Jonna Hamilton
Julia Fitz-Randolph
  Lesbian Innovations
  Fund at The Women's
  Foundation of CO
Deborah Heller &
  Ann Sanders
Highfields Capital
  Management LP
Philippe Hills
Jane A. Hiscock &
  Marijean Lauzier
Dean Hodge &
  Stavros Kissonerghis
Hogan Lovells
Nancy Horwitz
IBM
Jenner & Block, LLP
John Hancock
  Financial Services
Jones Day
Justice Resource Institute
Joyce Kauffman &
  Annie Weatherwax
Kauffman Law &
  Mediation
Kronos
Lesbian Equity
  Foundation
Karen Lichtenstein
Sharen Litwin
Locke Lord LLP
Matt Maguire
Harvey J. Makadon MD
Michael & Benjamin
  Manthei
Gwen Marcus &
  Nancy Alpert
Mintz Levin Cohn Ferris
  Glovsky & Popeo PC
Paul Moreno
Morgan, Lewis &
  Bockius LLP
Betty I. Morningstar &
  Jeanette Kruger
Nathaniel & Elizabeth P.
  Stevens Foundation
John B. Nay, Jr.
Nutter McClennen &
  Fish LLP
Patricia Peard &
  Alice Brock
Kirk Pessner & Russ Miller
James M. Pierce &
  Richard Cresswell
Carole & Richard Rifkind
  Rockland Trust
Molly & Rebecca
  Shangraw
Sidley Austin LLP
Skadden Arps Slate
  Meagher & Flom LLP

Joseph Smith &
  Scott Popkowski
Mark D. Smith &
  John T. O'Keefe
Timothy D. Stein
Sullivan & Worcester LLP
Sun Life Financial
Tracy Vasile &
  Lori Nikolic-Vasile
Vertex Pharmaceuticals
David Weidner &
  William Gannon
Lisa B. Weissmann, MD &
  Debra Shapiro, MD
Wellington Management
  Company LLP
WilmerHale LLP
Wilson, Marino &
  Bonnevie PC
Sherry Wintersitz &
  Jean Frazier
Wolf Greenfield &
  Sacks PC
Janson Wu &
  Adam Levine

**$3,000–4,999**
Anonymous (2)
ADP, LLC
Mark Allen
Susan A. &
  Donald P. Babson
  Charitable Foundation
Mariterese Balthrop
Jane Barber &
  Linda Rohler
Kenneth Barr &
  Michael Fenter
The Baupost Group LLC
Baystate Financial
Beth Israel Deaconess
  Medical Center
Janis Bettencourt
Kathleen Biro &
  Julie Nave
Blue Cross Blue Shield
  of Massachusetts
Brianna Boggs &
  Sean D. Best
Boston Private Bank
Broadway Cares/Equity
  Fights AIDS
Edward Byrne &
  David Jiles, Jr
Joanne Cancro, DC &
  Charlene P. Allen
Bonnie Catena
Rich Coffman
Kimberly Cohen &
  Susanna Benn
Community Works
Laurie A. Costa &
  Kathy Schulman
DangerLaw, LLC
Liz Doherty &
  Elizabeth Roberts

Marc Elovitz
Willis Emmons &
  Zach Durant-Emmons
Peter J. Epstein Esq.
Heidi Erlacher &
  Christine Donahue
Nima & Kate Eshghi
Finnegan, Henderson,
  Farabow, Garrett &
  Dunner LLP
Fish & Richardson
Foley & Lardner LLP
Ralph Freidin
Virginia Gassel &
  Belen Trevino
Julie Goodridge
Goulston & Storrs
David Halstead &
  Jay Santos
Dean T. Hara
Harvard Law School
  Lambda
Harvard Pilgrim
  Health Care
  Foundation
Joanne Herman &
  Terry Fallon
Tracy & Matt Heverly
Hinckley Allen
Hirsch Roberts
  Weinstein LLP
Carolyn Hotchkiss &
  Katherine M. Cole
Hilary Jaffe
Kathy & John Kaufmann
Susan E. Kennedy &
  William Buffett
J.B. Kittredge, Jr. &
  Winand Van Eeghen
Barry Kostinsky &
  Charles Kelly
Lawson & Weitzen LLP
Mary K. Loeffelholz &
  Laura Green
LPL Financial
Kristin Marcus
Massachusetts
  General Hospital
Anita McGahan &
  Sarah Kaplan
Hirschel D. McGinnis, MD &
  David G. O'Dowd
Mead, Talerman &
  Costa, LLC
Rolando Medina
Kendra Moore
Kathy Mulvey &
  Patricia Lambert
Nixon Peabody LLP
Gregory Noonan
Northeastern University
  School of Law
Ranesh &
  Erik Ramanathan
Fred Ramos &
  Bob Starmer

The Residences at
  Seashore Point
Roberts & Stauat LLP
Sanofi Genzyme
Jack Sansolo &
  Dean Waller
Marlene Seltzer &
  Janice Ambrose
Paul Smith &
  Michael Dennis
Charles Steenburg
Caleb P. Stewart
Charles Richard Studen
Susman Godfrey, LLP
Linda Z. Swartz &
  Jessica W. Seaton
Lee Swislow &
  Denise McWilliams
Douglas Talhelm &
  Ashley Eaton
Steven & Rebecca Taylor
John & Kristine
  Van Amsterdam
Nancy Vogele
Edmund & Jane Walsh
Richard & Sally Weitzen
Wells Fargo
Gene Yoon &
  Amil Shah

**$1,500–2,999**
Anonymous (8)
Catherine M. Adler &
  Ellen Dehm
John Affuso
Gavin Alexander
Muath Alwari
Jonathan &
  Erin Anderman
John Argos &
  Robert G. Ross
David Aronstein &
  Steven Tamasy
Sydney Atkins
Jens Audenaert &
  Amol Shah
Paul & Edith Babson
  Foundation
Joseph P. Barri, Esq. &
  Randal A. Farrar
Paul Beaulieu
Robert D. Beck &
  Greg Van Boven
Bruce Bell &
  George Smart
James Bennette &
  David Cowan
Rhonda L. Berchuck &
  Kat Katrouzas
Robert Biddleman &
  Daniel Sullivan
Kristen Bokhan
Kelly M. Bonnevie, Esq. &
  Karen Kaufman
Mohan Boodram &
  Robert Morris

11

## Thank You
continued from page 11

Boston Marriott
 Copley Place
Boston University
 School of Law
Eva N. Boyce
Peter Brady &
 Alan Davis
Susan F. Brand, Esq. &
 Gail E. Horowitz, Esq.
Seth Brennan
David W. Briggs &
 John Benton
Jean-Phillip Brignol &
 Rohan Barrett
Peter Brox
Alex Bucci &
 Julia Wagner Bucci
Herbert Burtis
Darian M. Butcher
Greg Butler
Richard Carey
Dr. Paula G. Carmichael &
 Rev. Richelle Russell
J.W. Carney & Joy Rosen
Paul G. Cellupica &
 Jesse Liu
Chandler Center for
 the Arts, Inc
David P. Chicoine
Lindsey Cimochowski &
 Bradley Rufleth
Jennifer Collins &
 Gretchen Randall
David Colton &
 Hsein M. Khoo
Deanne Colwell &
 Denise Serrecchia
Elizabeth J. Coolidge &
 Elisabeth Sackton
Margaret J. Covert &
 Brian S. Eberman
Patience Crozier &
 Jessica R. Keimowitz
Stanley Cushing &
 Daniel Lyons
Pam Cyr & Joyce Holupka
Pamela Daniels &
 Belden Daniels
Jo Davis, MSW
Day Pitney LLP
Thomas De Veng
Robert J. DeBenedictis &
 Donald Picard
Laura E. DeNardis &
 Deborah R. Smith
Andrew Devoogd &
 Nancy Griffiths
Kerry L. Dietz &
 Eva Schocken
Nancy Douttiel &
 Diane Willcox
Shane Dunn &
 Elizabeth Bernardi
Athena & Penn Edmonds
Betsy Ehrenberg &
 Beth Eisenberg

Meryl Epstein &
 Patricia Nuzzola
Will Evans, Esq
Kyle Faget &
 Tracy Brown
Diane M. Felicio PhD &
 Jan L. Donley
Marcy Feller &
 Gabby Hanna
Michael F. Fernon
First Parish Church
 of Brewster
Dwight Foley
Polly Franchot &
 Julie Smith
Benjamin Franklin &
 John Donnelly
Irene Gage & Susan Pierce
gc2b
Christiana N. Gianopulos
 & Paul Butler
Sterling Giles
Daniel A. Ginsburg &
 Laura A. Lechner
Laurie Glassman &
 Carla Bettano
Gail E. Goodearl
Richard Gosselin &
 Robb Johnson
Gordon Gottlieb &
 Rob Krikorian
Robert-Jay Green &
 Holden Lee
Dr. Lawrence L.
 Greenwald
Stanley N. Griffith &
 Ann E. Schauffler
Maria Grigoriadis
 Household
Paul Groipen &
 Todd Satterlee
Grossman
 Marketing Group
Holly Gunner &
 Anne Chalmers
Katherine Haffner
Robert H. Hale &
 William G. Church
Harry & John Harkins
Jonas Harrington
Ann Hartstein &
 Dr. Cathy Stern
Timothy Harwood
George Hastie &
 Quinn Kian
Dr. Catherine A. Hay &
 Kristine Clerkin
Eliza Hewat &
 Susan Weinberg
Kathryn Livelli &
 Wendy Hinden
Kenneth Hirschkind
Sarah Hodges
Terry & Todd Holzman
John Hopper
Matthew Horan

Horizons Foundation
G. Lee &
 Diana Humphrey
Frances Hutchins &
 Laura Kalba
Michael J. Izdepski &
 James Couchon
Elizabeth C. Janeway &
 Sen. Harold Janeway
Suriya Jeyadalan, MD &
 Cora Jeyadame
Arthur Kaplan &
 Duane Perry
Peter Kassel &
 Thomas Tostengard
Wendy Kirchick
Brad & Flint
 Kleinerman-Gehre
Martin Koski &
 James Fitzgerald
Kotin, Crabtree & Strong
G. Paul Kowal
Michael Kramer
Karen Kruskal &
 Sheera Strick
Stewart J. Landers, Esq.
Jacqueline Lapidus
Claire Laporte
Chuck Latovich
Joan A. Lenane &
 Sally A. Rose
Michele Lenke &
 Rachel Goldman
Shari & Robert Levitan
Mike Lew &
 Thomas Harrigan
Marie A. Longo &
 Allison F. Bauer
Maria Lopez &
 Stephen Mindich
Loughlin FitzGerald, PC
Chelsea Loughran
Kenneth Lowry &
 John Lynah
Paul E. Lynch, MD &
 John Pitfield
Keith J. MacDonald &
 Thomas P. Webber
Tony Maida &
 Anthony Volpe
Sara Malconian &
 Katherine Truscott
Seth Marnin
James Mattus &
 Trevor Fulmer
Marc Maxwell
Kenneth H. Mayer, MD
Richard D. McCarthy &
 Franc Castro
Anne McClintock
Siobhan McMahon &
 Philip Holland
Matthew McTygue &
 Todd Rivers
Judith Miles, Esq. &
 Renata Sos

David Mills
Jessica Mink
Frank C. Mockler &
 Stephen J. Griffin
Elizabeth &
 William Monnin-Browder
Marianne Monte &
 Lisa Carcieri
John Morrel
John Morrill
Christine Nickerson &
 Inga Bernstein
Jodi Nofsinger
Mark E. Ojakian &
 Jason Veretto
Deborah Olszewski
Open Society
 Foundations
Patricia Opsoyan &
 Tamar Hosansky
Rosemary Palladino &
 Marianne Brennick
Patterson Belknap Webb
 & Tyler LLP
Larry Petrovich &
 Robert Fogel
W. Glen Pierson &
 Charles P. Reed
Luke Platzer
David J. &
 Nancy Poorvu
Jose F. Portuondo &
 Maria L. Wilson-
 Portuondo
Ellen M. Poss, MD
Stephen R. Powell &
 Ronald McClelland
Provincetown Bears
Oliver Radford &
 Stephen C. Perry
Caroline Raisler
Brian Ramos
Catherine Reuben
Brian P. Rice &
 Jason D. Kelliher
Sharon L. Rich &
 Nancy E. Reed
Matthew Riemer &
 Leighton Brown
Craig Robbins &
 Eric Huang
Carol Rosensweig, Esq. &
 Charlene D. Grant
Richard Rubinstein
Jess & Robbie Samuels
Jane L. Scarborough, Esq.
 & Louise Wylan
Timothy Schofield &
 Stephen Chan
Johanna Schulman &
 Moira S. Barrett
Jocelyn M. Sedney &
 Holly A. Williams
Bradley Seeman
Linda Serafini &
 Cathy Welsh

Mark Serchuck
Robert Sessions
Mark Sexton &
 Kirk Wallace Fund of
 Stonewall Community
 Foundation
Matthew Shakespeare &
 Fritz Backus
Sherin and Lodgen LLP
John A. Shope &
 Stephen Sampang
Robin Shore &
 Laura Moskowitz
Bryan-Eric Simmons &
 Ralph Vetters
Joseph W. Singer &
 Martha Minow
SKDKnickerbocker
Julia Slee &
 Beth Grierson
Clifford Sloan &
 Mary Lou Hartman
Mary Grace Smith
Marc Solomon &
 Daniel Barrett
Andrew Sorbo
Scott Squillace, Esq.
John F. Stafstrom, Jr. &
 Dennis C. Murphy
Randall Steere
Stonewall Community
 Foundation
Sullivan Bille, PC
Ed Suplee &
 Matt Barrett
Suzanne Sylvester
Susan Symonds &
 Annie Landry
Tracy Talbot
Kevin A. Tedeschi
Mark R. Thall, MD &
 Tom Slavin
Martha J. Thurber &
 Dena G. Willmore
Karen Tirozzi &
 Danielle Pease
Christopher Transue &
 Adrienne Shapiro
Jonathan "Dutch" Treat
Mark & Wellner Tremallo
Thomas G. J.
 Trykowski, AIA
 & Joseph Cacciola
Geoffrey W. Tuba
United Parish of
 Auburndale
United Way of
 Rhode Island
Christopher Valente
Rich Van Loan
Anthony Viola &
 Michael Hershey
Ellen Wade, Esq. &
 Maureen Brodoff, Esq.
Wade Horowitz
 LaPointe LLC

O'Hanlan-Walker LGBT
 Equality Fund
Francis C. Ward
John P. Ward, Esq. &
 Alain Balseiro
Shana Weaver
Jeffrey Webb &
 Mark Schuster
Geoffrey Weber
Arthur E. Webster, Esq.
Don Cornuet &
 Steve Weiner
Katherine &
 Kimberly Weir
Nicholas Whalen
Mary White
Jo Ann Whitehead &
 Bette Jo Green
Susan Wilson, Esq. &
 Laura Kanter
Evan Wolfson & Cheng He
Rodney L. Yoder &
 Michael J. Piore
Mark R. Young &
 Gary Sullivan
Elizabeth A. Zeldin, Esq.
 & Polly Grant
Dana Zircher

*as of 11/27/17*

**Legacy Society**

Anonymous (3)
Carol Alms
Amy Aulwes &
 Warren Zola
Michael Baeder &
 David Wimberly
Sharyn Bahn
Gloria & Linda
 Bailey-Davies
Dawn Baumer &
 Rosie Hartzler
Bruce Bell &
 George Smart
Linda Betzer
Dr. Stephen Boswell &
 John Neale
Eva N. Boyce
Peter Brady & Alan Davis
Shelley Brauer &
 Jean Hey
Ann M. Briley, MD
Bill Brindamour &
 Peter Tognalli
David Brown
The Estate of Larry Brown
Dr. Paula G. Carmichael &
 Rev. Richelle Russell
The Estate of
 Leslie H. Carter
The Estate of Esther Carty
David Cash
Patience Crozier &
 Jessica R. Keimowitz

12

## Thank You

The Estate of Pam Dennis
Laura Diamond &
  Carolyn McDonald
Abby & Mary
  Diamond-Kissiday
Lisa J. Drapkin &
  Debbie Lewis
Nannette Dumas
Peter J. Epstein Esq.
In memory of Eli J.,
  Ada R. & Linda
  M. Ersken
Suzanne Estler
Adam Feinberg
Robert Flavell &
  Ronald Baker
David F. Freedman
John Giso
Gail E. Goodearl &
  Sarah Jane Guy
Holly Gunner &
  Anne Chalmers
Dean T. Hara
Harry Harkins
Christopher Hartley &
  Micah Buis
J. Bourge Hathaway &
  Julia Fitz-Randolph
Warren Hathaway
Deborah Heller &
  Ann Sanders
Joanne Herman
Gavin Hilgemeier
Joan Hilty
Kenneth Hirschkind
Leslie Horst
Claire E. Humphrey
James E. Humphreys
Rabbi Devorah Jacobson
  & Ms. Margaret Mastrangelo
Barbara Jordan
Susan Judge
John Kane
Terence Keane &
  Douglas Hughes
Rudy Kikel & Sterling Giles
Robert King & Gary Jordan
G. Paul Kowal
R.P. André LaCroix
Karen Lichtenstein
Arthur Lipkin &
  Robert Ellsworth
The Estate of
  Kay Longcope
Marie A. Longo
Tony Maida &
  Anthony Volpe
David Martin &
  The Rev. Steve Godbrey
Daniel Mauk &
  Mitchell Sendrowitz
Marc Maxwell
Richard D. McCarthy
Laura McMurry
Brian McNaught &
  Raymond Struble

The Estate of
  Russell Miller
Robert Minnocci
Paul Moreno &
  Stephen Barlow
Jeffrey H. Munger &
  Robert T. Whitman
The Estate of
  Vincent Nardone
Andrew S. &
  Samuel C. Pang, MD
Trevor Paulson
Patricia Peard &
  Alice Brock
Janet F. Peck &
  Carol A. Conklin
Estate of Jalna Perry, MD
Mark Philibert &
  David Rooks
Scott Pomfret &
  Scott Whittier
Brian Quint
Nick & Sian Robertson
Richard Rubinstein
Takoma Sampson &
  Leah Whaley-Holmes
Jess & Robbie Samuels
Arnold Sapenter &
  Joseph Reed
Mary & Jean B. Sevarese
The Estate of Joan Schneider
Robert Seletsky & Michael Miller
Joanne Shapiro
The Estate of Cameron Smith
Diane Smith
Tony Smith
Andrew Sorbo
Trina Soske & Sarah Yedinsky
Scott Squillace, Esq.
Anne Stanback &
  Charlotte Kinlock
Kenneth Stilwell
Donald Stone
Mark Strickland
The Estate of Raymond Sullivan
Amalie Tuffin & Laura Lewis
Anthony Volponi
Herbert Walcoe
Karen &
  Marilyn Watson-Etsell
Kendall Watts
Lisa B. Weissmann, MD &
  Debra Shapiro, MD
Tim Wernette
Jo Ann Whitehead &
  Bette Jo Green
The Roy Glenn Wood Trust
David Yalen
Peter Zupcofska &
  Robert Wilson

## The Pop-Up Transgender ID Project

*A project of GLAD, Ropes & Gray LLP and MTPC, the Pop-Up Transgender ID Project supports transgender people across New England in acquiring accurate identity documentation.*

Immediately following the 2016 presidential election, GLAD partnered with law firm Ropes & Gray LLP and the Massachusetts Transgender Political Coalition to launch the Pop-Up Transgender ID Project, a rapid response clinic that provides legal support to transgender people in New England needing to update their legal name or gender marker on documentation like Social Security cards and birth certificates.

Thanks to Ropes & Gray's steadfast support of this project, we've assisted over 450 people throughout New England. The recruitment of hundreds of attorneys and staff, and the ongoing training and information sharing Ropes & Gray provides them not only sustains the Pop-Up Transgender ID Project but ensures clients have a positive experience every step of the way.

**Thank you, Ropes & Gray, for your commitment to New England's transgender community!**

*I sought the help of the Pop-Up Transgender ID clinic when I needed to update my name on my Social Security card. The attorneys at Ropes & Gray were so supportive and respectful. It was comforting to know that they were there for me, from start to finish. – LB, Boston*

If you'd like to contact the Pop-Up Transgender ID Project, visit www.glad.org/id



13

# A Message From the CFO

GLAD's financial health is strong. We have about seven months of reserves, or net assets, as of March 31, 2017 including board designated funds. There is minimal debt and sufficient cash to meet our obligations.

In the first half of FY17, we were pleasantly surprised that event revenue exceeded expectations, with our most successful Summer Party and Spirit of Justice events ever. We also welcomed new foundation funding. By the end of October 2016, we were ahead of year-to-date revenue expectations.

And then, the November 8 election changed all our assumptions. We experienced a swell of new and increased contributions. For example, we raised almost $700,000 in December, which was well above our average of $400,000. The number of gifts in December also increased from an average of 800, to almost 1,200. We saw many significant first-time gifts from individual donors and foundations. While the election was the trigger, none of this support would have been possible without the strong reputation that GLAD enjoys as a strategic leader in the LGBTQ legal movement.

We ended FY17 in March 2017 with a surplus of $367,526 *(see table below)*. With this extra revenue, and the expectation that new fundraising opportunities will continue, the approved budget for FY18 grows GLAD as an organization in both staff and non-staff resources, to help us meet the increased demands of this new Administration. It does so through a combination of reserve spending and a focused fundraising campaign. Read more about the One Justice Fund—a campaign to grow GLAD's legal capacity—on page 9.

| | Operating Fund | Board Designated | Total Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|---|---|
| **Net Assets: March 31, 2016** | $ 945,628 | $ 574,838 | $ 1,520,466 | $ 418,379 | $ **1,938,845** |
| FY17: Change in Net Assets | 423,766 | (50,717) | 373,049 | (5,523) | **367,526** |
| FY: Board Approved Transfer | (425,000) | 425,000 | – | – | – |
| **Net Assets: March 31, 2017** | $ 944,394 | $ 949,121 | $ 1,893,515 | $ 412,856 | $ **2,306,371** |

**Based on the table above, a couple of things to note:**
- Temporarily restricted funds are cash gifts and pledges restricted by the donor for a particular purpose or timeframe. The net reduction of $5,523 means we are spending down our backlog of restricted money and complying with the donors' intent. These funds are available to GLAD in FY18 and subsequent years.
- The board voted to move all of the FY17 surplus into the board designated fund. The FY18 budget includes expenditures for strategic initiatives totaling $253,000 and for subsequent years we anticipate spending an additional $295,000 to increase our legal staff, strengthen development capacity, and pay for increased operating costs, including a March 2018 office relocation.

**Other highlights and trends:**
- During fiscal year 2017, GLAD received donated legal services of $4,008,303. These were unusually high, as a result of the new challenges presented by the new Presidential Administration and a reinvigorated religious opposition. Almost 75% of the donated services supported the Transgender Rights Project I.D. clinic and related impact litigation including in schools and prisons. The remaining 25% assisted GLAD in thwarting attempts to undermine non-discrimination protections and marriage equality. Please refer to the audit footnotes available at www.glad.org/financial-information/ for more details.
- At March 31, 2017, the market value of the investment portfolio was $1.3m. The Finance & Audit Committee monitors investment results, risk tolerance and asset mix in accordance with our cash & investment policy. There has been a recent trend to slowly and responsibly raise the cash and short term bond positions.

We remain committed to excellence and will carefully monitor our financial results with an eye to the future.

Thank you for investing in GLAD. ■

Eva N. Boyce
Chief Financial Officer
December 2017

14

# Summarized Financial Data
## for Annual Report

### Statement of Activities*
For the 12 month period ended March 31, 2017    **FY17**

**Support and Revenue**

| | | |
|---|---|---:|
| Contributions & Grants | $ | 2,399,981 |
| Special events revenue, net | | 783,005 |
| Fees & program revenue | | 280,501 |
| Other income | | 42,565 |
| **Operating Income** | | **3,506,052** |
| Donated Services (In-kind Legal Fees) | | 4,008,303 |
| **Total Support & Revenue** | | **7,514,355** |

**Expenses**

| | |
|---|---:|
| Transgender Rights Project | 3,410,510 |
| Civil Rights Project | 2,100,261 |
| AIDS Law Project | 293,496 |
| Public Affairs & Education | 580,541 |
| Development & Fundraising | 423,974 |
| General & Administrative | 330,492 |
| **Total Expenses** | **7,139,274** |
| **Change in Net Assets from Operations** | **375,081** |

**Other Revenue (Expenses)**

| | |
|---|---:|
| Investment income | 9,468 |
| Net realized & unrealized gain (losses) | 16,710 |
| Spending policy transfer | (33,733) |
| **Total Change in Net Assets** | **367,526** |
| **Net Assets, beginning of year** | 1,938,845 |
| **Net Assets, end of year** | **$  2,306,371** |

### Statement of Financial Position*
March 31, 2017    **FY17**

**Assets**

| | | |
|---|---|---:|
| Cash & cash equivalents | | $660,006 |
| Accounts receivable & pledges | | 444,388 |
| Investments | | 1,333,641 |
| Equipment, deposits & prepaid expenses | | 206,754 |
| **Total Assets** | | **$  2,644,789** |

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable & accrued expenses | | $  292,411 |
| Deferred rent | | 46,007 |
| **Total Liabilities** | | **338,418** |

**Net Assets**

| | |
|---|---:|
| Operating | 944,394 |
| Board Designated | 949,121 |
| Temporarily Restricted | 412,856 |
| **Total Net Assets** | **2,306,371** |
| **Total Liabilities & Net Assets** | **$  2,644,789** |

### Program Spending: FY17



Transgender Rights Project 53%
Civil Rights Project 33%
AIDS Law Project 5%
Public Affairs & Education 9%

### Cost Categories: FY17



Non Personnel 14%
Personnel 30%
In-Kind Legal Fees 56%

15

* Full audit available at www.glad.org/financial-information/

# Legal Update



**Keeping Families Together: In Re D.**

LGBTQ elders, particularly LGBTQ elders of color, face distinct barriers to resources that impact their health and wellbeing, economic security, and social connections. GLAD is representing B, a 73 year old Massachusetts woman, in her effort to be reunited with her spouse, D, 89, after guardianship of D was incorrectly assigned to D's nephew in Mississippi. B and D have been together for nearly thirty years and legally married in March 2017. After D was diagnosed with dementia-like symptoms, her nephew took D to Mississippi, where he lives, and secured guardianship and conservatorship of her—without telling the court about her marriage and her spouse in Massachusetts. GLAD is working to obtain access to critical medical information, assess D's current needs, and transfer guardianship to Massachusetts.

GLAD is hopeful that D will be able to return to Massachusetts, where she will once again be surrounded by the family and friends she knows and loves. We are grateful to co-counsel Mary Schmidt in Massachusetts and Dianne Ellis in Mississippi for their support in helping reunite B and D.

**Pelletier v. Executive Office of Health and Human Services, et al., Massachusetts Superior Court**

GLAD and Health Law Advocates are challenging a denial of medically necessary facial feminization surgery for a transgender woman by MassHealth, the state Medicaid agency. Following a diagnosis of severe gender dysphoria, our client's doctors prescribed a course of medical treatment to allow her to live in her affirmed gender, including facial feminization surgery. Our client's insurer, MassHealth, refused to provide coverage for the surgery, claiming that facial feminization is categorically excluded in every instance. We filed suit in Suffolk Superior Court in September 2017, arguing that this is an improper interpretation of MassHealth regulations on health care for transgender people, which require a case-by-case determination—based on presented medical evidence and physician assessments—of whether facial feminization surgery is medically necessary to treat a particular individual's gender dysphoria.

**Rivera v. Springfield Rescue Mission**

In January 2017, GLAD filed a complaint with the Massachusetts Commission Against Discrimination on behalf of our client, Lynn Rivera, who was discriminated against by a religiously affiliated place of business based on their gender identity, sex, and race in violation of Massachusetts Public Accommodation Laws. In the fall of 2016, Lynn, who is of Puerto Rican descent and identifies as transgender, tried to shop at the Give-Away Center, a distribution center in Springfield open to the public that provides items like clothing and toiletries to those in need. Because Lynn exclusively wears men's clothing, Lynn intended to shop only for men's clothing items at the Give-Away Center. But when Lynn began shopping for clothing, an employee loudly told Lynn

that "only men were allowed in the men's section" and "only women were allowed in the women's section." This employee later said that because Lynn's identification said female, Lynn could not take any clothing from the men's section. The business, Springfield Rescue Mission, moved to dismiss the case by arguing their religious character exempted them from coverage under the Massachusetts Public Accommodation Law. GLAD has since submitted an opposition to their motion to dismiss and a rebuttal to Springfield Rescue Mission's position statement.

**Commonwealth v. a Juvenile "LN"**

GLAD, along with the ACLU of Massachusetts, filed an amicus brief in this case at the Supreme Judicial Court exploring the question of whether the Massachusetts statutory rape law can properly be applied to consensual conduct between two individuals under the age of sixteen. Beyond legal arguments that the statute should not apply to children under sixteen as perpetrators, we submit that criminalizing consensual sexual activity between two individuals under the age of sixteen hinders honest communication between young people and parents, health care providers, school personnel, and other sources of support about their sexual feelings and conduct, and interferes with a positive identity and regard for one's sexuality that experts agree is critical to avoiding risky behavior. We also argue that criminalization of consensual activity between young people under the age of sixteen is particularly harmful to LGBTQ youth who already experience a range of harmful outcomes due to the societal stigma associated with LGBTQ identity and sexual behavior. The message of deviance conveyed by the criminal law reflects, reinforces and amplifies this stigma, which results in higher rates of suicidality, depression, drug use and sexually transmitted infections among LGBTQ youth. We argue that the statute should not be interpreted to apply to two young people under sixteen because the Legislature could not have intended to harm the youth the statute intended to protect.

**Title VII and The Courts: Zarda v. Altitude Express**

GLAD submitted an amicus brief in this case before the U.S. Court of Appeals for the Second Circuit in which a plaintiff brought a discrimination claim under Title VII, charging that he was fired for being gay. The Second Circuit granted en banc review and, in so doing, specifically invited amicus briefs addressing the question of whether Title VII—our federal law that protects against discrimination in employment—prohibits sexual orientation discrimination. GLAD and others have long made the clear, common sense case that both gender identity and sexual orientation are protected under the law's prohibition of discrimination "because of sex." Last year the US Court of Appeals for the Seventh Circuit issued a watershed en banc ruling that Title VII does prohibit sexual orientation discrimination, and we hope to see the Second Circuit Court of Appeals do the same.

**Masterpiece Cakeshop v. Colorado Civil Rights Commission**

On December 5, the U.S. Supreme Court heard oral arguments in this case involving a gay couple who were refused service by a public business based on religious objections to their marriage. David and

Charlie filed a complaint with the Colorado Civil Rights Commission, which found that the bakery had violated Colorado nondiscrimination law requiring businesses to provide the same services to LGBTQ people that they provide to others. The outcome of this case could either preserve hard won protections in local, state and federal antidiscrimination laws, or allow them to be overridden by religious and moral objections. In October, GLAD and NCLR, assisted by Pierce Atwood, LLP, filed one of about forty friend-of-the-court briefs in support of David and Charlie, arguing that a constitutionally-compelled exception to antidiscrimination laws would impose serious harms on LGBT people, other historically marginalized groups, and our broader society.

**Pidgeon v. Turner**
The U.S. Supreme Court denied a petition for review of *Pidgeon v. Turner*, a case moving through the Texas courts concerning the question of whether the *Obergefell* marriage decision requires the equal provision of benefits to same-sex spouses of municipal employees (in this case, the City of Houston) as to different-sex spouses. GLAD and NCLR submitted an amicus brief supporting the request for Supreme Court review following a June Texas State Supreme Court ruling that sent the case back to the trial court rather than settle the matter directly. This case is not over, and we hope and expect the Texas trial court, on remand, will uphold spousal benefits for employees married to a person of the same sex, as *Obergefell* and common sense require.

**Transgender Youth: School Bullying and Harassment**

**Rhode Island**
GLAD filed a complaint with the Office of Civil Rights on behalf of a nine-year-old Rhode Island transgender girl, H.H., who experienced pervasive physical and sexual harassment by her peers at her elementary school—including a sexual assault on the school bus— because of her gender expression. The student's family reported the harassment to the principal and H.H.'s teachers when the bullying and abuse began, but the school failed to take reasonable measures to end the harassment, even assigning H.H. a seat in her classroom next to a student who was her primary harasser and sexually assaulted her on the bus. Our complaint on behalf of the family states that the school violated Title IX through their deliberate indifference to the pervasive harassment and by failing to create a safe and welcoming environment for H.H.

**Massachusetts**
• We are working with a school district in Massachusetts to develop an inclusive and affirming athletics policy to make athletic spaces safer for transgender students. We became involved after we learned that a talented high school athlete experienced pervasive discrimination by his lacrosse team based on his gender identity. Despite being informed that the student had transitioned over the summer, the athletics director, coach and team captains hadn't proactively taken steps to ensure he would be welcomed when he joined his teammates in the fall. The team environment deteriorated into an unsafe place for him and the environment became so hostile, the student was forced to leave the team and stop playing sports at his school.

• **Cormier v. City of Lynn**
GLAD submitted an amicus letter to the Massachusetts Supreme Judicial Court in this bullying case involving very serious injury to a fourth-grade student while on school property. The student was bullied for years because of his physical appearance, and sustained the injury after being pushed down a flight of stairs at school by a known bully.

The issue in the case is when the school district and the city should be immune from liability and, conversely, what should trigger the possibility of liability.

Our letter discusses bullying as a pervasive problem in schools, particularly for vulnerable populations such as LGBTQ youth, and cites Massachusetts' bullying law that was enacted to protect students. The law notes that certain students are likely to be more vulnerable to bullying based upon actual or perceived characteristics including sexual orientation, gender identity or expression, and physical appearance. GLAD argues that a decision in this case in favor of the school district would undermine efforts to protect young people from bullying.

**Comprehensive Criminal Justice Reform in Massachusetts**
LGBTQ youth, particularly LGBTQ youth of color, are overrepresented in the juvenile justice system due to stereotypes, pervasive stigma, bias, and other structural factors. Family rejection, unsupportive schools and discriminatory policing practices contribute to increased interactions between LGBTQ youth and the juvenile and criminal justice systems. LGBTQ adults, too, are disproportionately vulnerable to discrimination when interacting with the criminal justice system.

GLAD is working in several coalitions to push legislative action for criminal justice reform. Through legislative action, GLAD hopes the Massachusetts Legislature will make major reforms to the criminal justice system that will, for example, reduce the involvement of youth and adults in the criminal justice system, lower the threshold for expungement of juvenile records so that such records do not follow youth for the rest of their lives, and reform the inhumane practice of solitary confinement on both youth and adults who are incarcerated. Our efforts gained momentum last session, with the House and Senate passing major criminal justice reform bills and including some of the coalitions' key amendments, such as expungement of some juvenile records and restrictions on the use of solitary confinement.

**Transgender Equality Across New England**
GLAD is leading two critical movements to advance and protect transgender equality in state law. GLAD and our partners in Freedom for All New Hampshire are working hard to pass House Bill 1319, which would add gender identity to the state's non-discrimination law. New Hampshire is the last state in New England to have no explicit protections for transgender people, and this bipartisan effort will be a model for the nation.

In Massachusetts, opponents of equality have put repealing our hard-won transgender public accommodations protections on the 2018 ballot. This November, Massachusetts voters will have the chance to show the nation that they support transgender equality. GLAD is a leading member of Freedom for All Massachusetts, the bipartisan coalition working to ensure Massachusetts upholds fairness and equality for all.

## Advocating for LGBTQ Youth in the Juvenile Justice System
continued from page 5

Our clients and their peers are remarkably resilient in spite of Long Creek's harmful environment, thanks in notable part to the support of local organization Portland Outright and its Executive Director Osgood.

Operating in Portland since the 1990s, Portland Outright is a youth-driven program that supports underserved LGBTQ+ youth through ongoing mentorship, social events and trainings, as well as intentional support to youth navigating systems, such as the foster care system, homelessness, mental health services, and the juvenile justice system, including Long Creek.

"At the core of Portland Outright has always been young people mobilizing other young people to be at the table about decisions being made in their own lives, supported by a network of adult mentors," says Osgood.

About five years ago, the organization started focusing on mobilizing low-income LGBTQ young people around gender and racial and economic justice, which drove their work in homeless shelters, residential treatment centers, and eventually Long Creek.

"We'd been working a lot with low-income folks and folks experiencing homelessness," Osgood says. "One of the things we were hearing was that a lot of them were coming into contact with the juvenile justice system, either going in and out of Long Creek or leaving Long Creek and going straight into homelessness or into residential treatment that was creating further harm."

To support the LGBTQ youth incarcerated in Long Creek, Portland Outright (www.portlandoutright.com) created Sexuality and Gender Awareness For Everyone (SAFE) Group, a space inside Long Creek where "young people can talk to each other and organize or create the kinds of connections that help them survive the day-to-day while also creating a vision for a more just system for community-based alternatives to incarceration," Osgood says. "They talk about the conditions of incarceration but also the systems that are funneling LGBTQ young people into incarceration—the school to prison pipeline, the mental health system, lack of healthcare, homelessness."

Portland Outright has also collaborated with Maine Inside Out (www.maineinsideout.org), an organization that uses original theater inside and outside correctional facilities to initiate dialogue and build community across boundaries. A new collaboration between the two organizations involves opportunities to create visual art pieces made by incarcerated LGBTQ youth. An installation of that visual work is part of "Love Is: Alternatives to Incarceration," a showcase of theater, film, and visual art. The body of work is a catalyst for young people and the outside community "to have conversations about their vision of justice and of the communities they want to live in," says Osgood.

We are proud to collaborate with Portland Outright and Maine Inside Out to empower and advocate for and with youth and to find solutions for systemic change.

> "[The assessment on Long Creek] confirms what we already know: prisons do not work for youth."
>
> – GLAD Civil Rights Project Director Mary L. Bonauto

"Getting to know our youth clients over the past year has been a privilege," says Crozier. "Their strength and resilience in the face of inhumane conditions is inspiring. And, witnessing how community organizations like Portland Outright and Maine Inside Out have supported their voices and empowerment reminds me of how important it is to fight to keep hope, and that we can change the systems that care for our youth."

"Partnering with GLAD has been like coming home to our community in lots of ways," says Osgood. "To have folks with a legal lens, who show up consistently for our members and are willing to do the community building, as well as the advocacy work, has really been a gift for the movement that we're building."

And we are making progress. Earlier this year, one of our clients was released early to after-care. Another of our clients still inside has become a resident leader and has a treatment program that better meets his needs. Our clients contributed their stories and voices in a federal audit process that led to the facility failing to meet federal standards and having to undergo policy and training changes. Maine's Department of Corrections is in the process of updating their transgender and intersex policy based on our recommendations and continued advocacy.

Last December, an expert assessment on Long Creek authorized by the Maine Juvenile Justice Advisory Group was released, highlighting problems at Long Creek and providing a roadmap of recommendations for addressing concerns GLAD has raised over the past year. We are working with Portland Outright, Maine Inside Out, and others on the ground in Long Creek, to push for immediate and dramatic changes, such as:

- Releasing the 25-50% of youth currently at Long Creek who, according to the assessment, should not be there.
- Correcting the serious safety concerns of the youth in Long Creek.
- Developing policy and training about LGBTQ youth.
- Increasing resources and accountability from the State for funding community-based alternatives to incarceration, such as residential facilities and family and community support services.

"This report confirms what we already know: prisons do not work for youth," says Bonauto. "We expect the committed leadership of Long Creek and staff and supervisors to seize this opportunity to take a hard and urgent look at rebuilding the medical and mental health services youth need based on research and experiences that work well elsewhere."

There is much work to be done, in and outside of Long Creek. But the courageous youth determined to change their futures give us hope. GLAD will keep fighting for them, will keep supporting their self-advocacy to send the message that LGBTQ youth, like all youth, deserve to be safe, welcomed, and loved for who they are. ◾

# Welcome New Staff

**Khari Charles, Community Engagement Manager**
Khari joined GLAD in January 2018, bringing to the organization deep community connections and experience in local and national organizing, including with the National LGBTQ/HIV Criminal Justice Working Group, The MA Against Solitary Confinement Coalition (MASC), and Black & Pink. Khari is Chairperson on the National Black Leadership Coalition, and the founder of Queeri, an organization aimed at bridging the gaps between intersections of race, class, gender, sexual identity and orientation.

**Tessa Holtzman, Legal Assistant**
Tessa joined GLAD in June 2017 after graduating from Bates College with a B.A. in Institutional Politics and a minor in Spanish. While at Bates, Tessa interned with the ACLU where she researched the barriers experienced by survivors of domestic violence who were applying for U.S. visas. She also interned with U.S. Senator Martin Heinrich where she worked to help draft information-technology legislation to serve Native American communities. Tessa is excited to be starting her career in public policy and legal advocacy at GLAD.

**Rianna Johnson-Levy, Legal Assistant**
Rianna joined GLAD in October 2017 after graduating from Yale University with a B.A. in African American Studies and Women's, Gender, and Sexuality Studies. Rianna previously interned with the ACLU's LGBT & HIV Project. She also interned with Lambda Legal, working with their Youth in Out-of-Home Care Project, researching the disproportionate contact LGBTQ youth of color have with the juvenile justice system.

**Chris Rainville, Events Manager**
Prior to joining GLAD in November 2017, Chris was the Manager of Production for Special Events and Communications at Columbia University Medical Center in the Office of Development in New York City. His previous work includes staffing the Children's Museum of the Arts as a Teaching Artist, and freelancing as a film producer in the New York City area. Chris earned a B.A. in Film & TV Production as well as a Certificate of Meeting and Conference Management from New York University.

# 36th Annual Summer Party

Honoring Jeanne Leszczynski & Diane DiCarlo for their dedication and work on behalf of LGBTQ justice    July 29, 2017



David Wilson, Sally Deane and Anderson Clark

Board members Fred Csibi and Francisco Cabas with TJ Rivetti

Morgan Wentworth and Corri Hale

19



Honorees Jeanne Leszczynski and Diane DiCarlo

Joanna Hamilton and Lindsay Harrison

GLAD Executive Director Janson Wu with Leila Eshghi and Kate Clinton

Photos: InfinityPortraitDesign.com



POSTAGE
INFO

30 Winter Street, STE 800, Boston, MA 02108

## Save the Date



