# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

     *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

     *Defendants*.

Civil Action No. 25 - 1107 (LLA)

## <u>MEMORANDUM OPINION</u>

In April 2025, President Donald J. Trump issued an Executive Order targeting the law firm Susman Godfrey LLP ("Susman") based on the clients it represents and the causes it supports. The order was one in a series attacking firms that had taken positions with which President Trump disagreed. In the ensuing months, every court to have considered a challenge to one of these orders has found grave constitutional violations and permanently enjoined enforcement of the order in full. *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-CV-716, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-CV-916, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, No. 25-CV-917, 2025 WL 1502329, at *33-34 (D.D.C. May 27, 2025). Today, this court follows suit, concluding that the order targeting Susman violates the U.S. Constitution and must be permanently enjoined.

# I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A.    Susman Godfrey LLP

Founded in 1980, Susman is a well-known trial firm with offices in Houston, Los Angeles, New York, and Seattle.  ECF No. 51-2 ¶¶ 1-2, 8; ECF No. 159-1 ¶¶ 1-2, 8.  While Susman has just over 230 attorneys, it is one of the top 100 revenue-generating law firms in the United States.  ECF No. 51-2 ¶¶ 2, 4; ECF No. 159-1 ¶¶ 2, 4.

Susman works on a wide variety of cases, and approximately one-third of its active matters take place before federal courts and agencies.  ECF No. 51-2 ¶¶ 3, 23; ECF No. 159-1 ¶¶ 3, 23.  In representing its clients, Susman has interacted with, and anticipates further interactions with, at least fifteen federal departments, agencies, and officials.  ECF No. 51-2 ¶ 26; ECF No. 159-1 ¶ 26.  Additionally, Susman has nearly twenty clients that either contract or do business with the federal government or have affiliates that are government contractors and subcontractors.  ECF No. 51-2 ¶ 28; ECF No. 159-1 ¶ 28.

Many of the practice areas in which Susman specializes require frequent interaction with the federal government.  ECF No. 51-2 ¶ 30; ECF No. 159-1 ¶ 30.  For example, Susman frequently handles cases involving the False Claims Act; patent infringement; antitrust matters including price-fixing, market allocation, refusal-to-deal, no-poach, and monopolization claims; and statutes regulating the environment.  ECF No. 51-2 ¶¶ 30-31, 39, 44, 46; ECF No. 159-1 ¶¶ 30-31, 39, 44, 46.  The same is true of Susman's pro bono activities, which include matters related to human rights violations, anti-discrimination issues, constitutional challenges, and death penalty appeals, and also involve interacting with the federal government and appearing in federal court.  ECF No. 51-2 ¶¶ 48-49; ECF No. 159-1 ¶¶ 48-49.

### B.      Executive Order 14,263

On April 9, 2025, President Trump signed and issued Executive Order 14,263 (the "Order"), titled "Addressing Risks from Susman Godfrey," along with an accompanying "fact sheet."  *See* Exec. Order No. 14,263, 90 Fed. Reg. 15615 (Apr. 15, 2025); ECF No. 51-7.  The Order followed on the heels of similar executive orders targeting several other law firms, including Perkins Coie LLP, Jenner & Block LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as well as a memorandum targeting Covington & Burling LLP.  ECF No. 51-2 ¶¶ 70-115; ECF No. 159-1 ¶¶ 70-115.[1]  The Order proceeds in six sections.

*Section 1.*  The first section, titled "Background," provides the factual basis for the Order. It begins by stating President Trump's belief that "[l]awyers and law firms that engage in activities detrimental to critical American interests should not have access to our Nation's secrets, nor should their conduct be subsidized by Federal taxpayer funds or contracts" and explains that the federal government must take steps to "guard against the actual, potential, or perceived conflicts of interest that arise when the Government funds, engages with, or otherwise devotes resources to law firms and their clients that engage in conduct undermining critical American interests and priorities." Order § 1.

The Order then zeroes in on Susman, offering three reasons that the President "ha[s] determined that action is necessary to address the significant risks, egregious conduct, and conflicts

---

[1] *See* Addressing Risks from WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14549 (Apr. 3, 2025); Addressing Risks from Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13997 (Mar. 28, 2025); Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 11, 2025); Addressing Risks from Paul Weiss, Exec. Order No. 14,237, 90 Fed. Reg. 13039 (Mar. 20, 2025) (revoked by Addressing Remedial Action by Paul Weiss, Exec. Order No. 14,244 § 1, 90 Fed. Reg. 13685 (Mar. 26, 2025)); Suspension of Security Clearances and Evaluation of Government Contracts, The White House (Feb. 25, 2025), https://perma.cc/66W7-9WM3.

of interest" posed by the firm. *Id.* First, it accuses Susman of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections." *Id.* Neither this section nor the rest of the Order explains what exactly this refers to, but Susman proffers—and the government does not dispute—that it references Susman's representation of Dominion Voting Systems and state election officials in connection with litigation concerning the 2020 election.[2] ECF No. 164, at 3; Hr'g Tr. at 4:19-21, 72:13-18. Next, the Order asserts that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Order § 1. Again, the Order offers no explanation of what is meant by this, but Defendants suggest that it refers to Susman's decision to donate funds to "GLBTQ Legal Advocates and Defenders (GLAD), which previously sued the Federal Government to enjoin [a] Department of Defense policy." ECF No. 159, at 13 n.2. Finally, the Order claims that Susman "supports efforts to discriminate on the basis of race" and "itself engages in unlawful discrimination, including . . . on the basis of race." Order § 1. To substantiate this claim, the Order explains that "Susman administers a program where it offers financial awards and employment opportunities only to 'students of color' . . . [which is] unlawful discrimination perpetrated in the name of 'diversity, equity, and inclusion' policies." *Id.* Throughout Section 1, the Order repeatedly asserts that Susman's activities are "inconsistent with the interests of the United States" and "undermin[e] critical American interests and priorities." *Id.*

---

[2] Following the 2020 election, various news outlets falsely claimed that voting machines supplied by Dominion Voting Systems had been rigged, causing President Trump to fail in his bid for reelection. ECF No. 51-2 ¶ 53; ECF No. 159-1 ¶ 53 (Defendants dispute portions of the statement "to [the] extent inconsistent with EO 14250 § 1," which is not at issue in this case). President Trump echoed these aspersions on social media. ECF No. 51-2 ¶¶ 53-55; ECF No. 159-1 ¶¶ 53-55. Susman represents Dominion Voting Systems in various defamation lawsuits related to these accusations. ECF No. 51-2 ¶¶ 56, 65; ECF No. 159-1 ¶¶ 56, 65. Susman also defended the Secretary of the State of Arizona and the Governor of Wisconsin in lawsuits accusing them of election interference. ECF No. 51-2 ¶¶ 66-67; ECF No. 159-1 ¶¶ 66-67.

*Section 2.* The second section, titled "Security Clearance Review," instructs the Attorney General, the Director of National Intelligence, and other agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." Order § 2(a). It further commands the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman" so that agency heads can "expeditiously cease such provision." *Id.* § 2(b) The section does not provide any further detail, nor does it explain what the review of Susman clearances to ensure "consisten[cy] with the national interest" might entail. *Id.*

*Section 3.* The third section, titled "Contracting," sets several limitations on the ability of Susman and parties that do business with Susman to contract with the federal government, purportedly so that the government does not subsidize "activities that are not aligned with American interests." Order § 3(a). The section first "require[s] Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract." *Id.* Informed by these disclosures, agency heads must review all contracts with Susman and parties that do business with Susman and "take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service" and "otherwise align their agency funding decisions . . . with the goals and priorities of [the Trump] Administration." *Id.* § 3(b). To ensure compliance with the Order, agencies are required to submit to the Office of Management and Budget an assessment of any relevant contracts, and actions taken with respect to those contracts, within thirty days. *Id.* § 3(b)(ii).

5

*Section 4.*  The fourth section, titled "Racial Discrimination," states only that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)."  Order § 4.  Section 4 of Executive Order 14,230 instructs the Chair of the Equal Employment Opportunity Commission to review the practices of "large, influential, or industry[-]leading law firms for consistency with Title VII of the Civil Rights Act of 1964," with a focus on whether these firms "reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis."  Exec. Order No. 14,230 § 4, 90 Fed. Reg. at 11782.  That order also directs the Attorney General to spearhead investigations into law firms that "do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered."  *Id.*

*Section 5.*  The fifth section of the Susman Order, titled "Personnel," instructs agency heads to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and to provide further guidance "limiting Government employees acting in their official capacity from engaging with Susman employees."  Order § 5(a).  It also creates a presumption against hiring Susman employees into the federal government, directing agency officials to "refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  *Id.* § 5(b).

*Section 6.*  The last section of the Order, titled "General Provisions," explains that the Order must be implemented "consistent with applicable law" and clarifies that nothing in the Order should be "construed to impair or otherwise affect" the "authority granted by law to an executive department or agency, or the head thereof" or "the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals."  Order § 6.

Alongside the Order, the White House issued a "fact sheet" that largely regurgitates the language of the Order, refers to Susman as a "rogue law firm[,]" and explains that "President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence."  ECF No. 51-7.

The Trump Administration did not contact Susman in advance of issuing the Order and accompanying fact sheet.  ECF No. 51-2 ¶¶ 157-58; ECF No. 159-1 ¶¶ 157-58.  It also has not provided the firm an opportunity to respond to the allegations contained in the Order and fact sheet. ECF No. 51-2 ¶ 159; ECF No. 51-3 ¶ 61.

## C.    Procedural History

On April 11, 2025, Susman filed suit to challenge the constitutionality of the Order.  ECF No. 1.[3]  A few days later, the firm sought a temporary restraining order ("TRO") to prevent implementation of Sections 1, 3, and 5 of the Order.  ECF No. 10.  On April 15, the court heard oral arguments from both parties and granted Susman's request for a TRO.  *See* Apr. 15, 2025 Minute Entry; ECF No. 15.  Specifically, the court temporarily enjoined Defendants "from

---

[3] Susman brings this suit against various agencies and officers in their official capacity.  To the extent that any officer who is a party to the case is replaced, "[t]he officer's successor is automatically substituted as a party" pursuant to Federal Rule of Civil Procedure 25(d).

implementing or giving effect to Sections 1, 3, and 5" of the Order and directed Defendants "to rescind any and all guidance or direction" relating to the implementation or enforcement of those sections of the Order. ECF No. 15, at 1. The court further ordered Defendants to file a status report "describing the steps taken to ensure compliance with [the court's] order and certifying compliance with its requirements." *Id.* at 2. Accordingly, Defendants reported that the Department of Justice had distributed the court's order with directions to ensure compliance. ECF No. 28, at 1. By the agreement of the parties, ECF No. 27, at 2; Fed. R. Civ. P. 65(b)(2), the court extended its TRO "until final judgment is entered in this matter" and set a dispositive briefing schedule, ECF No. 30, at 1.

Susman then moved for summary judgment, requesting that the court declare the Order "unlawful because it violates the First and Fifth Amendments to the U.S. Constitution, exceeds the President's constitutional authority under Article II, and violates the separation of powers." ECF No. 51, at 1. The firm seeks to permanently enjoin Defendants from implementing or enforcing the Order. *Id.* Defendants separately moved to dismiss Susman's claims. ECF No. 58. The court held a hearing on both motions on May 8. *See* May 8, 2025 Minute Entry.

Following the hearing, Susman amended its complaint to add additional federal defendants subject to the Order. ECF No. 178. Given the limited nature of the amendment, the parties agreed to not submit new briefing and, instead, incorporate the parties' prior briefing into their new motions. ECF No. 175. The renewed motions are both fully briefed. ECF Nos. 51, 159, 164, 181 (motion for summary judgment); ECF Nos. 58, 158, 174, 180 (motion to dismiss). The court is

also in receipt of twenty-one amicus briefs filed in support of Susman's motion for summary judgment.[4]

### D.     Related Orders and Litigation

Before and after the issuance of the Susman Order, several other law firms, including Skadden, Arps, Slate, Meagher & Flom LLP; Willkie Farr & Gallagher LLP; Milbank LLP; Kirkland & Ellis LLP; Allen Overy Shearman Sterling US, LLP; Simpson Thacher & Bartlett LLP; Latham & Watkins LLP; and Cadwalader, Wickersham & Taft LLP negotiated agreements with the Trump Administration to avoid being the target of similar orders.[5]  These firms committed to providing hundreds of millions of dollars in pro bono work on initiatives supported by President

---

[4] *See* ECF Nos. 65 (775 Law Professors); 66 (Lawyers Defending American Democracy, Inc.); 72 (Washington, Illinois, Massachusetts, New Jersey, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, and Vermont); 73 (Professor Aaron H. Caplan); 113 (Former and Current General Counsel); 114 (Fred T. Korematsu Center for Law and Equality); 141 (366 Former Judges); 142 (Lawyers' Committee for Civil Rights Under Law, Public Counsel, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Public Interest Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, and Lawyers' Committee for Civil Rights of the San Francisco Bay Area); 143 (Former Presidents of the District of Columbia Bar, Past Presidents of Voluntary Bar Associations, and Voluntary Bar Associations in the District of Columbia); 144 (Law Firm Partners United Inc.); 145 (NAACP Legal Defense & Educational Fund, Inc.); 146 (777 Solo and Small Firm Lawyers); 147 (23 Nongovernmental Organizations); 148 (American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Cato Institute, Center for Individual Rights, Electronic Frontier Foundation, Foundation for Individual Rights and Expression, Institute for Justice, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for the Freedom of the Press, Rutherford Institute, and Society for the Rule of Law Institute); 149 (Bar Associations and Lawyer Membership Associations); 150 (Legal Ethics Professors); 151 (884 Law Firms); 152 (Former Senior Government Officials); 153 (Litigation Firms); 154 (Institute for the Rule of Law of the Union Internationale des Avocats); 155 (1129 Law Students and 51 Law Student Organizations).

[5] One firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP, negotiated a deal after executive action had already been taken against it.  In exchange for millions of dollars in promised pro bono legal services, President Trump rescinded the executive order targeting the firm.  ECF No. 51-2 ¶¶ 87-97; ECF No. 159-1 ¶¶ 87-97.

Trump, including ones that "represent the full political spectrum, including [c]onservative ideals,"
ECF No. 51-2 ¶¶ 127, 132, 137, 141; ECF No. 159-1 ¶¶ 127, 132, 137, 141, and further affirmed
that they would not "engage in illegal DEI discrimination and preferences," ECF No. 51-2 ¶ 141;
ECF No. 159-1 ¶ 141; *see generally* ECF No. 51-2 ¶¶ 123-47; ECF No. 159-1 ¶¶ 123-47.

Three other law firms were subject to executive orders like the one targeting Susman, and
each filed suit.  On March 6, 2025, President Trump issued Executive Order 14,230, "Addressing
Risks from Perkins Coie LLP."  90 Fed. Reg. 11781 (Mar. 11, 2025).   In Section 1, that order
contends that Perkins Coie "represent[ed] failed Presidential candidate Hillary Clinton," "hired
Fusion GPS, which then manufactured a false 'dossier' designed to steal an election," and "worked
with activist donors including George Soros to judicially overturn . . . election laws," and in
Sections 2 through 6, it imposes restrictions on Perkins Coie akin to those placed on Susman.  *Id.*
Perkins Coie quickly moved for a temporary restraining order as to Sections 1, 3, and 5 of
Executive Order 14,230, which the court granted.  Order, *Perkins Coie LLP*, No. 25-CV-716, 2025
WL 782889 (D.D.C. Mar. 12, 2025), ECF No. 21.   On May 2, 2025, the court granted summary
judgment to Perkins Coie, concluding that Executive Order 14,230 violates the First, Fifth, and
Sixth Amendments to the U.S. Constitution.  *Perkins Coie LLP*, No. 25-CV-716, 2025 WL
1276857, at *49 (D.D.C. May 2, 2025).  The court permanently enjoined the order in its entirety.
*Id.*

On March 25, 2025, President Trump issued Executive Order 14,246, "Addressing Risks
from Jenner & Block."  90 Fed. Reg. 13997 (Mar. 28, 2025).   That order accuses Jenner of
"support[ing] attacks against women and children based on a refusal to accept the biological reality
of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific
crimes and trafficking deadly drugs within our borders."  *Id.*  Jenner sought a temporary restraining

order against Sections 1, 3, and 5 of Executive Order 14,246, which the court largely granted. Order, *Jenner & Block LLP*, No. 25-CV-916, 2025 WL 942426 (D.D.C. Mar. 28, 2025), ECF No. 9.  On May 23, 2025, the court granted summary judgment to Jenner, concluding that Executive Order 14,246 violates the First Amendment.  *Jenner & Block LLP*, No. 25-CV-916, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025).  The court permanently enjoined the order in full. *Id.*

On March 27, 2025, President Trump issued Executive Order 14,250, "Addressing Risks from WilmerHale."  90 Fed. Reg. 14549 (Apr. 3, 2025).  That order contends that WilmerHale "employ[s] lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.*  WilmerHale sought a temporary restraining order enjoining enforcement of the order, which the court granted as to Sections 3 and 5.  Order, *Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-CV-917, 2025 WL 946979 (D.D.C. Mar. 28, 2025), ECF No. 10.  On May 27, 2025, the court granted summary judgment to WilmerHale, concluding that Executive Order 14,250 violates the First, Fifth, and Sixth Amendments and is *ultra vires*.  *Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-CV-917, 2025 WL 1502329, at *33-34 (D.D.C. May 27, 2025).  As with the courts considering the Perkins Coie and Jenner orders, the court permanently enjoined the WilmerHale order in its entirety. *Id.*

In anticipation of additional executive orders targeting law firms, the American Bar Association ("ABA") filed suit to challenge the "Law Firm Intimidation Policy"—"a series of materially identical executive orders designed to severely damage . . . and intimidate . . . firms and lawyers" to "abandon clients, causes, and policy positions the President does not like."  Compl., *Am. Bar Ass'n v. Exec. Off. of President*, No. 25-CV-1888, ECF No. 1 ¶ 4 (D.D.C. June 16, 2025). The ABA has asked the court to declare the policy unconstitutional and enjoin the federal

government from implementing and enforcing the policy against the ABA or its members. *Id.* ¶¶ 269-78.

## II.    LEGAL STANDARDS

### A.    Rule 8

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint include: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought."    Fed. R. Civ. P. 8(a)    The rule ensures that defendants have "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).    A complaint that is "excessively long, rambling, disjointed, incoherent, or full of irrelevant and confusing material" or that "contains an untidy assortment of claims that are neither plainly nor concisely stated, nor meaningfully distinguished from bold conclusions, sharp harangues[,] and personal comments" will fail to meet Rule 8's pleading standard. *Jiggetts v. District of Columbia*, 319 F.R.D. 408, 413 (D.D.C. 2017) (quoting *T.M. v. District of Columbia*, 961 F. Supp. 2d 169, 174 (D.D.C. 2013)), *aff'd sub nom.*, *Cooper v. District of Columbia*, No. 17-7021, 2017 WL 5664737 (D.C. Cir. Nov. 1, 2017).

### B.    Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177 (D.D.C. 2007).  In

reviewing such a motion, the court "is not limited to the allegations set forth in the complaint" and "may consider materials outside the pleadings." *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Additionally, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### C.        Rule 12(b)(6)

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint states a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint

and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

### D.    Rule 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the parties do not dispute any material facts, as is the case here, the case is "particularly amenable to resolution on summary judgment" because all that remains is the application of law. *W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 164 (D.D.C. 2014).

### III.    DISCUSSION

In its ten-count complaint, Susman alleges that the Order violates the First Amendment because it retaliates against the firm for protected expression (Count I), ECF No. 178 ¶¶ 141-52; constitutes impermissible viewpoint discrimination (Count II), *id.* ¶¶ 153-61; interferes with the firm's right to petition the government (Count III), *id.* ¶¶ 162-67; interferes with the firm's right of free association (Count IV), *id.* ¶¶ 168-74; and places unconstitutional conditions on government contracts in violation of both the First Amendment and the Spending Clause (Count V), *id.* ¶¶ 175-81. Susman further contends that the Order violates the Fifth Amendment's guarantees of procedural due process (Count VI), *id.* ¶¶ 182-90; fair notice (Count VII), *id.* ¶¶ 191-97; the right to counsel (Count VIII), *id.* ¶¶ 198-202; and equal protection (Count IX), *id.* ¶¶ 203-11; and that it violates the Constitution's separation of powers and is *ultra vires* (Count X), *id.* ¶¶ 212-20.

Defendants seek dismissal of the complaint, raising threshold standing and procedural arguments concerning some of Susman's claims and challenging the sufficiency of the firm's allegations in support of others. ECF No. 180. While Federal Rule of Civil Procedure 12(b) directs a defendant to assert "[e]very defense to a *claim* for relief" in its motion to dismiss, Fed. R. Civ. P. 12(b) (emphasis added), Defendants curiously do not organize their motion to address Susman's complaint count-by-count but instead defend the Order section-by-section, *see generally* ECF No. 180. Susman opposes Defendants' motion to dismiss and argues that it is entitled to summary judgment and a permanent injunction against the Order in its entirety. ECF No. 181. To avoid potential redundancies created by Defendants' peculiar approach to their motion to dismiss, the court will proceed by first considering Defendants' threshold standing and procedural arguments on a section-by-section basis, next addressing—jointly—Defendants' disputes with the sufficiency of Susman's allegations and Susman's arguments in support of summary judgment, and finally determining whether Susman is entitled to a permanent injunction on any of its claims.

### A.    None of Defendants' Threshold Arguments Precludes Relief

#### 1.    Section 1

As noted, Section 1 states that Susman "engage[s] in activities detrimental to critical American interests," "spearheads efforts to weaponize the American legal system and degrade the quality of American elections[,] . . . funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and . . . supports efforts to discriminate on the basis of race." Order § 1. On this basis, President Trump has "determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman." *Id.*

Defendants move to dismiss Susman's claims concerning Section 1, arguing that the language contained therein "is simply government speech" and "is exempt from First Amendment scrutiny." ECF No. 174, at 1, 3 (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005)); *see* ECF No. 58-1, at 12. Susman responds that, while "a President is 'entitled to say what [he] wishes,'" the statements in Section 1 go beyond "mere presidential musing." ECF No. 158, at 34 (alteration in original) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). Susman identifies two ways in which Section 1 gives rise to actionable claims. First, Susman argues that the official findings in Section 1 "imbue every substantive provision of the Order with its operative effect" and "lay[] the predicate—and set[] the government policy— that will justify (even *require*) agencies' decisions to terminate contracts involving Susman or its clients." *Id.* Second, Susman contends that even if Section 1 were the entirety of the Order, it would still be actionable because federal agencies may rely on the official factual findings contained therein to take adverse action against the firm and because it has inflicted reputational harm that has damaged the firm's ability to attract and retain clients. *See* Hr'g Tr. at 9:13-11:8.

The court agrees with Susman. As the Supreme Court made clear in *National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024), "[a] government official can share h[is] views freely and criticize particular beliefs, and []he can do so forcefully in the hopes of persuading others to follow h[is] lead. What []he cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Id.* at 188. In instances where a plaintiff alleges the latter, the court is called "to scrutinize" the "application of state power" in question. *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)).

While Defendants describe Susman as attempting to "silence the Government's . . . opinions" because it "does not like what the current Administration thinks about [it]," this

mischaracterizes the relief that the firm is seeking.  ECF No. 58, at 12.  Susman is not asking the court to "muzzl[e] the Executive" by enjoining the President's speech.  *Id.* at 1.  Instead, it asks the court to enjoin Defendants "from implementing or giving effect to the Order in any way, including by relying on any of the statements in Section 1."  ECF No. 178, at 118.  In this way, Susman is asking the court to "scrutinize" the "application of state power" for evidence of an unconstitutional attempt to coerce.  *NAACP*, 357 U.S. at 463.  This aligns perfectly with the kind of claim contemplated in *Vullo*, and Susman may therefore proceed with its claims related to Section 1.

### 2.    Section 2

Section 2(a) of the Order directs the Attorney General, the Director of National Intelligence, and "all other relevant heads of executive departments and agencies" to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest."  Order § 2(a).  The mandate applies to all Susman personnel, whether attorneys or staff, and it does not differentiate between individuals who hold security clearances in connection with their work at the firm or in another context—such as one attorney's security clearance in connection with his military service.  ECF No. 51-3 ¶ 79.  Section 2(b) of the Order directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman," and instructs any agency heads providing such goods to, "to the extent permitted by law, expeditiously cease such provision."  Order § 2(b).

Defendants raise two threshold arguments for dismissing the counts concerning Section 2. First, they assert that the blanket suspension of security clearances under Section 2 is "not

judicially reviewable" in light of "governing D.C. Circuit precedent"—specifically *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), in which the D.C. Circuit concluded that "an Executive Branch decision to deny or revoke a security clearance" was not reviewable in court, *id.* at 891. ECF No. 58-1, at 12-13. Susman responds that *Lee* does not extend so broadly as to foreclose its constitutional challenges to Defendants' blanket revocation of its employees' security clearances divorced from national security concerns. ECF No. 158, at 35-37.

The court agrees that *Lee* does not bar its review of Susman's claims regarding Section 2 of the Order. *Lee* concerned an individual employee's challenge to the denial of his security clearance, which the D.C. Circuit held was nonjusticiable because "the decision whether to grant an employee a security clearance [is] 'a sensitive and inherently discretionary judgment call [that] is committed by law to the appropriate agency of the Executive Branch.'" 120 F.4th at 886 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988)). In so holding, the D.C. Circuit did not foreclose any challenge "simply because it tangentially relates to a security clearance," *id.* at 892, which is in keeping with other D.C. Circuit precedent explaining that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review," *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993). In *Greenberg*, the D.C. Circuit determined that it could consider the constitutionality of asking applicants for a security clearance about their history of drug use and mental health because (1) the plaintiffs' "alleged injuries—the compelled disclosure of incriminating or private facts—[] existed regardless of how the government might have resolved any particular application," and (2) the plaintiffs "did not seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance.'" *Lee*, 120 F.4th at 893 (quoting *Greenberg*, 983 F.2d at 290). That is precisely the situation here. Susman's alleged constitutional injuries exist independent of any final decision on

whether to reinstate any individual employee's security clearance. Susman is not seeking to review any discretionary judgment about an individual security clearance but is instead raising a constitutional challenge to President Trump's blanket policy of revoking all its employees' clearances.

Second, Defendants argue that Susman's challenges to Section 2 are not ripe yet because the revocation of its employees' security clearances is "pending a review whether such clearances are consistent with the national interest." ECF No. 58-1, at 14 (quoting Order § 2(a)). Defendants maintain that "[u]ntil any clearance suspension is accomplished consistent with applicable law[] and then reviewed consistent with applicable law and a further security clearance determination made, any dispute is premature for judicial consideration." ECF No. 58-1, at 15. Again, the court is not convinced. Section 2 of the Order directs the revocation of Susman employees' security clearances "immediately," Order § 2(a), which creates a here-and-now injury independent of the outcome of any individualized post-deprivation process. *See Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989) (holding that due process entitled the plaintiff to a "meaningful opportunity to contest" allegations before revocation of a security clearance).

### 3.    Section 3

Section 3 of the Order requires government contractors to "disclose any business they do with Susman and whether that business is related to the subject of the Government contract." Order § 3(a). It further instructs agency heads to "review all contracts with Susman or with entities that disclose doing business with Susman" and "[t]o the extent permitted by law . . . take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service." *Id.* § 3(b).

Defendants argue that Susman does not have standing to bring claims related to Section 3 because the firm has not alleged an injury-in-fact that is "concrete and particularized," "actual or imminent," or traceable to Defendants' actions.  ECF No. 58, at 18 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Specifically, Defendants discount as "speculative," ECF No. 58-1, at 20, Susman's arguments that Section 3 pressures the firm's existing clients to "sever or cut back on their relationship with Susman by requiring them to reveal any business they do with the Firm," "threaten[s] them with loss of government contracts that are almost certainly important to their businesses if they maintain their relationships with Susman," ECF No. 158, at 5, and discourages prospective clients from retaining the firm "for fear that doing so would risk unacceptable restrictions on their contracting work," *id.* at 6.  To be sure, Susman has not identified a current client that has severed ties with the firm or a prospective client that has declined to engage the firm on the basis of Section 3, but that is hardly surprising given the court's issuance of a temporary restraining order less than a week after the Order's publication.  The relevant question for standing purposes is whether such harms are "actual or imminent," *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)), and, here, Susman has sufficiently alleged both.  Susman alleges that Section 3 is chilling its current and prospective attorney-client relationships in the here-and-now, ECF No. 178 ¶¶ 171-72, and that clients are inquiring about how the Order will affect the firm's ability to represent them, ECF No. 51-3 ¶ 70.  These harms are directly tied to Section 3, thereby establishing traceability.  Accordingly, Susman has standing to challenge Section 3 of the Order.[6]

---

[6] Defendants further argue that Susman "has not demonstrated standing to challenge Section 3 insofar as it regulates its clients."  ECF No. 58-1, at 17.  If Defendants are arguing that *Susman* is not likely to suffer harm as a result of Section 3, that argument fails for the reasons described.  If Defendants are instead suggesting that Susman does not have third-party standing to challenge the restrictions on its clients' access to counsel, that argument is foreclosed by well-established

4.    **Section 4**

Section 4 states, in its entirety, that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)."  Order § 4.  The relevant portion of Executive Order 14,230 instructs that:

> (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.
>
> (b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Exec. Order No. 14,230 § 4.  Defendants argue that Susman has failed to sufficiently allege an injury that is traceable to Section 4 and redressable by the court.  ECF No. 58, at 24-27.  They contend that the Order "merely cross-references" Executive Order 14,230, which in turn only instructs the Equal Employment Opportunity Commission to carry out tasks that it is "already . . . supposed to be doing."  *Id.* at 25 (emphasis omitted).  In Defendants' view, because the Commission has not yet taken any action against Susman pursuant to the Order—and because any action would, in any case, be a part of the Commission's statutory duties—Susman has not suffered an injury that the court may remedy.  *Id.* at 24-25.

---

precedent.  *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989) (granting a law firm third-party standing to challenge a drug-forfeiture statute on behalf of an existing client); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720-21 (1990) (allowing an attorney to invoke the rights of clients to challenge a fee-restriction statute).

The court disagrees.  Susman alleges that the "threat[] [of] targeted investigations by the Equal Employment Opportunity Commission and Attorney General, with the prospect of potential prosecution," is retaliation for First Amendment activity that "damages Susman Godfrey's reputation, with attendant harm to client relationships and Firm business prospects."  ECF No. 178 ¶ 148.  The firm also explains that it is only being targeted because of "the viewpoint that the Order attributes to [it]" in Section 1.  *Id.* ¶ 156.  These are allegations of actual harm that are traceable to Section 4, plain and simple.  The court, of course, cannot redress these injuries by enjoining any otherwise-legitimate investigation into Susman.  But, as the parties agreed at the May 8 hearing, should the court find that there have been violations of the First Amendment, it may enjoin the Commission and the Attorney General from commencing an investigation on the basis of the Order.  Thus, because Susman has alleged injuries that are traceable to Section 4 and can be remedied by the court, it may proceed on its claims concerning Section 4.

### 5.    Section 5

Section 5(a) of the Order directs agency heads to "provide guidance limiting official access from Federal Government buildings to employees of Susman" and "limiting Government employees acting in their official capacity from engaging" with the firm's employees "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Order § 5(a).  Section 5(b) further directs that agency officials shall "refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management."  Order § 5(b).

Defendants raise a ripeness argument concerning Section 5, contending that Susman's claims will not be actionable until the agency heads provide the relevant guidance.  ECF No. 58-1, at 27-28.  This argument plainly fails with regard to Section 5(b), which does not instruct agency

heads to issue guidance but instead directs agency heads to "refrain from hiring [Susman] employees." Order § 5(b). That mandate could not be clearer: do not hire Susman employees. Accordingly, Section 5(b) presents a ripe matter for adjudication.

Defendants' argument fares no better with regard to Section 5(a). While the guidance contemplated by Section 5(a) has yet to issue, the Order provides a clear preview of what it will do: "limit[]" Susman's employees from entering federal buildings or engaging with federal employees to "ensure consistency" with the "interests of the United States," Order § 5(a), because Susman is engaging in "activities inconsistent with the interests of the United States," *id.* § 1. While the precise contours of those limitations have not been set, *any* limitation on Susman's ability to enter federal buildings and interact with federal officials necessarily threatens the firm given that nearly one-third of its matters involve federal courts and agencies. ECF No. 178 ¶ 90. This is precisely the type of imminent injury that confers Susman standing to challenge Section 5(a).

### 6.    Shotgun Pleading

Finally, Defendants criticize the entirety of Susman's amended complaint as a "shotgun pleading." ECF No. 58-1, at 3-4. It is not clear whether they are seeking dismissal on this basis; however, any such argument would fail because Susman's amended complaint complies with the Federal Rules of Civil Procedure. Susman's pleading begins with an organized series of facts that provides the necessary background to its claims for relief. ECF No. 178 ¶¶ 1-140. The amended complaint then sets forth ten counts, each of which references specific facts pertaining to the claim. *Id.* ¶¶ 141-220. Accordingly, Susman's amended complaint provides "sufficient notice of the nature and grounds of [the plaintiff's] legal claims." *Jiggetts*, 319 F.R.D. at 417 (distinguishing a "shotgun pleading" as "one in which 'it is virtually impossible to know which allegations of fact

are intended to support which claim(s) for relief'" (quoting *Kabbaj v. Obama*, 568 F. App'x 875, 879 (11th Cir. 2014))).

### B.    Susman is Entitled to Summary Judgment

Having dispensed with Defendants' threshold arguments, the court turns to Defendants' challenges to the sufficiency of Susman's claims and Susman's arguments in support of its motion for summary judgment.  As noted, the parties do not genuinely dispute any material facts, so the court is left to determine which party has the better legal argument for each count of the complaint. *See* ECF Nos. 51-2 & 159-1; Fed. R. Civ. P. 56(a).  For the reasons that follow, the court concludes that Susman is entitled to summary judgment on Counts I-IV and VI-X of its complaint.[7]

### 1.    First Amendment - Retaliation and Viewpoint Discrimination (Counts I and II)

"'[I]f there is any fixed star in our constitutional constellation,'" it is that the First Amendment's Free Speech Clause "protect[s] the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (first quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U. S. 624, 642 (1943), then quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)).  This protection applies "regardless of whether the government considers [a person's] speech sensible and well intentioned or deeply 'misguided.'" *Id.* at 587 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995)).  That is because "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187.  Thus, the First Amendment prohibits the government from both "impos[ing] prior restraints on speech"

---

[7] In Count V, Susman argues that Section 3 of the Order violates the First Amendment and the Spending Clause because it imposes unconstitutional conditions on government contracts.  ECF No. 178 ¶¶ 175-81.  Susman does not address this count in its motion for summary judgment, so the court need not reach it.

and "from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech" that the government does not favor. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

Counts I and II of Susman's complaint allege that the firm was subjected to unfavorable treatment in retaliation for and on the basis of its protected speech. ECF No. 178 ¶¶ 141-61. To succeed on these claims, Susman must establish (1) that it "engaged in conduct protected under the First Amendment"; (2) that Defendants "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action taken against [the firm]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). The court concludes that Susman has carried its burden and is entitled to summary judgment on Counts I and II.

a.    *Protected Activity*

It is clear from the face of the Order and the record in this case that the Order was issued in response to Susman's First-Amendment-protected activities. The Order explains that it was motivated by President Trump's concerns that Susman (1) "spearheads efforts to weaponize the American legal system and degrade the quality of American elections"; (2) "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; and (3) "supports efforts to discriminate on the basis of race." Order § 1. The court finds that each of these bases is tied to activity that is protected by the First Amendment.

While the Order does not identify which of Susman's activities purportedly "weaponize[s] the American legal system and degrade[s] the quality of American elections," the parties and the

court agree that this refers to Susman's representation of Dominion Voting Systems and government officials in Arizona and Wisconsin in connection with litigation regarding the 2020 election.  *See* Hr'g Tr. at 50:14-56:19; 72:13-22; ECF No. 51-1, at 18-19.  It is well established that "advice from [an] attorney to [a] client and . . . advocacy by the attorney to the courts" is private speech that is protected by the First Amendment.  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-43 (2001).  Specifically, "[t]he [F]irst [A]mendment guarantees the[] right to be free of governmental restraints on 'political expression' and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression." *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990).   Susman's representation of particular clients is therefore protected First Amendment activity.

The Order similarly does not explain what it means by its assertion that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology."  Order § 1.  Susman understands this provision to refer to a donation that it made to GLBTQ Legal Advocates and Defenders ("GLAD"), an organization that advocates for—among other things—the equal treatment of gay, lesbian, and transgender service members.  *See* Hr'g Tr. at 4:14-6:14.  Defendants appear to agree with this interpretation, stating in their briefing that Susman "has provided funds to [GLAD], which previously sued the Federal Government to enjoin Department of Defense policy, based on a radical theory of gender ideology," as support for their contention that Susman "engage[s] in dangerous efforts to undermine the effectiveness of the United States military."  ECF No. 159, at 13 n.2.  It is settled law that the political speech of corporations, including donations, is protected by the First Amendment.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342-43 (2010)

(collecting cases). Accordingly, Susman's donation to GLAD is also protected First Amendment activity.

The Order provides some—although scant—support for the accusation that Susman "engages in unlawful discrimination, including discrimination on the basis of race." Order § 1. Specifically, the Order asserts that "Susman administers a program where it offers financial awards and employment opportunities only to 'students of color,'" which contravenes the Trump Administration's "commit[ment] to ending . . . unlawful discrimination perpetrated in the name of 'diversity, equity, and inclusion' policies." *Id.* Defendants identify the "program" in question as the "Susman Godfrey Prize, which provides a cash award and ongoing mentorship from Susman attorneys to selected 'students of color.'" ECF No. 159, at 12. The trouble with this argument is that the parties agree that the Susman Godfrey Prize is a cash prize, which does not include an offer of employment, and it is thus not covered by Title VII. ECF No. 51-2 ¶¶ 165-66, 168-70; ECF No. 159-1 ¶¶ 165-66, 168-70. Indeed, at the hearing, Defendants' counsel agreed that "the Susman Prize is not an example of unlawful racial discrimination." Hr'g Tr. at 47:15-49:15.

Apart from the Susman Godfrey Prize—the only discriminatory practice alleged in the Order—Defendants also appear to take issue with (1) a "statement on [Susman's] website describing diversity as 'one of the firm's core values'"; (2) the fact that Susman "operates a 'Diversity Committee' that 'regularly meets to discuss and execute diversity-related initiatives,' focuses on 'recruiting and supporting lawyers who identify as members of groups underrepresented in today's legal profession,' and advances 'work first initiated by the Racial Justice Working Group'"; and (3) the fact that Susman is a signatory to "a Gender Fairness Commitment statement, which includes the explicit goal 'to achieve gender parity'" in law firm wages. ECF No. 159, at 12-13; *see* ECF No. 159-2, at 4-11. In their briefing, Defendants maintain

that these are "precisely the sort of racial and gender considerations prohibited by civil rights laws," ECF No. 159, at 13, but at the motions hearing, Defendants conceded that "increasing parity . . . [and] pay[ing] people that do the same work[] similar salaries" "wouldn't be objectionable" unless an unlawful quota for underrepresented groups was enforced, Hr'g Tr. at 45:12-17. Defendants point to no evidence of any such practice, and statements on the Susman website that merely evince a general commitment to diversity and gender parity do not suggest that one exists. In the absence of any plausible allegations of unlawful discrimination, Susman's statements on its website are speech plainly protected by the First Amendment.

*b.      Retaliatory Action*

Susman has amply demonstrated that Defendants' actions were "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. Indeed, this court previously granted Susman's motion for a temporary restraining order because of the irreparable harm that it anticipated would befall the firm in the absence of relief. *See Susman Godfrey LLP v. Exec. Off. of President*, No. 25-CV-1107, 2025 WL 1113408, at *1 (D.D.C. Apr. 15, 2025). That preliminary finding is further validated by the efforts of several other peer law firms to avoid precisely the consequences that have befallen Susman here. For example, Paul Weiss was targeted by an Executive Order virtually identical to the one in the instant case. *See* 90 Fed. Reg. 13039. Instead of suffering the financial and reputational consequences of that order, Paul Weiss negotiated a deal with the Trump Administration that involves

> adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum; committing to merit-based hiring, promotion, and retention, instead of "diversity, equity, and inclusion" policies; dedicating the equivalent of $40 million in pro bono legal services during [President Trump's] term in office to support causes including assisting our Nation's veterans,

fairness in the justice system, and combating anti-Semitism; and
other similar initiatives.

Addressing Remedial Action by Paul Weiss, Exec. Order No. 14,244 § 1, 90 Fed. Reg. 13685
(Mar. 26, 2025).  And rather than risk being targeted by President Trump, several other reputable
firms negotiated agreements with the White House regarding their pro bono work and diversity,
equity, and inclusion practices.  ECF No. 178 ¶¶ 123-47; *see supra* Part I.D.

Defendants do not seriously contend that the Order is not intended to adversely affect
Susman.  Instead, they argue that their actions cannot be understood as retaliatory because the
government is acting as a contractor "with an eye toward[] an undisputed federal interest," rather
than as a sovereign with an intent to punish.  ECF No. 159, at 9.[8]  They maintain that the federal
government may "choose with whom it will do business . . . [based on] the fulfillment of its public
policy goals, including those involving national security and civil rights."  *Id.* at 10.

As support, Defendants invoke *Board of County Commissioners v. Umbehr*, 518 U.S. 668,
671 (1996), which, in their view, instructs that "that courts should refrain from striking otherwise
constitutional acts due to allegations of improper motivations," ECF No. 159, at 9.  But that is not
an accurate description of *Umbehr*'s holding.  In *Umbehr*, a waste disposal contractor brought a
retaliation claim against his county employer when his contract was terminated after he criticized
the county and its board of commissioners.  518 U.S. at 671-72.  The Supreme Court determined

---

[8] For this reason, Defendants believe that *Vullo* is inapposite.  In their view, "*Vullo* addressed a
potential First Amendment violation where the state used its *sovereign* regulatory powers to
threaten private actors with enforcement actions in an attempt to discourage disfavored
speech . . . [but] [t]his Executive Order carries with it none of the force of the powers exhibited in
*Vullo*."  ECF No. 159, at 9.  But *Vullo* makes no distinction as to which capacity—sovereign,
contractor, or otherwise—in which the government operates.  Its holding is the same regardless:
while "[a] government official can share h[is] views freely and criticize particular beliefs, . . . []he
cannot . . . use the power of the State to punish or suppress disfavored expression."  *Vullo*, 602
U.S. at 188.

that while "independent contractors do enjoy some First Amendment protection," a court must evaluate whether the government's "legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake." *Id.* at 685. The case is not analogous because Susman is not a government contractor—instead, it *represents* several entities "that contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors." ECF No. 51-2 ¶ 28; ECF No. 159-1 ¶ 28. For this reason, the balancing test laid out in *Umbehr* is not applicable at all, and the regular standard for First Amendment retaliation applies.[9]

Thus, while it may be true that the government has a greater degree of discretion when it operates as a contractor, that is beside the point. Whether the executive is operating as a sovereign, contractor, landlord, or employer, it must comply with the Constitution. And as Defendants' counsel conceded at argument, the mere fact that the government has the right to exercise discretion does not immunize retaliatory intent. *See* Hr'g Tr. at 36:18-37:2.

### c. Causal Link

Finally, the record offers sufficient evidence to conclude that there is "a causal link between the exercise of a constitutional right and the adverse action taken against [Susman]." *Aref*, 833 F.3d at 258 (quoting *Banks*, 515 F. Supp. 2d at 111). As discussed, the Order's three stated reasons for enactment all hinge on Susman's protected speech, and nothing in the Order or its accompanying fact sheet suggests that there is any other governmental interest that may be served if the Order is permitted to take effect. *See supra* Part III.B.1.a; ECF No. 51-7. The context in

---

[9] Even if *Umbehr*'s balancing test did apply, the government has not established any "legitimate interests" here that could possibly outweigh Susman's weighty free speech interests. *See infra* Part III.B.1.c.

which the Order was issued, as well as an examination of each section of the Order itself, makes clear that the adverse consequences of the Order are tied to Susman's First-Amendment-protected activity.

*Section 2.*  The record indicates that the Order's command that the Attorney General, Director of National Intelligence, and other agency heads "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest," Order § 2(a), is impermissibly tied to Susman's protected activity.  First, based on the Order and Defendants' arguments, it is not clear what "national interest" is served by the revocation of Susman's employees' security clearances.  Defendants gesture towards the Order's accusation that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," ECF No. 58, at 13-14 (quoting Order § 1), as a basis for the suspension of security clearances, but, as discussed, the only example they offer to substantiate this serious claim is a one-time donation to GLAD Law, an advocacy organization.  Defendants offer absolutely no evidence to support their claim that this donation is a "dangerous effort[] to undermine the effectiveness of the United States military."  Order § 2.

The presence of nearly identical clauses in several executive orders targeting other law firms[10] further confirms that the security-clearance provision is intended as a retaliatory measure. Perhaps most revealing is the fact that the Paul Weiss executive order included a nearly identical provision, *see* Exec. Order No. 14,237 § 2, 90 Fed. Reg. at 13039, that was walked back by the

---

[10] *See* Addressing Risks from WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14549 (Apr. 3, 2025); Addressing Risks from Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13997 (Mar. 28, 2025); Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 11, 2025).

government as soon as Paul Weiss agreed to "adopt[] a policy of political neutrality with respect to client selection and attorney hiring; tak[e] on a wide range of pro bono matters representing the full political spectrum; commit[] to merit-based hiring, promotion, and retention . . . dedicat[e] the equivalent of $40 million in pro bono legal services during [President Trump's] term in office . . . ; and other similar initiatives." *Id.* § 1, 90 Fed. Reg. at 13685.  No facet of this agreement touches on national security at all; instead, each provision addresses a policy disagreement that the Trump Administration had with Paul Weiss's work.  Defendants' identical approach to the suspension of clearances in this case—which revokes any and all clearances held by Susman employees—further supports the court's conclusion that the government's action is retaliatory.

As Defendants themselves point out, "'[c]learance decisions involve an assessment of intangible qualities such as loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment.'  And such decisions also 'involve predictive judgment about whether individuals are likely to divulge sensitive information under compulsion of circumstances or for other reasons, which is an inexact science at best.'"  ECF No. 159, at 6 (citation omitted) (quoting *Lee*, 120 F.4th at 893).  In other words, decisions regarding clearances are individual determinations that depend on a host of person-specific factors.  The government's departure from the well-trodden path of individualized determination in favor of wholesale revocation—without even an ounce of supporting evidence for the court to evaluate—raises red flags and leads the court to believe that the only plausible motivation for Section 2 is retaliation.

*Section 3*.  Section 3 states on its face that it is causally tied to several of Susman's activities.  It explains that the government wishes to "prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination."  Order § 3(a).  But, as the court has laid

out, the activities that the Order contemplates—which include litigation concerning the 2020 election, a donation to GLAD Law, an academic prize that is not covered by Title VII, and general statements about diversity on Susman's website—are all plainly protected by the First Amendment. *See supra* Part III.B.1.a. Defendants cannot target Susman for those activities simply because it does not like them. And to the extent that Defendants argue that the Order is not intended as a punitive measure, but as a legitimate exercise of the government's discretion when it acts as a contractor, the court reiterates that the government is still required to comply with the Constitution when it acts as a contractor. *See supra* Part III.B.1.b.

*Section 4*. Defendants argue that Susman cannot show a causal link between the Order's threatened investigation by the Equal Employment Opportunity Commission and Susman's protected activity (1) because Susman has not yet received an inquiry letter from the Chair of the Commission; and (2) because the government had already been taking action—evinced by Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"), and publicly announced federal priorities—to "root[] out unlawful DEI-motivated race and sex discrimination." ECF No. 159, at 16 (quoting Press Release, Equal Employment Opportunity Commission, President Appoints Andrea R. Lucas EEOC Acting Chair (Jan. 21, 2025)).

Neither of these arguments holds water. While it is true that Susman has not yet received an inquiry from the Equal Employment Opportunity Commission, that is cold comfort given that the fact sheet accompanying the Order indicates that an investigation is forthcoming. *See* ECF No. 51-7 ("The practices of Susman *will be* reviewed under Title VII to ensure compliance with civil rights laws against racial bias." (emphasis added)). And Defendants' actions to legitimately address actual instances of race- and sex-based discrimination elsewhere do not help it *here*, where

it can point to no basis for an investigation into Susman except for lawful statements that the firm has made about diversity with which the government disagrees. *See supra* Part III.B.1.a.

*Section 5.*   To defend Section 5's command that agency heads issue guidance limiting Susman employees' access to federal buildings (presumably including courts), instructing government employees not to "engag[e] with" Susman employees, and forbidding agency officials from hiring Susman employees absent a waiver from an agency head, Defendants rest only on a threadbare invocation of "the national security and other interests of the United States," Order § 5(a), and speculation that "[s]urely some [f]ederal facilities, contacts, and employment positions require tighter restrictions than others based on national security concerns." ECF No. 159, at 17. But just as with earlier sections, Defendants offer no evidence to remotely support the idea that there is any interest (national-security-related or otherwise) that is implicated by Susman employees' entry into federal buildings, or federal employees' interaction with, or hiring of, Susman employees—much less one that requires intervention of the sort described in the Order.

Defendants protest that the text of Section 5 does not affirmatively place these restrictions on Susman employees, but rather, calls on agency heads to issue guidance to this effect. ECF No. 159, at 17. They contend that "scenarios such as *all* Susman attorneys being barred from courtroom practice is, currently, the stuff of imagination." *Id.* The court is unconvinced. While the government argues that eventual guidance may not realize the full extent of the restrictions that the Order contemplates, the White House's fact sheet states outright that the "[f]ederal [g]overnment *will* . . . restrict [Susman] employees' access to government buildings" and "[f]ederal [a]gencies *will* also refrain from hiring Susman employees unless specifically authorized." ECF No. 51-7 (emphases added). Any reassurance that the Order's limitation on Susman employees' access to federal buildings only applies when "access would threaten the

national security of or otherwise be inconsistent with the interests of the United States" falls flat in the larger context of the Order—particularly Section 1, which makes findings that Susman "engage[s] in activities detrimental to critical American interests [and] should not have access to our Nation's secrets."  Order § 1.  And because Defendants have offered no plausible explanation for the extraordinary action contemplated by Section 5—which, on its face, could go as far as banning Susman lawyers from courtrooms, post offices, and military bases—the court determines that the record can only support the conclusion that Section 5 was motivated by retaliatory intent.[11]

\*       \*       \*

The court concludes that the Order constitutes unlawful retaliation against Susman for activities that are protected by the First Amendment, including its representation of certain clients, its donations to certain causes, and its expression of its beliefs regarding diversity.  Susman is therefore entitled to summary judgment on Counts I and II.

### 2.    First Amendment - Freedom of Association (Count III)

In Count III, Susman argues that Section 3's requirement that agencies require "[g]overnment contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract" and its directive to agency heads to review and "take appropriate steps to terminate" "all contracts with Susman or with entities that disclose doing business with Susman" is intended to chill Susman's clients' freedom of association.  ECF No. 51-1, at 23.  Defendants respond only that a "disclosure requirement limited to a subset of government contractors is far afield from core associational rights," ECF No. 159, at 14, especially given that the Order applies to a small number of government contractors, all of whom are already

---

[11] To the extent that Defendants' arguments regarding the lawfulness of Section 5 sound in ripeness, the court has dispensed with those concerns above.  *See supra* Part III.A.5.

subject to substantial disclosure requirements as a condition of doing business with the Federal Government," ECF No. 58-1, at 23.  The court disagrees.

It has "long [been] understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  The Supreme Court has "noted that '[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action,'" and it has accordingly held that "the First Amendment prohibit[s] such compelled disclosure." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (first and second alterations in original) (quoting *NAACP*, 357 U.S. at 462).  The court therefore applies the "exacting scrutiny" standard to compelled-disclosure requirements, which requires that the government demonstrate "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Citizens United*, 558 U.S. at 366-67).  The weight of the governmental interest in question "must reflect the seriousness of the actual burden on First Amendment rights." *Id.*

Defendants cannot meet this burden.  As the court has already determined, Section 3 violates the First Amendment, and the government has no legitimate interest in retaliation and viewpoint discrimination.  *See supra* Part III.B.1.  In any event, the court would be hard-pressed to agree with Defendants that the compelled-disclosure requirement is "narrowly tailored to Section 3's stated goal." ECF No. 58, at 23.  Section 3 does not tie the disclosure requirement to a particular kind of contract for certain goods and services.  Indeed, Section 3 requires the disclosure of "*any* business" that any government contractor does with Susman, even if that business has nothing to do with the firm.  Order § 3(a) (emphasis added).  Because Defendants

cannot demonstrate that they have an important interest that would be served by the compelled-disclosure requirement, and because the scope of the required disclosure is far too broad for it to be considered "narrowly tailored," Susman is entitled to summary judgment on Count III.

### 3.    First Amendment - Right to Petition (Count IV)

Susman argues that various sections of the Order violate the First Amendment "right of the people . . . to petition the Government for a redress of grievances."  ECF No. 178 ¶ 142 (quoting U.S. Const. amend. I).  In particular, Susman identifies "the Order's provisions punishing Susman for past petitioning activity and restricting Susman's ability to petition federal employees and appear before federal agencies on federal property," as well as in federal courts, as clearly violative of the First Amendment.  ECF No. 51-1, at 22.  The court agrees.

"[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  Ample Supreme Court precedent establishes that "[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Id.* (quoting *Sure-Tan, Inc. v. Nat'l Lab. Rels. Bd.*, 467 U.S. 883, 896-97 (1984)) (collecting cases).  And "[l]aws that 'significant[ly] impair[]' this right must, like all substantial constitutional burdens, survive 'exacting scrutiny.'" *Patchak v. Jewell*, 109 F. Supp. 3d 152, 163 (D.D.C. 2015) (second and third alterations in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 362 (1976)), *aff'd*, 828 F.3d 995 (D.C. Cir. 2016), *aff'd sub nom.*, *Patchak v. Zinke*, 583 U.S. 244 (2018).

Defendants argue that properly evaluating the interest that Susman has at stake here requires the court to wait and see what guidance agency heads issue.  ECF No. 58, at 29-30.  But restrictions that prevent lawyers from entering federal buildings, interacting with agency officials,

and even entering courthouses plainly constitute a "significant impairment" of Susman's right to petition the government. *Elrod*, 427 U.S. at 362. That Defendants have not yet issued guidance to this end is irrelevant; the Order, fact sheet, and other statements made at the time of the Order's issuance makes clear that these restrictions are the government's goal. *See supra* Part III.B.1.c. And just like with the compelled-disclosure requirement in Section 3, Defendants fail to offer any evidence of a compelling governmental interest that would allow these restrictions, which heavily burden Susman's right to petition, to survive exacting scrutiny. *See id.* Because there is no legitimate governmental interest in abridging Susman's right to petition because it engages in disfavored speech, Susman is entitled to summary judgment on Count IV.

### 4.    Fifth Amendment - Procedural Due Process (Count VI)

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "'The fundamental requisite of due process of law is the opportunity to be heard' at 'a meaningful time and in a meaningful manner.'" *Alaska Commc'ns Sys. Holdings, Inc. v. Nat'l Lab. Rels. Bd.*, 6 F.4th 1291, 1298 (D.C. Cir. 2021) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). When evaluating a procedural due process claim, the court must "first determine whether constitutional safeguards apply at all, i.e., whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993). Then, the court evaluates whether the deprivation of interest occurred without process. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that process due is "flexible and calls for such procedural protections as the particular situation demands").

Susman contends in Count VI that the Order has deprived the firm of its constitutionally protected liberty and property interests without process. ECF No. 51-1, at 24-27. Specifically, Susman argues that, without any process whatever, the Order (1) interferes with the right of the firm and its attorneys to pursue their chosen profession; (2) harms the firm's reputation; and (3) deprives the firm of its protected property interest in contracts with its clients. The court holds that for each asserted liberty and property interest, Susman has shown that the Fifth Amendment's Due Process protections apply.

*Right to pursue chosen profession*. Susman attorneys have the right to pursue their chosen profession—law. *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 238-39 (1957) (holding that "[a] State cannot exclude a person from the practice of law" in contravention of the Due Process Clause). The Constitution safeguards an individual's "right to follow a chosen trade or profession" against governmental intrusions. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961)). Governmental action that creates "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities" is prohibited. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-78 (1972). The stigma may either "formally or automatically exclude[] [the plaintiff] from work on some category of future . . . government employment opportunities" or have "the broad effect of largely precluding [the plaintiff] from pursuing her chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998) (quoting *Kartseva*, 37 F.3d at 1528).

Here, the Order creates both sets of stigmas. First, the Order formally excludes the firm and its employees from being employed by the federal government or working on government contracts. *See* Order §§ 3, 5(b). Second, the Order has a preclusive effect on Susman's practice

of law.  The Order directs the government to terminate contracts with Susman's clients, pressuring clients to terminate their representation agreements with Susman and virtually shunning the firm as persona non grata.  *See* Order §§ 1, 3.  By banning Susman employees from government buildings and from engaging with government officials, the Order prevents the firm's attorneys from going to their place of work (the courts) and engaging in their daily business (discussing cases with the government).  Accordingly, the Order violates the right of Susman and its attorneys to pursue their chosen profession.

*Susman's reputation*.  Relatedly, Susman has a liberty and a property interest in its "good name, reputation, honor, [and] integrity."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  This interest is particularly acute in the legal profession, where each state bar requires a showing of honor and integrity for certification.  Against this, the Order is especially pernicious.  The Order tarnishes, without process, Susman's reputation with salacious allegations of wrongdoing—references to "egregious" actions by Susman and a statement that the firm has "degrade[d] the quality of American elections"—and it brands Susman as unfit for government work, or even government interaction.  The government is required to provide process when it issues "findings of wrongdoing" that "could have an adverse impact on [an organization]'s reputation."  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012).  Thus, the Order violates Susman's interest in its reputation.

*Contracts with clients*.  Finally, the Order deprives Susman of its interest in contracting with clientele.  *See Toxco Inc. v Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010) (holding that "contracts between private parties may give rise to property interests" for purposes of the Fifth Amendment).  The Order attaches a penalty to Susman's representation: if a client chooses Susman under the

Order's regime, that client loses their government contract.  *See supra* Part III.B.2.  The Order therefore violates the firm's interest in being able to contract with clients.

*      *      *

The aforementioned liberty and property interests were all taken without any process.  The Constitution demands more; specifically, that Susman has the "right to know the factual basis for the action" and have "the opportunity to rebut" it.  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).  Susman was afforded neither.  The firm was not given prior notice of the Order, learned of it only when it was announced on live television, and was not provided the opportunity to clear its name.  Susman is therefore entitled to summary judgment on Count VI.

### 5.        Fifth Amendment - Vagueness (Count VII)

The Due Process Clause of the Fifth Amendment prohibits "[v]ague laws."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see United States v. Williams*, 553 U.S. 285, 304 (2008) (explaining that the "[v]agueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment").  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fox Television*, 567 U.S. at 253.  Moreover, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.* at 253.  Under the Fifth Amendment, an enactment is void for vagueness if it fails to "give fair notice of conduct that is forbidden or required," *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *Fox Television*, 567 U.S. at 253), or "authorizes or even encourages arbitrary and discriminatory enforcement," *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  The law must "provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732.

"[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)); *see Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring) ("[A] 'stringent vagueness test' should apply to at least some civil laws—those abridging basic First Amendment freedoms."); *Fox Television*, 567 U.S. at 253-54 ("When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech."); *Grayned*, 408 U.S. at 109 ("Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))).

The parties dispute whether the Order is unconstitutionally vague. Susman maintains that the Order fails to provide it with "fair notice of what is prohibited and how the [f]irm can avoid sanctions in the future." ECF No. 178 ¶ 193. Susman continues that the Order "leverages that vagueness for its in terrorem effect," ECF No. 51-1, at 27; because it is "so standardless," "it gives agencies sweeping discretion to *further* restrict Susman's access over time," *id.* at 28. Defendants reject Susman's vagueness claim, asserting that the Order merely calls for agency heads to develop "guidance" and "[w]hat that guidance might consist of remains to be seen." ECF No. 159, at 17.

Susman has the better of the argument. Because the Order abridges the firm's basic First Amendment freedoms, a more stringent vagueness test applies. *See Fox Television*, 567 U.S. at 253-54. Against such a test, the Order simply does not pass muster.

The Order does little to provide the court, much less "a person of ordinary intelligence[,] fair notice of what is prohibited." *Williams*, 553 U.S. at 304. Section 1 states that Susman is a perpetrator of "activities inconsistent with the interests of the United States," Order § 1, and Section 5 directs agency heads to provide guidance limiting Susman employees from accessing federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," Order § 5(a). The court strains to understand the contours of that prohibition—conduct that is "inconsistent with the interests of the United States."

What is more plain to the court is the implication of such a vague prohibition. The Order promises only *discriminatory* enforcement by the Executive branch against such conduct and the threat of future retaliatory actions against the firm. *See supra* Part III.B.1. It chills Susman's speech advocating for clients whose interests are adverse to the government. Indeed, the Order hangs like the sword of Damocles over the firm. It "impermissibly delegates" matters to Defendants "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. Because the Order threatens penalties without sufficiently defining the conduct that triggers liability, it is unconstitutionally vague. Susman is therefore entitled to summary judgment on Count VII.

### 6.    Fifth Amendment - Equal Protection (Count VIII)

"The equal protection principles embodied in the Due Process Clause of the Fifth Amendment essentially direct 'that all persons similarly situated should be treated alike.'" *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To allege an equal protection violation, a plaintiff may either claim that "he or she received differential treatment by the government due to

membership in a protected class, such as one based on race, national origin, or gender," or that he or she is in a "class of one."  *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012) (first citing *Jones v. Helms*, 452 U.S. 412, 424 n.3 (1981), then quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000)).  Here, Susman is pursuing a "class of one" claim, arguing that it has been the subject of disparate treatment with no rational basis.  ECF No. 51-1, at 28-29; *see 3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).  Specifically, Susman contends that the Order intentionally treats it differently from similarly situated law firms and that this differential treatment is "apparent on the face of the Order."  ECF No. 51-1, at 29

Defendants first respond that "the class-of-one theory of equal protection is inapplicable in the government employment context."  ECF No. 58-1, at 17 (citing *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008)).  But, as explained, Susman is not a government employee.  *See supra* Part III.B.1.b.  It is also not fatal to Susman's class-of-one claim that a handful of other law firms have been subjected to similar orders.  That is because "the number of individuals in a class is immaterial for equal protection analysis."  *Olech*, 528 U.S. at 564 n.1.

Defendants further dispute whether Susman meets the elements of a class-of-one-claim. They suggest that Susman is not similarly situated to "other potential government contractors who do not engage in unlawful DEI practices."  ECF No. 58-1, at 17.  Defendants also claim that there is a "plainly rational" basis for distinguishing between "potential contractors who 'engage in blatant race-based and sex-based discrimination.'"  *Id.*  These arguments ring hollow for several reasons.  First, as already explained, Susman is not a government contractor—it is a law firm that has been singled out by the Order.  Next, Defendants have not established that Susman engages in unlawful discrimination practices—indeed, Defendants admit that Susman was *not* included

among the twenty firms that received "letters from the [Equal Employment Opportunity Commission] Acting Chair" regarding employment discrimination. *Id.* at 25. Finally, Defendants have offered no other purportedly rational basis for their differential treatment of Susman, nor can the court readily discern one. Accordingly, the Order violates the Fifth Amendment's equal protection principle. Susman is therefore entitled to summary judgment on Count VIII.

### 7. Fifth Amendment - Right to Counsel (Count IX)

The Fifth Amendment protects "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. Alabama*, 287 U.S. 45, 68 (1932). It guarantees due process by safeguarding the rights of individuals or entities to obtain legal representation. *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720-21 (1990); *see also Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 872-73 (D.C. Cir. 1984) ("[A]n individual or entity may in fact be denied the most fundamental elements of justice without prompt access to counsel."); *Muniz v. Meese*, 115 F.R.D. 63, 66 n.11 (D.D.C. 1987) ("[A] violation of civil liberties . . . is implied by a government intrusion into their right to select and to be represented by counsel of their choice."). Susman contends that the Order violates the Fifth Amendment right to counsel of the firm's clients by interfering with their ability to be represented by their chosen attorneys. The court agrees.

Section 5 of the Order restricts Susman's attorneys from "engaging with" government officials or "access[ing] . . . Federal Government buildings." Order § 5(a). In other words, the firm's clients would have "to go without their chosen counsel in upcoming meetings and hearings." ECF No. 51, at 30. Rather than being the "stuff of imagination," as Defendants claim, ECF No. 159, at 17, the Order directly interferes with Susman's clients by impermissibly restricting the firm's attorneys from entering federal courthouses or interacting with government officials. The Order cuts Susman off at the knees and effectively denies the firm's clients its counsel. Because

"governmental attempt[s] to deny counsel to a civil litigant" are invalid, *Am. Airways Charters*, 746 F.2d at 873 (collecting cases), the Order violates the Fifth Amendment right to counsel. Susman is therefore entitled to summary judgment on Count IX.

### 8.    Separation of Powers (Count X)

Finally, Susman argues that the Order violates separation-of-powers principles because it "tak[es] action for which the Executive Branch has no constitutional or statutory authority whatsoever," ECF No. 178 ¶¶ 21, 214, and because it unlawfully encroaches on the purview of the judiciary, *id.* ¶ 217.  The court agrees.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  While the Order proclaims that it has been made pursuant to the "authority vested in [Donald Trump] as President by the Constitution and the laws of the United States of America," Order, the court is not convinced that there is a statutory or constitutional basis for the actions taken therein.  Defendants do not point to any statutory authority that empowers the President to punish a law firm for its choice of clients, donations, or other speech, and the court is not aware of any law that would support such action.  Likewise, there is no constitutional authority that supports the action taken by the Order, and it cannot be sustained based on any of "the several constitutional provisions that grant executive power to the President."  *Youngstown*, 343 U.S. at 587-88.  None of the President's many powers—not his power as commander-in-chief, nor his foreign policy powers, nor his power to appoint and remove government officials—can justify the targeting of a law firm for protected speech and actions.

This is especially so because, in addition to being outside the ambit of power granted to the President by the Constitution, the Order usurps responsibilities that have been constitutionally

delegated to the judiciary and therefore "threatens severe impairment of the judicial function." *Velazquez*, 531 U.S. at 546. "Interpretation of the law and the Constitution is the primary mission of the judiciary when it acts within the sphere of its authority to resolve a case or controversy," and a "informed, independent judiciary presumes an informed, independent bar." *Id.* at 545. When the President attempts to limit who can present "the analysis of certain legal issues and . . . truncate[s] presentation [of certain issues] to the courts," he restricts "speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id.* For this reason, the power to "'fashion . . . appropriate sanction[s] for conduct which abuses the judicial process'" is exclusively among the judiciary's "'inherent powers,' not conferred by rule or statute"—and is a power that is not shared with any other branch of government. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (first quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), then quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). Thus, to the extent that the Order sanctions attorneys—particularly in ways that prevent them from appearing in court—it tramples on the province of the judiciary and violates the separation of powers.

Rather than genuinely contest Susman's separation-of-powers arguments, Defendants attempt to dodge them. Because Susman frames this claim as "*Ultra Vires* Presidential Action," ECF No. 178, at 116, Defendants cite *Federal Express Corp. v. U.S. Department of Commerce*, 39 F.4th 756 (D.C. Cir. 2022), for the proposition that *ultra vires* challenges are subject to a "demanding standard" and are only available in limited circumstances, ECF No. 58, at 7. But *Federal Express Corp.* is inapposite. In that case, the plaintiff challenged an agency interpretation of a statute in circumstances where Congress had explicitly foreclosed judicial review. *Id.* at 762-63. Because the plaintiff "[sought] the intervention of an equity court where Congress ha[d]

not authorized statutory judicial review," the D.C. Circuit determined that a "demanding standard [was] necessary." *Id.* at 765. The challenge mounted here lacks this key characteristic; it is a classic separation-of-powers claim in the vein of *Youngstown*, where the court was "asked to decide whether the President was acting within his constitutional power when he issued an [executive] order." 343 U.S. at 582.

Because the Order does not draw on an executive power that has been designated to the President by the Constitution or statute, and because it improperly seizes authority that the Constitution grants to the judiciary, the court will grant Susman's motion for summary judgment as to Count X.[12]

### C.    Susman is Entitled to a Permanent Injunction in Addition to Declaratory Relief

A plaintiff moving for a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[12] Susman also argues that the Order "punishes [it] in the manner of an unconstitutional bill of attainder" and that this violates the separation of powers because "Presidents cannot seize judicial power unto themselves to 'pronounce[] upon the guilt of [Plaintiff] . . . in accordance [solely] with [their] own notions.'" ECF No. 178 ¶ 218 (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866)); ECF No. 158, at 39. Several amici raise similar arguments. *See* ECF Nos. 73, 145, 152. The extent to which the Constitution's prohibition on bills of attainder applies to executive action remains unclear. Because Susman does not raise a standalone bill-of-attainder claim, the court declines to reach this issue.

### 1.    Irreparable Harm and Adequate Remedy at Law

It is well established that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373).  The court has determined that Susman and its clients have suffered constitutional violations.  *See supra* Part III.B.  Were it not for the court's temporary restraining order as to Sections 1, 3, and 5 of the Order, this harm would be ongoing.  And the court expects that, if the temporary restraining order were lifted, these harms would immediately resume.  Susman has also suffered reputational harms that are not monetarily reparable and that would continue if the court did not enter a permanent injunction.  *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017).  Because these harms "cannot be fully compensated by later damages," *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F. Supp. 218, 224 (D.D.C. 1990), they are irreparable.

In addition to constitutional and reputational harms, Susman would suffer significant monetary harm if the court's injunctive relief were curtailed.  To be sure, purely speculative monetary harm is not enough to justify a permanent injunction; instead, "[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (first alteration in original) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C. 1976)).  Although Susman does not yet allege that it has lost money because of the Order, it explains that clients have reached out to the firm to inquire about its effects, signaling that if it is permitted to go into effect, they may take their business elsewhere.  ECF No. 51-3 ¶ 70.  The court shares that concern.  By its own terms, the Order appears to prevent Susman attorneys from interacting with federal agencies—before whom they currently have a substantial amount of business—and even from entering courthouses.  Order § 5.  Because over a third of Susman's

matters are in federal court or require interaction with the federal government, *see* ECF No. 51-3 ¶¶ 72-73, it is evident that the Order will cause Susman significant financial loss if it goes into effect.

In many instances, "economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. But where, as here, Defendants' sovereign immunity prevents a plaintiff from seeking monetary damages, courts have acknowledged that financial losses "can . . . constitute irreparable harm." *Xiaomi Corp. v. Dep't of Def.*, No. 21-CV-280, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021). Accordingly, because Susman has no adequate remedy at law that would ameliorate its significant constitutional and financial injuries, it has suffered sufficient harm warranting permanent injunctive relief.

### 2.    Balance of Equities and Public Interest

The balance of the equities and the public interest squarely favor the issuance of an injunction. These factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem*, 960 F.3d at 668).

Evaluating these merged factors begins and ends with whether the Order is lawful. Susman has demonstrated that the Order is unconstitutional from beginning to end. *See supra* Part III.B. Because "enforcement of an unconstitutional law is always contrary to the public interest," *Karem*, 960 F.3d at 668 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)), the Order serves no public interest. Defendants cannot, nor do they, argue anything different. *See generally* ECF No. 159; *see, e.g.*, *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (holding that "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required'" (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015))); *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (concluding that

when balancing the equities of unlawful governmental conduct, "any hardship" that the government might identify "is not legally relevant"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explaining that, although "[t]here is generally no public interest in the perpetuation of unlawful agency action[,] . . . there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (internal quotation marks and quoted source omitted)).

Here, the Order goes beyond violating the Constitution and the laws of the United States. The Order threatens the independence of the bar—a necessity for the rule of law. Accordingly, the court concludes that the balance of the equities and the public interest weigh overwhelmingly in favor of granting the permanent injunction.[13]

### 3.    Appropriate Defendants

Having determined that Susman is entitled to relief, the court must next consider whether each of the Defendants is properly named. Defendants argue that Susman's naming of the Executive Office of the President is improper because it "is an entity comprising a number of other entities, offices, and establishments," and because Susman "fails to specify in the Complaint whether it seeks to limit relief to any particular EOP entity and, if so, which one, and what Plaintiff's claims are against that entity and why relief against it is necessary." ECF No. 58, at 31-32. This argument is unconvincing and may be quickly disposed of: Defendants fail to cite any authority suggesting that the Executive Office of the President is not a proper defendant merely

---

[13] Because the court concludes that no section of the Order can stand, it need not assess severability. "[A]ssuming, arguendo, that the severability standard for statutes . . . also applies to Executive Orders," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999), the court concludes that whether assessed on a section-by-section basis or as a whole, it cannot stand, *see id.* at 173.

because it has various constituent parts and offices—a fact that is true of federal agencies sued in federal court every day. And, as Susman points out, the lone case that Defendants do cite, *Armstrong v. Executive Office of the President*, 90 F.3d 553 (D.C. Cir. 1996)—if only for the proposition that the Executive Office of the President has several component parts—itself features the Executive Office of the President as a defendant, *see* ECF No. 158, at 40-41.

Defendants further contend that the United States is not a properly named defendant because "[s]uits alleging unconstitutional action by the Government must be brought 'against officials,' not against the 'agenc[y]' or the 'State[]' writ large, 'which retain their immunity against all suits in federal court.'" ECF No. 58, at 32 (second and third alterations in original) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). This argument falls flat given the Administrative Procedure Act's express waiver of sovereign immunity in cases where the United States is named as a defendant. 5 U.S.C. § 702. As Section 702 explains, "[t]he United States may be named as a defendant in any . . . action, and a judgment or decree may be entered against the United States," when the action is (1) "in a court of the United States," (2) "seeking relief other than money damages," and (3) "stat[es] a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *Id.* This is plainly such a suit, and Susman has therefore properly named the United States as a defendant.[14]

---

[14] To be sure, Section 702 requires that an order granting injunctive relief against the United States "specify the Federal officer or officers . . . personally responsible for compliance," 5 U.S.C. § 702, and Susman's proposed order has done just that, ECF No. 181-1.

## IV.    CONCLUSION

For the foregoing reasons, the court will deny Defendants' Motion to Dismiss, ECF No. 180, grant Plaintiff's Motion for Summary Judgment, ECF No. 181, enter judgment for Plaintiff on Counts I through IV and VI through IX of the Amended Complaint, and grant declaratory and permanent injunctive relief.  A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   June 27, 2025